# EXHIBIT 1

*(Translated from the French)*

## THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

Washington, D.C.

In proceedings between

**GETMA INTERNATIONAL,
NCT NECOTRANS,
GETMA INTERNATIONAL INVESTISSEMENTS,
NCT INFRASTRUCTURE & LOGISTIQUE**

Claimants

and

**THE REPUBLIC OF GUINEA**

Respondent

**CASE: ICSID ARB/11/29**

# AWARD

*Members of the Tribunal*
Mrs. Vera Van Houtte, President
Mr. Bernardo Cremades, Arbitrator
Professor Pierre Tercier, Arbitrator

*Secretary of the Tribunal*
Mrs. Mairée Uran Bidegain

*Date sent to the Parties: August 16, 2016*

CABINET DE TRADUCTION BONNEFOUS
Travaux d'Experts-Traducteurs
30 bis, rue Émile Menier - 75116 PARIS
Tél. : 01 45 53 23 13 - Fax : 01 45 53 34 19



## REPRESENTATION OF THE PARTIES

The Claimants are represented by:

Mr. Grégory Quérel
Mr. Abdel Aziz Thiam
Getma International, NCT Necotrans
Getma International Investissements, and
NCT Infrastructure & Logistique
40, Avenue George V
75008 Paris
France

And

José Miguel Júdice, Esq.
Tiago Duarte, Esq.
Filipa Cansado Carvalho, Esq.
Pacôme Ziegler, Esq.
PLMJ – A.M. Pereira, Sáragga Leal,
Oliveira Martins, Júdice e Associados,
RL, Attorneys, members of the Lisbon Bar,
Avenida da Liberdade, 224
1250-148 Lisbon
Portugal

And

Cédric Fischer, Esq.
Elisabeth Mahé, Esq.
Tristan Dupré de Puget, Esq.
Fischer, Tandeau de Marsac, Sur & Ass.
Attorneys, members of the Paris Bar
67, boulevard Malesherbes
75008 Paris
France

The Respondent is represented by:

Laurent Jaeger, Esq.
Pascal Agboyibor, Esq.
Romain Selleml, Esq.
Agnès Bizard, Esq.
Orrick Rambaud Martel, attorneys
31, Avenue Pierre 1$^{er}$ de Serbie
75782 Paris
France

And

Mamadou S. Traoré, Esq.
Attorneys
11 BP 721 CHS Ouagadougou
11 Place Nba Koom
Burkina Faso



**Contents**

I.      THE PARTIES ........................................................................................................... 1

II.     BACKGROUND OF THE PROCEEDINGS ....................................................................... 1

    A.      Beginning of the proceedings ............................................................................ 1

    B.      Request for recusal ........................................................................................... 2

    C.      Jurisdiction ...................................................................................................... 2

    D.      Suspension of the proceedings ........................................................................... 3

    E.      Exchange of Memorials on the merits and hearing ............................................. 4

    F.      After the hearing .............................................................................................. 6

III.    THE FACTS .............................................................................................................. 6

IV.     THE PARTIES' REQUESTS ........................................................................................ 16

    A.      The Claimants ................................................................................................ 16

    B.      Respondent .................................................................................................... 18

V.      JURISDICTION AND THE ADMISSIBILITY OF THE REQUESTS ...................................... 19

    A.      The Respondent's position .............................................................................. 19

    (1)     The Tribunal lacks jurisdiction *ratione materiae* due to the illegality of the investment
          and the acts of corruption ........................................................................... 19

    (2)     The Tribunal does not entertain jurisdiction to rule on the effects of termination, the
          loss of profit and the additional prejudice resulting from the Termination Decree, due
          to the decision on jurisdiction of December 29, 2012 .................................... 24

    (3)     Article 32.5 of the Concession Agreement constitutes a contrary agreement, such as
          acknowledged in a decision on jurisdiction, and the Claimants' position regarding its
          non-applicability comes up against the principal of estoppel ........................... 25

    (4)     Waiver and *res judicata* ............................................................................... 26

    (5)     The alleged denial of justice following the annulment of the award ................ 29

    (1)     The Tribunal entertains jurisdiction *ratione materiae* because the investment is legal 29

    (2)     The Tribunal entertains jurisdiction to rule on the effects of termination, the loss of
          profit and the additional prejudice resulting from the Termination Decree. .............. 33

    (3)     Article 32.5 of the Concession Agreement as a contrary agreement ............................ 34

    (4)     The defenses of *res judicata* and waiver ....................................................... 36

    (5)     The effects of the annulment of the CCJA award ........................................... 36

    C.      The Tribunal's Analysis .................................................................................. 36

    (1)     The Tribunal's jurisdiction *ratione materiae* ................................................ 37

(2) The Tribunal's jurisdiction regarding the effects of termination, the loss of profit and the additional counts of prejudice resulting from the Termination Decree, due to the Decision regarding Jurisdiction of December 29, 2012 ...................................... 75

(3) The effects of article 32.5 of the Concession Agreement as a contrary agreement in light of the Decision of December 29, 2012 ...................................... 80

(4) *Res judicata* and waiver ...................................... 82

(5) The annulment of the CCJA award. ...................................... 82

(6) In a subsidiary capacity: the inadmissibility of the requests ...................................... 84

(7) In an infinitely subsidiary capacity: rejection of the requests due to false statements . 84

VI.   LIABILITY ...................................... 85

A.   *The Claimants' Position* ...................................... 85

(1) Guinea violated article 5 of the Investment Code and customary international law in that it carried out an illegal expropriation, as a result both of the Termination Decree and the requisition Decree ...................................... 85

(2) Guinea violated article 6 of the Investment Code ...................................... 87

B.   *The Respondent's position* ...................................... 87

(1) The application of article 5 of the Investment Code to the case at issue ...................................... 87

(2) Article 6 of the Investment Code ...................................... 88

C.   *The Tribunal's Analysis* ...................................... 88

(1) Article 5 of the Investment Code ...................................... 89

(2) Article 6 of the Investment Code ...................................... 92

VII.   COMPENSATION FOR THE PREJUDICE ...................................... 92

A.   *The Claimants' Position* ...................................... 92

(1) The Claimants are entitled to full compensation and an outright sum in indemnification pursuant to Article 32.3 of the Concession Agreement does not apply ...................................... 92

(2) Amount of compensation ...................................... 93

(3) The allegations of double compensation ...................................... 96

B.   *The Respondent's position* ...................................... 96

(1) The all-inclusive indemnification referred to in article 32.3 of the Concession Agreement is applicable and requires that all indemnification be strictly appreciated 96

(2) Amount of compensation ...................................... 97

(3) Double Damages ...................................... 100

C.   *The Tribunal's analysis* ...................................... 101

(1) The principles of compensation ...................................... 101

(2) The amount of the compensation ...................................... 102

(3) The allegations of twofold damages ...................................... 115

VIII.   COSTS OF THE PROCEDURE ...................................... 116

A.   *The Claimants' Position* ...................................... 116

       B.      *The Respondent's position* ........................................................................................ 116

       C.      *The Tribunal's Analysis* ............................................................................................. 117

IX.      ENACTING TERMS .................................................................................................................. 118



## Abbreviation Glossary

| | |
|---|---|
| CCJA | Common Court of Justice and Arbitration of the Organization for the Harmonization of Business Law in Africa |
| C-Mem. | The Respondent's Counter-Memorial of March 30, 2015 |
| C-[no.] | Claimants' Exhibit |
| Committee | The National Public Contracts Committee, also called the Evaluation Committee |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes between States and Nationals of other States, of March 18, 1965 |
| Reply | The Respondent's reply of October 15, 2015 |
| Getma International | Getma International S.A.S., a simplified joint stock company under French Law, the first Claimant in this ICSID arbitration and sole Claimant in CCJA case no. 001/2011/ARB |
| GNF | Guinean francs |
| Mem. | Claimants' memorial of November 17, 2014 |
| Mem.AAC | Claimants' Post-Hearing Memorial of February 3, 2016 |
| Mem. AAR | Respondent's Post-Hearing Memorial of February 3, 2016 |
| MSC | Mediterranean Shipping Company SA |
| APC | Autonomous Port of Conakry |
| R-[no.] | Respondent exhibit |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration proceedings |
| Rejoinder | The Claimants' rejoinder of July 15, 2015 |
| CCJA award | The arbitration award rendered on April 29, 2014 in the CCJA case no.001/2011/ARB between Getma International and the Republic of Guinea |
| STCC | *Société de Terminal à Conteneurs de Conakry*, the Guinean subsidiary created by GI to operate the concession |
| CT | Container Terminal |
| TR I,p.[ ]:[lines] | Transcription of the hearing of November 23, 2015 |
| TR II, p.[ ]:[lines] | Transcription of the hearing of November 24, 2015 |
| TR III, p.[ ]:[lines] | Transcription of the hearing of November 25, 2015 |
| CCJA Tribunal | The Arbitral Tribunal, the composition of which was confirmed by OHADA [Organization for the Harmonization of African Business Law], and which, on April 29,2014, issued an award in CCJA Case no. 001/2011/ARB between Getma International and the Republic of Guinea |



**I.**   **THE PARTIES**

1.   This case relates to a dispute brought before the International Centre for Settlement of Investment Disputes (referred to hereinafter as the "ICSID" or the "Centre") pursuant to the Guinean Investment Code of January 3, 1987 as amended on June 30, 1995 (referred to hereinafter as the "Investment Code" or the "Code") and pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States of March 18, 1965, in force since October 14, 1966 (referred to hereinafter as the ICSID Convention"). The dispute relates to the termination by the Republic of Guinea of the Agreement for the Concession of the Container Terminal in the Port of Conakry, its extension and the development of an area in railway station (referred to hereinafter as the "Concession Agreement") concluded on September 22, 2008 between the Respondent and Getma International, the effects of a Termination Decree adopted by the President of the Republic of Guinea on March 8, 2011, and on a Requisition Decree of March 9, 2011.

2.   The first Claimant is Getma International, a French simplified joint stock company, with registered offices at 66 rue Pierre Charron, 75008 Paris.

3.   The second Claimant is Necotrans Holding (previously NCT Necotrans and still referred to in this manner in this Award), a French simplified joint stock company with registered offices at 40 avenue Georges V, 75008 Paris.

4.   The third Claimant is Getma International Investissements, a French simplified joint stock company with registered offices at 66 rue Pierre Charron, 75008 Paris.

5.   The fourth Claimant is NCT Infrastructure & Logistique, a French simplified joint stock company with registered offices at 66 rue Pierre Charron, 75008 Paris.

6.   The four Claimants are referred to together as the "Claimants"

7.   The Respondent is the Republic of Guinea (referred to hereinafter as the "Respondent", "Guinea" or the "Republic").

8.   The Claimants and the Respondent will be referred to collectively as the "Parties". The Parties' respective representatives and addresses are provided above.

**II.**   **BACKGROUND OF THE PROCEEDINGS**

*A.*   *Beginning of the proceedings*

9.   On September 29, 2011, the Claimants filed an arbitration request (referred to hereinafter as the "Request") with the ICSID against the Republic of Guinea.

10.   The Request is based on the ICSID Convention and on Order no. 001/PRG/87 of January 3, 1987, as amended by law no. L/95/029/CTRN of June 30, 1995 containing the Investment Code of the Republic of Guinea.

Eric
MIGNOT BONNEFOUS
58 Av. de l'Impératrice
64200 BIARRITZ
06 14 16 54 55
EXPERT TRADUCTEUR PRÈS LA COUR D'APPEL DE PAU
ANGLAIS

11. Pursuant to Article 36(3) of the ICSID Convention, the ICSID's Secretary-General registered the Request on November 3, 2011.

12. The Tribunal is composed of Mrs. Vera Van Houtte, of Belgian nationality, President, appointed by agreement of the Parties, Mr. Bernardo Cremades, of Spanish nationality, appointed by the Claimant, and Professor Pierre Tercier, of Swiss nationality, appointed by the Respondent.

13. On February 2, 2012, the Secretary-General notified the Parties, in accordance with Article 6(1) of the Rules of procedure governing ICSID Arbitration Proceedings (referred to hereinafter as the "Arbitration Rules"), that the three arbitrators had accepted their appointments, the Tribunal was therefore deemed to be constituted and the proceedings brought on that date. The Parties were also informed that Mrs. Maírée Uran-Bidegain, Legal Advisor at the ICSID, was the Tribunal's Secretary (referred to hereinafter as the "Secretary").

14. The Tribunal held its first session with the Parties on March 30, 2012.  The Parties confirmed the regularity of the Tribunal's constitution and stated that they had no objections concerning its members' statements.  It was also agreed that the Arbitration Rules which would apply would be those in force since April 2006, that the place of the proceedings would be Paris and that the proceedings would be conducted in French.   The Parties' agreement was recorded in the minutes of the first session.

## B. _Request for recusal_

15. On April 16, 2012, the Defendant submitted a request for recusal against Mr. Bernardo Cremades (referred to hereinafter as the "Recusal Request"), pursuant to Article 57 of the ICSID Convention.  Following a tie of the votes of Mrs. Vera Van Houtte and Professor Pierre Tercier, the Administrative Council ruled, on June 28, 2012, on the Recusal Request in accordance with Article 58 of the ICSID Convention.  He rejected the Recusal Request and decided that the costs incurred by the Parties and the Arbitrators following the Recusal Request would be the subject matter of a subsequent decision by the Tribunal.

## C. _Jurisdiction_

16. In accordance with the procedural calendar established in point 13 of the Minutes of the first session, the Parties submitted the following entries concerning the plea of lack of jurisdiction raised by the Respondent due to the arbitration initiated simultaneously by the Claimant, Getma International, on the basis of a contractual clause granting jurisdiction, in accordance with the Arbitration Rules of the OHADA Court of Justice and Arbitration (referred to hereinafter as the "CCJA arbitration" and "the CCJA Tribunal"):

a) On June 22, 2012: Respondent's Memorial no. 1 on jurisdiction (referred to hereinafter as "Memorial no. 1");

b) On July 13, 2012: Claimants' Counter-Memorial no. 1 on jurisdiction (referred to hereinafter as "Counter-Memorial no. 1);

c) On August 6, 2012: Respondent's Memorial no. 2 on jurisdiction (referred to hereinafter as "Memorial no. 2)

d) On September 7, 2012: Claimants' Counter-Memorial no. 2 (referred to hereinafter as "Counter-Memorial no. 2").

17.   On September 28, 2012: a hearing on the Arbitral Tribunal's jurisdiction took place in Paris, the record of which was submitted to the Parties and to the arbitrators in draft form, the same day, and in the final version, subject to possible corrections by the Parties or the arbitrators, on October 2, 2012.

18.   On December 29, 2012, the Tribunal issued its Decision on Jurisdiction, the enacting terms of which were the following:

> *"1.   This Tribunal does not entertain jurisdiction to rule on the effects of the termination of the Concession Agreement with respect to the four Claimants.*
>
> *2.   This Tribunal entertains jurisdiction to rule on the effects of the requisition and other alleged breaches of the Investment Code which do not fall into the context of the Concession Agreement with respect to the four Claimants.*
>
> *3.   The costs incurred by the parties and the members of the Tribunal up until now, including the costs of arbitration pertaining to the contestation of jurisdiction will be the object of a subsequent decision by the Tribunal."*

19.   This Decision on Jurisdiction is an integral part of this award by the Tribunal and is incorporated therein in its entirety.  It appears in Appendix A to this Award.

**D.   _Suspension of the proceedings_**

20.   In a letter of January 10, 2013, the Arbitral Tribunal asked the Parties *"as soon as they have been informed of the Arbitral Tribunal's Decision regarding Jurisdiction [...] to consult each other in order to reach an agreement if possible as to the follow-up on the proceedings, in particular if they intend to request that it be suspended"*.  In a letter of January 31, 2013, the Parties presented their respective positions regarding the follow-up on the procedure and in particular regarding its possible suspension.  The Plaintiffs requested of the Arbitral Tribunal in particular that it *"suspend the ICSID arbitration procedure until the CCJA Decision in the arbitration procedure"*, while the Defendant explained that it could not take a stand regarding a possible suspension until the Plaintiffs had specified what requests they intend to pursue before this Arbitral Tribunal.

21.   On February 12, 2013, following the Defendant's non-payment of the second advance, the Tribunal suspended the hearing, then resumed it on August 22, 2013 after the ICSID had received the payment from the Plaintiffs (who had replaced the Defendant).

22.   On October 1st, 2013, after the Parties had recalled their respective positions regarding suspension, the Tribunal rendered Procedural Order no. 1 which stated the following:

a.   *The parties are required to inform the Arbitral Tribunal without delay of the approximate date on which the CCJA Tribunal's award is expected and, as the case may be, of any delay of which they may be aware;*

b.   *The Plaintiffs shall notify the Arbitral Tribunal as soon as the decision or award of the CCJA Tribunal has been rendered;*

3

c.   *The parties shall, in any event, inform the Arbitral Tribunal by November 1st, 2013 at the latest, of the status of the procedure before the CCJA Tribunal at that time;*

d.   *These proceedings are suspended until December 1s, 2013, for all useful purposes, subject to the receipt of information mentioned in aforementioned points (a) to (c);*

e.   *The Arbitral Tribunal my reconsider this decision, at any time, in light of the relevant circumstances reported to it and will do so in any event* propria motu *prior to December 1st, 2013.*

23.   On November 28, 2013, the Tribunal rendered Procedural Order no. 2 stating that:

a.   *The parties shall inform this Arbitral Tribunal as soon as the decision or award of the CCJA Tribunal is rendered, and, in any event, inform the Arbitral Tribunal by January 6, 2014 at the latest of the status of the procedure before the CCJA Tribunal at that time;*

b.   *The suspension of these proceedings has been extended until Monday, January 13, 2014, for all useful purposes, subject to the receipt of information mentioned in point (a) above.*

24.   On January 13,2014, the Tribunal rendered Procedural Order no. 3 stating that:

a.   *The parties shall inform this Arbitral Tribunal as soon as the decision or award of the CCJA Tribunal has been rendered, and in any event, inform the Arbitral Tribunal by Monday, April 8, 2014 at the latest, of the status of the procedure before the CCJA Tribunal at that time.*

b.   *The suspension of these proceedings has been extended until Monday, April 21, 2014, for all useful purposes, subject to the receipt of information mentioned in point (a) above.*

25.   On April 16, 2014, the Tribunal rendered Procedural Order no. 4 stating that:

a)   *The parties shall inform this Arbitral Tribunal as soon as the decision or award of the CCJA Tribunal is rendered, and, in any event, inform the Arbitral Tribunal by Tuesday June 10, 2014 at the latest of the status of the procedure before the CCJA Tribunal at that time;*

b)   *The suspension of these proceedings has been extended until Monday, June 23, 2014, for all useful purposes, subject to the receipt of information mentioned in point (a) above.*

26.   On June 10, 2014, the Plaintiffs informed the Tribunal that the CCJA Tribunal had rendered its award on April 29, 2014 and, on June 17, 2014, the Tribunal decided to lift the suspension and resume the proceedings on this date.

E.   ***Exchange of Memorials on the merits and hearing***

27.   On July 7, 2014, the Tribunal rendered Procedural Order no. 5 establishing the calendar of the procedure.  In accordance with this calendar:

a)   On November 17, 2014, the Plaintiffs filed their Memorial on the merits ("Mem.");

b)   On March 30, 2015, the Defendant filed its Counter-Memorial on the merits ("C-Mem.");

c) On April 15, 2015, the Parties exchanged their respective requests for the production of documents; on May 7, 2015, they reacted; on May 15, 2015, each party sent a request to the Tribunal that the other party produce certain documents and, on June 3 and 11, 2015, the Tribunal rendered Procedural Orders no. 6 and 7 on this matter, respectively;

d) On July 15, 2015, the Plaintiffs filed their rejoinders ("Repl") on the merits; and

e) On October 15, 2015, the Defendant filed its Replication ("Dupl.").

28. On November 2, 2015, the Tribunal rendered Procedural Order no. 8 concerning the organization of the hearing and the examination of the witnesses and, on November 10, 2015, Procedural Order no. 9 concerning the appearance of certain witnesses at the hearing beginning on November 23, 2015.

29. A hearing on the merits took place in Paris on November 23, 24 and 25, 2015. In addition to the members of the Tribunal, the Tribunal's Secretary and court reporters, the following persons attended:

For the Claimants:
- José Miguel Judice
- Cédric Fisher
- Elisabeth Mahé
- Jean Daniel Littler
- Tiago Duarte
- Filipa Cansado Carvalho
- Pacôme Ziegler
- Tristan Dupré de Puget

For the Respondent:
- Laurent Jaeger
- Romain Sellem
- Agnès Bizard
- François Adao
- Line Geffrault
- Leonid Shmatenko
- Jean Tardi
- Anne Claire Habib

30. The following persons testified:

Presented by the Claimants:
- Grégory Quérel
- Dominique Perrier (PwC)
- Manoël de Goeij (PwC)

Presented by the Respondent:
- Demba Kourouma
- Ibrahima Lamizana Condé
- Mikaël Ouaniche (OAC)



31. In response to the Chairman's question at the end of the hearing, each Party confirmed that it had no criticism or reserves to express regarding the regularity of the procedure (TR III p. 88: 7-16).

32. The hearing was entirely recorded. On December 4, 2015, the sound recording of the hearing was placed at the parties' disposal and the court reporters' record was sent to them for a final reading; it was subsequently adopted in its final version with the consolidated modifications of the Claimants and the Respondent.

F. *After the hearing*

33. on November 26, 2015, the Arbitral Tribunal established the following stages of the procedure, and among them the possible filing by the Respondent of the comments of Mr. Ouaniche regarding certain errors in the model for calculating the loss of profit noted during the hearing. The December 7, 2015 deadline for submitting Mr. Ouaniche's comments was postponed by one week at the Respondent's request.

34. On December 21, 2015, the Respondents informed the secretary of the Arbitral Tribunal of the CCJA's decision of November 30, 2015 annulling the CCJA Tribunal's award of April 29, 2014 on the grounds that the CCJA Tribunal had not complied with its mission when it had asked the parties to settle an additional fee.

35. On December 30, 2015, the Claimants requested of the Arbitral Tribunal permission to append to their Post-Hearing Memorial, the technical documents prepared by PwC (Excel calculation sheets) displaying the errors impacting Mr. Ouaniche's model. On January 8, 2016, the Arbitral Tribunal authorized the Claimants to attach to their Post-Hearing Memorial only the spreadsheets mentioned in their letter of December 8, 2015.

36. Each party submitted its Post-Hearing Memorial on February 3, 2016 and its submission concerning the costs of the arbitration on February 17, 2016.

37. On July 20, 2016, the Arbitral Tribunal adjourned the proceedings.

III. **THE FACTS**

38. This summary of the facts does not claim to be exhaustive. If needed, other facts will be taken into account in the following chapters inasmuch as they are relevant for the decisions to be made.

39. This litigation concerns an investment made in the Container Terminal (referred to hereinafter as the "CT") in the Port of Conakry in the Republic of Guinea.

40. In March 2008, the Transport Ministry and the Autonomous Port of Conakry (referred to hereinafter as the "APC") issued a call for expression of interest in an extension and the granting of a concession to the Port of Conakry Container Terminal.[1] The announcement indicated that the project comprised two facets:

- *"The extension of the Container Terminal by creating a second 300-meter long, 13-meter deep, berth in front of the dock and 12 hectares of additional quayside surfaces with a view to*

---

[1] *Annonces Légales, Jeune Afrique* magazine, issue no. 2461 (C-102).

6

*increasing the berthing capacity by at least three hundred thousand (300,000) twenty foot equivalent (TFE) container units per year"; and*

- *"the refurbishment work on the existing Container Terminal, the modernizing of the handling equipment and the building of a platform on the rail connection level which will be annexed to the CT".*

The call specified that it "was directed exclusively to candidates with extensive, sound experience in the design, financing, realization, operation and maintenance of Container Terminals".

41.   On March 10, 2008, Getma International responded to the call for expression of interest, enclosing a brochure introducing the Necotrans group, and various letters from its commercial partners.[2]

42.   on April 7, 2008, the APC's Director General sent a letter to Transafrica Guinea, representing Getma International, informing them that it had been preselected and "granted permission to submit bids for the granting of the concession and the extension" of the APC CT.[3]

43.   The tender documents included the specifications and draft agreement, as well as the Bidding Regulations.[4]

44.   In July 2008, Getma International submitted a technical file[5] covering the technical aspects of its bid and presenting as its contractual partner, Europe Terminal, a subsidiary of the worldwide ship-owner Mediterranean Shipping Company SA (referred to hereinafter as "MSC") and simultaneously, but in a separate envelope, its financial proposal.[6]

45.   In August 2008, an evaluation report was drafted by the National Public Contracts Committee (referred to hereinafter as the "Committee")[7]. Getma International's technical proposal obtained the highest grade of the four bidders, all of whom obtained at least the minimum of 70 points, so that their financial proposals could also be opened. Following their evaluation, these bids were classified and Getma International was again in the first place. Thus, the National Public Contracts Committee decided, on August 22, 2008, to award the contract provisionally to Getma International.

46.   In a letter of August 27, 2008, the Transport Minister informed Getma International of this provisional award by the Committee. In the letter, it asked Getma International to travel to Conakry on September 2, 2008 to commence negotiations regarding the Concession Agreement[8].

47.   The negotiations of the Concession Agreement subsequently took place. The parties disagree as to the duration and degree of intensity thereof. One of the Claimants' witnesses, Mrs. Mangiante, states that "the negotiations took place at the end of the month of August and during the month of September 2008" and that they "were conducted article by article". She

---

[2] Getma International's expression of interest to the PAC (C-03 and C-16).
[3] Letter of April 7, 2008 from the PAC DG to Getma International (C-105).
[4] Bidding Regulations (C-108).
[5] Technical Proposal (C-174).
[6] Financial Proposal (C-179).
[7] Bid Evaluation Report (C-111).
[8] Letter of Aug. 27, 2008 from the Minister of Transport to Getma International (C-10).



added that "the negotiations were particularly difficult, and Necotrans team was [sic] compelled to make major concessions regarding the initial draft" (Julie Mangiante's affidavit).

48. On September 11, 2008, FFA Ernst & Young sent a legal opinion to the APC regarding the draft agreement (apparently in the context of a service contract concluded between these two parties, strangely on the same date of September 11, 2008).[9] The analysis concerns, among other things, the project's tax and customs schemes and concludes that "this situation does […] not appear advantageous for the Grantor".

49. In a technical note was drafted on which the recipient is not specified, which appears to be dated September 15 and 16, 2008, issued by a APC representative. It is specified that a longer negotiation period could have been retained and regretted the fact that the discussions were conducted by the proposal Contracts Commission[10] rather than by the APC itself[11].

50. On September 22, 2008, the Respondent and Getma International signed the Agreement for the Concession of the Container Terminal of the Autonomous Port of Conakry, its extension and the building of a rail connection area (referred to hereinafter as the "Concession Agreement" or "agreement").[12]

51. On October 2, 2008, the Guinean Treasury Department cashed a check - already issued on September 15, 2008 - on Getma International for the amount of €7,500,000, corresponding to the first half of the entry ticket.[13] Article 15.2 of the agreement stipulated that the second half was owed within six months of the date of the signing of the agreement.

52. On October 31, 2008, Getma International and NCT Necotrans created a joint subsidiary in Paris, Getma International Investissements, registered on November 13, 2008.[14]

53. On November 14, 2008, a "Report – critical study of the sale agreement [sic] of the Container Terminal of the port of Conakry" was sent to the Prime Minister by various entities, namely the shipping agents and warehousemen, Guinean executives evolving in the Port Sector, corporate

---

[9] E & Y Legal opinion (C-119): the transmission letter of Sept. 11, 2008, and p. 1 of the opinion note that: "this legal opinion is being sent to you in accordance with terms of the service contract of September 11, 2008...".
[10] After verification, the Arbitral Tribunal concluded that this Committee is the same as the National Public Markets Committee: article 2 of the Bidding Regulations (see-108) states that the receipt and opening of the bids will be performed by "a Committee appointed for this purpose." And that the analysis and evaluation are performed by "the Committee"; article 19, stipulates that "the Committee, which counts and evaluates the bids" will grant the concession provisionally; and the witnesses at the hearing spoke of the "Contracts Commission". One can therefore presume that the name "national public contract Committee" which appears on the Committee evaluation report (C-111) is the official name of the Contracts Commission, particularly as the list of the Committee's members also comprises the name of the two witnesses, as well as those of the persons to whom they referred.
[11] Technical note (C-120).
[12] Concession Agreement (C-11 and C-48)
[13] Check on a Getma International account to the order of the Guinean Treasury Department (C-121). Cashing of check no. 817 (C-122).
[14] K-bis extract for Getma International Investissements (C-3). According to Mem. §205, Getma International Investissements was "created on October 31, 2008, between Getma International who owned 51% and therefore controlled it as per articles L.233-3 of the French Commercial Code and the Uniform Act concerning the law of Commercial Companies and Economic Interest Groups and in the respect of Article-7.2 of the Concession Agreement, and NCT Necotrans, which owned 49% thereof". According to Mem. § 56, it was decided that Getma International Investissements would be created as an intermediate structure "which would therefore have direct access to the financing of the holding of the Necotrans group".

unions and Companies operating the APC, the Bureau of Importers of Secondhand Vehicles, the National Union of Road Transporters of Guinea, the Employers Federation of Customs and Forwarding Agents of Guinea, and the Bureau of the Informal Sector Importers[15]. The document criticized the tender document calling for expression of interest, the specifications and the signed Agreement and recommended a complete revision of the Concession Agreement.

54. On November 20, 2008, the *Société du Terminal à Conteneurs de Conakry SA* (Container Terminal of Conakry Company) (referred to hereinafter as the "STCC") was created by Getma International Investissements and Transafrica SA.[16]

55. An undated document entitled "summary of the reserves of the Autonomous Port Authority on the agreement for the granting of the concession to the Container Terminal, its extension and the building of a rail connection area" was drafted by the APC (the recipient was unknown). Four reserves were put forth:
- the weakness of the tender file,
- the thoughtlessness of the awarding,
- the weakness of the agreement negotiations, and
- the inadequacy of the agreement, such as signed.[17]

56. On November 24, 2008, STCC provided the Transport Minister with the names of the permanent representatives of "our group" on the monitoring Committee stipulated in article 29 of the Concession Agreement.[18]

57. On December 4, 2008, the Minister Secretary General of the Office of the President sent a letter to the Transport Minister reviewing the various reserves expressed in the document referred to in paragraph 55 above[19]. The letter concluded that "in the end, the monopoly generated by this agreement will entail for the State a definite, enormous loss in terms of earnings." The Minister Secretary General added: "regarding these reserves and by instruction from the authority, I ask that you suspend the application of this agreement with a view to its total revision and invite the signatory company to a meeting for this purpose".

58. On December 11, 2008, the Council of Ministers approved the agreement.[20]

59. On December 16, 2008, the Transport Minister issued a Decree *"containing a technical approval of the port warehousing of the Container Terminal of Conakry Company "S.T.C.C.-SA""*.[21]

60. On December 17, 2008, Getma International sent a letter to the Transport Minister, stating "that on December 17, 2008, all of the conditions precedent had been lifted."[22] These

[15] Critical study (C-141).
[16] STCC Articles of Association (C-125)
[17] Summary document (C-142).
[18] Letter of November 25, 2008 to the Transport Minister (C-128).
[19] Letter of December 4, 2008 from the Secretary General of the President's Office to the Transport Minister (C-143).
[20] Letter of December 22,20087 from the Transport Minister to NCT Necotrans (C-145).
[21] Decree of December 16, 2008 of the Transport Minister (C-123).
[22] Letter of December 17, 2008 from Getma International to the Transport Minister.

conditions concern (i) the approval of the CT regulations and operating instructions, (ii) the obtaining of the warehousing and consignment approvals, (iii) the creation of the operating company and (iv) the setting up of guarantees (article 39 of the agreement).

61.   On the same date, all Port of Conakry operator union sections notified the Guinean Prime Minister of a general strike to support their claim for the annulment of the contract with Getma International.[23]

62.   On December 22, 2008, President Lansana Conté died and, the very next day, Captain Moussa Dadis Camara seized power.

63.   On December 22, 2008, the Transport Minister sent a letter to NCT Necotrans (President of Getma International) stating that the Council of Ministers had instructed the Transport Department to meet with the APC "in order to take account of certain remarks and suggestions made after the signing of the agreement".[24] The letter stated that the Minister "wanted to postpone the entry into force of the agreement".

64.   On December 31, 2008 and January 2, 2009, APC's Board of Directors convened in an extraordinary meeting without all of its members.[25] After having noted, "serious failures in the legislation in force" in the conclusion of the Concession Agreement, "questions linked to the Concessionary's capacity and quality", questions on the tax scheme which applies, and the "consequences on the viability and future of the port of Conakry", the APC decided "to purely and simply annul the agreement".

65.   On January 14, 2009, the President of the Republic issued a Decree "for the suspension of the application of the agreement for the construction of the Container Terminal of the Autonomous Port of Conakry and any judicial procedure pertaining thereto".[26]

66.   A Committee for the re-examination of the Concession Agreement, composed of six members (primarily from the customs administration), was put into place in January, 2009; it issued an undated report[27] constituting a reflection on the Concession Agreement.[28] The report expresses reserves as to the award procedure and Getma International's capacities, then criticizes numerous provisions of the Concession Agreement. The report concludes by "asking the Grantor urgently to exercise Article 37 of the Agreement in order to obtain an amendment [of the Concession Agreement]".

67.   An unsigned document, dated March 27, 2009, presented by the Plaintiffs as issued by one of the members of the Committee mentioned in the preceding paragraph and addressed to Guinea's President, contains a list of the "questions raised by the conclusions of the Committee's members", and calls some of the Committee's conclusions in to question before

---

[23] Letter of December 17, 2008 to the Prime Minister (R-28).
[24] Letter of December 22, 2008 from the Transport Minister to NCT Necotrans (C-145).
[25] Minutes of the Extraordinary Meeting of PAC's Board of Directors of December 31, 2008 and January 2, 2009 (C-146).
[26] Decree containing the suspension of the Concession Agreement (C-149).
[27] But which the Defendant states was issued on March 26, 2009 (Counter-memorial on the merits § 56).
[28] Reflexion document (C-150)

concluding, on behalf of the Committee's members, that "we have not fulfilled the mission entrusted to us".[29]

68.   On April 9, 2009, the President of the Republic issued a Decree "containing a lifting of the suspension of the application of the Agreement for the construction of the Container Terminal Autonomous Port of Conakry and all the judicial procedures pertaining thereto", however "subject to the protection of the interests of the State and the initial Guinean shareholders".[30] [31]

69.   On April 27, 2009, APC's Director General sent (i) a letter to STCC's administrator "asking him to take all necessary measures for the effective commencement of [its] activities on the [CT]"[32]and (ii) a letter to the administrator of Conakry Terminal Services asking him to "take the necessary measures aimed at making the premises available to the STCC".[33]

70.   On April 30, 2009, a report on the availability of the land, works and equipment was signed between APC and STCC.[34]

71.   On May 19, 2009, the Minister Secretary General of the President's Office sent a letter to Getma International stating that "pursuant to Article 7 [of the Concession Agreement]" the State intended "to participate in [STCC]'s capital in the proportion of 25%".[35]  The letter added "clearly and unequivocally that the availability of the [CT] is only partial and provisional to date, and excludes the operational activities".

72.   On May 27, 2009, a meeting was held between the State and Getma International in the offices of the Secretary General of the President's Office of the Republic concerning

-      the structure of STCC's capital and the State's participation,
-      the setting-up of the Monitoring Committee, and
-      the effective availability of the CT.

73.   During this meeting, the State pledged "to respect and strictly apply Article 26 [exclusive guarantee of operation and possession] of the Concession Agreement from June 1[st], 2009 onwards".  It was also agreed that an Additional Clause to the Concession Agreement would be negotiated to take account of all the respective concerns.[36]

74.   The Claimants state that the effective, but partial, availability of the CT occurred on June 1st, 2009.

---

[29] Document listing questions (C-153).
[30] Decree lifting the suspension of the Concession Agreement of April 9, 2009 (C-154).
[31] According to the exhibit (C-155), Excerpt from the *Journal Officiel de la République de Guinée,* this Decree was published in the March 10 and 25, 2009 issues of the *Journal Officiel.*
[32] Letter of April 27, 2009 from PAC's DG to STCC (C-156).
[33] Letter of April 27, 2009 from PAC's DG to CTS (C-157).
[34] Report of April 30, 2009 (C-17 and C-176).
[35] Letter of May 19, 2009 from the Secretary General of the President's Office to Getma International (C-158).
[36] Minutes of the meeting of May 27, 2009 (C-159).

75.   On July 24, 2009, the Bazie Koyo Assa firm sent a legal opinion on the Concession Agreement and its revision to the Director General of APC.[37]

76.   Getma International prepared a draft Additional Clause to the Agreement which was criticized in a letter of October 8, 2009 from APC's Director General to the Minister Secretary General of the President's Office.[38] In the same letter, APC announced its intention of elaborating itself a draft Additional Clause which would take account of the State's interests.

77.   The Parties negotiated the draft Additional Clause on October 28 and 29, 2009.[39]

78.   On November 7, 2009, the Respondent and Getma International concluded "Additional Clause no. 1 to the Agreement for the granting of a Concession to the Container Terminal of the Port of Conakry, its extension and the construction of rail connection area no. 2008/001/CC of September 22, 2008 following-up on the Minutes of the meeting of May 27, 2008" (referred to hereinafter as "Additional Clause no. 1")[40]. The principal purpose of this Additional Clause was to carry forward the effective date of the beginning of the work to the date of Additional Clause no. 1, namely November 7, 2009.  The Additional Clause also stipulated that the balance on the entry ticket, i.e. € 7,500,000, would be paid in two installments, the first within 90 days of the date of the Additional Clause and the second within 180 days.

79.   The Parties disagree as to the scope of the work performed by the Claimants between Additional Clause no. 1 and the Termination Decree, as well as on the impact on the execution of the work for making available the rail connection platform to the Concessionary, which did not take place, according to the Claimants, until March 23, 2010.

80.   On April 30, 2010, Getma International sent a check of €3,750,000 to the APC[41], corresponding to the third fourth of the entry ticket.[42]

81.   On May 28th 2010, the APC signed a "receipt" confirming the receipt of a transfer made by Getma International for the amount of €3,750,000 corresponding to the last fourth of the entry ticket.[43]

82.   On December 3, 2010, the Supreme Court of Guinea confirmed the election in November 2010 of the new President Alpha Condé.[44]

83.   On January 4, 2011, the new Transport Minister sent a letter to Getma International inviting it to a meeting in order to "review the agreement".[45] The meeting was held on January 14, 2011. The parties disagree regarding the very purpose of the meeting and regarding the issue of whether the discussion of the financial aspects of the project was on the agenda. The APC's

---

[37] Legal opinion of Bazie-Koyo-Assa of July 24, 2009(C-160).
[38] Letter of October 8, 2009 from the DG of PAC to the Secretary General of the President's Office (C-161).
[39] Attendance sheets for the meeting of October 28, 2009 (C-162 and C-163).
[40] Additional Clause no. 1 (C-12).
[41] See Mem. P. 45, note no. 202 explaining why the second half of the entry ticket, payable in two tranches, was paid to the PAC and not to the Finance Ministry as stipulated in the Agreement.
[42] Check no. 875 of April 30, 2010 (C-165) and its receipt of May 3, 2010 (C-167).
[43] Transfer of € 3,765,000 of May 28,2010 (C-166).
[44] Article of December 3, 2010 in the newspaper Le Monde (C-71).
[45] . Letter of January 4, 2011, the Transport Minister to Getma International (C-181)

representatives left the meeting when Getma International's representatives stated that they were not able to discuss financial issues.[46]

84. One of the Claimants' witnesses, Mr. Wiltzer, stated that the meeting had been held on January 21, 2011 between him (representing the Claimants) and Chairman Condé, who then appointed Mr. Curtis to continue the discussion on the Concession Agreement[47] . According to the witness[48], Mr. Condé had a "stern" expression and "did not want to broach the subject" and the discussion with Mr. Curtis produced no results.

85. On January 25, 2011, the National Merchant Marine Administration informed Getma International that it had noted, "with great satisfaction The quality of the presentation of the work carried out and the work which is scheduled", asking it for a chronological forecast of the execution of phase 2 of the work.[49]

86. On February 1, 2011, the Technical Services Director (probably of the APC) handed in a "technical opinion of February 9, 2011 on the Concession Agreement".[50] The document states that "if the acquisition of the equipment permitted Getma International to load and unload the containers suitably in the port of Conakry during this financial year, on the other hand the forecast of the work to be performed in [sic] has sustained [sic] a delay in the project." The document concludes that "it is necessary to terminate the Concession Agreement and to entrust the paternity of the file to the [APC]". [51]

87. On February 8, 2011, the APC's Audit Committee convened for the purpose of examining the Concession Agreement. It noted that "one of the major weaknesses" of the Concession Agreement is that it "purely and simply ignores the principal, if not cardinal, role of the APC" and "decides to act," in particular, by putting together a technical file to "review the agreement and the renegotiation thereof, with emphasis on the central role of the APC" or by "termination with the APC's instruction to find another partner". [52]

88. On February 11, 2011, the APC's Board of Directors convened in an extraordinary meeting, the heading on the minutes of which reads "Cancellation of the Container Terminal Concession Agreement".[53]. The document contains criticism of the legal, technical, financial and operating aspects of the Concession Agreement and "requests the pure and simple cancellation thereof by the country's highest authorities". On the same day, the chairman of the APC's Board of Directors informed the minister of state of the Board's recommendation that the Concession Agreement of September 22, 2008, be terminated.[54]

89. On March 8, 2011, the President of the Republic of Guinea issued Decree D/2011 071, in which the Concession Agreement and Additional Clause no. 1 were "cancelled due to the

---

[46] Mr. Sory Camara's affidavit of March 22, 2013 produced in the CCJR arbitration (R-31).

[47] Pierre-André Wiltzer's affidavit (C-185 and C-186).

[48] The defendant waived cross examination of the witness

[49] Letter of January 25, 2011, from the National Merchant Marine director (Transport Ministry) to Getma International (C-18).

[50] Technical opinion of February 9, 2011 (C-175).

[51] Technical opinion of February 9, 2011 (C-175).

[52] Minutes of the meeting of the audit committee of February 2011 (C-195).

[53] Extraordinary meeting of the PAC's Board of Directors of February 11, 2011, (C-196), Minutes of the extraordinary meeting of the PACs Board of Directors of February 11, 2011 (C-197).

[54] Letter of February 11, 2011, from the chairman of the PACs Board of Directors to the minister of state (C-198).

Concessionary's failure to meet its obligations […]with immediate effect and without indemnification, at the expense, risk and based on the fault of the companies [sic] Getma International SAS," (referred to hereinafter as "the Termination Decree").[55]

90. On March 9, 2011, the President of the Republic of Guinea issued Decree D/2011 074 "for the requisition of the personnel, facilities, real property and assets on the territory of the Republic of Guinea of the Getma International SAS and Conakry Container Terminal companies" for a period of 60 days (referred to hereinafter as "the requisition Decree").[56]

91. On March 9, 2011 also, Getma International and STCC had a bailiff's report drawn up in which they declared that the police had "turned up" on March 8, 2011 in front of their offices and had "instructed them to vacate and lock the premises, prohibiting them from reopening them". The report confirms the Bailiff's ascertainment on the premises, "of the effective closing of the doors giving access to the Claimant's various offices".[57]

92. Again on March 9, 2011, Getma International sent to the Transport Ministry a letter containing "preliminary notice of change of law" in which it stated that the termination constituted "a Change of Law and Acts of the Public Authorities, impeding the proper functioning of the activities granted in the concession as per article 32.5, paragraph 1 of the Concession Agreement". The letter also stated that this notice initiated a 60 day period to remedy the consequences thereof and requested, in the event that this period were not respected, payment of the indemnities stipulated in Article 32.3 of the Concession Agreement, without prejudice to full indemnification of the prejudice.[58]

93. On March 10, 2011, the APC signed a technical assistance agreement with SDV Guinea, a joint stock company under Guinean law, for a duration of 21 days, the purpose of which was the management of the Conakry Container Terminal warehousing activities[59]. The Claimants contend that no call for bids was issued prior to this agreement.

94. On March 11, 2011, the APC signed a "Concession Agreement for the Container Terminal, its extension and the conventional building in the port of Conakry of a storage platform and a drydock in Kagbelen".[60] The Claimants contend that no call for bids was issued prior to this agreement. The Bolloré company, Necotrans' competitor, had also submitted a bid for the concession in 2008, which had been classified second.

95. In March 2011, the INECOR company produced an audit of the Conakry Container Terminal Concession Agreement, comparing the new agreement concluded with the Bolloré company, to that of 2008 concluded with the Claimants.[61] Regarding the Bolloré Agreement, the report notes that "in no African or European port, is total exclusivity granted to a given private operator covering all port operations involving all types of freight […] and covering the entire

---

[55] Termination Decree (C-19).
[56] Requisition Decree (C-21).
[57] Bailiff's report of March 8, 2011 (C-23).
[58] Letter of March 9, 2011, from Getma International to the Transport Minister (C-25).
[59] Technical assistance agreement (C-204).
[60] Concession Agreement between the PAC and the Bolloré company (C-205).
[61] Audit by the INECOR Company of March 2011 (C-207).



scope of the port. It concludes that, "due to its insufficient negotiation period, the Concession Agreement is excessively advantageous to the private Concessionary, to the detriment of Guinea's interests" and recommends several amendments.

96.   On March 22, 2011, Getma International notified to the Minister of State responsible for public works and transports, by bailiff, a protest against the measures concerning termination and the requisition, as well as a formal notice requesting that it minimized the effects of the change of law and of the acts of the Public Authorities which impeded the smooth functioning of the activities granted in the concession and a the indemnifications stipulated in the Concession Agreement.[62]

97.   On April 26, 2011, any Additional Clause to the agreement mentioned in paragraph 94 was signed between the APC and Conakry terminal company (which had replaced the Bolloré company)[63] "in order to [...] Exclude the conventional freight warehousing activities, as well as the Concessionary's obligations under said activities and the conventional terminal".

98.   On May 4, 2011, Getma International sent a letter to the Transport Minister containing "the strongest protests" concerning the Termination Decree and the requisition Decree. A "brief memorandum" was appended thereto, describing the history of the Concession Agreement, and the requests for indemnification.[64]

99.   On May 10, 2011, Getma International filed an arbitration request with the DCJ a based on the arbitration clause contained in the Concession Agreement.[65]

100.  On June 30, 2011, the Minister of State in charge of Public Works and Transport sent a letter to Getma International, accompanying Decree D/2011 187 of June 22, 2011 "containing a lifting of the requisition for the personnel, facilities, real property and assets of the Getma International SAS and Conakry Container Terminal companies on the territory of the Republic of Guinea", as per the decision of March 9, 2011 contained in Decree D/2011 74. The letter asked Getma International "to come and recover all of [its] movables, real property... of which [STCC] had the disposal".[66]

101.  On April 29, 2014, the CCJA Tribunal issued its award. It "stated that the termination [of the Concession Agreement] was irregular" and ordered the Respondent to pay the following amounts:
-    a flat termination indemnification of €20,884,966,
-    a termination indemnification for the assets granted in the concession of €3,234,995,
-    the unamortized amount of the entry ticket of €14,201,096 and
-    an indemnity of €210,070 for unrestituted stocks[67]

---

[62] Bailiff's notification of March 22, 2011 (C-24).
[63] Additional Clause no. 1 between the PAC and the Conakry Terminal company of April 26, 2011 (C-209).
[64] Letter of May 4, 2011 from Getma International to the Transport Minister (C-27).
[65] CCJA award of May 26, 2014 (C-50).
[66] Letter of January 30, 2011 from the Minister of State in charge of Public Works and Transport to Getma International (C-26).
[67] CCJA Award of May 26, 2014 (C-50).

102. This award was annulled on November 30, 2002, after the hearing of witnesses held by this Arbitral Tribunal from November 23 to 25, 2015, at the OHADA Common Court of Justice and Arbitration, on the "grounds that the Arbitral Tribunal failed to comply with its mission by deliberately ignoring the imperative provisions of the arbitration regulations, which prohibit agreements between the parties and the arbitrators regarding the amount of their fees". In a letter of December 21, 2015, the Claimants communicated a copy of the annulment decision to this Arbitral Tribunal's Secretariat.

***

103. After recalling the parties' requests (chapter IV), this Arbitral Tribunal will study successively its jurisdiction and the admissibility of the requests (chapter V), liability (chapter VI) and the damages for the prejudice (chapter VII). In each chapter, it shall first summarize the parties' respective positions such as they were presented in their successive briefs and memorials, namely the Claimants' brief, the Respondent's counter-memorial, the Claimants' rejoinder, as well as the memorials submitted after the hearing. The Arbitral Tribunal specifies that the discretionary portion of each of these chapters takes into consideration all of the arguments put forth by the parties in their written and oral submissions, including those which are not explicitly mentioned in the description of the parties' positions preceding the observations of the Arbitral Tribunal.

## IV.   THE PARTIES' REQUESTS

### A.   *The Claimants*

104. In their request for arbitration of September 29, 2011, the Claimants requested the following of this Tribunal (reserving the right to modify its requests):

a)   *that it declare that the state of Guinea violated its investment legislation and/or international law, and in particular that it dispossessed the Claimants, in a discriminatory manner, of their investment, without prompt, fair, adequate indemnification, in breach of articles 5, 6 and 7 of the Investment Code and/or in breach of customary international law;*

b)   *that it order Guinea to indemnify the Claimant, due to the violation of its investment legislation and/or international law by an amount to be determined at the appropriate time in this procedure, in a freely convertible currency accepted by the Claimants, plus interest, calculated at a commercially reasonable rate for the currency at issue, accruing from the date of the expropriation until the date of the full payment of the amount;*

c)   *that it award any other compensation that the Tribunal considers appropriate, and*

d)   *that it order the State of Guinea to pay all the costs of this arbitration procedure, including, without limitation, the Tribunal's fees and expenses, the fees and expenses of the ICSID, the fees and expenses of the Claimant's legal representation, and the costs and fees of any expert, appointed by the Claimant, or by the Tribunal, plus the interest owed.*

105. In its brief, the Claimant asked this Arbitral Tribunal:

*In a principal capacity:*
- *that it state that, by issuing the termination and requisition Decrees, Guinea violated article 5 of the Investment Code;*
- *that it state that, by issuing the termination and requisition Decrees, Guinea violated article 6 (1) of the Investment Code;*

*Or, in a subsidiary capacity:*
- *that it state that, by issuing the termination and requisition Decree is, Guinea violated the minimum standard of treatment which it was required to provide to the Claimants under customary international law.*

*And consequently:*
- *that it order Guinea to pay to the Claimants the sum of €103,031,250, corresponding to the net value of the cash flow updated for the period of the concession of which the Claimants were deprived due to their expropriation;*
- *that it order Guinea to pay to the Claimants the sum of €1,950,996 corresponding to the prejudice resulting from the requisition;*
- *that it order Guinea to pay to the Claimants the sum of €1,058,502 corresponding to the additional prejudice resulting from the Termination Decree; that it order the payment of interest to the Claimants, calculated at the rate of 8.7%, capitalized annually, on the sums indicated above, beginning on March 8, 2011 and up until the date of the payment thereof;*
- *that it order Guinea to pay to the Claimants. The sum of €1,000,000 for their non-pecuniary prejudice;*
- *that it award all other indemnification which the Tribunal considers appropriate;*
- *that it offset all sums awarded to the Claimants pursuant to this arbitration procedure against all sums effectively and definitively paid by Guinea for the same prejudice pursuant to the CCJA arbitration on the date of the arbitral award; and*
- *that it leave it up Guinea to pay all of the costs, expenses and fees of attorneys and experts corresponding to this arbitration procedure, including the costs borne by the Claimants.*

106.   Some of these requests were adapted in the Claimants' rejoinder[223]:

*In a principal capacity:*
- *that it state that Guinea, by issuing the termination and requisition Decrees, violated article 5 of the Investment Code;*
- *that it state that Guinea, by issuing the termination and requisition Decrees, violated article 6 (1) of the Investment Code;*

*Or, in a subsidiary capacity:*
- *that it state that, by issuing the termination and requisition Decrees, Guinea violated the minimum standard of treatment which it was required to grant to the Claimants pursuant to customary international law.*

*And consequently:*
- *that it order Guinea to pay to the Claimants the sum of €108,428,105 corresponding to the net value of the updated cash flow for the period of the concession of which the plaintiffs were deprived due to their expropriation;*
- *that it order Guinea to pay to the Claimants the sum of €1,950,996, corresponding to the prejudice resulting from the requisition;*
- *that it order Guinea to pay to the Claimants the sum of €1,058,502, corresponding to the additional prejudice resulting from the Termination Decree;*
- *that it order the payment of interest to the Claimants at the rate of 8.7%, capitalized annually, accruing on the sums indicated above, from March 8, 2011 until the date of the*

---

[223] The differences with the Stament of Claim are in bold



payment thereof, namely **€160,087,487 at July 10, 2015, without prejudice to subsequent interest;**

- that it order Guinea to pay to the Claimant the sum of **€1,000,000** for their non-pecuniary prejudice, **bearing interest at the rate indicated above, beginning on March 8, 2011;**
- that it grant all other indemnification considered appropriate by the Tribunal;
- **that it state that all sums effectively and definitively paid by Guinea for the same counts of prejudice pursuant to the CCJA arbitration and by the Bolloré group, in the procedure against the Necotrans group before the French state courts shall be deducted from the sums awarded by this Tribunal;** and
- that it leave it up to Guinea to pay all the costs, expenses and fees, in particular the fees of attorneys and experts, corresponding to this procedure.

107. The Post-Hearing Memorial contains of all modifications of form, with the exception of the suitable calculation of interest. Its being understood that this Arbitral Tribunal shall rule on these requests, they are also literally quoted below:

*That it state that, by virtue of the termination and requisition Decrees, the Respondent:*

*In a principal capacity:*
*i. violated article 5 of the Investment Code of the Republic of Guinea;*
*ii. violated article 6 (1) of the Investment Code of the Republic of Guinea;*

*Or, in a subsidiary capacity:*
*iii. violated the minimum standard of treatment it was required to grant to the Claimants pursuant to customary international law.*

*And consequently,*
*i. that it order the Respondent to pay to the Claimants:*
- *the sum of €108,428,125 corresponding to the net value of the cash-flow, updated for the period of the concession of which the Claimants were deprived due to their expropriation;*
- *the sum of €1,950,996 corresponding to the prejudice resulting from the requisition;*
- *the sum of €1,058,502 corresponding to the additional prejudice resulting from the Termination Decree;*
- *the sum of €1,000,000 for the Claimants' non-pecuniary prejudice;*
- *interest at the rate of 8.7%, capitalized annually, accruing on the sums indicated above, from March 8, 2011 until the date of the full, effective payment thereof, namely €56,950,551 in interest, at February 3, 2016, without prejudice to subsequent interest;*

*ii. that it grant to the Claimants all other indemnification which the Tribunal may consider appropriate;*
*iii. That it state that all sums effectively and definitively paid by the defendant for the same prejudice pursuant to the CCJA arbitration or by the Bolloré group pursuant to the procedure against the Necotrans group before the French State courts, will be deducted from the sums awarded by this Tribunal, and*
*iv. That it leave it up to the Defendant to pay all the costs, expenses and fees, in particular the fees of attorneys and experts, corresponding to this arbitration procedure, including those borne by the Claimants.*

**B.   Respondent**

108. The Respondent's counter-memorial requested of the Arbitral Tribunal:



1. *In a principal capacity:*
- *that it declare its lack of jurisdiction to rule on all of the Claimants' requests;*
2. *In a subsidiary capacity:*
- *that it declare that all of the Claimants' requests are inadmissible;*
3. *In an infinitely subsidiary capacity:*
- *that it reject all of the Claimants' requests.*
4. *In any event:*
- *that it order the Claimants to pay all of the costs of arbitration including the costs and fees incurred by the Respondent for the purposes of its defense in the context of this arbitration, the amount of which shall be determined at the end of the procedure.*

109.   These requests were not modified in the Respondent's subsequent memorials.

## V.   JURISDICTION AND THE ADMISSIBILITY OF THE REQUESTS

### A.   *The Respondent's position*

**(1)   The Tribunal lacks jurisdiction *ratione materiae* due to the illegality of the investment and the acts of corruption**

110.   The Respondent first recalls an uninterrupted line of arbitral precedents establishing that the ICSID system can protect only legal investments carried out in good faith, and not those obtained by fraud[69].   The decisions quoted to this effect are those of the *Phoenix Action versus/ Czech Republic*[70], *Inceysa versus/ the Republic of Salvador*[71], *Fraport versus/ Philippes*[72], *and Metal-Tech versus/ Uzbekistan* cases.[73]

111.   Applying this principle, the Respondent contends that the Tribunal must declare its lack of jurisdiction because (i) the Investment Code specifies that it applies only to investments made in the respect of the laws and regulations of Guinea and (ii) passive corruption, active corruption and influence peddling are prohibited under the Guinean Criminal Code.[74]

112.   The Respondent contends that sufficient proof and evidence exist to consider that the Concession Agreement was obtained in breach of Guinean law. Thus, the agreement was allegedly awarded to the Claimants illegally, by fraud committed on the level of the bid files and by corruption, in breach of Guinean law on both the criminal (art. 191 to 195 for the offense of corruption and art. 430 for the offense of swindling) and the civil (art. 649 and the following of the Civil Code, for fraudulent tactics) levels.[75] Under these conditions, the Respondent claims that "the Claimants' investment was carried out in breach of the laws of the Republic of Guinea, and furthermore, more broadly, in breach of international public policy,"[76] entailing the violation of article 2.1 of the Investment Code which states that

---

[69] C-Mem. §§ 215-229.

[70] *Phoenix Action Ltd. Versus the Czech Republic,* ICSID ARB/06/5, Award, April 15, 2009 (R-47).

[71] *Inceysa Vallisoletana S.L. versus/the Republic of Salvador,* ICSID ARB/03/26, Award, Aug. 2, 2006 (R-51).

[72]   *Fraport AG Frankfurt Airport Services Worldwide versus/the Republic of the Philippines,* ICSID ARB/03/25, Award, Aug. 16, 2007 (R-52)

[73] *Metal-Tech Ltd. Versus/the Republic of Uzbekistan,* ICSID ARB/10/3, Award, Oct 4, 2013 (R-54)

[74] C-Mem. §§ 235-244.

[75] Respondent's replication, §§ 217-224.

[76] C-Mem., §§ 240-241.



investments must be made "in the respect of the laws and regulations of the Republic"[77]. It can therefore not constitute an 'investment' protected under the Investment Code.[78] The According to the Respondent, the Tribunal should therefore declare that it lacks jurisdiction *ratione materiae* or subsidiarily declare that the illegality of the investment resulting from the alleged acts of corruption entailed the inadmissibility of the Claimants' requests (or the rejection of the requests in an infinitely subsidiary capacity).[79]

113.  Furthermore, in its Replication, the Respondent refutes the Claimants' argument that the accusations of corruption are subject to a higher degree of proof. In response to the awards quoted by the Claimants, it refers to *Metal-Tech versus Uzbekistan*[80], *Tokios Tokelès versus Ukraine*[81], *Libananco Holdings versus Turkey*[82], and *Rompetrol versus/Romania*[83], in order to prove that no unanimous position exists which requires a stricter standard of proof and above all to establish that several courts have applied the ordinary standard of proof and admitted the evidence of corruption broadly.[84] The Respondent also bases its argument on several doctrinal comments and decisions to conclude that corruption can be proven by indirect evidence or clues, inasmuch as corruption is characterized by secrecy and the scarcity of evidence and that it is often difficult to establish.[85]

114.  The Respondent also contends that it is invoking both indirect and direct evidence in support of its allegations of corruption. As direct evidence, it has produced three affidavits by witnesses:[86]

-  The affidavit of Stephen Fox of the Veracity company concerning (i) US$1,000,000 paid to the Transport Minister at the time, who signed the Concession Agreement, (ii) US$200,000 paid to the finance minister at the time, who signed the Concession Agreement, (iii) US$100,000 paid to (each of) various members of the national evaluation committee, namely Mr. Ansoumane Camara, Mr. Demba Kourouma, Mr. Ibrahima Lamizana Condé, Mr. Saifoulaye Barry, Mr. Mohamed Fofana and Mr. Mamadou Diallo. In response to the Claimants' criticism, the Respondent contends that, even if Mr. Fox did not witness the event directly, he has been a professional in the anticorruption campaign in Guinea since 2005 and that his inquiry was based on his privileged access to sources of information – which were confidential indeed - but reliable, direct and not based on personal interests. The Respondent states also that the minor inaccuracies underlined by the Claimants (such as the amounts effectively distributed at the end of the chain and an error regarding a name) are irrelevant or explainable.[87]

-  the affidavit of Mr. Demba Kourouma concerning the sum of €35,000 received following the signature of the Concession Agreement by Mr. Mamadou Diallo, an officer at the

---

[77] Dupl. §§ 217-220, 226.
[78] C-Mem. §§ 240-241
[79] C-Mem. §§ 245-254; Dupl. §§ 225-240.
[80] *Metal-Tech Ltd. Versus/the Republic of Uzbekistan,* ICSID ARB/10/3, Award, Oct. 4,2013 (R-54).
[81] *Tokios Tokelès versus/Ukraine,* ICSID ARB/02/18, Award, July 26, 2007 (R-109).
[82] *Libananco Holdings Co. versus the Republic of Turkey,* ICSID ARB/06/8, Award, Sept. 2, 2011 (R-111).
[83] *The Rompetrol Group N.V. versus/Romania,* ICSID ARB§06/3, Award, May 6, 2013 (R-112).
[84] Dupl. §§ 56-67.
[85] Dupl. §§ 68-81 referring in particular to the *Case of the Straits of Corfu* (merits), CCJA, decision of April 9, 1949 R-117); *Rumeli Telekom A.S. versus/the Republic of Kazakhstan,* ICSID ARB/05/16, Award, July 29,2008 (C-270).
[86] C-Mem. §§ 83-97
[87] Dupl. §§ 85-94.

Transport Ministry and member of the Evaluation Commission, on behalf of Getma International.

- the affidavit of Mr. Ibrahima Lamizana Condé concerning the sum of €20,000 received during the negotiations of the Concession Agreement from Mr. Mamadou Diallo on behalf of Getma International.

115.  Regarding the last two affidavits, which the Respondent was not authorized to produce in the CCJA arbitration, the Respondent considers (i) that the differences between the amounts quoted in these affidavits and those mentioned by Mr. Fox can be explained by an intermediate use in the chain of corruption as seen above, (ii) that the link between Mr. Diallo, who handed over the funds, and Getma International is established, because he was in direct contact with two representatives of Getma International, and (iii) that the absence of sanctions against these civil servants does not contradict the veracity of the facts contained in their affidavits.[88]

116.  Regarding the indirect evidence, the Respondent bases its argument on a "body of evidence" to confirm the existence of corruption, namely:

a.  the "endemic" nature of corruption in Guinea[89],

b.  the "guilty" passivity of the members of the commission who did not, according to the Respondent, note the weaknesses of the Claimants' bid, namely:

- the Claimants' lies regarding their true experience in the design, financing and operation of Container Terminals, because they appropriated as references the projects of the MSC group, the second-largest ship owner in the world, with which the Claimants claim to have concluded a partnership.[90]  In its Replication, the Respondent contends that the technical partnership agreement of March 6, 2008, presented by the Claimants as proof of the close commercial ties they entertained with MSC had been concluded solely for the purpose of responding to the call for bids and ended with the signing of the Concession Agreement.[91] The Respondent also emphasizes that Getma International was the only company to respond to the call for expression of interest, to the exclusion of its "joint and several partner" (which implied, according to the regulations of the call for bids, that it could not submit a joint bid with its partner, either) and notes that Mr. Quérel provided contradictory explanations in the absence of a joint bid.[92] . The Respondent contends moreover that MSC did not play the slightest role in the execution of the Concession Agreement, contrary to the joint execution which Getma International's bid presented as a (technical and financial) asset[93]. The Respondent concludes on this point that the cooperation between the Nécotrans group and MSC was false, pointing out (i) that the precise analysis of the alleged technical partnership contract reveals that in fact it had been concluded only to support the Claimants' bid and that it contained no commitment on MSC's part for the execution, given that the agreement covered only the period of the call for bids and expired at the end thereof, (ii) the total absence of MSC's intervention in the execution of the concession, as MSC and Nécotrans in fact entertained only limited commercial relations in 2005 and 2006,

---

[88] Dupl. §§ 94-104.

[89] C-Mem. §§ 107-123; Dupl. §§ 107-108

[90] C-Mem. §§ 107-123.

[91] Dupl. §§ 109-112.

[92] Dupl. §§ 113-120.

[93] Dupl. §§ 121-131.



and (iii) the simple share in Getma International's capital which did not make MSC a partner for the execution of the Concession Agreement, a share which ended up being sold by MSC.[94]

- the absence of a certificate of financial capacity which was a condition of the admissibility of the bid and, in any event, an essential criterion for evaluating the file; instead, the Claimants presented documents describing their good relations with their banks, but not their real financial or borrowing capacities.[95]

- false financial information in their business plan, over-estimating the project's profitability and the fees it could pay to Guinea.[96.]

c.   Getma International's failure to make the investments stipulated in the Concession Agreement, which would confirm that the Claimants did not have the financial capacities to perform the contract and that only corruption can explain the fact that they were the successful bidders.[97]

117.   This issue of the Claimants' failure to perform the contract (due in particular to their lack of auto-financing capacity) is presented in conjunction with several points:

- The execution deadlines, even taking into account the postponement under Additional Clause no. 1, had not been respected on the date of the Termination Decree.[98] Thus, phase 2 of the project concerning the new CT represented 97% of the total amount of the investments and was the object of no progress on the part of the Claimants.[99] And yet, the investments were to be made during the first two years of the concession.[100] In its Replication, the Respondent responds to the Claimants' argument that the work could not begin until the warehousing platform was available (which occurred on March 23, 2010); it states (i) that Additional Clause no. 1 contained the new status of the calculation of the time frames without the availability of the platform having any influence, and (ii) that the availability of the platform was in any event not necessary for the Claimants to begin their work, primarily for the construction of the new CT.[101]

- On January 14, 2011, during a meeting with representatives of the Transport Ministry and the APC, Getma International was unable to say whether it was able to finance the work.[102].

- The Respondent considers that the Claimants concealed their financial incapacity to meet the necessary investments, for example, during the negotiations of Additional Clause no. 1 and during the period preceding the termination of the Concession Agreement, and even lied to Guinea, by stating on several occasions that they had the necessary financing although that was not the case.[103] . This incapacity was obvious however. In particular, the total investment program represented €92.7 million; the Claimants had executed €15 million and €77.7 million

---

[94] Dupl. §§ 132-158.

[95] C-Mem. §§ 124-138.

[96] C-Mem. §§ 139-144.

[97] C-Mem. §§ 145-214; Dupl. §§ 159-160.

[98] C-Mem. §§ 152-158.

[99] C-Mem. §§ 149-151.

[100] C-Mem. §§ 152; Dupl. §§ 161-166.

[101] Dupl. §§ 167-180.

[102] C-Mem. §§ 159-164. The Arbitral Tribunal notes that the Claimants consider that this meeting was purely technical and was not supposed to tackle financial issues] (Mem. §§ 301-302).

[103] Dupl ; §§ 205-216.



therefore remained which the Claimants could provide neither with their own funds, nor with outside financing (or by loan agreements, or on the basis of a project financing) within the deadline granted for executing the agreement.[104]

- The Respondent questions the sources of financing mentioned by the Claimants, stating that they were purely speculative or inaccessible to the Claimants. In response to the affidavit filed by Mr. Grégory Quérel for the Claimants, the Respondent also emphasizes the following: (i) no dedicated funding existed despite the six requests made by the Claimants, because the Claimants, over-indebted, could provide no guarantee to the banks (Dupl. §§ 184-189); (ii) the loan agreement advanced by the Claimants was aimed solely at refinancing the debt of the Nécotrans group and could not be used to finance the Conakry investments as stipulated in the contract (Dupl. §§ 190-195); (iii) the cash balance and short term lines of credit, in addition to the fact that it is very unusual to use this type of financing for long-term investments, were in fact negative at the end of 2010, and all future cash flow was purely hypothetical (Dupl. §§ 196-200); (iv); similarly, and lastly, a participation in the financing of the concession by shareholders or third party partners, such as MSC or Maersk, was entirely speculative, given that MSC never participated in the investments and that Maersk's participation was hypothetical (Dupl. §§ 201-204);

118. The Respondent contends that Getma International's investment is vitiated not only by corruption, but also by fraud due to the all statements made by Getma International regarding the essential elements of its bid, either by providing misleading information regarding its technical and financial capacity, by invoking an alleged partnership with the MSC group, and by producing a fictive affidavit of financial capacity.[105] According to the Respondent, Getma International's lie concerning its partnership with MSC permitted it first of all to get through the preselection stage without having the required experience, as Mr. Quérel acknowledged for that matter during his examination.[106] The deceit regarding the purported partnership continued until the moment of the bid, which contained MSC's references and the financial statements of Europe Terminal, which implied that Getma was acting in a partnership with MSC, while subsequently the nonexistence of this partnership was in fact apparent in MSC's failure to intervene in the execution of the Concession Agreement.[107] The consequence of the fraudulent obtaining of the concession was Getma International's failure to finance the investments which it had undertaken to finance under the contract.[108] These fraudulent tactics are contrary to the Guinean laws governing fraud, the general principles governing public contracts and the obligation to invest in the respect of Guinean laws.[109]

119. In a subsidiary capacity, the Respondent is requesting that, if the Arbitral Tribunal were to declare that it entertained jurisdiction, it rule that the requests are inadmissible due to the illegality of the investment.[110]

120. Lastly, in an infinitely subsidiary capacity, the Respondent asks that the Arbitral Tribunal reject the Claimants' request, because resorting to illicit acts in order to obtain the agreement warrants the early termination thereof, without indemnification, as the Tribunal did in the *Azinian versus Mexico* case, in which the investors were denied indemnification for the

---

[104] C-Mem.§§ 171-213; Dupl. §§ 161,165.
[105] Mem. AAR §§ 139-140.
[106] Mem. AAR §§ 144-163.
[107] Mem. AAR §§ 164-201.
[108] Mem. AAR §§ 215-235.
[109] C-Mem. §§ 242-244
[110] C-Mem. § 245-254: Dupl. §§ 230-233.



termination of the Concession Agreement, which had been signed on the basis of false statements.[111]

**(2)   The Tribunal does not entertain jurisdiction to rule on the effects of termination, the loss of profit and the additional prejudice resulting from the Termination Decree, due to the decision on jurisdiction of December 29, 2012**

121.   The Respondent considers furthermore that the Tribunal lacks jurisdiction to rule on the effects of the termination of the Concession Agreement, including the loss of profit and additional counts of prejudice resulting from the Termination Decree, due to the application of the decision of the Arbitral Tribunal regarding jurisdiction of December 29, 2012.[112]

122.   The Respondent contends that the Arbitral Tribunal made a clear distinction between the effects of the termination of the agreement, and the effects of the requisition of the worksite equipment. The Tribunal declared that it entertained jurisdiction only regarding the effects of the requisition of the worksite equipment, and the other violations of the Code, to the exclusion of the effects of the termination of the Concession Agreement. It adds that the CCJA Tribunal alone entertained jurisdiction to rule on the effects of the termination of the agreement.[113]

123.   Consequently, the Respondent considers that the Tribunal does not entertain jurisdiction to indemnify the Claimants for:

- Prejudice for loss of profit, which is the result solely of the termination of the Concession Agreement, because it corresponds to the profit which one party would have made had the contract been performed to term, established at the amount of 103,031,250 euros by the Claimants.[114]

- The additional prejudice resulting from the termination of the agreement, as acknowledged on several occasions by the Claimants, for an amount estimated at €1,058,202, concerning the costs of repatriating the requisition equipment, the crisis management costs and the wages of two persons for a given period of time.[115]

124.   In its Replication, the Respondent contends that the distinction between the contractual and extra-contractual effects of termination, such as argued by the Claimants, is pure fiction and was never made by the Tribunal in the decision regarding jurisdiction. It also considers that such a distinction has no meaning in this case because the alleged violations of the Investment Code resulting from termination were contractualized under article 32.5 of the Concession Agreement.[116]

125.   It also contends that the loss of profit is a damaging consequence of termination for which indemnification is explicitly stipulated under article 32.5 which refers to the indemnity of article 32.3, including that for loss of activity, which therefore falls into the framework of the agreement, and not into the jurisdiction of the Tribunal. The Respondent adds finally that "the

[111] Dupl. § 2324-240 and in particular *Robert Azinian, Kenneth Davitian, and Ellen BACA versus the United States of Mexico*, ICSID ARB(AF)/97/2, Award, Nov. 1st, 1999 (R-133).
[112] Dupl. § 51 ; Mem.AAR §§ 19 and the following
[113] C-Mem. §§ 258-262.
[114] C-Mem.§§ 263-273.
[115] C-Mem. §§ 274-290.
[116] Dupl. §§ 3-9, 37-41.



issue of determining whether the Claimants could request indemnification for loss of profit for an amount exceeding that of the all-inclusive indemnity for termination is an issue pertaining to the application of article 32.5, which falls into the scope of the exclusive jurisdiction of the CCJA Tribunal as emphasized by the Tribunal".[117]

**(3)     Article 32.5 of the Concession Agreement constitutes a contrary agreement, such as acknowledged in a decision on jurisdiction, and the Claimants' position regarding its non-applicability comes up against the principal of estoppel**

126.   According to the Respondent, the Arbitral Tribunal has already acknowledged in its decision regarding jurisdiction that Article. 32.5 of the Concession Agreement constitutes an agreement which is contrary (as per article 28.2 of the Investment Code) to the jurisdiction of an ICSID Tribunal (in favor of CCJA Arbitral Tribunal) and that this provision concerns the consequences of termination, as caused by an act of the Public Authorities (such as defined under the agreement)[118]. In its Replication, the Respondent refutes the Claimants' allegations regarding the alleged non-applicability of such a contrary agreement in the case at issue, and specifies that the Tribunal necessarily applied the contrary agreement contained in the Concession Agreement when it declared that it lacked jurisdiction to rule on the effects of termination[119]. Consequently, the Tribunal does not entertain jurisdiction to rule on a substantial portion of the requests presented again at this stage by the Claimants.

127.   Furthermore, from the very outset of the litigation, the Claimants always contended that the termination of the agreement was based on article 32.5 and that it carried entitlement for the Concessionary to the indemnities stipulated in article 32.3[120]. Furthermore, Getma International sent the two notices referred to in article 32.5 to the Grantor to avail itself of the termination procedure stipulated in this article. The Claimants based their argument exclusively on this same provision in the CCJA arbitration, asserting that the indemnifications referred to in article 32.3 were due independently of the issue of determining whether termination had occurred due to the Grantor.[121] Also their requests were always based on article 32.5, in both the CCJA arbitration[122], and in this arbitration[123], and it was only in their first brief of November 17, 2014 that the Claimants, based on a non-decisive rationale for the decision on Jurisdiction, proffered for the first time the argument that the litigation cannot fall within the scope of Article 32.5, which the Respondent considers as a "flagrant case of estoppel" characterized by poor faith.[124]

128.   Thus, the Respondent contends that the principal of estoppel prevents the Claimants from contending at this stage that article 32.5 of the Concession Agreement would not apply. Once the acceptance in international law, and in ICSID case law of the principal of estoppel has been recalled, the Respondent contends that the conditions for estoppel have been met:   (i) : the Claimants defend a thesis, which is in contradiction with the position they defended before the CCJA Tribunal and (ii) the theses are aimed at procuring a benefit for the Claimants to the

---

[117] Dupl. §§ 42-52.
[118] C-Mem.§§293-300; Dupl. §§ 25-26.
[119] Dupl. §§ 10-19, 21.
[120] C-Mem. §§ 299-316; Dupl. §§ 22, 24.
[121] C-Mem, §§ 306-316; Dupl. §§ 22-23; Mem.AAR §§ 45-52.
[122] Mem.AAR §§ 53-54 and §§ 56-62.
[123] Mem.AAR§55.
[124] Mem. AAR§§ 64-67.



detriment of the Republic of Guinea and at avoiding the parties agreement regarding the amount of the indemnification owed pursuant to the termination of the agreement.[125]

129. The Respondent specifies also that, inasmuch as the Claimants never contended before the CCJA that article 32.5 could be implemented only in the case of termination, at the Concessionary's initiative (and not by of the Grantor) and that they succeeded regarding this point, during the CCJA arbitration, and received an indemnification based on this article, the parties agree on the fact that article 32.5 applies to a termination of the Concession Agreement, even if it is caused by the Grantor. This also leads to granting exclusive jurisdiction to these CCJA Tribunal to rule on the effects of such termination.[126]

**(4)    Waiver and *res judicata***

130. The Respondent considers that the requests concerning (i) loss of profit, (ii) the prejudice caused by the requisition and (iii) the additional prejudice resulting from the Termination Decree, are inadmissible because they have already been brought before the CCJA Tribunal which ruled on them in its award of April 29, 2014.[127]

131. The request concerning the prejudice "resulting [from] the loss of the future income of the concession" was granted by the CCJA Tribunal for the amount of €20,884,966. According to the Respondent, this indemnification is "designed to compensate for the loss of activity" such as referred to in article 32.3 of the Concession Agreement, "in other words, the loss of profit, and covers the entire amount of the indemnification owed in the event of expropriation, as the parties limited the amount thereof under the contract".[128]

132. The Respondent also specifies the following:

- *the request concerning the "cost of repairing the requisitioned operational equipment" was submitted to the CCJA Tribunal under the term "cost of repair". Whereas, Getma did not produce proof of the causal link between the damage ascertained and the requisition, the CCJA Tribunal rejected this request.*

- *The request concerning the "prejudice corresponding to stocks not restituted" was submitted to the CCJA Tribunal under the term "stocks". The CCJA Tribunal acceded to this request.*

- *The request concerning the "prejudice pertaining to the land services performed prior to the requisition, but not invoiced" was submitted to the CCJA Tribunal under the term "indemnity for invoices not yet issued." The Tribunal rejected this request on the grounds that the prejudice was not established.*

- *The request concerning the "costs of repatriating the requisitioned operational equipment" was submitted to the CCJA Tribunal under the term "repatriation costs". Whereas these costs are the consequence of termination and not of the requisition, and whereas they were therefore included in the indemnification of article 32.3 already granted to Getma, the CCJA Tribunal rejected this request.*

- *The request concerning "crisis management costs" was submitted to the CCJA Tribunal under the term "indemnification for expenditures linked to crisis management". Whereas*

---

[125] C-Mem.§§ 321-332
[126] C-Mem. §§ 317; Dupl. §§ 27-35.
[127] C-Mem.§§ 379-384.
[128] C-Mem. § 380.



*these costs were included in the indemnification of article 32.3 already granted to Getma, the CCJA Tribunal rejected this request.*

- *The request concerning the "wages of two employees during the period of inactivity which followed the Termination Decree" was submitted to the CCJA Tribunal under the term "indemnification corresponding to repatriated personnel". The Tribunal rejected this request on the grounds that the prejudice was too indirect to warrant indemnification.[129]*

133. Consequently, the principal of *res judicata* would warrant, according to the Respondent, this Tribunal's rejection of the complaints concerning the loss of profit, as well as the additional prejudice resulting from both termination and requisition.

134. The Respondent recalls the debate concerning the legal conditions of the principle of *res judicata* in arbitration (identity of parties, identity of the litigation, identity of the purpose of the requests, identity of cause, identity of the damaging events) and asserts that they have all been met in the case at issue.[130]

135. As regards the identity of the parties, it emphasizes that Getma International was party to the two arbitrations, so that even if, inasmuch as the other Claimants were not formally party to the CCJA arbitration, "the very close ties they entertained with Getma International permit one to ascertain without difficulty the parties' identity also as far as they are concerned."[131]

136. Concerning identity of purpose, Guinea considers that the Claimants are presenting "to two Tribunals requests concerning the same events and the same damages, modifying only the label". It adds that "all of these requests, presented to the CCJA Tribunal, then to the ICSID Tribunal, are based on the same events: termination and requisition" and that "only the formal counts of prejudice (contractual indemnification/indemnification for expropriation) were modified". [132] In support of a comparative chart, the Respondent asserts that both the amounts claimed and the counts of prejudice are strictly identical before the two Arbitral Tribunals.[133]

137. In its Replication on the issue of loss of profit, in particular, the Respondent contends that the artificial withdrawal of this argument before the CCJA Tribunal had no impact; it indeed uses article 32.3 to grant it damages, as said article grants damages precisely for the prejudice of loss of profit.[134] Regarding the prejudice linked to the requisition (presented by the Claimants as unrelated to termination and the CCJA procedure), the Respondent emphasizes that even before the CCJA Tribunal, the Claimants submitted requests for indemnification divided into several counts of prejudice the generating event of which was not termination, but rather requisition (repair, redemption of stocks, repayment of invoices not yet issued).[135]Therefore, according to it, identity of purpose indeed exists.

138. Concerning the identity of the damaging events, it explains that the requests presented are in any event chargeable to the same damaging events, namely termination and requisition.[136]

---

[129] C-Mem. § 383.
[130] C-Mem. §§ 390-394.
[131] C-Mem. § 396.
[132] C-Mem. §§ 418-420.
[133] C-Mem. § 422.
[134] Dupl. §§ 312-319.
[135] Dupl. §§320-325
[136] C-Mem. §§ 423-435.



139. The criterion of identity of cause calls for further developments on the Respondent's part. It contends that identity of cause is not necessary for *res judicata,* as long as there is identity of purpose and identity of parties and quotes several arbitral awards to this effect.[137] Furthermore, in support of numerous doctrinal comments and international awards, it considers that, if one party modifies the basis or *"instrumentum"* of a given action artificially, or requalifies its requests, the principle of *res judicata* must apply to avoid that the same case be tried twice.[138]

140. In the case at issue, the Respondent contends that the Claimants simply and artificially modified the cause of their action (contractual basis before the CCJA Tribunal, legal basis with the Investment Code before this Tribunal) in order to have the same events retried and obtain damages for the same prejudice[139]: (i) for a certain period of time at least, the Claimants had presented all of their requests (including those concerning expropriation) before the CCJA Tribunal, then withdrew them after having begun the ICSID procedure, (ii) and they then brought the same requests before this Tribunal (on the effects of termination and the requisition) by simply changing the legal basis (Investment Code and no longer the Concession Agreement). This leads the Respondent to conclude that the Claimants waived certain requests when they were withdrawn from the CCJA action. More specifically, it concluded that, if the Claimants considered that the all-inclusive indemnification of Article 32.3 of the Agreement covered only a portion of the prejudice, it was indeed in the CCJA arbitration proceedings that the request for full damages should have been made on the basis of the Agreement. By failing to do so, the Claimants waived the right to do so.

141. The Respondent reiterates on several occasions that the distinction between *treaty claims/contract claims* repeated by the Claimants is not relevant here because it does not permit damages for the same prejudice twice and does not prevent the application of the principle of *res judicata,* and this even if the first award is the subject matter of action for annulment[140]. The artificial changing of the basis for the requests before the CCJA Tribunal, precisely to be able to argue artificially that the ICSID entertains jurisdiction, changes nothing regarding the fact that the underlying counts of prejudice have already been indemnified.[141] . It alleges that, when "two Tribunals have been called upon to examine the same damaging event and when indemnification has already been awarded by the first Tribunal, the principal of *res judicata* prohibits a request for a second indemnification for the same deeds, regardless of the legal basis of the Tribunal's jurisdiction".[142] Thus, the Tribunal must give emphasis to the merits rather than the form.[143]

*In concluding the Concession Agreement, the parties knowingly contractualized treaty claims – via Article 32.5 –when termination is consecutive to expropriation...*

---

[137] C-Mem. §§ 438-443.

[138] C-Mem. §§ 444-457

[139] C-Mem. §§ 458-487 ; Dupl. §§ 337-347.

[140] Dupl; §§ 329 (by reference to the *Rachel S. Grynberg, Stephen M. Grynberg, Miriam Z. Grynberg and RSM Production Corporation versus Grenade* case, ICSID no. ARB/10/6, Award, Dec. 10, 2010

[141] Dupl. §§ 306-311; §§ 328-336; §§ 337-347.

[142] Dupl. § 309.

[143] Dupl. §§ 344-345

*Indeed, the CCJA Tribunal entertained jurisdiction over the requests concerning expropriation which are traditionally qualified as "treaty claims" because they are contained in a law or a BIT, but in this case they fall within the scope of the Agreement's arbitration clause because they were "contractualized" by will of the parties. In the end, the mechanism of article 32.5 of the Agreement functions, so to speak, as a reversed umbrella clause.*[144]

142. Lastly, the Respondent adds that, as long as the procedure for the annulment of the CCJA award which it initiated is pending, the CCJA award retains authority of *res judicata* and it is therefore not contradictory to request the application of the principle of *res judicata* to the case at issue.[145]

## (5) The alleged denial of justice following the annulment of the award

143. The Respondent did not have the opportunity to react to the arguments derived by the Claimants in their Post-Hearing Memorial from the annulment of the CCJA award (see chapter V.B (5) below). However, it broached the topic following the letter of December 21, 2015 in which the Claimants called into question the independence and impartiality of the CCJA whose annulment decision they qualify as "an unequivocal reminder that this [ICSID] Tribunal constitutes the last bastion separating the Claimants from denial of justice". The Respondent highlights the fact that the Claimants did not raise the topic of the decision, at the hearing in this arbitration of November 23-25, 2015 and defends the procedure and the CCJA decision. It denies any denial of justice, given that Getma International retains the possibility of filing a new procedure under the aegis of the CCJA.[146]

## B    *The Claimants' position*

## (1) The Tribunal entertains jurisdiction *ratione materiae* because the investment is legal

144. The Claimants consider that the Concession Agreement was obtained in a due manner, as the alleged fraud does not exist and has not been proven by the Respondent, who bears the burden of proof.[147] Given that there was neither corruption nor fraud in the obtaining or maintaining of the Claimants' investment, this investment is legal (contrary to the investment in the *Inceysa* case) and the requests are admissible. They consider that these proceedings were already settled during the phase concerning jurisdiction and that the decision of December 29, 2012 in which this Tribunal declared its jurisdiction implies that this procedure is henceforth at the "merits" stage, as the Respondent had ample opportunity during the preceding jurisdiction phase to plead this Tribunal's lack of jurisdiction.[148] They specify moreover that the allegations of corruption were analyzed and rejected by the CCJA Tribunal.[149]

145. Concerning more specifically the allegations of corruption, the Claimants contend, in the first place, that the burden of proof of corruption is borne by the party invoking it, and that allegations of corruption require a particularly high level of proof.[150] Thus, the Respondent cannot merely present a body of evidence to prove corruption. The Claimants base their

---

[144] Dupl. §§ 334-335.
[145] Dupl. §§ 302-305.
[146] Mem.AAR §§83-93
[147] Repl.§§ 8-308.
[148] Repl. §§ 309-329.
[149] Repl. §§ 36-38, 91-99 and 326.
[150] Repl.§§ 18-55



argument in this respect on the *Siag and Vecchi versus Egypt[151]*, *Saba Fakes versus Turkey[152]*, *Fraport versus the Philippines[153]*, *Africa Holding versus DRC[154]*, *TSA versus Argentina[155]*, *SPP versus Egypt[156]*, *EDF versus Romania[157]*, *International Thunderbird Gaming versus Mexico[158]*, *Wena Hotels versus Egypt[159]* cases to maintain that any allegation of corruption, given its seriousness, requires a high standard of proof.[160] And yet, the Respondent has not produced the slightest concrete, objective evidence. The Claimants add that "Guinea not only did not take any measures against the persons whose passive corruption it is alleging, but it also promoted (as we shall see further down) some of the most important players, according to its statements, in the alleged implementation of the corruption".[161]

146. The Claimants then review the three affidavits presented by the Respondent (those of Messrs. Steven Fox, Demba Kourouma and Ibrahima Lamizana Condé) to contest the value thereof as evidence.[162] . They consider first of all that the information presented by Mr. Fox is indirect and is based on no verifiable document or testimony.[163] They also question Mr. Fox's credibility, referring to his testimony in the CCJA case and certain affirmations he made which they consider to be false, for example those regarding the sums paid to the Guinean civil servants which are allegedly in contradiction with the sums mentioned in the testimony of Messrs. Kourouma and Condé.[164]

147. The Claimants then deem that the affidavits of Messrs. Kourouma and Condé in which they "incriminate themselves," are not accompanied by evidence, were drafted following the lapsing of the period of limitation, and that they were made by persons who have never been the subject matter of sanctions in Guinea (Mr. Kourouma was even promoted on a later date). These persons supposedly received funds from Mr. Mamadou Diallo, who never worked for one of the Claimants; they therefore cast doubt on the fact that these persons effectively committed acts of passive corruption. The Claimants also emphasize that the CCJA Tribunal decided, in December 2013 and in January 2014, not to extend the debates to permit Guinea to present new evidence of corruption and, in its award, that the proposed affidavits, like Mr. Steven Fox's affidavit, did not permit one "to attribute the slightest relevance to the particularly serious grievance of corruption".[165]

---

[151] *Waguih Elie George Siag and Clorida Vecchi versus the Arab Republic of Egypt,* ICSID ARB/05/15, Award, June 1st, 2009 (C-321).

[152] *Saba Fakes versus the Republic of Turkey,* ICSID ARB/07/20, Award, July 14, 2010 (C-322).

[153] *Fraport AG Frankfurt Airport Services Worldwide versus the Republic of the Philippines,* ICSID ARB/11/12, Award, December 10,2014 (C-323).

[154] *African Holding Company of America, Inc. and Société Africaine de Construction au Congo SARL versus the Democratic Republic of Congo,* ICSID ARB/05/21, Award, July 29, 2008 (C-324).

[155] *TSA Spectrum de Argentina SA versus the Republic of Argentina,* ICSID ARB/05/5, Award, Oct. 19, 2008 (C-325).

[156] *Southern Pacific Properties (Middle East) Limited versus the Arab Republic of Egypt,* ICSID ARB/84/3, Award, May 20, 1992 (C-326).

[157] *EDF (Services) Limited versus Romania,* ICSID ARB/05/13, Award, Oct. 8, 2008 (C-327).

[158] *International Thunderbird Gaming Corporation versus United States of Mexico,* UNCITRAL, Award, Jan. 26, 2006 (C-328 and C-329).

[159] *Wena Hotels Limited versus the Arab Republic of Egypt,* ICSID ARB/98/4, Award, Dec. 8, 2000 (C-253).

[160] Repl. §§ 18-55.

[161] Repl. §§ 51,72 , 88.

[162] Repl.§§ 57-90.

[163] Repl. § 60

[164] Repl.§§61-74.

[165] Repl. §§ 75-90.

148. The Claimants then contend that the "signs" of corruption, such as presented by the Respondent, have no value as evidence.[166]

149. The first sign is the generalized nature of corruption in Guinea, which, according to the Claimants proves nothing in the case at issue. Furthermore, the political crisis of 2008-2010 mentioned by the Respondent did not truly begin until December 2008, with the death of President Lansana Conté, several months after the awarding of the Concession in August 2008.[167]

150. In the second place, the Claimant analyzed the allegations that the Commission in charge of selecting the Concessionary detected serious flaws and irregularities in Getma International, but "nonetheless allegedly deliberately overlooked them because of a bribe from the Claimants", thereby proving that only corruption could explain the choice of Getma International as Concessionary.[168]

151. Regarding the partnership between MSC and the Necotrans group[169]

   - MSC and Necotrans entertained close partnership ties under a Technical Partnership Agreement which represented what was almost an equal share in Getma International's capital. From 2006 to 2010, NCT Necotrans owned only 50.02% of the capital of Getma International; a company in the MSC group owned the remaining 49.98%.

   - Pursuant to its real partnership with MSC and after ascertaining that only Getma International had been allowed to submit a bid, the response to the call for bids was officially filed by MSC alone, although it was a joint bid.

   - Relinquishment of the idea of presenting a bid for the Concession as a joint and several group changed nothing in terms of the partnership, which always existed and was not at all limited to the technical partnership agreement. The only reason for which the *Memorandum of Understanding* which is the basis of this general partnership, could not be produced in this arbitration is the fact that MSC was opposed thereto, although MSC's letters of March 5, 2008 and April 10, 2013 confirmed the existence thereof[170].

152. Regarding the use of MSC's references:

   - The Claimants contend that the response to the invitation for bids was of a quality on a par with projects they had already carried out in other countries, and that the projects MSC had carried out were clearly identified. Furthermore, the Evaluation Commission understood well that certain references included in the bid belonged to other groups.[171] One of Getma International's witnesses, Mr. Sory Camara, confirmed before the CCJA Tribunal that the

---

[166] Repl. §§ 125-294.
[167] Repl. §§ 129-132.
[168] Repl. §134
[169] Mem. §§ 381-384; Repl. §§ 152-181
[170] Mem. AC §§ 243-267.
[171] Repl. §§ 136-151



Commission was aware that a significant portion of the experience claimed by Getma International was that of MSC.[172]

- The Claimants pointed out the contradiction in the call for expression of interest which targets, on the one hand, "undertakings with solid experience in the management of Container Terminals", and, on the other hand, "targets exclusively candidates with long, solid experience in the design, financing, realization, operation and maintenance of Container Terminals"; they acknowledge that Getma International did not have this second form of experience, but affirm that "it had designed, financed, operated, realized, maintained port operations, dedicated areas or areas suitable for containers, but also other for other types of goods"; they consider lastly that if Getma International had not been pre-selected, it would have been discriminated against in relation to its competitors, Afrimarine/TCB and Bolloré, who lacked the experience in the design, financing and realization of Container Terminals.[173]

153. Regarding the Claimants' financial capacities[174]

- The Claimants admit that the financial certificate produced in their application file did not strictly fulfill the formal conditions required, but they deny that the consequence of this situation should be the exclusion of a bidder in accordance with the rules which apply.

- They add the following: (i) the commission had taken into account, in its evaluation note, the fact that the certificate did not correspond to the model provided, (ii) the Claimants have access to a banking pool for their financing and therefore indeed met the conditions of financial soundness imposed, and (iii) the faulty termination of the Concession Agreement is the reason for which the Claimants were "prevented" from proving their financial capacities.

- The errors in the business plan were not deliberate and had no influence on the Commission's choice; in any event, they concern a related activity which was not included in the perimeter of the activities of the Concession.

- If there was an alleged "passivity" on the part of the Commission, it can be explained by its lack of experience, as was acknowledged by a witness for Guinea in the framework of the CCJA procedure.

154. Regarding Getma International's alleged failure to make the investments stipulated in the Agreement, which, according to the Respondents, proves the weakness of its file and therefore the corruption in the selection process:

- The Claimants admit that the work of phase 2 was to be performed over a total period of two years, but they allege that this work was not scheduled to begin until eleven months after the entry into force of the Concession Agreement, once the work of phase 1 had at least progressed well.

- The delay concerning phase 2 of the timetable is chargeable to Guinea, which delayed the effective entry into force of the agreement and the delivery of a platform which was

---

[172] Mem. AAC § 239.
[173] Mem.AAC§§ 221-231.
[174] Mem. §§ 385-392 and the following: Repl. §§ 182-225.



32

necessary for the unfolding of the work; it therefore in no manner corresponds to a contractual failure on the Claimants' part.[175]

- If Europe Terminal did not provide services pursuant to the Concession Agreement, MSC nonetheless intervened in the execution thereof via other subsidiaries.[176]

155. The Claimants contend also that the execution of the Agreement was unfolding normally on the date of termination: the construction work on the existing Container Terminal was almost complete, as was the work on the rail connection, and the studies for the extension of the Container Terminal were completed.[177]

156. After having refuted the allegations of corruption, the Claimants re-assert that the reasons for which their proposal had been selected by the Commission was simply that it was the best one[178]:

- Even before the National Commission entered into the game, the APC itself had pre-selected the Necotrans group and had allowed it to submit an adjudication file.[179]

- Experience and references from prior projects, as well as the financial capacity (presented by the Respondent as the two major weaknesses of the Claimants' file) were only two criteria, among others. In any event, the Claimants consider that they indeed satisfied these two criteria[224].

- Among the major criteria, the Claimants refer to the financial conditions (entry ticket and fees) which were more advantageous for Guinea, than the terms of the Bolloré group's proposal.[181]

157. Lastly, the Claimants assert that Guinea's only witness in the CCJA procedure confirmed during his deposition, "not only... that the Concession Agreement had been terminated for the sole purpose of granting it to Bolloré, without respecting the contractual procedure and notice period, but also acknowledged that the invitation for bids, following which Getma International had been declared as the successful bidder was properly conducted."[182]

**(2)  The Tribunal entertains jurisdiction to rule on the effects of termination, the loss of profit and the additional prejudice resulting from the Termination Decree.**

158. The Claimants consider that termination amounts to expropriation under international law, and that consequently, the Tribunal entertains jurisdiction to rule on its entire prejudice pursuant to the Code. They consider that the CCJA Tribunal granted indemnification only for

---

[175] Mem. §§ 399-411; Repl. §§ 226-254.

[176] Mem. AAC §§ 268-285.

[177] Mem. §§ 255-293, summary of the work performed on the date of termination in § 293. Regarding this precise point, the Respondent contends that the work concerning the new CT (and not the former one) represented 97% of the total amount of the investments and had not been commenced by the Claimants (see § 102).

[178] Repl. §§ 255-294.

[179] Repl. §§ 259-262.

[224] Repl. §§ 265-275.

[181] Repl. §§ 278-286.

[182] Repl. § 288



the contractual consequences of termination; termination was so serious that it could not fall into any contractual framework which was subject to the jurisdiction of the CCJA arbitration.[183]

159.   The Claimants contend the following:

- *There were two acts on the part of the Public Authorities (requisition and termination, even if the latter act is disguised as the simple termination of the contract for breach thereof), which constitute a double violation of the Investment Code and of Customary International Law.*[184]

- *Like the requisition act, the termination act also "entailed damaging consequences other than (those of) the termination of the Agreement.*[185]

- *The contractual consequences of termination have already been appreciated by the CCJA Tribunal. This Tribunal must therefore appreciate (regarding the termination act) the "other" "damaging consequences" of Guinea's violations of the Investment Code and of Customary International Law*[186].

- *The loss of profit is not in casu a contractual consequence of the termination of the contract, but a consequence of the breach of the Investment Code, resulting from an illegal expropriation act taking on the appearance of the termination of a contract*[187].

160.   The Claimants consider that, "because the Termination Decree is not included in the provisions of article 32.5 of the Agreement, "and consequently is not "contractualized"), it can and must be appreciated by this Tribunal which entertains jurisdiction in its turn to examine the effects of the breach of the Investment Code and not to rule on the contractual effects of the Termination Decree".[188]

**(3)   Article 32.5 of the Concession Agreement as a contrary agreement**

161.   The Claimants consider that "in the case at issue, the issue is to appreciate here the legal consequences which an act terminating a contract, carried out not in the framework of contractual relations, but in the exercise of public authority, implies in terms of indemnification.[189] And this Tribunal has already declared that it entertains jurisdiction to perform such an analysis and to rule on the possible breaches of the Investment Code entailed by the act of termination and the act of requisition.[190]

162.   Thus, the Claimants contend that there is no "contrary agreement" between the Parties aimed at not applying the Investment Code, or the arbitration mechanism stipulated therein.  They consider that this Tribunal accepted to rule on the issue of *lucrum cessans* in the event that the CCJA Tribunal did not consider that this issue could be brought before it, and they recall that

---

[183] Repl. §§ 330-397.
[184] Repl. § 335.
[185] Repl. § 336.
[186] Repl. § 337 ; Mem. AAC § 21
[187] Repl. § 340.
[188] Mem. AAC § 29.
[189] Repl. §§ 343-344.
[190] Repl. §§ 362, 364; Mem. AAC §§ 21-29.



this latter Tribunal refrained from ruling in this respect "on pain of being qualified as *ultra petita*".[191]

163. The Claimants affirm also that it was the Tribunal – and not they – who, in its Decision on Jurisdiction, decided that Article 32.5 did not apply to the case at issue, because termination occurred at the Grantor's initiative and not that of the Concessionary.[191]  They reject the Respondent's arguments concerning Article 32.5 of the Agreement and contend the following:

- Article 32.5 of the Agreement applies only if the Concessionary has terminated the contract.[192]

- In the case at issue, the Termination Decree does not even constitute a *"fait du prince"* [government action] due to its illegality, as expropriation is not in the public interest, and was carried out without just, adequate indemnification;[193]

- To be covered by article 32.5, termination must follow an act of the Public Authorities, not in the sense of "succession", but "chronologically subsequent to"; this reading is confirmed by articles 32.6 and 32.7, which stipulate termination "consecutive" to a lack of foresight and a case of *force majeure* respectively, and in which termination necessarily follows the *fait du prince* or *force majeure*. And yet the Termination Decree immediately terminated the Agreement, and there was no subsequent termination.[194]

164. Regarding the precise point of estoppel, the Claimants acknowledge that in their notices to Guinea, they refer to article 32.5 of the Concession Agreement inasmuch as no other clause more applicable to their situation existed, and for the sole purpose of protecting their rights[195]. They consider that the damages which they claimed pursuant to article 32.5 correspond only to a portion of the prejudice sustained (the contractual effect of termination) and that their requests in this case are broader and concern the breach of the Investment Code and International Law (the extra-contractual effect of termination).

165. According to the Claimants therefore, there is no cause to apply the principle of estoppel because "the breach of the Investment Code, based on expropriation, is not to be confused with breach of contract, based on article 32.5 of the Concession Agreement".

166. The Claimants consider that by now acknowledging that Article 32.5 "was not the most suitable in the extraordinary legal circumstances" and that "the situation at issue was not provided for in Article 32.5", their resorting to the ICSID arbitration procedure does not violate the principle of good faith or fall within the notion of estoppel, but constitutes the simple respect of the decision of the Arbitral Tribunal.[197]

---

[191] Mem ; § 37 ; Repl. § 357; Mem. AAC §19.

[192] Mem; AAC§19.
[193] Mem. AAC §§ 40-59.
[194] Mem.AAC §§ 60-68.
[195] Repl. §§ 372-397, the most pertinent
[197] Mem.AAC §§ 72-76.



**(4)  The defenses of *res judicata* and waiver**

167.  Lastly, regarding the defenses of *res judicata* and waiver raised by the Respondent, the Claimants contend that there was no waiver before the CCJA Tribunal because only the *contract claims* were presented therein, as this Tribunal on the contrary rules on *treaty/legal claims*.[198]

168.  Furthermore, they consider that the principle of *res judicata* cannot be applied in the case at issue, because the Respondent is attempting simultaneously to have the CCJA award annulled (and never had the intention of executing it) while it contends that said award prevails.

169.  They also contend that only the facts are the same, but that identity of facts does not mean identity of disputes, if the parties, the purpose and the grounds of the two litigations differ. The Claimants specify that "the issue of the analysis of the termination act has already been dealt with by the CCJA Tribunal, which decided that it had constituted a breach of the Concession Agreement. In this procedure, the Claimants are requesting that the Tribunal analyze and decide (which the Tribunal has already accepted to do) whether or not this same act of termination, as well as the act of requisition, constituted an expropriation, violating the Investment Code and customary international law."[199]

170.  According to the Claimants, two litigations therefore exist because the Termination Decree violated the contract (resulting in the contractual litigation before the CCJA Tribunal) and the Investment Code (resulting in this case). Lastly, the Claimants consider that the CCJA Tribunal never ruled on the loss of profit, or on the consequences of the requisition. Consequently, the Respondent cannot contend the existence of *res judicata*, with respect to these requests.

**(5)  The effects of the annulment of the CCJA award**

171.  In their Post-Hearing Memorial, the Claimants developed a fifth and new argument[200], based on the annulment of the CCJA award by the decision of the CCJA of November 30, 2015. They consider that following this annulment (i) Getma International's *contract claims* ceased to exist, (ii) Getma International's request that the CCJA Tribunal grant indemnification for the additional prejudice can no longer impede its request in this arbitration for indemnification for the breaches of the Investment Code and (iii) the Respondent's arguments concerning estoppel, waiver and *res judicata* ensue.[201]

**C.  *The Tribunal's Analysis***

172.  The Arbitral Tribunal clearly decided, in a separate procedure, the extent to which it considered that it entertained jurisdiction to rule on the requests which had been brought before it by the Claimants. It is recalled that this decision is an integral part of this procedure. The Arbitral Tribunal does not intend, nor could it if it wanted to, to rescind this decision.

---

[198] Repl. §§ 398-400.

[199] Repl. § 416.

[200] M.AAC §§ 77-93, Chapter II.B, p. 10 to 12, not-listed in the table of contents and not to be confused with a second Chapter II.B, which is found on pages 12 to 14 and which does appear in the table of contents

[201] M. AAC §§ 77-93.

173. The issue of jurisdiction should therefore be definitively settled. Nonetheless, the parties subsequently returned to this issue, the Respondent in order to put forth two new objections based on allegations of corruption and fraud, the Claimants in order to interpret the content of the decision on jurisdiction. The Respondent's objections will be examined under chapter (1) below, the Claimants' under chapters (2) to (5) below.

## (1)   The Tribunal's jurisdiction *ratione materiae*

174. The Arbitral Tribunal agrees with the Respondent that only legal investments, carried out in good faith, are to be protected by the ICSID arbitration, and that the Arbitral Tribunal must decline jurisdiction, if it appears that the investment was made fraudulently or as a result of corruption. Furthermore, this point is not contested by the Claimants.[202]

175. The Claimants contest however the existence of fraud or corruption and consider that the allegations of fraud and corruption warrant a particularly high level of proof. In any event, they are of the opinion that the CCJA Tribunal has already analyzed and rejected the allegation of corruption and that the Respondent can no longer invoke it, as this Arbitral Tribunal has already declared that it entertained jurisdiction in its decision of December 29, 2012.

176. This Arbitral Tribunal considers that neither of these two grounds constitutes an obstacle to an examination of the allegation of corruption.

177. First of all, concerning the decision of the CCJA Tribunal on the alleged corruption, the parties disagree on the issue of determining whether the CCJA Tribunal ruled in this respect. The CCJA award reveals that on November 4, 2013, after the hearing of May 27-29 2013, during which the witnesses and experts were questioned and after the hearing for oral arguments held on July 8, 2013, the Respondents informed the CCJA Tribunal that it had evidence pertaining to corruption. It was not until November 14, 2013, that the Respondent produced in the CCJA procedure Mr. Steven Fox's affidavit, designed to prove the alleged corruption. On December 16, 2013, the CCJA Tribunal heard Mr. Steven Fox, whose allegations it found to be unverifiable. Consequently, it denied a new extension of the procedural schedule, which according to the Respondent would have permitted the production of new evidence on the allegation of corruption, namely two additional affidavits by Messrs. Demba Kourouma and Ibrahima Lamizana Condé acknowledging the deeds of corruption and dated December 13, 2013. The Claimants consider that the requests for a four-month extension was purely a delaying tactic and no new evidence could have been produced. They contend that even in this case, the Respondent is still not able to produce evidence of corruption and they therefore do not understand how the extension of the schedule of the CCJA case could have assisted them in providing such proof.[203]

178. The Arbitral Tribunal notes that the affidavits of Messrs. Demba Kourouma and Ibrahima Lamizana Condé of December 13, 2013, like a third exhibit (R-34, a complaint against named persons on the counts of corruption and influence peddling, filed on December 13, 2013 by the Guinean state), were neither produced nor analyzed in the CCJA arbitration. These exhibits therefore constitute new exhibits which require that the issue of whether the investment was the subject matter of corruption be reconsidered. International public policy requires that this Arbitral Tribunal express an opinion on the serious allegation of corruption, even if another Tribunal has already considered the issue, when new evidence not analyzed by the first

---

[202] Repl ; § 311.

[203] C-Mem. §76 and Repl. §§ 96-124.



Tribunal is produced. The obligation of this Arbitral Tribunal to verify the allegation of corruption prevails over its respect of the award of the CCJA Tribunal and even over the possible *res judicata* effect of this award. This is the case *a fortiori* after the annulment of the CCJA award (even if it was decided on grounds which have nothing to do with the decision of the CCJA Tribunal on corruption).

179. Secondly, the Arbitral Tribunal notes that the Respondent in this procedure raised the defense of lack of jurisdiction due to corruption and/or fraud only in its Counter Memorial of March 30, 2015, and did not raise it at all in its two memorials on jurisdiction (dated June 22 and August 6, 2012, respectively). Also, this Arbitral Tribunal rendered its decision on jurisdiction on December 29, 2012, without having had to deal with this objection. Even if, according to the Claimants, this rationale was "explicitly understood" from the outset of the CCJA procedure[204] – without the invalidity of the Concession Agreement, due to corruption being requested[205] – it was not until November 4, 2013 that the Respondent felt it could prove that. And it was not until this ICSID arbitration was resumed after its suspension while awaiting the CCJA award, that the Respondents put forth in this arbitration, the defense of corruption and produced the two affidavits of December 13, 2013, as exhibits R-35 and R-36, attached to the Counter-Memorial of March 30, 2015.

180. Even if all the grounds for lack of jurisdiction must be raised *in limine litis* and if this Arbitral Tribunal has already declared that it entertained jurisdiction in its Decision on jurisdiction of December 29, 2012, it considers that, given the public policy nature of the grounds based on corruption and fraud, it is its duty to now verify its jurisdiction from this standpoint also. In any event, even if this Arbitral Tribunal were to consider that the debate regarding its jurisdiction had been definitively closed by said decision, the allegations of corruption and fraud should be investigated, because the Respondent bases its argument on the same allegations to request in a subsidiary capacity that the requests be declared inadmissible due to the illegality of the investment, or, in an infinitely subsidiary capacity, rejected for the same reason.

a.    **The degree of evidence of corruption**

181. It is not contested that the Respondent has the burden of proof of corruption, but the parties disagree regarding the level of this proof. Both of them have quoted decisions of other courts in support of their respective positions. The Arbitral Tribunal not only verified the context in which the apparently contradictory rules were formulated by these other courts, but also each court's application of them to the facts and evidence submitted to them. This Arbitral Tribunal therefore concludes that it cannot follow the Claimants according to whom proof of corruption must be "irrefutable" in accordance with "an uninterrupted line of precedents".[206]

182. The decisions on which the Claimants rely do not support their thesis:

   - In the *Siag and Vecchi versus Egypt* case, the court specified (in the framework of its verification into whether one of the plaintiffs had obtained his Lebanese nationality by fraud) that the level of proof which applies for allegations of fraud ranges between the traditional civil law standard, i.e. the balance of probabilities, and the criminal law standard which requires that the allegation be beyond reasonable doubt. It concluded that the

---

[204] Mem ; § 372.

[205] CCJA award of May 26, 2014 (C-50) § 63

[206] Repl ; § 36.



evidence must be clear and convincing[207]. Also this court evaluated all of the alleged proof (including the clues mentioned) at its proper merit, and concluded that, in the case at issue, fraud and falsification in conjunction with the plaintiff's nationality were not proven.[208]

- In the *Saba Fakes* case, the court had to rule on the authenticity of certain certificates regarding which the defendant had suggested that they had been post-dated for the purposes of the arbitration, without nonetheless contending that they had been falsified. The defendants presented only allegations based on presumptions derived from indirect proof discussed in other arbitration proceedings[209]. Having merely ascertained that *"the burden of proof of any impropriety whatsoever is particularly heavy"*, the court concluded (without the slightest discussion or evaluation of the evidence produced) that this burden had not been met and that the dates of the transfer of the certificates mentioned by the plaintiff were correct. This Arbitral Tribunal understands the ascertainment quoted as simple justification of the court's decision that the allegation was not proven. In the absence of other specifications or clarifications, either of the principle adopted by the court, or its application of this principle to the facts and proof at its disposal, this Arbitral Tribunal considers that this decision does not offer a criterion which is relevant for this debate.

- In the *Fraport versus Philippines* case, the court considered, like the court in the first case mentioned above, that proof of corruption should be clear and convincing so that one can reasonably believe that the events occurred as alleged.[210] In this case, the court confronted an allegation that Fraport was aware of and had participated in the corruption when it had made its initial investment. Later on in the procedure, the State alleged that the *prima facie* evidence it had produced had shifted the burden of proof to Fraport and that payments to civil servants must not be proven by direct evidence, but can be proven by "circumstantial" evidence and clues. The court analyzed the evidence submitted in support of the allegations of corruption during the periods preceding and following the investment, but concluded that it did not prove that Fraport was aware of and was involved in the corruption and fraud concerning the terminal 3 project at the time it was making its investment.

- The same is true for the *EDF versus Romania* court, which demanded clear and convincing evidence, and then reviewed the evidence submitted by the investor of a civil servant's alleged request for a bribe. This evidence included the written and oral testimony of the person to whom the request had allegedly been made, but which the court ruled, along with the other evidence, was not clear and convincing.[212]

- In the *TSA* case, criminal investigations concerning the alleged corruption had been initiated and pursued in Argentina but were not yet complete at the time the Tribunal was to render its award. The Tribunal considered that corruption had not been proven by the material presented; it was open to the possibility that it be proven by the criminal investigation which was under way, but did not retain corruption as grounds for its lack of jurisdiction,

---

[207] *Waguih Elie George Siag and Clorinda Vecchi versus the Arab Republic of Egypt,* ICSID ARB/05/15, Award, June 1st, 2009 (C-321) § 326.
[208] *Waguih Elie George Siag and Clorinda Vecchi versus the Arab Republic of Egypt,* ICSID ARB/05/15, Award, June 1st, 2009 (C-321) § 3276.-359
[209] *M. Saba Fakes versus the Republic of Turkey,* ICSID ARB/07/20, Award, July 14,2010 (C-322) § 130.
[210] *Fraport AG Frankfurt Airport Services Worldwide versus the Republic of the Philippines,* ICSID ARB/11/12, Award, Dec. 10, 2014 (C-323) §§ 477 and 479.
[212] *EDF (Services) Limited versus Romania* ICSID ARB/05/13, Award, Oct. 8, 2009 (C-327) §§ 222-232.

which also existed for other reasons.[213] The Arbitral Tribunal notes that the *TSA* Tribunal did not rule in the abstract on the level of proof it required for corruption.

- As mentioned by the Claimants[214], the Tribunal in the *SPP versus Egypt* case also noted that *"the allegations concerning irregular contacts and connections are not supported by the evidence in the record and are based on suppositions, guilt by association and what [Egypt] describes as a 'commencement of proof'"*[215] . This Tribunal however did not refer to a rule concerning the level of proof required.

- The only international Tribunal which, according to the Claimants' records, required that proof of corruption be irrefutable is the Tribunal which ruled in the case of *Africa Holdings versus the Democratic Republic of Congo.* This Tribunal even specified that such irrefutable proof would be "such as that which might result from criminal prosecution in countries in which corruption constitutes a criminal violation". This expression gives the impression that the Tribunal wanted to aim at the required level of proof in criminal cases, namely beyond any doubt. In fact, however reference to this high level was gratuitous because the Tribunal considered that corruption was not proven, given that the sole allegations were based exclusively on general considerations concerning the Mobutu period and the related political events.[216]

183. This Arbitral Tribunal considers that, given that these Tribunals – to the exclusion of the latter – have described perfectly the standard of proof to be applied to corruption, even if, as the *Fraport* Tribunal acknowledged, proof can be "circumstantial" given the difficulty of proving corruption by direct proof[217]. Thus, understood correctly, the case law quoted by the Claimants does not differ substantially from that on which the Respondent relies, even if, in most of the cases quoted by the Respondent, the issue of corruption did not arise[218], but rather other, serious deeds alleged against a State or the Public Authorities. The Arbitral Tribunal however considers that the issue of determining whether the nature of the allegation demands a higher level of proof is the same for all serious allegations involving a State, whether they concern corruption or another offense. This Arbitral Tribunal therefore considers that the case law quoted by the Respondent is relevant:

- The *Metal-Tech versus Uzbekistan* Tribunal, which indeed concerned corruption, required "reasonable certainty", while accepting, as did the *Fraport* Tribunal, that proof could be circumstantial[219]. Even if, as the Claimants pointed out[220], this Tribunal did not consider it

---

[213] *TSA Spectrum de Argentina S.A. versus the Republic of Argentina,* ICSID ARB/05/5, Award, Dec. 19, 2008 (C-325) §§ 174-176.

[214] Repl. § 34.

[215] *EDF (Services) Limited versus Romania* ICSID ARB/05/13,Award, Oct. 8, 2009 (C-327) § 132.

[216] *African Holding Company of America, INC. and Société Africaine de Construction au Congo S.A.R.L. versus the Democratic Republic of Congo* ICSID ARB/05/21, Award on the denials of jurisdiction and admissibility, July 29, 2008 (C-324) § 52.

[217] *Fraport G Frankfurt Airport Services Worldwide versus the Republic of the Philippines,* ICSID ARB/11/12, Award, Dec. 10, 2014 (C-323) § 479: *The Tribunal holds that considering the difficulty to prove corruption by direct evidence, the same may be circumstantial.  However, in view of the consequences of corruption on the investor's ability to claim the BIT protection, evidence must be clear and convincing so as to reasonably make-believe that the facts, as alleged, have occurred.*

[218] Mem. AAC § 302

[219] *Metal-Tech Ltd. Versus the Republic of Uzbekistan* ICSID ARB/10/3, Award, Oct. 4, 2013 (R-54) § 243: *The Tribunal will determine on the basis of the evidence before it whether corruption has been established with*

necessary to determine which party had the burden of proof, it clearly specified - contrary to that which the Claimants would have us believe[221] - the standard of proof which it considered applicable.

- The Tribunal in the case *Tokios Tokelès versus Ukraine* rejected the two theses according to which proof of "nayizd"[222] requires a special standard of proof, either a higher one or a lower one than the usual standard; it subsequently simply required that the party concerned prove that its allegation is *"more probably correct than incorrect"*[223].

- Similarly, in the *Libananco versus the Republic of Turkey* case, the Tribunal ruled, not regarding corruption, but concerning fraud and other serious wrongdoing, that the fact that the allegation concerns a very serious deed does not suffice in itself to require a higher level of proof.[224]

- The Tribunal, sitting the case of *The Rompetrol Group N.V. versus Romania,* after having studied existing case law covering allegations of very diverse irregularities, concluded that the nature of the allegation, like the position of the person concerned, necessary influences the arbitrator in his evaluation of the evidence, but that it is the particular circumstances of the case which are determinant and which make all codification impossible.[225]

184. This Arbitration Tribunal concludes that there are no valid precedents for contending, as the Claimants do, that the level of proof required must be higher for corruption than for other deeds. Therefore, it shall verify below whether the evidence submitted by the Respondent is clear and convincing and if it can provide this Tribunal with a reasonable certainty that the Concession Agreement was obtained by the active corruption of Getma International.

**b.   The direct evidence**

185. This Tribunal considers that it is not necessary to again examine the evidence which has already been submitted to and evaluated by the CCJA Tribunal[226], consisting in:

---

*reasonable certainty* in this context, it notes that corruption is by essence difficult to establish and that it is thus generally admitted that it can be shown through circumstantial evidence.

[220] Mem. AAC § 307.

[221] In their footnote no. 185, the Claimants quote, among others, § 243 of the *Metal-Tech versus the Republic of Uzbekistan* award but omit precisely the very clear order quoted above.

[222] a concerted practice on the part of various authorities aimed at intentionally harming a private company or individual.

[223] *Tokios Tokelès versus Ukraine* ICSID ARB/12/18, Award, July 26, 2007 (R-109) § 124: *We [...] shall approach the issues on the basis that in order to prove its case on the existence and causal relevance of a nayizd the Claimant must show that its assertion is more likely than not to be true.*

[224] *Libananco Holdings Co. Limited versus the Republic of Turkey* ICSID ARB/06/8, Award, Sept. 2, 2011 (R-111) § 125: *While agreeing with the general proposition that "the graver the charge, the more confidence there must be in the evidence relied on [...] this does not necessarily entail a higher standard of proof."*

[225] *The guidance which the Tribunal draws from the cases is that there may well be situations in which, given the nature of an allegation of wrongful conduct (in the broadest sense), and in the light of the position of the person concerned, an adjudicator would be reluctant to find the allegation proved in the absence of a sufficient weight of positive evidence – as opposed to pure probabilities or circumstantial inferences. But the particular circumstances would be determinative, and in the Tribunal's view defy codification.*

[226] On November 30, 2015, the CCJA Court cancelled the CCJA award on the grounds that the "Arbitral Tribunal did not comply with its mission" by deliberately ignoring the imperative provisions of the arbitration regulations, which prohibit agreements between parties and arbitrators regarding the amount of their fees.

- Mr. Steven Fox's affidavit (also produced in this arbitration as R-33), who was heard for that matter as witness by the CCJA Tribunal[227].   As the Respondent did not deem it was necessary to reintroduce Mr. Fox as a witness in this arbitration, this Arbitral Tribunal considers that the opinion of the CCJA Tribunal regarding his testimony is conclusive. The Arbitral Tribunal notes that the CCJA Tribunal ascertained that Mr. Steven Fox was not the direct or indirect witness of the deeds of corruption he is reporting, that he refers to no document, and that his allegations are non-verifiable, to conclude that his affidavit "does not permit [us] to attribute the slightest relevance to the particularly serious grievance of corruption".[228]

- The CCJA Tribunal added that "the same is true of the last-minute affidavits proposed, regarding which the Republic of Guinea acknowledges were prepared on December 13 for the hearing of December 16, 2013".[229]  However, as the CCJA Tribunal did not authorize the production of these two affidavits, it was not able to examine them or to hear the parties who wrote them.  As the CCJA Tribunal did not motivate the reference quoted either, this Arbitral Tribunal does not feel it is bound by this reference and will attribute to these affidavits and the testimony of the persons who wrote them the weight they merit.

186. This Arbitral Tribunal will therefore concentrate on the affidavits of Messrs. Demba Kouorouma and Ibrahima Lamizana Condé and the complaint filed on December 13, 2013 by the Guinean Government on the counts of corruption and influence peddling (R-34).  It will also examine "the body of evidence of corruption" which, according to the Respondent, corroborates the existence of corruption.

(i)     The affidavits of the "witnesses" – Exhibits (R-35 and 36)

187. The Arbitral Tribunal notes that these two exhibits, entitled "Affidavit" (R-35) and "Sworn Statement" (R-36), respectively, were not communicated, in this arbitration, by the Respondent with its counter-memorial of March 30, 2015 in the form of written depositions of witnesses, but were produced as simple exhibits among numerous others.  Furthermore, the Respondent did not request either that the Arbitral Tribunal hear Messrs. Kourouma and Condé as witnesses and was therefore apparently prepared to do without the oral testimony of these two persons whose role in principle was to bolster the credibility of the exhibits (R-35 and 36).

188. If the Arbitral Tribunal was nonetheless able to hear the authors of these exhibits, it was following the Claimants' request of October 20, 2015 to have the opportunity to cross-examine them at the hearing beginning on November 23, 2015. The Respondent began by protesting to this request because it considered that it had been made late and asked that the Arbitral Tribunal grant to the exhibits (R-35 and 36) the evidentiary value of a written confession.  The Arbitral Tribunal rejected this request in its Procedural Order no. 8 of November 2, 2015, deeming that it was up to it to appreciate this evidentiary valued when the time came, based on all the evidence in the file known at the time.

---

This annulment does not prevent this Arbitral Tribunal from forming an opinion on the factual ascertainments of the CCJA Tribunal which have nothing to do with the grounds for annulment.
[227] CCJA Award § 73
[228] CCJA Award § 76
[229] CCJA Award § 76

189. Notwithstanding the Respondent's initial opposition to the deposition of Messrs. Lourouma and Condé and, afterwards, its uncertainty as to the feasibility of this deposition (due, among other things, to alleged visa and/or passport problems) – uncertainty which continued to exist, for that matter, as concerned Mr. Lamizana Condé, until the morning of his deposition[230] - both witnesses appeared before the Arbitral Tribunal, during the morning of the third (and last) day of the hearing.

190. During his testimony of November 25, 2015, Mr. Lourouma confirmed:

- that he had been asked to write the affidavit[231] - subsequently produced as an exhibit (R-35) – by the Minister of Justice, Mr. Christian Sow[232] who informed him that the affidavit he was to write would be used in the dispute between the Government and Getma International[233]; that he had written the affidavit on December 13, 2013 by hand in the office of the Government's judicial agent, Mr. Goureissy, who subsequently had it typed on the premises by his secretary[234]; that the next Minister of Justice, Mr. Sako, asked him "last Friday" [i.e. Friday, November 20, 2015 or three days before the beginning of the hearing] to come and testify in Paris[235] which he was able to do because he had a permanent visa[236];

- That he never wondered whether his comments might be retained against him in the criminal procedure or what the consequences of his "confession"[237] might be; and that he was never informed of the filing of a complaint against him[238];

- That he was promised money, before it was paid to him[239] [240]; that it was the Committee's president, Mr. Ansoumane Camara who made him understand "that he must help Getma and if Getma is the successful bidder [...] it will do something....And it will be money"[241] and that this money "will be from Getma"[242];

- That he was surprised by the proposal, because *others are not in the habit of doing this* [243] [244];

- That as rapporteur, he had a vote in the Committee for the evaluation of offers and that it was his job to "enhance the report [...] as if to justify each rating"[245];

- That Mr. Diallo gave him money "on behalf of Getma"[246]; that it was 35,000 euros, notwithstanding the fact that Mr. Fox's affidavit – which he never saw – refers to USD

---

[230] TR III, p. 4 :5-8.

[231] TR III, p.26 :13-15

[232] TR III, p. 30 :4-30.

[233] TR III, p. 30 :6-7; see also TR III, p. 31:1-2.

[234] TR III, p.33 :29-p.34 :16.

[235] TR III, p.31 :12-p.32 :9.

[236] TR III, p.32 :10-16.

[237] TR III, p.32 :19-29.

[238] TR III, p.40:1-23 ; p.39:32-p.40:7.

[239] TR III, p.27 :9.

[240] The Arbitral Tribunal notes that this was not mentioned in his written affidavit.

[241] TR III, p. 44 :2-23.

[242] TR III, p.46 :12-24.

[243] TR III, p.27 : 25-31.

[244] This appears to contradict the Respondent's allegations concerning the « endemic » nature of corruption in Guinea (C-Mem. § 101).

[245] TR III, p.42 :40 ; p.53 :37-38.

[246] TR III, p. 45 :30-33 and p. 46 :12-14.



100,000[747]; that the amount was paid in two tranches, an initial one of 15,000 euros and a second one of 20,000 euros[248] as mentioned for that matter in his affidavit[249];

- That in his opinion, other members of the Committee also received money[250];

- That he could not say exactly what he had done in exchange for the promise of payment.[251]

191. Questioned regarding the regularity of Getma International's offer and his evaluation, Mr. Kourouma no longer remembers whether it had been regular and/or whether he had "turned a blind eye" to certain of its elements[252]; he confirmed simply that he had established a rating depending on the ratings of the other members of the Committee and "possibly" higher ratings than "he would normally have established in all good conscience".[253]   Questioned again on the same point, he did not recall any details of the evaluation[254].

192. This Arbitral Tribunal finds it incomprehensible that Mr. Kourouma, when according to his own words, he was corrupted for the first time in his life, did not ask himself any questions: regarding the amount promised, regarding that which exactly was expected of him, regarding the possible consequences of his acts, and that he no longer remembered what he had done exactly in exchange for the money he was certain at the time he was going to receive, even if he had no idea of the time or amount of his payment.  It is even less comprehensible that, again without asking about the possible consequences, he admitted, the first time he was asked, his passive corruption, agreed to make this confession in writing and finally accepted to come to Paris to testify to his corruption.[255]

193. His testimony therefore cannot be seriously retained, also because despite his admission of passive corruption, he was not prosecuted.

194. Furthermore, Mr. Ibrahima Lamizana Condé's deposition revealed the following:

- He also was not asked until the Friday prior to the hearing in Paris, to come and testify[256],

- His statements concerning the manner in which he had been contacted for the purpose of preparing and signing the affidavit containing his "confession" are confusing[257]: one retains therefrom that "an attorney" went to Mr. Condé's office, asked him to write the affidavit and that Mr. Condé prepared "a written draft"[258] and read it "as he was writing it", which

---

[247] TR III, p.47 :31-42 and p.48 :21-22.

[248] TR III, p.50 :40-p.51 :8.

[249] The response he gives several minutes later, and from which one can infer that he first received the amount of 20,000 euros and then the sum of 15,000 euros, is perhaps due to a misunderstanding.  The Arbitral Tribunal is therefore not holding it against the witness.

[250] TR III, p.50 :34-37

[251] TR III, p.53 :39-p.54 :20.

[252] TR III, p.51:2-8;p. 51:25-p.52-20.

[253] TR III, p.53 :39-p.54 :21

[254] TR III, p.56 :20-28.

[255] T4R III, p.56 :30-39.

[256] TR III, p.58 :17-22.

[257] TR III, p.58 :37-p.60 :21.

[258] TR III, p.60 :8.



permitted the attorney to type the text on the premises (i.e. in Mr. Condé's office at the French National Directorate of Investment Programming)[259];

- Mr. Condé did not know what use would be made of his affidavit and he was surprised to find himself in Paris[260];

- When he wrote his affidavit, Mr. Condé was aware that he could be prosecuted, but he considered that it was more important to tell the truth as is commonplace in his ethnic group[261]; however the attorney reassured him and indeed there were no problems.[262]

Later on, when questioned, Mr. Condé stated that he had been threatened with legal action (without specifying whether the threat was aimed at making him admit passive corruption or a possible subsequent denial of his initial confession)[263], he then refused categorically to say whether he had effectively been prosecuted[264].

- Notwithstanding his own insistence on the necessity of telling the truth[265], Mr. Condé refused to answer the question of whether he had already been the subject matter of other attempts at passive corruption[266];

- Mr. Condé had no knowledge of the complaint filed against him and he was thereafter never convened by the local or state police[267]. Subsequently, he answered however that he had been informed of the complaint by the judicial officer[268];

- Like Mr. Lourouma, Mr. Condé was expecting a "reward" because the President of the Contracts Commission "had told him to work, that we would be rewarded for good work in any event"[269];
- Mr. Condé denies having received US$ 100,000 as claimed by Mr. Fox[270] and affirms that he received a manila envelope containing 20,000 euros in 50-euro bills[271];

- Mr. Condé has failed to state clearly that the money he received came from Getma International:

   *Mr. Fischer. – Unanimously. Do you conclude that everyone, unanimously, received money from Getma?*

   *Mr. Condé. – No. I myself received money. From Getma, no. I received it and the person who gave it to me said: "Mr. Condé, this is Getma's share". For the others, I don't know.[272]*

---

[259] TR III, p.60 :12-21.
[260] TR III, p. 61 :25-p.62 :6.
[261] TR III, p.62 :7-19.
[262] TR III, p.63 :39-42
[263] TR III, p.67 :6-12.
[264] TR III, p.67 :13-17.
[265] See also TR III, p.72 :17-19
[266] TR III, p.66 :22-27
[267] TR III, p.63 :1-12.
[268] TR III, pm.67 :24-33.
[269] TR III, p.66 :19-21
[270] TR III, p.68 :24-33
[271] TR III, p. 67 :1-5



- After his cross-examination, in reply to the questions of counsel for Guinea, Mr. Condé explained in detail his conversation with the Chairman of the Contracts Commission, during which he asked him to "support him each time, particularly at the time of the voting and attributions".[273]

195. According to Mr. Condé's testimony, the Chairman of the Contracts Commission did not tell him, prior to the evaluation, what bidder was to be voted for.  The name of Mr. Challoub (Getma International's representative in Conakry) was presented, but Mr. Condé did not know him (and did not know either who he was or what he represented) and, according to his own affirmations, it was not until negotiations were under way (therefore after the Contracts Commission's decision) that the President spoke to him of Mr. Challoub.[274]  It therefore appears that  Mr. Condé did not know he was to favor Getma  International, but that the President had just asked him to vote as he did.  In this case, he did not know either by whom he was (on the verge) of being corrupted.  Indeed, it was not until the negotiations of the Agreement that it became clear for Mr. Condé who Mr. Challoub was and that he was a member of the "Getma group"[275]; the simple awareness of the fact that Mr. Challoub had approached the Chairman of the Commission did not suffice for Mr. Condé to surmise that it was Getma International he was to vote for.  At the end of his deposition, Mr. Condé attempted to establish the connection between Getma and Mr. Challoub:

> **The President.** -It was therefore this Mr. Camara who made you understand that there would be a reward if Getma got the contract?
>
> **Mr. Condé.** -If Challoub got the contract – the term he used. We must see, now, whether Challoub with Getma or...Well...[276]

196. The Arbitral Tribunal notes that Mr. Condé was not a particularly reliable witness; the following excerpt illustrates the degree to which he avoided answering questions although they were clear, and that despite his denial, he was aware that other persons had been called upon to testify:

> **President Tercier.** - Mr. Condé,...You yourself signed the sworn statement.  This is the Statement you signed.  You therefore did so in the presence of an attorney?
> **Mr. Condé.** - Of course.
> **President Tercier.**- Do you know whether other persons were also called upon to make a statement of this type?
> **Mr. Condé.** - No. We were convened individually.
> **President Tercier.** - Alright. But do you think there were other persons who were asked to sign a comparable statement?
> **Mr. Condé.** - No. In short, the attorney told me that we were bound individually, the members of the Commission.[277]

---

[272] TR III, p. 69 :20-24
[273] TR III, p.70 :17-37
[274] TR III, p.71 :22-44
[275] TR III, p.71 :22-28
[276] TR III, p.76 :16-18
[277] TR III, p.72 :3-14.



197. Mr. Condé did not reinforce the credibility of his testimony before the Arbitral Tribunal when confronted with the contradiction between, on the one hand, his repeated testimony during his deposition of November 25, 2015 that he had received the money "after the signing of the Agreement"[278] and, on the other hand, his written affidavit according to which "during the negotiations of the Concession Agreement, Mr. Mamadou Diallo…gave me an envelope containing €20,000 in 50-euro bills"[279]:

> *The President. - Thank you. Is it therefore true that there is a contradiction between what you wrote in your sworn statement, on the one hand, and, on the other hand, that which you attested on three occasions this morning, here, before our Tribunal?*
> *Mr. Condé. - Hum, hum.*
> *The President: - I'm sorry, what does "Hum, hum" mean?*
> *Mr. Condé. - I said yes, I didn't understand, that's what I meant to say.  You tell me there's a contradiction?*
> *The President. - Yes.*
> *Mr. Condé. - What did I say this morning that is not written there? This morning I said: after the signing of the agreement, Mr. Diallo called me to give me this money.*
> *The President. - Yes, after the signing of the agreement, the money was given to you.*
> *Mr. Condé. - After our signature, we weren't the ones who signed the agreement.  I clearly said: "That, that's my signature. That, that's our signature".  We, we signed a document. We sent. It was after that signature that we received that amount.*
> *The President. - Yes, but here, it says in writing that the envelope was given to you – I quote: "During the negotiations of the agreement".*
> *Mr. Condé. - Exactly.*
> *The President. - So, does the written statement correspond to the oral statement you made this morning?*
> *Mr. Condé. - That's exactly what I wanted to say, it was at the time of the agreement that the money was given to us, because we were in the room.  It was in the room that we left, we signed the minutes, we were given the money, I was given the money.  At the time, they were, we were in the midst of negotiations.*
> *Mrs. President, I repeated that ten times, but this morning I feel very tired. It's 8 a.m., I've been awake, sitting, I haven't gotten a minute of sleep.*
> *The President: Therefore, your last statement is that it was at the time of the agreement.*
> *Mr. Condé: Exactly*
> *The President. - Without specifying whether it was the signing of the negotiations.*
> *Mr. Condé.- In any event, that's what I have written here, that's how it happened.[280]*

198. For counsel for the Respondent, the contradictions are due to the fact that, when Mr. Condé spoke of "signing", he was referring to the signing of the Minutes of the negotiations.[281]  While the Arbitral Tribunal is attentive to the risk of misunderstandings or even of small errors or nuance in a testimony, it considers that the fact that Mr. Condé spoke explicitly, on three occasions of "the signing **of the agreement**" cannot be nullified by a simple "clarification" that he was referring to another signing.  This is even truer in that Mr. Condé also contradicted himself on another point: he first explained that, "after the evaluation and signing of the contract", he wanted to go back to his own office, but that the Chairman of the Contracts Commission told him not to leave because they were going to call him (which he did not regret), and that **"two or three days later"**, Mr. Diallo called him to give him the envelope

---

[278] TR III, p.66 :38-39; p. 70 :38; p.74 :38 and p.75 :25-26.
[279] Statement made by Mr. Ibrahima Lamizana Condé on December 13, 2013 (R-36).
[280] TR III, p.75 :17-p.76 :5.
[281] Mem.AAR§126-128.



with the money.[282]  However, a little later in his deposition, he stated, just as firmly, that "it was at the time of the agreement that the money was given to us, because we went into the room. It was in the room that we went out, we signed the minutes, we were given the money. At that time, they were, we were in the midst of negotiations".[283]

199.  Even with the understanding for a certain confusion on the witness' part because he felt "very tired" and had "not had a minute's sleep"[284], the Arbitral Tribunal has not retained of this testimony a clear, precise idea of the manner in which the corruption occurred.  Furthermore, the facts reported do not prove clearly that the corruption was the doing of Getma International.

200.  The Claimants insisted greatly in their Post-Hearing Memorial on the contradictions between the testimony of Messrs. Kourouma and Condé.  The Arbitral Tribunal is of the opinion that these contradictions alone do not suffice to cast doubt on the credibility of the testimony.  On the contrary, inasmuch as each witness speaks of his own passive corruption, it is normal that their respective testimony not be concordant.  On the other hand, a contradiction in the testimony of a single witness, for example between his written affidavit and his own oral statement, or between various oral statements, necessarily influences the Tribunal's opinion regarding the credibility of the testimony, even if it makes allowance for misunderstandings during the deposition or for any possible confusion, on the part of both the witness and the examiner.[285]

201.  It is remarkable that neither of the two witnesses referred to the alleged irregularity or inadmissibility of Getma International's offer; even when questioned regarding the financial aspects of the offer, the two witnesses remembered only the high price of the entry ticket[286].  Neither of them confirmed that he had "turned a blind eye" to the irregularities – and neither of them was able to describe them – while Guinea asserts today that they are so flagrant that the admission of the offer can be explained only by the corruption of the members of the Contracts Commission.  The Arbitral Tribunal considers that, if the two witnesses had truly been corrupt, they would have a more accurate recollection of the irregularities of the offer.  Until the end of his deposition, Mr. Condé was unable to provide a precise example of favoritism toward Getma International.[287]  Details regarding these aspects are important however in appreciating the evidence of the alleged corruption.

---

[282] TR III, p.70 :38-71 :2.

[283] TR III, p.75 :38-41.

[284] TR III, p.72 :44-45.

[285] See, for example TR III, p.64:23-35.

*Mr. Fischer. - Who was physically present at this meeting?  Given that you have told us that you received a letter, you therefore responded to the invitation you received. Who were the persons attending this meeting?*

*Mr. Condé. - There was the judicial officer, the legal advisor to the President. There were two other Guinean attorneys, there was…I don't know.  **There were at least some nine persons in the room.***

*Mr. Fischer. - And was there – I am not asking you for the names of the attorneys, because you perhaps don't remember, unless…*

*Mr. Condé. - No, I…For me, because we were convened individually, the entire Committee, but me practically, I was asked the question regarding my affidavit.*

*Mr. Fischer. - I understand.  Were there other members of the Committee during this…*

*Mr. Condé. - No, during the interview, **I was alone**.*

The contradiction between "nine persons" or "alone" is clear, but it's impossible to verify whether the witness is referring to the same meeting or summons to a meeting.

[286] Mr. Kourouma: TR III, p.51:39-p.52:12; Mr. Condé: TR III, p.72 :34-p.73 :15

[287] TR III, p.77 :41-p.78 :37

202. Both witnesses suffered memory lapses when it came to describing the details of the summons they had received to attest that they had accepted bribes: they no longer remembered them and emphasized that the facts went back seven years.[288]

203. In all cases, the deposition of these two witnesses revealed that – as both of them had been convened by or pursuant to instructions from the Ministers of Justice successively in office, first to attest that they had been corrupted and then to confirm it in Paris – neither their confession, nor their testimony was spontaneous, even if both of them insisted greatly on the fact that they themselves were the authors of their respective affidavits.

204. For the Arbitral Tribunal, the fact that the two affidavits had been requested by the Ministry of Justice can explain the similarities in form and presentation, despite the fact that the two affidavits were typed on two different computers in two different offices (Mr. Kourouma's in the office of the Government judicial officer, Mr. Goureissy, who had it typed by his secretary, and Mr. Condé's in his office, typed by "the attorney" whose name Mr. Condé no longer recalls). Questioned in this respect, Mr. Condé tried to explain these similarities, stating that all the typewriters were purchased together by the administration. Even if the Arbitral Tribunal accepted this explanation, it cannot explain why two different typists, acting separately (see below) chose respectively on two typewriters (to be read as "computers" or "word processing programs") – even if they are from the same manufacturer – the same font and the same size letters, as well as an almost identical layout to type messages given to them respectively in draft form by an author and read as he went along by another authors.

205. One can only admit that the date of the notice for writing and singing the affidavits, December 13, 2013, is no coincidence either: the CCJA was on the verge of pronouncing its award and Guinea succeeded in obtaining another hearing for Mr. Fox' deposition on December 165, 2013. The affidavits appear to have been produced in conjunction with the course of the CCJA procedure: indeed, they could have been obtained much earlier and the file contains no other explanation for why the affidavits were requested on this date alone.

206. It was therefore the same Ministry, namely the Justice Ministry, which made possible the defense in the corruption in this investment arbitration; it was it also which had the power to decide on the follow-up to be given to the criminal complaint, but it did not follow-up on it (see sub-chapter (ii) below).

207. If the invitations of the Ministry of Justice to the "witnesses" of the corruption were not in themselves reprehensible, the question nonetheless arises as to who the two witnesses agreed to "self-incriminate". The fact that this question cannot be answered does not add to the witnesses' credibility.

208. Even if it does not dwell on the inherent contradictions and lacunae in the testimony of the two witnesses, the Arbitral Tribunal cannot disregard the Respondent's reluctance to present these two witnesses. Indeed, if the affidavits and their authors had no weak points, the oral testimony could only reinforce the Respondent's allegations

209. Furthermore, why were only two affidavits and – reluctantly – two witnesses presented in this procedure? According to the witnesses, all the members of the Contracts Commission were convened to the office of the President (Mr. Fofana) by the judicial officer, in order to be heard

---

[288] Mr. Kourouma: TR III, p.35:18, p.47:6, p.51:43 and p.56:25; Mr. Condé: TR III, p.60:21;p.62:2, p.73:14 and p.78:36.

regarding what had occurred in the Contracts Commission.[289] One can therefore reasonably infer that the Ministry attempted to obtain affidavits or confessions from the other members also. There were even confrontations between Mr. Diallo and Mr. Condé during which Mr. Diallo contradicted Mr. Condé and denied the corruption.[290] It is also reasonably to believe that the other members also denied it, otherwise their affidavits would have been produced.

210. Nonetheless, the Respondent announced to the CCJA that, in a period of several weeks, it would gather other evidence of corruption. And yet, with the exception of these two affidavits (and the complaint), no other proof has since been produced.

211. The Arbitral Tribunal notes that there is no other evidence confirming the testimony of Messrs. Condé and Kourouma (other than Mr. Fox' affidavit, on the condition that the differences in the amounts of the bribes paid to these two witnesses not be taken into consideration.)[291] Their two testimonies are not confirmed by other evidence: Mr. Diallo was not introduced as a witness, and since Mr. Condé's testimony, we know that this can be explained by Mr. Diallo's denial of Mr. Condé's confession. Mr. Ansoumane Camara, the Chairman of the Committee, who asked Messrs. Kourouma and Condé to follow him in the points he gave to the different tenderers, has died.[292]

212. Mr. Ansoumane Camara's role in the corruption of the two "witnesses" is not clearly apparent in the two testimonies. Mr. Kourouma first states that Mr. Camara told him that Getma had approached him to assist him and was grateful to him for this.[293] He then becomes more vague:

> *Mr. Fischer. - Mr. Ansoumane Camara made a specific proposal to you?*
> *Mr. Kourouma. - No.*
> *Mr. Fischer. - Implied to you. In your mind, what was it… what did you think? In your mind, what did you understand from what he said?*
> *Mr. Kourouma.-Judging from what he said, I understood that Getma had to be assisted and if Getma is the successful tenderer…It was clear, he said: it'll do something for you.*
> *Mr. Fischer.- And what did you personally hope for?*
> *Mr. Kourouma.- I don't know what I hoped for. He promised us, he would do something for us. I said to myself that…He wasn't going to give us each a car. It will be money.*
> *Mr. Kourouma.[sic].- You therefore thought that they were proposing something if you cast the right vote?*
> *Mr. Kourouma.- I said to myself that that's the promise they made to the President.[294]*

213. On the other hand, Mr. Camara supposedly asked Mr. Condé only to "support him each time, particularly at the time of the votes and attributions"[295], without telling him exactly what tenderer was to be favored, while indicating that he would be rewarded.[296]

---

[289] Mr. Kourouma : TR III, p.40:23 and following; Mr. Condé: TR III, p.64:18-35.

[290] TR III, p.69 :29-38 ; .76 :6 and p.78 :39 – p.79 :19

[291] The Arbitral Tribunal notes that according to Mr. Fox' affidavit (R-33), Mr. Talbot provided a budget to Mr. Challoub for a total amount of 2.5 million euros (3.3 million US$) with funds from an account opened in Zug, Switzerland. This corresponds partially with Mr. Condé's testimony that the President of the Contracts Commission had told him that he had been approached by Mr. Challoub.

[292] TR III, p.68 :38-41.

[293] TR III, p.44 :14-19.

[294] TR III, p.44 :14-26.

[295] TR III, p.70 :17-37.

[296] TR III, p.71 :13-28 and p.76 :15-18.

214. The two witnesses' statements concerning the request for "leniency" made to them by the President of the Contracts Commission, Mr. Ansoumane Camara, are plausible, but unverifiable given that Mr. Camara has since died.

215. The fact that there are only two witnesses who admitted their passive corruption (while, according to Mr. Fox' report, at least eight persons, namely two ministers and six members of the Contracts Commission, were corrupted), in itself does not prove that the corruption did not take place. Self-incrimination is in itself sufficiently extraordinary to not find it surprising that six persons refused to participate therein. But the absence of any other written or other evidence (other than Mr. Fox' report) of the corruption either of the two witnesses, or of one of the other corrupted parties, considerably weakens the evidentiary value which the two testimonies could have in other circumstances.

216. This absence of evidence is even more surprising in that neither of the two witnesses was disturbed following his confession of passive corruption. They did not even know that a complaint had been filed against them.[297] The degree to which Mr. Condé showed himself to be even heedless of the possible consequences of his confession, while insisting on the fact that he had told the truth, is striking for that matter.[298]

217. Mr. Condé testified that he had "discovered" the existence of the criminal complaint during his deposition before this Arbitral Tribunal[299] and confirms that he was never questioned regarding the complaint by the local or state police, but that it was the judicial officer who subsequently mentioned it to him[300]. Later on during his examination, he stated that the judicial officer threatened to "communicate the file to the court".[301] Mr. Condé is very uncertain as to the date of this conversation with the judicial officer[302]: first of all, he appears to be saying that over two years ago (therefore prior to the end of 2013), but later he confirmed that this meeting occurred after the date of his affidavit.[303] One cannot totally escape the impression that the criminal complaint was used to exert pressure on the authors of the affidavit in order to secure their oral testimony, even if, in the chronology of the events, the specific request that they come to testify at the hearing of this Arbitral Tribunal does not appear to have been made prior to prior to Friday, November 20, 2015.

218. This Arbitral Tribunal can only conclude that the testimony of Messrs. Kourouma and Condé did not provide clear convincing evidence of the corruption of which Getma International is accused and this notwithstanding all powers and resources t Guinea's disposal to provide such proof. This testimony however remains to be evaluated in the context of other elements.

(ii) The complaint filed on December 13, 2013 by the Guinean State on the counts of corruption and influence peddling (rR-34)

219. According to the complaint, it was "in the framework of the arbitration procedure opposing the Guinean State and Getma International" that the Council of State mandated Mr. Fox to investigate the conditions under which the concession had been granted. The complaint was

---

[297] Mr. Kourouma : TR III, p.39:29-p.40:7; Mr. Condé: TR III, p.62:43-p.63:9.
[298] TR III, p.62 :7-19 ;p.64-17.
[299] TR III, p.62 :44 ; p. 63 :9.
[300] TR III, p. 63 :10-14
[301] TR III, p.67 :24-33
[302] TR III, p.63-27.
[303] TR III, p.64 :4-28.



obviously based on the data in Mr. Fox' report which refers to "payments [which…] were allegedly made to the persons […] in exchange for their assistance for granting to Getma the desired port concession".   It concludes that, "if the investigation shows that the aforementioned facts prove true, they could constitute the offences of corruption and influence peddling governed by and punishable under Articles 191 and the following of the Guinean Republic's Criminal Code".  Mr. Fox therefore did not consider that he already possessed proof of the alleged corruption, but required an investigation.   And yet, this investigation apparently never took place; at least Guinea never produced proof thereof.  The examination of Messrs. Kourouma and Condé of December 13,2013 did not occur in the framework of an investigation (which was not possible for that matter given that the complaint itself dates back to December 13, 2013), but apparently fell into the context of the State's defense in the CCJA arbitration, which was approaching its final phase.  The date of the complaint, which is the same as that of the affidavits of Messrs. Kourouma and Condé, confirms that it too was filed in conjunction with Guinea's defense before the CCJA Court: strangely, Mr. Fox' report is not dated, but it is obviously at the basis of the letter from counsel for the Respondent to the CCJA Court of November 4, 2013, in which it is informed that "the Republic of Guinea very recently obtained information and evidence regarding the circumstances surrounding the conclusion of the Concession Agreement for the Container Terminal in the Port of Conakry in 2008"; therefore Guinea was aware thereof by November 4, 2013 at the latest and yet it waited until December 13, 2013 to file a complaint, probably prompted by the letter from counsel for the Claimants of November 29, 2013 expressing surprise that the parties who were allegedly corrupt not be the subject matter of judicial prosecution in Guinea.[304]

220.  Subsequently, in the contest of this arbitration procedure and its exhibit production process, the Claimants asked that the Respondent produce "the documents established by the Respondent following the criminal complaint filed on December 13, 2013 by the public prosecutor at the district court of Kaloum (exhibit no. R34)" (point 12 of the Claimants' request for the production of documents).   The Claimants' request concerned in particular the administrative documents (and therefore not covered by the secrecy of the investigation or the inquiry) which are normally drafted following a complaint, such as the notice of the definitive closing of the case, the notice of the opening of a judicial investigation, the filing of a complaint with request for damages, or the direct subpoenas (cf. Redfern Schedule, Claimants' requests no.12a, 12b and 12c).  Notwithstanding Order no. 6 (point 12) of the Arbitral Tribunal according to which these documents had to be produced by June 8, 2015, they were not produced because, according to the letter from counsel for Guinea of June 19, 2015 to counsel for the Claimants (of which the Arbitral Tribunal received copy), these documents could not be found, and this, "despite the steps taken in the office of public prosecution at the district court of Kaloum, Conakry".

221.  The Arbitral Tribunal considers that it can conclude from this failure to produce exhibits, combined with the flagrant absence of any other evidence of any follow-up whatsoever given to the complaint of December 13, 2013, that Guinea and its Justice Ministry attempted rather to prove corruption in the CCJA procedure than to sanction it.  The Respondent gave priority to the grounds of defense which corruption constitutes, rather than to the prosecution of the corrupted parties.   Even if the offense of corruption had been time-barred at the time that Guinea, on the basis of Mr. Fox' report, had become aware of the corruption[305], one could

---

[304] Letter from the Claimants to the Tribunal of November 29, 2013 (C-340),p.5, point 3.

[305] The Claimants referred to Article 4 of the Guinean Criminal Code, according to which offenses are time barred after three years (Repl. § 77 and footnote no. 59) and are of the opinion that the admitted that the statute of limitations had become effective (Mem. AAC §§6 and 121-123).

have expected that the State would protect its public interests by seeing to it that the persons suspected of passive corruption no longer have the opportunity to exploit their public office a second time to make money. And yet, neither of the two witnesses was fired, or demoted: Mr. Kourouma, "previously *ad interim* director at the *Direction des Infrastructures et Transports* (Infrastructure and Transport Administration) [was] appointed *Directeur des Travaux Publics et Urbanisme*" (Director of Public Works and Urban Planning) in a Decree of President Alpha Condé of March 8, 2011,[306] and Mr. Lamizana Condé performs, according to his own affidavit, the duties of Inspector of financial and accounting services.[307]   Similarly, the duties of Mr. Cheick Touré, one of the other persons called into question in Mr. Fox' report, as Secretary General at the Ministry of Transportation, were confirmed by President Alpha Condé.[308]   And on June 18, 2014, the President appointed Mr. Mamadou Diallo, who, according to Mr. Fox' report, made the alleged payments, as the National Deputy Director of the Merchant Marine and Mr. Mohamed Fofana as Director General of the Engineering and Planning Bureau.[309]

222.  According to the complaint of December 13, 2013, "at the time of the attribution of the Concession Agreement, a certain number of press articles reported deeds of corruption which permitted Getma to obtain the concession against competitors with a sum of experience and a financial capacity which by far exceeded its own". Indeed, these articles were produced in this arbitration, not by Guinea, but  by the Claimants themselves[310] to illustrate what they call a slanderous press campaign against them and following which Getma International and its CEO Richard Talbot filed a complaint [311] in Paris (complaint closed with no action).  The only press article which the Respondent produced concerning the alleged corruption pertaining to Getma International's concession appears to be the one of May 6, 2009 and concerns "suspicions of occult dealings to obtain the lifting of the suspension of the Getma concession"[312] (suspension ordered on January 14, 2009 and lifted on April 9, 2009).  It therefore does not concern the actual awarding of the concession.

223.  The Arbitral Tribunal is surprised that, notwithstanding these rumors of corruption, Guinea waited until 2013, five years later, before appointing Mr. Fox/Veracity Worldwide LLC, to conduct an investigation into the conditions on which the concession was awarded.  It cannot explain either why President Alpha Condé, who had announced publicly that he wished to cancel the concession, did not order an investigation which could have proven the corruption and justified the cancellation.

224.  The Arbitral Tribunal can only admit that the State itself did not attach sufficient importance to the corruption to launch an investigation or, if it did so, to give it the follow-up it warranted in the general interest. Such a complaint is therefore void of all relevance as evidence.

225.  What's more, by failing to follow-up on the complaint and to launch the investigation, Guinea deprived itself of the possibility it had to prove the alleged corruption clearly and convincingly. Not only did the Respondent have the necessary powers for gathering evidence of the alleged corruption, it also had the obligation to do so because it is responsible for the proof of the corruption it is invoking.

---

[306] Article from *AfricaLog* of July 2, 2015 (C-339).

[307] Statement of Mr. Ibrahima Lamizana Condé of December 13,2013 (R-36).

[308] Article from the website Guineenews.org of June 19, 2014 (C-334).

[309] Article from the website Guineenews.org of June 19, 2014 (C-334)

[310] Articles from the website guinee24.com of September 25, 2008 ; of September 27,2008, of October 10, 2008, of October 24, 2008, and October 30 and 31, 2008 (C-130 to C-135).

[311] Claimants' complaint against X with request for damages of October 31, 2008 (C-137).

[312] Article from the website Guinéa Actu of April 16,2012 (R-30).

226.  In the absence of any justification on the Respondent's part of its failure to use its powers to provide evidence, as the case may be, of corruption, the Arbitral Tribunal sees no possible conclusion to draw from this omission other than that the State itself did not believe that the proof existed.

(iii)  The "body of proof" of corruption

227.  The Respondent insisted greatly on the "endemic nature" of the corruption in Guinea, in particular in 2008, and spoke of it in its Post-Hearing Memorial, even before processing the testimony of Messrs. Kourouma and Condé regarding which it requests that it be "taken in the context of the general corruption which has taken root in Guinea".[313]

228.  This Tribunal considers however that this context changes nothing in the value as evidence of each of the individual elements of proof submitted to it, which must be ruled on independently, unless these elements have an evidentiary weight exceeding a threshold of credibility which the Arbitral Tribunal has now found in the two testimonies and the complaint of December 13, 2013. Even widespread corruption does not permit one to consider that a specific alleged corruption is proven. Inversely, the absence of widespread or endemic corruption does not permit one either to neutralize proof of a specific instance of corruption. Even if one accepts that corruption is plausible, in a specific case because it is endemic in the country, this does not prove that it effectively exists. As the Respondent admits, this is indeed only a clue which, although it inspires greater attentiveness to the elements of proof put forth, does not suffice to render convincing the elements of proof which are not. Even if this Arbitral Tribunal acknowledges that it is not to be ruled out that Getma International obtained its contract by resorting to corruption, the two witnesses and the complaint alone did not convince it that this corruption effectively took place. On the contrary, the State's soliciting of testimony (which inspired a positive reaction only on the part of Messrs. Kourouma and Lamizana Condé, and not the six other "corrupted parties" named in Mr. Fox's report) and the absence of any follow-up on the complaint prove rather that no corruption occurred in the case at issue.

229.  Also the allegations of corruption surrounding the granting of the concession to Bolloré, after the termination of Getma's contract, do not suffice as evidence of corruption likely to increase the credibility of the testimonies of Messrs. Kourouma and Lamizana Condé. On the contrary, when the Arbitral Tribunal attempted to test, in questioning these witnesses, the allegedly endemic nature of corruption in Guinea, it did not obtain a clear confirmation thereof: Mr. Kourouma asserted that he had never received an offer of money in exchange for irregular conduct[314], which rather indicates the absence of endemic corruption; Mr. Condé for this part refused obstinately to answer the question of whether he had been the subject matter of (other attempts at) corruption[315], which can of course be explained by the desire not to incriminate himself further. Questioned directly regarding the endemic nature of corruption in this country, he replied that "perhaps with the newspapers... You know that we were at the centre of the most corrupt country during Conté's time. That, we acknowledge".

230.  The Respondent also relied on alleged irregularities in Getma International's offer and the "guilty passivity" of the members of the Evaluation Commission who did not take them into account; it considers that this attitude can be explained only by corruption. Once again, the

---

[313] MemAAR§101.
[314] TR III, p. 56:7-9.
[315] TR III, p. 5-39.



Tribunal wonders why this argument was evoked only after Getma International had begun the CCJA arbitration aimed at obtaining indemnification for the termination of the concession, why, if indeed fraud had occurred at the time of the conclusion of the concession, this did not constitute the - legal - grounds for the cancellation of the Concession Agreement.

231.  The Arbitral Tribunal however will verify these alleged irregularities, not only as possible indications of corruption, but also from the standpoint of fraud. Indeed, the Respondent contends that Getma International's investment is not only vitiated by corruption, but also by fraud due to the false statements made by Getma International, at the time of the invitation for bids, concerning its references and its experience, its financial situation and the existence of a partnership with the MSC group. According to the Respondent, these "fraudulent tactics are contrary to the Guinean laws governing fraud, the general principles pertaining to public contracts and the obligation to invest in the respect of Guinean laws".[316]

*1      The partnership between MSC and Getma*

232.  The parties spoke a great deal about a partnership between Getma International and MSC, but in fact, if partnership there was, it was with MSC's subsidiary, Europe Terminal. According to the Respondent, Getma International, boasted falsely of having a partnership with MSC and appropriated its references wrongfully.

233.  It must first of all be established that this partnership was not mentioned as such, in Getma International's letter of March 10, 2008, in response to the invitation for expression of interest in an extension and the concession of the CT of March 9, 2008. This letter mentioned MSC as one of the 11 "principal client or partner shipowners"[317] and among its three appendices was a letter from MSC's Vice President already written on March 5, 2008 regarding "the MSC group's commitment in the context of the concession of the terminal"[318]. The Vice President referred to "general agreements binding the MSC group and Getma International on the African West coast" and confirmed that Getma International benefited "in this capacity from all the necessary support which our group can provide to you, and in particular our terminal subsidiary". The letter went on to say:

> *It falls perfectly into the framework of the partnership agreement MSC has with Getma International for Africa.*
>
> *This partnership covers all domains of expertise and eligibility required specifically for this project...*
>
> *We authorize you to mention it in your final bid and to present MSC as GI's joint and several partner in accordance with the terms of the Bidding Regulations (Article 4). Our shipyard would be very interested in your management of this terminal and could envisage stops in Conakry port in the future.*[319]

234.  On the day following this letter, March 6, 2008, a Technical Partnership Agreement was signed between Getma International and MSC's Europe Terminal subsidiary (C-174, p. 89 – 92), the principal terms of which stipulated the following:

---

[316] C-Mem. § 242-244.
[317] Getma International's Expression of Interest of March 10, 2008 (C-103), p. 8.
[318] Getma International's Expression of Interest of March 10, 2008 (C-103), p. 15
[319] Getma International's Expression of Interest of March 10, 2008 (C-103), p. 15



Art. 1: *Definitions: [...]*

| | |
|---|---|
| *Representative:* | *The GETMA INTERNATIONAL Company, represented by TRANSAFRICA, representing each of the parties vis-a-vis the Grantor and, as the case may be, third parties;* |
| *Technical Partner:* | *The EUROPE TERMINAL Company; [... ... ... ...]* |

Art. 2:*...with a view to elaborating and submitting the Bid to the Grantor and in the event that the Project were awarded to the parties, to negotiating the Contract with the Grantor and carrying out the Project.*

Art. 3: *[...]*
*If, at the Grantor's request, the Parties accept the principle of a "joint and several" commitment to the Grantor for the realization of the Project, joint and several liability is excluded in relations with third parties and for the Parties' mutual relations.*

Art. 4: *Generally speaking, the Representative's mission is to represent each of the Parties vis-à-vis the Grantor and, as the case may be, third parties, as well as the management of the Project.*
*The Representative is more particularly responsible for the following tasks: [...]*

Art. 5: *Generally speaking, the Technical Partner's mission is to provide technical support in order to permit the realization of the Project.*
*The Technical Partner is responsible more particularly for the following tasks:*

- ♦ *Engineering studies (sizing of infrastructures, sampling, etc.)*
- ♦ *Traffic and traffic projection analysis*
- ♦ *Proposal regarding the required handling equipment*
- ♦ *Elaboration of the documents necessary for the Project*

*The Technical Partner authorizes the Representative to avail itself of its technical support for the account and on behalf of the Parties.*

Art. 7: *The Agreement [...] shall remain in force:*

- *In the case of the non-acceptance of the Bid, until the date of the Grantor's notice of the rejection of the Bid;*
- *in the case of the acceptance of the Bid, until the signing of the contract between the Grantor and GETMA INTERNATIONAL.*

235. On July 28, 2008, it was this technical partnership agreement which Getma International appended to "the NCT Necotrans Group's Getma International/Transafrica SA technical bid[320]". This bid (the mere title of which already creates ambiguity as to the bidder's identity") refers to its Europe Terminal partnership in Chapter 1.1, which provides a "general presentation of the bidder and its partner" in the following terms:

*GETMA INTERNATIONAL is a network of agencies established essentially on the Atlantic coast of Africa, specialized in the shipping professions: forwarding..., cargo handling, the*

---

[320] Technical proposal (C-174).

*management of Container Terminals, transit, post-shipment to landlocked countries, warehousing and international logistics.* (p. 5)

*[...]*

*Getma International is a container handler in the ports of the Dakar, Conakry (via the subsidiary TransAfrica S.A.), San Pedro, [...] and Luanda. GETMA INTERNATIONAL is a shareholder and an operator of the Container Terminal of Douala (DIT), owner of and operator of two latest generation Gottwald container cranes in the port of Dakar, historical handlers of the port of Libreville-Owendo, where in 2007 it became a shareholder in the new Container Terminal, operator of the future roro terminal of the port of Abidjan and operator and designer of the future Container Terminal of Luanda. (Page 6-7).*

*[... ... ...]*

*Getma International's primary ship owner clients or partners in the domain of container handling are:*

- *MAERSK LINE, world leader*
- *MSC, second worldwide* (p. 8)

*[...]*

*Getma International is the privileged partner of Europe Terminal, subsidiary of the group Mediterranean Shipping Company (MST), with which the global port handling contract was signed for the principal ports of the African West Coast. In this capacity, GETMA INTERNATIONAL enjoys the full support of Europe Terminal. Its references for putting into place and managing a Container Terminal are presented below. The technical partnership agreement binding Getma International and Europe Terminal, is appended hereto in appendix OT 2.[321] (p. 9)*

236. The bid adds this to page 10 under the heading "Contractual Partner":

*Europe Terminal is a subsidiary of the Mediterranean Shipping Company (MSC) shipyard and 50% partner of MSC Home Terminal S.A. in Antwerp. This company operates and exploits Container Terminals in Belgium (Antwerp), in Spain (Valencia), in Italy (Naples), in France (Le Havre and Marseilles) and in Brazil with the recent creation of a Navigantes terminal (southeast coast of Brazil). The total annual container traffic volume (EVP) transiting through the various terminals is well above 5 million EVP.*

*The performances of several European terminals managed and operated in full and under the direct sole control of Europe Terminal (among the 30 Container Terminals throughout the world in which MSC is either the sole shareholder, or a partner) make this entity one of the European leaders in the management of Container Terminals. [...]*

*The technical – commercial strategy of the Mediterranean Shipping Company Group (MSC) and a brief presentation of Europe Terminal are appended hereto in appendices OT3 and OT4.[322]*

237. At first sight, a partnership therefore existed between Getma International and Europe Terminal, which required that Europe Terminal assist Getma International in negotiating the contract and carrying out the project, and, "in the event that the parties were the successful bidders", to negotiate the contract with the Grantor and to carry out the Project. The Arbitral Tribunal is aware that such a *modus operandi* in the event of the grouping together of two or several partners for project is commonplace: the partners first commit to cooperation during the pre-contract phase and then specify their cooperation for the execution in greater detail, after the contract has been awarded to them.

---

[321] Our underlining

[322] Appendices OT 3 and OT 4 were commercial brochures of MSC and Europe Terminal, respectively.

238. The impression which the expression of interest and the bid, in combination with their attached documents, gave however, does not correspond to reality because Getma International expressed its interest in its own name only and not in the name of a group comprised of itself and its "partner".

239. Indeed, article 4 of the Bidding Regulations stipulated the following:

> *This bid is reserved to the selected candidates following the call for expression of interest. The term "bidder" used below applies strictly to the selected candidates. It is understood that no grouping together of the selected candidates following the call for expression of interest is henceforth authorized.*[323]

240. Getma International therefore knew - must have known - from the outset of the competitive bidding for the Concession that Europe Terminal could not be the joint and several bidder if both partners did not express their interest in the invitation for bids together and formally, as a group. Without a joint expression of interest permitting a preselection of Europe Terminal also, Europe Terminal could never become one of the successful bidders in the project, although the technical partnership agreement envisaged such a scenario[324].

241. Moreover, Getma International, by not including Europe Terminal in the expression of interest, disregarded the terms of Mr. Aponte's letter of March 5, 2008, quoted above. This letter authorizes Getma International to "present MSC as joint and several partner of Getma International **in accordance with the terms of the Bidding Regulations (Article 4)**"[325]. Getma International did not respect this authorization procedure when it expressed it interest alone, and not on behalf of the partnership. This implies that the technical partnership agreement which was signed the day following Mr. Aponte's letter of support, could not come into effect if the expression of interest originated solely in Getma International and not also Europe terminal. Indeed, as already stipulated above, the agreement itself envisaged that the partners would become successful bidders.

242. Article 7 of the technical partnership agreement stipulates that the agreement would end at the time of the signing of the contract between Getma International and the Grantor, namely, precisely at the time that Getma International would need Europe Terminal for executing its contractual obligations for the building of the new terminal[326]. Although it is possible that the parties to the technical partnership agreement envisaged the conclusion of a new, more detailed contract at the time of the signing of the agreement with the Grantor, as is generally done in this type of partnership, this intention is not expressed and, according to the wording of article 7, the technical partnership agreement - in the event that it had come into effect notwithstanding the failure to respect article 4 of the regulations on which Mr. Aponte had insisted - ended at the time of the signing of the Concession Agreement, namely on September 22, 2008. The file therefore contains no indication establishing that a new contract was effectively signed between the partners after the awarding of the concession to Getma International. Nor did Getma International prove, or even claim, that it had called upon Europe

---

[323] Bidding Regulations (C-108) p. 13.
[324] Article 2 confirms that if their offer prevails, both parties become « successful bidders » and Articles 4 and 5 concerning the assignment of roles between them in this case imply a contractual commitment on the part of the Technical Partner to the Grantor and not at all a subcontracting relation.
[325] Our underlining
[326] The CCJA Tribunal quoted this clause but without discussing it : it simply added that article  broadened the purpose of the Agreement beyond the elaboration of the bid (C-50 § 134) and does not appear to have realized that this required that Europe Terminal be a co-successive bidder.

Terminal for performing engineering studies or traffic analyses. On the contrary, it recognized that Europe Terminal did not provide services to Getma International for the execution of the Concession Agreement.[327] If "other subsidiaries in the MSC group" intervened in the execution according to Mr. Quérel, such interventions were limited to the purchase of equipment and the opening of a line to Conakry, as ship owner. [328] In any event, if the partnership had been extended beyond the award to Getma International, it would not have been joint and several with respect to the Grantor as the bid and the Agreement implied.

243. In short, (i)  this agreement - in the event that it had entered into force notwithstanding the "obsolete"  expression of interest – existed only very briefly and was not renewed; (ii), even during this short period, the partnership was not joint and several, and (iii) that which remained after the awarding of the concession to Getma International was merely a "general" partnership, which envisaged the possible direct or indirect holding of 50% of Getma International's capital, as well as the possibility of port handling services in Africa and a joint participation in the port projects in Africa.

244. In the presence of these observations, it is up to the Tribunal to determine whether the partnership was false, as Guinea alleges.

245. The Claimants contend that these references to a partner are warranted by a Memorandum of Understanding (MoU), signed on November 9, 2005 between the Necotrans group and the MSC group, defining the major lies of the cooperation between the two groups concerning port activities in Africa, in the context of which the e.a. Technical partnership agreement of March 6, 2008, was concluded, but which was much broader and covered all port operations. According to the Claimants, this MoU however, is confidential[331], which was confirmed in the response of MSC's CEO, Mr. Aponte of April 10, 2013[332] at the request of Mr. Talbot, CEO of Necotrans, to authorize communication of the MoU in the framework of the CCJA arbitration[333]. In this same letter, Mr. Aponte confirmed that "it is in the framework of our agreements, including, in particular our participation in the capital of Getma International that you made a bid for the concession of the Conakry Container Terminal, and that in this context, you have included in your bid our partnership agreement, my letter of March 5, 2008, as well as the references of Europe terminal".

246. The Arbitral Tribunal has ascertained that the information as its disposal, concerning the MoU, MSC's direct participation in Getma International's capital and the technical partnership agreement prove that a partnership effectively existed between Getma International (or at least its parent company Necotrans) and MSC or at least Europe terminal). The file contains no trace of any complaint on the part of MSC regarding the fact that Getma International had not involved it as a full partner in the expression of interest or in the bid. On the contrary, Mr. Aponte's letter to Necotrans of April 10, 2013, confirms that MSC maintained its support to Getma International, also in the context of the arbitration proceedings, following the termination of the contract, and that, notwithstanding the fact that MSC or Europe Terminal had not become a co-successful bidder of the concession, another form of cooperation for this operation was certainly envisaged. One can accept as fact that Getma International could at all times call upon Europe terminal's assistance and would have probably obtained it, on the

---

[327] Repl. § 176

[328] TR I, p. 54:18-55:20.

[331] Repl; §§ 150-158 and TR I, p. 58:11-21.

[332] Letter of April 10, 2013 from Mediterranean Shipping Compny S.A. to NTC Necotrans (C-346).

[333] Letter of January 3,2013 from Necotrans to Mediterranean Shipping Company (C-347).

condition that the two companies come to an agreement as to the terms and conditions. In this sense, the two companies were partners.

247. However, this partnership was a commercial one only and the file contains no evidence that Europe Terminal was effectively bound to Getma International legally.  As soon as it was excluded from the expression of interest and above all after the awarding of the concession to Getma International alone, Europe Terminal was no longer bound by the Technical Partnership Agreement.  Furthermore, and above all, there was no joint and several liability between the two partners and Europe Terminal made no commitment to the Grantor. MSC's participation in Getma International's capital created no commitment beyond the amount of this financial participation and in any event did not give Guinea a second debtor for the contractual obligations made to it by Getma International.  In his letter of April 10, 2013, Mr. Aponte did not confirm either that his group had made a concrete commitment to Getma International for the execution of its obligations to Guinea – beyond that which was covered by the Technical Partnership Agreement of March 6, 2008. During his deposition, Mr. Quérel, who was Secretary General of NCT Necotrans from 2008 to 2010, recognized for that matter that in the Necotrans group, they were aware that by responding alone and in its own name to the expression of interest, Getma International had excluded Europe Terminal from becoming a joint and several partner.[334]

248. Hence, could Getma International, aware that there was no concrete commitment on Europe Terminal's part for the concession, refer to Mr. Aponte's letter of March 5, 2008 in its expression of interest, and join the Technical Partnership Agreement of May 6, 2008 to the bid it handed in on July 28, 2008?  At first glance, the answer is no.

249. Mr. Quérel was questioned during the hearing on this incoherent attitude, in particular, following his statement that "the method of the bidding as a joint and several group was <u>abandoned following the ascertainment that Getma International, and it alone, had been preselected</u>".[335] . According to his recollection, this "pertained, according to the explanation provided by our local teams, to the fact the file had been withdrawn, on behalf of Getma International"[336]. Therefore, he appears to be saying that the two partners confronted a *fait accompli*, following the withdrawal of the file and the expression of interest in the name of Getma International. And yet, as the Respondent pointed out[337], this statement does not comply with the statement made before the CCJA Tribunal according to which the joint undertaking was abandoned following a decision of the shareholders of both companies, in particular because they did not deem it was necessary to create one more joint entity while they were already together in the shareholding of Getma International[338]. Questioned again regarding this contradiction, during the hearing of this Arbitral Tribunal, the witness was repeated this explanation, Getma had withdrawn its file and the teams launched the file, the shareholders were informed and then decided "not to enter into the legal mechanism", because the partnership still existed, but not according to that which had been envisaged at the outset[339].

250. The Arbitral Tribunal can understand that there was a misunderstanding between "the local teams at the time, who, according to Mr. Quérel, withdrew the file locally and launched the

---

[334] TR 1, p. 62:1-7.
[335] Our underlining.
[336] G. Quérel's affidavit § 19.
[337] Dupl ; §§ 117-119.
[338] Record of the CCJA hearing of May 27, 2013 (R-43), p. 41:28-41.
[339] TR I, p.62 :1-7.



file, on the one hand, and the shareholders in Paris who were to decide the form and the degree of cooperation, on the other. But when questioned further, Mr. Quérel answered that "Getma International's staff is not necessarily aware of the complete agreement between the Nécotrans group and the MSC group"[340]. This comment may be true for the local teams, but not for Mr. J.-F. Ollivier, director general of Getma International who signed the cover letter for the expression of interest[341] in Paris and who, one can presume, was aware of the intention to submit a joint bid. Even if, like the local teams, he was indeed not aware of his intention and believed that the expression of interest concerned Getma International alone, one cannot explain how Mr. Aponte's letter of March 5, 2008 could have been appended to the expression of interest, although precisely he had sent it in his capacity as director general of Getma International-Paris" authorizing it to introduce MSC as joint and several partner. One does not understand either how the signature page of the expression of interest (p. 14/19) could have mentioned as appendix 1 "MSC's commitment" without alerting the staff in charge, whoever they be, of the fact that this commitment necessitated that the partners be introduced as a group.

251.   Another contradiction exists between the following statements:

> Getma International's staff is not necessarily aware of the complete agreement between the Necotrans Group and the MSC Group.[342] and

> Then, in the production of exhibits, our teams asked MSC who, among them, had written this letter."[343]

252.   How also can one explain that Mr. Quérel, over a period of time of several minutes, presented first the staff, as ignorant of all that which concerns the cooperation agreements between their management/ shareholders and MSC, and then as persons who were even taking the initiative of soliciting MSC who "on their own"[344] prepare the disputed letter authorizing the presentation of MSC as a joint and several partner? The Claimants, apparently aware of the weakness of this testimony, the responded in their Post-Hearing Memorial that Mr. Quérel had not been involved in the expression of interest.[345] This can only increase the doubt concerning his credibility regarding this topic.

253.   The Arbitral Tribunal is not convinced by these fluctuating explanations, which are contradictory and sometimes inaccurate. Indeed, it is not the identity of the party withdrawing the file from the administration which determines who may express its interest and, after its preselection, submit a bid. It ensues from article 4 of the regulations that groups may participate in the procedure on the condition that they be preselected. To do so, all they had to do was to file the expression of interest in the name of the two companies. The cover letter on the expression of interest was received by the APC on March 28, 2008[346], namely three weeks after Mr. Aponte's letter of March 5 and the signing of the partnership agreement of

---

[340] TR I, p. 61:28-29.

[341] Letter of March 28, 2008 from Getma International to the General Management of the Port Authority of Conakry (R-27 and C-16).

[342] TR I, p. 61:28-29.

[343] TR I, p. 61:23-24.

[344] The term appears to contradict the fact that MSC was approached by Getma International.

[345] Mem; AAC § 242.

[346] See the handwritten date of receipt on Getma International's letter to the General Management of the Port Authority of Conakry (R-27 and C-16).

March 6, 2008. This lapse of time was perfect for making sure that the teams and the staff on the one hand, and the shareholders on the other, were in tune.

254.   In their Post-Hearing Memorial, the Claimants even attempted to blame the Respondent for the situation, alleging that "[...] if [...] the fact that MSC authorized Getma to introduce it as joint and several partner in its final bid had played the crucial role purported by Guinea in APC's preselection of Getma, it should have (also) preselected MSC. [As footnote no. 116:] by failing to do so, it put an end once and for all - given the substance of article 4 of the [...] Regulations - to any possibility that Getma come forth as a formal joint and several group with MSC"[347]. The Arbitral Tribunal cannot accept this rejection of responsibility on the Claimants' part: they alone chose, with full knowledge of the regulations, if and how, with or without a partner, one of them would submit a bid. If Getma International bid alone, it was not up to the Grantor, who was in its turn also bound by its own regulations, to attract a third-party, as bidder and force it into a group with another bidder.

255.   Therefore, it is not proven that Getma International effectively intended to bid as a group with Europe Terminal, and that it was effectively due to poor communication between the Getma International staff on-site and the shareholders in Paris that Getma International acted alone in the bidding procedure.

256.   Mr. Quérel was unable to explain why, notwithstanding the abandonment of the joint and several partnership, Getma International nonetheless enclosed MSC's letter in its bid, unless he was saying that the letter was, in addition to a joint and several commitment, "also a commercial expression" and that MSC "like the other ship owners, [......] was confirming commercially its interest in the project".[348]

257.   Getma International's bid makes no secret of its dependency on other companies of the Nécotrans group and also on other partners: it refers numerous times to various Getma International partners and mentions them almost each time that Getma International, Nécotrans and the group are mentioned; the bid says nothing which could lead one to believe that one of them is jointly and severally committed with Getma International regarding the concession project.

258.   The situation is different however, for Europe terminal: in (Chapter 1.1 of) its bid Getma International introduced itself and **its partner**[349], calling it its **"CONTRACTUAL PARTNER"**[350], described in its chapter 1.2. the commitments of Getma International and its partner, Europe Terminal, concerning the granting of a concession to the Conakry CT and its extension[351], and confirmed that "our group and its partners pledge to take on the work of the refurbishment of the existing terminal[352]" and "the work of building the extension to the existing terminal"[353]. However, these statements rely on only one MoU between Nécotrans and MSC which was not attached to the bid (nor could it be produced in this arbitration). If the MoU made it possible to call Europe Terminal (like MSC and all its subsidiaries) a partner (in the commercial sense),

---

[347] Mem; AAC § 228
[348] TR I, p.62: 16-18.
[349] Technical proposal (C-174), p. 26.
[350] Technical proposal (C-174), p. 31
[351] Technical proposal (C-174), p. 32
[352] Technical proposal (C-174), p. 59
[353] Technical proposal (C-174), p. 59



the Arbitral Tribunal sees no justification for the confirmation of commitments on the partner's part and above all for calling Europe terminal, a <u>contractual</u> partner[354].

259. There is no doubt that by appending the technical partnership agreement with Europe Terminal[355] to its bid, Getma International wanted to lend credibility to its reference to a "contractual" partner. But as noted above, the condition for permitting this agreement to come into effect, in particular, a joint bid, was not met. The Tribunal agrees with the Claimant, that Guinea cannot confuse a partnership with a joint and several group and "that it is possible to have a partnership without having a joint, several group".[356] However, a "contractual partner" implies a contract between the partners and the existence of a contract binding Europe Terminal has not been proven.

260. Furthermore, even if, in its bid Getma International did not declare that it had a "joint and several" partnership with Europe terminal, the use of this term in article 3 of the technical partnership agreement (p. 90/254) quoted above, could only reinforce the desired impression of a contractual partnership.

261. The following question is that of determining whether Getma International had the intention of misleading Guinea, by presenting the bid in this manner, and if Guinea was misled.

262. The Arbitral Tribunal points out beforehand that the "deliberate vagueness" of the expression of interest and of Getma International's bid extends also to the identity of the bidder itself: the letter in which Getma International transmitted the expression of interest to the APC states that the expression of interest is that "of the GETMA INTERNATIONAL group"[357] and contains as an attachment, among others, "the <u>NECOTRANS group</u>'s introductory folder"; the expression of interest itself mentions that "GETMA INTERNATIONAL and the <u>NCT Nécotrans group</u> pledge..."[358]; and the first page of technical bid mentions that it is the "bid of the NCT Nécotrans / Getma International/ Transafrica group".[359]

263. Notwithstanding these multiple references to the group, the file contains no evidence that other companies in the Necotrans group, other than Getma International, made a commitment to the Respondent.  Even Getma International Investissements, which was created by Getma International and NCT Necotrans on October 31, 2008 and in its turn created the *Société d'Exploitation Guinéenne* (STCC) on November 20, 2008, did not make a commitment in addition to those of Getma International.  It simply replaced Getma International for meeting the contractual obligation it had taken on with respect to the Respondent, namely that of creating, within three months following the signing of the Agreement, an operating company under Guinean law which it controlled.[360]

---

[354] Our underlining.
[355] Technical proposal (C-174), p. 89-92.
[356] Mem; AAC §241.
[357] Letter of March 28, 2008 from Getma International to the General Management of he Conkry Port Authority (C-16 and R-27); our underlining.
[358] Getma International's expression of interest to the PAC (C-103), p. 11; our underlining.
[359] Technical proposal (C-174); our underlining.
[360] Concession Agreement (C-11) art. 7.1. See also §§ 52 and 54 above and footnote no. 14. According to the Claimants' opening brief, it was decided that Getma International Investissements would be created "as an intermediate structure [(...] which would therefore have direct access to the financing of the Nécotrans group's holding company" (§56). The Arbitral Tribunal wonders however why a Getma International subsidiary would have had more direct access to this financing than Getma International itself and suspects that other grounds were at play.

264. However, it is not the group's commitments which are called into question, but rather those of Getma International's "contractual partner" whom Getma International involved in its bid in a manner not warranted by circumstance. This Arbitral Tribunal deems that it "embellished" the facts more than commercially and that it at least verged on, if it did not exceed, the limit between a favorable, commercially skillful presentation and a misleading one. Even if one does not take account of the absence of joint and several liability, Getma International has always presented Europe Terminal as a "contractual partner" while there was no contract binding the two companies, and in the arbitration it attempted to justify this presentation by relying on an MoU between the parent companies of the commercial partners which was anything but concrete.

265. In any event, the Respondent, on its side, could not have been unaware that a single company, and not a group, had expressed its interest, submitted the bid and subsequently negotiated and signed the Agreement, and that its only co-contractor was Getma International and not Europe Terminal. The file contains no trace of a request by the Respondent for a commitment on the part of Europe Terminal. This can be explained by the Respondent's confidence in the statements made by Getma International concerning its partnership. It is difficult to determine whether this trust was deserved.

266. And yet, to conclude that fraud was committed, not only must one party have made a false statement; this statement must also concern a substantial element and the other party must have effectively been misled.

267. However it is judicious not to rule on these aspects without taking into account simultaneously. the Respondent's second charge regarding the bid.

*2. The references in the bid*

268. **The call for an expression of interest** in the extension and the granting of a concession on the CT specified that it was intended "exclusively for candidates with long, solid experience in the design, financing, realization, operation and maintenance of CT. Only candidates who are legal entities or groups will be admissible". It is not easy to determine whether Getma International's response to this call for bids, confirms this long, solid experience in very vast and diverse activities. Getma International wrote the following:

*GETMA INTERNATIONAL wishes to become lastingly involved in the region through the granting of a concession for certain port activities, and among them the Conakry Container Terminal is one of its priority projects. (p. 1)*
*[..........]*
*beginning in 1989, the GETMA network vested itself in port operations and land logistics [.........] along the West African Coast*
*[.........] Industrial project and oil related logistics gave the NCT Nécotrans group, the dimension it has today.*
*This dimension was reinforced in 2007 by the creation of the "NCT Infrastructure – logistique" company specialized in land, infrastructure projects (rail, roads, ports and airports). (p. 2)*

269. Getma International therefore does not at all claim to have the required experience. Phrases such as:
*Specialized in Africa, the NCT Necotrans group rapidly diversified around the domains of international transport and multimodal logistics.*

or

*in 1992, the NCT Necotrans group seized the opportunity of diversifying itself by building an automobile distribution network*

are certainly proof of a spirit of initiative and ambition, but in fact do not say that Getma International or the group to which it belongs, has the required experience "in the design, the financing, realization, operation and maintenance of CTs". The letter is commercial and it must be read attentively if one is to understand what it truly states and does not state.

270. Further down, we read that "NCT Infrastructure et Logistique is the last subsidiary created by NCT Necotrans to meet the needs of its own network and its subsidiaries, railroad networks, local authorities, or any other company the goal of which is to perform all studies, expert research, audits in all the domains linked to logistics and land, sea and air transportation. This new subsidiary, is specialized in infrastructure projects such as they are to be found in the port and railroad domains, but also concerning mining or oil logistics and falls into a logic of complementarity with the various subsidiaries of the NCT Necotrans group in order to best meet the logistic and operational challenges of these various structures" (C-103) (p. 5-6).

271. An attentive reader understands that all the group's experience in the design, realization and maintenance of infrastructures could be found at NCT Infrastructure et Logistique, which had existed on March 10, 2008 for no more than one year and whose services at the time were "complementary" to those of the group's other subsidiaries, namely that it operated primarily within the group. And yet, the document continues with reassuring phrases such as:

*Necotrans aata, AMT SA and Vopak-AMT are all vectors of growth in traffic, whether it be via the transport commission or through major industrial and mining projects. [..........]*
*Getma International's experience and professionalism in the management, development, operation and development of port activities are a token of success in the conduct of the project. (p. 12)*

272. By using such language, one skillfully creates the impression that this large group in fact does possess all the required experience, at least for operating a CT.  An inattentive reader can be misled... And this was undoubtedly the goal. And yet, the letter does not contain any false statements: when it says that, for studies, Getma International can count on the Inros-Lackner AG engineering firm, the Gottwald Port Technology engineering firm and, in the third place, NCT Infrastructure et Logistique (p. 11), one understands that the role of Getma International and NCT Infrastructure et Logistique in this aspect of the concession will be minimal. Even if the letter adds that "The expertise of NCT Infrastructure et Logistique is a true asset in this context for the development of intermodality, in particular concerning land development and service in Guinea's hinterlands" (p.11), it is nonetheless a fact that the company has accumulated this expertise in no more than one year.

273. On the other hand, financing is not at all mentioned in the long list of "Getma International's commitment concerning the taking-on of the Container Terminal concession in the Autonomous Port of Conakry and its future extension" (p. 11-14).

274. The expression of interest, and its presentation of the group achieved the desired effect, given that on April 7, 2008, the director general of the Autonomous Port of Conakry (APC) informed Transafrica as Getma International's representative, that it had been preselected and that it could submit a bid. Hardly any mention has been made in this arbitration of the preselection process, but one can surmise, due to the fact that the expression of interest was sent to the APC and that it was the APC which responded thereto, that this preselection was performed by

the APC. The Respondent did not allege that the APC was also corrupted[365] and the Arbitral Tribunal infers therefrom that, if Getma International was selected, this was not due to corruption, but to the fact that the presentation of the group had been deemed satisfactory, at least for the purposes of the preselection.

275. Nonetheless, the APC's decision to preselect G.I. is contestable. Even Mr. Quérel admitted, after lengthy questioning by counsel for the Respondent, that Getma International had "neither designed, nor realized, nor financed Container Terminals in 2008"[366] and that it would have been possible that it not pass preselection stage[367]. This question revealed the point to which the commercial aspect and ambition can outweigh stringency in bidding procedures. Initially, Mr. Quérel defended the expression of interest, insisting on Getma International's financing of "port terminals" in Cameroon, namely a "dock"[368], on the fact that "we[369] financed, operated, realized, maintained areas dedicated to containers, but did not have the notion of terminals"[370] and on the fact that the "Container Terminal" notion did not exist in 2008 in Senegal, which implies that Getma International's financing of a "port operation," in Dakar could also meet the criterion of experience.[371]

276. The question then arises of determining whether Getma International's expression of interest constitutes fraud. The Arbitral Tribunal deems that this is not the case. It is commonplace that, in practice, contractors who do not meet all of the conditions of admissibility participate in the preselection, in the hope of getting through notwithstanding their lack of qualifications. One obvious motivation is to open up new markets. This precisely is the reason for which calls for bids are preceded by a preselection. The awarding authority may be more or less strict in evaluating the criteria it itself has established (on the condition of course that it not discriminate against the other competitors). The Arbitral Tribunal considers that, in this concrete case, Getma International was not guilty of fraud and the tactics it used in its expression of interest were nothing but commonplace commercial tactics and were not fraudulent. In any event, its preselection can be explained otherwise than by corruption.

277. Getma International's **technical bid** is more explicit concerning the references. Article 11.2.1 of the Bidding Regulations demanded explicitly the following technical data:

- *The BIDDER's experience and references in the design, financing, realization, operation and management of Container Terminals;*
- *Consolidated global traffic reports per port and for all the terminals managed on behalf of and under the responsibility of the BIDDER for the years 2005, 2006 and 2007;*
- *Presentation of the BIDDER's activities and references in the domains of handling, the operation, maintenance, design, financing and realization of Container Terminals, including the following information:*
- *[...]*

---

[365] Notwithstanding the fact that one of the press articles concerning the awarding of the concession to Getma International, produced by the Claimants to prove the slanderous nature of the campaign organized, according to them, by competitors, mentions that the PAC's director, Mr. Morlaye Camara, also received money from Getma International, in particular the sum of € 300,000. Articles in guinee24.com of Oct. 10, 2008, Oct. 24, 2008, Oct. 31, 2008 (C-132 and C-134).

[366] TR I, p.63:17-p.64:34.

[367] TR I, p.64:39.

[368] TR I, p.64:1-10.

[369] The Arbitral Tribunal notes the use of the term "we" which does not indicate whether the financing, operating and realizing party was effectively Getma International or another company in the MSC group.

[370] TR I, p.64:13-14.

[371] TR I, p.64:20-26.

- *List of the ports for which the design, financing and realization of the terminals was handled by the BIDDER...*
- *Proof of the capacities for performing the study, the planning and the monitoring of the work for the construction of the Container Terminal;*
- *an indication of possible TECHNICAL PARTNERS and financial partners for the implementation of the concession.[372]*

278. We noted therefore that the references requested are those of the bidder itself, and that the partners were simply to be mentioned.

279. Chapter 1.3, of the bid submitted by Getma International comprises "the BIDDER's experience and references in the design, financing, realization, operation and management of Container Terminals".[373] . It consists in a chart which enumerates ten Container Terminals, including Antwerp, Le Havre, Los Angeles and Marseilles, as well as the date of their creation, their surface areas in square meters, the length of their docks and the fact that MSC operates in these terminals. One cannot infer therefrom, what is or was Getma International's role in the design, financing, realization, operation or management of these various terminals. The Arbitral Tribunal understands that these are perhaps terminals in which one of these subsidiaries of the Necotrans group rendered services to MSC or perhaps terminals financed or built by Europe Terminal. In any event, they are not Container Terminals which the bidder, namely, Getma International, designed, financed and or built. And yet, the experience requested had to cover all of these aspects, not all for each of the terminals, but at least for one of them.

280. When the Arbitral Tribunal questioned the Claimants regarding these references, one of their attorneys answered that "at the time 50% of Getma International was owned by the MSC group. Therefore, Getma International was a sister company of all the companies in the MSC group" and that "it was a joint 50/50 company with two families". Thus, the President of the Arbitral Tribunal concluded that the "references which were provided are not only those, or are not those [...] of the bidder, including in the technical legal sense; in other words, Getma International, but they are also or exclusively references of the bidder's shareholders", which was confirmed.[374]

281. This response is therefore not satisfactory. Indeed, although a shareholder can very well form a group with its subsidiary and if the two can then submit bids together as a group, a shareholder is not automatically a bidder and its references cannot be mentioned as being those of the bidder. Counsel for the Claimants confirmed during the hearing that "indications of references indicate very clearly what company manages them"[375], but the Arbitral Tribunal considers that this statement is incorrect: the chart on page 15 of the technical bid mentions for the 10 Container Terminals only what lines are operated on each of them (MSC), but does not state that it was also MSC which designed and built them.[376]

282. The following chapter of the technical bid is entitled: "1.4. Consolidated global traffic per port and for all the terminals managed on behalf and under the responsibility of the <u>Bidder[377]</u> (2005, 2006, 2007)". The Arbitral Tribunal can only infer that Getma International manages

---

[372] Implementation of the Concession (C-108), p.8-16. Our capital letters.

[373] Technical proposal (C-174) p. 36. Our capital letters.

[374] TR I, p.36:19-29.

[375] TR I, p. 36:31-32.

[376] Technical bid (C-174), p. 36.

[377] Our underlining.



terminals in Antwerp, Freeport in the Bahamas, Long Beach in the United States, Las Palmas and Le Havre. However, Mr. Quérel admitted clearly that these are MSC references[378].

283. Chapter 1.5 "Presentation of the Bidder's[379] activities and references (handling, operations, maintenance, design, financing, building)" contains a simple reference to appendices OT 1 and OT 4, the first being a description of "Getma International's network in Africa" consisting in its presence[380] in 14 different countries on the continent, and the second being a presentation of Europe Terminal (including its "home terminal" in Antwerp). If the Arbitral Tribunal rejects the notion that a bidder's shareholder can, due to the simple fact of its shareholder's capacity, become a bidder itself, the production of appendix OT 4 was not warranted. The Tribunal notes, incidentally, the same confusion between Getma International, the sole shareholder, and Europe terminal, a MSC subsidiary, when the financial statements of Europe Terminal for the years 2005, 2006 and 2007 were attached, with those of Getma International, to the financial bid, representing almost 90 pages in this 230-and page document.[381]

284. Chapter 1.6 then follows with the "List of the ports for which the design, financing and realization of the terminals were performed by the Bidder[382]. Here, the bid does not refer to "Container Terminals", but to "terminals" only.[383] The chart mentions four of them, regarding which one understands, thanks to a comparison with appendices OT 1 and 4, that only the first, to be built in 2008-2013 in Luanda, has a link – the intensity of which is unknown – with Getma International, inasmuch as it is a "shareholder of the 5M company, in charge of the construction, management and operation of the Luanda Container Terminal" and that the three others are Europe Terminal references. In short, Getma International had one single reference work, in the future, which remains to be built for a price which was not mentioned, and by a subsidiary company in which it is not even the only shareholder. The Arbitral Tribunal notes that Getma was clearly more transparent in the note entitled "Conakry port: the truth and the proof" which it published on 14 February 2011 to defend itself against the rumors of a threat that its contract with the terminated:

*1.2.2. Proof of Getma's experience*

*Getma at the time was found [sic] the MSC group (your terminal) under a technical partnership agreement (appendix no. 13).*

*In the context of the call for bids, Getma was able to provide proof of significant experience (appendix no. 14); today, Getma Aubrey operates terminals, alone or in cooperation (in particular with Bolloré and Maersk) in Luanda, Lomé, Douala, Libreville, Cotonou and Abidjan.[384]*

---

[378] TR I, p. 71:16-23.
[379] Our underlining.
[380] The Arbitral Tribunal notes a certain negligence in the description of this "presence": depending on the country, it can be a subsidiary, establishment or branch office, or Getma International, or the "Getma International group" which was never defined by the Claimants.
[381] Financial bid of July 2008 (C-179), p. 112-201/230.
[382] Technical Proposal (C-174), p.16. Our underlining.
[383] The Claimants acknowledged in their Mem.AAC that GI *"did not personally have all the references [...] on the level of the design, the financial or the realization of container terminals specifically"* but insisted on the fact that it had *"designed, financed, operated, built, maintained port operations, dedicated areas or areas which could be dedicated to containers, but also to other types of goods as Mr. Quérel explained"* (Mem.AAC § 229)
[384] press conference given by Mr. Fischer and his partner on the truth and proof regarding the Port of Conakry (C-193) p. 5.

285. The Arbitral Tribunal concludes that Getma International did not have the required references, and that it provided references which were not its own and to which it could not refer because the shareholder to which they belong (or its parent company, MSC) was not a co-bidder, nor was it otherwise bound to the Grantor.

286. Thus, therefore, Getma International bid did not satisfy the requirements of the bidding regulations, according to which: "the bid submitted by the bidder (one single entity or group of companies) shall contain [...] all the members of the group must be jointly and severally liable to the Grantor, for the execution of the concession. A statement to this effect is included in the mandate mentioned above, as well as in the submission". Either Getma International relinquished your terminal references and submitted a bid alone, or it formed a group with Europe terminal, which was then required to make a joint and several commitments to the Grantor.

287. Notwithstanding the problems raised therefore by Getma International's offer, it nonetheless received a positive appreciation and even obtained the contract, to the detriment of its competitors. The Respondent considers that this can be explained only by the corruption of the members of the evaluation. As the purpose of the corruption was to obtain the concession, it is fitting to verify whether because references permitted Getma International to become successful bidders. If the awarding of the concession does not depend on references, one cannot consider these false references as evidence of corruption. In this case, the references do not constitute either a substantial factor for concluding the contract and the fact that they are false cannot constitute fraud.

288. The Arbitral Tribunal therefore verified the impact which Getma International's presentation of Europe terminal's references as its own may have had on the evaluation of the bids and the awarding of the concession.

289. The evaluation report shows that the committee work in two phases: the first analyzed the technical bids of the four bidders on the basis of the criteria defined in article 17 of the bidding regulations. The references were part of the "technical proposal" criteria, accounting for 15 points. These 15 points were broken down into 67 criteria, the following of which are impacted:

   b.1 *Experience and references in design, financing, realization, operation and management of container terminals:* 4 points.

   Getma International received 4/4 on the grounds that "the bidder has [...] It's more than two (2) experiences in the design, financing, realization, operation and management of container terminals". It's competitor Bolloré, on the other hand, has received only two because "the committee notes that bidder presents no experience in the design and realization of container terminals".
   The Arbitral Tribunal notes that Getma International did not have these references either, nor did it have those for the financing, and that it therefore was able to receive only 2/4 at the most (given that we are not even certain that it was indeed it, and not Europe terminal, which operated and managed the container terminals). In order to verify the maximum impact of the lack of references, the Arbitral Tribunal grants it 1/4.

   b.2 *Global consolidated traffic report for 2005, 2006, and 2007:* 1 point



69

Getma received 1/1, because "the bidder presented the global traffic reports per port and for all the ports managed in its name and under his responsibility [...]. The ports concerned are located in Belgium, the Bahamas, the United States, Spain and France."

It turned out in this arbitration that this evaluation was inaccurate: these ports are managed by Europe Terminal, and not at all in the name and under the responsibility of Getma International, which was a handler only in the ports of the African Atlantic Coast. Therefore: 0/1.

b.3   [...]

b.4   List of the container terminals designed, financed and built by the bidder: 2 points.

The committee deducted 0.5 points because it had noted that "the structure of the capital of the operating companies and the operating system of each terminal are not specified".

Bolloré received zero points because "the bidder presented no experience in the design, financing and building of container terminals".

Nor did Getma have any experience and the justification which the committee gives for the point of 1.5 is false: "the information provided by the bidder is the following. [sic]:[...] the length of the docks varies between 900 to 2,140 meters; the costs and construction time vary from one €130 to €200 million and construction time from 2 to 8 years; [...] The list of the equipment implemented and the characteristics was provided". As we have seen above, Getma had never yet built a CT and the figures which the commission quotes here are those of the chart, which constitutes chapter 1.6 of Getma International's technical bid, in which the only CT mentioned among the four referred to, which is not an MSC reference, concerns the Luanda terminal to be built by 5M between 2008 and 2013 with docks of 300+600 meters, i.e. shorter than the 900 to 2140 meters which the commission quotes.

Getma International had to receive, like Bolloré, 0/2.

290. Thus, the Arbitral Tribunal  notes that instead of receiving 14.5/15 as total rating for its technical proposal (while Bolloré had 11), Getma International deserved only 9/15. The Arbitral Tribunal  has no reason to verify the other aspects of the evaluation, because only the partnership and the references were the object of debate in this arbitration. Thus, the sum of the points for Getma's technical bid would have been 86.75 points, instead of 92.25 points which the committee awarded (to be compared with the 90.75 points of Bolloré's technical bid).

291. As the four bidders had obtained the minimum of 70 points, their financial bids were also opened by the commission, which granted 78.54 points to Getma International and 69.95 points to Bolloré. The Arbitral Tribunal  notes however that among the financial sub-criteria, there was also one which pertained to the references, in particular the references to the financing of similar projects. The commission granted 5/5 to Getma International, deeming that "the references presented by the bidder prove its capacity to design, finance, build and operate container terminals." Given that it has been established above that Getma International had never designed, financed, or built a container terminal in 2008, it did not deserve these five points. This judgment is warranted by the standards applied by the commission for the same sub-criterion to Bolloré: "the commission notes upon reading the four affidavits presented, that the bidder did not provide any references in design, or for the

work of constructing walls, docks and backfilling". Thus, the grade to be granted to Getma International was 73.54 instead of the 78.53 granted by the commission (to be compared with the 55.68 for Bolloré's financial bid).

292. The final grades were calculated by the commission by adding the weighted technical and financial grades. If the Tribunal applies the same weighting to Getma International's corrected points, one obtains:

$$(86.75 \times 0.60) + (73.54 \times 0.40) = 52.02 + 29.416 = 81.436 \text{ (instead of 86.77)}$$

293. This means that in the general classification of the four competitors, Getma International should have received at least four fewer points, but would have still been the first, with at least four points more than Bolloré. Therefore, if Getma International won the competitive bidding, it was not due to the false references. The references counted, among the various criteria for the award, only for 10 out of the 100 points of the evaluation of the technical bid and 5/100 in that of the financial bid, therefore, a total of $10 \times 0.6 + 5 \times 0.4 = 8$ points out of 100.

294. Furthermore, the fact that the criteria of experience and references were graded, like the other evaluation criteria, by a point system, proves that these criteria were not eliminatory criteria. The elimination of the parties concerned who did not have the required experience and references was done at the preselection stage. And as noted in §274 above, the PAC, which in this instance is beyond any suspicion of corruption, deemed that Getma International's manifestation of interest was satisfactory.

295. Thus, the Arbitral Tribunal  does not accept that the granting of the concession to Getma International, notwithstanding these false references, proves corruption.

296. The issue remains of determining whether the investment is legal because it was obtained by fraud as alleged by the Respondent;

297. It is not excluded that the bid may have misled the Grantor. Given the size and expertise of the group to which Getma International belonged, it is not excluded either that this was precisely Getma International's intention.  An undertaking such as Getma International is familiar with the bidding rules and practices for contracts and cannot deny that it knows the difference between-and the legal consequences of-eight bids submitted in its own name and the bid, binding a group of contractors. Furthermore, the bidding regulations were clear in this respect.

298. The Arbitral Tribunal  considers that the attractive/misleading nature of the technical bid is not obvious. Both the manifestation of interest, and the technical bid were voluminous documents and, the analysis thereof required a serious study, as is apparent in the preceding paragraphs. Only an attentive reading of the technical partnership agreement, such as appended to the bid, could reveal that it did not bind Europe Terminal with respect to the Respondent, that it had never, and could no longer, become effective without violating the bidding regulations (because Getma International alone, had manifested its interest and it alone would submit a bid). The Arbitral Tribunal  does not know whether there was a legal expert on the evaluation commission[386], but in all events, it was up to the Respondent to create a commission comprising persons sufficiently informed to evaluate a bid well.

---

[386] The list of the members of the Commission is at the beginning of the evaluation report (C-111, p. 3).  The file contains only the following information on some of them:
-    At the end of 2012, Mr. Kourouma was Director of public works and urban planning (R-35)

299. In all events, Mr. Sory Camara, one of the two members of the evaluation commission, who, according to Mr. Fox's report, had not been corrupted and who appeared as witness for Guinea in the CCJA arbitration, attested that:

> For us, it therefore appeared that Getma International was bidding in the context of its partnership with MSC. MSC's presence therefore lent credibility to Getma International's candidacy which permitted it to be selected at this stage;

> [F]or the members of the Commission, it was clear that Getma International was bidding with its partner, MSC, which had serious references in the domain of the design, financing and building of container terminals.

> Given this partnership, it appeared normal that Getma International present MSC's references...[388] ; and

> The Commission also took account of the commercial strategy commitments made by Getma International, and in particular, the commitment under the agreement with the shippers from Mali, which met the goal sought in the call for manifestations of interest, which was that the container terminal become a cross-docking and transit platform for the hinterland countries, and in particular Mali, a neighboring country of Guinea.[389]

300. This testimony confirms:

   (i)    that Guinea was aware that the references were not those of Getma International, but those of MSC; and
   (ii)   that other criteria, then the references had also played in favor of Getma International.

301. Even if the bid was presented by Getma International in a manner which could mislead an inattentive reader, and even if, from a strictly legal standpoint, Getma International was not authorized to mention the references of its commercial partner because the bid did not originate in their group, the Respondent was not unaware that the bid was that of Getma International alone, and that the references were those of MSC. The Respondent therefore was not misled (and if it nonetheless was, it was also due to its own negligence in examining the bid and its appendices) and the agreement was concluded by the Respondent with full knowledge of the facts. The Arbitral Tribunal  concludes that it is not proven that the agreement was concluded based on fraud. This conclusion is confirmed, even when one takes into account not only the false references, but also the references to a false contractual partnership.

3.    *The financial commitments*

302. *The bidding regulations required that the bid be accompanied by affidavits testifying to financial capacity, issued in accordance with the appended model and issued by one of the first*

---

   -   In 2013 Mr. Condé was Inspector of financial and accounting services (R-36);
   -   Mr. Sory Camara has training in "finance" economy (R-31);
   -   Mr. Morlaye Camara was Director of the PAC's technical services and project chief (§ 16)

[387] Mr. Sory Camara's affidavit produced in the CCJA arbitration, on March 22, 2013 (R-31) § 13.
[388] Mr. Sory Camara's affidavit produced in the CCJA arbitration, on March 22, 2013 (R-31) § 19.
[388] Mr. Sory Camara's affidavit produced in the CCJA arbitration, on March 22, 2013 (R-31) § 20.



*ranking banks in Guinea or abroad, certifying that the candidate had access to loans for an amount permitting it on the one hand, to take on and operate the existing container terminal, and on the other hand, to build the extension to the container terminal and to install an embankment on the rail connection platform.[390]*

303.   According to the formula model, this should attest that

*The candidate has access to the loans of……. Euros[…] permitting it on the one hand, to take on and operate the existing container terminal, and, on the other hand, to build the container terminal extension and to install an embankment on the rail connection platform.[391]*

304.   Getma International produced a *Société Générale* certificate of financial capacity, the terms of which in no manner reiterated those of the formula required in the invitation for bids, but confirmed only that:

*Since 1993, the Getma International company […] has had an account in our books, which has operated to our full satisfaction. We entertain excellent relations with this company, which to date has never made any commercial or financial commitments which it was unable to meet […].[392]*

305.   It also produced a "certificate of recognition", worded in a similar manner, on the part of the Natexis company.[393]

306.   It is obvious, and it must have been obvious for the members of the evaluation commission, that these certificates were not compliant. For that matter, the commission noted this nonconformity explicitly in the evaluation report and it also gave a reduced rating (1/3) for this item.

307.   The fact that points are granted for the evaluation sub-criterion called "financial capacity certificates" proves that these certificates do not constitute a condition of the admissibility of the bid, but are, along with other sub-criteria, a factor in the global evaluation.

308.   This is confirmed by the fact that other bids, which were not accompanied either by the required financial certificates, were not eliminated either. Thus, it was shown during the hearing that another competitor, APM Terminals, had not attached the proper financial certificate, but that its bid was nonetheless not eliminated.[394]
       It even received 3/3 points for this item in the administrative file on the basis of the simple realization by the evaluation commission that "the financial capacity certificate presented by the bidder was issued by the HSBC bank of the Netherlands".[395]
       Another competitor, the group Maritime TCB/Afrimarine, did not present any bank certificate at all[396], as was pointed out by the Claimants in their rejoinder.[397] . The Arbitral Tribunal was able to verify that TBC/Afrimarine received 0/3 points for not having provided a bank

---

[390] File of call for bids of the Republic of Guinea for the granting of a concession to the Container Terminal of the Port of Conakry, its extension and the building of a rail connection (C-108) p. 7.
[391] Concession Agreement (R-4) p. 61.
[392] Technical bid (C-174) p. 17 of the electronic version
[393] Technical bid (C-174) p. 18 of the electronic version
[394] TR I, p.87:37-88:12.
[395] *Commission Nationale des Grands Marchés de la République de Guinée* (C-111) p. 26
[396] Letters of Bid and Interest (C-358).
[397] Repl. § 202 and footnote n° 173.



certificate (but from KPMG)[398]. Only Bolloré's certificates complied[399] with requirements, and this company received the maximum number of points for this item in the administrative file.

309.  The fact that Getma International's bid was taken into consideration, despite the nonconformity of its financial certificates with the model, is therefore in no manner an indication of corruption and is warranted once more, by the little weight which these certificates carry among the various sub-criteria of the evaluation and the relative importance of certain other sub-criteria, such as the entry ticket, for which Getma International was by far the best bidder.[400] Mr. Sory Camara's testimony before the CCJA Tribunal confirmed this:

> *Mr. Fischer.- You therefore considered that the commission on which you sat had at its own initiative changed the order of the criteria and decided that the financial criteria on the entry ticket, to speak simply, prevailed over the technical criterion?*

> *Mr. Camara.- In the ratings attributed to each of the bidders, the entry tickets had received many more points because Getma had proposed 15 M€, compared to the others who had proposed 5 or 10 million. The fees they proposed where higher than those of the others. Given the context in which we were working, collecting funds for the State appeared important. I believe that it was that which meant that… Because each time the commission worked, the finance ministry's representative consulted the department for the decision to be made. When the technical bids were evaluated, it obtained the minister's opinion, when the financial evaluations were made, the opinion of the Finance Minister. I believe that's what happened.[401]*

310.  The financial certificates which did not comply with regulations did not constitute fraud either: they were not false and their non-compliance did not escape the Respondent, who was therefore not misled in this regard.

4.  *The failure to make the investments*

311.  The Respondent invokes Getma's failure to finance and make the investments in the concession, as the consequence of its fraudulent obtaining thereof. This failure-on which the Arbitral Tribunal  has not been called upon to rule, but regarding which it notes that it was not invoked as grounds for terminating the concession-can in no event prove corruption. At most, it is evidence that the quality of the bid, of the partnership with MSC, and the references given, was not sufficiently sound to guarantee the punctual execution of the Concession Agreement. Neither this failure, nor its possible causes, whether it be the noncompliant bid or the use of references of a partner which was not involved, prove corruption, whether it be *per se* or in combination with other factors. None of these alleged pieces of evidence will lend more credibility to the two testimonies referred to above.

312.  In the absence of other proof, the Arbitral Tribunal  can only conclude that corruption or fraud has not been proven in a clear convincing manner, and that the investment was not illegal on one of these counts.

---

[398] *Commission Nationale des Grands Marchés de la République de Guinée* (C-111) p. 9
[399] TR I, p.82:1-83:11.
[400] *Commission Nationale des Grands Marchés de la République de Guinée* (C-111) p.88/88.
[401] Record of the CCJA hearing of May 28, 2013 (R-104) p. 36:23-35.



(2)   **The Tribunal's jurisdiction regarding the effects of termination, the loss of profit and the additional counts of prejudice resulting from the Termination Decree, due to the Decision regarding Jurisdiction of December 29, 2012**

313.   In its decision of December 29, 2012, the Arbitral Tribunal  decided the following:

-   *There is a "contrary agreement" pursuant to which the jurisdiction of the CCJA Tribunal replaces that of the ICSID, but the scope of application of which is strictly determined by the terms of article 32.5. There is therefore no jurisdiction which competes with the CCJA Tribunal and with that of the ICSID Tribunal for the requests based on the termination of the agreement caused by an act of the Public Authorities, but at the very most, it jurisdiction, which is complementary to this Tribunal if the Concessionary considers that an act of the Public Authorities constituted a violation of the Investment Code and entailed damaging consequences other than (those of) the termination of the agreement.[402]*

-   *The scope of the application of the jurisdiction of this Tribunal therefore does not encompass litigations resulting from the Concession Agreement, including its termination, even following an act of the Public Authorities. Articles 32.5 and 31 of the Concession Agreement are in fact also binding upon this Tribunal. However, it will not be until the time of the analysis of the Claimants' precise requests, of their legal foundation, of their factual causes and of the damages that this Tribunal will be able to determine whether and to what extent its jurisdiction which is complementary to that of the CCJA Tribunal can be effectively implemented to award a "complementary" indemnity for a "complementary" prejudice, which might exceed the jurisdiction of the CCJA Tribunal. [403]*

314.   The Claimants allege that the loss of profit (like the additional counts of prejudice resulting from the Termination Decree) "is not *in casu* a contractual consequence of the termination of the contract, but a consequence of the breach of the Investment Code, resulting from an illegal act of expropriation under the auspices of the termination of a contract.[404]

315.   Contrary to that which the Claimants contend, the loss of profit, like most of the additional counts of prejudice[405], is the consequence of termination and the following distinctions which the Claimants make to maintain the contrary change nothing.

316.   The distinction which the Claimants want to make between "termination" and "the act of termination" is not warranted. It's not because the manner in which termination was carried out in this case (by Decree) is not explicitly stipulated in article 32.5 that termination does not constitute a breach of the contract and would become a violation of the Investment Code. An irregular termination constitutes *a fortiori* a breach of contract and the ensuing litigation falls within the jurisdiction of the court stipulated in the contract. If termination is an act of the Public Authorities, the consequence is the same: it is still the termination of the same contract, the ensuing disputes and litigations of which fall within the scope of the exclusive jurisdiction of the CCJA Tribunal.  Article 32.5 of the agreement contains a very broad definition of acts of the Public Authorities with an exemplary list of those which can impede its proper execution,

---

[402] Decision on Jurisdiction § 125.
[403] Decision on jurisdiction § 152.
[404] Repl. § 340.
[405] Namely the costs of repatriating the requisitioned equipment, and the employee costs caused by the laying off of the personnel. This is less clear for the costs of crisis management; see below.

in particular expropriation. Therefore, the Claimants insist in vain on the fact that the act of termination was in fact an expropriation, as the latter was also included in article 32.5.

317. The distinction made by the Claimants between the so-called "contractual" consequences and the "extra-contractual" consequences of termination cannot be adopted by the Arbitral Tribunal . Indeed, their definition of contractual consequences is unacceptable: *The contractual consequences of the act of termination are those stipulated in the contract".[406]* According to them, it would ensue that all indemnities not stipulated in article 32.3 would be extra-contractual consequences and therefore would be covered by the Investment Code and fall within the jurisdiction of this Tribunal inasmuch as the prejudice exceeds the contractual ceiling for indemnification stipulated in article 32.3

318. The Claimants' reasoning cannot be followed. A count of prejudice is not of a different nature because it is limited under the contract and the amount which exceeds the contractual limit does not become "extra-contractual". The Claimants appeared to lose sight of the fact that this Arbitral Tribunal  has already declared in its decision on jurisdiction, that "what the agreement regulates are the consequences of these acts [of the Public Authorities] on the agreement. Inasmuch as termination is consecutive to an act of the Public Authorities, article 32.5 *"contractualizes"* the *treaty claims* which, consequently, must be submitted to the CCJA Tribunal in accordance with article 31 of the agreement."[407]

319. Contrary to that which the Claimants suggest, the serious nature of termination does not prevent it either from falling into the contractual context. Indeed, article 32.5 thereof refers to acts of the Public Authorities which can, due to their nature, be serious and yet does not make a distinction between such acts based on their seriousness.

320. The agreement set a clear limit on the indemnity which the Concessionary can claim. This all-inclusive/limitative nature of the indemnity of article 32.3 was apparently not the object of debate before the CCJA Tribunal. As noted in the decision on jurisdiction, this was an issue on the merits, "which shall be settled by the court before which requests concerning such additional indemnitees are brought".[408] Contrary to that which the Claimants are attempting to do, this sentence cannot be interpreted as an acknowledgment of the jurisdiction of this Arbitral Tribunal  in the event that the CCJA Tribunal did not consider that it entertained jurisdiction, and even less in the event that it did not rule on the issue for another reason.

321. Indeed, Getma International had initially requested of the CCJA Tribunal not only what it called its "contractual prejudice", namely four counts of damages set as a limited sum in article 32.3 of the agreement, but also the "additional prejudice" comprising "an indemnity equal to the loss of profit it could legitimately have expected for the entire duration of the Concession Agreement".[409] After having confirmed in the CCJA arbitration award its request for indemnity for the additional prejudice[410], Getma International nonetheless omitted this *lucrum cessans* from the request made in its CCJA memorial of June 15, 2012[411], while maintaining its request for the all-inclusive termination indemnity which is, according to article 32.3, "designed to compensate for the loss of activity". Also the CCJA Tribunal noted in its award of April 29, 2014 that Getma International confirmed during the CCJA hearing of July 8, 2013 the withdrawal of

---

[406] Repl. § 341.

[407] Decision on Jurisdiction § 123.

[408] Decision on Jurisdiction § 124.

[409] Decision on Jurisdiction § 129 and Request for Arbitration submitted to the CCJA on May 10, 2011 (R-9).

[410] CCJA record of March 12, 2012 (R-10), p. 16

[411] Claimants' CCJA memorial of June 15, 2012 (R-6) and Decision on Jurisdiction § 139.

its request for indemnification for loss of profit and decided that it could not, on pain of committing *ultra petita*, rule on the withdrawn request[412].

322. The Claimants now consider that "this Arbitral Tribunal  entertains jurisdiction to rule on the breach of the Investment Code, because the CCJA Tribunal recognized that it had not been asked to rule on the request for damages, linked to the loss of profit and the request for damages, linked to the property requisition"[413]. This reasoning cannot be followed: it is not because Getma International, withdrew its request for additional prejudice from the CCJA arbitration, and subsequently submitted it in this ICSID arbitration, that the CCJA Tribunal lacked or could have lacked jurisdiction and that the ICSID Tribunal entertains or could entertain jurisdiction. The referral of a case to a Tribunal does not suffice to confirm or justify the jurisdiction thereof. The complementary jurisdiction of the two Tribunals requires that the jurisdiction of each of them be determined on the basis of the rules which apply thereto, respectively. The "carve-out" brought about by article 32.5 of the agreement is clear and concerns terminations resulting from an act of the Public Authorities: "The scope of the application of this Tribunal's jurisdiction therefore does not include litigations resulting from the Concession Agreement, including the termination thereof, even following an act of the Public Authorities".[414]

323. In their opening brief, the Claimants presented to this Arbitral Tribunal  a request for additional indemnification for loss of profit [415]and claimed the sum of 103,031,250 euros (subsequently increased to 108,428,125 euros) "corresponding to the net value of the cash flow updated for the period of the concession of which the Claimants were deprived due to their expropriation," as well as the sum of 1,058,502 euros, "corresponding to the additional prejudice resulting from the Termination Decree".

324. The net value of the cash flow is nothing other than the loss of profit[416] and therefore targets the same prejudice as the all-inclusive indemnification for termination referred to in article 32.3, which is, again, according to a literal reading of this article, "designed to compensate for the loss of activity" in the case of the termination of the agreement. This all-inclusive termination indemnification is equal to:

   o *The sales made over the course of the 12 (twelve) preceding months if termination takes place over 12 (twelve) months after the entry into force of the agreement;*
   o *the sales of the first year stipulated in the realistic business plan mentioned in appendix 8 if termination takes place over the course of the 12 (twelve) first months following the entry into force of the agreement.*[417]

325. It therefore appears that the parties, by agreeing that the damages following the loss of activity, or of income, namely the loss of profit, would be limited to an amount equal to the sales of one year, recognized implicitly that these damages are the result of the termination of the agreement.

---

[412] CCJA award of April 29, 2014 §§ 189 and 190.
[413] Mem.AAR p. 12, Heading B
[414] Decision on jurisdiction § 153.
[415] The request for arbitration claimed in general a "faire, adequate" indemnification, but no quantified for the prejudice caused by Guinea's breach of Articles 5, 6 and 7 of the Investment Code
[416] Mem. §§ 443 and the following in which the Claimants explain how they utilize the updated cash flow method to calculate "*the prejudice resulting from the loss of future income from the Concession*".
[417] Art. 32.3 Agreement

326.   In CCJA arbitration, Getma International based its request for compensation for the profit it may have "hoped for for the entire duration of the concession" on article 104, paragraph 2, of the code of public contracts of the Republic of Guinea, which determines the formalities to be performed "when the contracting authority puts an end to the execution of the services prior to the completion thereof in a contract termination decision[418]". This confirms once again that the request for loss of profit is directly linked to the termination of the concession and that the litigation arising around the request is indeed a dispute resulting from the agreement.

327.   The same is true of *"the additional prejudice resulting from the Termination Decree"* which is a consequence of the termination of the agreement which was governed in its entirety by the agreement.

328.   Indeed, it's not enough to change the terminology and to no longer refer to loss of profit after termination of the contract, but to a *"prejudice sustained by the expropriated investors[419],"* or *a consequence of the breach of the Investment Code, resulting from an illegal act of expropriation under the appearance of the termination of the contract"[420]* to change the legal grounds and the cause of the request. That article. 32.5 of the agreement applies also in the cases in which termination is the result of an expropriation, is the result of the very wording of this article, which applies to:

   *Any act or decision,... originating in the State,... the direct or indirect effect of which is to impede the Concessionary's proper execution of its obligations..., and in particular:*

   *(iii)...*
   *(iv) Expropriation...[421]*

329.   It is therefore not by using the term "expropriation" that the Claimants can avoid the consequences of the agreement, which they made after intensive negotiations[422]. Their agreement concerned both the jurisdiction of the CCJA Tribunal and the limit on the amount of damages. Therefore, even if this Arbitral Tribunal entertained jurisdiction to rule on the damaging consequences of termination – *quod non* -, it should also apply the parties' agreement, namely article 323, and not the Investment Code.

330.   The damages which the Claimants are claiming were caused by the termination of the agreement. It matters little that such termination was carried out by means of a notice, such as stipulated in the public contracts code, by a simple letter, or by a Decree; the parties' intention to limit the indemnification to which the Concessionary would be entitled in such cases was clear. Article 31, 32.3 and 32.5, were not imposed upon the Concessionary unilaterally by the Respondent in the framework of a competitive procedure, in which the contractual clauses are sometimes non-negotiable. On the contrary, the Articles and Conditions on the basis of which

---

[418] *When the contracting authority terminates the performance of the services prior to the completion thereof due to a decision to terminate the contract, this must be notified by registered mail or hand-delivered against an acknowledgement of receipt to the contract holder, the latter may present a demand for compensation for the prejudice he claims to suffer. This demand must be presented at the latest 60 days after notification of the decision to terminate. The compensation may in no event be higher that the loss of profits of the holder of the cancelled contract, and this loss must be proven via accounting documents.* Code of Public Contracts of Guinea, Order no. 1922- (R-57), p.16

[419] Counter-Memorial n° 1 on Jurisdiction § 109

[420] Repl; § 340.

[421] Our underlining.

[422] Mem; § 188 and screenshot of the computer directory containing the various working versions of the Draft of the Concession Agreement (C-117).

the candidates – Grantor submitted their bids and stipulated that "the disputes arising from the application or the interpretation of these Articles and Conditions will be settled in accordance with the provisions of the Concession Agreement" (article 26)[423]. Regarding the end of the concession, the Articles and Conditions specified only that "the duration of the concession will be established in the agreement" (article 2) and that "the conditions of termination, are defined in the agreement" (article 24). Negotiations for the agreement began on September 2, 2008[424] and lasted for several weeks; the agreement was signed on September 22, 2008. Even if the Respondent in no manner proved its allegation that Getma International is the "author" of article 32.5, the Arbitral Tribunal  is satisfied that it had the opportunity to rule on the indemnity scheme of article 32.3, and that of the acts of the Public Authorities governed by article 32.5[425]. The Claimants themselves provided proof that there were 15 negotiation projects[426] and that the delegations counted two legal consultants and three attorneys on Getma International's side and two legal consultants on the State's side[427] who "discussed, article by article, the draft Concession Agreement prepared on the basis of the draft appearing in the appendix to the articles and conditions"[428]. This Arbitral Tribunal  is therefore satisfied that the wording of article 31 and 32 was validly agreed upon by the parties, and that nothing opposes the application thereof.

331.   Clearly, after the termination of the agreement, the Claimants were unable to settle for this limited indemnification and attempted to escape the contractual limit by initiating a second arbitration invoking violations of the Investment Code before the ICSID Tribunal. One of the Claimants' attorneys recognized explicitly that the goal was to find a way to escape the limitation, although Getma International had accepted it freely:

> Second point, why did we slip, evolve as you said? It's perfectly true, because the issue we were confronting was to determine if the all-inclusive indemnity stipulated under the Concession Agreement was necessarily limited in the context of the contract and could we request a higher sum or not? In other words, could we consider under the Concession Agreement that the damages determined contractually exhausted all the prejudice for which we could request indemnification under the Concession Agreement?[429]

332.   With the exception of the observation that this question alone indicates that for the Claimants also the *lucrum cessans* is a contractual matter, governed by the agreement, the response is clearly that the damages determined in the contract exhausted the prejudice in its entirety. The Claimants provided no valid argument to prove the contrary. They did not explain why their agreement does not mean that which it states and why, notwithstanding the clear agreement, it would suffice, to come before another court and evoke the Investment Code, to annul the validity of the contractual limitation on damages. On the contrary, the Claimants' spontaneous reaction after termination, of calling upon the CCJA Tribunal, confirms that in their minds also the consequences of termination, regardless of the cause thereof, were those agreed upon in the contract. Indeed, to request such indemnification based on the Investment Code and to present termination as expropriation, permitted the Claimants to hope for access

---

[423] Bid evaluation report (C-11) p. 54-62

[424] Notice of provisional award decision (C-10).

[425] Mem. AAR § 52.

[426] Screen shot of computer directory containing the various working versions of the Draft Concession Agreement (C-117).

[427] Claimants' CCJA Memorial of June 15, 2012 (R-6) §§ 162-163 and Mem. § 185.

[428] Claimants' CCJA Memorial of June 15, 2013 (R-6) § 165, confirmed by the affidavit of Mrs. Mangiante, witness for the Claimants §§ 5-7.

[429] Record, ICSID hearing on Jurisdiction, p. 69:24-31.

to the jurisdiction of a ICSID Tribunal. But as long as the object of the request concerned the consequences of termination and not damaging consequences other than (those of) termination, an ICSID Tribunal cannot assume jurisdiction.

333. Indeed, it was decided that this ICSID Arbitral Tribunal  entertained, "at the most, a complementary jurisdiction [...] [that] if the Concessionary considers[430] that an act of the Public Authorities constitutes a breach of the Investment Code and entailed damaging consequences other than (those of) termination"[431]. A determination will be made in chapter VI of whether these conditions have been met.

334. *To conclude,* the Tribunal can only confirm what had already been decided, in its decision on jurisdiction, namely that "this Tribunal does not entertain jurisdiction to rule on the effects of the termination of the Concession Agreement with respect to four Claimants".

**(3)     The effects of article 32.5 of the Concession Agreement as a contrary agreement in light of the Decision of December 29, 2012**

335. The decision on jurisdiction has already clearly established that article 32.5 was a contrary agreement pursuant to which the jurisdiction of the CCJA Tribunal replaces that of the ICSID, but the scope of the application of which is strictly limited by the terms of article 32.5.[432]

336. The Claimants now rely on an observation of the Arbitral Tribunal  in the same decision to assert that article 32.5 of the agreement does not apply to the case at issue:

> *Even if this is not explicitly stipulated, the preliminary and final notifications procedure stipulated in article 32.5 requires that the decision to terminate the agreement following a change of law/act of the Public Authorities belongs to the Concessionary. Only this decision carries entitlement for the Concessionary to the indemnification stipulated in article 32.3 (which is identical to that stipulated in the case of termination due to a fault on the Grantor's part).[433]*

337. The Respondent opposes, with various arguments, the conclusion that the Respondents draw from this observation, namely that this Arbitral Tribunal  entertains jurisdiction to rule on the issue of the additional prejudice.

338. It is not necessary for this Arbitral Tribunal  to evaluate each party's arguments on this point, because it ensues from the decision on jurisdiction and the respective jurisdiction of this Arbitral Tribunal and the CCJA Tribunal that it is not up to the former to decide whether article 32.5 of the agreement applies or not in the case at issue. The observation referred to was merely a non-decisive which followed the ascertainment of this Arbitral Tribunal  that article 325 does not establish "a strict correlation between the change of law/act of the Public Authorities and the termination of the agreement". Neither of the parties had, at the time this Arbitral Tribunal  rendered its award on jurisdiction, formulated an argument based on the formalities required under article 32.5 or the author of the notices envisaged in this article. Over the course of the first phase of this arbitration, and prior to the decision on jurisdiction, there was therefore no debate on this issue; thus, paragraph 116 of this decision was merely a

---

[430] The formula necessarily implies also 'and proves'.
[431] Decision regarding Jurisdiction § 125.
[432] Decision on Jurisdiction § 125.
[433] Decision on Jurisdiction § 116.



reflection following an exhaustive legal analysis, without being necessary for the purposes of the decision.

339. Notwithstanding their knowledge of this reflection (the decision was made on December 29, 2012), the Claimants formulated no argument concerning the applicability of article 32.5 before the CCJA Tribunal, the only Tribunal with jurisdiction for this subject; on the contrary, they continue to request the application of this article:

> GETMA observes that the Termination Decree is a legal act, which is binding upon it (summary statement number 833) with immediate effect and without any possible return to the prior status quo due to the conclusion of a contract with a new Concessionary. The direct effect of the Decree thereby prevented the Concessionary from executing its contractual obligations. Based on this analysis, the Claimant applied the provisions of article 32.5 of the agreement governing "changes of law and acts of the Public Authorities impeding the proper functioning of the activities granted in the concession". It therefore proceeded to make a preliminary notice of change of law which the Republic of Guinea left without response, then a final notice, following the 60-day period stipulated in article 32.5.

> Consequently, Getma International is requesting the application of the stipulation of article 32.5, which states that: [...]

> Thus it requested payment of the indemnities listed in article 32.3 and the indemnification for the violation of article 3.2.5, paragraph 3, which imposes upon the Grantor that it minimize the effects of the change of law and the acts of the Public Authorities".[434]

> Getma considers that the termination decision, made without prior notice, was illegal.
> It likens the termination which occurred to a change of law and act of the Public Authorities, impeding the proper functioning of the activities granted in the concession (article 32.5 of the agreement) carrying its entitlement to the indemnification provided under article 32.5 of the agreement.[435]

340. The absence of any debate regarding the applicability of article 32.5 before the CCJA Tribunal does not create a legal foundation for extending the jurisdiction of this Arbitral Tribunal in disregard of the parties' agreement. The arguments exchanged between the parties in this arbitration concerning the applicability of article 32.5, and in particular the Claimants' objections to this applicability[436] could have and should have been presented before the CCJA Tribunal, which entertained jurisdiction to rule on all litigations resulting from the agreement, therefore *a priori* a dispute concerning the application of article 32.5, in the case at issue. In no event should this Arbitral Tribunal disregard the jurisdiction of the CCJA Tribunal by basing its decision on the observation that article 32.5 does not apply in the case at issue.

341. A possible decision of a CCJA Tribunal that article. 32.5 does not apply in the case at issue, would still not mean that this Arbitral Tribunal would automatically entertain jurisdiction to rule on the consequences of the termination, on the basis of the Investment Code. Even a termination carried out in a manner not explicitly stipulated in the contract, and which, to quote the Claimants, "goes beyond contractual logic" in that it is carried out (i), by means of a presidential Decree, (ii), without respecting the contractual formalities and (iii), without

---

[434] CCJA award of May 26, 2014 (C-50) § 59.
[435] CCJA award of May 26, 2014 (C-50) § 98.
[436] The most recently in Mem. AAC §§ 19-76.



specifying a contractual justification, is still a breach of this contract and the ensuing litigation continues to fall within the jurisdiction of the court designated in the Agreement.

342. The Claimants themselves chose this channel by qualifying termination, as an "expropriation", precisely in order to place it in the context of article 32.5. If they considered that termination was irregular, nothing forced them to base their argument on this article in their successive notices, or in their statement and nothing prevented them from contending that none of the provisions of article 32 apply. Whatever the argument developed may have been, it should have been developed before the CCJA Tribunal which entertained jurisdiction to rule on a litigation following the agreement, including its termination.

343. The principal of estoppel, invoked, by the Respondent, effectively prohibits the Claimants from invoking before this Arbitral Tribunal  the inapplicability of article 32.5, after Getma International based itself explicitly on this article in these notices of March 9 and May 4, 2011, after it requested and obtained from the CCJA Tribunal the application of this article, and continues to pursue the execution of the CCJA award notwithstanding its annulment.[437]

**(4)   *Res judicata* and waiver**

344. The Claimants consider that the Respondent's arguments concerning the waiver and *res judicata* are no longer relevant, since the annulment of the CCJA award, no portions of which survive according to them. The Arbitral Tribunal  considers that it is not necessary to analyze the impact of the annulment of the award on these additional arguments of the Respondent in support of its objection to the jurisdiction of this Tribunal. Even if these arguments fall, the annulment cannot bestow upon this Arbitral Tribunal  a jurisdiction which it has never had. Its jurisdiction does not exist by default, but concerns exclusively the breaches of the Investment Code with the exception of those which were contractualized. Thus, the disputes resulting from the agreement and its termination are still subject to the jurisdiction of a CCJA Tribunal.

**(5)   The annulment of the CCJA award.**

345. The Arbitral Tribunal  cannot follow the Claimants in their analysis of the consequences of the annulment of the CCJA award. First of all, it is not true that "the contract claims have ceased to exist;"[438] it is only the decision concerning the requests which Getma International brought before the CCJA Tribunal, which was annulled and which therefore may no longer be enforceable in certain countries. The annulment of this decision, however, cannot influence the jurisdiction of this Arbitral Tribunal , as the contractual jurisdiction clause which contractualized the Acts of the Public Authorities, impeding the execution of the agreement, is still valid. This contractualization also comprises the limitation of the damages following the termination of the agreement. The issues of the validity and applicability of this limitation are contractual issues which continue to fall within the jurisdiction of a CCJA Tribunal.

346. Then, it is not the initial referral of a request for additional damages to the CCJA Tribunal which prevents the Claimants from requesting this indemnification in this arbitration, as the Claimants are suggesting[439]. Even if Getma International had never submitted a request to the

---

[437] In their Mem.AAC §§ 85-87 and 92, the Claimants state that their initial referral of the case before the CCJA Tribunal for loss of profit and the counts of prejudice following the requisition can no longer have an estoppel effect since the annulment of the CCJA award. This Arbitral Tribunal points out however that estoppel is not linked to the CCJA award, but to the Claimants' prior conduct.

[438] Mem.AAC § 83.

[439] Mem.AAC §84.

CCJA Tribunal, this Arbitral Tribunal would have declared its lack of jurisdiction because we are referring to a prejudice resulting from termination. Contrary to that which the Claimants suggest, the intention of this Arbitral Tribunal has never been "to accept the decision of the CCJA a Tribunal in [the] domains [of loss of profit and the requisition]"[440], but indeed to determine with full independence its own jurisdiction, while granting the CCJA Tribunal, the right and the duty to do likewise.

347. The Claimants declared that "the injustice of the annulment of the CCJA award did not modify the scope of the jurisdiction of this arbitral procedure"[441]. The Arbitral Tribunal also considers that the annulment has no impact on its jurisdiction, such as specified in its decision on jurisdiction, and confirmed above. The annulment of the CCJA award cannot give this Arbitral Tribunal a jurisdiction which it has never had. Even if the Respondent's arguments concerning estoppel, waiver, and *res judicata* fall with the annulment of the CCJA award as the Claimants are claiming[442], the two preceding subchapters show that it is not on these arguments that this Arbitral Tribunal based its decision. Its decision of lack of jurisdiction for the litigations resulting from the Concession Agreement, including the termination thereof, even following an Act of the Public Authorities[443], was made independently of any decision of the CCJA Tribunal (and even 17 months prior to the CCJA award) and continues to be valid, notwithstanding the annulment thereof. If the Decision on jurisdiction specified that "however it will not be until the time of the analysis of the Claimants' precise requests, their legal foundation, their factual causes and damages that this Tribunal can determine whether and to what extent its jurisdiction, complementary to that of the CCJA Tribunal, can effectively be implemented for deciding on a 'complementary' indemnification for a 'complementary' prejudice, which would exceed the jurisdiction of the CCJA Tribunal ", this does not mean, as the Claimants appear to believe, that any damages not obtained from the CCJA Tribunal (whether it be due to the rejection of the request or because of the annulment of the award acceding to the request) could be attributed by this Arbitral Tribunal, namely, would automatically fall within its jurisdiction. The sentence would refer solely to the fact that the Claimants' requests before this Arbitral Tribunal were not, at the end of 2012, detailed and did not therefore make it possible to appoint *nominatim* and concretely those for which the Arbitral Tribunal could assume jurisdiction.

348. In their letter of December 21, 2016, in which they informed this Arbitral Tribunal of the annulment of the CCJA award, the Claimants referred to this Arbitral Tribunal as *"the last bastion separating the Claimants from a denial of justice"*. This viewpoint is not accurate. In this respect they themselves referred[444] to Article 29.5 of the CCJA regulations. It stipulates that after an annulment, either the court evokes if the parties so request, or the case is taken on at the request of the most diligent party. If, as the Claimants noticed, the court has not designated "the last act of the arbitral body recognized as valid by the Court", it ensues that the proceedings must begin again from zero, but not that the Claimants are deprived of all access to the court system. If they have no confidence in the CCJA institution as the dissident opinion[445] suggests, this in itself does not yet prove a denial of justice. If an ICSID Tribunal can entertain jurisdiction to rule on a denial of justice, this must be proven and be attributable to the Respondent. In the case at issue, the Claimants did not adapt their requests or arguments in order to justify a correction by this Arbitral Tribunal of the alleged denial of justice, which

---

[440] Mem.AAC § 88.

[441] Mem.AAC §91.

[442] Mem. AAC §92.

[443] Decision regarding Jurisdiction § 152.

[444] Mem. AAC § 93.

[445] Dissenting opinion of Mr. Bernardo Cremades § 11. This Opinion appears in Appendix B to this award.

occurred following the end of the hearing. The requests before this Arbitral Tribunal are always the same, either loss of profit and the additional prejudice and the grounds thereof are always the termination of the agreement. It is not because the alleged denial of justice was committed by annulling the CCJA award, that this Arbitral Tribunal can extend its jurisdiction to matters which the parties, by their agreement to the contrary, excluded from the jurisdiction of the ICSID Tribunals.

**(6)     In a subsidiary capacity: the inadmissibility of the requests**

349.   Given that the Arbitral Tribunal decided that the Claimants' investment was not illegal, the requests are not inadmissible, but come up against the Tribunal's lack of jurisdiction.

**(7)     In an infinitely subsidiary capacity: rejection of the requests due to false statements**

350.   The Respondent invokes to no avail the *Azinian versus Mexico* case, which is not comparable to the case at issue. In this case, the contract had been terminated by the Grantor who had determined beforehand that it had valid, serious reasons (false statements at the time of the call for bids) for canceling it; then, three successive levels of Mexican courts had, at the initiative of the investors, verified and confirmed the validity of the termination decision. Lastly, and ICSID Tribunal rejected the request for indemnification of the investors because, among other grounds, they had not proven that the Mexican courts had committed errors or denied justice.[446]

351.   In this case, the Respondent did not prove that it had been misled by the statements in the bid, nor that the concession was attributed to Getma International on the basis of false statements. On the contrary, it has been proven above that its bid was accepted with full knowledge of its flaws, because it was planning on an entry ticket which the Respondent could not resist and which prevailed over all other considerations.

***

352.   *To conclude,* the Arbitral Tribunal did not accept jurisdiction to rule on the effects of the termination of the Agreement. Nonetheless, it still entertains jurisdiction to verify whether the Acts of the Public Authorities, other than termination, constitute a breach of the Investment Code and entailed damaging consequences other than those of termination.



---

[446] *Robert Azinian, Kenneth Davitian, and Ellen BACA versus the United States of Mexico, ICSID ARB (AF)/97/2, Award 1st November 1999 (R-133).*

## VI.   LIABILITY

### A.   *The Claimants' Position*

(1)   **Guinea violated article 5 of the Investment Code and customary international law in that it carried out an illegal expropriation, as a result both of the Termination Decree and the requisition Decree**

#### a.   The Termination Decree

353.   The Claimants contend that the Termination Decree, as an act of the Public Authorities, constitutes an expropriation, which falls into the scope of the Investment Code and customary international law, because (i) termination was carried out outside the contractual framework (ii) by the President of the Republic and (iii), without any grounds or contractual justification.

354.   To characterize the Termination Decree as an act of the Public Authorities  void of any contractual logic, the Claimants refer to several cases in which it was determined that the acts of the state, were not those of a co-contracting party, but rather stemmed from the Public Authorities[447]: *Biwater versus Tanzania*[448] (announcement in the press of the termination of a license and the occupation by the Public Authorities of the co-contracting party's premises) ; *SAUR versus Argentina*[449] (administrative takeover of the concession and termination of the contract by Decree); *RFCC versus Morocco*[450] (distinction between contractual actions and those falling into the scope of international law, in which  the *instrumentum* - , such as a law, a Decree or court decision - is an indication of the non-contractual nature, thereof).

355.   On these bases, the Claimants contend first of all that termination fell into no contractual framework because it was carried out by means of a presidential Decree, without respecting the provisions of the agreement governing termination and without corresponding to the application of the procedure stipulated under the agreement. On the contrary, the Termination Decree was purportedly an act of the Public Authorities stemming from the President's will alone, without articulating any justification or non-performance the contract[451]. The Claimants consider that the fictively contractual appearance given by Guinea to termination should not mislead the court, inasmuch as the non-performances alleged by Guinea were nonexistent.[452]

356.   They also affirm the following:

> *Ex abundante cautela, if all of these elements did not suffice to qualify the Termination Decree as an act of the Public Authorities, the presence of the Army and the armed police force In the CT and in the Concessionary's premises [sic] to deny access to the employees of the Concessionary and the STCC to their facilities as soon as the Termination Decree was signed, and this even before the requisition Decree was signed and before any of these two*

---

[447.] Mem.§§ 456-468.

[448] *Biwater Gauff (Tanzania) Ltd. Versus the United Republic of Tanzania,* ICSID ARB/05/22, Award, July 24, 2008 (C-231).

[449] *SAUR Internationale SA versus the Republic of Argentina*, ICSID ARB/04/4, Award, June 6, 2012 (C-237).

[450] *Consortium RFCC versus the Kingdom of Morocco,* ICSID ARB/00/6, Award, December 22, 2003 (C-240).

[451] Mem. §§ 431-437.

[452] Mem. § 427-452.

*Decrees had been notified to the Concessionary, constitutes an obvious demonstration of the extra-contractual nature of the Termination Decree.[453]*

357. Having concluded that the Termination Decree constitutes an expropriation, the Claimants then analyze the criteria of article 5 of the Code, to conclude that the expropriation resulting from termination, was illegal. On the following grounds:

    (i) It was not an act of public utility, because the ultimate goal was to grant the concession to the Bolloré[454] group. The Decree makes no mention of public utility as grounds for termination and, in all events, under Guinean law, expropriation, in order to be legal, must be preceded by a notice to the parties, followed by an act declaring it as a measure of public utility;

    (ii) expropriation was allegedly discriminatory because the Termination Decree was aimed solely and specifically at the concession, rather than at a particular sector or group of companies. Other foreign investors were not the object of the same animosity on the government's part even when it wanted to terminate their contracts; indeed, Guinea gave them a more favorable treatment[455];

    (iii) No indemnification was awarded, such as explicitly specified in the Termination Decree itself.[456]

358. The Claimants contend lastly, in a subsidiary capacity, that even if one were to conclude that the Termination Decree was not violated [*sic*] by article 5 of the Code, it nonetheless constitutes a violation of the minimum standard of treatment which Guinea was required to grant to the Claimants under international law.[457]

359. The Claimants consider that this standard implies "that the actions of the state toward foreigners present on its territory must be judged in light of the "ordinary standards of civilization"" and define it as protection against "all arbitrary actions, carried out without reason, or contrary to good faith" based on the award rendered in the *Abengoa versus Mexico[458]* case. The Claimants allege that termination was carried out without prior notice and was utilized as a political tool in Mr. Condé's presidential campaign.[459]

**b.     The Requisition Decree**

360. The Claimants affirm, evoking the *Saur versus Argentina* [460]case, "that there is no doubt" that the requisition Decree constitutes an act of the Public Authorities governed by the Investment Code and international law in general.[461]

---

[453] Mem. § 448.

[454] Mem. § 474-478.

[455] Mem. §§ 484-488.

[456] Mem. §§ 489-490.

[457] Mem. § 491 (it is to be noted that the Code does not contain any articles on fair, equitable treatment, hence the use of customary law as grounds).

[458] *Abengoa S.A. and Cofides S.A. versus the United States of Mexico,* ICSID ARB/(AF°/09/2, Award, Apr. 18, 2013 (C-251).

[459] Mem. §§ 491-498.

[460] *saur Internationale SA versus the Republic of Argentina,* ICSID ARB/04/98/4, Award, Dec; 8, 2000 (C-253).

[461] Mem. §§ 499-501.

361. They then consider that the requisition violated article 5, even if it was only temporary[462], based on draft number 12 of the Harvard Convention, and the awards in the *Wena Hotels versus Egypt*[463], and *Middle East Cement versus Egypt*[464] cases.

362. Lastly, the Claimants contend in a subsidiary capacity that even if it were concluded that the requisition Decree did not violate article 5 of the code, it is nonetheless contrary to the minimum standard of treatment under customary international law. They contend that the test, in the case of abstention or insufficient action on the part of the executive of the host state, is that of a "simple absence or lack of diligence". The Claimants contend here, that Guinea did not take the necessary measures to minimize the consequences of the requisition on them, for example by providing protection and maintaining the requisitioned equipment[465].

**(2)    Guinea violated article 6 of the Investment Code**

363. The Claimants consider that the (termination and requisition) Decrees, violated article 6 of the code on national treatment, because, by being expropriated without indemnification, they received a less favorable treatment that the Guinean investor. According to the Claimants, Guinean investors would have benefited from the provisions of fundamental Guinean law and the Civil Code, which stipulate indemnifications in the event of expropriation.[466]

**B.    *The Respondent's position***

**(1)    The application of article 5 of the Investment Code to the case at issue**

364. The Respondent states that article 5 of the Investment Code stipulates "that, in the case of expropriation, the investor is entitled to just, adequate compensation, to be determined according to the usual rules and practices in international law" and that, in this case, the parties stipulated by contract the just and adequate compensation for the consequences of an expropriation in articles 32.5 and 32.3 of the Concession Agreement.[467]

365. Thus, article 32.5 constitutes a special agreement governing the just compensation for the prejudice claimed in the framework of a treaty claim resulting from the termination of the Concession Agreement, following an act of the Public Authorities[468] and the indemnities of article 32.3 covering all of the consequences of the alleged expropriation, and in particular loss of profit[469]. The Respondent considers moreover, that:

*The Tribunal must therefore apply the indemnification agreement concluded by the parties, in accordance with the principles of autonomy of will and the binding force of the contract, which are both general principles of international law. It is only if the contract makes no provision to this effect that it can apply the general standards of international law, the purpose of which is merely suppletive.*

---

[462] Mem. §§ 504.
[463] *Wena Hotels Limited versus the Arab Republic of Egypt,* ICSID ARB/98/4, Award. December 8, 2000 (C-253).
[464] *Middle East Cement Shipping and Handling Co. S.A. versus the Arab Republic of Egypt,* ICSID ARB/99/6, Award, April 12, 2002 (C-254).
[465] Mem. §§ 5067-509.
[466] Mem. §§ 511-518.
[467] Dupl. §§ 246.
[468] Dupl. § 260.
[469] Dupl. §§ 254, 268-269.



> *Indeed the consequence of a case being brought before the Tribunal pursuant to a law, in this instance the Investment Code, cannot be to eliminate the principal of the autonomy of the parties' will[470].*

366. The Respondent concludes that, as the value of the investment in the event of the loss thereof, following termination by an act of the Public Authorities, is defined by article 32.2 of the agreement, it also corresponds to the "just and adequate compensation" referred to in article 5 of the Investment Code. "It is therefore this amount which shall be awarded to the Claimants in the event that the Tribunal were to consider that the Claimants are entitled to indemnification."[471]

367. The Respondent contends moreover that there is no contradiction to the detriment of others in requesting, in a subsidiary capacity, the application of the all-inclusive indemnification agreement concluded by the parties, in the event that the Tribunal were to consider that the Claimants are entitled to indemnification[472], and that, in all events, the indemnification agreement constitutes the *lex specialis* of international law, which applies to the consequences of the termination of the Concession Agreement caused by an act of the Public Authorities.[473] The Respondent explains this in the following manner:

> *Pursuant to the aforementioned article 5 of the Investment Code, the rules governing compensation in the domain of expropriation are to be found in the standards of international law in the broad sense, and this includes investment contracts such as the Concession Agreement.... In the instance of a state contract, the rules governing compensation of the agreement are based on international law, and in particular on the principle of* pacta sunt servanda *which is at the top of the hierarchy of international law standards. Of all the standards of international law, which are potentially applicable, articles 32.5 and 32.3 of the Concession Agreement therefore constitute the* lex speciali *by which the parties explicitly stipulated the rules governing the indemnification of the consequences of the termination of the Concession Agreement as a result of an act of the Public Authorities.*

**(2)   Article 6 of the Investment Code**

368. The Respondent presents no arguments on this point.

**C.   *The Tribunal's Analysis***

369. In their arbitration request, the Claimants charged the Respondent with having dispossessed them in a discriminating manner, without prompt, fair, adequate indemnification, in breach of Articles 5, 6 and 7 of the Investment Code and/or in breach of customary international law. The violation of Article 7 however was not discussed and no longer appears in their subsequent statements. Thus, this Arbitral Tribunal shall limit itself to the enacting terms reiterated in paragraph 471 of the Post-Hearing Memorial which mentions only the violations, by both the Termination Decree and by the requisition Decree, of Articles 5 and 6 of the Investment Code and, in a subsidiary capacity, of the minimum standard of treatment pursuant to customary international law.

---

[470] Dupl. §§ 261-262.
[471] Dupl; §§ 268-269.
[472] Dupl. §§ 280-285.
[473] Dupl. §§ 286-293.



**(1)    Article 5 of the Investment Code**

370.   Article 5 stipulates this:

> *The Guinean State takes no expropriation or nationalization measure regarding investments made by persons or companies subject to cases of public utility established on the conditions stipulated by law.*
>
> *In the case of public utility, the expropriation measures must not be discriminating and must provide a faire, sufficient compensation  for an amount to be determined according to the usual rules and practices of international law.[474]*

**a.    The Termination Decree**

371.   This Arbitral Tribunal has already noted that it does not suffice to call the termination of a contract a "expropriation" to make the Investment Code applicable.  The Claimants consider however that termination constitutes an expropriation because (i) it was carried out by a presidential Decree, (ii) it refers to no contractual non-execution, and (iii) it does not respect the contractual provisions for a termnation.[475]

372.   Regarding these factors, the Arbitral Tribunal notes the following:

    (i)   The president's intervention is surprising inasmuch as the Transport Minister and the Minister of the Economy and Finance had signed the agreement and were therefore the persons authorized to terminate the contract.

    (ii)   The Decree mentions explicitly that the Agreement is terminated *"for failures to meet the concession-holder's obligations",* without however specifying the grievances.

    (iii)   The holder of the concession was not ordered by a written notice of the failures to remedy this situation and did not, within a grace period of 60 days, as required under Article 32.2.

373.   There is no question that this makes the termination irregular, and contractually faulty. According to the Claimants, this *"contractual fault, due to its seriousness, also constitutes   a violation of the Investment Code and of customary international law[476]*

374.   The Arbitral Tribunal is aware of the doctrine quoted by the Claimants according to which the termination of a contract <u>can</u> constitute an expropriation.  However, as the Claimants acknowledge, "in order to fall within the scope of international law, such termination must however display certain characteristics; in particular, it must result from a powerful public act in which the State acts above and beyond the contractual framework.

375.   This Arbitral Tribunal considers that the contractualization carried out under Article 32.5 of the Agreement, of Acts by the Public Authorities entail the termination of the concession. the specific of the first file and permits a distinction between the case law mentioned by the Claimants. [477] . Thus, the form given to the termination decision, namely that of a presidential

---

[474] Investment Code of Guinea, Order no. 001/PRG/87 of January 3, 19087 (R-1).
[475] Mem; §§ 431-447.
[476] M.AAC § 319.

Decree, does not suffice to remove it from the context of the agreement, which stipulates explicitly in article 32.5 the acts of the Public Authorities. The result of termination would have been the same if the ministers in office had made the decision to terminate instead of the president. In any event, the contract to isolation of the acts of the Public Authorities, including the expropriation which the termination of the contract represents, implies that this Arbitral Tribunal entertained jurisdiction, even for wrongful termination.

376. The subsequent granting of the concession to Bolloré is also quoted by the Claimants, as evidenced of the dispossessing nature of the termination. The Arbitral Tribunal notes, however, that Bolloré was classified second following the evaluation of the bids of and that the Claimants did not prove that the Guinean public contract code required a new invitation for tenders before being able to the award the concession or that this awarding was in any other way wrongful under the Guinean law.[478] The fact that it is proven that termination was inspired by the presidents wish to grant the concession to Bolloré, could confirm that the concession was not terminated in the public interest, but this does not suffice to requalify termination as expropriation.

377. On the other hand, the presidents public announcement of his intention to terminate the Getma International contract[479] , the reading on the 8 PM news on the same day of the effectiveness of the Termination Decree[480] , even before it had been notified and the enlistment of soldiers and policemen, beginning at 9 PM, before the offices of STCC on the CT [481] are indeed aggravating and vexatious circumstances which go beyond the termination, regardless of its form, and constitute acts of the Public Authorities, other than termination.

378. Concerning the evidence of these deeds which exceed the framework of termination, the Arbitral Tribunal notes that Mr. Malone's affidavit is more reliable than the press article which the Claimants quote *in extenso* as follows:[482] "The Port of Conakry, outside nighttime. On March 8, at around 9 PM, a squad of policeman and Guinean soldiers, carrying Kalashnikovs, take over the docks harboring cranes and containers. The commando jumps onto the offices of Getma International, the French company, which has exploited the port zone since 2008. The employees are evicted *manu militari;* the premises securely locked. "Requisition"? The order comes from the presidential palace."[483]  The article clearly mixes up the events of the evening of March 8th 2011, following the Termination Decree but preceding the requisition Decree, with those of March 9, 2011, following the requisition Decree.  According to Mr. Barone, the evening of March 8th, at around 9 p.m., soldiers and policemen "were in the process of taking

---

[478] the Claimants assert that the Bolloré contract is more advantageous than theirs, but do not prove that this makes it illegal, nor that they exercised action against this allegedly wrongful awarding.

[479] In an interview of President Alpha Condé on the website of the television channel France 24 placed online on February 6, 2012 (C-227), the president declared: "*before my election, I told friends who have supported me that if I won, I would annul this contract. [...] This undertaking made no investment in the Port, go look at the Port. Therefore, they sign the contract on the basis of lies, stating that they managed many ports, whereas they managed no ports anywhere. Therefore, this contract, I have said from the outset that this contract was against the interests of Guinea".*
Affidavit of Mr. Wiltzer according to whom very rapidly after the election of Mr. Alpha Condé as President on December 2, 2010, *rumors were circulating in informed circles in Conakry regarding the new president's alleged intention to call the [CT] concession into question, and this within view to awarding it to the Bolloré group...*" (§4).

[480] §3 of Claude Baron's affidavit of November 14, 2014, did not call as witness for cross examination and whose statements were accepted by the Arbitral Tribunal.

[481] Para. 4 of the affidavit of Claude Barone of November 14, 2014

[482] Mem ; § 320.

[483] Article from classified archives of March 24, 2011 (C-199). Underlining added by the Claimants.

their positions in front of STCC's offices (ground floor and 3rd floor)"[484] and "The next morning (on March 9th)", they were still "on guard in front of the various entries to STCC's offices"[485] "Moreover, on the morning of March 9, 2011, all of STCC's administrative employees had remained outside the office, in the parking lot, because the soldiers had denied them access to their work stations and they could not even recover their personal effects.  They were joined by a certain number of drivers and maintenance personnel...There must have been about sixty persons in front of the offices; The employees were in a state of shock and traumatized by what they were seeing;..the armed forces, as though they were arresting criminals".

379.  The Arbitral Tribunal therefore concludes that, contrary to that which the press articles quoted by the Claimants and above all the comic strip produced as exhibit C-203 (p. 8) imply, during the night of March 8, 2011, the soldiers and the policemen did not "jump" onto Getma's offices, by force in the company of Bolloré's representatives, nor did they evict its personnel. Nonetheless, the presence of soldiers and policemen in front of the offices on the eve of March 8, 2011, while the requisition Decree had not yet been adopted, is an act of the Public Authorities, which is not at all necessary for terminating a contract, and for which the Respondent did not proffer the slightest justification.  This was an act of the Public Authorities which is not covered by the Agreement and which constitutes a violation of the most basic standard of treatment under customary international law.

380.  We shall see further down, in Chapter VII, whether and what damage, other than that of termination itself, these aggravating circumstances caused the Claimants.

**b.    The requisition Decree**

381.  The requisition Decree of March 9, 2011 was pronounced "considering the necessity of the continuity of the public services provided in the Conakry Container Terminal"[486] and it concerned "the personnel, equipment, facilities, real property and assets which the Guinean State] deems necessary, belonging to Getma International and to the *Société du Terminal à Conteneurs* [Container Terminal Company of Conakry]".

382.  It is not contested that this was an act of the Public Authorities, but the Claimants consider furthermore that the requisition constitutes an illegal expropriation, even if the requisition was only temporary. [487] They base their argument not only on what they call "the Harvard Agreement" (but which to date is merely a project), but also on the *Wena Hotels versus Egypt and Middle East Cement versus Egypt* cases.[488]

383.  This Arbitral Tribunal considers that indeed the requisition for over three months constitutes an illegal expropriation, if and inasmuch as the State did not pay compensation for the losses sustained by the Claimants and STCC, even if the assets were subsequently returned.  The consequence of the restitution of the assets on June 22, 2011 was that the expropriation was only temporary, which will have an impact on the determination of the indemnification owed.

---

[484] § 4 of Claude Barone's affidavit of November 14 ?2014.
[485] § 5 of Claude Barone's affidavit of November 14, 2014.
[486] Requisition Decree (C-21).
[487] Indeed, the requisition was lifted on June 22, 2011 with, as sole justification, other than the references to legal texts, "*the necessities of operations and the implementation of the Conakry Container Terminal extension project*" (C-26).
[488] Mem ; § 504.

**(2)    Article 6 of the Investment Code**

384.  Article 6 is worded as follows:

> *1) Subject to the laws and regulations of the Republic, foreign natural persons and legal entities duly established in Guinea receive the same treatment as Guinean citizens regarding the rights and obligations pertaining to the pursuit of their activities. [489]*

385.  The Arbitral Tribunal notes that the resorting to law enforcement was excessive and it has not been proven that the acts of intimidation of the Claimants' personnel which accompanied the requisition were necessary, duly warranted or proportionate.

386.  The Arbitral Tribunal recalls that any administrative measure or act of the Public Authorities must be duly warranted and proportional to the goal pursued; this constitutes a general principle which applies also under Guinean law.  This principle is essential in any state governed by law in order to avoid arbitrary actions.  It applies in both civil and administrative and criminal matters, and for foreigners and for citizens.  In this sense, the Arbitral Tribunal notes that the Government's actions toward the Claimants exceeded its prerogatives.

387.  The Arbitral Tribunal concludes that the requisition act and the measures which accompanied termination did not respect Article 6 of the Investment Code.

388.  Similarly, the Arbitral Tribunal concludes that the foreign investors were not treated in accordance with the basis standards of international law.

## VII.    COMPENSATION FOR THE PREJUDICE

### A.    *The Claimants' Position*

**(1)    The Claimants are entitled to full compensation and an outright sum in indemnification pursuant to Article 32.3 of the Concession Agreement does not apply**

389.  According to the Claimants, compensation for the prejudice resulting from Guinea's violation of the Investment Code and Customary International Law must be calculated in accordance with Customary International Law.  Thus, in evoking the *Chorzow* case and the UN International Law Committee, the Claimants contend that the compensation for the damage sustained must comply with the principle of compensation in full.[490]

390.  They also consider that:[491]

> *"The Investment Code (and Article 5, para. 2 thereof) governs the measure of compensation only as the condition of a lawful expropriation.  Such a measure cannot therefore not constitute a direct basis for determining the compensation measure owed for an unlawful expropriation, thereby making it necessary to refer to customary international law and the criterion of indemnification which it stipulates in cases of unlawful expropriation."*

---

[489] The Investment Code of Guinea, Order no. 001/PRG/87 of January 3, 1987 (R-1).

[490] Mem. §§ 523-531 ; Case of the Chorzow Factory (request for indemnity) (merits), Permanent International Court of Justice, *Recueil des Arrêts,* Series A – no. 17, Sept. 13, 1928, p. 47 – (C.263).

[491] Mem. § 535.

And that:

> "In any event, the criterion of compensation of Article 32.3 of the Concession Agreement was not intended to apply in this case.[492]

391.  The Claimants claim that the standard of full compensation implies more precisely "that one adopt the hypothetical scenario in which the Concession Agreement has been executed to term" and consequently "all contractual provisions pertaining to the indemnification owed in the case of the termination of said agreement cannot be taken into account."[493]

392.  Regarding the two arguments raised by the Respondent, it considers (i) that Guinea's invoking of article 32.3 of the Concession Agreement and the *pacta sunt servanda* principle is not admissible, although it itself violated its various contractual agreements on several occasions[494], and (ii) that the *lex specialis* principle cannot lead to the fact that the agreement (a contractual agreement) can prevail over an established rule of public international law, stipulating full compensation; moreover the agreement was "repudiated" by the Termination Decree and article 323 thereof can therefore not apply.[495]

**(2)    Amount of compensation**

393.  The Claimants are requesting compensation for four counts of prejudice: (i) the loss of future income caused by the termination of the Concession Agreement (also called the "loss of profit"); (ii) the prejudice linked to the requisition; (iii) the additional prejudice resulting from termination; and (iv) the moral prejudice.[496]

394.  *Regarding the loss of future income,* the Claimants have submitted a report by PwC based on the method of updated, or discounted, cash flow (DCF) taking into account as point of departure the value of the concession on the date of termination, which they considered as the date of the evaluation. The report establishes two cash flows (based on two different hypotheses on inflation) until the end of the Concession Agreement, namely the year 2034, for the amount of 1,134,548 million GNF and 882,607 million GNF. The two assumptions are then updated by the capital cost rate and the cost of the debt. The average of the two assumptions leads PwC to conclude that the value of the concession at March 8, 2011 (date of the Termination Decree) was €105,000,000, and that as Getma International owned 98.125% of STCC, the prejudice of loss of profit, amounts to 103,031,250 euros for the Claimants.[497]

395.  In their rejoinder, the Claimants, based on a second PwC report, revised these amounts upwards: having modified the estimated rate of inflation, as well as the fiscal burden, PwC determines in its second report, the value of the concession at €124 and €97.5 million in the two respective assumptions, which gives an average value of €110.5 million[498], of which the Claimants are claiming 98.125%, or €108,428,125.[499]

---

[492] Mem. § 536.

[493] Mem. § 538.

[494] Repl. §§ 453-460

[495] Mem. §§ 536-539; Repl. §§ 461-471.

[496] It is noteworthy that the Claimants do not consider that the requisition alone is an expropriation, and as seen above, termination is, according to them, one of the aspects of expropriation of which they were the victims.

[497] Mem. §§ 543-570.

[498] Second PwC report, § 219.

[499] Repl. §§ 578-589.



396. In their rejoinder, the Claimants contend that PwC's calculation assumption corresponds to the price of sale of the concession at a given time, but that this constitutes merely a working assumption which does not require that a sale be effectively authorized at a given time under the Concession Agreement itself[500]. They also contend that the evaluation must indeed be made at March 8, 2011 with the information available on this date (and not on the date of PwC's report), without article 7.2 of the agreement departing from this principle, particularly as international law places the evaluation on the date of expropriation[501]. Lastly, they proffer that, if Guinea would like to prove that they in fact derived a profit from termination, the Respondent must produce evidence of this affirmation[502]. They add that PwC's model is based on solid assumptions because, contrary to that which the Respondent asserts, they had the capacities to finance the investments and the method for calculating projected growth in container traffic and prices is described in precise detail by PwC.[503]

397. _Regarding the additional prejudice caused by the Termination Decree,_ the Claimants are claiming reimbursement of certain costs which, according to them, are independent of the loss of profit, namely:[504]

- The costs of repatriating the requisitioned equipment for the amount of €734,212. They specify in their rejoinder that it is commonplace in concessions that the Grantor buyback the equipment, following the contract[505].

- Crisis management costs for the amount of €258,834. They add in their rejoinder that these costs are linked directly to Guinea's specific fault, and that even the costs already incurred prior to the Termination Decree are owed because they are "the direct material consequences of this breach".[506]

- The wage costs caused by the laying off of several employees, for the amount of €65,456. They specify in their rejoinder that labor law obligations in terms of reclassification and paid leave, do not leave the Claimants any alternative for the two employees concerned, other than layoffs[507].

398. _Regarding the prejudice caused by the requisition_, the Claimants consider that they are entitled to the following:[508]

- Reimbursement of the costs of repairing the requisitioned operating equipment. They consider that two cranes and five container removal vehicles were considerably damaged, and that the cost of their repair amounts to €1,151,508. They specify in their rejoinder that the damage indeed occurred during the period of the requisition, and not prior thereto.[509]

- The reimbursement of stocks (such as gasoline or spare parts for handling machinery) which were part of the requisition equipment and which they recovered only partially at

---

[500] Repl. §§ 509-513.
[501] Repl. §§ 514-540.
[502] Repl. §§ 548-558.
[503] Repl. §§ 559-599.
[504] Mem. §§ 601-615; Repl. §§ 600-614.
[505] Mem. §§ 602-606; Repl. §§ 600-604.
[506] Mem. §§ 607-609; Repl. §§ 605-610.
[507] Mem. §§ 610-615; Repl. §§ 611-614.
[508] Mem. §§ 571-600.
[509] Mem. §§ 571-587; Repl. §§ 615-622.



the time of the lifting of the requisition, for the amount of 210,070 euros[510]. They specify in their rejoinder that these stocks were consumed by Guinea, and that the amount claimed in this capacity is not part of the indemnification for the value of the concession, which was calculated on the basis of the DCF method and therefore does not include the book value of the stocks at March 8, 2011[511].

-   Payment of these services performed by STCC, but not invoiced on the date of the requisition, for the amount of €589,418. They explain that due to the requisition, it was impossible to know whether the goods had been delivered to their owners[512] and that invoices could be issued only on the basis of documents in its successor's possession[513]. They add that their expert accountant, PwC, verified that the data produced by the Getport software program, based on which they calculated this prejudice, are reliable.[514] Lastly, they confirm that the amount of the invoices to be issued is not included in the 2011 sales used for calculating the value of the concession and that this prejudice is therefore not one in the same with the loss of profit[515].

399. _Regarding the moral prejudice,_ the Claimants recall first of all the recognition of the principle of compensation for this type of prejudice under international law and consider that moral prejudice can consist "in prejudice caused to the credit or reputation of a natural person or legal entity" and in a prejudice caused to the legal entity[516] for "physical violence exercised on a company's personnel".[517]

400. The Claimants consider that their moral prejudice is of the seriousness required for entitlement to indemnification[518], but nonetheless recall that doctrine is of the opinion that moral damage opposes this different treatment of material damage[519]. They emphasize the suddenness of the termination and the requisition, which, according to them was conducted by a unit of soldiers and armed policeman, in a hostile tense atmosphere, in which the employees were "requisitioned" and "the premises were partially looted". Furthermore, the Claimants suffered an undermining of their image, due to the fact of the propagation of the erroneous idea by the President of the Republic, the Bolloré group and the national and international press that Necotrans was a "substandard" and "faulty" operator, following the termination and granting of the contract to the Bolloré company, its direct competitor.[520]

401. The Claimants consider that they are entitled to an indemnification of €1,000,000 on this count.[521]

---

[510] Mem. §§ 588-593.

[511] Repl. §§ 623-632.

[512] Mem. § 599.

[513] Repl. §§ 637-638.

[514] Repl. § 639 and PwC report of July 10, 2015 §§ 240-243.

[515] Repl. §§ 6365-636.

[516] Mem. §§ 616-617 (quoting the _Desert Line Projects LCC versus Republic of Yemen_ case, ICSID ARB/05/17, Award, Feb. 6, 2008, (C-267); _and Opinion in the cases of Lusitania, Joint Germany- USA Commission,_ Nov. 1st, 1923, _Recueil des sentences arbitrales,_ Volume VII, pp. 32-44, p. 40, (C-280)).

[517] Mem. §§ 618-619.

[518] Mem. § 620 (quoting _Franck Charles Arif versus the Republic of Moldavia,_ ICSID ARB/11/23, Award, April 8, 2013, (C-282); _Joseph Charles Lemire versus the Republic of Ukraine,_ ICSID ARB/06/18, Award, March 28, 2011, (C-281)).

[519] Repl. §§ 641-649.

[520] Mem. § 620 and Repl. §§ 650-669.

[521] Mem. §§ 616-624, Repl. §§ 640-669.

402. *Regarding interest,* the Claimants are requesting payment of interest, capitalized annually at the rate of 8.7%, from March 8, 2011 onwards[522]. They specify in their rejoinder that this interest is indeed owed to them in order to indemnify them for the lapsing of the period of time between the date of the expropriation and the date of the payment of the indemnity and that this interest was calculated at July 10, 2015, at the sum of €160,087,489.[523]

**(3)   The allegations of double compensation**

403. Regarding the issue of double compensation, the Claimants consider first of all that the Respondent is ill-advised to invoke this argument, inasmuch as (i) to date, the Claimants have obtained no payment pursuant to the CCJA award, and (ii) the Respondent filed action for the annulment of said award - which in the interim has been confirmed.[524] Furthermore, this issue is not a new one in ICSID arbitration, and the Tribunal has full freedom in its enacting terms to reduce the compensation awarded based on other payments effectively received from Guinea (and not merely awarded by the CCJA Tribunal). The Claimants quote several ICSID awards and one decision of the Paris Court of Appeal which adopted this solution in the case of parallel procedures.[525]

404. The Claimants consider that the Respondent's position consisting in taking into account only the amounts invested on the date of termination, to then consider that the Claimants had already recovered a portion of the sums by operating the CT, disregards the principle of full compensation, including the loss of profit.[526]

**B.   *The Respondent's position***

**(1)   The all-inclusive indemnification referred to in article 32.3 of the Concession Agreement is applicable and requires that all indemnification be strictly appreciated**

405. The Respondent contends that article 32.3 of the Concession Agreement, which stipulates Guinea's payment of an all-inclusive termination indemnification, covers all of the consequences of the alleged expropriation.[527]

406. More precisely, the Respondent quotes several legal sources who confirmed the possibility of stipulating an all-inclusive indemnification agreement in international arbitration.[528] It then contends that the all-inclusive sum covers all requests, because (i) the loss of profit is included in the expression "to compensate the loss of activity" of article 32.3, and (ii) the list of the indemnities in article 32.3 (which includes unamortized assets or severance pay) is exhaustive[529]. It adds in its Replication that the addition of article 32.3 had been explicitly requested by Getma International, during the process of concluding the agreement and had been worded in a precise sophisticated manner in order to cover the entire prejudice

---

[522] Mem. §§ 625-630.
[523] Repl. §§ 670-677.
[524] The CCJA award has since been annulled in a decision of the CCJA of November 30, 2015.
[525] Repl. §§ 472-488.
[526] Repl. §§ 489-504.
[527] C-Mem. §§ 350-353.
[528] C-Mem. §§ 334-346.
[529] C-Mem. §§ 347-354.



sustained in the event of termination, while avoiding the Concessionary's enrichment in the case of premature termination.[530]

407. The two principles which the Respondent would like the Tribunal to apply are (i) *pacta sunt servanda,* namely the fact that, as the parties reached a contractual agreement regarding the compensation to pay in the event of termination, it is not possible to apply the principle of full compensation resulting, according to the Claimants, from international law[531] and (ii) moreover, the Agreement constitutes a *lex specialis* which permits a departure from the common law governing compensation without its being possible that the termination of the Concession Agreement imply the non-application of the indemnification agreement it contains.[532]

408. In its Replication, the Respondent adds that the principle of estoppel inhibits the Claimants from contesting the application of article 32.5. Whereas if the argument they presented (and, on which they obtained compensation) before the CCJA a Tribunal, and that on its side, it never waived its right to invoke the indemnification agreement (either by another alleged termination of the agreement, which would entail the non-applicability of the all-inclusive agreement, according to the Claimants, or by the principle of estoppel, the conditions of the application of which have not been met in the case at issue).[533]

409. The Respondent considers furthermore that the Tribunal must adopt a strict vision of the alleged counts of prejudice, in order to avoid all unwarranted increment of wealth, considering that on the date of termination, the results of the operation permitted Getma International to cover all of the investments it had made[534].

410. In this capacity, it contends that the Claimants already received, during the operation., €20,000,000, which covers, according to the Respondent, their entry ticket, as well as the investments in the work performed, corresponding to the amount of approximately €3 million.[535] Furthermore, the Claimants recovered all of the equipment fully for an amount of €10-€12 million.[536]

**(2)   Amount of compensation**

411. *For loss of profit,* the Respondent's main position consists in contending that this prejudice is already covered by the all-inclusive indemnification of article 32.3, which constituted the basis for the CCJA award, and which is designed to compensate the loss of activity.

412. In a subsidiary capacity, the Respondent criticizes PwC's calculation method.[537]

- It considers first of all that the calculation premise (PwC sought on March 8, 2011, the price of the sale of the concession to a potential third-party) is erroneous and ineffective because the agreement could not be sold pursuant to article 7.2 of the Concession Agreement, which prohibited such sale.

---

[530] Dupl. §§ 246-258.
[531] C-Mem. §§ 359-365 ; Dupl. §§ 259-269.
[532] C-Mem. §§ 366-376; Dupl. §§ 286-298.
[533] Dupl. §§ 270-285.
[534] C-Mem. § 505.
[535] C-Mem. §§ 500-502
[536] C-Mem. § 503.
[537] C-Mem. §§ 509-533; Dupl. §§ 377-433.



- PwC should have taken into account all of the *"ex post"* data and information known on the date of the evaluation, and not only the information available on March 8, 2011. In particular, the value of the concession should have been calculated by taking into account all the cash flow which the pursuit of the agreement would have generated over the period of 2011 to 2034[538]. According to the Respondent, taking account of all the *ex post* factors complies with the principle of full compensation singled out in the *Chorzow* case presented by the Claimants, which is to reposition the investor in a financial situation identical to the situation it would have been in had the damaging event not occurred.[539] This method also permits a precise, coherent evaluation[540] of the loss of profit and avoids at the same time the punitive nature of the indemnification[541].

- PwC could not add to the value of the concession the interest on arrears between March 8, 2011, and the date of the award, inasmuch as in the event of the maintaining of the concession, the Claimants would never have been credited at March 8, 2011, with a sum equal to the value of the concession. The Respondent adds that interest is not automatically granted in international law, that the all-inclusive agreement excludes the addition of interest, particularly for the prejudice for loss of profit, and that the granting of interest must be excluded for the period during which the Claimants, prolonged the procedure, with no grounds before this Arbitral Tribunal .[542]

- PwC did not take into account the Claimants, poor financial situation and ignores the fact that they would have been unable to finance the investments, including for the second terminal, and that consequently all of PwC's financial projections based on the existence of the second terminal, and the increase in volumes and fees thought to result therefrom must be disregarded[543].

- PwC ignores the profits which the Claimants derived from termination, for example by not having to accumulate debts because the Claimants released from their obligation to mobilize 77.7 million in funds to make the CT investments[544].

413. Regarding the accounting aspects of the calculation of loss of profit, the Respondent contends that:[545]

- The sales (constituting the basis for calculating updated cash flow) were overestimated because (i) PwC does not explain how the container volume handled was calculated, while Guinea's growth prospects are not optimistic, (ii) the calculation of the evolution in the price of services per container, did not take account of real inflation;

- The cost projections taken into account by PwC are not presented in detail and can therefore not be verified;

---

[538] Dupl. § 380.
[539] Dupl. §§ 380-398
[540] Dupl. §§ 399-403.
[541] Dupl. §§ 404-406.
[542] Dupl. §§ 416-433.
[543] Dupl. §§ 407-410.
[544] Dupl. §§ 411-415.
[545] C-Mem ; §§ 534-549 ; Dupl. §§ 435-472.



> the rate of the updating of cash flow is poorly calculated because the market risk premium utilized by PwC was not accurate and the country risk premium was underestimated.

414. The Respondent concludes that, on October 30, 2015, the value of the concession taken at March 8, 2011 was €30 million or 33 million constant euros.[546]

415. _Regarding the additional prejudice caused by the Termination Decree_ [547], the Respondent contends that (i) the repatriation costs are unwarranted because in all events the Grantor had no obligation to recover the equipment, which therefore would nonetheless have had to be repatriated, (ii) crisis management costs are unrelated to termination because they correspond to services rendered prior to the Termination Decree and are not connected to this litigation, (iii) the wages were paid because the Claimants decided to keep the employees at issue on the premises where they rendered further services for that matter; and that the first two counts of prejudice are also covered by the indemnification referred to in article 32.2.

416. _Regarding the prejudice caused by the requisition_ [548] the Respondent contends that:

- the costs of repairing the equipment are unwarranted because (i) the same request was made and rejected before the CCJA, and (ii) the real cause of the damage is Getma International's poor maintenance during the operation of the CT as established, according to the Respondent, in the reports presented by the Claimants; lastly, the report presented by the Claimants in their rejoinder supposedly to prove the good condition of the equipment on the date of the requisition is very limited (only two cranes) and the Respondent wonders why this report was not presented to the CCJA Tribunal, given its relevance.

- The value of the stocks not returned implies that the Claimants did not effectively recover them, which they are not able to prove[549]; the Claimants had an inventory taken of their property by a bailiff on March 12, 2011 and their defense argument that no physical inventory of their stocks could be performed on March 8, 2011 therefore does not justify their present calculation of the value of the stocks which were allegedly not returned[550];

---

[546] Dupl. § 469.

[547] C-Mem §§ 550-567; Dupl. §§ 473-479

[548] C-Mem §§ 568-606; Dupl. §§ 484-499

[549] C-Mem §§ 594-597; Dupl. § 496

[550] Dupl. § 469 and Mem. AAR

[551] C-Mem § 592; Dupl. § 495; Mem. AAR § 425.

[552] C-Mem §§ 601-603 and Dupl. § 499.

[553] C-Mem §§ 604-606 and Dupl. § 498.

[554] Mem. AAR 436-440.

[555] C-Mem. §§607-616 (citing cases Desert Line projects LLV versus Republic of Yemen, ICSID ARB/05/17, Award, 6 Feb. 2008, (C-267); Franck Charles Arif versus Republic of Moldova, ICSID ARB/11/23, Award, 8 April 2013, 5C-282); Joseph Charles versus Reuplic of Ukraine, ICSID ARB/06/18, Award, 28 March 2011 (C-281); Dupl. §§ 500-520.

[556] C-Mem. §§ 616-62; Dupl §§ 502-505, Mem. AAR §§ 503-505

[557] C-Mem. §§ 622-630; Dupl §§ 506-509, Mem. AAR §§ 503-508

[558] C-Mem. §§ 631-633; Dupl §§ 510-514.

[559] C-Mem. §§ 634-664; Dupl §§ 515-520.

[560] C-Mem. §§490-499.

[561] C-Mem. § 493

[562] C-Mem. §§ 495-498

[563] Dupl. §§ 351-356

[564] Dupl. §§ 357-365

[565] Dupl. §§ 362, 364, 366-368



furthermore, indemnification for this prejudice has already been awarded by the CCJA Tribunal, for the amount claimed of €210,070[551].

- Payment of services not invoiced is unwarranted because the Claimants do not prove that they attempted to recover the slightest sum from their debtors[552] and that they were unable to invoice[553]. They recall that the Claimants had had access to the PAC after the requisition, as proven by the inventory of March 12, 2011 and the expert inspection of a Gottwald Crane performed on April 15, 2011[554].

417. _Regarding the moral prejudice,_ the Respondent contends that, even if this type of prejudice was acknowledged in the arbitration, it requires, for entitlement to damages, the existence of exceptional circumstances when the alleged facts are particularly serious, especially when it is invoked by a legal entity, and quotes several ICSID awards in this domain[555].

418. The Respondent then considers that no exceptional circumstances warrant here the granting of damages for moral prejudice because (i) a contractual failure cannot suffice, particularly if as is the case here it is repaired by an all-inclusive indemnification[556], (ii) the presence of the police force and the Army does not constitute a unit as the Claimants contend and corresponds to the normal exercise of public authority, particularly in that the Claimants have not proven that they resorted to the use of force[557], (iii) the so-called looting by the PAC's employees and the Bolloré company is alleged only in a statement by a witness and the simple stress of an employee cannot be qualified as moral prejudice, and the Claimants had access to the TAC during the requisition period[558] and (iv) the undermining of the image has not been proven inasmuch as the Claimants refocused their activities on a different type of container and even work with the Bolloré company on certain projects[559].

**(3)   Double Damages**

419. The defendant considers that if the Claimants obtained the full compensation which they are claiming in this case, they will have received double the amount in damages for the same prejudice[560]. It insists on the fact that the same requests were already made before the CCJA Tribunal and that this Tribunal awarded:

- €20,884,966 for the all-inclusive termination indemnification for which the amount of hundred and €103,031,250 was requested based on the future income of the concession, and would cover according to the defendant the entire amount of the indemnity owed in the event of expropriation;

- €210,070 for the goods returned which would also correspond to the indemnity requested for the unreturned stocks;

- €734,212 for the costs of repatriating the operating equipment and €258,834 for the crisis management costs, included in the amount of €38,321,057 granted to Getma International pursuant to article 32.3 of the agreement[561].

420. The Respondent contends that it does not suffice to "offset the sums possibly granted pursuant to this procedure against those effectively paid by the Republic of Guinea for the same counts of prejudice pursuant to the CCJA arbitration, to avoid this risk of double indemnification[562]."

421. According to the Respondent, "the only way of avoiding all risks of double indemnification is therefore to establish that the Claimants have already obtained a sentence against the Republic of Guinea to pay indemnifications" requested by the Claimants. If this were not the case, the Republic of Guinea could be in the possession of two writs of execution, both ordering pecuniary sentences for the same counts of prejudice.

422. The Respondent alleges first of all that the Claimants are not acting in good faith because without contesting that they obtained indemnification for the counts of prejudice they are again bringing before the ICSID Tribunal, they nonetheless do not deduct from the amounts requested in this procedure the sums already awarded by the CCJA Tribunal[563].

423. Therefore according to the Respondent, there is a risk surrounding the Claimants argument according to which full damages should be awarded to them, it's being up to them to execute the ICSID award only partially so as to recover only the surplus of the sums to which they would be entitled, particularly since Guinea will not be able to prevent the parallel enforcement of the CCJA and ICSID awards[564]. Indeed, according to the Respondent no contractual mechanism exists compelling the Claimants to reimburse sums collected twice, or any mechanism whatsoever which we would permit the Republic of Guinea to avoid double indemnification, thereby creating a true risk of an unwarranted increase of wealth[565].

424. The Respondent adds that its action for the annulment of the CCJA award does not at all dispel the risk of twofold compensation. It contends that the Tribunal must take all necessary precautions to avoid this risk[566] and concludes by urging the Tribunal to simply deduct the amounts awarded by the CCJA Tribunal from any compensation it may grant in this procedure.[567]

### C.   *The Tribunal's analysis*

### (1)   **The principles of compensation**

425. As the Arbitral Tribunal lacks jurisdiction to rule on the consequences of the termination, there is no cause to rule on the requests for indemnification for the damaging consequences of termination, or the loss of profit and additional prejudice resulting from termination, which were established as a set amount by agreement of the Parties.

426. The Arbitral Tribunal will therefore not dwell on the following items:

   (i)   The costs of repatriating the equipment, which are a consequence of termination (as was decided for that matter by the CCJA Tribunal[568]);

   (ii)   The wages of the two employees during the latency period which followed the Termination Decree (€ 65 456) which were a consequence of termination and Getma International's internal decision to maintain the personnel. According to Article 32.5 of the Agreement, a maximum of 75 days could lapse between the Public Authority's Act and termination; in the event of termination on the basis of Article 32.3, there would have been 60 days between the notice of the grievances and termination. In both cases, Getma International itself would have had to absorb the costs of the latency, its being

---

566 Dupl. §§ 348-350.

567 Dupl ; §§ 369-376.

568 CCJA award § 256.



understood that Article 32.3 stipulated only the reimbursement of the severance pay and this only inasmuch as the concession-holder had paid them.

427. On the other hand, the damage caused not by the termination, but by the aggravating circumstances surrounding the termination as well as those caused by the requisition Decree falling within the jurisdiction of the Arbitral Tribunal, are to be indemnified.

**(2)   The amount of the compensation**

428. Five counts of indemnification remain in the Claimants' requests (three of which are linked to the requisition) for which the Arbitral Tribunal entertains jurisdiction and established the Respondent's liability.

**a.   Crisis management costs**

429. In paragraph 608 of their opening brief, the Claimants confirm that these costs amount to €248 834 [569] and refer in footnote no. 492 to Appendix 57 of the PwC expert's report;  It appears that the invoices are in fact in Appendix 56 of the PwC report, at least in the paper version.[570]  Eight of these 19 invoices which, according to the Claimants, "constitute a natural, direct (future, consummated) consequence of the Termination Decree" were issued prior to termination (the earliest one was issued on January 28, 2011 and concerns the creation of a website for STCC).  This caused the Respondent to allege that these costs cannot be recovered because they precede termination. They also asserted that these costs are not the result of a specific fault on the part of Guinea.

430. This request has already been submitted to the CCJA Tribunal which considered that "these costs are included in the indemnity of article 32.3" and that "Getma has not proven a special expenditure which might be due to a specific fault, other than termination, on the part of the Republic of Guinea".

431. The Arbitral Tribunal, having verified the invoices at issue (including not only invoices from communication consulting agencies, but also from Mr. Fischer), notes that they concern services in the framework of the reaction against the rumors which circulated at the beginning of 2011 after Mr. Alpha Condé's appointment as President, regarding his intention to terminate the agreement.   As established above, the President's announcement of his intention to terminate the agreement was a violation of the Investment Code, to be distinguished from termination itself. The Claimants were warranted in protecting themselves from the rumors and in making their position publicly known by press releases and notes.[571] . The lack of discretion concerning the intention to terminate the agreement constitutes a fault to be distinguished from termination itself, the consequences of which, other than those of termination, are not covered by article 32.3 and therefore recoverable. Thus, Guinea must indemnify the Claimants for the communication and public defense expenditures they had to incur, amounting to **248 834 euros**.[572]

---

[569] In the CCJA procedure, Getma International requested €258,834 on this count.

[570] In the digital version, these invoices were not produced, as Appendix 56 contains the detailed charts and pay slips of Messrs. Bérenger and Chanchevrier.

[571] examples and traces of which can be found in (C193), (C-173), (C-187), (C-283), (which refers to a press conference given by Mr. Fischer and his partner), and (C-199).

[572] The sum of the invoices is € 258.83, but the Arbitral Tribunal cannot award such a small amount.

**b.     The costs of repairing the requisitioned operating equipment**

432. The Claimants have proven the violation of the Investment Code by the Respondent's requisition Decree, but they also have the burden of proof of the existence of the prejudice and the amount thereof, as well as the causal link with the violation.

433. To appreciate this evidence, it is worthwhile to first the recall several relevant dates:[573]

- On March 8, 2011 access to the STCC offices and to the CT was blocked.

- On March 9, 2011 the requisition was made;

- A "transfer of powers" between the APC and Bolloré took place on April 11, 2011;

- On April 29, 2011, Getma International proposed to Bolloré to sell to it the requisitioned goods which were then being used by Bolloré; but the proposal remained unanswered;

- On June 22, 2011, the State lifted the requisition;

- From June 22 to August 19, 2011, Getma International organized the repatriation of the requisitioned goods; in the interim, the equipment was on a  median adjacent to the CT and in the custody of the APC and Bolloré[574];

- on August 19, 2011, the requisitioned goods were transported to the SS Happy River from Conakry in Lomé where they were unloaded by the Manuport company.[575]

434. As regards the damage to the requisitioned equipment, the Claimants produced with their opening brief (i) a list of the goods requisitioned (established between March 12 and 25 by a court bailiff appointed by Getma International and STCC, which is an inventory of the equipment in the offices and in the perimeter of the CT[576], and which says nothing regarding the state of these goods), and (ii) a general inspection report which was drafted according to the Claimants on April 15, 2011 during the "transfer of power" between APC and Bolloré, by an employee of the Raoul Neveu-Gottwald company and which concerns one of Getma International's two Gottwald cranes in Conakry, bearing number 360190.[577] . The Claimants quoted three statements in this report, according to which certain parts are in good condition.

435. Upon reading this report, which confirms essentially that the crane is generally in good condition and well maintained, the Arbitral Tribunal however notes that it also mentions negative points such as:

- "the hydraulic slip ring for its part, is not functioning! Leaks were ascertained and oil covers the floor of the well" (p.7);

- in the orientation gear-motor "the filter must be changed for the cooling of the motor to take place properly and to operate under nominal conditions [sic]" (p. 7);

---

[573] Generally affirmed by the Claimants (Mem. §§ 575-581); not contested by Respondent
[574] Mem. § 580.
[575] Gexco expert report (C-278), p. 2
[576] Bailiff's report on the State of the premises of March 25, 2011 (C-170); see also appendix PwC 17.
[577] General Inspection STCC Conakry – Guinea on April 15, 2011 (C-276); p.1

-   the air-conditioners in the electrical room "(absence of dehumidifier!")" (p. 8);

-   several neon lights are not operating, thereby making access to "Tower Cabin" dangerous. (p. 10);

-   in the Tower cabin we note that "nonetheless, the orientation manipulator is slightly loose." (p. 10);

-   "the base of the halogen lamp in the middle of the arrow is no longer properly installed (risk of accident !!)" (p. 11)

-   there is a large leak in the jack" (p. 11) "a slight leak detected in the hook thereby flooding the oil spreader" (p. 12)

-   The flippers "are beginning to show wear" (p. 12).

-   The arrow has not been entirely verified: "the 'Arrowhead" and 'rewinder' parts will not be repaired due to lack of means for reaching these elements on the one hand and the unavailability of the crane, on the other" (p. 11).

436.   The Arbitral Tribunal infers therefrom that this crane was not in impeccable condition. In any event, this report concerns only one crane and proves nothing regarding the condition on March 9, 2011 of the other requisitioned goods.

437.   The Claimants then rely[578] on the fact that "the two Gottwald HMK cranes were then inspected twice by three independent experts":

-   *An initial technical inspection [...] performed in the Port of Conakry, just before the loading of the cranes for Lomé and after their arrival, by Messrs. Ferreiro and Delaroche of the Raoul Neveu-Gottwald firm.[579]*
-   *Expert operations [...] conducted in Lomé from August 22-26, 2011 by Mr. Dur (who has since died) of the Gexco company.[580]*

438.   A study of these reports raises several questions for the Arbitral Tribunal:

1.   The first page of the report by Messrs. Ferreiro and Delaroche of the Raoul Neveu SAS company explains that "it comes as a complement to the expert report prepared by Mr. Christian DUR-GEXCO", that the place in which the expert inspection was performed is "Conakry, Lomé", that the period is weeks 33 and 34" and that it concerns the "general condition of the two cranes, such as found in the Port of Conakry prior to all interventions".[581] Weeks 33 and 34 of 2011 were the weeks of August 15 and August 22, 2011. One therefore can understand that the technical inspection performed by Messrs. Ferreiro and Delaroche began in Conakry no earlier than four days prior to the departure of the equipment for Lomé on August 19, and continued after the transport, to Lomé, to be

---

[578] Mem. § 582.

[579] Mem. § 582, first point: with reference to Appendix 48 of the PwC report, the Claimants' expert and the Gexco Expert's Report (C-278)

[580] Mem. § 582, second pint; also with reference to the Gexco Expert Report exhibit (C-278).

[581] P.1 of appendix 47 (paper version) to the PwC report and appendix 48 (digital version to which the Claimants appeared to refer).

terminated there no later than August 26, 2011.[582]  However, Mr. Dur Gexco's report bears the title "Expert inspection in Lomé from August 22 to 26, 2011 of a batch of handling equipment transported on the SS "Happy River" from Conakry"[583]  and mentions on page 89 the date of September 21, 2011. If Mr. Dur began his expert inspection operations on August 22, 2011 in Lomé[584] , one has difficulty understanding how Messrs. Ferreiro and Delaroche who, according to the Claimants, began their inspection prior to the loading of the cranes for Lomé, can write that their report, which was not dated for that matter, "is in addition" to the expert report drafted by Mr. Dur who was not appointed until August 12, 2011. [585]

2. Mr. Dur's report specifies equipment according to type, with the registration numbers, the chassis numbers and the fleet numbers, in short, a much more detailed precise method than that which had been applied by the bailiff in Conakry between March 12 to 25 2011. The correlation between the enumeration in the Gexco report and the bailiff's inventory is only partial and the Arbitral Tribunal's comparison thereof reveals that there are exhibits mentioned in one of them which are not mentioned in the other one, and vice versa.

3. The heading on the first page of the undated report by Messrs. Ferreiro and Delaroche indicates that their employer is Raoul Neveu S.A.S., a simplified joint stock company, and it bears on the same page Raoul Neveu S.A.'s stamp, with the same address as that mentioned in the heading to the report for the engineering Department of Raoul Neveu S.A.S.[586] . Even if one admits that two different companies belonging to the same group can bear the same name, the Tribunal is surprised that this general inspection report of April 15, 2011 of Raoul Neveu S.A. (C-276) bears another heading and has a form which in no manner resembles that of the report of "weeks 33 and 34, 2011" (appendix 47/48 to the PwC report).

4. The purpose of the undated report by Messrs. Ferreiro and Delaroche (Raoul Neveu S.A.S.), even if "it is complementary to" the report by Mr. Dur, is much more restricted than this one, and is limited to ascertainments concerning the two Gottwald cranes.[587]  At the beginning of the chapters in his report concerning each of the Gottwald cranes, Mr. Dur explains his cooperation with Raoul Neveu  S.A.(S.?) as follows: "the following ascertainments were made in the presence of the technical director of Gottwald France , whose expertise permitted us to detect the anomalies, the defects, the failures and the damage impacting this equipment".[588] On page 2 of his report, Mr. Dur drafts a list of the parties present during his expert inspection, among whom there was Mr. Delaroche, but not Mr. Ferreiro.  And yet Raoul Neveu's report of weeks 33 and 34 mentions explicitly that it was prepared jointly by Messrs. Ferreiro and Delaroche.

---

[582] These dates are more or less corroborated by the invoice to be found for this expert inspection in appendix 49 (p. 19-1) to the PwC report which refers among other things to "the travel of Messrs. Delaroche and Ferreiro on August 16-27, 2011 to Conakry, then Lomé".

[583] Gexco Expert Report (C-278), p. 1

[584] Gexco Expert Report (C-278), p. 2: "expert inspection: it occurred on August 22 to 26, 2011 in Lomé on the Ss "Happy River" and on the dock of the Lomé (Togo) Port Authority".

[585] Gexco Expert's report (C-278, p. 2).

[586] Appendix 47, PwC report (paper version) or appendix 48 in digital version.

[587] This can undoubtedly be explained by the fact that Raoul Neveu S.A. (or S.A.S.) is the Gottwald crane specialist in France: see the heading on its report of April 15, 2011: "Raoul Neveu SA, Gottwald France" (C-276), p.1 as well as the reference in Mr. Dur's report concerning the participation in his expert inspection of "Mr. Delaroche Raoul Neveu SA, representative of the manufacturer Gottwald (cranes)" (C-278), p. 2

[588] Gexco Expert's Report (C-278), pp. 8 & 20.

5.  Another issue appears upon reading the reports of Mr. Dur and those of Raoul Neveu S.A.S.: each report which concerns the Gottwald cranes contains, for each crane, a statement of the hours of operation. Thus, one can compare statements in different reports, including only the engine hours mentioned on the packing list which the Claimants produced locally only with their rejoinder:

| Report | N/S 360189, fleet no. G6401 | | | | N/S 360190, fleet NO. G6402 | | | |
|---|---|---|---|---|---|---|---|---|
| | Diesel engine | Hydraulic pump | Lifting device | Orientation | Diesel engine | Hydraulic pump | Lifting device | Orientation |
| April 15, 2015 Raoul Neveu C-276 p.1 | | | | | 7117 h | 6225 h | 3100 h | 2392 h |
| 19(?) Aug, 2011 Packing list C-391 | 712773 (!?) | | | | 7273 | | | |
| Week 33 & 34 Aug. 2011 Raoul Neveu Appendix 47 PwC p. 2 & 4 | 7237 h | 6316 h | 3132 h | 2417 h | 7127 h | 6060 h | 3210 h | 2508 h |
| Aug. 22-26, 2011 Gexco Mr. Dur C-278 p. 8 & 30 | 7127 h | 6050 h | 3129 h | 2508 h | 7273 h | 6319 h | 3133 h | 2417 h |

We note on this chart (i) that, notwithstanding Mr. Dur's cooperation with Messrs. Ferreiro and Delaroche (Raoul Neveu S.A.S.), one of their reports of August inverted the values of the two cranes; (ii) that the values mentioned in the two successive Raoul Neveu reports do not follow each other logically, inasmuch as one of them, for the hydraulic pump, was higher in April than the value in August 2011. It would therefore appear that it was Raoul Neveu S.A.S. which inverted the two cranes in its report for weeks 33 and 34 of 2011.

439.  With the exception of these issues, as well as the very pertinent issues of the Respondents concerning the Raoul Neveu report of April 2011[589], which was not even communicated to the Claimant's expert, PwC, the Arbitral Tribunal has no doubts concerning the value as evidence of the report by Mr. Dur-Gexco regarding the damage to the equipment on the date on which the expert inspection was performed. However, one must note that none of the reports produced by the Claimants, including Mr. Dur-Gexco's report, prove:

-   the condition of the equipment prior to the requisition: the bailiff's inventory of March 12, 2011 does not describe the condition of the equipment[590] and the Respondent, as it does not bear the burden of proof, was not required to prepare a description thereof; however, proof that prior to the requisition the equipment was not in the good condition which the Claimants would have had us believe, was provided by the Respondents in the form of the technical opinion of the technical director of the APC of February 9, 2011 concerning the Concession Agreement[591]; the report by Raoul Neveu S.A.S. of April 15, 2015 cannot be used to establish the condition of the equipment at this time because it is a document which was apparently drafted for other purposes (a "transfer of authority"

---

[589] c ; Mem ; §§ 579-583.

[590] The Respondent justly remarked that that this very detailed inventory, prepared the day after the requisition, indeed proves that G.I. access to equipment, even in its premises, and therefore could have, with the exception of a bailiff, also been able to appoint a technical expert to prepare the necessary reports on the condition of this equipment (Mem.AAR §§ 421-424).

[591] "three cranes have broken down. State of advanced deterioration of the other cranes must be established" (C-175) p. 4. This exhibit was produced by the Claimants for other purposes, and the portion quoted, although not flattering for G.I., was not contested by them.

between the state and Bolloré)[592], and in any event, the concerned solely crane 36109, namely the G6402 ;

- that the damage ascertained after the lifting of the requisition, the storing thereof while awaiting transport, the transport thereof from Conakry to Lomé and the unloading thereof in Lomé[593] were caused during the requisition: first, because the state of the equipment at the time of the requisition is not known; then, because between the lifting of the requisition and the reports of August 2011, 2 months elapsed. The Arbitral Tribunal notes, furthermore, that this period from June 22 of August 19, 2011 is problematic. The Claimants affirm that during the period the equipment was being stored on his median adjacent to the TC in the custody of the APC and of Bolloré"[594] . And yet, and yet, it is not clear whether and in what circumstances this custody was imposed upon Getma International and why it accepted it. As soon as the requisition was lifted, it recovered possession of its equipment and again became responsible for the custody thereof.

440. As regards the quantification of the cost of repairing equipment which the Claimants are claiming, Mr. Dur stated in his expert report that the precise estimate for the repair of Gottwald cranes G6401  and G6402 must be communicated to Getma International by Gottwald[595]and that the calculation for the remaining machines would be prepared by Manuport's engineering department[596]. The Manuport Togo company, holder of a container maintenance license, is a subsidiary 100% controlled by Getma International[597]. One can therefore wonder about the objectivity of the crisis. It practices. The Claimants produced as appendix 50[598] the PWC report, the invoices they had a for this repair work, coming to a total amount of 1,151,508 €. The Arbitral Tribunal notes that most of the invoices, initially issued by Raoul Neveu to Necotrans trading, were subsequently reinvoiced by Necotrans Trading to Manuport, which apparently became the owner or at least the user of the equipment after its arrival in Lomé. Some of these invoices refer explicitly to the equipment to be repaired (such for example, as crane no. 361090, but for numerous other orders or invoices, it is impossible to link them to a damaged piece of equipment. The Respondent's expert complained, moreover, that he could not attribute certain invoices to damage ascertained by Gexco[599]. The Claimants reply that PWC may have established this late on the basis of the Konecrane catalog pertaining to the *reachstackers*[600]. However, the reply does not state where and in what PwC report. The Arbitral Tribunal can find this conciliation. In any case, it does not concern *reachstackers*.

441. *In conclusion,* the Arbitral Tribunal concludes that it cannot exceed to the Claimant's request for indemnification for the cost of repairing the requisition equipment, because neither because only between the requisition and the damage, nor the amount of the damage, has been proven to the point of satisfying the law.

---

[592] We do not know who appointed Raoul Neveu for this report, and one can even wonder why and how the Claimants could have obtained a copy of this report

[593]   The Tribunal notes that all of the equipment requisitioned was apparently unloaded in Lomé, notwithstanding the mention on the packing list (see-391) that only 13 pieces of equipment, including the Gottwald G6402 crane were intended for a final destination in Lomé, while the destination of all the other items, including the G6401 crane, had still "to be defined".

[594] Mem; § 580

[595](C-278);pp 11 & 23.

[596] (C-278), p. 89.

[597] Financial proposal of July 2008 (C-179), p. 110/230.

[598] Appendix 49 in the paper version.

[599] First OCA report of March 30, 2015, §§ 242-249.

[600] Reply. § 621.



c.   **Prejudice corresponding to the stocks which were not returned**

442.  Guinea's defense that this Arbitral Tribunal can no longer award, and indemnity for this prejudice because the CCJA Tribunal has already awarded. It, has no longer been valid, since the cancellation of the CCJA award.

443.  In any event, this prejudice is clearly linked to the requisition (as the CCJA Tribunal also noted that matter[601]), and this Arbitral Tribunal entertains jurisdiction to rule on all the consequences of the act of the Public Authorities constituted by the requisition.

444.  If the return of the requisition aspects after the lifting of the requisition is the Respondent's responsibility, the burden of proof that it did not return all the requisition stocks is incumbent upon the Claimants. Thus, therefore, they must prove the value of the requisition stocks and that of the stocks not returned. To do so, the Claimants rely on the report by the PWC expert of November 13, 2014, who in his term refers to the PWC report of January 7, 2013 in the CCJA arbitration[602].  Article 149 explains the following:

> *Given the context, no visible inventory of the stocks could be prepared on March 8, 2011. For this reason, the amounts entered into accounts in the general balancing thereof on this date corresponds to the evaluation of stocks on the date of the closing of the last financial year (December 31, 2010) to which the 2011 movements were added.*

445.  The value obtained in this matter is 244 828 euros, an amount also reiterated in §327 of the PWC report of November 13, 2014. PwC then states that the stock returned was sold by STCC to NCT Trading for the amount of 36,608 euros[603].  This Arbitral Tribunal then expected that the value of stocks not returned be calculated by deducting this amount from the value of the stocks at December 31, 2010, namely 208,220 euros. PWC however obtains a value of 210070 euros on the basis of the general balance sheets at December 31, 2011 and the conversion of the amounts into GNF which this table mentions as stock provisions (GNF 2,196,936,859) at the exchange rate at March 8, 2011.[604]

446.  The expert of the Respondent, OCA, however, does not criticize this calculation which the Tribunal therefore accepts.  It considers on the other hand that the value of the stocks which were not returned  duplicates the value of the concession which the Claimants are claiming in the first instance:  if the concession had not been terminated, STCC would have used these stocks, the consumption of which is necessarily already taken into account in calculating the cash flow which the concession would have generated.[605] PwC responded that, in paragraph 293 of its report of November 13, 2014, it had deducted, for the purpose of calculating the project's net value, the needs in working capital which also comprise the stocks determined on the basis of the balance at March 8, 2011.[606]  In its second report, OCA formally acknowledged this response and confirmed the absence of a duplicate amount. [607]

---

[601] CCJA award, § 255.

[602] Appendix 1 to the PwC report of November 13, 2014.

[603] PwC report of January 7, 2013, § 152 which contains in appendix 20 the invoice for this sale.  If this report was produced in this arbitration as Appendix 1 to the PwC report of November 13, 2014, this is not the case of its appendix 20.  The Tribunal was therefore not able to examine the description in this invoice, which probably contains details concerning the equipment sold which may have been compared to the equipment mentioned in the inventory of March 8, 2011.

[604] PwC report of Nov. 13, 2014, §§ 328-330 and its appendix 1 §§ 154-156.

[605] OCA Expert report 253-255.

[606] Second PwC report of July 10, 2015, § 231 and appendix 45 to the PwC report of Nov. 13, 2014.

[607] Second OCA report of Oct. 14, 2015, § 284.

447. Thus, all that remains is the Respondent's charge that the Claimants had an inventory taken on March 12, 2011, and that it was on the basis of a physical inventory of this type that they should have proved their prejudice.  At the hearing of the witnesses, PwC's expert, Mrs. Perrier, questioned in this regard, acknowledged that at the time of the return of the stocks, the Claimants had not verified whether the stocks which were missing had been included in the inventory of March 12, 2011. On the other hand, PwC "adopted a global approach which consisted [in a calculation] based on the accounting stock. We deducted that which had been returned by Guinea and determined the stock which had been lost, by comparison. It was not possible to go into more detail. Therefore, it was an estimated approach". [608] The expert also testified that to verify that that which was allegedly missing was indeed in the physical inventory of March 12, 2011 "would have been very complicated, given that it would have been necessary to be able to juxtapose to these factors the state of the stock at December 31st. And there are not necessarily enough details. In any event, this is not the only part, there are many others. For example, when one reads "total oil stock, 2 full barrels, barrels partially used", I do not see how one can balance this with the stocks. We found ourselves in the situation in which we had an accounting inventory and these detailed elements, but they could not be balanced. This is why we adopted an approximate approach"[609].

448. The Arbitral Tribunal notes the following:

    (i)   Due to the failure to produce the invoice for the goods returned and sold by STCC to NCT Trading, it has become impossible to compare the list of these returned goods with the physical inventory of the goods at March 12, 2011;

    (ii)  PwC was not able to convince the Arbitral Tribunal that it was impossible to work on the basis of physical inventories (instead of accounting inventories);

    (iii) PwC could not convince the Arbitral Tribunal either that it could not base its calculation on the physical inventory at March 12, 2011 without comparing it beforehand "to the statement of the stock at December 31st";

    (iv)  The physical inventory of March 12, 2011 is as detailed as one could hope and has not at all overlooked the stocks;

    (v)   PwC declared in its report of January 7, 2013 for the CCJA Tribunal that "given the context, no physical inventory of the stocks could be taken on March 87, 2011"[610] and thereby justified why it had worked with an accounting inventory: "the amounts entered into account in the general balance on this date [March 8, 2011] correspond to the value of the stocks on the date of the closing of the last financial year (Dec. 31, 2010) to which the 2011 movements were added".  In the footnote in this same report, it declared that "we were informed of the existence of a bailiff's report attesting to the use of the equipment by the new license-holder"[611].  It therefore appears that at the time of its report for the CCJA Tribunal, PwC was not aware of the physical inventory which the bailiff prepared on March 12, 2011.  However, when it prepared its report of Nov. 13, 2014 for this arbitration, PwC was aware of this physical inventory, given that it attached it to this report as appendix 17 (to prove the presence of new equipment, which would make it possible to establish that phase I of the investments required under the Concession Agreement had been made).[612]  Therefore, in its report of November 13, 2014, PwC no longer explains why it calculated the value of the stocks which had not been

---

[608] TR II, p.39 :37-40.
[609] TR II, p. 39 ;44-p.40 :5.
[610] PwC report for the CCJA Tribunal of Jan. 7, 2013, p. 27§149.

[611] PwC report for the CCJA Tribunal of Jan. 7, 2013, p. 28, note no. 42.
[612] PwC report of Nov. 13, 2014, § 98 and note no. 27.



returned on the basis of the general balance at December 31, 2010, to which the movements which occurred up until March 8, 2011 were added.  Hence Mrs. Perrier's questioning in this regard during the hearing.

449.   The Arbitral Tribunal therefore considers that the calculation method adopted by the Claimants' expert is not warranted and is too theoretical.  However, this is not a reason for rejecting the request.  Indeed, it is entirely reasonable to assume that the requisitioned stocks were used in the operation of the CT following March 8, 2011 and the Respondent did not deny this either.  In the absence of other evidence (such for example as the average month use of stocks) and as the Respondent did not express an objection either to the price of the sale of the returned stocks, the Arbitral Tribunal sets the amount of this prejudice at the flat sum of € **200,000.**

**d.   Prejudice pertaining to the land services provided prior to the requisition, but not invoiced**

450.   The Arbitral Tribunal considers that the Claimants did not prove that it was impossible for them to issue the invoices for STCC's services linked to the unloading of containers or in storage at the time of the requisition:

-   First because it turns out that, contrary to that which the Claimants contend, they were able to have access to the CT after March 8, 2011, which is established by the fact that they were able to have a detailed inventory taken on March 12, 2011, and an expert inspection of one of the Gottwald cranes, on April 15, 2011.

-   Then, because it also turns out that, in order to be able to issue invoices, the Claimants did not at all need to know the date of the removal of the goods by the importers.  Indeed, after March 8, 2011, the Claimants no longer operated the CT; therefore, the only services they could still invoice were those rendered up until March 8,2011.  To do so, it was not necessary to have documentary proof of the lifting of the containers, or to know the date of the removal of the goods.  At most, it might have been pertinent for determining the date on which the invoice was owed.

-   The Claimants had a software program for managing invoicing which enabled the issuing of invoices.  It is this program moreover, combined with the data produced by the Getport software program concerning the operations which permitted them to calculate the amount of the invoices to be issued.

451.   The Claimants moreover did not prove either that they at least attempted to collect the amounts for their services up until March 8, 2011, from their clients, nor that they served formal notice on the Respondent requesting that it permit it to issue its invoices.

452.   In the absence of any evidence that the non-invoicing is due to the requisition, the request is rejected.

**e.   Moral prejudice**

453.   The issue of determining whether a moral prejudice can be compensated in an investment arbitration is controversial.  Several decisions admitted the principle and are invoked, by both the Claimants and the Respondent.   The Arbitral Tribunal analyzed them and retained the following:

- There is no doubt that the measure is of a particular nature and that, in the few decisions which admitted it, the situation was particular: in the former *Lusitania* case, the mental suffering and consternation of the families of the 128 persons who perished out of the 197 persons on board the ship which sank and in the *Desert Line* case of 2008, it had been proven that the Claimant had been the victim of a real siege of its worksite, the arrest of three of its executives, including the son of the company's CEO, physical violence and theft by armed gangs.  Particularly serious violence is required.

- In the (2011) *Lemire* case, the Tribunal based its decision on the two cases mentioned, as well as a third case, *Siag*, which simply recalled the rule of *Desert Line* that moral prejudice is reserved for extreme cases, for establishing three conditions for acknowledging moral prejudice:

  (i) Acts by the state must involve physical threats, illegal detention or a similar situation the abuse of which violates the standards of civilized nations;
  (ii) The acts of the state are damaging to health, cause stress, anxiety or another form of mental suffering such as humiliation, shame, debasement, or loss of reputation, credit and social position;
  (iii) Both the cause and the prejudice must be serious and substantial.[613]

- In the third case quoted by the Parties, *Arif,* the Tribunal rejected the strict, cumulative application of the three conditions of the *Lemire* case, and insisted on the discretion which a Tribunal generally enjoys to rule that damages for moral prejudice are an exceptional remedy.[614]

- Two cases, *Lemire* and *Arif,* in their decision not to indemnify moral prejudice, referred to the indemnification of material damage:

  *The acknowledgement in the First Decision that Ukraine has indeed breached the BIT, and* **the present award of substantial compensation,** *are elements of redress which may significantly repair Mr. Lemire's loss of reputation. [… ] the moral aspects of his injuries have already been compensated by the* **awarding of a significant amount of economic compensation,** *and [that] the extraordinary tests required for the recognition of separate and additional moral damages have not been met in this case.[615]*

---

[613] *"The State's actions imply physical threat, illegal detention or other analogous situations in which the ill-treatment contravenes the norms according to which civilized nations are expected to act; the State's actions cause a deterioration of health, stress, anxiety, other mental suffering such as humiliation, shame and degradation, or loss of reputation, credit and social position ; and both cause and effect are grave or substantial."* (C-281)§ 333.

[614] *Franck Charles Arif versus the Republic of Moldavia,* ICSID ARB/11/23, Award, April 8, 2013 (C-282)§§ 590-591.

[615] *Joseph Charles Lemire versus Ukraine* ICSID ARB/06/18), Award, March 28, 2011 (C-281)§§ 339 and 344. Our underlining.

*A pecuniary premium for compensation for such sentiment, **in addition to the compensation of economic damages,** would have an enormous impact on the system of contractual and tortious relations.[616]*

454. This Arbitral Tribunal shall examine the evidence produced for Claimants' the moral prejudice in light of the principles established by this relatively limited case law.  They invoke four factors to justify their moral prejudice:

    (i)    The non-respect of the Agreement;
    (ii)   The intervention of the police and the military;
    (iii)  The pillage and attitude of the employees of the APC and Bolloré;
    (iv)  The undermining of the Claimants' image and reputation.

455. The Arbitral Tribunal refers to Chapter VI.C(1) above, in which it has already concluded that "the President's public announcement of his intention to terminate the Getma International contract, the reading on the news on television on 8 p.m. of the same day of the effectiveness of the Termination Decree before it had even been  notified and the positioning of soldiers and policemen, beginning at 9 p.m., in front of STCC's offices on the CT are effectively aggravating and vexatious circumstances which go beyond termination, regardless of its form, and constitute acts of the Public Authorities other than termination".

456. The Arbitral Tribunal considers however that none of these deeds displays the seriousness required by case law for the moral prejudice to warrant indemnification:

    (i)    The President's announcement of his intention to termination the contract was the subject of rumors which were not confirmed until the day on which the President mentioned it, eleven months after termination, in his interview of February 6, 2012[617].  According to the interview, the announcement was made to friends and was therefore less sudden than the public announcement made in December 2008 by Capitan Moussa Dadis Camara in the interview with *Jeune Afrique,* several days after he took over power after the death of President Lansana Conté, under whose regime Getma International had won the concession: "...All the administration's contracts will be reviewed.   The concession of the Autonomous Port of Conakry's to Getma International, for example, will purely and simply be annulled.  Despite an audit conducted by FFA Ernst & Young, which declared that this contract was obviously unfavorable to the State, the outgoing government obstinately decided to give away our port".[618]  The numerous press articles produced in this file, also on the topic of the granting of the concession to Bolloré, prove the degree to which these major contracts, important for the country's economy, were at the centre of the public's attention and were not of an extraordinary nature.

    (ii)   This Arbitral Tribunal has already noted in paragraph 379 above that the placing of soldiers and policemen in front of STCC's offices on March 8,2011 even before the requisition Decree was adopted was neither warranted nor necessary, but that their

---

[616] *Franck Charles Arif versus the Republic of Moldavia,* ICSID ARB/11/23, Award, April 8, 2013 (C-282)§§ 592 - our underlining.

[617] See note at the bottom of page no. 478

[618] Interview of Captain Moussa Dadis Camara (R-29).

intervention was correct and had not been as sudden as suggested in the press articles[619] and the comic strip concerning these events[620] produced by the Claimants.

(iii) Mr. Barone attested that on March 10, 2011, when the police force performed the requisition *per se*, a *"chaos"* reigned in STCC's offices at the end of the morning (§ 7j) where *"at least 25 members of Bolloré's personnel, very sure of themselves and totally serene, and even arrogant in their conduct"* were also present (§8).   That *"STCC's employees [...] had the impression that a part of themselves was being torn out of them"* (§ 9) and that *"STCC's expatriate executive staff members decided to leave Guinea [...] leaving their personal effects behind in their homes"* (§ 13).  These events were indeed unpleasant for the personnel and for Mr. Barone himself, but do not prove pillage or any other excessive conduct.  Also the fact that the requisitioned stocks were not returned does not constitute pillage.

(iv) The presence and even the arrogance of Bolloré's personnel may have been vexatious for the personnel of Getma International, particularly in the competitive context which had existed between the two groups since Getma International had won the concession. However, there is nothing surprising or shocking in this fact, given that it was a public secret that the concession had been withdrawn to be awarded to Bolloré: the newspapers had been speaking of it since February 8, 2011[621] and the press releases which Getma itself published on February 28 and March 1st, 2011, as well as its letter of February 9, 2011 to the Minister of Transport refer explicitly to Mr. Vincent Bolloré's personal measures of February 3 and 4, 2011 in Conakry to exert pressure on the authorities with a view to terminating the Agreement.[622] The opposition of the two competitors was also expressed in France for that matter; it was strong, but was not at all extraordinary, as proven moreover by the cooperation which was subsequently developed between the two groups.

(v) Mr. Barone also mentioned home visits to several STCC executives by bailiffs and APC executives which created a feeling of danger, and caused expatriate executives to leave the country on March 11, 2011.  It is not proven however, nor is it even alleged, that these visits involved physical violence or were anything more than administrative visits, linked to the unfolding of CT's takeover and its operations.

457. The acts by the Public Authorities which surrounded the termination of the Agreement and the requisition therefore do not display the seriousness required for recognizing moral prejudice. Furthermore, the Claimants obtained of the CCJA Tribunal an award which grants compensation to Getma International for the material prejudice caused by the termination

---

[619] Article in the classified Archives of March 24, 2011 (C-199). See also C-395.
[620] R. Dély & Aurel, comics trip entitled "Sarkozy et les riches", Drugstore, excerpt, pp. 42-50 (C-203).
[621] *Guinée en ligne* article (C-184).
[622] Article and Getma International's letter to the Minister of state regarding the Conakry Port case (C-187 and C-188).

and in this award a compensation for the prejudice caused by the requisition and by the rumors of an upcoming termination of the contract. The fact that the amounts awarded are not as high as that which Getma International, respectively the Claimants, requested of the two Arbitral Tribunals is due to different reasons (lack of evidence, withdrawal of the request for loss of profit before a court and lack of jurisdiction of the other court). Therefore, even if a broad interpretation of the *Lemire* case leaves room for pleading that a moral prejudice can be indemnified when the compensation for material prejudice is not significant, this Arbitral Tribunal cannot, in this concrete case, take account of the reduced indemnification of the material prejudice.

458.  The Arbitral Tribunal rejects the request for compensation for moral prejudice.

f.    interest

459.  The Claimants are requesting interest, capitalized annually on the sums which are awarded to them at the rate of 8.7% for the period of March 8, 2011 up to the day of effective, full payment thereof. In their Post-Hearing Memorial, they quantify this interest, at February 3,2016, at the amount of € 56,950,551.

460.  The Respondent was categorically opposed to the application of interest to the amount of the *lucrum cessans,* but did not have any special reaction to the rate requested, nor to the capitalization requested. Its sole defense concerns the application of interest for the period during which this arbitration was suspended, according to it at the Claimants' initiative, from January 31, 2013 to June 17, 2014.

461.  And if this Arbitral Tribunal does not entertain jurisdiction to rule on the *lucrum cessans,* the disagreement regarding the application of interest on the amount thereof becomes pointless.

462.  As regards the period for which the interest is owed, the Arbitral Tribunal recalls the following facts:

     -    On January 10, 2013, the Arbitral Tribunal asked the Parties "as soon as they have examined the Decision on the Jurisdiction of the Arbitral Tribunal [...] to consult each other in order to reach an agreement if possible on the follow-up on the procedure, in particular if they intend to request that it be suspended".
     -    In a letter of January 31, 2013, the Claimants requested that the Arbitral Tribunal suspend the ICSID arbitration procedure until the Decision in the CCJA arbitration procedure. On the same day, the Respondent responded that the pursuit or suspension of the procedure depended on the clarifications which the Claimants provide regarding the requests they intend to pursue before this Arbitral Tribunal.
     -    On February 12, 2013, the Arbitral Tribunal suspended the proceedings due to the non-payment of the second advance requested of the Parties, in accordance with Article 14(3)(d) of the administrative and financial Regulations. It informed the Parties moreover that it would refuse to follow-up on the Claimants' suspension request of January 31, 2013 as long as the proceedings were suspended for the non-payment of the advance.
     -    On August 21, 2013, the Claimants confirmed that they had replaced the Respondent for the payment of the second advance, and reiterated their request for a suspension of the suit until notice of the CCJA's arbitral award.

- On August 22, 2013, the Arbitral Tribunal announced the resumption of the proceedings, following the Claimants' payment of the entire amount of the second advance and asked the Respondent to respond to the Claimants' request for a suspension. The Respondent maintained its position of January 31, 2013.
- On September 30, 2013, the Arbitral Tribunal suspended the proceedings until December 1st, 2013.
- This suspension was extended three times and was lifted on June 17, 2014.

463. Thus, the suspension due to the parallel proceedings lasted only from September 30, 2013 until June 17, 2014, i.e. for 260 days.

464. Even if, in an initial stage, the Claimants requested a suspension in response to an invitation on the part of the Arbitral Tribunal and even if the suspension was warranted by the circumstances, these circumstances were the result of the Claimants' decision to launch two parallel arbitration proceedings. Thus, the Arbitral Tribunal considers that they are responsible for the suspension and are not entitled to interest during this period.

465. Interest at the rate of 8.7% capitalized annually is owed on the principal sum of €448,834 from March 8, 2011 until September 30 2013 and beginning on June 17, 2014 until the date of effective full payment.

**(3)    The allegations of twofold damages**

466. Given (i) the restrictions to this Arbitral Tribunal's jurisdiction, (ii) its decision to order the Respondent to pay the amount of € 200,000 as an indemnity determined *ex aequo et bono* for the requisitioned goods which were not returned, it appears that duplicate damages would be possible only in the event that the Claimants, after having received payment of this amount of € 200,000 on the basis of this award, succeeded, notwithstanding the annulment of the CCJA award, in having it enforced and received, on the basis of this award, another sum of € 210,070 for the same prejudice.

467. In order to avoid this risk of duplicate damages, this Arbitral Tribunal will accompany the ordering of the Respondent to pay the amount of €200,000 by the condition that the Claimants not have recovered beforehand the amount of €210,070 on the basis of the CCJA award and, vice versa, waive for the future their claim to this CCJA award.

468. The Claimants have also asked the Arbitral Tribunal to "state that all sums effectively and definitively paid [..] by the Bolloré group pursuant to the procedure against the Necotrans group before the French state courts will be deducted from the sums awarded by this Tribunal"[623]. The Arbitral Tribunal notes that neither the Claimants nor the Respondent have mentioned this request in their briefs, if only to explain which requests pending before the French courts could duplicate the requests awarded by this Arbitral Tribunal. The request can therefore not be accepted and must not be, inasmuch as the Claimants themselves can see to it that the enforcement of duplicate indemnification is not claimed.

---

[623] § 107 above.



## VIII.   COSTS OF THE PROCEDURE

### A.   *The Claimants' Position*

469. The Claimants point out first of all that Article 31, paragraph 7, of the Concession Agreement[624] applies only to the procedures envisaged under said Agreement, namely an OHADA arbitration[625].

470. They consider the costs and expenses of this arbitration as a part of their *damnum emergens* and recall that they reserved their right to quantify the amount thereof in their opening brief. They refer to the Parties' agreement, at the end of the hearing of November 25, 2015, on the procedures for providing proof of these costs and expenses and present a total of € 1,729,519.33, plus US$ 725,000.00 in costs and expenses, comprised of:

| | |
|---|---|
| - Fees and expenses of the PLMJ firm | € 961,148.49 |
| - Fees and expenses of the FTMS firm | € 484,770.84 |
| - Fees and expenses of PwC | € 283,600.00 |
| - Amounts paid directly to the ICSID | US$ 425,000.00 |
| - For the account of Guinea | US$ 300,000.00[626] |

471. The Claimants invoke international case law and doctrine to request that the breakdown of the costs of the arbitration take account of the Respondent's poor conduct:

- the presentation of a request, which it knew was unfounded, for an arbitrator's recusal, as a delaying tactic;
- the Respondent's nonpayment of the advances requested of it by the Centre;
- the presentation and maintaining of arguments which it knew were unfounded;
- delays in producing certain documents and the failure to produce others;
- reliance on a contractual clause and award which it never had the intention to respect;
- the maintaining of suspense concerning the appearance of Messrs. Kourouma and Lamizana Condé at the hearing of November 2015.

### B.   *The Respondent's position*

472. The Respondent on its side requests in its successive briefs that all the costs of the arbitration be made incumbent upon the Claimants. These costs amount to the sum of €1,630,028.41 broken down as follows:

- €1,485,799.05 for the Orrick firm.
- €140,000.00 for the OCA firm;
- €4,229.36 in witnesses costs for the hearing of November 25, 2015.[314627]

---

[624] *Each of the parties will bear the cost of the arbitrator it has appointed.  The other costs generated by the arbitration will be shared equally by the parties.*

[625] Statement on the costs of the arbitration of February 17, 2016, footnote no. 1.

[626] According to footnote number six, this amount includes US$ 125,000 which the Claimants were to pay up until March 11, 2016 pursuant to the letter from the Secretariat of February 10, 2016, but not the amount which the Respondent was required to pay.

*C.*     ***The Tribunal's Analysis***

473. Pursuant to Article 61(2) of the ICSID Convention, unless otherwise agreed by the Parties, the Arbitral Tribunal has set the amount of the costs it has incurred and decides on the terms for breaking down said costs, fees, the expenses of the members of the Tribunal and the fees owed for the use of the Centre's services.

474.     The fees and costs of the Tribunal as well as the administrative fees and costs of the ICSID are as follows (in US dollars):[628]

The arbitrators' fees and costs:

| | |
|---|---|
| Mrs. Vera Van Houtte | $247,695.31 |
| Prof. Bernardo Cremades | $208,277.78 |
| Prof. Pierre Tercier | $153,718.90 |
| | |
| The ICSID's administrative fees | $160,000.00 |
| Costs paid by the ICSID (estimated)[629] | $52,344.31 |

475. Regarding the amounts claimed by each party, the Tribunal notes the following:

- Notwithstanding the three successive requests for the payment of advances by the Secretariat, the Respondent never paid its share and the Claimant had to replace it for such payment, for a total to date of €425,000[630]; thus, the Claimants advanced the total amount of the expenses and fees of the arbitrators and the Secretariat, amounting to US dollars 850,000;

- The amounts of the fees of each of the parties' counsel are comparable and can be considered as reasonable; the same is true of the experts' fees, even if those of PwC represent twice the amount of those of OCA, and of the expenses of the witnesses for the Respondent; furthermore, neither party requested the right to react to the communication of the other party's expenses.

476. Regarding the Respondent's conduct, the Arbitral Tribunal  cannot concur with the Claimants' criticism (the request for recusal and the arguments developed by the Respondent are not manifestly unfounded; and the delay or failure to produce documents, like the late

---

[627] Letter of February 17, 2016.

[628] The ICSID Secretariat will send a detailed financial statement of the account of the case to the Parties as soon as it has been finalized.

[629] This amount covers in particular the costs pertaining to the hearing, and includes the estimate of the costs (express courier services, printing, copying) for the sending of this Award.  The balance will be reimbursed to the parties in proportion to the advances paid to the ICSID.

[630] Letters from the Secretariat to the Parties of February 10, 2016 (noting that in the past, the Secretariat had received three transfers of US$ 100,000 from the Claimants as an advance payment owed by the Respondent and asking each of the Parties to pay a fourth installment of US$ 125,000) and of April 27, 2016 (acknowledging receipt of the Claimants' payment of US$ 125,000 and announcing the Respondent's failure to pay) and letter of April 28, 2016 from the Claimants to the Secretariat (establishing that the Respondent had failed on four occasions to meet its obligations to pay advances and announcing their payment  of US$ 125,000 in lieu of the Respondent).

confirmation of the appearance of the Respondent's witnesses, can be explained otherwise than by deliberate tactics), except as concerns the nonpayment of the advances to the ICSID. Article 14 of the ICSID's administrative and financial regulations stipulates that the parties will make advanced payments in order to permit the centre to cover the direct costs of ongoing ICSID proceedings including the arbitrators' fees and expenses. The Respondent, which did not even attempt to justify its nonpayment, therefore violated its obligation to pay its share, although it had accepted this obligation by stipulating in its Investment Code that disputes concerning the application of the code are, unless otherwise agreed by the parties, settled by arbitration in accordance with the provisions of the ICSID convention, ratified by it on November 4, 1986.

477. In rendering its decision concerning the costs of the arbitration, the Tribunal will take into consideration on the one hand the fact that the Claimants prevailed (even if this choice is accompanied by considerable overtones) in the decision on jurisdiction of December 29, 2012 and the principle of the breach of the Investment Code, and, on the other hand, the fact that the Respondent was unable to prove corruption and fraud (subjects which occupied the Arbitral Tribunal to a great extent), but prevailed in the issue concerning lack of jurisdiction for the *lucrum cessans* following termination and, as concerns the merits, on several counts of prejudice which were either rejected or the amount of which was reduced.

478. Consequently, availing itself of its power of appreciation afforded also by Article 28 of the ICSID arbitration regulations, the Tribunal decides that the costs of the arbitration are to be broken down as follows:

-   Each party will bear the burden of the expenses and fees of the attorneys and experts it has hired in this procedure;

-   The costs of the arbitration, including the expenses and fees of the members of the Tribunal, as well as the ICSID costs will be borne by the Claimants for the amount of 60% and by the Respondent for the amount of 40%.

## IX.    ENACTING TERMS

A.    The investment was not illegal due to corruption and the Arbitral Tribunal therefore confirms its jurisdiction (already decided on December 29, 2012) to rule on the effects of the requisition and other alleged violations of the Investment Code which do not fall into the framework of the Concession Agreement with respect to the four Claimants.

B.    The Arbitral Tribunal does not entertain jurisdiction to rule on the request concerning the net value of the cash flow for the period of the concession of which the Claimants were deprived (*lucrum cessans*) because this loss is a consequence solely of the termination of the Concession Agreement.

C.    The Arbitral Tribunal does not entertain jurisdiction to rule on the requests concerning the additional counts of prejudice resulting from the Termination Decree which are the consequence solely of the termination of the Agreement.

D.   The Respondent violated Articles 5 and 6 of the Investment Code by the acts of the Public Authorities which certain aggravating circumstances of the Termination Decree and the requisition Decree constitute.

E.   The Respondent is sentenced to indemnify the Claimants for the prejudice linked to crisis management and to pay the sum of euros 248,834 in this capacity.

F.   The Respondent is sentenced to indemnify the Claimants for the prejudice linked to the non-restitution of a portion of the requisitioned goods and to pay in this capacity €200,000. If Getma International obtains, notwithstanding its annulment, the enforcement of the CCJA award and the payment of euros 210,070 which the CCJA Tribunal awarded to it for the same prejudice, the amount already received for this prejudice will be deducted from the amount awarded here in the same capacity.

G.   The Respondent is sentenced to pay interest capitalized annually on the foregoing amounts accruing from March 8, 2011 until September 30, 2013 and from June 17, 2014 up to the date of effective full payment.

H.   The Respondent is sentenced to pay to the Claimants 40% of the cost of the arbitration, namely US dollars 340,000.

I.   All the parties' other requests are rejected.



*[signature]*                                           *[signature]*

_____                    _____
Mr. Bernardo M. Cremades                         Professor Pierre Tercier
Arbitrator                                              Arbitrator
(subject to the attached dissident opinion)
Date: August 6, 2016                                  March 8, 2016


*[signature]*

_____
Mrs. Vera Van Houtte
President of the Tribunal
Date: January 21, 2016



# APPENDIX A



THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

Washington, D.C.

In a procedure between

**GETMA INTERNATIONAL, NCT NECOTRANS, GETMA INTERNATIONAL INVESTISSEMENTS, & NCT INFRASTRUCTURE & LOGISTIQUE**

Claimants

versus

**THE REPUBLIC OF GUINEA**

Respondent

(Case: ICSID NO. ARB/11/29)

---

## DECISION REGARDING JURISDICTION

Rendered by:

**Mrs. Vera Van Houtte, President
Mr. Bernardo M. Cremades, Arbitrator
Professor Pierre Tercier, Arbitrator**

Secretary of the Tribunal: Mrs. Mairée Uran Bidegain

---

*Counsel for the Claimants:*      *Counsel for the Respondent:*

José Miguel Judice, Esq.
Tiago Duarte, Esq.
*PLMJ Sociédade de Advogados, RL*
Cédric Fischer, Esq.
Elisabeth Mahé, Esq.
*Fischer, Tandeau de Marsac, Sur & Ass.*

Laurent Jaeger, Esq.
Pascal Agboyibor, Esq.
Romain Sellem, Esq.
*ORRICK Rambaud Martel, Attorneys*
Mamadou Traoré
Edasso Bayala
*The Firm Mamadou S. Traoré*

Date sent to the Parties: December 29, 2012



## Table of contents:

I.    THE PARTIES .................................................................................................. 3

    a. THE CLAIMANTS................................................................................................ 3

    b. THE RESPONDENT ........................................................................................... 3

II.   THE ARBITRAL TRIBUNAL............................................................................. 4

III.  THE ARBITRATION CLAUSE ......................................................................... 4

IV.  BRIEF STATEMENT OF THE FACTS ............................................................ 5

V.   BACKGROUND OF THE PROCEDURE......................................................... 7

    a. BEGINNING OF THE PROCEDURE.................................................................... 7

    b. REQUEST FOR RECUSAL ................................................................................. 8

    c. BIFURCATION OF THE PROCEDURE................................................................. 8

VI.  THE PARTIES' REQUESTS CONCERNING JURISDICTION ........................ 9

    a. THE RESPONDENT .......................................................................................... 9

    b. THE CLAIMANTS............................................................................................. 9

VII. THE PARTIES' ARGUMENTS ..................................................................... 10

    a. THE RESPONDENT'S ARGUMENT ................................................................. 10

    b. THE CLAIMANTS' ARGUMENT ..................................................................... 14

VIII. DISCUSSION ............................................................................................. 18

    a. INTRODUCTION – BIFURCATION................................................................... 18

    b. ARBITRATION CLAUSE AS A "CONTRARY AGREEMENT" ................................ 19

    c. ARTICLE 32.5 OF THE CONCESSION AGREEMENT ........................................ 22

    d. GETMA INTERNATIONAL'S REQUESTS IN THE CCJA ARBITRATION................ 26

    e. THE CONTRARY AGREEMENT OF THE 2ND, 3RD AND 4TH CLAIMANTS............ 33

IX.  DECISION .................................................................................................. 38



## I.   THE PARTIES

### a.   THE CLAIMANTS

1.   The first Claimant is **Getma International,** a simplified joint stock company existing under French law, with registered offices at 66 rue Pierre Charron, 75008 Paris.

2.   The second Claimant is **NCT Necotrans,** a joint stock company existing under French law with registered offices at 66 rue Pierre Charron, 75008 Paris.

3.   The third Claimant is **Getma International Investissements,** a simplified joint stock company existing under French law with registered offices at 66 rue Pierre Charron, 75008 Paris.

4.   The fourth Claimant is **NCT Infrastructure & Logistique**, a simplified joint stock company with registered offices at 66 rue Pierre Charron, 75008 Paris.

5.   The Claimants are represented in the arbitration procedure by:
José Miguel Judice, Esq.
Tiago Duarte, Esq.
PLMJ-A.M. Pereira, Saragga Leal, Oliveira Martins, Judice e Associados, RL
Attorneys & Members of the Lisbon Bar Association
Avenida da Liberdade, 224
1250-148 Lisbon
Portugal

And

Cédric Fischer, Esq.
Elisabeth Mahé, Esq.
Fischer, Tandeau de Marsac, Sur & Ass.
Attorneys & Members of the Paris Bar Association
67, Boulevard Malesherbes
75008 Paris
France

### b.   THE RESPONDENT

6.   The Respondent is the **Republic of Guinea**, represented by the State Judicial Agency whose offices at POB 1005 Conakry, the Republic of Guinea (referred to hereinafter as the "Respondent" or the "Republic").

7.   The Respondent is represented in this arbitration procedure by:

Laurent Jaeger, Esq.
Pascal Agboyibor, Esq.
Romain Sellem, Esq.
Orrick Rambaud Martel, Attorneys
Avenue Pierre 1er de Serbie
75782 Paris
France



And
Mamadou Traoré, Esq.
Edasso Bayala, Esq.
Of the Firm Mamadou S. Traoré
11 POB 721 CMS Ouagadougou
Place Naba Koom, 11
Burkina Faso

## II.  THE ARBITRAL TRIBUNAL

8.  On November 14, 2011, the Claimants appointed as arbitrator, pursuant to Article 2 of the ICSID Regulations:
Mr. Bernardo M. Cremades
B. CREMADES Y ASOCIADOS
Goya, 18
28001 Madrid
Spain

9.  On December 12, 2011, the Republic appointed as arbitrator, in accordance with Article 2 of the ICSID Regulations:
Professor Pierre Tercier
Chemin Guillaume Ritter 5
1700 Fribourg
Switzerland

10.  On January 20, 2012, the Parties jointly appointed as President of the Arbitral Tribunal:
Mrs. Vera Van Houtte
STIBBE
Central Plaza
Rue de Loxum, 25
1000 Brussels
Belgium

11.  On February 2, 2012, the Secretary General of the Centre appointed Mrs. Mairée Uran Bidegain, Legal Advisor at the ICSID, as Secretary of the Arbitral Tribunal.

## III.  THE ARBITRATION CLAUSE

12.  Article 28 of Court Order no.00/PRG/87 of January 3, 1987, amended by law no.L/95/029/CTR in of June 30, 1995 governing the Investment Code of the Republic of Guinea (the "Investment Code") stipulates that:

"1)  *Disputes resulting from the interpretation or application of this Code are settled by the Guinean courts entertaining jurisdiction in accordance with the laws and regulations of the Republic.*

2)  *However, disputes between the Guinean State and foreign nationals, concerning the application or interpretation of this Code are, unless otherwise agreed by the parties involved, definitively settled by arbitration conducted:*

●  *in accordance with the provisions of the Convention of March 18, 1985 for the "settlement of disputes concerning investments between States and nationals of other states"*

4

*established under the aegis of the International Bank for Reconstruction and Development, ratified by the Republic of Guinea on November 4, 1986, or;*

- *if the person or company concerned does not meet the nationality conditions stipulated in Article 25 of said Convention, in accordance with the provisions of the regulations of the additional mechanism approved on September 27, 1978 by the Administrative Council of the International Centre for the Settlement of Investment Disputes (ICSID)."*

## IV.   BRIEF STATEMENT OF THE FACTS

13.   On September 22, 2008, the Republic of Guinea and Getma International concluded an agreement for the Concession of the container terminal of the port of Conakry, its extension and the building of a rail extension (the "Concession Agreement") (Exhibit C – 11). Under this agreement, the Republic of Guinea granted to Getma International a Concession to the public service of managing and operating the Conakry container terminal (the "Concession").

14.   Pursuant to Article 7 of the Concession Agreement, Getma International was to create a company under Guinean law for the operation of the Concession. Pursuant to this provision, the *Société du Terminal à Conteneurs de Conakry SA* (the Conakry container terminal company) (the "STCC") was created on November 20, 2008 (Exhibit C – 13). 95% of the STCC is owned by Getma International Investissements, created on November 12, 2008, 51% by Getma International in its turn, and 49% by NCT Necotrans (Counter-Memorial no.2 § 219, Memorial no. 2 § 69).

15.   On November 7, 2009, the Republic and Getma International concluded Additional Clause no. 1 to the Concession Agreement in order to specify the conditions for suspending and calculating the terms and deadlines contained in the Concession Agreement, the number of members in the monitoring committee, the nature of the activities granted, the share in the parking costs and fees ("Additional Clause no. 1") (Exhibit C – 12).

16.   Through its French subsidiary NCT Infrastructure & Logistique, Getma International launched an international call for bids, closed in February 2011, for the construction of a new dock and the building of a new area of 120,000 m² (Counter-Memorial no. 2 § 219, Memorial no. 2 § 70).

17.   On March 8, 2011, the President of the Republic adopted a Decree pursuant to which the Concession Agreement and its Additional Clause were *"terminated for failures to meet the Concessionary's obligations […] effective immediately and without indemnification, at the expense and risk and based on the faults of the Getma International SAS companies* [sic] (the "Termination Decree") (Exhibit C – 19).

18.   On March 9, 2011, the President of the Republic adopted a second Decree pursuant to which *"the Guinean State has decided to requisition, for a period of 60 days or more, beginning on the date of the signing of this Decree, the personnel, equipment, installations, real property and assets it deems necessary, belonging to the Getma International SAS company and to the Conakry container terminal company, which are located in the Conakry container terminal or elsewhere on the national territory of the Republic of Guinea"* (the "Requisition Decree") (Exhibit C – 21).

19. On May 10, 2011, Getma International submitted a request for arbitration to the common court of justice and arbitration (the "CCJA") of the *Organisation pour l'Harmonisation en Afrique du Droit des Affaires* (the "O.H.A.D.A.) (Organization for the Harmonization of Business Law in Africa) against the Guinean state, pursuant to the Arbitration Clause stipulated in Article 31 of the Concession Agreement (the "Arbitration Clause").

20. Pursuant to its request for arbitration of May 10, 2011, Getma International requested of the Tribunal created as a result of this request and composed of Messrs. Eric Teynier, Juan Antonio Cremades and Ibrahim Fadlallah (referred to hereinafter as "the CCJA Tribunal") to:

   *"State and rule that the termination of the Concession Agreement pursuant to the Decree of the President of the Republic of Guinea is null and void;*
   *Establish that, due to the new Concession Agreement granted on March 11, 2011 to BAL, or to any other company in the Bolloré group, a return to the "statu quo ante bellum" is henceforth impossible;*
   *Sentence the Respondent to indemnify the Concessionary for the prejudice sustained due to the termination of the Concession Agreement, and comprising <u>among other things</u> and subject to adjustment (i) the all-inclusive termination indemnity, (ii) the termination indemnity, (iii) the unamortized amount of the entry ticket, (iv) the severance pay and (v) the additional prejudice, in addition to interest accruing at the legal rate from the date of the preliminary notice of a change of law;*
   *To leave it up to the Respondent to pay all the costs, expenses and fees borne by the Claimant"*
   (Exhibit R – 9).

21. The CCJA procedure is currently underway.

22. On September 29, 2011, the Claimants filed a request pursuant to Article 36 of the ICSID Convention as well as order no.00/PRG/87 of January 3, 1987, amended by law no..L/95/029/CTRN of June 30, 1995 pertaining to the Investment Code of the Republic of Guinea.

23. Pursuant to their arbitration request of September 29, 2011, the Claimants requested of the ICSID Tribunal (the Tribunal composed as mentioned in chapter 2 above, also referred to as "the Arbitral Tribunal"):

   *"a)  to declare that the state of Guinea violated its investment laws and/or International law, in particular that it expropriated in a discriminatory manner the Claimants' investment, without prompt, just adequate compensation, in breach of Articles 5, 6 and 7 of the Investment Code and/or in breach of customary International law;*
   *c)  to order Guinea to indemnify the Claimant due to the breach of its investment laws and/or International law in an amount to be determined at the appropriate time in this procedure, in a freely convertible currency accepted by the Claimants, plus interest accruing at a reasonable commercial rate for the currency at issue from the date of the expropriation until full payment of the amount has been made;*
   *d)  To award all other compensation which the Tribunal considers appropriate, and;*
   *e)  to order the state of Guinea to pay all the costs of this arbitration procedure, including, without limitation, the fees and costs of the Tribunal, the fees and costs of the ICSID, the*

6

*fees and costs pertaining to the Claimant's legal presentation and the costs and fees of any expert appointed by the Claimant or the Tribunal, plus the interest owed".*

## V.   BACKGROUND OF THE PROCEDURE

### a.   BEGINNING OF THE PROCEDURE

24.   On September 29, 2011, Getma International, NCT Necotrans, Getma International Investissements and NCT Infrastructure & Logistique (referred to hereinafter as the "Claimants") filed a request for arbitration ("the request") with the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") against the Republic of Guinea.

25.   The basis of the request is the convention for the settlement of investment disputes between states and nationals of other states (the "Convention" or the "ICSID Convention") as well as order no.00/PRG/87 of January 3, 1987, amended by law no. L/95/029/CTRN of June 30, 1995 governing the Investment Code of the Republic of Guinea.

26.   On October 19, 2011, the ICSID Secretariat, in order to pursue the examination of the request, asked the Claimants to clarify the requesting parties' respective roles in the Concession and to explain the investment made by Getma International Investissements and NCT infrastructure & Logistique. According to the information submitted by the Claimants on October 28, 2011:

-   NCT Necotrans is the group's leading holding company owning directly or indirectly 100% of the three other Claimants, and financed the investment in Guinea;

-   Getma International was the Concessionary of the container terminal;

-   Getma International Investissements is an intermediary holding company controlled by Getma International and controlling the Guinean Company STCC which is the company which operates the terminal;

-   NCT infrastructure & Logistique is NCT Necotrans' technical subsidiary responsible for the work of extending the terminal.

27.   In accordance with Article 36(3) of the ICSID Convention, ICSID's Secretary General registered the request on November 3, 2011.

28.   In a letter of November 14, 2011, the Claimants proposed that the dispute be settled by the Tribunal composed of three members, one arbitrator appointed by each of the parties and the third appointed by common agreement. In this same letter, the Claimants confirmed the appointment as arbitrator of Mr. Bernardo Cremades, of Spanish nationality, whom they had already announced in the request.

29.   In a letter of December 12, 2011, the Respondent accepted the Claimants' proposal concerning the method of appointing the Arbitral Tribunal and appointed Professor Pierre Tercier of Swiss nationality as arbitrator.

30.   In a letter of December 20, 2011, the Centre's Secretariat informed the parties that Mr. Bernardo Cremades and Professor Pierre Tercier had accepted their appointments, and communicated to them the acceptance and independence statements signed respectively by the two arbitrators, in accordance with Article 6 (2) of the procedural regulations governing the ICSID's arbitration proceedings (the "Arbitration Regulations").

31.   On January 20, 2012, the parties appointed jointly Mrs. Vera Van Houtte of Belgian nationality, as President of the Arbitral Tribunal. Mrs. Van Houtte accepted her appointment on February 2, 2012. On the same day, the Centre's Secretary General informed the parties that the three arbitrators had accepted their appointments and that in accordance with Article 6 (1) of the Arbitration Regulations, the Tribunal was considered was created and the proceedings commenced on such date, namely February 2, 2012. A copy of the statement signed by Mrs. Van Houtte was also communicated to the parties on the same day.

32.   Mrs. Mairée Uran Bidegain was also appointed as the Tribunal's Secretary on same date.

33.   In accordance with Article 13 of the Arbitration Regulations, the Arbitral Tribunal's first session was held in Paris with the parties on March 30, 2012. During this session, the Arbitral Tribunal established the specific rules for the procedure. A record of this session was approved by the parties as stated below.

   **b.   REQUEST FOR RECUSAL**

34.   On April 16, 2012, the Respondent submitted a request for recusal against Mr. Bernardo Cremades (the "request for recusal") pursuant to Article 57 of the ICSID Convention.

35.   In a letter of April 18, 2012, the ICSID Secretariat informed the parties that in accordance with Article 9(6) of the Arbitration Regulations, the proceedings were considered as suspended on the date of the filing of the request, namely on April 16, 2012. The secretary of the Arbitral Tribunal communicated to them a draft record of the first session held on March 30, 2012, with the indication that the parties would be asked to confirm their agreement to various points on the agenda upon resumption of the proceedings.

36.   After an exchange of memorials between the parties regarding the request for recusal and the filing of the observations of Mr. Bernardo Cremades, Mrs. Vera Van Houtte and Professor Pierre Tercier considered the request for recusal and put it to an immediate vote without the presence of Mr. Bernardo Cremades. Following a tie of the votes of the two arbitrators, the Chairman of the Administrative Council made the decision on June 28, 2012 regarding the request for recusal, in accordance with Article 58 of the ICSID convention. According to the decision of the Chairman of the Administrative Council:

   *"1.   The request for recusal made by the Republic of Guinea on April 16, 2012 against Mr. Bernardo M. Cremades is rejected.*

   *2.   The costs incurred by the parties and the members of the Tribunal in examining this request for recusal will be the object of a subsequent decision by the Tribunal.*

   *3.   In accordance with Article 9(6) of the Arbitration Regulations, these proceedings are considered as having resumed on the date of this decision".*

   **c.   BIFURCATION OF THE PROCEDURE**

37.   During its first session, the Arbitral Tribunal – after having noted that the Respondent intended to contest the jurisdiction of the Arbitral Tribunal and that the parties agreed on the bifurcation of the procedure – established the procedural calendar on the issue of jurisdiction as follows:
   • June 22, 2012: Respondent's Memorial on jurisdiction

8



- July 13, 2012: the Claimants' Counter Memorial on jurisdiction
- August 3, 2012: the Respondent's Replication
- September 7, 2012: the Claimants' rejoinder
- September 28, 2012: Hearing

38. On June 7, 2012, the Arbitral Tribunal proposed that the parties not suspend the calendar of the procedure and maintain the dates established during the first session, notwithstanding the suspension of the procedure following the Respondent's request for recusal. The parties marked their agreement on June 8, 2012.

39. On June 22, 2012, the Respondent submitted its Memorial no. 1 on jurisdiction by email ("Memorial no. 1").

40. On June 28, 2012, the parties were asked to confirm their agreement regarding the draft record of the first session of the Arbitral Tribunal. The Claimants and the Respondent mark their agreement regarding the record respectively on July 4 and 12th 2012. On this occasion, the parties also stated that they were not opposed to the ICSID's publication of the decision of the Chairman of the administrative council regarding the request for recusal.

41. On July 13, 2012, the Claimants submitted their Counter Memorial no. 1 on jurisdiction by email ("Counter Memorial no. 1").

42. On July 30, 2012, the Respondent requested, pursuant to Article 26(2) of the ICSID regulations, a three-day extension to present its Memorial no. 2 on jurisdiction. Given the Claimants' agreement, the Arbitral Tribunal granted the requested extension. On August 6, 2012, the Respondent submitted its Memorial no. 2 on jurisdiction by email ("Memorial no. 2").

43. On September 7, 2012, the Claimants submitted their Counter Memorial no.2 on jurisdiction by email ("Counter Memorial no.2").

44. On September 28, 2012, a hearing on the jurisdiction of this Arbitral Tribunal was held in Paris, the record of which was submitted to the Parties and the arbitrators in draft form on the same day, and in its final form subject to possible corrections by the Parties or the arbitrators, on October 2, 2012.

## VI.   THE PARTIES' REQUESTS REGARDING JURISDICTION

### a.   THE RESPONDENT

45. In its Memorial no. 1 on jurisdiction of June 22, 2012 and its Memorial no.2 on jurisdiction of August 6, 2012, the Respondent requested that the Arbitral Tribunal:

   *"-   declare that it entertains jurisdiction;*
   - *sentence the Claimants to pay all of the arbitration costs including the costs and fees incurred by the Respondent for the purposes of its defense in the framework of this arbitration, the amount of which will be determined at the end of the procedure."*

### b.   THE CLAIMANTS

46. In their Counter Memorial no.1 on jurisdiction of July 13, 2012 and their Counter Memorial no.2 on jurisdiction of September 7, 2012, the Claimants request that the Arbitral Tribunal:

*"- declare that it entertains jurisdiction;*

*"- sentence the Republic of Guinea to pay all the costs incurred up until the present day, including the costs of arbitration pertaining to the objection to jurisdiction and the costs and fees of the Claimants' attorneys."*

## VII.   THE PARTIES' ARGUMENTS

### a.   THE RESPONDENT'S ARGUMENT

### i)   The Arbitration Clause as "a contrary agreement"

47.   The Respondent contests the jurisdiction of this Arbitral Tribunal, on the basis of Article 23 of the ICSID Convention. It contends that the parties did not grant their consent in writing to submit their dispute to the ICSID.

48.   The Respondent claims that the ICSID arbitration proposal contained in the Investment Code is limited. Indeed, Article 28 of the Investment Code stipulates that *"Disputes between the Guinean state and foreign nationals concerning the application or interpretation of this code are, **unless otherwise agreed by the parties involved,** definitively settled by arbitration [ICSID]..."* (The Respondent's underlying) (Memorial no. 1 §§ 12 and 14).

49.   The Respondent considers that Article 28 of the Investment Code must be interpreted objectively. It agrees to seek out the parties' common intent. According to the Respondent, Article 28 means that the ICSID entertained jurisdiction only failing the parties' choice of another court. The *"contrary agreement"* at issue must be a contractual agreement between the Guinean State and the foreign investor which has a result which is contrary to that of the appointment of the ICSID as the arbitration institution with authority to rule on their investment dispute. Such an agreement could be in the form of an exclusion clause or clause for the selection of the forum (Memorial no. 1 §§ 18-24).

50.   The Respondent affirms that the parties concluded such a "contrary agreement" when they inserted the Arbitration Clause designating the CCJA in their Concession Agreement. According to the Respondent, this Arbitration Clause encompasses all grievances and litigations resulting from the Concession Agreement regardless of their nature or legal grounds (Memorial no. 1 § 31).

51.   Contrary to the Claimants' affirmations, the Respondent considers that the *"contrary agreement"* must not explicitly govern litigations concerning the interpretation and the application of the Investment Code.  It affirms that the restrictive interpretation rule invoked by the Claimants is based on no rule or case law (Memorial no. 2 §§ 34-37). Assuming even that a specific contrary agreement were required, the Respondent specifies that Article 32.5 of the Concession Agreement clearly incorporates the protection afforded investors under the Investment Code. Indeed, this Article refers to the *"amendment of the Guinean Investment Code and of the laws in force [...]"*, namely acts of the State acting as legislator and not as a party to the Concession Agreement (Memorial no. 2 §§ 38-40).

52.   The Respondent contends that the Parties' choice to grant jurisdiction to the CCJA is irrevocable.  It is based on the use of the term *"irrevocable"* in the arbitration clause. The Respondent claims that Article 28 of the Investment Code is identical to the so-called *"fork in the road"* clauses. Thus, like the *"fork in the road"* clauses, Article 28 proposes an exclusive

choice between the ICSID or another court and the choice — once made — is irrevocable (Memorial no. 1 §§ 47-51).

53.   Furthermore, the Respondent alleges that the Parties' choice of the CCJA was confirmed by (i) the filing of Getma International's arbitration request before the CCJA on May 10, 2011 and (ii) the signing of the minutes of the meeting of the CCJA Tribunal on March 12, 2012 which constitutes a valid Arbitration Clause (Memorial no. 1 §§ 54-55).

*ii)   Scope of the Concession Agreement and the Arbitration Clause*

54.   According to the Respondent, the requests made by the Claimants before the ICSID resulted directly from the Concession Agreement and are covered by the Arbitration Clause given that (i) the Concession Agreement constitutes the exclusive basis for the investment on which the Claimants are relying, (ii) the termination of the Concession Agreement constitutes the foundation for the Claimants' requests, and (iii) the prejudice for which the Claimants are requesting damages relies on the stipulations of the Concession Agreement (Memorial no. 1 §§ 35-37).

55.   Regarding the investment, the Respondent alleges that according to the terms of the Claimants' arbitration request, the Concession Agreement is the exclusive basis thereof. The Claimants indeed affirmed that *"we are confronting a true investment […]. Indeed, (i) the execution of the public service Concession contract implied a financial investment to be made by the Concessionary (investor)"* (Memorial no. 1 § 35).

56.   Concerning the basis of the request, the Respondent quotes the Claimants' arbitration request according to which *"the termination of the contract represents […] an act of the Public Authorities and not only a simple execution of the clause of the contract, thereby constituting a measure with an effect equivalent to expropriation"*. The Respondent specifies that Article 32.5 of the Concession Agreement governs explicitly litigations concerning acts of the Public Authorities contravening the investor's rights (Memorial no. 1 §§ 39-41, Memorial no. 2 § 23). If the expropriation is explicitly governed by the Concession Agreement, the Respondent considers that any litigation concerning an expropriation is a result of the Concession Agreement and falls into the scope of the Arbitration Clause. The Arbitration Clause and Article 32 moreover are contained in the same chapter in the Concession Agreement (Memorial no. 2 §§ 25-26).

57.   Concerning the prejudice, the Respondent argues that the extra-contractual prejudice claimed by Getma International to warrant the jurisdiction of this Arbitral Tribunal (namely the *lucrum cessans*) is in fact the direct result of the termination of the Concession Agreement. According to the Respondent, the *"just, adequate compensation"* stipulated in the Investment Code can only be that which was agreed upon by the parties in the Concession Agreement. Indeed, the application of the *"usual rules and practices of International law"* to which the Investment Code refers leads to the application of the Concession Agreement via the *pacta sunt servanda* principle. The prejudice claimed by Getma International therefore indeed results from the Concession Agreement (Memorial no. 2 §§ 98-110).

*iii)   Parties to the Arbitration Clause*

58.   The Respondent specifies that the *"contrary agreement"* binds all the Claimants to this arbitration procedure. The Respondent bases its argument on the theory of groups of companies (established by the Paris Court of Appeal in the *Dow Chemical* case) to extend the effects of the Arbitration Clause to NCT Necotrans, Getma International Investissements and

NCT infrastructure & Logistique. The Respondent considers that the groups of companies theory applies in the case at issue because, pursuant to a material rule of the international law of arbitration acknowledged in the uniform act on the OHADA arbitration laws, the existence and effectiveness of an Arbitration Clause is appreciated on the basis of the parties' will, independently of any reference to a state law (Memorial no. 2 §§ 87-91).

59.   According to the Respondent, the Claimants – belonging to the same group of companies – due to their participation in the conclusion and execution of the Concession Agreement and Additional Clause no.1, manifested their wish to be bound by the Arbitration Clause. Indeed (Memorial no. 2 §§ 58-74):

   a)   the Claimants all belong to the same group of companies (the Necotrans group) and share executives who are also officers in NCT Necotrans;

   b)   the Claimants (with the exception of Getma International Investissements) participated and were personally represented during the negotiations of the Concession Agreement, which was signed by Mr. Talbot in his capacity as *"president of the NCT Necotrans group";*

   c)   NCT Necotrans was in charge of obtaining the financing necessary for making the investments stipulated in the Concession Agreement. Getma International Investissements was created as the holding company vehicle for the Necotrans group's participation in the STCC and NCT Infrastructure & Logistique launched a call for bids for the construction of the new dock stipulated in the Concession Agreement for the account of Getma International;

   d)   Additional Clause no. 1 to the Concession Agreement – which explicitly targets the Getma International Investissements company – was signed by the president of the Necotrans group and by the president of the STCC and of NCT Infrastructure & Logistique;

   e)   The CCJA arbitration was initiated and pursued at the initiative and under the control of NCT Necotrans.

   *iv)   Identity between litigation brought before the CCJA Tribunal and the ICSID Tribunal.*

60.   The Respondent contends that the CCJA Tribunal's record shows that the litigations and requests brought before the CCJA Tribunal and the ICSID Tribunal are identical and that the Arbitral Tribunal entertains jurisdiction to rule on the investment litigations.  On the one hand, Getma International's presentation of the dispute quoted in the minutes of the meeting of the CCJA Tribunal of March 12, 2012 is identical *verbatim* to the presentation made by the Claimants in their request for ICSID arbitration and, on the other hand, all the Claimants' requests were brought before the CCJA Tribunal, including those governed by the legislation on investments (Memorial no. 1 § 77).

61.   The Respondent specifies that the litigation brought before the CCJA concerns not only the contract but also the investment.  The Respondent refers to an opening brief introduced by Getma International in the context of the CCJA procedure which states that:

   a)   The suit is based on International principles for the protection of investments. Getma International invokes the rules and principles of International law, the notion of a *"State Contract"*, the general principles which apply to investments (such as good faith, legitimate expectations or just and equitable treatment) as well as doctrine in the domain of International investment law and ICSID case law (Memorial no. 1 §§ 80-84, Memorial no. 2 § 54).

   b)   The litigation concerns the Termination Decree and the Requisition Decree which are acts of the Public Authorities. Getma International therefore acknowledges that the jurisdiction of the CCJA Tribunal is not limited solely to contractual aspects but

encompasses all aspects linked to the illegal actions of the Public Authorities (Memorial no. 1 § 89, Memorial no. 2 § 49).

   c) The litigation concerns an expropriation. Getma International utilizes terms specific to this type of measure such as *"requisitioning [...] using the armed forces"* or *"manu military"* and is requesting indemnification for this expropriation. The Respondent specifies that the CCJA entertains jurisdiction to rule on all of requests concerning the alleged expropriation, including the violation of investment laws (Memorial no. 1 §§ 92-97).

62. The Respondent refutes the Claimants' allegation that Getma International's requests before the CCJA Tribunal do not cover their entire prejudice.

63. As concerns the requisition of goods, the Respondent emphasizes that the indemnity claimed before the CCJA Tribunal corresponds to the value of the goods. This indemnity covers therefore all the consequences of the requisition Decree and not only the consequences of the Republic's failure to meet its contractual obligation to minimize the prejudice sustained by Getma International in its capacity as Concessionary (Memorial no. 2 §§ 46-48).

64. As far as the loss of profit (*lucrum cessans*) is concerned, the Respondent contends that this item is included in the all-inclusive termination indemnity stipulated in Article 32 three of the Concession Agreement which is claimed by Getma International before the CCJA Tribunal. Indeed, the all-inclusive indemnity is aimed at compensating the loss of activity and is based on revenue (Memorial no. 2 §§ 51-53).

65. The Respondent emphasizes that Getma International brought the case before the CCJA freely with full knowledge of the facts. It was due to the CCJA's guarantees of independence and jurisdiction that Getma International allegedly accepted and confirmed the jurisdiction of this arbitration organization. On the other hand, the ICSID procedure stems from a *"forum shopping"* strategy on the Claimants' part (Memorial no. 1 §§ 64-65).

   *v) Capacity as investor and the carrying out of the investment*

66. The Respondent alleges that neither NCT Necotrans nor Getma International Investissements, nor NCT Infrastructure & Logistique refers to any dispute presenting a direct connection with an investment. These companies do not specify the nature of their investment, the violations of the Investment Code or the facts they intend to invoke and do not prove their capacity as investor or the actual prejudice they allege they sustained. According to the Respondent, alleging a *treaty claim* does not suffice to warrant the jurisdiction of the ICSID. The Respondent quotes in this respect the court's decisions in the *SGS versus the Philippines* and *Impregilo versus Pakistan* cases, according to which it is necessary – at the jurisdiction stage – to determine whether the alleged facts are *prima facie* such that they constitute a violation of investment laws. It therefore requests that the Arbitral Tribunal establish that the *treaty claims* invoked by the NCT Necotrans, Getma International Investissements and NCT Infrastructure & Logistique companies are nonexistent (Memorial no. 2 §§ 113 and 122).

67. Finally, the Respondent contends that NCT Necotrans does not have the capacity of investor because it has made no investment in the Republic of Guinea as per the Investment Code. Indeed, only direct contributions to a company established in Guinea in exchange for company stock are considered as investments under Article 3.2 of the Investment Code, to the exclusion of indirect holdings. And according to the Respondent, NCT Necotrans is participating in this arbitration due solely to the fact of its control over Getma International (Memorial no. 2 §§ 129-131)

**b.** THE CLAIMANTS' ARGUMENT

*i)   Arbitration Clause as a "contrary agreement"*

68.   The Claimants contest the existence of a *"contrary agreement"* between the parties, as per Article 28 of the Investment Code, which would exclude the ICSID's jurisdiction for settling litigations concerning the interpretation and application of said code. According to the Claimants, only one agreement exists between one of them and the Respondent as concerns the method for settling contractual litigation (Counter Memorial no. 1 § 149).

69.   The Claimants contend that in order to rule out the ICSID's jurisdiction pursuant to Article 28 of the Investment Code, the "contrary agreement" must be concluded by the Republic itself and all the investors concerned and must concern the same litigation, the same requests and the application of the same legal standards (Counter Memorial no. 1 §§17-18). The Claimants consider that this is not the case here.

70.   The Claimants allege that the Arbitration Clause and Article 28 of the Investment Code do not have the same *ratione materiae* scope of application. According to the Claimants, Article 28 covers solely disputes concerning the interpretation or application of the Investment Code, while the Arbitration Clause covers disputes resulting from the Concession Agreement and its Additional Clauses (Counter Memorial no. 1 §§ 25-27).

71.   The Claimants consider that the simple fact that an Arbitration Clause exists in the Concession Agreement is not sufficient for ruling out the existence of another arbitral agreement concerning the interpretation and application of the Investment Code (Counter Memorial no. 1 § 35). The Claimants referred to the case law of the Arbitral Tribunal according to which the method for settling litigations stipulated in a bilateral investment treaty cannot be excluded following the simple confirmation of an alternative forum in a contract. The Claimants quote in this respect the *Aguasdel Tunari versus Bolivia* and *Vivendi versus Argentina* cases (ad hoc committee) (Counter Memorial no. 1 §§ 33-39).

72.   The Claimants consider indeed that it is exceptional that a contractual clause for settling litigations encompass also investment litigations. If such were the parties wish, the Claimants considered that it was necessary to express it in a clear unequivocal manner. And yet the Concession Agreement makes no reference to litigations concerning the interpretation and application of the Investment Code, to the parties wish to eliminate ICSID arbitration or to the fact that the Arbitration Clause is the *"contrary agreement"* as per the Investment Code. The scope of the application of the Arbitration Clause is narrow moreover in that it applies solely to disputes or litigations *"resulting from this agreement or its Additional Clauses"*. (Counter Memorial no. 2 §§ 23-27).

73.   The Claimants add that under Article 32.5 of the Concession Agreement, the parties stipulated explicitly the obligation to maintain the provisions of the Investment Code. In light of this explicit obligation, the Claimants consider that it is not reasonable to claim that the Parties wanted to implicitly exclude some of the most important clauses of the Investment Code (such as those pertaining to the limits on expropriations or to the method for settling disputes) (Counter Memorial no. 2 § 31).

74.   According to the Claimants, the parties' conduct also shows that no *"contrary agreement"* exists. Thus, up until March 15, 2012, the Republic expressed no objection to the Claimant's letter of May 24, 2011 containing the acceptance of the ICSID arbitration proposal (Counter Memorial no. 2 §§ 41-42).

75. Even if one considered that a contrary agreement exists, the Claimants deem that it has not been proven that this agreement grants exclusive jurisdiction to the CCJA Tribunal to deal with investment litigations as opposed to a jurisdiction which is alternative to that of the ICSID. The Claimants establish an analogy with Article 26 of the ICSID Convention which stipulates that *"unless otherwise agreed"*, consent to the ICSID's arbitration implies a waiver of the right to exercise any other recourse. In the case of the departure from the rule of the exclusive jurisdiction of the ICSID, the other four have a jurisdiction which is alternative to that of the ICSID which is nonetheless not excluded (Counter Memorial no. 2 §§ 48-56). The Claimants reject the Respondent's argument concerning the *"irrevocable"* nature of the choice of the CCJA arbitration or the analogy with the *"fork in the road"* clauses. The Claimants consider that the adjective *"irrevocable"* refers to the decision of the Arbitral Tribunal and not to the parties' choice of the CCJA Tribunal. The Claimants note moreover that it is always possible for the parties to amend an Arbitration Clause later on, so that the choice of the CCJA arbitration is never irrevocable. As concerns the *"fork in the road"* clauses, the Claimants allege that Article 28 of the Investment Code does not offer a choice between several Tribunals but requires that the litigations concerning its interpretation or application be settled exclusively by an ICSID Tribunal (Counter Memorial no. 1 §§ 87-92 and 96-99).

76. As an explicit, unequivocal *"contrary agreement"* does not exist between the Parties, the Claimants consider that the Investment Code must be interpreted in a manner which protects the investors and, more specifically, which favors the jurisdiction of the ICSID (Counter Memorial no. 2 §§ 12-13).

77. The Claimants argue that at the jurisdiction stage, the Arbitral Tribunal must determine solely, *prima facie,* whether the facts alleged by the Claimants (in the event that they were to prove founded) are apt to constitute a breach of the Investment Code. The Claimants refer in this respect to the *AMCO versus Indonesia, Impregilo versus Pakistan* and *SGS versus Pakistan* cases. The Claimants recall that this latter case also concerned a contractual termination and that the Arbitral Tribunal acknowledged its jurisdiction, despite the fact that the contractual Arbitration Clause was broader than the Arbitration Clause in the case at issue (Counter Memorial no. 2 §§ 132-141 and §§ 90-94, 122 and 213).

   ii)  *Scope of the Concession Agreement and the Arbitration Clause*

78. Contrary to the Respondent's allegation, the Claimants object that the expropriations scheme is not governed by the Concession Agreement and that the requests concerning expropriations do not fall into the scope of the Arbitration Clause. The Concession Agreement indeed stipulates that an act of expropriation can lead to the termination thereof and to the payment of a contractual indemnification. But, according to the Claimants, this does not imply that the expropriation – as an act of the Public Authorities – cannot also constitute a breach of the Investment Code (which was not abrogated), as acknowledged by the court in the *SPP versus Egypt, Azurix versus Argentina* or *Impregilo versus Pakistan* cases (Counter-Memorial no. 2 §§ 65-73).

79. According to the Claimants, the Concession Agreement was not aimed at replacing the Investment Code. The reference to the expropriation was aimed solely at prohibiting the Republic from modifying in its legal order in order to permit, for example, that contractual terminations following expropriations not call for indemnification. According to the Claimants, the reference to the Investment Code proves that for Getma International the fact of maintaining the clauses of the Investment Code continued to constitute a useful guarantee (Counter Memorial no. 2 §§ 95-99).

80.     As concerns specifically the indemnity, the Claimants object that the "just and adequate compensation" referred to in Article 5 of the Investment Code, is not defined by Article 32.5 of the Concession Agreement. According to them, a distinction exists between indemnification (due to the contractual termination) stipulated in the Concession Agreement and calculated according to the rules of stipulated in the contract on the one hand, and the compensation (due to the expropriation) stipulated in the Investment Code and calculated according to the usual rules and practices of international law, on the other hand. They add that the Investment Code does not permit the parties to depart from the evaluation criteria stipulated in Article 5 of the Investment Code and that the Concession Agreement makes no reference to Article 5 of the Investment Code (Counter Memorial no. 2 §§ 110-114). To illustrate the difference between contractual compensation for termination and legal compensation for expropriation, the Claimants contend that in the event of a partial expropriation not entailing the termination of the Concession Agreement, only the legal indemnification would be owed (Counter Memorial no. 2 §§ 146-149).

*iii) Parties to the Arbitration Clause*

81.     The Claimants contend that only Getma International is party to the Arbitration Clause. They consider that the theory of the group of companies does not apply in the case at issue and in all events would not lead to the elimination of the ICSID arbitration (Counter Memorial no. 2 § 155).

82.     On the one hand, the Claimants allege that the group of companies theory is far from being established and was even rejected in several countries. In all events, they consider that the crucial factor for applying the group of companies theory – namely the parties' common intention to bind non-signatories – has not been proven by the Respondent. They emphasize that the Respondent merely establishes that the Claimants are part of the same group of companies and alleges (without proving it) that they participated in the negotiation, conclusion or execution of the Concession Agreement. And yet, the *"negotiation, conclusion and execution"* can, according to the Claimants, merely indicate the parties' common intent. In the case at issue, the Claimants denied that it was their wish to be bound under the Arbitration Clause and, in particular, under an implicit "contrary agreement" liable to obviate an ICSID arbitration. The Claimants specify that Mr. Talbot's signing of the Concession Agreement is not relevant, inasmuch as this was necessary for Getma International's valid commitment (Counter Memorial no. 2 §§ 157-181, 190-197).

83.     Moreover, the Claimants allege that the group of companies theory was never utilized in case law to eliminate an investor's right to resort to ICSID arbitration. The effect of this argument on the contrary, is to extend the rights of the creditors or members of the group of companies by involving non-signatories in the arbitration. As for the argument of the *"piercing of the corporate veil"*, the Claimants consider that it can apply only if it is proven that the corporate veil is utilized for illegal purposes. However, the Claimants affirm that Getma International's signing of the Concession Agreement is not the result of an attempt to commit fraud or to derive undue benefit from any right whatsoever (Counter-Memorial no. 2 §§ 201-211).

*iv) Identity between the litigation brought before the CCJA Tribunal and before the ICSID Tribunal*

84.     The Claimants contend that the CCJA arbitration and the ICS IT arbitration are distinct, as they are dealing with different litigations, different requests and different grounds. Only the facts are the same (Counter Memorial no. 2§§ 114-115); the Claimants allege that the Respondent

acknowledged moreover the existence of a contractual litigation and an investment litigation in paragraph 79 of its Memorial. They emphasize in this respect that contrary to that which the Respondent alleges, the investment litigation has not been brought before the CCJA. This interpretation would seem to stem from a poor reading of the Memorial filed by Getma International in the CCJA procedure (Counter Memorial no. 2 §§117 and 130). In all events, the CCJA Tribunal could always decline its jurisdiction if requests concerning the application of the investment legislation were effectively brought before it (Counter Memorial no. 2 § 125).

85. The Claimants recall that international arbitral case law admits that the same series of facts can constitute simultaneously a breach of a contract and of a bilateral investment treaty (or *mutatis mutandis* of national legislation for the protection of foreign investments). The Claimants quote the decisions pronounced in the *Vivendi versus Argentina* case (award canceling the *ad hoc* committee), the *Bayindir versus Pakistan, Impregilo versus Pakistan, Vivendi versus Argentina* cases (Vivendi II) and the *Biwater versus Tanzania* case (Counter Memorial no. 1 §§ 57-67).

86. The Claimants contend that in the case at issue, the Termination Decree is an act of the Public Authorities which – incidentally – also resulted in a breach of the Concession Agreement (Counter Memorial no. 2 §§ 68-70). The Claimants emphasize that the Respondent itself acknowledges that the Termination and Requisition Decrees are acts of the Public Authorities and not merely acts on the part of a party to a contract (Counter Memorial no. 2 § 73).

87. The Claimants explain that the litigation brought before the ICSID Tribunal concerns precisely the extra-contractual effect of the act of the Public Authorities constituting an expropriation measure as per the Investment Code. The CCJA Tribunal for its part has been asked to rule on the contractual effects of this Termination Decree which constitutes an act *"which impedes the proper functioning of the activities of the concession"* as per article 32.5 of the Concession Agreement (Counter Memorial no. 1 §§ 48-49, 78-80, Counter-Memorial no. 2 §§ 82-87).

88. Moreover, the Claimants allege that the grounds for the requests and the indemnification claimed before the CCJA Tribunal and the ICSID Tribunal are distinct. In this regard, the Claimants quote the opening brief submitted by Getma International in the CCJA procedure, in which the requests are based on the Republic's violation of its contractual obligation to minimize the effects of any change of law and acts of the Public Authorities which impede the proper functioning of the activities in the concession. In this same brief, Getma International also indicates that the damages claimed in its capacity as Concessionary correspond to *"the portion of its prejudice which was contractualized in the Concession Agreement"* but that *"the indemnification stipulated in article 32.3, paragraph 5, as well as that resulting from the breach of article 32.5, paragraph 3, of the Concession Agreement (cf. Section 5.5) is not such that it will indemnify Getma International for the entire prejudice it sustained in its capacity as an investor evicted as the result of an illegal act on the part of the Public Authorities amounting to an expropriation"* (Counter-Memorial no. 1 §§ 105-107, Counter-Memorial no. 2 §§ 125-130).

89. The Claimants add that they intend to request of the ICSID Tribunal a decision which places them in the economic and financial position in which they would have been had the Concession Agreement been pursued for the total 25-year period (*lucrum cessans*). This amount will be considerably higher than the amount requested, in the strictly contractual terms, by Getma International, and the CCJA arbitration (Counter Memorial no. 1 §§ 72-76, 109, 141-142).

90.    The Claimants specify finally that the independence of the CCJA and ICSID Tribunals, emphasized by the Respondent, is not called into question and is not relevant for resolving the issue of jurisdiction (Counter-Memorial no. 1 § 38).

       v)   *Capacity as investor and the making of an investment*

91.    In a preliminary capacity, the Claimants note that the Republic acknowledges that Getma International and the Concession Agreement constitute respectively an investor and an investment. Concerning the other members of the group, the Claimants refer to their letter of October 28, 2011 to the ICSID's Secretariat, and contend that the investments they made respectively are the result of: (i) the signing of the Concession Agreement and Getma International's direct shareholding in the STCC Company, (ii) STCC's activity as operator, (iii) NCT Infrastructure Logistique's performance of the work of extending the container terminal, (iv) the shares owned directly or indirectly in the aforementioned companies by NCT Necotrans and Getma International Investissements (Counter Memorial no. 2 §§ 216-222).

92.    The Claimants specify that the Investment Code does not restrict the scope of its application to certain types of investments. The Investment Code indeed does not stipulate that the litigations subject to the ICSID's arbitration must pertain to investments and does not contain a definition of the notion of investment (article 3.2 concerns only the *"investment of capital from abroad"*). According to the Claimants, under article 28 of the Investment Code, it suffices that the Claimant be a foreign investor and that the litigation pertain to the application and interpretation of said code, which is the case here (Counter Memorial no. 2 §§ 230-240).

93.    Finally, the Claimants allege that each of them sustained a personal prejudice in direct conjunction with the Republic's actions, in their respective capacities as contracting parties to the Concession Agreement, a shareholder in the group's companies, financer of the investments, Concessionary, first ranking investor, STCC's money-lender and assistant project manager. They point out however that the grounds of the alleged counts of prejudice must be examined at the merits stage (Counter Memorial no. 2 §§ 248-265).

## VIII.   DISCUSSION

### a.   INTRODUCTION – BIFURCATION

94.    During the first procedural meeting of March 30, 2012, as the Respondent had announced that it intended to contest the jurisdiction of the Arbitral Tribunal, the parties agreed on the bifurcation of the procedure and a procedural calendar which implemented this bifurcation.

95.    The Arbitral Tribunal is therefore called upon at this stage to rule exclusively on its jurisdiction, without ruling on the merits of the litigation. However, as shall be discussed below, questions regarding the merits are or may be raised at this stage, during the analysis of the issue of determining whether the Claimants, and in particular the second, third and fourth Claimants, are "investors" or have made "investments" as per the Investment Code, and the issue of the relation between the material clauses of the Concession Agreement and those of the Investment Code, issues which inevitably arise in the analysis of the jurisdiction of this Arbitral Tribunal.

96.    The arbitrators consider however that this decision regarding their jurisdiction can and must be made regardless of the possible ties with the merits of the litigation. Given the parties' agreement on the bifurcation, the Arbitral Tribunal is also of the opinion that its decision

regarding jurisdiction is to be made independently of any issue regarding the merits. The Arbitral Tribunal is therefore adopting the following decision regarding its jurisdiction, without prejudice to possible issues pertaining to the merits on which it will be called upon as the case may be to dwell at a later stage.

**b.   THE ARBITRATION CLAUSE AS A "CONTRARY AGREEMENT".**

97.   The jurisdiction of the Arbitral Tribunal (if it exists) relies on Article 28, para. 2, of the Investment Code quoted above in para. 12.  This provision however reserves for the parties involved the right to conclude contrary agreements.  Consequently, the Arbitral Tribunal would not entertain jurisdiction if it turned out that the Parties had concluded such a "contrary agreement".

98.   The Arbitral Tribunal considers that the expression "contrary agreement":

   a)   allows for a parallel jurisdiction: to exclude the ICSID's arbitration, it does not suffice to grant jurisdiction to another forum for the same litigations;
   b)   implies the expression of a clear intent on the parties' part;
   c)   places the burden of proof on the party who intends to claim such a contrary agreement.

99.   It must then be determined whether Article 31 of the Concession Agreement, on which the Respondent bases its plea of lack of jurisdiction, constitutes a "contrary agreement of the parties involved" as per article 28 of the Investment Code.

100.   Article 31 is the first article of section 4 of the Concession Agreement which covers *"the settlement of disputes and litigations, termination and indemnification"*. It stipulates that:

*"this clause will survive the termination of the agreement.*

*The OHADA treaty and its subsequent uniform act will apply to this agreement.*

*Any dispute or litigation resulting from this agreement or its Additional Clauses will be settled amicably.*

*Failing an amicable settlement within 3 (three) months following the protest, the parties may resort to arbitration in the manner stipulated below:*

*The grievance, dispute or litigation will be settled definitively and irrevocably following an arbitration procedure governed by the arbitration regulations of the OHADA Common Court of Justice and Arbitration (the "CCJA Arbitration Regulations").*

*The arbitral commission will be composed of 3 (three) arbitrators, one appointed by the Grantor, the second by the Concessionary, and the third by joint agreement of the two arbitrators. If one party fails to appoint an arbitrator within a period of thirty (30) days following receipt of a request to this effect from the other party, or the two arbitrators failed to agree on the choice of the third arbitrator within a period of thirty (30) days (beginning on the date of the appointment of the second arbitrator), the Common Court of Justice and Arbitration will replace the parties in accordance with the CCJA Arbitration Regulations.*

*Each of the parties will bear the cost of the arbitrator it has appointed. The other costs generated by the arbitration will be shared equally between the parties.*

*The arbitration will be conducted in the French language in Abidjan, the Republic of the Ivory Coast.*

*The granting authority explicitly waves its right to claim for itself or for its assets any sovereign immunity in order to defeat the execution of an award rendered by an arbitral commission made up in accordance with this clause."* (Referred to hereinafter as "the arbitration clause").

101.  The "contrary agreement" must be concluded between the "parties involved". It is not contested that the Concession Agreement was concluded between the signatory parties, namely the Guinean state and the first Claimant, Getma International. The Arbitral Tribunal will if necessary focus on the issue of determining whether the three other Claimants are also parties thereto, after having decided whether article 33 constitutes a "contrary agreement" concluded between the Guinean state and Getma International.

102.  The arbitration clause establishes recourse to an Arbitral Tribunal  according to the OHADA regulations (the "CCJA Tribunal") for:

       a)  any "dispute or litigation" (art. 31, para. 3), or "the grievance, dispute or litigation" (art. 31, para. 5), a formula which appears broad and certainly broader than "the disputes" which are the object of article 28. of the Investment Code;
       b)  "resulting from this Agreement and its Additional Clauses".

103.  According to the Respondent, a contrary agreement between the parties "must lead to a result "contrary" to that of the designation of the ICSID as the arbitration institution with jurisdiction to rule on <u>their investment litigation</u>"[2] (Memorial no. 1 § 23). It considers that the arbitration clause designates "irrevocably" the CCJA Tribunal for all disputes resulting from the agreement and <u>excludes the jurisdiction of the ICSID</u>[3] (Memorial no. 1 § 29).

104.  The Tribunal cannot follow the Respondent's reasoning.  For there to be a "contrary" agreement, the Arbitration Clause contained in Article 31 of the Concession Agreement must grant jurisdiction to a CCJA Tribunal to settle all the claims which Getma International might infer from the Investment Code, thereby depriving the ICSID Tribunal of all the jurisdiction it would otherwise have to rule on this issue.

105.  And yet the arbitration clause, by granting jurisdiction to the CCJA Tribunal (i) did not specify that this jurisdiction replaces that of the ICSID, nor did it explicitly exclude the ICSID's jurisdiction; and (ii) did not specifically attribute jurisdiction to the CCJA court to settle disputes "pertaining to the application and interpretation of the Investment Code". And the disputes "resulting from this agreement" are not *a priori* necessarily the same as those "pertaining to the application and interpretation of the Investment Code"

106.  Contrary to that which the Respondent claims, the fact that all the litigations arising from the agreement must be brought before a CCJA Tribunal, regardless of their nature or the legal grounds invoked by the parties (memorandum no. 1 § 31), does not prove that the arbitration clause applies also to (or to all the) disputes concerning the application and interpretation of the Investment Code and excludes the jurisdiction of the ICSID. The Respondent is thereby

---

[2] Our underlining.
[3] Our underlining.

attempting to lump together[4] the *contract claims* and the *treaty claims* (the different nature and grounds of which are nonetheless generally acknowledged by arbitral case law[5]) and denies the fact that a same given act can constitute both a breach of a contractual obligation and a violation of the Investment Code, and, as the case may be the subject to two different courts.

107. A literal reading of Article 28.2 of the Investment Code which mentions only the litigations arising from the Concession Agreement, in no manner constitutes a "restrictive interpretation" such as the Respondent claims (Memorial,° 2 §§ 35-37).

108. Inasmuch as the jurisdiction of the ICSID Tribunal was not excluded, this Tribunal in theory entertains jurisdiction to settle disputes pertaining to the application and interpretation of the Investment Code. Inasmuch as an act of the state would constitute both a breach of the contract and a violation of the Investment Code, there would then be the parallel jurisdiction of the two Tribunals. However, it would not be competitive, given that the focus of the jurisdiction of each Tribunal would depend on the respective legal grounds of each request, the rights violated, the parties injured, the prejudice sustained and the entitlement to respective compensation under the Concession Agreement, or the Investment Code. The fact that the parallel jurisdictions can lead to a double collection of damages, does not mean that each court will not be called upon to exercise its own jurisdiction. It is in the handling of the merits and in particular at the time of the verification of the evidence of the prejudice, that the double collection of compensation shall be avoided.

109. Subject to that which is stated in subsection D below, the Tribunal rejects the Respondent's argument that Getma International chose irrevocably the CCJA Tribunal as the only Tribunal with jurisdiction by coming before it in the first place. Contrary to that which the Respondent claims (Memorial no. 1, §§ 44), the use of the term "irrevocable" in article 33 of the Concession Agreement does not mean that the choice of CCJA arbitration excludes all other judicial or arbitral channels. It is clear upon reading the article that the terms "irrevocably" and "definitively" pertain to the manner in which the dispute arising from the agreement will be settled by the CCJA Tribunal, namely without any possibility of appeal. The fact that the two terms are undoubtedly pleonasms does not permit one to interpret one of them as pertaining to anything other than the Tribunal's decision. The irrevocable nature of the choice between the two courts would imply moreover that the jurisdiction of the two (OHADA and ICSID) Tribunals is mutually exclusive. And yet it has not yet been proven that the jurisdiction of the CCJA Tribunal excludes that of the ICSID Tribunal for disputes concerning the interpretation and application of the Investment Code.

110. For the same reason, the Tribunal cannot follow the Respondent's argument according to which article 28 two of the Investment Code is comparable to a *"fork in the road"* clause. This comparison stems, according to the Respondent, from the nature of the "exclusive" choice the

---

[4] Although it recognizes the distinction, given that, in its Memorial n° 2 it supposes that the Arbitratin Clause includes not only the *contract claims*, but also the *treaty claims* (§§ 17 and the following).

[5] *whether there has been a breach of the BIT and whether there has been a breach of contract are different questions. Each of these claims will be determined by reference to its own proper or applicable law (…)"* (Vivendi versus Argentina, annulment decision, Case ARB/97/3, § 96); "treaty claims are juridically [sic] distinct from claims for breach of contract, even where they arise out of the same facts" (Bayindir versus Pakistan, decision on jurisdiction, Case. ARB/03/29, § 148); "The fact that a breach may give rise to a contract claim does not mean that it cannot also – and separately – give rise to a treaty claim. Even if the two perfectly coincide, they remain analytically distinct, and necessarily require different enquiries". (Impregilo versus Pakistan, decision on jurisdiction, April 22, 2005, Case. ARB/03/3, § 258).

21

Code offers the parties (Memorial no. 1 §§ 46-53, and in particular § 52). And yet up until now the analysis of the arguments proffered by the Respondent does not allow one to conclude that the arbitration clause excluded the ICSID's jurisdiction.

**c.   ARTICLE 32.5 OF THE CONCESSION AGREEMENT**

111.   The Respondent also invokes article 32.5 of the Concession Agreement in support of its argument that the CCJA arbitration agreement covers not only the *contract claims* but also the *treaty claims* and therefore excludes the ICSID's jurisdiction for the *treaty claims*.

112.   Article 32.5 is part of the same section 4 (*"settlement of disputes and litigations, termination and indemnification"*) as article 31. The Arbitral Tribunal  recognizes that this circumstance could be relevant for interpreting the arbitration clause. This article stipulates:

*"32.5  Changes of law and acts of the Public Authorities impeding the proper functioning of the activities in the concession*

*Any act, decision or absence of an act or decision, springing from the state, the dismemberment of the state or of the granting authority of a constitutional, legislative, regulatory or other nature, the direct or indirect effect of which is to prevent the Concessionary's proper execution of its obligations (a "change of law and acts of the Public Authorities impeding the smooth functioning of the activities granted in the concession"), and in particular:*

*(i)   Any unwarranted withdrawal, nonrenewal or non-issuing of any permit, license or other form of authorization necessary for the execution of the agreement, for the operation or management of the activities granted in the concession.*

*(ii)  Expropriation, nationalization, gradual expropriation and gradual nationalization.*

*(iii) Amendment of the Investment Code and of the laws in force.*

*(iv)  Direct and indirect measures, the result of which is to discriminate against the Concessionary in favor of possible competitor(s) of the Concessionary, or to favor them to the Concessionary's detriment, in the port of Conakry.*

*The Concessionary will send to the Grantor a "preliminary notice of change of law" within fifteen (15) days following the change of law, (or within forty-eight (48) hours following the becoming aware of the Change of Law if the Concessionary could not reasonably have become aware thereof beforehand.)*

*The Grantor will do its utmost to minimize the effects of any change of law or acts of the Public Authorities which impede the smooth functioning of the activities granted under the concession.*

*If, at the expiry of a period of sixty (60) days, the consequences of the change of law and acts of the Public Authorities impeding the smooth functioning of the activities granted in the concession have not been satisfactorily remedied for the Concessionary, it may serve "final notice of change of law" upon the Grantor and the Monitoring Committee.*

22

*In the event of a termination following a change of law and acts of the Public Authorities impeding the smooth functioning of the activities granted under the concession", the Concessionary will receive the indemnification stipulated in article 32.3 of the agreement."*

113.   This article therefore contains several provisions aimed at acts which constitute violations of the Investment Code such as:

-   the withdrawal etc.... of any authorization whatsoever which is not warranted;

-   expropriation and nationalization (even gradual) (art. 5 of the Investment Code);

-   measures discriminating against the Concessionary in favor of its possible competitors or favoring these competitors to the detriment of the Concessionary (art. 6 of the Investment Code).

113.   On the other hand, the act referred to in subparagraph (iii) consisting in amending the Investment Code, does not necessarily constitute a violation of this code. This is the case in particular when the guarantees benefiting the investor pursuant to the first book of the Code are not restricted by said amendment. Article 32.5 of the Concession Agreement for its part is aimed at the amendment of the Investment Code only inasmuch as its "direct or indirect direct effect is to prevent the Concessionary's proper execution of its obligations".

114.   Furthermore, the other provisions of article 32.5 do not concern as is such violations of the Investment Code, but are aimed at them exclusively inasmuch as they prevent "the Concessionary's proper execution of its obligations". The article is aimed above all at the Concessionary's obligations and not its rights. If a change of law or an act of the Public Authorities prevents the Concessionary from meeting its obligations properly, article 32.5 confers upon the Concessionary the right to terminate the agreement after the mailing of two notices and the observance of a waiting period. Regarding this point, article 32.5 clearly departs from the Investment Code, which is aimed at maintaining the Concessionary's rights as an investor.

116.   Article 32.5 also uses the term "impeding the smooth functioning of the activities granted in the Concession". The "activities granted in the Concession" however are operational activities, defined objectively (article 2, as well as article 6 of the Concession Agreement) and do not directly concern the conditions in which the Concessionary must execute them (subjective element in the operator's count). This confirms that article 32.5 is hardly preoccupied with the Concessionary's situation, except that it authorizes it to terminate the Concession Agreement with the financial consequences stipulated in another article (article 32.3) and identical to those which prevail in the case of a termination due to the Grantor's fault. Article 32.5 indeed does not establish a strict correlation between the change of law/act of the Public Authorities and the termination of the agreement. Even if this is not explicitly stipulated, it ensues from the preliminary and final notice procedure stipulated in article 32.5 that the decision to terminate the agreement following a change of law/act of the Public Authorities belongs to the Concessionary. Only this decision creates the right for the Concessionary to the indemnities stipulated in article 32.3 (which are identical to those stipulated in the case of termination due to the Grantor's fault).



23

117. According to the Respondent, (i) article 32.5 "introduces the expropriation dispute into the scope of the contract" and (ii) the combination of this provision and of article 31[6] (which submits any litigation resulting from the Concession Agreement to the CCJA Tribunal) constitute an agreement contrary to the jurisdiction of the ICSID (Memorial no. 2, § 17). As expropriations are explicitly governed by article 32.5 and as this clause is in the same section 4 as the arbitration clause, the Respondent considers that *"this confirms that the parties intended to place expropriation disputes in the scope of the CCJA arbitration agreement."* (memorial no. 2 § 26).

118. The Tribunal accepts that *"the expropriation and its consequences are expressly governed by article 32.5 of the Concession Agreement. They therefore fall into the scope of the CCJA arbitration agreement"* (Memorial no. 2 § 31). However, this is true only inasmuch as the expropriation becomes the cause of the agreement's termination and therefore of a litigation as a result of the agreement. Article 32.5, like article 31, therefore covers only one particular aspect of expropriation, which is the termination resulting therefrom. It does not govern expropriation *per se*. This distinction was perfectly illustrated by the example of a partial expropriation given by the Claimants[7]: in the event that the State were to expropriate two cranes in the port of Conakry belonging to Getma International, without however impeding the Concessionary's proper execution of its obligations or the smooth functioning of the activities granted under the concession, both article 5 and article 28.2 of the Investment Code would continue to apply.

119. Thus, the Tribunal cannot follow the Respondent when it infers from the observation quoted at the beginning of paragraph 117 above, that the parties *"chose explicitly to grant jurisdiction to the CCJA for litigations concerning the Guinean Investment Code"* and that they *"intended to withdraw this litigation from the jurisdiction of the ICSID"* (Memorial no. 2§ 41). The jurisdiction granted to the CCJA Tribunal concerns litigations resulting from the agreement, including those pertaining to the termination of the agreement following a change of law or an act of the Public Authorities which prevents the Concessionary's proper execution of its obligation or impedes the smooth functioning of the activities granted under the concession. However, it covers nothing else.

120. Article 32.5 of the agreement establishes a particular termination scheme following a change of law or other act on the part of the Public Authorities which applies subject to the respect of certain conditions of substance (impeding the smooth functioning of the activities granted under the concession and/or[8] the direct or indirect effect of which is to prevent the Concessionary's proper execution of its obligations) and of form (two notices and two waiting periods). This particular scheme differs from the scheme which applies to termination as a result of the Grantor's fault (covered by article 32.3 of the agreement) due to:

- a double notice (preliminary notice of change of law and final notice of change of law), although in the case of a purely contractual fault, a single written notice specifying the list of the grievances put forth suffices;

---

[6] The Tribunal notes that the Respondent acknowledges here implicitly that Article 31 alone does not suffice to conclude that the ICSID's jurisdiction is excluded by Article 31, conclusion of sub-section b. above.

[7] Counter-Memorial n° 2 §§ 147-149.

[8] It is an issue pertaining to the merits which must not be resolved at this stage, to determine whether "to impede the smooth functioning of the Activities granted under the concession" is the same condition as, or an additional condition to, or only an alternative condition compared to, the condition of "having as direct or indirect effect of impeding the Concessionary's proper execution of its obligations.

- a fixed 60-day correction period, while in the case of a purely contractual fault the period can be established by the Concessionary itself, although it cannot be under 60 days;
- the 15-day period beginning on the date of the change of law (or 48 hours following the becoming aware of the change of law) for mailing the preliminary notice, while no time limit is imposed in the case of a purely contractual fault;
- The intervention of the Monitoring Committee which must also receive the final notice of change of law.

121. On the other hand, the indemnity owed under the contract in the event of termination following a change of law or an act of the Public Authorities and that which is owed in the case of termination due to the Grantor's fault, are identical. This scheme is not illogical: by signing the agreement, the state acknowledges that any change of law or act on the part of the Public Authorities, without even being faulty or unwarranted, authorized the Concessionary to terminate the agreement and entitled it to an indemnity which was identical to that owed in the event of the Grantor's fault, if, and only if, the change of law or act on the part of the Public Authorities impeded the smooth functioning of the activities granted under the concession/or impeded, directly or indirectly, the Concessionary's proper execution of its obligations.

122. Litigations concerning the application of article 32.5, like those pertaining to the other articles of the agreement, obviously fall within the sole jurisdiction of the CCJA Tribunal.

123. The fact that the parties have specifically determined the impact which a change of law or act of the Public Authorities could have on their contract, does not in itself constitute a basis for contending that this contractual scheme replaces the legal scheme set forth in the Investment Code. Article 32.5 has its own specific contractual objective which cannot replace a general legal scheme. The reference, in article 32.5 of the Concession Agreement, to *"any act [...] on the part of the state"* cannot replace the Investment Code. As stated above, such acts are taken into account – and will be covered – by the agreement only if their *"direct or indirect effect is to prevent the Concessionary's proper execution of its obligations"* or if they impede *"the smooth functioning of the activities granted under the concession"*. The agreement governs the consequences of these acts on the agreement. Inasmuch as termination follows an act on the part of the Public Authorities, article 32.5 "contractualizes" the *treaty claims* which must, as a consequence, be brought before the CCJA Tribunal in accordance with article 31 of the agreement.

124. The question which remains then is to determine whether the agreement governs exhaustively the consequences of the acts fulfilling the conditions of article 32.5. The answer to this question would determine concretely whether the Concessionary, acting in its capacity as investor or otherwise, can – in the case of an expropriation leading to the termination of the agreement – claim other indemnities or indemnities higher than those stipulated in article 32.3, and before what court. This is an issue pertaining to the merits which must be solved by the court before which the requests concerning these additional indemnitees are brought.

125. This Arbitral Tribunal therefore concludes that there is a "contrary agreement" pursuant to which the jurisdiction of the CCJA Tribunal replaces that of the ICSID, but the scope of the application of which is strictly circumscribed by the terms of article 32.5. There is therefore no jurisdiction which competes with the CCJA Tribunal and the ICSID Tribunal for requests based on the termination of the agreement as a result of an act by the Public Authorities, but at the very most this Tribunal's additional jurisdiction if the Concessionary deems that an act of the Public Authorities constitutes a violation of the Investment Code and has entailed damaging consequences other than (those of) the termination of the agreement.

D. **GETMA INTERNATIONAL'S REQUEST IN THE CCJA ARBITRATION**

126. The Respondent contends that Getma International's filing of the request for arbitration before the CCJA of May 10, 2011 and the signing of the minutes of the meeting of the CCJA Tribunal of March 12, 2012 confirm the parties' agreement to totally exclude the ICSID's jurisdiction for disputes concerning the application and interpretation of the Investment Code pursuant to the arbitration clause (Memorial no. 1 §§ 54 and the following).

127. It is therefore fitting to determine whether the first Claimant's conduct (i) proves its agreement to replace the ICSID's jurisdiction in its entirety (and not only for the act of the Public Authorities which causes the termination of the agreement) by that of the CCJA Tribunal, (ii) can constitute a waiver of the ICSID's jurisdiction or (iii) constitutes an obstacle (or estoppel) to its now denying that it accepted the jurisdiction of the CCJA Tribunal for the *treaty claims* which "result from the agreement".

128. Referral to the CCJA Tribunal does not in itself prove Getma International's waiver of the ICSID's jurisdiction. In the case of parallel jurisdictions, each Tribunal exercises its own jurisdiction and the prior referral of a case to one of them does not deprive the other of its jurisdiction. Indeed, the *"fork in the road"* doctrine applies only in the case of competing jurisdictions.

129. On the other hand, the fact of submitting to one court requests which fall within the specific jurisdiction of another court could possibly constitute a waiver. In this regard, the Claimants statement of the requests made by Getma International before the CCJA Tribunal (Memorial no. 1 §§ 54-97 and Memorial no. 2 §§ 44-56) is interesting. Indeed, it appears that the request for arbitration filed on May 10, 2011 by Getma International before the CCJA Tribunal did not concern solely the contractual requests such as defined in article 32.3 of the Concession Agreement. Getma International requested in particular that the CCJA Tribunal sentence the Respondent to pay not only the "contractual prejudice" (para. 3.3.1) comprising the four indemnitees mentioned in article 32.3, but also the "additional prejudice", comprising, in addition to an indemnification for undermining its reputation, *"an indemnity equal to the loss of profit it could legitimately have expected for the entire duration of the Concession Agreement"* (para. 3.3.2) (exhibit R-9). The Tribunal notes that Getma International bases this request on article 104, para. 2 of the public contracts code of the Republic of Guinea.

130. It is remarkable that, notwithstanding this very clear language, the Claimants allege categorically, in their Counter Memorial no. 1, that *"in the CCJA - contractual- arbitration, Getma did not request compensation for the* lucrum cessans *which is unquestionably part of the prejudice sustained by the expropriated investors [...]* (§ 109).

131. The requests made in the request for CCJA arbitration were subsequently broadened, in particular in the minutes of the parties' meeting with the CCJA Tribunal on March 12, 2012 (also called *"CCJA arbitration agreement"*). At this stage, Getma International intended to see the Respondent sentenced to pay the following, duly quantified, indemnities:

" - *20,894,966 € as an all-inclusive termination indemnity;*

- *€2,508,214 as a termination indemnity;*

- *€14,201,096 as an indemnity equal to the unamortized amount of the entry ticket;*

- *€13,606,721 as the indemnity owed for the requisitioned goods*[9]

- *€1,361,305 for the indemnity owed for initial capital expenditures and formation expenses;*

- *€110,557 as the indemnity owed for the current contracts;*

- *€806,959 as the indemnity owed for the non-collection of the current assets;*

- *€87,124 as the indemnity owed for the costs of repatriating personnel;*

- *€279,863 as an indemnity owed for expenditures linked to crisis management;*

- *an indemnity to be quantified for the additional prejudice[10] referred to in § 33.2 of the arbitration request;*

- *the interest accruing at the legal rate on all the preceding sums from the date of the preliminary notice of change of law"* (exhibit R-10, p. 16).

132. Of the items on this list, only the first three items clearly pertain to the contractual indemnities stipulated in article 32.3 of the agreement; the sixth and eight items could represent the fourth contractual count of prejudice stipulated in article 32.3, namely *"the amount of the possible severance indemnities which the Concessionary might owe to its personnel".* The "additional prejudice" is again claimed therein, but once more, without being quantified. Among the other new items, one draws particular attention: the amount of €13,606,721 claimed as an *"indemnity owed for the goods requisitioned".*

133. Even if all the other new items, like the additional prejudice, could be considered as contractual counts of prejudice (notwithstanding the fact that they are not included in the all-inclusive indemnities established in article 32.3 of the agreement), the indemnity for the requisitioned goods is, for its part, clearly outside the scope of the application of the contract and constitutes without a doubt an investor's request based on the guarantees contained in article 5 the Investment Code.[11]

134. Getma International's initial conduct could therefore cause one to conclude that it recognized or accepted the jurisdiction of the CCJA Tribunal, even for the treaty claims which are not explicitly referred to in article 32.5 of the Concession Agreement or, alternatively, waived the jurisdiction of the ICSID to rule on these claims. The Claimants however contest this conclusion

135. First of all, they place the accent on a letter sent by Getma International to the Guinean President on May 24th 2011 to confirm its consent to submit the disputes existing between the state concerning the application and interpretation of the Investment Code to the arbitration of the ICSID, and to accept the offer of arbitration made by the State in article 28 of the Investment Code (exhibit C-6). The Tribunal considers, along with the Respondent, that the

---

[9] Our underlining.

[10] Our underlining.

[11] Article 5 of the Investment Code: "*The Guinean State takes no measures of expropriation or nationalization impacting the investments made by persons or companies, subject to the cases of public utility established on the conditions stipulated by law. In the event of public utility, the expropriation measures must not be discriminatory and must provide just, adequate compensation the amount of which will be determined according to the usual rules and practices of international law.*

simple acceptance of the offer, without formulating the slightest request and without even referring to the "expropriation" (although it occurred on March 8, 2011 and was notified formally to Getma on March 18, 2012) cannot be considered as a referral of the case to the ICSID. The Claimants acknowledged this moreover implicitly when they asserted that: *"Document number C-6 is a very standard document. Its purpose is to no longer permit the Republic of Guinea to withdraw its offer which is in the Investment Code"* (record of the hearing on ICSID's jurisdiction, p. 54, lines 24-26). The Tribunal considers moreover that given that the jurisdiction of the CCJA Tribunal for treaty claims is limited to those which fall into the scope of article 32.5, thereby leaving additional jurisdiction to the ICSID, the Respondent had no reason to protest to the acceptance of the principle of the ICSID arbitration proposal.

136.  Secondly, in their Counter Memorial no. 2, the Claimants distanced themselves from their requests for indemnification for the additional prejudice and the goods requisitioned. They have not responded to the argument developed by the Respondent in its Memorial no. 2 (§§ 44-56) according to which Getma International submitted it treaty claims to the CCJA Tribunal in its request for CCJA arbitration and in the CCJA arbitration agreement. The Claimants deny having called upon the  CCJA Tribunal regarding the *lucrum cessans*  and the indemnification for the requisition, not only by their silence regarding that which the request for CCJA arbitration and the CCJA arbitration agreement say, but also by the fact that they deny explicitly having presented a *treaty claim: "First of all, it is important to recall that, even if Getma International had presented a treaty claim to the CCJA Arbitral Tribunal – <u>which is not the case</u> – this would not mean that the CCJA Tribunal necessarily entertains jurisdiction to rule on this same claim"* (§ 125). They rely exclusively on the Memorial presented by Getma International in the framework of the CCJA arbitration (Exhibit R-6) and charge the Respondent with not having referred to this Memorial in its statements on jurisdiction filed in the framework of this ICSID arbitration.  They refer (§ 129) in particular to paragraph 571 of the CCJA Memorial according to which *"despite its contractual obligation, the Guinean State not only did not believe it was its duty to minimize the prejudice it was deliberately causing Getma International. Worse even, it preferred to requisition all of Getma International's assets, goods and employees using the armed forces"*. They conclude (in § 130) that the legal basis for this request for indemnification is the breach of Art. 32.5 of the Concession Agreement, which stipulates that *"the Grantor shall take all useful measures for minimizing the effects of any Change of Law and Acts of the Public Authorities which impede the smooth functioning of the Activities granted in the Concession"*.

137.  In order to grasp the Claimants' change of position, which they are attempting to deny – wrongly according to this Tribunal -, it is important to recall the chronology of the pertinent facts and acts of the procedure:
    -   March 8, 2011: Termination Decree of which Getma became aware from television (and communicated formally on March 18, 2011)

    -   March 9, 2011: Preliminary Notice from Getma, with reference to Article 32.5, of a change of Law

    -   March 9, 2011: requisition Decree

    -   March 9 2011: Getma's final notice

    -   May 10 2011: Getma's request for CCJA arbitration, based on article 32.5 of the agreement and targeting, in addition to the contractual prejudice, also the additional prejudice (comprising the *lucrum cessans*) (exhibit R-9);

- May 24 2011: letter accepting the offer of ICSID arbitration in article 28.2 of the Investment Code (exhibit C-6).

- June 22, 2011: Decree lifting the requisition of Getma's assets (exhibit C-26)

- September 29 2011: request for ICSID arbitration and just, adequate indemnification-which is not quantified-for the breach of articles 5, 6 and 7 of the Investment Codes.

- March 12, 2012: (report) CCJA arbitration agreement, comprising €13.6 million for the assets requisitioned and an unquantified indemnity for the additional prejudice (R-10)

- March 30, 2012: minutes of the first session of this ICSID Tribunal

- June 15, 2012: CCJA Memorial presenting the (highly reduced) indemnity for the goods requisitioned as an indemnity for the breach of a contractual duty and no longer claiming the *lucrum cessans* (exhibit R-6)

- June 22, 2012: the Claimants' opening brief on jurisdiction in the ICSID arbitration

- July 13, 2012: the Claimants' first Counter Memorial on jurisdiction in the ICSID arbitration

138. The Arbitral Tribunal notes that it is only after the first session of this Tribunal that the Claimants removed from their request before the CCJA Tribunal the indemnities for the *lucrum cessans* and for the requisitioned goods.

139. Indeed, page 119 of the CCJA Memorial contains, in conclusion the request to sentence the Respondent to pay a total amount of €42,245,208 for the following items (exhibit R-6):

| | |
|---|---|
| - *All-inclusive termination indemnity* | *€20,884,966* |
| - *termination indemnity* | *€4,189,140* |
| - *indemnity for the entry ticket* | *€14,201,096* |
| - *indemnity linked to repatriated personnel* | *€172,874* |
| - *indemnity pertaining to invoices to be issued* | *€589,418* |
| - *indemnity pertaining to restituted goods* | *€1,974,885* |
| - *indemnity pertaining to non-terminated contracts* | *€187,995* |
| - *indemnity pertaining to crisis management costs* | *€258,834* |

140. On first site, these counts of request are similar to those appearing in the CCJA arbitration[13] agreement, (even if there are several differences, not only in the amounts, but also in their wording). However, the total amount of the requests is no longer €53,856,805 (as in the CCJA arbitration agreement), but is reduced to €42,459,208. There is no longer a request for "an additional indemnity" (*lucrum cessans*). Moreover, the list no longer contains "*the indemnity owed for the assets requisitioned*" for the amount of €13,606,721, but rather and indemnity for the requisitioned goods "for an amount of €1,974,885. In paragraphs 568 – 572, it presents this request for indemnity pertaining to the requisitioned assets as based on a violation of the Respondent's contractual duty to minimize, after receipt of a preliminary notice, the effects of any change of law and acts of the Public Authorities. In paragraphs 592 to 623 of the same CCJA Memorial, Getma International explains then that following the requisition Decree of March 9, 2011, its operating equipment and stocks were made unavailable and "*were returned*

---
[13] See § 131 above.

29

*only later"* pursuant to a new Decree of June 22, 2011, for the purposes of lifting the requisition of these assets[14]. The costs entered into accounts concern the repatriation and repair of the equipment.

141. This new presentation of the facts and request leads us to the realization that, at least in the CCJA Memorial, there are no longer, currently, any requests which could be considered as treaty claims.

142. During this Tribunal's hearing on jurisdiction in Paris, on September 28, 2012, one of the Claimants' attorneys specified that *"in the [CCJA] Memorial [...] Exhibit R-6 [...], The counts of prejudice are specified and quantified this time; it's paragraph 645. In all of these counts of prejudice, not one concerns the loss of future income[15]... On the other hand, in the request for arbitration before your Tribunal, the issue, which preceded the opening brief before the CCJA, is extremely precise. Even if the quantification has not been done at this stage, [...]."* (Record of hearing on ICSID jurisdiction, p. 58, line 26-p. 59, line 3).

143. The Tribunal then sought confirmation of Getma International's change of position in the CCJA arbitration:

*"Professor P. Tercier.-* [...] *In the current state of the CCJA procedure, you have no more requests based on the violation of the... Investment Code?*

*Mr. C. Fischer.- That is totally true. With one overtone; it's not that there are "no more" requests, there are none[16]. In my opinion there never were any explicit clear requests.*

*Professor P. Tercier.-* [...] *At the end there was a reference to number 332 regarding which we understood* [...] *that it was a prejudice which resulted this time from the breach of article 5, of articles 6 and of article 7 of the [mining] code.*

*Is this a change in your position?*
*Mr. C. Fischer  - My reference to articles 5, 6 and 7 of the Investment Code was indeed in the request for ICSID arbitration.*

*Professor P. Tercier,- Alright. My question is obviously: at the CCJA, you no longer have any justified requests?*

*Mr. C. Fischer- No, there are no more.*

*Professor P. Tercier.- There are no more, to answer your question, because there were some, if I may say in the initial stage; is that true?*

*Mr. C. Fischer.- No, that is not our understanding of things."* (Record of hearing on ICSID jurisdiction, p. 60, line 8 – 26).

---

[14] This Decree lifting the requisition is also mentioned on page 12 of the ICSID arbitration request.
[15] Our underlining.
[16] Our underlining.

144. Later on, another of the Claimants' attorneys made a similar statement:

> "**Mr. J.M. Judice.**- [...] *My strongest conviction is to the effect that we used explicitly the criteria of article 32.3 and no other criteria. <u>We did not request lucrum cessans</u>[19]*." (Record of the hearing on the ICSID's jurisdiction, p. 62, lines 25 – 27).

145. The question pertaining to that which the Tribunal could only consider as a change of Getma International's position-but which its attorneys were reluctant to acknowledge-was nonetheless brought back to the table in conjunction with the indemnity of €13.6 million owed for the requisitioned goods requested in the CCJA arbitration agreement, but no longer in the CCJA Memorial of June 15, 2012. At that moment, the Claimants acknowledged the change in the request and explained it as follows:

> "**Mr. C. Fischer.**- [...] *Second point, why did we slip, evolve as you said? That is perfectly true, because the question we were confronting was to determine whether the all-inclusive indemnity stipulated under the Concession Agreement was necessarily limited, in the contractual context, and could we request a higher sum or not? In other words, could we under the Concession Agreement, consider that the compensation stipulated in the contract exhausted all the prejudice for which we could request indemnification under the Concession Agreement?*" (record of hearing on ICSID jurisdiction, p. 69, lines 20-27).

146. The Tribunal considers that it cannot settle for this answer. It is clear that Getma International indeed envisaged at the outset bringing all its requests resulting from the termination and the requisition, including that for indemnification for its *lucrum cessans* and for a substantial indemnification for the requisitioned goods before the CCJA Tribunal. The idea of basing certain requests on the Investment Code and of claiming them before an ICSID Tribunal was a second reflex. However, it was not implemented in a substantial manner:

(i) the request for ICSID arbitration of September 29, 2011 brought before this Tribunal is-with the exception of (i) the description of the facts, which is practically identical to that of the request for CCJA arbitration and (ii) the legal grounds[20] - very vague and in no manner quantifies the prejudice but plans to determine it "at the appropriate time in this procedure" (p.22, b) thereby allowing a doubt to remain regarding that which is requested in each of the two procedures and;

(ii) even after the filing of the request for the ICSID arbitration, on March 12, 2012, Getma International again signed a report/CCJA arbitration agreement which covers explicitly a request for indemnification for its *lucrum cessans* and for the requisitioned assets. It is only in its CCJA Memorial of June 15, 2012, six weeks after the first session of this ICSID Tribunal, that Getma International appears[21] to have reduced its request to the counts of request which is considers to be "contractual".

147. The evolution in the Claimants' procedural strategy however does not prevent the fact that this Tribunal must determine the parties' common intent at the time of the conclusion of the Concession Agreement and that this intent, if it was not explained, can also be inferred from

---

[19] Our underlining.
[20] Which, in short, consist in stating that the termination of the contract was discriminatory, produce effects comparable to those of an expropriation (p. 14) and represent an act of the Public Authorities and not only a simple contractual execution or breach (p. 5 and 16).
[21] Its being understood that this Tribunal is not required to rule on the nature of the requests before the CCJA Tribunal and furthermore it does not have the means to do so.

the parties' execution of the contract. And the fact that Getma International included, in its request for CCJA arbitration, requests which were not "strictly contractual" in the sense that they exceeded that which article 32.3 stipulated, but some of which (the indemnities for the *lucrum cessans* prejudice, for undermining its reputation and for the goods requisitioned) could, depending on their grounds, be contractual or based on the Investment Code, then became relevant.

148. If the *lucrum cessans* request <u>no longer</u> appears in the CCJA Memorial of June 15, 2012, the question arises as to whether it still falls within the jurisdiction of the CCJA Tribunal. According to the Respondent's attorney, the arbitration agreement defines the perimeter of the CCJA Tribunal's mission and it matters little that Getma modified its position in its Memorial (record of hearing on ICSID jurisdiction, p. 63, lines 6 – 12). This Tribunal considers that the issue is one for the CCJA Tribunal, the only Tribunal with jurisdiction to determine the scope of the referral, particularly as the Respondent did not accept Getma International's rejection or waiver of the CCJA's jurisdiction for *lucrum cessans* and the requisition of the goods. This Tribunal must therefore accept as fact the initial referral of the case to the CCJA Tribunal for the *lucrum cessans* and requisition indemnities.

149. This Tribunal attempted during its hearing on jurisdiction on September 28, 2012, to clarify the parties' respective positions. It specifically questioned the Claimants regarding the legal interpretation to give to the limitation on their requests in the CCJA Memorial and in particular whether the requests which no longer appear therein had been abandoned before the CCJA Tribunal and if this waiver was then explicit and final (record of hearing on ICSID jurisdiction, p. 68, lines 24-31).

150. In response, the Claimants acknowledged that *"our analysis [...] has evolved and we considered that under the Concession Agreement a prejudice existed which had been contractualized and that, on the basis of the Concession Agreement, we do not have the grounds for requesting future profits for the loss of the contract [...]. Today things are very clear, although they were not clear previously, before the CCJA: we are no, and are no longer, requesting future profits, if it can be considered that we made such a request [...]. It was considered contractually that the prejudice for the loss of the contract [...] should not be assessed as a number of years of results, but should be lumped together in one year of revenue"* (record of hearing on IC jurisdiction, p. 69, line 28, – p. 70, line 20°;

151. It is then fitting to determine what the Claimants are requesting of this Tribunal. An analysis of the request brought before this Tribunal reveals that the Claimants consider that:

   i. Having acted in a unilateral manner, the Guinean state violated the standards binding it through the Investment Code, in particular in the domain of expropriation, i.e. the most consolidated rules of customary international law (p. 13, 3rd para.);

   ii. the decision to terminate the contract, in the terms in which it was carried out, was discriminatory inasmuch as it could not be applied to a Guinean investor (p. 14, 1st para.);

   iii. Termination produced effects comparable to those of an expropriation (p. 14, 4th para.);

   iv. The termination of the contract by the President represents an act of the Public Authorities (p.15, 4th para.) and exceeds the framework of the execution of the contract because:

1. the state is represented in the contract by the Transport Minister;
2. the preliminary formalities for a contractual termination based on the Concessionary's fault, such for example as a formal notice and a 60-day correction period, were not carried out (p. 17);

v.   the requisition also produced effects equivalent to those of an expropriation, because no type of indemnification is provided for (p. 17);

vi.   the two Decrees constitute *jus imperiiet* acts, not merely acts carried out pursuant to a contract in force (p. 17, last para.).

152.   *Prima facie* this Tribunal entertains jurisdiction for requests formulated in this manner, subject to the requests which the parties to the Concession Agreement had excluded from the ICSID's jurisdiction in their contrary agreement, in accordance with article 28.2 of the Investment Code. The scope of the application of this Tribunal's jurisdiction therefore does not include litigations resulting from the Concession Agreement, including its termination, even following an act of the Public Authorities. Indeed, Articles 32.5 and 31 of the Concession Agreement are also binding upon this Tribunal. However, it will not be until the time of the analysis of the Claimants' precise requests, their legal grounds, their factual causes and the damages, that this Tribunal can determine if and to what extent its jurisdiction, supplementary to that of the CCJA Tribunal, can be effectively implemented to rule on a "supplementary" indemnity for a "supplementary" prejudice, which exceeds the jurisdiction of the CCJA Tribunal.

e.   THE CONTRARY AGREEMENT OF THE SECOND, THIRD AND FOURTH CLAIMANTS

153.   This Tribunal must then determine what parties are bound by the arbitration clause. To do so, it is not enough to observe that the second, third and fourth Claimants all belong to the same group of companies and that they have shared executives. To appreciate whether these other three Claimants indeed intended to be bound by the arbitration clause, it is fitting to examine their respective roles during the negotiation, conclusion and execution of the Concession Agreement. This is what this Tribunal will do in an initial stage.

(i)   *NCT Necotrans' signing of the Concession Agreement*

154.   It is not contested that only Getma International signed the Concession Agreement. According to the introduction and the signature page (p. 27) of the Concession Agreement, Getma International was represented at the time of the conclusion of the agreement by its President, the NCT Necotrans company, represented in its turn by Mr. Richard Talbot in his capacity as chairman of NCT Necotrans' Board of Directors. The fact that Getma International was represented by its President appears normal[22] and does not permit one to infer a desire on

---

[22] According to Article 12 of the Articles of Association: *"the company is represented, managed and administered by a president, who can be a legal entity or natural person, of French or foreign nationality, a company shareholder or not. The president, if it is a legal entity, is represented by its corporate officers or by a representative appointed specifically for this purpose."* (Exhibit R-12)
According to the excerpt from the Trade and Companies Register of September 12, 2011 for Getma International, Getma International's president was NCT Necotrans (Exhibit C-1).
The Tribunal notes that, according to the entry in the Trade and Companies Register of May 13, 2011 for NCT Necotrans, Mr. Richard Talbot was chairman of the Supervisory Board at the time, while the chairman of the Executive Board was Mr. Gregory Quérel (Exhibit C-2). However this does not enable one to conclude that on September 22, 2008, the title utilized by Mr. Talbot was not correct (which neither party has raised for that

33

NCT Necotrans' part to be involved in the Concession Agreement in its own name. Even if article 15 of Getma International's Articles of Association stipulates that *"the president* [i.e. NCT Necotrans] *is vested in all circumstances with all the powers necessary for representing and managing the company"*, this power is merely a power of representation and management *"as regards third parties[23]"* and does not permit one to conclude that the two companies are identical or one in the same.

155. If Mr. Talbot's signature implies the agreement of NCT Necotrans (of which he was a corporate officer) with the conclusion of the contract by its subsidiary Getma International, this still does not mean that NCT Necotrans, although a Getma International shareholder, is itself bound under the contract (as the Respondent claims in its Memorial° 2, § 66).

156. Similarly, the fact that it be the chairman of NCT Necotrans' Executive Board, Mr. Quérel, who signed it for NCT Necotrans acting in the capacity of Getma International's chairman, the special power of attorney granted to the Fischer and Judice firms to represent Getma International in the CCJA arbitration (exhibit R – 14), in no manner means that this power of attorney was granted by NCT Necotrans, and even less that it thereby became a party to the contract, or even to the procedure. There is no doubt that NCT Necotrans acted, in all of these instruments, as Getma International's president.

157. It appears that the NCT Necotrans company is the chairman of the Board of Directors, not only of the Getma International (exhibit C – one), but also of Getma International Investissements (Exhibit C-3). The signature of the president of NCT Necotrans can therefore, depending on the case, bind this company or one of its subsidiaries of which NCT Necotrans is the legal representative. It is therefore fitting to check each time in what capacity NCT Necotrans has affixed its signature. It is not proven that NCT Necotrans affixed its signature in a capacity other than as Getma International's president.

*(ii)  joint address*

158. We note furthermore that NCT Necotrans, Getma International, Getma International Investissements and NCT infrastructure & logistique all four had their respective registered offices at the same address (66, rue Pierre shower all, 75008 Paris).

159. This same address, like the double functions, are apt to create a certain confusion between the various companies. However, they do not mean that the distinct identities of these various legal entities can be disregarded and that the rights and obligations of some with those of the others are lumped together. Third parties are required to recognize each company's specific identity, unless the companies themselves fail to respect it and create confusion in this regard.

*(iii)  The role of NCT Necotrans' legal director in the CCJA arbitration*

160. The Respondent also invokes the direct participation of Mr. Sean Danielle Littler legal director of NCT Necotrans, in the CCJA arbitration, and in particular his presence at the hearing of March 12, 2012, as well as his signing of the CCJA arbitration agreement (Memorial no. 2 § 74).

161. Mr. Littler was indeed present, but it was clearly in his capacity as "Legal Director of NCT Necotrans" (exhibit R – 10, last page). The mere presence of the legal director of a group's

---

matter). In all events, both of them were "corporate officers" of NCT Necotrans, which appears to suffice under article 12 of Getma's Articles of Association

[23] The Respondent omitted to quote these important words in § 60 of its Memorial n° 2.

holding company does not allow one to conclude that he represented one or several companies not party to the procedure at this hearing. It is common practice that a parent company provide services (i.e. legal services) to its subsidiaries[24]. Nowhere in the record is it stated that Mr. Littler was present in any capacity other than that of the group's (and therefore also Getma International's) legal director, for example as legal representative of NCT Necotrans. Mr. Littler also signed the record of the hearing (Exhibit R-10), but it was clearly specified on page 1 of the record that he was (present as) "Legal Director NTC [sic] Necotrans".

162. The Tribunal concludes that the mere signing of the record by Mr. Littler does not bind NCT Necotrans anymore than his presence at the hearing.

*(iv) Mr. Abdel Aziz Thiam's signature*

163. The position as president of NCT Infrastructure & Logistique of Mr. Abdel Aziz Thiam, who is also Vice-Chairman of NCT Necotrans' supervisory board (Exhibit C-4), does not suffice either in itself to conclude that these two companies are bound under contracts concluded by Getma International.

164. Mr. Abdel Aziz Thiam cosigned (along with Mr. Richard Talbot) Additional Clause no. 1 to the Concession Agreement. As he is both chairman of the Board of Directors of the STCC operating company and president of the Board of Directors of NCT Infrastructure & Logistique, it is nonetheless clear that he signed this Additional Clause in his capacity as STCC's corporate officer: his signature proves that the operating company "read and approved" (as stated above his signature) Additional Clause no. 1 to which only Getma International and the Guinean State were parties. The preamble to Additional Clause no. 1 recalls that the operating company was (in accordance with the Concession Agreement) the "Concessionary's representative". It was in the capacity of contractual representative that it was present at the signing of the Additional Clause, as was the Conakry port authority which was there as "the Grantor's representative". None of these representatives however was party to Additional Clause no. 1.

*(v) The negotiators of the Concession Agreement*

165. The respondent also derives an argument from the fact that Mr. Abdel Aziz Thiam also directed Getma International's negotiation team, as confirmed by Getma International in its opening brief before the CCJA (exhibit R6- § 161). Getma International specified however that this same Mr. Aziz Thiam subsequently became Chairman of the Board of Directors of the operating company ("STCC") which was to be created in accordance with the obligations resulting from article 7.1 of the Concession Agreement. The Arbitral Tribunal considers that it is entirely normal that the person selected for managing the operating company, who has the technical knowledge pertaining to the concession operations, be a member, even the manager, of the negotiation team. One cannot infer solely from his presence on the team that the future operating company or NCT Necotrans was planning to be bound by the contract.

166. It is the same for the legal director and the assistant legal director of the NCT Necotrans group who were also part of the contract negotiation team. If NCT Necotrans delegates the negotiation to its legal directors, this does not necessarily imply that they represent their employer in these negotiations. As already noted above, these persons participated in negotiations as the group's legal experts whose legal services can be provided to all the companies in the group on the basis of intergroup service agreements. In such a case, these of

---

[24] Cfr. Also the presence of Mr. Littler at the hearing of this Tribunal of March 30, 2012.



services concern purely intellectual contributions and cannot be confused with a mandate to represent their employer.

167. "Mr. Michel Kerambrun, port expert intervening for the account of the subsidiary and NCT infrastructure & Logistique" and "Mr. Jean de Montmarin, project chief at NCT Infrastructure & Logistique" (opening brief before the CCJA Tribunal § 162 and Exhibit C-11 p. 38) also participated in the negotiations. This observation alone however does not permit one to conclude that NCT infrastructure & Logistique became a party to the Concession Agreement. Indeed, according to the letter of October 28, 2012 from the Claimants to ICSID's Secretariat, NCT infrastructure & Logistique was a technical subsidiary of NCT Necotrans responsible as assistant project manager for the work of extending the container terminal. Under these circumstances, this company's mere delegation of its technical experts to the negotiations was not abnormal and did not necessarily mean that NCT Infrastructure & Logistique was becoming or had the intention of becoming party to the Concession Agreement itself.

168. It is in the same capacity that NCT Infrastructure & Logistique was able to execute a portion of the obligations resulting from the Concession Agreement, among others by launching, for the account of Getma International, the call for bids for the construction of the new dock stipulated under the Concession Agreement (ICSID arbitration request, p. 11). The position as assistant project manager can constitute the legal basis on which NCT Infrastructure & Logistique executed certain obligations under the Concession Agreement for Getma International, a basis which was therefore distinct from the contract binding Getma International to the Guinean state.

169. The Tribunal therefore concludes that, taken in an isolated manner, each of the interventions of the second, third and fourth Claimants in the negotiation, the signing and execution of the Concession Agreement - inasmuch as they are proven - is legally and/or factually warranted by and based on specific mandates. In themselves these interventions in no manner prove that they are due to the neglect of, or confusion between, the companies belonging to a given economic group, acting in breach of their legal identities and respective roles. The mandate and specific role of each company in the group, such as they appear in the file, prove that the second, third and fourth Claimants did not agree to be bound directly under the Concession Agreement. Subject to that which follows, the Tribunal notes that the respondent has not proven that the involvement of the aforementioned Claimants in the negotiation, the signing or execution of the agreement proves such an intent on their account.

   *(vi)  The Claimants' joint, concerted action*
170. The Arbitral Tribunal deems however that it is necessary to consider the Claimants' different interventions in this negotiation, signing and execution, not only separately, but also globally and in their context. An entirely different impression then emerges.

171. First of all, we note that the Claimants acknowledge that the investment which constitutes their basis for making their requests in this ICSID arbitration, is exclusively the product of each of their contributions to the execution of the Concession Agreement (Claimants' letter to ICSID's Secretariat of October 28, 2011). In their request for ICSID arbitration, the Claimants acknowledged that *"the execution of the public service concession contract implied a financial investment to be made by the Concessionary (investor)"* (ICSID arbitration request, p. 21). Therefore, this financial obligation of the contract was in fact not executed, or certainly not exclusively by the Concessionary, Getma International, but by NCT Necotrans, via the Concessionary Getma International, and by the intermediary holding company Getma International Investissements which was created specifically for the purpose of owning 95% of the STCC operating company. This Tribunal considers that Concession's financial structure

proves that NCT Necotrans' intervention in the execution of the Concession Agreement (and in particular its financial obligations) had been envisaged from the outset when Getma submitted its bid. This appears to be confirmed by the title of exhibit C – 15 in the index of the attachments to the ICSID arbitration request: *"excerpt from the NCT NECOTRANS group's financial proposal,* [blank] *GETMA INTERNATIONAL/TRANSAFRICA S.A., containing the summary of the investments made during the first two years of the Concession".* NCT Necotrans' argument that it was not bound by the Concession Agreement can therefore not be followed.

172. The situation is comparable for NCT Infrastructure & Logistique which apparently had the necessary technical knowledge to meet other obligations of the Concession Agreement and in particular to become the assistant project manager appointed by Getma International for the extension of the terminal.

173. This being said, the participation of the representatives of NCT Necotrans and NCT Infrastructure & Logistique (even if individually they can also be considered as the representatives or legal or technical advisors of Getma International as stated above in subsection (v)) takes on a particular meaning: if they are viewed as a group, they are the representatives of the companies which planned from the outset of the negotiations (or even since the filing of the bid) to execute the Concession Agreement together. In fact, the list of the parties participating in the negotiation of the Agreement (attached thereto as appendix 10) makes no mention of any person representing the Concessionary, Getma International, alone. It is therefore fitting to consider Getma International, NCT Necotrans and NCT infrastructure & Logistique as an association or group whose members have undertaken jointly to execute the obligations of the Concession Agreement together.

174. Even if this joint and several commitment was not made in writing vis-a-vis the Respondent (regarding which the two Claimants could however not have ignored that they would derive assurances of the presence of the representatives of the various companies in the negotiations and the close ties between them[25]), this Tribunal concludes that the participation in the negotiations on the part of natural persons with double roles, but representing in fact also companies who are clearly participating in the execution of the Agreement - which was effectively confirmed later on - warrants that these companies which did not sign the agreement be bound by the Agreement, if not jointly and severally, at least each for its part, and also by the Arbitration Clause.

175. Furthermore, without wanting to prejudge the capacity as investors of the second and third Claimant (NCT Necotrans and NCT Infrastructure & Logistique), the Tribunal considers that their affirmation, in their letter of October 28, 2011 to the ICS IDs Secretariat, that they are both investors (exhibit C-44) confirms that they were just as committed as Getma International, and on the same conditions, including the arbitration clause.

176. Inasmuch as the investment(s) made in Guinea constitute the execution of the Concession Agreement, this Tribunal cannot admit that the Claimants base their argument on their respective investment, i.e. their joint and several investment, while denying that they are bound under the agreement. It is inadmissible that they infer a right from the Investment Code on the basis of the same acts which constitute the execution of contractual obligations which they claim they did not take on. The duty of this Tribunal however is not to rule on the execution of the Concession Agreement, but only on the "contrary agreement" which

---

[25] This could be a confusion created on the count of a third party, which is discussed in § 158 above.

eliminated the jurisdiction of this ICSID Tribunal for the consequences of the termination of the agreement which ensues from an act on the part of the Public Authorities.

177. For the foregoing reasons, this Tribunal considers that NCT Necotrans and NCT Infrastructure & Logistique are bound by the arbitration clause in article 31 of the agreement.

**(vii)  Getma International Investissements**

178. As concerns Getma International Investissements, the Tribunal noted that it was not created until November 12, 2008, as an intermediate holding company, in order to channel the investment which Getma International had undertaken to make in a Guinean operating company, itself created on November 20, 2008. This implies therefore that, contrary to the other Claimants, Getma International Investissements was not able to participate in the negotiations of the Concession Agreement or to express any wishes whatsoever regarding the Arbitration Clause. However, this does not suffice to maintain that this intermediate holding company is not bound by this Arbitration Clause.

179. Precisely because Getma International is merely an instrument created specifically for the purposes of fulfilling Getma's obligation to create an operating company (article 9 of the agreement) and constituted merely a "pass-through" for the capitalization of STCC by Getma International and NCT Necotrans, there is no reason to exclude it from the application of the Arbitration Clause which binds its two shareholders. The fact that the Arbitration Clause can be applied to it is confirmed by its shareholders meeting which decided on May 9, 2011, as did (i) NCT Infrastructure & Logistique's shareholders meeting, (ii) NCT Necotrans' executive board and (iii) Getma International's sole shareholder[26]:

> *"to initiate all judicial or arbitral procedures designed to obtain compensation for the prejudice sustained by the company following the termination of the Conakry container terminal Concession Agreement and the expropriation of which it was the victim, and in particular in the framework of arbitrations before the CCJA and the ICSID against the Guinean State as well as against the Bolloré group."[27]*

**(viii)  Conclusion**

180. For the reasons stated above, as well as for the acknowledgment implicit in the decisions of their respective competent bodies of May 9, 2011, the wording of which, identical for each Claimant, is mentioned in paragraph 179 above, this Tribunal concludes that its jurisdiction to rule on disputes pertaining to the interpretation and application of the Investment Code is limited, with respect to the four Claimants, by the arbitration clause in article 31 of the Concession Agreement.

**X.  DECISION**

For the reasons stated above, the Tribunal decides:

1. This Tribunal does not entertain jurisdiction to rule on the effects of the termination of the Concession Agreement as concerns the four Claimants.

---

[26] Documents n° 1, n° 2, n° 3 and n° 4, attached to the Claimants' letter to the ICSID Secretariat.
[27] Our underlining.

2.  This Tribunal entertains jurisdiction to rule on the effects of the requisition and other alleged breaches of the Investment Code which do not fall into the framework of the Concession Agreement with respect to the four Claimants.

3.  The costs incurred by the parties and the members of the Tribunal up until this date, including the costs of arbitration pertaining to the declining of jurisdiction will be the object of a subsequent decision of the Tribunal.

|                                  |                          |
|----------------------------------|--------------------------|
| [*Signature*]                    | [*signature*]            |
| BERNARDO M. CREMADES             | PIERRE TERCIER           |
| Arbitrator                       | Arbitrator               |

[*Signature*]
VERA VAN HOUTTE
President



# APPENDIX B



THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
Washington, D.C.

In a proceedings between

**GETMA INTERNATIONAL, NCT NECOTRANS,**
**GETMA INTERNATIONAL INVESTISSEMENTS,**
**NCT INFRASTRUCTURE & LOGISTIQUE**
**Versus**
**THE REPUBLIC OF GUINEA**

**(ICSID Case no. ARB/11/29)**

---

**Dissident opinion of Bernardo M. Cremades**

1. Despite the profound respect I have for my prestigious colleagues, it is impossible for me to subscribe to the conclusions of the majority of the Arbitral Tribunal in which it is asserted that it is not up to the Arbitral Tribunal to rule on a possible denial of justice, grounds alleged by the Claimants during the procedure, and on the consequences of the annulment of the CCJA arbitral award of April 29, 2014, by the CCJA itself, notified to the parties on November 30, 2015. These grounds were expressed in the letter of December 21, 2015 from the Claimants to the Arbitral Tribunal, as well as in their post hearing memorials of February 3, 2016 [1].

2. Concerning the history of the decision of the Arbitral Tribunal , it is referred to hereinafter as the *"Decision on Jurisdiction"),* in which the Arbitral Tribunal  decided that:

   *"1. This Tribunal does not entertain jurisdiction to rule on the effects of the termination of the Concession Agreement with respect to the four Claimants.*

   *2.This Tribunal entertains jurisdiction to rule on the effects of the requisition and other alleged violations of the Investment Code not falling into the framework of the Concession Agreement, with respect to the four Claimants.*

   *3. The costs incurred by the parties and the members of the Tribunal up until the present day, including the costs of arbitration pertaining to the declining of jurisdiction will be the object of a subsequent decision by the Tribunal".*

3. In the decision on jurisdiction, the difference existing between the "treaty claims" (subject to the Investment Code, concretely article 28.2 thereof) and the "contract claims" (subject to the Concession Agreement, concretely article 31 and 32 thereof) is implicit. It is in this perspective that the Arbitral Tribunal confirmed the possibility of a jurisdiction parallel to that of the CCJA.



---

[1] Claimants' post-hearing Memorial of February 3, 2016, §§ 77 to 93.

4. It is also fitting to recall the position of the CCJA Arbitral Tribunal in its award of April 29, 2014 (referred to hereinafter as *"the CCJA award"*):

> *"1. Rejects the request of the Republic of Guinea to benefit from a period of four months to gather evidence of alleged corruption against the Getma International SAS company;*
>
> *Ruling on the merits:*
>
> *2. States that the termination of the container terminal Concession Agreement concluded on September 22, 2008 between the Republic of Guinea and the Getma International SAS company is irregular;*
>
> 3. *Establishes that, due to the new Concession Agreement concluded on March 11, 2011 with BAL or any other company in the Bolloré group, a return to the* statu quo ante *is henceforth impossible;*
>
> 4. *Sentences the respondent to indemnify the Getma International SAS company for the prejudice sustained due to termination, broken down as follows:*
>
> a.  *an all-inclusive indemnification for termination of €20,884,966;*
> b. *a termination indemnification pertaining to the assets granted under the concession of €3,234,995;*
> c. *the unamortized amount of the entry ticket of €14,201,096;*
>
> 5. *Sentences the respondent also to pay to GETMA an indemnity for the stocks not returned of €210,070;*
>
> 6. *Rejects all the other indemnities requested by Getma International SAS;*
>
> 7. *States that the amounts awarded in paragraphs 4 and 5 below will produce interest at the discount rate of the European Central Bank, increased by one percent, and this from the date of the arbitration request on May 10, 2011 up until the date of full payment;*
>
> 8. *Maintain the confidentiality of exhibit R107 in the context of the arbitration procedure, subject to the rights of the defense;*
>
> 9. *Regarding costs:*
>
> -  *Leaves it up to each party to pay its own legal costs (attorneys, consultants, experts, witnesses);*
>
> -  *States that the parties will bear the other costs of the arbitration equally;*
>
> -  *Acknowledges that the court has set the cost of arbitration at the sum of 100,480,332 CFA francs, 40,480,332 CFA francs of which are fees for the arbitrators;*
>
> -  *States that the party which has paid more than its share is entitled to demand reimbursement of the surplus from the other party*

*10. rejects all the parties' other requests".*

5.  The CCJA decision, notified to the parties on November 30, 2015 (*"the CCJA award"*), annulled the entire CCJA award. This annulment was based on the CCJA's disagreement with the amounts of the Tribunal's fees, which the Tribunal had agreed upon with the parties. The CCJA considered that they did not comply with the price scale provided under article 10.1 of its arbitration regulations.

6.  The Claimants allege that:*" with the annulment of the CCJA award, Getma's contract claims ceased to exist",* and emphasized that *"this is important even in the perspective of this Tribunal, which is that contract claims can coexist with treaty claims"[2].* For the Claimants *"any hesitation (...) no longer needs to exist regarding the fact of determining whether Getma's presentation in the CCJA arbitration record(...) of requests concerning "the indemnity owed for the assets requisitioned" and the "additional prejudice" prevented the Claimants from requesting indemnification in these capacities in this arbitration, on the basis of violations of the Investment Code"[3].*

7.  Also, according to the Claimants, the fact that the CCJA Tribunal refused to rule on the issues concerning the loss of profit and requisition in order to avoid ruling *ultra petita* is of no importance, given that said award has been annulled.

8.  The Claimants emphasize the fact that only this arbitral procedure can permit a determination of whether the expropriation of the Claimants' investments by means of the Termination and Requisition Decrees, violated the Investment Code. In the event that a violation were established in this respect, the indemnifications stipulated would compensate for the entire amount of the *damnum emergens* and the *lucrum cessans,* which are the consequences of said Decrees.

9.  According to the Claimants, Guinea relied on the CCJA award as grounds for its allegations concerning the principle of estoppel, waiver and *res judicata.* However, the total annulment of the award by the CCJA defeats this argument. The Claimants point out moreover that the CCJA could have chosen to maintain the procedural acts carried out in the framework of the CCJA procedure in accordance with article 29.5 of its regulations, but this option was not retained. According to the Claimants, it is therefore clear that the CCJA considered that all procedural acts carried out before the CCJA Tribunal were invalid, as per Guinea's request for that matter[4] .

10. Concerning the arguments regarding the denial of justice, the Respondent, in its post-hearing Memorial, insists on the fact that the Claimants did not even evoke the CCJA annulment decision at the hearing while, according to the Respondent, they were aware thereof. As grounds for its affirmation that the Claimants were aware of the annulment, the Respondent quoted the following statement by the Claimants during the hearing: *"the CCJA system which is already proven to be not at all impartial, can have the award annulled on any pretext whatsoever, while an ICSID decision for its part is final"[5].* The respondent concludes finally that the Claimants chose deliberately to send a post-hearing letter to the Arbitral Tribunal for purely self-serving purposes so that it would declare that it entertained jurisdiction. The

---

[2] *Idem,*§ 83.

[3] *Idem,* § 84

[4] *Idem,* §§ 92-93.

[5] Respondent's post-hearing Memorial, § 84.



Respondent also affirms that the Claimants have the possibility of initiating a new arbitration procedure before the CCJA, which would exclude denial of justice.[6]

11. In light of the foregoing, it appears that the circumstances of the case, following the annulment of the CCJA award, impose the application of the *rebus sic stanibus* principal, which moderates the potential effects of the *res judicata* principle in the instance of the decision on jurisdiction, and this inasmuch as the just decision on jurisdiction is based on the premise that the arbitral procedure concerning the contract claims respected a series of guarantees. One premise which was not confirmed in the facts. Consequently, if one takes account: of the letter from the Claimants to the Arbitral Tribunal following the annulment of the CCJA award, in which the Claimants announce the denial of justice that such a situation implied for them, as well as the possible exclusive responsibility of the members of the CCJA Tribunal concerning the amount of the fees and the total annulment of the CCJA award to the sole prejudice of the parties, it is not possible to conclude, simply, that the Claimants can initiate another arbitration before an institution which no longer enjoys the parties' trust as regards their fundamental procedural guarantees. Contrary to that which was asserted by the majority of the Arbitral Tribunal, the consideration of a possible denial of justice alleged by the Claimants concerns this Arbitral Tribunal.

12. It is necessary also to add that the Arbitral Tribunal has a duty of procedural fairness to the parties. And yet, it was with total awareness of the situation of a possible denial of justice at the beginning of its deliberations, that it did not convene the parties on this point, nor did it require of the parties that they tackle the issue in a more detailed manner in their post-hearing Memorials. No reference is made to the jurisdiction of the Arbitral Tribunal on the basis of the decision on jurisdiction made at the time. And yet, the Tribunal was able to give a very different impression to the parties in light of its attitude when, for example, after the hearing of November 2015, it permitted Mr. Ouaniche to correct his expert report *"in relation to the value and the quantification of the investments established in his reports"* and requested access to PwC's simulation template.[7]

13. This Arbitral Tribunal has a duty to the parties to protect the proper conduct of the arbitration, involving the respect of the equitable standards of these proceedings. As guarantor of the right to a fair trial and the right to effective access to justice, it cannot remain silent regarding such fundamental issues until its final award, as was unfortunately the case in this procedure.

14. Indeed, the Tribunal, in its final deliberation, made an excessively restrictive interpretation of its Decision on jurisdiction. The distinction made between termination and requisition leading to such a restrictive exclusion of the direct and indirect consequences of the termination does not correspond to that which the parties were entitled to expect. In light of the conduct of the arbitral procedure and its unfolding, one could have expected that these contractual claims would be considered as claims in light of the breach of the Investment Code.

15. The Tribunal should have at least convened the parties before ruling on the alleged situation of injustice.

---

[6] *Idem* §§ 85-93.
[7] Procedural order n° 10 of Nov. 26, 2015, para. 2.2



16. In light of all the foregoing, I am convinced that the possible effectiveness of the *res judicata* of the decision on jurisdiction must be appreciated in light of the *rebus sic stantibus* principle and not in a categorical manner without taking account of the circumstances surrounding this decision, or of those which occurred subsequently to the decision on jurisdiction.

[*signature*]

_____

Bernardo M. Cremades

Date: August 1, 2016

