# EXHIBIT 2

**CENTRE INTERNATIONAL POUR LE RÈGLEMENT DES DIFFÉRENDS RELATIFS AUX INVESTISSEMENTS**
WASHINGTON, D.C.

Dans une procédure entre

**GETMA INTERNATIONAL,
NCT NECOTRANS,
GETMA INTERNATIONAL INVESTISSEMENTS,
NCT INFRASTRUCTURE & LOGISTIQUE**

Demanderesses


ET


**LA REPUBLIQUE DE GUINEE**

Défenderesse


**Affaire CIRDI ARB/11/29**

---

# SENTENCE

---

*Membres du Tribunal*
Mme Vera Van Houtte, Présidente
M. Bernardo Cremades, Arbitre
Prof. Pierre Tercier, Arbitre


*Secrétaire du Tribunal*
Mme Mairée Uran Bidegain


*Date d'envoi aux Parties: le 16 août 2016*

# REPRÉSENTATION DES PARTIES

| Les Demanderesses sont représentées par : | La Défenderesse est représentée par : |
|---|---|
| M. Grégory Quérel<br>M. Abdel Aziz Thiam<br>Getma International, NCT Necotrans,<br>Getma International Investissements, et<br>NCT Infrastructure & Logistique<br>40, Avenue George V<br>75008 Paris<br>France | Me Laurent Jaeger<br>Me Pascal Agboyibor<br>Me Romain Sellem<br>Me Agnès Bizard<br>Orrick Rambaud Martel, Société d'avocats<br>31, Avenue Pierre 1er de Serbie<br>75782 Paris<br>France |
| et | et |
| Me José Miguel Júdice<br>Me Tiago Duarte<br>Me Filipa Cansado Carvalho<br>Me Pacôme Ziegler<br>PLMJ – A.M. Pereira, Sáragga Leal,<br>Oliveira Martins, Júdice e Associados,<br>RL, Avocats au Barreau de Lisbonne<br>Avenida da Liberdade, 224<br>1250-148 Lisbonne<br>Portugal | Me Mamadou S. Traoré<br>Cabinet d'avocats<br>11 BP 721 CMS Ouagadougou<br>11 Place Naba Koom<br>Burkina Faso |
| et | |
| Me Cédric Fischer<br>Me Elisabeth Mahé<br>Me Tristan Dupré de Puget<br>Fischer, Tandeau de Marsac, Sur &Ass.<br>Société d'Avocats au Barreau de Paris<br>67, boulevard Malesherbes<br>75008 Paris<br>France | |

**SOMMAIRE**

I.    INTRODUCTION ET PARTIES .............................................................................. 1

II.   HISTORIQUE DE LA PROCÉDURE ................................................................... 2

    A.   Commencement de la procédure ..................................................................... 2

    B.   Demande de récusation .................................................................................... 3

    C.   Compétence ....................................................................................................... 3

    D.   Suspension de la procédure ............................................................................. 4

    E.   Echange de mémoires sur le fond et audience ............................................. 6

    F.   Après l'audience ................................................................................................ 8

III.  FAITS ........................................................................................................................ 9

IV.   DEMANDES DES PARTIES ................................................................................. 25

    A.   Demanderesses ................................................................................................ 25

    B.   Défenderesse ................................................................................................... 28

V.    LA COMPETENCE ET LA RECEVABILITE DES DEMANDES ................. 29

    A.   Position de la Défenderesse .......................................................................... 29

        (1)   Le Tribunal est incompétent *ratione materiae* du fait de l'illégalité de l'investissement et des actes de corruption ........................................... 29

        (2)   Le Tribunal est incompétent pour statuer sur les effets de la résiliation, le gain manqué et les préjudices supplémentaires découlant du Décret de résiliation, du fait de la Décision sur la Compétence du 29 décembre 2012 .............................. 37

        (3)   L'article 32.5 de la Convention de concession constitue un accord contraire, tel que reconnu par la Décision sur la Compétence, et la position des Demanderesses en ce qui concerne son inapplicabilité se heurte au principe de l'« *estoppel* » .... 39

        (4)   Renonciation et *res judicata* ................................................................. 41

        (5)   Le prétendu déni de justice suivant l'annulation de la sentence .......................... 46

    B.   Position des Demanderesses .......................................................................... 46

        (1)   Le Tribunal est compétent *ratione materiae* car l'investissement est légal .......... 46

        (2)   Le Tribunal est compétent pour statuer sur les effets de la résiliation, le gain manqué et les préjudices supplémentaires découlant du Décret de résiliation ..... 53

        (3)   L'article 32.5 de la Convention de concession en tant qu'accord contraire ......... 55

        (4)   Les défenses de *res judicata* et renonciation ....................................... 57

        (5)   Les effets de l'annulation de la sentence CCJA ..................................... 58

    C.    Analyse du Tribunal ................................................................................ 58

        (1)   La compétence du Tribunal *ratione materiae* ...................................... 59

        (2)   La compétence du Tribunal sur les effets de la résiliation, le gain manqué et les préjudices supplémentaires découlant du Décret de résiliation, du fait de la Décision sur la Compétence du 29 décembre 2012 ............................................ 123

        (3)   Les effets de l'article 32.5 de la Convention de concession en tant qu'accord contraire à la lumière de la Décision du 29 décembre 2012 .............................. 132

        (4)   *Res judicata* et renonciation ................................................................ 135

        (5)   L'annulation de la sentence CCJA ...................................................... 135

        (6)   En ordre subsidiaire : l'irrecevabilité des demandes ......................... 138

        (7)   En ordre infiniment subsidiaire : rejet des demandes pour cause de fausses déclarations ............................................................................................. 138

VI.   LA RESPONSABILITE ..................................................................................... 140

    A.    Position des Demanderesses ................................................................... 140

        (1)   La Guinée a violé l'article 5 du Code des investissements et le droit international coutumier en tant qu'elle a réalisé une expropriation illégale résultant tant du Décret de résiliation que du Décret de réquisition ................................. 140

        (2)   La Guinée a violé l'article 6 du Code des investissements................................ 143

    B.    Position de la Défenderesse .................................................................... 144

        (1)   L'application de l'article 5 du Code des investissements au cas d'espèce ........ 144

        (2)   L'article 6 du Code des investissements ............................................. 145

    C.    Analyse du Tribunal ................................................................................ 146

        (1)   L'article 5 du Code des investissements ............................................. 146

        (2)   L'article 6 du Code des investissements ............................................. 151

VII.  LA REPARATION DU PREJUDICE ............................................................... 152

    A.    Position des Demanderesses ................................................................... 152

        (1)   Les Demanderesses ont droit à une réparation intégrale et l'indemnisation forfaitaire de l'article 32.3 de la Convention de concession est inapplicable..... 152

        (2)   Montant de la réparation ..................................................................... 153

        (3)   Les allégations de la double réparation .............................................. 158

    B.    Position de la Défenderesse .................................................................... 159

        (1)   L'indemnisation forfaitaire de l'article 32.3 de la Convention de concession est applicable et exige que toute indemnisation soit appréciée strictement ............ 159

        (2)   Montant de la réparation ..................................................................... 160

        (3)   La double réparation ........................................................................... 165

C.   Analyse du Tribunal ................................................................................ 167

(1) Les principes de réparation ............................................................. 167

(2) Le montant de la réparation ........................................................... 168

(3) Les allégations de double réparation.............................................. 189

VIII. FRAIS DE LA PROCEDURE...................................................................... 190

A.   Position des Demanderesses........................................................................ 190

B.   Position de la Défenderesse......................................................................... 191

C.   Analyse du Tribunal .................................................................................... 192

IX.   DISPOSITIF .................................................................................................... 194

GLOSSAIRE DES ABREVIATIONS

| | |
|---|---|
| CCJA | Cour Commune de Justice et d'Arbitrage de l'Organisation pour l'Harmonisation en Afrique du Droit des Affaires |
| C-Mem. | Contre-mémoire de la Défenderesse, du 30 mars 2015 |
| C-[n°] | Pièce Demanderesses |
| Commission | Commission Nationale des Grands Marchés, aussi appelée Commission d'évaluation |
| CIRDI ou le Centre | Centre international pour le règlement des différends relatifs aux investissements |
| Convention CIRDI | Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, du 18 mars 1965 |
| Dupl. | Duplique de la Défenderesse, du 15 octobre 2015 |
| Getma International | Getma International S.A.S. de droit français, première demanderesse dans le présent arbitrage CIRDI et demanderesse unique dans l'affaire CCJA N° 001/2011/ARB |
| GNF | Francs guinéens |
| Mem. | Mémoire des Demanderesses, du 17 novembre 2014 |
| Mem.AAC | Mémoire après Audience des Demanderesses, du 3 février 2016 |
| Mem.AAR | Mémoire après Audience de la Défenderesse, du 3 février 2016 |
| MSC | Mediterranean Shipping Company SA |
| PAC | Port Automne de Conakry |
| R-[n°] | Pièce Défenderesse |
| Règlement d'arbitrage | Règlement de procédure relative aux instances d'arbitrage du CIRDI |
| Répl. | Réplique des Demanderesses, du 15 juillet 2015 |
| Sentence CCJA | La sentence arbitrale rendue le 29 avril 2014 dans l'affaire CCJA N° 001/2011/ARB entre la société Getma International et la République de Guinée |
| STCC | Société du Terminal à Conteneurs de Conakry, la filiale de droit guinéen constituée par GI pour exploiter la concession |
| TAC | Terminal à conteneurs |

| | |
|---|---|
| TR I, p.[ ]:[ lignes] | Transcription de l'audience du 23 novembre 2015 |
| TR II, p.[ ]:[lignes] | Transcription de l'audience du 24 novembre 2015 |
| TR III, p.[ ]:[lignes] | Transcription de l'audience du 25 novembre 2015 |
| Tribunal CCJA | Le Tribunal arbitral dont la Cour Commune de Justice et d'Arbitrage de l'OHADA a confirmé la composition et qui, le 29 avril 2014, a rendu une sentence dans l'affaire CCJA N° 001/2011/ARB entre la société Getma International et la République de Guinée |

## I.  INTRODUCTION ET PARTIES

1.  Cette affaire concerne un différend soumis au Centre international pour le règlement des différends relatifs aux investissements (ci-après le « CIRDI » ou le « Centre ») sur le fondement du Code des investissements guinéen du 3 janvier 1987 tel que modifié le 30 juin 1995 (ci-après le « Code des investissements » ou « Code ») et sur le fondement de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats du 18 mars 1965, en vigueur depuis le 14 octobre 1966 (ci-après la « Convention CIRDI »). Le différend porte sur la résiliation par la République de Guinée de la Convention de mise en concession du Terminal à conteneurs du port automne de Conakry, son extension et l'aménagement d'un espace de la gare ferroviaire (ci-après la « Convention de concession »), conclue le 22 septembre 2008 entre la Défenderesse et Getma International, sur les effets d'un Décret de résiliation adopté par le Président de la République de Guinée en date du 8 mars 2011, ainsi sur un Décret de réquisition du 9 mars 2011.

2.  La première Demanderesse est Getma International, une société par actions simplifiée de droit français, dont le siège est établi au 66 rue Pierre Charron, 75008 Paris.

3.  La deuxième Demanderesse est Necotrans Holding (précédemment NCT Necotrans et encore appelée ainsi dans cette Sentence), une société par actions simplifiée de droit français, dont le siège est établi au 40 avenue Georges V, 75008 Paris.

4.  La troisième Demanderesse est Getma International Investissements, une société par actions simplifiée de droit français, dont le siège est établi au 66 rue Pierre Charron, 75008 Paris.

5.  La quatrième Demanderesse est NCT Infrastructure & Logistique, une société par actions simplifiée de droit français, dont le siège est établi au 66 rue Pierre Charron, 75008 Paris.

6.  Les quatre Demanderesses sont ensemble appelées les « Demanderesses ».

7.  La Défenderesse est la République de Guinée (ci-après la « Défenderesse », la « Guinée » ou la « République »).

8.  Les Demanderesses et la Défenderesse seront collectivement appelés les « Parties ». Les représentants respectifs des Parties et leurs adresses sont mentionnés ci-dessus.

## II. HISTORIQUE DE LA PROCEDURE

### A. *Commencement de la procédure*

9.  Le 29 septembre 2011, les Demanderesses ont introduit une requête d'arbitrage (ci-après la « Requête ») auprès du CIRDI contre la République de Guinée.

10.  La Requête a pour fondement la Convention CIRDI ainsi que l'Ordonnance N° 001/PRG/87 du 3 janvier 1987, modifiée par la loi N° L/95/029/CTRN du 30 juin 1995 portant Code des investissements de la République de Guinée.

11.  En application de l'article 36(3) de la Convention CIRDI, le Secrétaire général du CIRDI a enregistré la Requête le 3 novembre 2011.

12.  Le Tribunal est composé de Mme Vera Van Houtte, de nationalité belge, Présidente, nommée par accord des Parties, de M. Bernardo Cremades, de nationalité espagnole, nommé par la Demanderesse, et de M. le professeur Pierre Tercier, de nationalité suisse, nommé par la Défenderesse.

13.  Le 2 février 2012, le Secrétaire général a notifié aux Parties, conformément à l'article 6(1) du Règlement de procédure relatif aux instances d'arbitrage du CIRDI (ci-après le « Règlement d'arbitrage »), que les trois arbitres avaient accepté leur nomination, que le Tribunal était ainsi réputé constitué et l'instance engagée à cette date. Les Parties ont également été informées de ce que Madame Mairée Uran-Bidegain, Conseiller juridique au CIRDI, était la Secrétaire du Tribunal (ci-après la « Secrétaire »).

14.   Le Tribunal a tenu sa première session avec les Parties le 30 mars 2012. Les Parties ont confirmé la régularité de la constitution du Tribunal et ont indiqué ne pas avoir d'objections concernant les déclarations de ses membres. Il a été également convenu que le Règlement d'arbitrage applicable serait celui entré en vigueur depuis avril 2006, que le lieu de la procédure serait Paris et que la procédure se déroulerait en langue française. L'accord des Parties est retranscrit dans le Procès-verbal de la première session.

## B.  *Demande de récusation*

15.   Le 16 avril 2012, la Défenderesse a soumis une demande de récusation à l'encontre de M. Bernardo Cremades (ci-après la « Demande de récusation »), en application de l'article 57 de la Convention CIRDI. Suite au partage des voix de Mme Vera Van Houtte et de M. le professeur Pierre Tercier, le Président du Conseil administratif s'est prononcé, le 28 juin 2012, sur la Demande de récusation conformément à l'article 58 de la Convention CIRDI. Il a rejeté la Demande de récusation et a décidé que les frais encourus par les Parties et les arbitres à la suite de la Demande de récusation feraient l'objet d'une décision ultérieure du Tribunal.

## C.  *Compétence*

16.   Conformément au calendrier de la procédure établi au point 13 du Procès-verbal de la première session, les Parties ont soumis les écritures suivantes concernant l'exception d'incompétence soulevée par la Défenderesse à cause de l'arbitrage lancé en parallèle par la première Demanderesse, Getma International, sur la base d'une clause contractuelle d'attribution de juridiction, conformément au Règlement d'Arbitrage de la Cour de Justice et d'Arbitrage OHADA (ci-après « l'arbitrage CCJA » et « le Tribunal CCJA ») :

a) Le 22 juin 2012: Mémoire n°1 de la Défenderesse sur la compétence (ci-après le « Mémoire n°1 ») ;

b) Le 13 juillet 2012: Contre-Mémoire n°1 des Demanderesses sur la compétence (le « Contre-Mémoire n°1 ») ;

c) Le 6 août 2012: Mémoire n°2 de la Défenderesse sur la compétence (le « Mémoire n°2 ») ; et

d) Le 7 septembre 2012: Contre-Mémoire n°2 des Demanderesses sur la compétence (le « Contre-Mémoire n°2 »).

17. Le 28 septembre 2012, une audience sur la compétence de ce Tribunal arbitral a eu lieu à Paris, dont un Procès-verbal a été soumis aux Parties et aux arbitres sous forme de projet, le même jour, et sous forme de version finale, sous réserves d'éventuelles corrections par les Parties ou les arbitres, le 2 octobre 2012.

18. Le 29 décembre 2012, le Tribunal a rendu sa Décision sur la Compétence. Le dispositif en était le suivant :

   *« 1. Ce Tribunal n'est pas compétent pour se prononcer sur les effets de la résiliation de la Convention de concession à l'égard des quatre demanderesses.*

   *2. Ce Tribunal est compétent pour se prononcer sur les effets de la réquisition et autres violations alléguées du Code des investissements n'entrant pas dans le cadre de la Convention de concession à l'égard des quatre demanderesses.*

   *3. Les frais encourus par les parties et les membres du Tribunal jusqu'à présent, y compris les frais d'arbitrage se rapportant au déclinatoire de compétence feront l'objet d'une décision ultérieure du Tribunal. »*

19. Cette Décision sur la Compétence fait partie intégrante de la présente sentence du Tribunal et y est incorporée dans sa totalité. Elle figure en Annexe A de cette Sentence.

### D.  _Suspension de la procédure_

20. Par lettre du 10 janvier 2013, le Tribunal arbitral a invité les Parties « *dès qu'elles auront pris connaissance de la Décision sur la Compétence du Tribunal arbitral […] de se consulter afin de se mettre si possible d'accord sur la suite de la procédure, en particulier si elles entendent demander la suspension de la procédure* ». Par lettre du 31 janvier 2013, les Parties ont présenté leurs positions respectives sur la suite de la procédure et, notamment, sur une éventuelle suspension de celle-ci. En particulier, les Demanderesses ont demandé au Tribunal arbitral « *de suspendre la procédure*

*d'arbitrage CIRDI jusqu'à la Décision de la procédure d'arbitrage CCJA »*, tandis que la Défenderesse a expliqué ne pouvoir prendre position sur une éventuelle suspension qu'après que les Demanderesses auront précisé quelles demandes elles entendent poursuivre devant ce Tribunal arbitral.

21. Le 12 février 2013, suite au non-paiement de la deuxième avance par la Défenderesse, le Tribunal a suspendu l'audience, puis l'a reprise le 22 août 2013 après réception par le CIRDI du paiement des Demanderesses (lesquelles se sont substituées à la Défenderesse).

22. Le 1er octobre 2013, après que les Parties eurent rappelé leurs positions respectives sur la suspension, le Tribunal a rendu l'Ordonnance de Procédure n°1 décidant ceci :

*a. Les parties sont tenues d'informer le Tribunal arbitral sans délai de la date approximative à laquelle la sentence [du Tribunal CCJA] est attendue et, le cas échéant, de tout retard dont elles pourraient avoir connaissance ;*

*b. Les Demanderesses devront notifier le Tribunal arbitral dès que la décision ou sentence du Tribunal CCJA sera rendue ;*

*c. Les parties devront en tout état de cause informer le Tribunal arbitral au plus tard le 1er novembre 2013, de la situation de la procédure devant le Tribunal CCJA à ce moment-là ;*

*d. La présente instance est suspendue jusqu'au 1er décembre 2013, à toutes fins utiles, sauf la réception d'informations mentionnées aux points (a) à (c) susmentionnés ;*

*e. Le Tribunal arbitral pourra à tout moment reconsidérer la présente décision en fonction des circonstances pertinentes portées à sa connaissance et le fera en tout cas proprio motu avant le 1er décembre 2013.*

23. Le 28 novembre 2013, le Tribunal a rendu l'Ordonnance de Procédure n°2 décidant ceci:

*a. Les parties devront informer ce Tribunal arbitral dès que la décision ou sentence du Tribunal CCJA sera rendue, et, en tout état de cause, informer le Tribunal arbitral au plus tard le lundi 6 janvier 2014, de la situation de la procédure devant le Tribunal CCJA à ce moment-là ;*

*b. La suspension de la présente instance est prorogée jusqu'au lundi 13 janvier 2014, à toutes fins utiles, sauf pour la réception d'information évoquée au point (a) susmentionné.*

24. Le 13 janvier 2014, le Tribunal a rendu l'Ordonnance de Procédure n°3 décidant ceci :

*a. Les parties devront informer ce Tribunal arbitral dès que la décision ou sentence du Tribunal CCJA sera rendue, et, en tout état de cause, informer le Tribunal arbitral au plus tard le lundi 8 avril 2014, de la situation de la procédure devant le Tribunal CCJA à ce moment-là ;*

*b. La suspension de la présente instance est prorogée jusqu'au lundi 21 avril 2014, à toutes fins utiles, sauf pour la réception d'information évoquée au point (a) susmentionné.*

25. Le 16 avril 2014, le Tribunal a rendu l'Ordonnance de Procédure n°4 décidant ceci :

*a. Les parties devront informer ce Tribunal arbitral dès que la décision ou sentence du Tribunal CCJA sera rendue, et, en tout état de cause, informer le Tribunal arbitral au plus tard le mardi 10 juin 2014, de la situation de la procédure devant le Tribunal CCJA à ce moment-là ;*

*b. La suspension de la présente instance est prorogée jusqu'au lundi 23 juin 2014, à toutes fins utiles, sauf pour la réception d'information évoquée au point (a) susmentionné.*

26. Le 10 juin 2014, les Demanderesses ont informé le Tribunal que le Tribunal CCJA avait rendu sa sentence le 29 avril 2014 et, le 17 juin 2014, le Tribunal a décidé de lever la suspension et de reprendre l'instance à cette date.

## E.  *Echange de mémoires sur le fond et audience*

27. Le 7 juillet 2014, le Tribunal a rendu l'Ordonnance de Procédure n°5 fixant le calendrier de la procédure. Conformément à ce calendrier :

   a)   Le 17 novembre 2014, les Demanderesses ont déposé leur Mémoire sur le fond (« Mem.») ;

   b)   Le 30 mars 2015, la Défenderesse a déposé son Contre-mémoire sur le fond (« C-Mem.») ;

    c)    Le 15 avril 2015, les Parties ont échangé leurs demandes respectives de production de documents ; le 7 mai 2015, elles y ont réagi; le 15 mai 2015, chaque partie a adressé au Tribunal une demande afin que l'autre partie produise certains documents et, les 3 et 11 juin 2005, le Tribunal a rendu, respectivement, les Ordonnances de Procédure n°6 et 7 en la matière;

    d)    Le 15 juillet 2015, les Demanderesses ont déposé leur Mémoire en Réplique (« Répl.») sur le fond ; et

    e)    Le 15 Octobre 2015, la Défenderesse a déposé sa Duplique sur le fond (« Dupl.»).

28.    Le 2 novembre 2015, le Tribunal a rendu l'Ordonnance de Procédure n°8 concernant l'organisation de l'audience et l'interrogation des témoins et, le 10 novembre 2015, l'Ordonnance de Procédure n°9 concernant la comparution de certains témoins à l'audience commençant le 23 novembre 2015.

29.    Une audience sur le fond a eu lieu à Paris du 23 au 25 novembre 2015. Outre les membres du Tribunal, la Secrétaire du Tribunal et les sténotypistes, les personnes suivantes étaient présentes :

Pour les Demanderesses :

- José Miguel Júdice
- Cédric Fisher
- Elisabeth Mahé
- Jean Daniel Littler
- Tiago Duarte
- Filipa Cansado Carvalho
- Pacôme Ziegler
- Tristan Dupré de Puget

Pour la Défenderesse :

- Laurent Jaeger
- Romain Sellem
- Agnès Bizard
- François Adao
- Line Geffrault
- Leonid Shmatenko
- Jean Tardi

- Anne Claire Habib

30.    Les personnes suivantes ont témoigné :

Présentées par les Demanderesses :

- Grégory Quérel
- Dominique Perrier  (PwC)
- Manoël de Goeij (PwC)

Présentées par la Défenderesse :

- Demba Kourouma
- Ibrahima Lamizana Condé
- Mikaël Ouaniche (OAC)

31.    En réponse à la question de la Présidente en fin d'audience, chaque Partie a confirmé qu'elle n'avait pas de critiques ou de réserves à formuler au sujet de la régularité de la procédure (TR III p.88 : 7-16).

32.    L'audience a été entièrement enregistrée. Le 4 décembre 2015, l'enregistrement sonore de l'audience a été mis à la disposition des Parties et le Procès-verbal établi par les sténotypistes leur a été envoyé pour relecture ; il a été par la suite adopté dans sa version finale avec les modifications consolidées des Demanderesses et de la Défenderesse.

### F.  *Après l'audience*

33.    Le 26 novembre 2015, le Tribunal arbitral a fixé les étapes suivantes de la procédure, parmi lesquelles le dépôt éventuel par la Défenderesse de commentaires de M. Ouaniche sur certaines erreurs dans le modèle de calcul du gain manqué relevées pendant l'audience. Le délai du 7 décembre 2015 pour la soumission des commentaires de M. Ouaniche a été prolongé d'une semaine à la demande de la Défenderesse.

34.    Le 21 décembre 2015, les Demanderesses ont informé la Secrétaire du Tribunal arbitral de l'arrêt de la CCJA du 30 novembre 2015 annulant la sentence du Tribunal CCJA du 29 avril 2014 au motif que le Tribunal CCJA ne s'était pas conformé à sa mission quand il avait demandé aux parties de régler un supplément d'honoraires.

35.    Le 30 décembre 2015, les Demanderesses ont demandé au Tribunal arbitral l'autorisation de présenter en annexe à leur Mémoire après Audience, les documents techniques préparés par PwC (des feuilles de calcul Excel) montrant les erreurs affectant le modèle de M. Ouaniche. Le 8 janvier 2016, le Tribunal arbitral a autorisé les Demanderesses à joindre à leur Mémoire après Audience uniquement les *spreadsheets* mentionnées dans leur lettre du 8 décembre 2015.

36.    Chaque Partie a soumis son Mémoire après-audience le 3 février 2016 et sa soumission relative aux frais de l'arbitrage le 17 février 2016.

37.    Le 20 juillet 2016, le Tribunal arbitral a clôturé les débats.

## III. FAITS

38.    Ce résumé des faits n'a pas la prétention d'être exhaustif. En tant que de besoin, d'autres faits seront pris en compte dans les chapitres suivants dans la mesure où ils sont pertinents pour les décisions à prendre.

39.    Ce litige concerne un investissement opéré sur le terminal à conteneurs (ci-après le « TAC ») du port de Conakry en République de Guinée.

40.    En mars 2008, le Ministère des Transports et le Port Autonome de Conakry (ci-après le « PAC ») ont publié un appel à manifestation d'intérêt pour l'extension et la mise en concession du Terminal conteneurs du Port de Conakry.[1] L'annonce indiquait que le projet comporterait deux volets :

-       *« L'extension du Terminal à Conteneurs par la création notamment d'un deuxième poste à quai de 300 m de longueur avec une profondeur de -13 m devant le quai et 12 ha de terre-pleins supplémentaires en vue d'augmenter la capacité d'accueil*

---

[1] Annonces Légales, Magasine Jeune Afrique n°2461 (C-102).

*d'au moins trois cent mille (300.000) conteneurs Equivalent-Vingt-Pied (EVP) par an » ;* et

- *« Les travaux de réhabilitation du Terminal à Conteneurs existant, la modernisation des équipements de manutention et l'aménagement au niveau de la gare ferroviaire d'une plateforme qui sera annexée au TAC ».*

L'appel précisait qu'il « s'adress[ait] exclusivement aux candidats ayant une longue et solide expérience dans la conception, le financement, la réalisation, l'exploitation et l'entretien de terminaux à conteneurs ».

41. Le 10 mars 2008, Getma International a répondu à l'appel à manifestation d'intérêt, joignant une plaquette de présentation du groupe Necotrans et diverses lettres de ses partenaires commerciaux.[2]

42. Le 7 avril 2008, le Directeur-Général du PAC a envoyé une lettre à Transafrica Guinée, représentant Getma International, l'informant qu'elle avait été « présélectionné[e] » et « admis[e] à soumissionner pour la mise en concession et l'extension » du TAC du PAC.[3]

43. Le dossier d'appel d'offres comprenait le cahier des charges et le projet de convention, ainsi que le Règlement de la Consultation.[4]

44. En juillet 2008, Getma International a déposé un dossier technique[5], portant sur les aspects techniques de son offre et présentant comme son partenaire contractuel Europe Terminal, une filiale de l'armateur mondial Mediterranean Shipping Company SA (ci-

---

[2] Manifestation d'intérêt de Getma International au PAC (C-103 et C-16).
[3] Lettre du DG du PAC à Getma International en date du 7 avril 2008 (C-105).
[4] Règlement de la Consultation (C-108).
[5] Proposition technique (C-174).

après la « MSC ») et, simultanément mais sous une enveloppe séparée, son offre financière.[6]

45. En août 2008, un Rapport d'évaluation des offres a été dressé par la Commission Nationale des Grands Marchés (ci-après la « Commission »).[7] L'offre technique de Getma International a obtenu la note la plus élevée des quatre soumissionnaires, lesquels avaient tous obtenu au moins le minimum de 70 points de telle façon que leurs offres financières pouvaient également être ouvertes. Après leur évaluation, ces offres ont conduit à un classement dans lequel celle de Getma International était à nouveau la première. Ainsi, la Commission Nationale des Grands Marchés a décidé, le 22 août 2008, d'adjuger provisoirement le contrat à Getma International.

46. Par lettre du 27 août 2008, le Ministre des Transports a informé Getma International de cette adjudication provisoire par la Commission. La lettre invitait Getma International à se rendre à Conakry le 2 septembre 2008 afin d'entamer les négociations relatives à la Convention de concession.[8]

47. Les négociations de la Convention de concession se sont tenues par la suite. Les Parties sont en désaccord quant à leur durée et leur degré d'intensité. Un des témoins des Demanderesses, Mme Mangiante, indique que « [l]es négociations se sont déroulées à la fin du mois d'août et au cours du mois de septembre 2008 » et qu'elles « étaient conduites article par article ». Elle ajoute que « les négociations ont été particulièrement difficiles, et l'équipe Necotrans est été [*sic*] contrainte de faire d'importantes concessions par rapport au projet de texte initial » (attestation Julie Mangiante).

48. Le 11 septembre 2008, FFA Ernst & Young a adressé au PAC un avis juridique relatif au projet de Convention (apparemment en exécution d'un contrat de services conclu

---

[6] Offre financière (C- 179).

[7] Rapport d'évaluation des offres (C-111).

[8] Lettre du Ministre des Transports à Getma International en date du 27 août 2008 (C-10).

entre ces deux parties, étrangement à la même date du 11 septembre 2008).[9] L'analyse porte, entre autres, sur le régime fiscal et douanier du projet et conclut que « cette situation ne […] semble pas avantageuse pour le Concédant ».

49.  Une note technique a été rédigée, dont le destinataire n'est pas précisé, note semblant être datée des 15 et 16 septembre 2008 et émise par un représentant du PAC. Elle précisait qu'un délai plus long de négociation aurait pu être retenu et regrettait que les discussions soient menées par la Commission d'évaluation des offres [10] plutôt que par le PAC lui-même.[11]

50.  Le 22 septembre 2008, la Défenderesse et Getma International ont signé la Convention de mise en concession du Terminal à conteneurs du port automne de Conakry, son extension et l'aménagement d'un espace de la gare ferroviaire (ci-après la « Convention de concession » ou « Convention »).[12]

51.  Le 2 octobre 2008, le Trésor Public de Guinée a tiré un chèque – déjà émis le 15 septembre 2008 – sur Getma International d'un montant de 7.500.000 euros, correspondant à la première moitié du ticket d'entrée.[13] L'article 15.2 de la Convention prévoyait que la deuxième moitié était due au plus tard six mois après la date de la signature de la Convention.

---

[9] Avis juridique d'E&Y (C-119) : la lettre de transmission date du 11 septembre 2008, et la p.1 de l'avis signale que : « *La présente opinion juridique vous est adressée conformément aux termes du contrat de prestation de services du 11 septembre 2008....* »

[10] Après vérification, le Tribunal arbitral conclut que cette Commission est la même que la Commission Nationale des Grands Marchés : Le Règlement de la Consultation (C-108) dit dans son art. 2 que la réception et l'ouverture des offres seront faites par « *une commission désignée à cet effet* » et que l'analyse et l'évaluation en est faite par « *la commission* » ; l'art. 19 prévoit que « *la commission de dépouillement et d'évaluation des offres* » attribuera provisoirement la Concession; et les témoins à l'audience ont parlé de la « Commission d'évaluation ». L'on peut donc présumer que la dénomination « Commission Nationale des Grands Marchés » qui figure sur le Rapport d'Evaluation des Offres (C-111) est le nom officiel de la Commission d'évaluation, d'autant plus que la liste des membres de la Commission comprend aussi le nom des deux témoins ainsi que ceux des personnes auxquelles ils se sont référés.

[11] Note technique (C-120).

[12] Convention de concession (C-11 et C-48).

[13] Chèque tiré sur Getma International à l'ordre du Trésor publique de Guinée (C-121). Encaissement du chèque n°817 (C-122).

52.   Le 31 octobre 2008, Getma International et NCT Necotrans ont constitué à Paris une filiale commune, Getma International Investissements, immatriculée le 13 novembre 2008.[14]

53.   Le 14 novembre 2008, une « Dénonciation - Etude critique de la Convention de cession [*sic*] du Terminal à conteneurs du port de Conakry » a été envoyée au Premier Ministre par différentes entités, à savoir les Agents Consignataires et Manutentionnaires, les Cadres Guinéens évoluant dans le Secteur Portuaire, les Syndicats des Entreprises et Sociétés Opérantes du PAC, le Bureau des Importateurs de Véhicules d'Occasion, l'Union Nationale des Transporteurs Routiers de Guinée, la Fédération Patronale des Commissionnaires en Douane et Transitaires de Guinée, et le Bureau des Importateurs du Secteur Informel.[15] Le document critiquait le Document d'appel à manifestation d'intérêt, le cahier des charges et la Convention signée et préconisait une « refonte » complète de la Convention de concession.

54.   Le 20 novembre 2008, la Société du Terminal à Conteneurs de Conakry SA (ci-après la « STCC ») a été constituée par Getma International Investissements et Transafrica SA.[16]

55.   Un document non daté intitulé « Synthèse des réserves du Port Autonome de Conakry sur la Convention de Mise en Concession du Terminal à Conteneurs, son Extension et l'Aménagement d'un Espace de la gare ferroviaire » a été rédigé par le PAC (le destinataire étant inconnu). Quatre réserves étaient avancées :
   –   Faiblesse du Dossier d'appel d'offres,
   –   Légèreté de l'Adjudication,

---

[14] Extrait Kbis de Getma International Investissements (C-3). Selon Mem. § 205, Getma International Investissements fut « constituée le 31 octobre 2008, entre Getma International qui en détenait 51%, et la contrôlait donc au sens des articles L.233-3 du code de commerce français et de l'Acte uniforme relatif au droit des Sociétés Commerciales et du Groupement d'Intérêt Économique et dans le respect de l'article 7.2 de la Convention de concession, et NCT Necotrans, qui en détenait 49% ». Selon Mem. § 56, il fut décidé de constituer Getma International Investissements comme une structure intermédiaire « qui aurait ainsi accès directement aux financements de la holding du groupe Necotrans ».

[15] Etude critique (C-141).

[16] Statuts de la société STCC (C-125).

– Faiblesse de la négociation de la Convention, et

– Insuffisance de la Convention telle que signée. [17]

56.   Le 24 novembre 2008, STCC a communiqué au Ministre des Transports les noms des représentants permanents de « notre Groupe » au comité de suivi prévu à l'article 29 de la Convention de concession.[18]

57.   Le 4 décembre 2008, le Ministre Secrétaire Général de la Présidence a envoyé une lettre au Ministre des Transports reprenant les diverses réserves formulées dans le document visé au paragraphe 55 ci-dessus.[19] Le courrier concluait qu' « [e]n définitive le monopole qu'engendre cette convention entraînera pour l'Etat une perte énorme et certaine en termes de recettes ». Le Ministre Secrétaire Général ajoutait : « [a]u regard de ces réserves et sur instruction de l'autorité, je vous demande de suspendre l'application de cette convention en vue de sa refonte totale en invitant la Société signataire à une réunion à cet effet ».

58.   Le 11 décembre 2008, le Conseil des Ministres a approuvé la Convention.[20]

59.   Le 16 décembre 2008, le Ministre des Transports a pris un arrêté « *portant agrément technique de manutention portuaire de la Société du Terminal à Conteneurs de Conakry-SA « S.T.C.C – SA » ».*[21]

60.   Le 17 décembre 2008, Getma International a envoyé une lettre au Ministre des Transports indiquant « qu'à la date du 17 décembre 2008, l'intégralité des conditions suspensives a[vait] été levée. »[22] Ces conditions concernaient (i) l'approbation du règlement et des consignes d'exploitation du TAC, (ii) l'obtention d'agréments de

---

[17] Document de synthèse (C-142).

[18] Lettre au Ministre des Transports en date du 24 novembre 2008 (C-128).

[19] Lettre du Secrétaire Général de la Présidence au Ministre des Transports en date du 4 décembre 2008 (C-143).

[20] Lettre du Ministre des Transports à NCT Necotrans en date du 22 décembre 2008 (C-145).

[21] Arrêté du Ministre des Transports du 16 décembre 2008 (C-123).

[22] Lettre de Getma International au Ministre des Transports en date du 17 décembre 2008 (C-129).

manutention et de consignation, (iii) la constitution de la société d'exploitation et (iv) la mise en place de garanties (article 39 de la Convention).

61.    A la même date, l'ensemble des sections syndicales des opérateurs du Port de Conakry ont communiqué au Premier Ministre guinéen un préavis de grève générale pour renforcer leur revendication d'annulation du contrat avec Getma International.[23]

62.    Le 22 décembre 2008, le Président Lansana Conté est décédé et, dès le lendemain, le capitaine Moussa Dadis Camara a pris le pouvoir.

63.    Le 22 décembre 2008, le Ministre des Transports a envoyé une lettre à NCT Necotrans (Président de Getma International) indiquant que le Conseil des Ministres avait instruit le Département des Transports de se réunir avec le PAC « afin de tenir compte de certaines remarques et suggestions formulées après la signature de la Convention ».[24] La lettre indiquait que le Ministre « souhaiter[ait] différer l'entrée en vigueur de la Convention ».

64.    Le 31 décembre 2008 et le 2 janvier 2009, le Conseil d'administration du PAC s'est réuni en session extraordinaire, sans l'intégralité de ses membres.[25] Après avoir noté des « manquements graves à la législation en vigueur » dans la conclusion de la Convention de concession, des « questions liées à la Capacité et la Qualité du Concessionnaire », des questions sur le régime fiscal applicable, et les « Conséquences sur la viabilité et l'avenir du Port de Conakry », le PAC a décidé de « l'annulation pure et simple de la convention ».

---

[23] Lettre au Premier Ministre du 17 décembre 2008 (R-28).

[24] Lettre du Ministre des Transports à NCT Necotrans en date du 22 décembre 2008 (C-145).

[25] Procès-verbal de la session extraordinaire du Conseil d'administration du PAC du 31 décembre 2008 et 2 janvier 2009 (C-146).

65.     Le 14 janvier 2009, le Président de la République a pris un décret « portant suspension de l'application de la convention relative à la construction du Terminal à conteneurs du Port Autonome de Conakry et toute procédure judiciaire y afférent ».[26]

66.     Une commission de réexamen de la Convention de concession, composée de six membres (principalement de l'administration des douanes), a été mise en place en janvier 2009 ; elle a émis un rapport non daté[27] constituant une réflexion sur la Convention de concession.[28] Le rapport émet des réserves sur la procédure d'adjudication et les capacités de Getma International, puis critique de nombreuses dispositions de la Convention de concession. Le rapport conclut en « demand[ant] urgemment au concédant de se prévaloir de l'article 37 de la convention pour obtenir la modification [de la Convention de concession]».

67.     Un document non signé, daté du 27 mars 2009, présenté par les Demanderesses comme émanant d'un des membres de la commission mentionnée au paragraphe précédent et adressé au Président de la Guinée, dresse la liste des « interrogations provoquées par les conclusions des membres de la commission », et met en cause certaines conclusions de la commission avant de conclure, au nom des membres de la commission, que « nous n'avons pas rempli la mission qui nous a été confiée ».[29]

68.     Le 9 avril 2009, le Président de la République a pris un décret « portant levée de suspension de l'application de la Convention relative à la construction du Terminal à conteneurs du port autonome de Conakry et de toutes les procédures judiciaires y afférent », toutefois « sous réserve de la préservation des intérêts de l'Etat et des actionnaires Guinéens initiaux».[30] [31]

_____

[26] Décret portant suspension de la Convention de concession (C-149).

[27] Mais que la Défenderesse dit avoir été rendu le 26 mars 2009 (Contre-mémoire sur le fond § 56).

[28] Document de réflexion (C-150).

[29] Document listant des interrogations (C-153).

[30] Décret de levée de suspension de la Convention de concession en date du 9 avril 2009 (C-154).

[31] Selon la pièce (C-155), Extrait du Journal Officiel de la République de Guinée, ce décret aurait été publié au Journal Officiel des 10 et 25 mars 2009.

69.  Le 27 avril 2009, le Directeur-Général du PAC a envoyé (i) une lettre à l'administrateur de STCC lui « demand[ant] de prendre toutes les dispositions nécessaires pour le démarrage effectif de [ses] activités sur le [TAC] »[32] et (ii) une lettre à l'administrateur du Conakry Terminal Services pour l'inviter à « prendre les dispositions nécessaires pour mise à disposition des lieux à la STCC ».[33]

70.  Le 30 avril 2009 un Procès-verbal de mise à disposition des terrains, ouvrages et équipements a été signé entre le PAC et la STCC.[34]

71.  Le 19 mai 2009, le Ministre Secrétaire Général de la Présidence a envoyé une lettre à Getma International indiquant qu' « en application de l'article 7 [de la Convention de concession] » l'Etat entendait « prendre part au capital de [STCC] en proportion de 25% ».[35] La lettre ajoutait « de façon claire et sans équivoque que la mise à disposition du [TAC] n'est à ce jour que partielle et provisoire excluant les activités d'exploitation opérationnelles ».

72.  Le 27 mai 2009, une réunion s'est tenue entre l'Etat et Getma International dans le bureau du Secrétaire Général à la Présidence de la République concernant

   –   la structure du capital de STCC et la participation de l'Etat,
   –   la mise en place du Comité de Suivi, et
   –   la mise à disposition effective du TAC.

73.  Lors de cette réunion, l'Etat s'est engagé « à respecter et à appliquer strictement l'article 26 [garantie exclusive d'exploitation et de jouissance] de la Convention de concession à compter du 1er juin 2009 ». Il était également convenu de négocier un avenant à la

---

[32] Lettre du DG du PAC à STCC en date du 27 avril 2009 (C-156).
[33] Lettre du DG du PAC à CTS en date du 27 avril 2009 (C-157).
[34] Procès-verbal en date du 30 avril 2009 (C-17 et C-176).
[35] Lettre du Secrétaire Général de la Présidence à Getma International en date du 19 mai 2009 (C-158).

Convention de concession pour prendre en compte l'ensemble des préoccupations respectives.[36]

74. Les Demanderesses indiquent que la mise à disposition effective, mais partielle, du TAC a eu lieu le 1er juin 2009.

75. Le 24 juillet 2009, le cabinet Bazie Koyo Assa a envoyé au Directeur-Général du PAC un avis juridique sur la Convention de concession et sa révision.[37]

76. Getma International a préparé un projet d'avenant à la Convention qui a été critiqué dans une lettre du 8 octobre 2009 du Directeur-Général du PAC au Ministre Secrétaire Général à la Présidence.[38] Dans la même lettre, le PAC annonçait son intention d'élaborer lui-même un projet d'avenant qui prendrait en compte les intérêts de l'Etat.

77. Les Parties ont négocié le projet d'avenant les 28 et 29 octobre 2009.[39]

78. Le 7 novembre 2009, la Défenderesse et Getma International ont conclu un « Avenant n°1 à la Convention de Mise en Concession du Terminal à conteneur du port de Conakry, son extension et l'aménagement d'un espace de la gare ferroviaire n°2008/001/CC en date du 22 septembre 2008 faisant suite au Procès-verbal de réunion du 27 mai 2008 » (ci-après « l'Avenant n°1 »).[40] L'objet principal de cet Avenant était de reporter la date effective de début de travaux au jour de la date de l'Avenant n°1, soit le 7 novembre 2009. L'Avenant prévoyait aussi que le solde du ticket d'entrée, soit 7.500.000 euros, serait payé en deux fois, la première échéance dans les 90 jours à compter de la date de l'Avenant et la deuxième dans les 180 jours.

79. Les Parties sont en désaccord sur l'étendue des travaux exécutés par les Demanderesses entre l'Avenant n°1 et le Décret de Résiliation, ainsi que sur l'impact sur l'exécution

---

[36] Procès-verbal de la réunion du 27 mai 2009 (C-159).
[37] Avis juridique de Bazie-Koyo-Assa en date du 24 juillet 2009 (C-160).
[38] Lettre du DG du PAC au Secrétaire Général de la Présidence en date du 8 octobre 209 (C-161).
[39] Feuilles de présence pour la réunion du 28 octobre 2009 (C-162 et C-163).
[40] Avenant n°1 (C-12).

des travaux de la mise à disposition du concessionnaire de la plateforme ferroviaire, laquelle selon les Demanderesses n'aurait eu lieu que le 23 mars 2010.

80.   Le 30 avril 2010, Getma International a envoyé un chèque de 3.750.000 euros au PAC[41], correspondant au troisième quart du ticket d'entrée.[42]

81.   Le 28 mai 2010, le PAC a signé une « quittance » confirmant la réception d'un virement opéré par Getma International pour un montant de 3.750.000 euros correspondant au dernier quart du ticket d'entrée. [43]

82.   Le 3 décembre 2010, la Cour suprême de Guinée a confirmé l'élection, en novembre 2010, du nouveau Président Alpha Condé.[44]

83.   Le 4 janvier 2011, le nouveau Ministre des Transports a envoyé une lettre à Getma International pour l'inviter à une réunion afin de « passer en revue la convention ».[45] La réunion s'est tenue le 14 janvier 2011. Les Parties sont en désaccord sur l'objet même de la réunion et sur le fait de savoir si la discussion des aspects financiers du projet était à l'ordre du jour. Les représentants du PAC ont quitté la réunion lorsque ceux de Getma International ont indiqué ne pas être en mesure de discuter des questions financières.[46]

84.   Un des témoins des Demanderesses, M. Wiltzer, a déclaré qu'une réunion s'est tenue le 21 janvier 2011 entre lui (représentant les Demanderesses) et le Président Condé, qui a ensuite délégué à M. Curtis le soin de continuer la discussion sur la Convention de

---

[41] Voir Mem.p.45, note n°202 expliquant pourquoi la deuxième moitié du ticket d'entrée, payable en deux tranches, a été payé au PAC et non au Ministère des finances comme prévu par la Convention.

[42] Chèque n°875 du 30 avril 2010 (C-165) et sa quittance du 3 mai 2010 (C-167).

[43] Virement de 3.750.000 euros du 28 mai 2010 (C-166).

[44] Article du journal Le Monde du 3 décembre 2010 (C-71).

[45] Lettre du Ministre des Transports à Getma International en date du 4 janvier 2011 (C-181).

[46] Attestation de M. Sory Camara produite dans l'arbitrage CCJA, 22 mars 2013 (R-31).

concession.[47] Selon le témoin[48], M. Condé avait le visage « fermé » et « n'a[vait] pas envie d'aborder le sujet » et la discussion avec M. Curtis n'avait donné aucun résultat.

85.   Le 25 janvier 2011, la Direction nationale de la marine marchande a informé Getma International qu'elle avait noté « avec beaucoup de satisfaction la qualité de la présentation des travaux réalisés et ceux qui sont programmés » et lui a demandé un chronogramme d'exécution de la phase 2 des travaux.[49]

86.   Le 1er février 2011, le Directeur des Services Techniques (probablement du PAC) a rendu un « Avis technique 09/02/2011 sur la Convention de concession ».[50] Le document indique que « [s]i l'acquisition des équipements a permis à Getma International de charger et décharger les conteneurs convenablement au Port de Conakry au cours du présent exercice, l'aspect des travaux à réaliser à [sic] subit [sic] par contre un retard dans le projet ». Le document conclut qu' « il est nécessaire de résilier la Convention de Concession et de confier la paternité du dossier au [PAC] ».[51]

87.   Le 8 février 2011, le Comité d'Audit du PAC s'est réuni avec pour objet l'examen de la Convention de concession. Il note que « l'une des faiblesses majeures » de la Convention de concession est qu'elle « ignore purement et simplement le rôle principal sinon cardinal du PAC » et « décide d'agir » notamment par la constitution d'un dossier technique pour « révision de la Convention et sa renégociation en ressortant le rôle central du PAC » ou par la « résiliation avec instruction du PAC de trouver un autre partenaire ». [52]

88.   Le 11 février 2011, le Conseil d'administration du PAC s'est réuni en session extraordinaire dont le Procès-verbal indique en titre « Dénonciation de la convention de

---

[47] Attestation Pierre-André Wiltzer (C-185 et C-186).

[48] La Défenderesse a renoncé à contre-interroger le témoin.

[49] Lettre du Directeur national de la marine marchande (Ministère des Transports) à Getma International en date du 25 janvier 2011 (C-18).

[50] Avis technique en date du 9 février 2011 (C-175).

[51] Avis technique en date du 9 février 2011 (C-175).

[52] Procès-verbal du Comité d'audit en date du 8 février 2011 (C-195).

concession du Terminal à conteneur ».[53] Le document contient des critiques sur les aspects juridique, technique, financier et d'exploitation de la Convention de concession et « sollicite des plus hautes autorités du Pays [s]a résiliation pure et simple ». Le même jour, le Président du Conseil d'administration du PAC a informé le Ministre d'Etat de la recommandation du conseil que la Convention de concession du 22 septembre 2008 soit résiliée.[54]

89.   Le 8 mars 2011, le Président de la République de Guinée a pris le décret D/2011 071 par lequel la Convention de concession et l'Avenant n°1 étaient « résiliés pour manquement aux obligations du Cessionnaire [...] avec effet immédiat et sans indemnités, aux frais, risques et torts des Sociétés [sic] GETMA International SAS » (ci-après le « Décret de résiliation »).[55]

90.   Le 9 mars 2011, le Président de la République de Guinée a pris le décret D/2011 074 « portant réquisition des personnels, installations, immeubles et actifs sur le territoire de la république de Guinée des sociétés Getma International SAS et de la société du Terminal à Conteneurs de Conakry » pour une durée de 60 jours (ci-après le « Décret de réquisition »).[56]

91.   Egalement le 9 mars 2011, Getma International et STCC ont fait dresser un Procès-verbal d'huissier dans lequel elles déclaraient que la police avait « débarqué » le 8 mars 2011 devant leurs bureaux et leur avait « intimé d'évacuer les bureaux et de les fermer en leur interdisant les rouvrir ». Le Procès-verbal confirme le constat sur place par huissier de « la fermeture effective des portes d'accès aux différents bureaux de la requérante ».[57]

---

[53] Session extraordinaire du Conseil d'administration du PAC du 11 février 2011, (C-196); Procès-verbal de la session extraordinaire du Conseil d'administration du PAC du 11 février 2011 (C-197).
[54] Lettre du Président du Conseil d'administration du PAC au Ministre de l'Etat en date du 11 février 2011 (C-198).
[55] Décret de résiliation (C-19).
[56] Décret de réquisition (C-21).
[57] Procès-verbal de constat du 8 mars 2011 (C-23).

92.   Toujours le 9 mars 2011, Getma International a envoyé au Ministre des Transports une lettre ayant pour objet « Notification Préliminaire de Changement de Loi » dans laquelle elle indiquait que la résiliation constituait « un Changement de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées au sens de l'article 32.5, 1$^{er}$ alinéa de la Convention de Concession ». La lettre indiquait également que cette notification faisait courir un délai de 60 jours pour remédier à ses conséquences et demandait, au cas où ce délai ne serait pas respecté, le paiement des indemnités prévues à l'article 32.3 de la Convention de concession, sans préjudice de l'indemnisation intégrale du préjudice.[58]

93.   Le 10 mars 2011, le PAC a signé une Convention d'assistance technique avec SDV Guinée, une société anonyme de droit guinéen, ayant une durée de 21 jours et pour objet la gestion des activités de manutention du Terminal à conteneurs de Conakry.[59] Les Demanderesses soutiennent que cette convention n'a pas fait l'objet d'un appel d'offres.

94.   Le 11 mars 2011, le PAC a signé avec la société Bolloré une « Convention de concession du Terminal à conteneurs, de son extension et l'aménagement conventionnel au port de Conakry d'une plate-forme de stockage et d'un port sec à Kagbelen ».[60] Les Demanderesses soutiennent que cette convention n'a pas fait l'objet d'un appel d'offres. La société Bolloré, concurrent de Necotrans, avait également soumis une offre pour la concession en 2008, offre qui avait été classée deuxième.

95.   En mars 2011, la société INECOR a rendu un Audit de la Convention de concession du Terminal à conteneurs de Conakry, audit comparant la nouvelle convention conclue avec la société Bolloré et celle de 2008 conclue avec les Demanderesses.[61] Au sujet de la convention de Bolloré, le rapport note qu'« il n'existe dans aucun port africain ou européen une exclusivité totale accordée à un même opérateur privé sur toutes les

---

[58] Lettre de Getma International au Ministre des Transports en date du 9 mars 2011 (C-25).
[59] Convention d'assistance technique (C-204).
[60] Convention de concession entre le PAC et la société Bolloré (C-205).
[61] Audit de la société INECOR de mars 2011 (C-207).

opérations portuaires de tous les types de fret […] et couvrant toute l'étendue du port ». Il conclut que, « [d]u fait de son délai de négociation insuffisant, la convention de concession avantage excessivement le concessionnaire privé au détriment des intérêts de la Guinée » et recommande plusieurs modifications.

96.    Le 22 mars 2011, Getma International a notifié par huissier au Ministre d'Etat chargé des Travaux Publics et des Transports une protestation à l'encontre des mesures relatives à la résiliation et la réquisition, ainsi qu'une mise en demeure de minimiser les effets du Changement de Loi et des Actes de la Puissance Publique ayant entravé le bon fonctionnement des Activités Concédées et de verser les indemnisations prévues par la Convention de concession.[62]

97.    Le 26 avril 2011, un avenant à la convention mentionné au paragraphe 94 a été signé entre le PAC et la société Conakry Terminal (qui avait remplacé la société Bolloré) [63] « afin d'[…] exclure les activités de manutention du Fret Conventionnel ainsi que les obligations du Concessionnaire tenant aux dites activités et au Terminal Conventionnel ».

98.    Le 4 mai 2011, Getma International a envoyé au Ministre des Transports une lettre de « vives protestations » concernant le Décret de résiliation et le Décret de réquisition. Un « mémoire sommaire » y était annexé, relatant l'historique de la Convention de concession et les demandes d'indemnisation.[64]

99.    Le 10 mai 2011, Getma International a déposé une demande d'arbitrage auprès de la CCJA sur la base de la clause d'arbitrage contenue dans la Convention de concession.[65]

100.    Le 30 juin 2011, le Ministre d'Etat en charge des Travaux publics et des Transports a envoyé à Getma International une lettre accompagnant le Décret D/2011 187 du 22 juin

---

[62] Signification d'huissier en date 22 mars 2011 (C-24).
[63] Avenant n°1 entre le PAC et la société Conakry Terminal en date du 26 avril 2011 (C-209).
[64] Lettre de Getma International au Ministre des Transports en date du 4 mai 2011 (C-27).
[65] Sentence CCJA du 26 mai 2014 (C-50).

2011 « Portant Levée de la Réquisition des Personnels, Installations, Immeubles et Actifs sur le Territoire de la République de Guinée, des Sociétés Getma International SAS et de la Société du Terminal à Conteneurs de Conakry », levée qui avait été décidée le 9 mars 2011 par le Décret D/2011 074. La lettre invitait Getma International « à venir reprendre l'ensemble de [ses] biens meubles, immeubles … dont disposait [STCC] ». [66]

101.   Le 29 avril 2014, le Tribunal CCJA a rendu sa sentence. Il a « dit irrégulière la résiliation [de la Convention de concession] » et a condamné la Défenderesse à payer les montants suivants :

– une indemnité forfaitaire de résiliation de 20.884.966 euros,

– une indemnité de résiliation relative aux biens concédés de 3.234.995 euros,

– le montant non amorti du Ticket d'entrée de 14.201.096 euros, et

– une indemnité relative aux stocks non restitués de 210.070 euros. [67]

102.   Cette sentence a été annulée le 30 novembre 2015, soit après l'audience de témoins tenue par ce Tribunal arbitral du 23 au 25 novembre 2015, à la Cour Commune de Justice et d'Arbitrage de l'OHADA, au « motif que le tribunal arbitral ne s'est pas conformé à sa mission en ignorant délibérément les dispositions impératives du règlement d'arbitrage, qui interdisent les accords entre parties et arbitres sur le montant de leurs honoraires ». Les Demanderesses ont communiqué au Secrétariat de ce Tribunal arbitral une copie de l'arrêt d'annulation par courrier du 21 décembre 2015.

*****

103.   Après le rappel des demandes des Parties (chapitre IV), le présent Tribunal arbitral étudiera successivement sa compétence et la recevabilité des demandes (chapitre V), la responsabilité (chapitre VI) et la réparation du préjudice (chapitre VII). Dans chaque chapitre, il résumera d'abord les positions respectives des Parties telles qu'elles ont été présentées dans leurs mémoires successifs, à savoir le Mémoire en Demande, le Contre-

---

[66] Lettre du Ministre d'Etat en charge de travaux publics et des transports à Getma International en date du 30 janvier 2011 (C-26).

[67] Sentence CCJA du 26 mai 2014 (C-50).

Mémoire, le Mémoire en Réplique, le Mémoire en Duplique ainsi que les Mémoires après-audience. Le Tribunal arbitral précise que la partie décisionnelle de chacun de ces chapitres prend en considération tous les arguments invoqués par les Parties dans leurs soumissions écrites et orales, y compris ceux qui ne sont pas mentionnés explicitement dans la description des positions des Parties précédant les observations du Tribunal arbitral.

## IV. DEMANDES DES PARTIES

### A. *Demanderesses*

104. Dans leur demande d'arbitrage du 29 septembre 2011, les Demanderesses sollicitaient de ce Tribunal (en se réservant le droit de modifier leurs demandes) ce qui suit :

   a) *Déclarer que l'Etat de Guinée a enfreint sa législation d'investissement et/ou le droit international, et en particulier, qu'il a exproprié, de manière discriminatoire, l'investissement des Demanderesses, sans une prompte, juste et adéquate indemnisation, en violation des articles 5, 6 et 7 du Code des Investissements et/ou en violation du droit international coutumier ;*

   b) *Ordonner à la Guinée d'indemniser la partie Demanderesse en raison de la violation de sa législation d'investissements et/ou du droit international d'un montant à déterminer au moment approprié de cette procédure, en monnaie librement convertible acceptée par les Demanderesses, plus les intérêts versés à un taux commercialement raisonnable pour la monnaie en question depuis la date de l'expropriation jusqu'à ce que le paiement intégral du montant soit réalisé ;*

   c) *Attribuer toute autre compensation que le Tribunal considère appropriée, et*

   d) *Ordonner à l'Etat de Guinée de payer tous les coûts de la présente procédure arbitrale, y compris, sans limitation, les honoraires et dépenses du Tribunal, les honoraires et frais du CIRDI, les honoraires et frais relatifs à la représentation juridique de la partie Demanderesse, et les frais et honoraires de tout expert désigné par la Demanderesse ou le Tribunal, majoré des intérêts dus.*

105. Le Mémoire en Demande invitait ce Tribunal arbitral à

   *À titre principal:*
   - *Dire que la Guinée a, au moyen des Décrets de résiliation et de réquisition, violé l'article 5 du Code des Investissements;*

- *Dire que la Guinée a, au moyen des Décrets de résiliation et de réquisition, violé l'article 6(1) du Code des Investissements;*

*Ou, à titre subsidiaire:*

- *Dire que la Guinée a, au moyen des Décrets de résiliation et de réquisition, violé le standard minimum de traitement qu'elle était tenue d'accorder aux Demanderesses en vertu du droit international coutumier.*

*Et en conséquence, de:*
- *Condamner la Guinée à payer aux Demanderesses la somme de **103.031.250 euros**, correspondant à la valeur nette des flux de trésorerie actualisés pour la période de Concession dont les Demanderesses ont été privées du fait de leur expropriation ;*
- *Condamner la Guinée à payer aux Demanderesses la somme de **1.950.996 euros**, correspondant aux préjudices découlant de la Réquisition ;*
- *Condamner la Guinée à payer aux Demanderesses la somme de **1.058.502 euros**, correspondant aux préjudices supplémentaires découlant du Décret de résiliation ;*
- *Ordonner le paiement d'intérêts aux Demanderesses au taux de 8,7%, capitalisés annuellement, sur les sommes indiquées ci-dessus à compter du 8 mars 2011 jusqu'au jour de leur paiement ;*
- *Condamner la Guinée à payer aux Demanderesses la somme de **1.000.000 euros** au titre de leur préjudice moral ;*
- *Accorder toute autre indemnisation que le Tribunal considère appropriée ;*
- *Effectuer la compensation entre toute somme octroyée aux Demanderesses au titre de la présente procédure arbitrale et toute somme effectivement et définitivement payée par la Guinée pour les mêmes préjudices au titre de l'arbitrage CCJA au jour de la sentence arbitrale ; et*
- *Laisser à la charge de la Guinée l'ensemble des frais, dépens et honoraires notamment d'avocats et experts, relatifs à la présente procédure arbitrale, y compris ceux portés par les Demanderesses.*

106. Certaines de ces demandes ont été adaptées dans la Réplique:[68]

*À titre principal:*
- *Dire que la Guinée a, au moyen des Décrets de résiliation et de réquisition, violé l'article 5 du Code des Investissements ;*
- *Dire que la Guinée a, au moyen des Décrets de résiliation et de réquisition, violé l'article 6(1) du Code des Investissements ;*

*Ou, à titre subsidiaire:*

---

[68] Les différences par rapport au Mémoire en Demande sont mises en gras.

- *Dire que la Guinée a, au moyen des Décrets de résiliation et de réquisition, violé le standard minimum de traitement qu'elle était tenue d'accorder aux Demanderesses en vertu du droit international coutumier.*

*Et en conséquence, de:*
- *Condamner la Guinée à payer aux Demanderesses la somme de **108.428.125 euros**, correspondant à la valeur nette des flux de trésorerie actualisés pour la période de Concession dont les Demanderesses ont été privées du fait de leur expropriation ;*
- *Condamner la Guinée à payer aux Demanderesses la somme de 1.950.996 euros, correspondant aux préjudices découlant de la Réquisition ;*
- *Condamner la Guinée à payer aux Demanderesses la somme de 1.058.502 euros, correspondant aux préjudices supplémentaires découlant du Décret de résiliation ;*
- *Ordonner le paiement d'intérêts aux Demanderesses au taux de 8,7%, capitalisés annuellement, sur les sommes indiquées ci-dessus à compter du 8 mars 2011 jusqu'au jour de leur paiement, **soit 160.087.489 euros au 10 juillet 2015, sans préjudice des intérêts ultérieurs** ;*
- *Condamner la Guinée à payer aux Demanderesses la somme de **1.000.000 euros** au titre de leur préjudice moral, **qui portera intérêts au taux indiqué ci-dessus à partir du 8 mars 2011** ; et*
- *Accorder toute autre indemnisation que le Tribunal considère appropriée ;*
- ***Dire que toute somme effectivement et définitivement payée par la Guinée pour les mêmes préjudices au titre de l'arbitrage CCJA et par le groupe Bolloré au titre de la procédure contre le groupe Necotrans devant les tribunaux étatiques français s'imputera sur les sommes allouées par ce Tribunal ;** et*
- *Laisser à la charge de la Guinée l'ensemble des frais, dépens et honoraires notamment d'avocats et experts, relatifs à la présente.*

107. Le Mémoire après Audience contient, le calcul adapté des intérêts mis à part, surtout des modifications de forme. Etant entendu que ce Tribunal arbitral devra statuer sur ces demandes, elles sont également reprises ci-après littéralement:

*Dire que la Défenderesse a, au moyen des Décrets de résiliation et de réquisition,*

*À titre principal :*
*i.   Violé l'art. 5 du Code des Investissements de la République de Guinée ;*
*ii   Violé l'art. 6(1) du Code des Investissements de la République de Guinée ;*

*Ou, à titre subsidiaire :*
*iii. Violé le standard minimum de traitement qu'elle était tenue d'accorder aux Demanderesses en vertu du droit international coutumier.*

*Et en conséquence, de :*
*i.   Condamner la Défenderesse à payer aux Demanderesses :*

27

(i) *La somme de **108.428.125 euros**, correspondant à la valeur nette des flux de trésorerie actualisés pour la période de Concession dont les Demanderesses ont été privées du fait de leur expropriation ;*

(ii) *La somme de **1.950.996 euros**, correspondant aux préjudices découlant de la Réquisition ;*

(iii) *La somme de **1.058.502 euros**, correspondant aux préjudices supplémentaires découlant du Décret de résiliation ;*

(iv) *La somme de **1.000.000 euros** au titre du préjudice moral des Demanderesses ;*

(v) *Les intérêts au taux de 8,7%, capitalisés annuellement, sur les sommes indiquées ci-dessus à compter du 8 mars 2011 jusqu'au jour de leur paiement effectif et intégral soit **56.950.551 euros** d'intérêts arrêtés au 3 février 2016, sans préjudice des intérêts ultérieurs ;*

ii. *Accorder aux Demanderesses toute autre indemnisation que le Tribunal considèrerait appropriée ;*

iii. *Dire que toute somme effectivement et définitivement payée par la Défenderesse pour les mêmes préjudices au titre de l'arbitrage CCJA ou par le groupe Bolloré au titre de la procédure contre le groupe Necotrans devant les tribunaux étatiques français s'imputera sur les sommes allouées par ce Tribunal ; et*

iv. *Laisser à la charge de la Défenderesse l'ensemble des frais, dépens et honoraires notamment d'avocats et experts, relatifs à la présente procédure arbitrale, y compris ceux supportés par les Demanderesses.*

## B.  *Défenderesse*

108.   Le Contre-Mémoire demandait au Tribunal arbitral de :

1. *À titre principal :*
   – *se déclarer incompétent pour statuer sur l'intégralité des demandes des Demanderesses.*
2. *À titre subsidiaire :*
   – *déclarer irrecevable l'intégralité des demandes des Demanderesses.*
3. *À titre infiniment subsidiaire :*
   – *rejeter l'intégralité des demandes des Demanderesses.*
4. *En tout état de cause :*
   – *Condamner les Demanderesses à payer l'intégralité des frais d'arbitrage en ce compris les frais et honoraires exposés par la Défenderesse pour les besoins de sa défense dans le cadre du présent arbitrage, dont le montant sera déterminé à la fin de la procédure.*

109.   Ces demandes n'ont pas été modifiées dans les mémoires postérieurs de la Défenderesse.

## V.  LA COMPETENCE ET LA RECEVABILITE DES DEMANDES

### A.  *Position de la Défenderesse*

**(1) Le Tribunal est incompétent *ratione materiae* du fait de l'illégalité de l'investissement et des actes de corruption**

110.   La Défenderesse rappelle d'abord une lignée de jurisprudence arbitrale établissant que le système CIRDI ne peut protéger que les investissements légaux et réalisés de bonne foi, et non pas ceux obtenus par fraude.[69] Les décisions citées en ce sens sont celles des affaires *Phoenix Action c. République Tchèque*[70], *Inceysa c. République du Salvador*[71], *Fraport c. Philippes*[72], et *Metal-Tech c. Ouzbékistan.*[73]

111.   Appliquant ce principe, la Défenderesse soutient que le Tribunal doit se déclarer incompétent car (i) le Code des investissements précise qu'il ne s'applique qu'aux investissements réalisés dans le respect des lois et règlements de la Guinée et (ii) la corruption passive, la corruption active et le trafic d'influence sont interdits par le Code pénal guinéen.[74]

112.   La Défenderesse soutient qu'il existe des preuves et indices suffisants pour considérer que la Convention de concession a été obtenue en violation du droit guinéen. Ainsi, la Convention aurait été attribuée aux Demanderesses de manière illégale par fraude dans le dossier de candidature et par corruption, en violation du droit guinéen tant au plan pénal (art. 191 à 195 pour le délit de corruption et art. 430 pour le délit d'escroquerie) que sur le plan civil (art. 649 et suivants du Code civil pour les manœuvres dolosives).[75] Dans ces conditions, la Défenderesse prétend que « l'investissement des Demanderesses

---

[69] C-Mem. §§ 215-229.

[70] *Phoenix Action Ltd c. République Tchèque*, CIRDI ARB/06/5, Sentence, 15 avril 2009 (R-47).

[71] *Inceysa Vallisoletana S.L. c. République du Salvador*, CIRDI ARB/03/26, Sentence, 2 août 2006 (R-51).

[72] *Fraport AG Frankfurt Airport Services Worldwide c. République des Philippines*, CIRDI ARB/03/25, Sentence, 16 août 2007 (R-52).

[73] *Metal-Tech Ltd c. République d'Ouzbékistan*, CIRDI ARB/10/3, Sentence, 4 octobre 2013 (R-54).

[74] C-Mem. §§ 235-244.

[75] Dupl. §§ 217-224.

a été réalisé en violation des lois de la République de Guinée, et par ailleurs plus largement de l'Ordre Public International »[76], entraînant la violation de l'article 2.1 du Code des investissements qui énonce que les investissements doivent être réalisés « dans le respect des lois et règlements de la République ».[77] Il ne saurait alors constituer un 'investissement' protégé au sens du Code des investissements.[78] Le Tribunal devrait donc, selon la Défenderesse, se déclarer incompétent *ratione materiae* ou subsidiairement déclarer que l'illégalité de l'investissement résultant des actes de corruption allégués entraîne l'irrecevabilité des demandes des Demanderesses (ou le rejet des demandes à titre infiniment subsidiaire).[79]

113. En outre, dans sa Duplique, la Défenderesse réfute l'argument des Demanderesses selon lequel les accusations de corruption seraient soumises à un degré de preuve plus élevé. En réponse aux sentences citées par les Demanderesses, elle fait référence à *Metal-Tech c. Ouzbékistan*[80], *Tokios Tokelès c. Ukraine*[81], *Libananco Holdings c. Turquie*[82], et *Rompetrol c. Roumanie*[83], afin de démontrer qu'il n'existe pas de position unanime exigeant un standard de preuve plus strict et surtout d'établir que plusieurs tribunaux ont fait application du standard de preuve ordinaire et ont admis de façon large les éléments de preuve de corruption.[84] La Défenderesse se fonde en outre sur plusieurs commentaires doctrinaux et décisions pour conclure que la corruption peut être prouvée par preuves indirectes ou indices, dans la mesure où la corruption se caractérise par le secret et la faible disponibilité des preuves et qu'elle est souvent difficile à établir.[85]

---

[76] C-Mem. §§ 240-241.

[77] Dupl. §§ 217-220, 226.

[78] C-Mem. §§ 240-241.

[79] C-Mem. §§ 245-254; Dupl. §§ 225-240.

[80] *Metal-Tech Ltd c. République d'Ouzbékistan*, CIRDI ARB/10/3, Sentence, 4 octobre 2013 (R-54).

[81] *Tokios Tokelès c. Ukraine*, CIRDI ARB/02/18, Sentence, 26 juillet 2007 (R-109).

[82] *Libananco Holdings Co. c. République de Turquie*, CIRDI ARB/06/8, Sentence, 2 septembre 2011 (R-111).

[83] *The Rompetrol Group N.V. c. Roumanie*, CIRDI ARB/06/3, Sentence, 6 mai 2013 (R-112).

[84] Dupl. §§ 56-67.

[85] Dupl. §§ 68-81 faisant référence notamment à l'*Affaire du Détroit de Corfou* (fond), CIJ, arrêt du 9 avril 1949 (R-117); *Rumeli Telekom A.S. c. République du Kazakhstan*, CIRDI ARB/05/16, Sentence, 29 Juillet 2008 (C-270).

114. La Défenderesse soutient en outre qu'elle invoque tant des éléments de preuve indirectes que directes au soutien de ses allégations de corruption. Comme preuves directes, elle soumet trois attestations de témoins :[86]

- L'attestation de Steven Fox de la société Veracity concernant (i) 1 million USD versés au Ministre des Transport de l'époque, signataire de la Convention de concession, (ii) 200.000 USD versés au Ministre des Finances de l'époque, signataire de la Convention de concession, (iii) 100.000 USD versés à différents membres (chacun) de la Commission nationale d'évaluation des offres, à savoir M. Ansoumane Camara, M. Demba Kourouma, M. Ibrahima Lamizana Condé, M. Saifoulaye Barry, M. Mohamed Fofana et M. Mamadou Diallo. En réponse aux critiques des Demanderesses, la Défenderesse soutient que, même si M. Fox n'était pas un témoin direct des faits, il est un professionnel de la lutte anti-corruption en Guinée depuis 2005 et que son enquête était basée sur un accès privilégié à des sources d'information – confidentielles, certes – mais fiables, directes et sans intérêt personnel. La Défenderesse indique en outre que les inexactitudes mineures soulignées par les Demanderesses (comme les montants effectivement distribués en bout de chaîne et une erreur de nom) sont sans pertinence ou explicables.[87]

- L'attestation de M. Demba Kourouma concernant la somme de 35.000 euros reçue après la signature de la Convention de concession de M. Mamadou Diallo, cadre du Ministère des Transports et membre de la Commission d'évaluation des offres, de la part de Getma International.

- L'attestation de M. Ibrahima Lamizana Condé concernant la somme de 20.000 euros reçue au cours des négociations de la Convention de concession de M. Mamadou Diallo de la part de Getma International.

---

[86] C-Mem. §§ 83-97.
[87] Dupl. §§ 85-94.

115. En ce qui concerne les deux dernières attestations, que la Défenderesse n'a pas été autorisée à produire dans l'arbitrage CCJA, la Défenderesse estime (i) que les différences entre les montants cités dans celles-ci et ceux mentionnés par M. Fox peuvent s'expliquer par une utilisation intermédiaire dans la chaîne de corruption comme vu ci-dessus, (ii) que le lien entre M. Diallo, qui remettait les fonds, et Getma International est établi car il était en contact direct avec deux représentants de Getma International, et (iii) que l'absence de sanction contre ces fonctionnaires ne permet pas de contredire la véracité des faits qu'ils rapportent dans leurs attestations.[88]

116. En ce qui concerne les éléments de preuve indirecte, la Défenderesse se base sur un « faisceau d'indices » pour confirmer l'existence de la corruption, à savoir :

   a. le caractère « endémique » de la corruption en Guinée[89],

   b. la passivité « coupable » des membres de la Commission qui n'ont pas, selon la Défenderesse, relevé les faiblesses de l'offre des Demanderesses, à savoir:

      - les mensonges des Demanderesses sur leur expérience réelle en matière de conception, financement et exploitation de terminaux à conteneurs, car elles se sont attribué comme références les projets du groupe MSC, deuxième armateur mondial, avec lequel les Demanderesses prétendent avoir conclu un partenariat.[90] Dans sa Duplique, la Défenderesse soutient que l'Accord de Partenariat Technique du 6 mars 2008 présenté par les Demanderesses comme preuve des liens commerciaux étroits entre elles et MSC n'avait été conclu que dans le but de répondre à l'appel d'offres et prenait fin à la signature de la Convention de concession.[91] La Défenderesse souligne aussi que Getma International était seule à répondre à l'appel à manifestation d'intérêt, à l'exclusion de son « partenaire conjoint et solidaire » (ce qui impliquait, selon

---

[88] Dupl. §§ 94-104.
[89] C-Mem. §§ 101-105; Dupl. §§107-108.
[90] C-Mem §§ 107-123.
[91] Dupl. §§ 109-112.

le Règlement de la Consultation, qu'elle ne pouvait pas non plus déposer une offre conjointe avec son partenaire) et note que M. Quérel a donné des explications contradictoires à l'absence de soumission conjointe.[92] La Défenderesse soutient de plus que MSC n'a pas eu le moindre rôle dans l'exécution de la Convention de concession, contrairement à l'exécution conjointe que le dossier de candidature de Getma International présentait comme un atout (technique et financier). [93] La Défenderesse conclut sur ce point à une fausse coopération entre le groupe Nécotrans et MSC en relevant (i) qu'une analyse précise du prétendu contrat de partenariat technique révèle qu'en réalité il n'avait été conclu que pour soutenir l'offre des Demanderesses et qu'il ne contenait aucun engagement de MSC pour l'exécution puisque l'accord portait uniquement sur la période de l'appel d'offres et expirait à la fin de celle-ci, (ii) l'absence totale d'intervention de MSC dans l'exécution de la concession, MSC et Nécotrans n'ayant en fait eu que des rapports commerciaux limités en 2005 et 2006, et (iii) la simple participation au capital de Getma International qui ne fait pas de MSC un partenaire pour l'exécution de la Convention de concession, participation qui a fini par être cédée par MSC.[94]

- l'absence d'une attestation de capacité financière qui était une condition même de recevabilité de l'offre et, en tout état de cause, un critère essentiel pour évaluer le dossier; les Demanderesses ont à la place présenté des documents décrivant les bonnes relations entretenues avec leurs banques mais non leurs capacités financières réelles ou d'emprunt.[95]

- de fausses informations financières dans leur *business plan*, surévaluant ainsi la rentabilité du projet et les redevances qu'elles pourraient payer à la Guinée.[96]

---

[92] Dupl. §§ 113-120.
[93] Dupl. §§ 121-131.
[94] Dupl. §§ 132-158.
[95] C-Mem. §§ 124-138.
[96] C-Mem. §§ 139-144.

c. La défaillance de Getma International à réaliser les investissements prévus selon la Convention de concession, qui confirmerait que les Demanderesses n'avaient pas les capacités financières pour exécuter le contrat et que seule la corruption peut expliquer le fait qu'elles soient devenues adjudicataires.[97]

117. Cette question de la défaillance des Demanderesses à exécuter le contrat (en raison notamment de leur manque de capacité à se financer) est présentée autour de plusieurs points :

- Les délais d'exécution, même en prenant en compte le report par l'Avenant n°1, n'avaient pas été respectés au jour du Décret de résiliation.[98] Ainsi, la phase 2 du projet concernant le nouveau TAC représentait 97% du montant total des investissements et n'a fait l'objet d'aucun progrès par les Demanderesses.[99] Or, les investissements devaient être réalisés au cours des deux premières années de la concession.[100] Dans sa Duplique, la Défenderesse répond à l'argument des Demanderesses selon lequel les travaux ne pouvaient pas commencer avant la mise à disposition de la plateforme de stockage (intervenue le 23 mars 2010) ; elle indique (i) que l'Avenant n°1 disposait du nouveau point de computation des délais sans que la mise à disposition de la plateforme n'ait une influence, et (ii) que la mise à disposition de la plateforme n'était en tout état de cause pas nécessaire pour que les Demanderesses commencent leurs travaux principalement pour la construction du nouveau TAC.[101]

---

[97] C-Mem. §§ 145-214; Dupl. §§ 159-160.
[98] C-Mem. §§ 152-158.
[99] C-Mem. §§ 149-151.
[100] C-Mem. § 152; Dupl. §§ 161-166.
[101] Dupl. §§ 167-180.

- Le 14 janvier 2011, lors d'une réunion avec des représentants du Ministère des Transports et du PAC, Getma International n'a pas pu indiquer si elle était en mesure de financer les travaux.[102]

- La Défenderesse estime que les Demanderesses ont dissimulé leur incapacité financière pour faire face aux investissements nécessaires, par exemple lors de la négociation de l'Avenant n°1 et au cours de la période précédant la résiliation de la Convention de concession, et ont même menti à la Guinée en déclarant à plusieurs reprises qu'elles disposaient des financements nécessaires alors que cela n'était pas le cas.[103] Cette incapacité était cependant évidente. En particulier, le programme total des investissements représentait 92,7 millions d'euros, les Demanderesses avaient exécuté des travaux à hauteur de 15 millions et il restait donc 77,7 millions que les Demanderesses ne pouvaient ni apporter par leurs fonds propres, ni par un financement extérieur (soit par des conventions de crédit ou sur la base d'un financement de projet) dans les délais impartis pour exécuter la Convention.[104]

- La Défenderesse remet en question les sources de financement évoquées par les Demanderesses en indiquant qu'elles étaient purement spéculatives ou inaccessibles pour les Demanderesses. En réponse à l'attestation déposée par M. Grégory Quérel pour les Demanderesses, la Défenderesse souligne en outre ceci : (i) aucun financement dédié n'existait malgré les six demandes formulées par les Demanderesses, car les Demanderesses, trop endettées, ne pouvaient donner aucune garantie aux banques (Dupl. §§ 184-189) ; (ii) la convention de crédit avancée par les Demanderesses avait pour seul but de refinancer la dette du groupe Necotrans et ne pouvait être utilisée pour financer les investissements de Conakry comme le prévoit le Contrat (Dupl. §§ 190-195); (iii) la trésorerie et les lignes de crédit à court terme, outre le fait qu'il soit très inhabituel d'utiliser ce type de financement pour

---

[102] C-Mem. §§ 159-164. Le Tribunal arbitral note que les Demanderesses estiment que cette réunion était purement technique et n'était pas censée aborder les questions de financement] (Mem. §§ 301- 302).

[103] Dupl. §§ 205-216.

[104] C-Mem. §§ 171-213; Dupl §§ 161,165.

des investissements à long terme, étaient en réalité négatives à fin 2010, et tout flux de trésorerie futur était purement hypothétique (Dupl. §§ 196-200) ; (iv) de même et enfin, la participation d'actionnaires ou de partenaires tiers au financement de la concession, tels que MSC ou Maersk, était entièrement spéculative, le fait étant que MSC n'a jamais participé aux investissements et que la participation de Maersk était hypothétique (Dupl. §§ 201-204).

118.    La Défenderesse soutient que l'investissement de Getma International n'est pas seulement entaché de corruption, mais aussi de fraude à cause des fausses déclarations faites par Getma International sur des éléments essentiels de son offre, soit en fournissant des informations mensongères sur sa capacité technique et financière, en invoquant un prétendu partenariat avec le groupe MSC, et en fournissant une attestation de capacité financière fictive.[105] Selon la Défenderesse, le mensonge de Getma International concernant son partenariat avec MSC lui a permis tout d'abord de franchir le cap de la présélection sans disposer de l'expérience requise, comme l'a d'ailleurs reconnu M. Quérel pendant son interrogation.[106] La tromperie sur le prétendu partenariat s'est prolongée au stade de l'offre qui contenait les références de MSC et les états financiers d'Europe Terminal, qui ont laissé croire que Getma agissait en partenariat avec MSC, alors qu'ultérieurement l'inexistence de ce partenariat s'est traduite dans les faits par l'absence d'intervention de MSC dans l'exécution de la Convention de concession.[107] La conséquence de l'obtention frauduleuse de la concession a été la défaillance de Getma International à financer les investissements auxquels elle s'était contractuellement engagée.[108] Ces manœuvres frauduleuses sont contraires aux lois guinéennes relatives au dol, aux principes généraux relatifs aux commandes publiques et à l'obligation d'investir dans le respect des lois guinéennes.[109]

---

[105] Mem.AAR §§ 139-140.
[106] Mem.AAR §§ 144-163.
[107] Mem.AAR §§ 164-201.
[108] Mem.AAR §§ 215-235.
[109] C-Mem. §§ 242-244.

119. A titre subsidiaire, la Défenderesse demande que, si le Tribunal arbitral se déclarait compétent, il juge que les demandes sont irrecevables à cause de l'illégalité de l'investissement.[110]

120. Enfin, à titre infiniment subsidiaire, la Défenderesse demande au Tribunal arbitral de rejeter les demandes des Demanderesses, parce que le recours à des actes illicites pour obtenir la Convention justifie la résiliation anticipée sans indemnité de la Convention, à l'instar de ce qu'a fait le tribunal dans l'affaire *Azinian c. Mexique*, où les investisseurs se sont vu refuser l'indemnisation pour la résiliation d'une convention de concession qui avait été signée sur la base de fausses déclarations.[111]

**(2) Le Tribunal est incompétent pour statuer sur les effets de la résiliation, le gain manqué et les préjudices supplémentaires découlant du Décret de résiliation, du fait de la Décision sur la Compétence du 29 décembre 2012**

121. La Défenderesse considère en outre que le Tribunal est incompétent pour statuer sur les effets de la résiliation de la Convention de concession, en ce compris le gain manqué et les préjudices supplémentaires découlant du Décret de résiliation, du fait de l'application de la Décision du Tribunal arbitral sur la compétence du 29 décembre 2012.[112]

122. La Défenderesse soutient que le Tribunal arbitral a fait une distinction claire entre les effets de la résiliation de la Convention et les effets de la réquisition du matériel du chantier. Le Tribunal ne s'est déclaré compétent que pour les effets de la réquisition du matériel du chantier et les autres violations du Code, à l'exclusion des effets de la résiliation de la Convention de concession. Elle ajoute que le Tribunal CCJA était seul compétent pour statuer sur les effets de la résiliation de le Convention.[113]

---

[110] C-Mem. § 245-254; Dupl. §§ 230-233.

[111] Dupl. § 234 – 240 et en particulier *Robert Azinian, Kenneth Davitian, et Ellen BACA c. Etats-Unis du Mexique*, CIRDI ARB(AF)/97/2, Sentence, 1er novembre 1999 (R-133).

[112] Dupl. § 51; Mem.AAR §§ 19 et svts.

[113] C-Mem. §§ 258-262.

123. En conséquence, la Défenderesse estime que le Tribunal n'est pas compétent pour indemniser les Demanderesses sur :

- Le préjudice de gain manqué, qui ne découle que de la résiliation de la Convention de concession, car il correspond au bénéfice qu'aurait tiré une Partie si le contrat avait été exécuté jusqu'à son terme, établi à hauteur de 103.031.250 euros par les Demanderesses.[114]

- Les préjudices supplémentaires découlant de la résiliation de la Convention, comme l'ont reconnu à plusieurs reprises les Demanderesses, pour un montant évalué par elles à hauteur de 1.058.202 euros, concernant les frais de rapatriement du matériel réquisitionné, les frais de gestion de crise, et les salaires de deux personnes pendant une certaine période.[115]

124. Dans sa Duplique, la Défenderesse soutient que la distinction entre effets contractuels et extracontractuels de la résiliation, telle qu'argumentée par les Demanderesses, est une fiction et n'a jamais été opérée par le Tribunal dans la Décision sur la Compétence. Elle considère en outre qu'une telle distinction n'a pas de sens dans la présente affaire car les violations alléguées au Code des investissements résultant de la résiliation ont été contractualisées par l'article 32.5 de la Convention de concession.[116]

125. Elle soutient en outre que le gain manqué est une conséquence dommageable de la résiliation dont l'indemnisation est expressément prévue par l'article 32.5 qui renvoie aux indemnités de l'article 32.3, dont celles pour perte d'activité, et qui entre donc dans le cadre de l'accord et sort de la compétence du Tribunal. La Défenderesse ajoute enfin que « la question de savoir si les Demanderesses pouvaient solliciter une indemnisation du gain manqué pour un montant allant au-delà de celui de l'Indemnité Forfaitaire de

---

[114] C-Mem. §§ 263-273.
[115] C-Mem. §§ 274-290.
[116] Dupl. §§ 3-9, 37-41.

Résiliation est une question relative à l'application de l'article 32.5, qui relève de la compétence exclusive du Tribunal CCJA comme l'a souligné le Tribunal ».[117]

### (3) L'article 32.5 de la Convention de concession constitue un accord contraire, tel que reconnu par la Décision sur la Compétence, et la position des Demanderesses en ce qui concerne son inapplicabilité se heurte au principe de l'« *estoppel* »

126. Selon la Défenderesse, le Tribunal arbitral a déjà reconnu dans sa Décision sur la Compétence que l'article 32.5 de la Convention de concession constitue un accord contraire (au sens de l'article 28.2 du Code des investissements) à la compétence d'un tribunal CIRDI (au profit d'un tribunal arbitral CCJA) et que cette disposition concerne les conséquences d'une résiliation causée par un Acte de Puissance Publique (tel que défini par la Convention).[118] Dans sa Duplique, la Défenderesse réfute les allégations des Demanderesses sur la prétendue inapplicabilité d'un tel accord contraire en l'espèce, et précise que le Tribunal a nécessairement fait application de l'accord contraire contenu dans la Convention de concession en se déclarant incompétent pour se prononcer sur les effets de la résiliation.[119] Par conséquent, le Tribunal n'est pas compétent pour se prononcer sur une grande partie des demandes présentées de nouveau à ce stade par les Demanderesses.

127. En outre, dès la naissance du litige, les Demanderesses ont toujours soutenu que la résiliation de la Convention était fondée sur l'article 32.5 et qu'elle ouvrait le droit pour le concessionnaire aux indemnités prévues à l'article 32.3.[120] Par ailleurs, Getma International a adressé au Concédant les deux notifications visées par l'article 32.5 pour faire valoir la procédure de résiliation prévue par cet article. Les Demanderesses se sont fondées exclusivement sur cette même disposition dans l'arbitrage CCJA, affirmant que les indemnisations visées à l'article 32.3 étaient dues indépendamment de la question

---

[117] Dupl. §§ 42-52.
[118] C-Mem. §§ 293-300; Dupl. §§ 25-26.
[119] Dupl. §§ 10-19, 21.
[120] C-Mem. §§ 299-316; Dupl. §§ 22, 24.

de savoir si la résiliation était intervenue du fait du concédant[121]. Aussi leurs demandes ont toujours été basées sur l'art. 32.5, tant dans l'arbitrage CCJA[122] que dans le présent arbitrage[123] et ce n'est que dans leur Mémoire en Demande du 17 novembre 2014 que les Demanderesses, se basant sur un motif non-décisoire de la Décision sur la Compétence, ont avancé pour la première fois l'argument que le litige ne peut pas entrer dans le champ de l'article 32.5, ce que la Défenderesse considère comme un « cas flagrant d'*estoppel* » et empreint de mauvaise foi.[124]

128.  Ainsi, la Défenderesse soutient que le principe de *l'estoppel* empêche les Demanderesses de soutenir à ce stade que l'article 32.5 de la Convention de concession ne s'appliquerait pas. Une fois rappelée l'acceptation en droit international et en jurisprudence CIRDI du principe de *l'estoppel,* la Défenderesse soutient que les conditions de l'*estoppel* sont remplies : (i) les Demanderesses soutiennent une thèse qui est en contradiction avec la position qu'elles ont défendue devant le Tribunal CCJA, et (ii) ces thèses visent à apporter un bénéfice aux Demanderesses au détriment de la République de Guinée et à contourner l'accord des Parties sur le montant de l'indemnisation due au titre de la résiliation de la Convention.[125]

129.  La Défenderesse précise aussi que, dans la mesure où les Demanderesses n'ont jamais soutenu devant le Tribunal CCJA que l'article 32.5 ne pouvait être mis en œuvre qu'en cas de résiliation à l'initiative du concessionnaire (et non pas du Concédant) et qu'elles ont obtenu gain de cause sur ce point lors de l'arbitrage CCJA en recevant une indemnisation fondée sur cet article, il y a accord des Parties sur le fait que l'article 32.5 est applicable à une résiliation de la Convention de concession, même causée par le

---

[121] C-Mem. §§ 306-316; Dupl. §§ 22-23; Mem.AAR §§ 45-52.
[122] Mem.AAR §§ 53-54 et §§ 56-62.
[123] Mem.AAR § 55.
[124] Mem.AAR §§ 64-67.
[125] C-Mem. §§ 321-332.

Concédant. Cela conduit en outre à attribuer une compétence exclusive au Tribunal CCJA pour statuer sur les effets d'une telle résiliation.[126]

**(4) Renonciation et *res judicata***

130. La Défenderesse estime que les demandes relatives (i) au gain manqué (ii), aux préjudices causés par la réquisition et (iii) aux préjudices supplémentaires découlant du Décret de Résiliation, sont irrecevables car elles ont déjà été portées devant le Tribunal CCJA qui les a tranchées dans sa sentence du 29 avril 2014.[127]

131. La demande relative au préjudice « découlant [de] la perte des revenus futurs de la Concession » a été octroyée par le Tribunal CCJA pour un montant de 20.884.966 euros. Selon la Défenderesse, cette indemnité est « destinée à compenser la perte d'activité » telle que visée dans l'article 32.3 de la Convention de concession, « en d'autres termes, le gain manqué, et couvre la totalité de l'indemnité due en cas d'expropriation, les parties en ayant contractuellement limité le montant ».[128]

132. La Défenderesse précise en outre ceci :

- *La demande relative aux « frais de remise en état du matériel d'exploitation réquisitionné » a été soumise au Tribunal CCJA sous la qualification « frais de remise en état ». Considérant que Getma ne rapportait pas la preuve du lien de causalité entre les dommages constatés et la période de réquisition, le Tribunal CCJA a rejeté cette demande.*

- *La demande relative au « préjudice correspondant aux stocks non restitués » a été soumise au Tribunal CCJA sous la qualification « stocks ». Le Tribunal CCJA a accueilli cette demande.*

- *La demande relative au « préjudice relatif aux prestations terre effectuées avant la Réquisition mais non facturées » a été soumise au*

---

[126] C-Mem. § 317; Dupl. §§ 27-35.
[127] C-Mem. §§ 379-384.
[128] C-Mem. § 380.

*Tribunal CCJA sous la qualification d'« indemnité relative aux factures à émettre ». Le Tribunal a rejeté cette demande au motif que le préjudice n'était pas établi.*

- *La demande relative aux « frais de rapatriement du matériel d'exploitation réquisitionné » a été soumise au Tribunal CCJA sous la qualification « frais de rapatriement ». Considérant que ces frais étaient la conséquence de la résiliation et non de la réquisition, et qu'ils étaient dès lors compris dans l'indemnité de l'article 32.3 déjà octroyée à Getma, le Tribunal CCJA a rejeté cette demande.*

- *La demande relative aux « frais de gestion de crise » a été soumise au Tribunal CCJA sous la qualification d' « indemnité au titre des dépenses liées à la gestion de crise ». Considérant que ces frais étaient compris dans l'indemnité de l'article 32.3 déjà octroyée à Getma, le Tribunal CCJA a rejeté cette demande.*

- *La demande relative aux « salaires de deux salariés pendant la période de latence ayant suivi le Décret de résiliation » a été soumise au Tribunal CCJA sous la qualification d' « indemnité relative au personnel rapatrié ». Le Tribunal a rejeté cette demande au motif que le préjudice présentait un caractère trop indirect pour être indemnisable.*[129]

133. Par conséquent, le principe de *res judicata* justifierait, selon la Défenderesse, un rejet par ce Tribunal des réclamations portant sur le gain manqué ainsi que les préjudices supplémentaires issus aussi bien de la résiliation que de la réquisition.

134. La Défenderesse rappelle le débat concernant les conditions juridiques de l'autorité de la chose jugée en matière d'arbitrage (identité de parties, identité du litige, identité d'objet des demandes, identité de cause, identité de faits dommageables) et affirme qu'elles sont toutes remplies en l'espèce.[130]

135. En ce qui concerne l'identité des parties, elle souligne que Getma International était partie aux deux arbitrages, si bien que même dans la mesure où les autres

---

[129] C-Mem. § 383.
[130] C-Mem. §§ 390-394.

Demanderesses n'étaient pas formellement parties à l'arbitrage CCJA, « les liens très étroits qu'elles entretiennent avec Getma International permettent de constater sans difficulté une identité des parties également en ce qui les concerne. »[131]

136.  En ce qui concerne l'identité d'objet, la Guinée considère que les Demanderesses présentent « à deux tribunaux des demandes portant sur les mêmes faits et les mêmes dommages, en modifiant seulement l'étiquette ». Elle ajoute que « [l]a totalité de ces demandes, présentées devant le Tribunal CCJA, puis devant le Tribunal CIRDI repose sur les mêmes faits : la résiliation et la réquisition » et que « seuls les chefs de préjudice formels (indemnisation contractuelle / indemnisation pour expropriation) ont été modifiés ».[132] A l'appui d'un tableau comparatif la Défenderesse affirme que tant les montants réclamés que les postes de préjudice sont strictement identiques devant les deux tribunaux arbitraux.[133]

137.  Dans sa Duplique, sur la question du gain manqué en particulier, la Défenderesse soutient que le retrait artificiel de cet argument devant le Tribunal CCJA n'a pas eu d'impact ; celui-ci a bien utilisé l'article 32.3 pour accorder sa réparation, ledit article réparant précisément le préjudice de gain manqué.[134] Sur les préjudices liés à la réquisition (présentés par les Demanderesses comme sans rapport avec la résiliation et la procédure CCJA), la Défenderesse souligne que, même devant le Tribunal CCJA, les Demanderesses ont formulé des demandes indemnitaires divisées en plusieurs chefs de préjudice qui avaient comme fait générateur non pas la résiliation mais la réquisition (remise en état, rachat des stocks, remboursement des factures à émettre).[135] Il y a donc bien, selon elle, identité d'objet.

---

[131] C-Mem. § 396.

[132] C-Mem. §§ 418-420.

[133] C-Mem. § 422.

[134] Dupl. §§ 312-319.

[135] Dupl. §§ 320-325.

138.  En ce qui concerne l'identité des faits dommageables, elle explique que les demandes présentées sont dans tous les cas imputées aux mêmes faits dommageables, à savoir la résiliation et la réquisition.[136]

139.  Le critère de l'identité de cause appelle plus de développements de la part de la Défenderesse. Elle soutient que l'identité de cause n'est pas nécessaire pour qu'il y ait *res judicata*, tant qu'il y a identité d'objet et des parties, et cite plusieurs sentences arbitrales en ce sens.[137] De plus, à l'appui de nombreux commentaires doctrinaux et de sentences internationales, elle considère que, si une partie modifie artificiellement le fondement ou « *instrumentum* » d'une même action, ou requalifie ses demandes, le principe de *res judicata* doit s'appliquer pour éviter que la même affaire soit jugée une seconde fois.[138]

140.  En l'espèce, la Défenderesse soutient que les Demanderesses ont simplement, et artificiellement, modifié la cause de leur action (fondement contractuel devant le Tribunal CCJA, fondement légal avec le Code des investissements devant ce Tribunal) afin de faire rejuger les mêmes faits et obtenir réparation du même préjudice[139]: (i) les Demanderesses avaient, au moins pendant un certain temps, présenté l'ensemble de leurs demandes (y compris celles portant sur l'expropriation) devant le Tribunal CCJA, puis les ont retirées après avoir commencé la procédure CIRDI, (ii) et elles ont ensuite présenté les mêmes demandes devant ce Tribunal (sur les effets de la résiliation et de la réquisition) en changeant simplement la base juridique (Code des investissements et non plus Convention de concession). Cela conduit la Défenderesse à conclure que les Demanderesses ont renoncé à certaines demandes lorsque celles-ci ont été retirées de l'action CCJA. Plus spécifiquement, elle conclut que, si les Demanderesses estimaient que l'indemnisation forfaitaire de l'article 32.3 de la Convention ne couvrait qu'une partie du préjudice, c'était bien dans l'instance arbitrale CCJA qu'il fallait demander

---

[136] C-Mem. §§ 423-435.
[137] C-Mem. §§ 438-443.
[138] C-Mem. §§ 444-457.
[139] C-Mem. §§ 458-487; Dupl. §§ 337-347.

réparation intégrale sur la base de la Convention. En ne le faisant pas, les Demanderesses y ont renoncé.

141. La Défenderesse réitère à plusieurs reprises que la distinction *treaty claims / contract claims* répétée par les Demanderesses est ici non pertinente car elle ne permet pas la réparation du même préjudice deux fois et n'empêche pas l'application du principe de *res judicata,* ce même si la première sentence fait l'objet d'un recours en annulation.[140] La modification artificielle du fondement des demandes devant le Tribunal CCJA, précisément pour pouvoir arguer artificiellement d'une compétence du CIRDI, ne change rien au fait que les préjudices sous-jacents ont déjà été indemnisés.[141] Elle allègue que, lorsque « deux tribunaux ont eu à connaitre d'un même fait dommageable et qu'une indemnisation a déjà été octroyée par le premier tribunal, le principe de *res judicata* interdit de demander une seconde indemnisation pour les mêmes faits, quel que soit le fondement textuel sur lequel repose la compétence du Tribunal ».[142] Ainsi, le Tribunal doit privilégier le fond sur la forme.[143]

> *En concluant la Convention de concession, les parties ont sciemment contractualisé – par le biais de l'article 32.5 – des treaty claims lorsqu'une résiliation est consécutive à une expropriation. …*
>
> *Le Tribunal CCJA était en effet compétent pour les demandes relatives à l'expropriation qui, traditionnellement, sont qualifiées de «treaty claim» parce que contenu dans une loi ou un TBI mais relèvent, en l'espèce, de la clause compromissoire de la Convention parce que «contractualisées» par la volonté des parties. En définitive, le mécanisme de l'article 32.5 de la Convention fonctionne en quelque sorte comme une umbrella clause inversée.[144]*

---

[140] Dupl. §§329 (par référence à l'affaire *Rachel S. Grynberg, Stephen M. Grynberg, Miriam Z. Grynberg, et RSM Production Corporation c. Grenade*, CIRDI No. ARB/10/6, Sentence, 10 Décembre 2010.

[141] Dupl. §§ 306-311 ; §§ 328-336 ; §§ 337-347.

[142] Dupl. § 309.

[143] Dupl. §§ 344-345.

[144] Dupl. §§ 334-335.

142. Enfin, la Défenderesse ajoute que, tant que la procédure d'annulation de la sentence CCJA qu'elle a initiée reste en suspens, la sentence CCJA conserve l'autorité de chose jugée et il n'est donc pas contradictoire de demander l'application du principe de *res judicata* en l'espèce.[145]

**(5) Le prétendu déni de justice suivant l'annulation de la sentence**

143. La Défenderesse n'a pas eu l'occasion de réagir aux arguments que les Demanderesses ont tirés dans leur Mémoire après Audience de l'annulation de la sentence CCJA (voir chapitre V.B (5) ci-dessous). Elle a toutefois abordé le sujet à la suite de la lettre du 21 décembre 2015 dans laquelle les Demanderesses ont mis en cause l'indépendance et l'impartialité de la CCJA dont elles qualifient l'arrêt d'annulation de « rappel sans équivoque que ce Tribunal [CIRDI] constitue le dernier bastion séparant les Demanderesses du déni de justice ». La Défenderesse dénonce le fait que les Demanderesses n'ont pas évoqué l'arrêt à l'audience dans le présent arbitrage du 23-25 novembre 2015 et défend la procédure et la décision CCJA. Elle nie qu'il y ait déni de justice puisque Getma International conserve la possibilité d'intenter une nouvelle procédure sous l'égide de la CCJA.[146]

**B. *Position des Demanderesses***

**(1) Le Tribunal est compétent *ratione materiae* car l'investissement est légal**

144. Les Demanderesses estiment que la Convention de concession a été obtenue de façon régulière, la prétendue fraude n'existant pas et n'étant pas prouvée par la Défenderesse, laquelle a pourtant la charge de la preuve.[147] Puisqu'il n'y a eu ni corruption ni fraude dans l'obtention ou dans le maintien de l'investissement des Demanderesses, celui-ci

---

[145] Dupl. §§ 302-305.
[146] Mem.AAR §§83-93.
[147] Répl. §§ 8-308.

est légal (contrairement à celui de l'affaire *Inceysa*) et les demandes sont recevables. Elles estiment que ces débats ont déjà été tranchés lors de la phase concernant la compétence et que la décision du 29 décembre 2012 par laquelle ce Tribunal s'est déclaré compétent implique que cette procédure est désormais au stade du fond, la Défenderesse ayant eu dans la phase précédente de juridiction toutes opportunités pour plaider l'incompétence de ce Tribunal.[148] Elles précisent de plus que les allégations de corruption ont déjà été analysées puis écartées par le Tribunal CCJA.[149]

145. Concernant plus précisément les allégations de corruption, les Demanderesses soutiennent en premier lieu que la charge de la preuve de la corruption appartient à celui qui l'invoque, et que les allégations de corruption requièrent un degré de preuve particulièrement élevé.[150] Ainsi, la Défenderesse ne peut se contenter de présenter un faisceau d'indices pour prouver la corruption. Les Demanderesses se fondent en la matière sur les sentences *Siag et Vecchi c. Egypte*[151], *Saba Fakes c. Turquie*[152], *Fraport c. Philippines*[153], *African Holding c. DRC*[154], *TSA c. Argentine*[155], *SPP c. Egypte*[156], *EDF c. Roumanie*[157], *International Thunderbird Gaming c. Mexique*[158], *Wena Hotels c. Egypte*[159] pour soutenir que toute allégation de corruption, vu sa gravité, doit être

---

[148] Répl. §§ 309-329.

[149] Répl. §§ 36-38, 91-99 et 326.

[150] Répl. §§ 18-55.

[151] *Waguih Elie George Siag et Clorida Vecchi c. République Arabe d'Egypte*, CIRDI ARB/05/15, Sentence, 1er juin 2009 (C-321).

[152] *Saba Fakes c. République de Turquie*, CIRDI ARB/07/20, Sentence, 14 juillet 2010 (C-322).

[153] *Fraport AG Frankfurt Airport Services Worldwide c. République des Philippines*, CIRDI ARB/11/12, Sentence, 10 décembre 2014 (C-323).

[154] *African Holding Company of America, Inc et Société Africaine de construction au Congo SARL c. République démocratique du Congo*, CIRDI ARB/05/21, Sentence, 29 juillet 2008 (C-324).

[155] *TSA Spectrum de Argentina SA c. République argentine*, CIRDI ARB/05/5, Sentence, 19 octobre 2008 (C-325).

[156] *Southern Pacific Properties (Middle East) Limited c. République Arabe d'Egypte*, CIRDI ARB/84/3, Sentence, 20 mai 1992 (C-326).

[157] *EDF (Services) Limited c. Roumanie*, CIRDI ARB/05/13, Sentence, 8 octobre 2008 (C-327).

[158] *International Thunderbird Gaming Corporation c. Etats-Unis du Mexique*, UNCITRAL, Sentence, 26 janvier 2006 (C-328 et C-329).

[159] *Wena Hotels Limited c. République Arabe d'Egypte*, CIRDI ARB/98/4, Sentence, 8 décembre 2000 (C-253).

prouvée par un standard de preuve élevé.[160] Or, la Défenderesse n'a pas présenté le moindre élément de preuve concret et objectif. Les Demanderesses ajoutent que « la Guinée n'a non seulement pas pris de mesures contre les personnes dont elle allègue la corruption passive mais a, en outre, promu (comme l'on verra ci-après) certains des acteurs les plus importants, selon ses dires, dans la prétendue mise en œuvre de la corruption ».[161]

146. Les Demanderesses passent ensuite en revue les trois attestations présentées par la Défenderesse (de MM. Steven Fox, Demba Kourouma et Ibrahima Lamizana Condé) pour en contester la valeur probante.[162] Elles estiment d'abord que les informations présentées par M. Fox sont indirectes et ne reposent sur aucun document ou témoignage vérifiable.[163] Elles mettent aussi en doute la crédibilité de M. Fox, en se référant à son interrogatoire dans l'affaire CCJA et à certaines de ses affirmations qu'elles considèrent être fausses, par exemple celles sur les sommes versées aux fonctionnaires guinéens qui seraient en contradiction avec les sommes mentionnées dans les témoignages de MM. Kourouma et Condé.[164]

147. Les Demanderesses estiment ensuite que les attestations de MM. Kourouma et Condé par lesquelles ils « s'auto-incriminent » ne sont pas accompagnées de preuves, ont été rédigées après l'expiration du délai de prescription et qu'elles émanent de personnes qui n'ont jamais fait l'objet de sanction en Guinée (M. Kourouma a même été promu par la suite). Ces personnes sont censées avoir reçu des fonds de M. Mamadou Diallo, lequel n'a jamais travaillé pour l'une des Demanderesses; celles-ci mettent donc en doute le fait que ces personnes aient effectivement commis des actes de corruption passive. Les Demanderesses soulignent aussi que le Tribunal CCJA a décidé, en décembre 2013 et janvier 2014, de ne pas prolonger les débats pour permettre à la Guinée de présenter de

---

[160] Répl. §§ 18-55.

[161] Répl. §§ 51, 72, 88.

[162] Répl. §§ 57-90.

[163] Répl. § 60.

[164] Répl. §§ 61-74.

nouvelles preuves de la corruption et, dans sa sentence, que les attestations proposées, tout comme l'attestation de M. Steven Fox, ne permettaient pas « d'accorder la moindre pertinence au grief particulièrement grave de corruption ».[165]

148. Les Demanderesses soutiennent ensuite que les « indices » de la corruption, tels que présentés par la Défenderesse, n'ont aucune force probante.[166]

149. Le premier indice est le caractère généralisé de la corruption en Guinée, qui, selon les Demanderesses, ne prouve rien en l'espèce. En outre, la crise politique de 2008-2010 mentionnée par la Défenderesse n'a vraiment commencé qu'en décembre 2008 avec le décès du Président Lansana Conté, quelques mois après l'adjudication de la concession en août 2008.[167]

150. En second lieu, les Demanderesses analysent les allégations selon lesquelles la Commission en charge de sélectionner le concessionnaire aurait détecté de graves défaillances et irrégularités dans l'offre de Getma International, mais « aurait pourtant volontairement fermé les yeux parce que les Demanderesses l'aurait payée », prouvant ainsi que seule la corruption expliquerait le choix de Getma International comme concessionnaire.[168]

151. Sur le partenariat entre MSC et le groupe Necotrans[169] :

- MSC et Necotrans avaient des liens étroits de partenariat avec un Accord de Partenariat Technique, allant jusqu'à une prise de participation quasi égalitaire dans le capital de Getma International. De 2006 à 2010, NCT Necotrans ne détenait que 50,02% du capital de Getma International; une société du groupe MSC détenait les 49,98% restant.

---

[165] Répl. §§ 75-90.
[166] Répl. §§ 125-294.
[167] Répl. §§ 129-132.
[168] Répl. § 134.
[169] Mem. §§ 381-384; Répl. §§ 152-181.

- En vertu de son partenariat réel avec MSC et après constatation que seule Getma International avait été admise à soumissionner, la réponse à l'appel d'offres était déposée officiellement par Necotrans seule, bien qu'elle fût commune.

- L'abandon de l'idée de soumissionner en groupement solidaire et conjoint pour la concession n'a rien changé en termes de partenariat qui existait toujours et n'était nullement limité à l'accord de partenariat technique. La seule raison pour laquelle le *Memorandum of Understanding* qui est la base de ce partenariat général n'a pas pu être produit dans cet arbitrage est le fait que MSC s'y opposait, bien que les lettres de MSC du 5 mars 2008 et du 10 avril 2013 en aient encore confirmé l'existence.[170]

152. Sur l'emploi des références de MSC :

- Les Demanderesses soutiennent que la réponse à l'appel d'offres présentait la qualité des projets déjà effectués par elles dans d'autres pays, et que les projets réalisés par MSC étaient clairement identifiés. En outre la Commission d'évaluation a bien compris que certaines des références incluses dans l'offre appartenaient à d'autres groupes.[171] Un des témoins de Getma International, M. Sory Camara, a confirmé devant le Tribunal CCJA que la Commission savait qu'une partie significative de l'expérience évoquée par Getma International appartenait à MSC.[172]

- Les Demanderesses signalent la contradiction dans l'appel à manifestation d'intérêt qui, d'une part, s'adresse aux « Entreprises ayant une solide expérience dans la gestion de terminaux à conteneurs », et, d'autre part, « s'adresse exclusivement aux candidats ayant une longue et solide expérience dans la conception, le financement, la réalisation, l'exploitation et l'entretien de terminaux à conteneurs » ; elles reconnaissent que Getma International n'avait pas cette seconde expérience mais affirment qu'« elle avait conçu, financé, exploité, réalisé, entretenu des opérations

---

[170] Mem.AAC §§ 243-267.
[171] Répl. §§ 136-151.
[172] Mem.AAC § 239.

portuaires, espaces dédiés ou pouvant être dédiés à des conteneurs mais aussi à d'autres types de marchandises » ; elles estiment, enfin, que si Getma International n'avait pas été présélectionnée, elle aurait été discriminée par rapport à ses concurrents Afrimarine/TCB et Bolloré à qui il manquait l'expérience en conception, financement et réalisation de terminaux à conteneurs.[173]

153.   Sur les capacités financières des Demanderesses[174] :

- Les Demanderesses admettent que l'attestation financière fournie dans leur dossier de candidature ne remplissait pas strictement les conditions de forme requises, mais elles nient que cette situation doive avoir comme conséquence l'exclusion d'un soumissionnaire conformément aux règles applicables.

- Elles ajoutent ceci : (i) la Commission avait pris en compte, dans sa note d'évaluation, le fait que l'attestation ne correspondait pas au modèle, (ii) les Demanderesses avaient accès à un pool bancaire pour leurs financements et remplissaient donc bien les conditions de solidités financières imposées, et (iii) la résiliation fautive de la Convention de concession est la raison pour laquelle les Demanderesses ont été « empêchées » de prouver leurs capacités financières.

- Les erreurs du *business plan* n'ont pas été volontaires et n'ont eu aucune influence sur le choix de la Commission; en tout état de cause, elles concernaient une activité annexe qui n'a pas été incluse dans le périmètre des activités concédées.

- S'il y avait une prétendue « passivité » de la Commission, celle–ci s'explique par son inexpérience, comme l'avait reconnu un témoin de la Guinée dans le cadre de la procédure CCJA.

---

[173] Mem.AAC §§ 221-231.
[174] Mem. §§ 385-392 et suiv ; Répl. §§ 182-225.

154. En ce qui concerne la prétendue défaillance de Getma International à réaliser les investissements prévus par la Convention, qui, selon la Défenderesse, prouverait la fragilité de son dossier et donc la corruption dans le processus de sélection :

- Les Demanderesses admettent que les travaux de la phase 2 devaient être réalisés dans une période totale de deux ans, mais elles allèguent qu'ils ne devaient débuter qu'onze mois après l'entrée en vigueur de la Convention de concession, et une fois que les travaux de la phase 1 étaient au moins bien avancés.

- Le retard concernant la phase 2 du calendrier est imputable à la Guinée qui a retardé l'entrée en vigueur effective de la Convention et la remise d'une plateforme nécessaire au déroulement des travaux ; il ne correspond donc nullement à un manquement contractuel de la part des Demanderesses.[175]

- Si Europe Terminal n'a pas fourni de prestations au titre d'exécution de la Convention de concession, cela n'empêche que MSC est intervenu dans l'exécution via d'autres filiales.[176]

155. Les Demanderesses soutiennent aussi que l'exécution se déroulait normalement au jour de la résiliation: les travaux d'aménagement du TAC existant étaient achevés dans leur quasi-totalité, tout comme les travaux de la gare ferroviaire, et les travaux d'études de l'extension du TAC étaient terminés.[177]

156. Après avoir réfuté les allégations de corruption, les Demanderesses réaffirment que la raison pour laquelle leur proposition avait été sélectionnée par la Commission est simplement qu'elle était la meilleure[178] :

---

[175] Mem. §§ 399-411 ; Répl. §§ 226-254.

[176] Mem.AAC §§ 268-285.

[177] Mem. §§ 255-293, résumé sur les travaux effectués au jour de la résiliation à §293. Sur ce point précis, la Défenderesse soutient que les travaux concernant le nouveau TAC (et pas l'ancien) représentait 97% du montant total des investissements et n'avaient pas été débuté par les Demanderesses (voir § 102).

[178] Répl. §§ 255-294.

- Avant même que la Commission nationale n'entre en jeu, le PAC lui-même avait présélectionné le groupe Necotrans et lui avait permis de déposer un dossier d'adjudication.[179]

- Les expériences et références pour des projets antérieurs, ainsi que la capacité financière (présentés par la Défenderesse comme les deux faiblesses majeures du dossier des Demanderesses) n'étaient que deux critères parmi d'autres. En tout état de cause, les Demanderesses estiment qu'elles remplissaient bien ces deux critères.[180]

- Au titre des critères importants, les Demanderesses font référence aux conditions financières (ticket d'entrée et redevances) qui étaient plus avantageuses pour la Guinée que les termes de l'offre du groupe Bolloré.[181]

157. Enfin, les Demanderesses affirment que le seul témoin de la Guinée dans la procédure CCJA a confirmé lors de son audition, « non seulement … que la Convention de concession avait été résiliée dans le but qu'elle soit attribuée à Bolloré sans respecter la procédure et le préavis contractuels mais a également reconnu que la procédure d'appel d'offres international à l'issue de laquelle Getma International avait été déclarée adjudicataire fut conduite régulièrement. »[182]

### (2) Le Tribunal est compétent pour statuer sur les effets de la résiliation, le gain manqué et les préjudices supplémentaires découlant du Décret de résiliation

158. Les Demanderesses estiment que la résiliation équivaut à une expropriation en droit international et que, par conséquent, le Tribunal est compétent pour statuer sur l'ensemble de son préjudice en application du Code. Elles estiment que le Tribunal CCJA n'a accordé d'indemnisation que sur les conséquences contractuelles de la

---

[179] Répl. §§ 259-262.
[180] Répl. §§ 265-275.
[181] Répl. §§ 278-286.
[182] Répl. § 288.

résiliation. La résiliation était si grave qu'elle ne pouvait s'inscrire dans un quelconque cadre contractuel qui, lui, était soumis à la compétence de l'arbitrage CCJA. [183]

159.   Les Demanderesses soutiennent ceci :

-   *Il y a eu deux actes de la puissance publique (l'acte de réquisition et l'acte de résiliation, même si ce dernier est déguisé en simple résiliation du contrat pour manquement), ce qui constitue une double violation du Code des investissements et du droit international coutumier.*[184]

-   *tout comme l'acte de réquisition, l'acte de résiliation aussi « a entrainé des conséquences dommageables autres que (celles de) la résiliation de la Convention.*[185]

-   *les conséquences contractuelles de la résiliation ont déjà été appréciées par le Tribunal CCJA. Ce tribunal doit donc apprécier (quant à l'acte de résiliation) les « autres » « conséquences dommageables » des violations par la Guinée du Code des investissements et du droit international coutumier.*[186]

-   *le gain manqué n'est pas in casu une conséquence contractuelle de la résiliation du contrat, mais une conséquence de la violation du Code des investissements, résultant d'un acte d'expropriation illégal prenant l'apparence d'une résiliation du contrat.*[187]

160.   Les Demanderesses estiment que, « parce que le Décret de résiliation n'est pas compris dans les prévisions de l'art. 32.5 de la Convention (et par conséquent, n'est pas « contractualisé »), il peut et doit être apprécié par ce Tribunal, qui est à son tour

---

[183] Répl. §§ 330-397.
[184] Répl. § 335.
[185] Répl. § 336.
[186] Répl. § 337; Mem.AAC § 21.
[187] Répl. § 340.

compétent pour examiner les effets de la violation du Code des investissements et non pas pour se prononcer sur les effets contractuels du Décret de résiliation ».[188]

### (3) L'article 32.5 de la Convention de concession en tant qu'accord contraire

161. Les Demanderesses considèrent qu'« en l'espèce, il s'agit d'apprécier ici les conséquences légales qu'implique, en termes d'indemnisation, un acte de résiliation d'un contrat, pratiqué non pas dans le cadre d'une relation contractuelle, mais dans l'exercice de la puissance publique ».[189] Et ce Tribunal s'est déjà déclaré compétent pour procéder à une telle analyse et pour statuer sur les éventuelles violations du Code des investissements entraînées par l'acte de résiliation et par l'acte de réquisition.[190]

162. Ainsi, les Demanderesses soutiennent qu'il n'y a aucun « accord contraire » entre les Parties visant à ne pas appliquer le Code des investissements, ni le mécanisme d'arbitrage qui y est prévu. Elles estiment que ce Tribunal a accepté de trancher la question du *lucrum cessans* au cas où le Tribunal CCJA ne se considérerait pas saisi de cette question, et elles rappellent que ce dernier s'est abstenu de se prononcer à leur sujet « sous peine d'*ultra petita*. »

163. Les Demanderesses affirment aussi que c'est le Tribunal – et non pas elles – qui, dans sa Décision sur la Compétence, a décidé que l'article 32.5 n'était pas applicable en l'espèce, car la résiliation est intervenue à l'initiative du Concédant et non du concessionnaire.[191] Elles rejettent les arguments de la Défenderesse relatifs à l'article 32.5 de la Convention et soutiennent ce qui suit :

- l'article 32.5 de la Convention ne s'applique que si le concessionnaire a résilié le contrat[192] ;

---

[188] Mem.AAC § 29.
[189] Répl. §§ 343-344.
[190] Répl. §§ 362, 364; Mem.AAC §§ 21-29.
[191] Mem. § 37; Repl. § 357; Mem.AAC § 19.
[192] Mem.AAC § 19.

- en l'espèce le Décret de résiliation ne constitue même pas un « fait du prince » à cause de son illégalité, l'expropriation n'étant pas dans l'intérêt public et ayant été faite sans juste et adéquate réparation[193] ;

- pour être couverte par l'article 32.5, la résiliation doit être consécutive à un Acte de la Puissance Publique, non pas dans le sens de « successif » mais de « chronologiquement ultérieur à » ; cette lecture est confirmée par les articles 32.6 et 32.7 qui prévoient la résiliation « consécutive » à un cas d'imprévision et à un cas de force majeure respectivement, et où la résiliation est nécessairement postérieure au fait du prince ou à la force majeure. Or, le Décret de résiliation a immédiatement mis fin à la Convention et il n'y a pas eu de résiliation postérieure.[194]

164. Sur le point précis de l'*estoppel*, les Demanderesses reconnaissent avoir fait référence dans leurs notifications à la Guinée à l'article 32.5 de la Convention de concession dans la mesure où il n'existait aucune autre clause plus justement applicable à leur situation, et dans le seul but de préserver leurs droits.[195] Elles estiment que la réparation à laquelle elles ont prétendu en application de l'article 32.5 ne correspond qu'à une partie du dommage subi (l'effet contractuel de la résiliation) et que leurs demandes dans la présente affaire sont plus larges et concernent la violation du Code des investissements et du droit international (l'effet extracontractuel de la résiliation).

165. Il n'y a donc pas, selon les Demanderesses, à appliquer le principe de l'*estoppel* car « la violation du Code des investissements, fondée sur l'expropriation, ne se confond pas avec la violation contractuelle, fondée sur l'article 32.5 de la Convention de concession ».[196]

166. Les Demanderesses estiment qu'en reconnaissant maintenant que l'article 32.5 « n'était pas le plus approprié aux circonstances juridiques extraordinaires » et que « la situation

---

[193] Mem.AAC §§ 40-59.

[194] Mem.AAC §§ 60-68.

[195] Répl. §§ 372-397, développements les plus pertinents sur ce point à §§ 372-375 ; Mem.AAC §§ 69-76.

[196] Répl. § 376.

en question n'était pas prévue par l'art.32.5 », leur recours à l'arbitrage CIRDI ne viole pas le principe de la bonne foi, ne relève pas de la notion d'*estoppel*, mais constitue le simple respect de la décision d'un tribunal arbitral.[197]

### (4) Les défenses de *res judicata* et renonciation

167.   Enfin, sur les défenses de *res judicata* et de renonciation soulevées par la Défenderesse, les Demanderesses soutiennent qu'il n'y a pas eu renonciation devant le Tribunal CCJA car les *contract claims* y ont seules été présentées, le présent Tribunal se prononçant au contraire sur les *treaty/legal claims*.[198]

168.   De plus, elles estiment que le principe de *res judicata* ne peut être appliqué en l'espèce car la Défenderesse cherche en parallèle à faire annuler la sentence CCJA (et n'a jamais eu l'intention de l'exécuter) alors qu'elle prétend que ladite sentence fait foi.

169.   Elles soutiennent aussi que seuls les faits sont les mêmes mais que identité des faits ne signifie pas identité des différends, dès lors que les parties, l'objet et le fondement des deux litiges sont différents. Les Demanderesses précisent que « la question de l'analyse de l'acte de résiliation a déjà été faite par le Tribunal CCJA, qui a décidé qu'il avait constitué une violation de la Convention de concession. Dans cette procédure, les Demanderesses demandent à ce Tribunal d'analyser et de décider (chose que le Tribunal a déjà accepté de faire) si ce même acte de résiliation, ainsi que l'acte de réquisition, ont constitué ou non une expropriation, violant le Code des investissements et le droit international coutumier. »[199]

170.   Selon les Demanderesses, il existerait donc bien deux litiges car le Décret de résiliation a violé le contrat (donnant lieu au litige contractuel devant le Tribunal CCJA) et le Code des investissements (donnant lieu à la présente affaire). Les Demanderesses estiment enfin que le Tribunal CCJA ne s'est jamais prononcé ni sur le gain manqué ni sur les

---

[197] Mem.AAC §§ 72-76.
[198] Répl. §§ 398-400.
[199] Répl. § 416.

conséquences de la réquisition. Par conséquent, la Défenderesse ne peut pas soutenir l'existence de *res judicata* à l'égard de ces demandes.

**(5) Les effets de l'annulation de la sentence CCJA**

171.  Dans leur Mémoire après Audience, les Demanderesses ont développé un cinquième et nouvel argument[200], tiré de l'annulation de la sentence CCJA par l'arrêt de la CCJA du 30 novembre 2015. Elles estiment qu'à la suite de cette annulation (i) les *contract claims* de Getma International ont cessé d'exister, (ii) la demande par Getma International au Tribunal CCJA de lui accorder une indemnité pour le préjudice complémentaire ne peut plus empêcher sa demande dans le présent arbitrage d'une indemnisation pour les violations du Code des investissements et (iii) les arguments de la Défenderesse relatifs aux *estoppel*, renonciation et *res judicata* tombent d'eux-mêmes.[201]

**C.  *Analyse du Tribunal***

172.  Le Tribunal arbitral a clairement décidé, au terme d'une procédure séparée, dans quelle mesure il se jugeait compétent pour connaître des demandes que lui avaient adressées les Demanderesses. Il est rappelé que cette décision fait partie intégrante de la présente procédure. Le Tribunal arbitral n'entend pas, ni ne peut même s'il le voulait, revenir sur cette décision.

173.  La question de la juridiction devrait donc être définitivement tranchée. Les Parties sont néanmoins par la suite revenues sur la question, la Défenderesse pour opposer deux nouvelles objections fondées sur des allégations de corruption et de fraude, les Demanderesses pour interpréter le contenu de la Décision sur la Compétence. Les

---

[200] M.AAC §§ 77-93, chapitre II.B, p. 10 à 12, non – répertorié dans la table des matières et à ne pas confondre avec un deuxième chapitre II.B, qu'on trouve aux pages 12 à 14 et qui, lui, apparaît dans la table des matières.
[201] M.AAC §§ 77-93.

objections de la Défenderesse seront examinées sous le chapitre (1) ci-après, celles des Demanderesses sous les chapitres (2) à (5) ci-dessous.

**(1) La compétence du Tribunal *ratione materiae***

174. Le Tribunal arbitral est d'accord avec la Défenderesse que seuls les investissements légaux et réalisés dans la bonne foi sont à protéger par l'arbitrage CIRDI et que le Tribunal arbitral doit se déclarer incompétent s'il apparaît que l'investissement a été fait frauduleusement ou à la suite de corruption. Ce point n'est par ailleurs pas contesté par les Demanderesses.[202]

175. Les Demanderesses contestent toutefois qu'il y ait eu fraude ou corruption et estiment que les allégations de fraude et corruption requièrent un degré de preuve particulièrement élevé. De toute façon, elles sont d'avis que le Tribunal CCJA a déjà analysé et écarté l'allégation de corruption et que la Défenderesse ne peut plus l'invoquer, ce Tribunal arbitral s'étant déjà déclaré compétent dans sa décision du 29 décembre 2012.

176. Ce Tribunal arbitral estime qu'aucun de ces deux motifs ne fait obstacle à un examen de l'allégation de corruption.

177. Premièrement, en ce qui concerne la décision du Tribunal CCJA sur la corruption alléguée, les Parties sont en désaccord sur la question de savoir si le Tribunal CCJA s'est prononcé à ce sujet. La sentence CCJA révèle que le 4 novembre 2013, soit après l'audience d'audition des témoins et experts des 27 - 29 mai 2013 et après l'audience de plaidoiries tenue le 8 juillet 2013, la Défenderesse a informé le Tribunal CCJA qu'elle avait des éléments de preuve relatifs à la corruption. Ce n'est que le 14 novembre 2013 que la Défenderesse a produit dans la procédure CCJA une attestation de M. Steven Fox destinée à prouver la prétendue corruption. Le 16 décembre 2013, le Tribunal CCJA a entendu M. Steven Fox dont il a trouvé les allégations invérifiables; il a en conséquence

---

[202] Répl. § 311.

refusé une nouvelle extension du calendrier procédural qui aurait permis, selon la Défenderesse, de fournir de nouvelles preuves sur l'allégation de corruption, soit deux attestations additionnelles, émanant de MM. Demba Kourouma et Ibrahima Lamizana Condé reconnaissant les faits de corruption et datées du 13 décembre 2013. Les Demanderesses estiment que la demande d'extension de quatre mois était purement dilatoire et qu'aucune nouvelle preuve n'aurait pu être fournie. Elles soutiennent que, même dans la présente affaire, la Défenderesse n'est toujours pas en mesure de présenter des preuves de la corruption et elles ne comprennent donc pas comment l'extension du calendrier de l'affaire CCJA aurait pu les aider pour en faire la démonstration.[203]

178.   Le Tribunal arbitral constate que les attestations de MM. Demba Kourouma et Ibrahima Lamizana Condé du 13 décembre 2013, tout comme une troisième pièce (R-34, soit une Plainte contre Personnes Dénommées des chefs de Corruption et de Trafic d'Influence, déposée le 13 décembre 2013 par l'Etat guinéen) n'ont été ni produites ni analysées dans l'arbitrage CCJA. Ces pièces constituent donc de nouvelles pièces qui nécessitent de reconsidérer si l'investissement a fait l'objet de corruption. L'ordre public international exige que ce Tribunal arbitral s'exprime sur l'allégation grave de corruption, même si un autre tribunal s'est déjà penché sur la question, quand de nouvelles preuves non analysées par le premier tribunal sont produites. L'obligation de ce Tribunal arbitral à vérifier l'allégation de corruption prime sur son respect de la sentence du Tribunal CCJA et même sur l'éventuel effet de *res judicata* de cette sentence. Ceci est *a fortiori* le cas après l'annulation de la sentence CCJA (même si elle a été décidée pour un motif qui ne concerne pas la décision du Tribunal CCJA sur la corruption).

179.   Deuxièmement, le Tribunal arbitral constate que la Défenderesse dans la présente procédure n'a soulevé la défense d'incompétence pour cause de corruption et/ou fraude que dans son Contre-Mémoire du 30 mars 2015 et ne l'a nullement soulevée dans ses deux mémoires sur la compétence (datés du 22 juin et du 6 août 2012, respectivement). Aussi ce Tribunal arbitral a rendu sa Décision sur la Compétence le 29 décembre 2012

---

[203] C-Mem. §76 et Répl. §§ 96-124.

sans avoir eu à traiter de cette objection. Même si, selon les Demanderesses, ce moyen a été « sous-entendu explicitement» dès le début de la procédure CCJA[204] - sans que la nullité de la Convention de concession pour corruption n'y soit toutefois demandée[205] -, ce n'est le 4 novembre 2013 que la Défenderesse a cru pouvoir les prouver. Et ce n'est que quand le présent arbitrage CIRDI a repris après sa suspension dans l'attente de la sentence CCJA, que la Défenderesse a évoqué dans le présent arbitrage la défense de la corruption et a produit les deux attestations du 13 décembre 2013, comme pièces R-35 et R-36 jointes au Contre-Mémoire du 30 mars 2015.

180. Même si tous les motifs d'incompétence doivent être soulevés *in limine litis* et si ce Tribunal arbitral s'est déjà déclaré compétent dans sa Décision sur la Compétence du 29 décembre 2012, il estime que, compte tenu du caractère d'ordre public des moyens tirés de la corruption et de la fraude, il lui revient de vérifier maintenant sa compétence sous cet angle également. Quoi qu'il en soit, même si ce Tribunal arbitral estimait que le débat sur sa compétence a été définitivement clos par ladite Décision, les allégations de corruption et de fraude devraient être instruites, parce que la Défenderesse se base sur ces mêmes allégations pour demander en ordre subsidiaire que les demandes soient déclarées irrecevables pour cause de l'illégalité de l'investissement, ou, en ordre infiniment subsidiaire, rejetées pour la même cause.

**a.   Le degré de preuve de corruption**

181. Il n'est pas contesté que la Défenderesse a la charge de la preuve de la corruption, mais il y a désaccord entre les Parties en ce qui concerne le degré de cette preuve. Elles ont, de part et d'autre, cité des décisions d'autres tribunaux en support de leurs positions respectives. Le Tribunal arbitral a non seulement vérifié le contexte dans lequel des règles apparemment contradictoires ont été formulées par ces autres tribunaux, mais aussi l'application qu'en a faite chacun d'eux aux faits et preuves qui leur avaient été soumis. Ce Tribunal arbitral conclut ainsi qu'il ne peut suivre les Demanderesses selon

---

[204] Mem. § 372.
[205] Sentence CCJA du 26 mai 2014 (C-50) § 63.

lesquelles la preuve de corruption doit être « irréfutable » conformément à une « jurisprudence constante ».[206]

182.  Les décisions sur lesquelles s'appuient les Demanderesses ne soutiennent pas leur thèse :

- Le tribunal dans l'affaire *Siag et Vecchi c. Egypte* a spécifié (dans le cadre de sa vérification si un des demandeurs avait obtenu sa nationalité libanaise par une fraude) que le degré de preuve applicable pour des allégations de fraude se trouve entre le standard traditionnel du droit civil, *the balance of probabilities*, et le standard de droit pénal exigeant que l'allégation soit *beyond reasonable doubt*. Il a conclu que la preuve doit être claire et convaincante (*clear and convincing*).[207] Aussi ce tribunal a évalué chacune des prétendues preuves (y compris les indices mentionnées) à leur juste valeur et conclu qu'en l'espèce la fraude et la falsification en rapport avec la nationalité du demandeur n'était pas prouvée.[208]

- Dans l'affaire *Saba Fakes*, le tribunal devait se prononcer sur l'authenticité de certains certificats dont le défendeur avait suggéré qu'ils étaient postdatés pour les besoins de l'arbitrage sans pour autant prétendre qu'ils avaient été falsifiés. Le défendeur ne présentait que des allégations basées sur des présomptions tirées de preuves indirectes discutées dans d'autres arbitrages.[209] Ayant simplement constaté que « *la charge de la preuve d'une quelconque impropriété est particulièrement lourde* », le tribunal conclut (sans la moindre discussion ou évaluation des preuves soumises) que cette charge n'a pas été remplie et que les dates de transfert des certificats mentionnées par le demandeur étaient correctes. Ce Tribunal arbitral comprend la constatation citée comme une simple justification de la décision du

---

[206] Répl. § 36.

[207] *Waguih Elie George Siag et Clorinda Vecchi c. République Arabe d'Egypte*, CIRDI ARB/05/15, Sentence, 1er juin 2009 (C-321) § 326

[208] *Waguih Elie George Siag et Clorinda Vecchi c. République Arabe d'Egypte*, CIRDI ARB/05/15, Sentence, 1er juin 2009 (C-321) §§ 327-359.

[209] *M. Saba Fakes c. République de Turquie*, CIRDI ARB/07/20, Sentence, 14 juillet 2010 (C-322) § 130.

tribunal que l'allégation n'était pas prouvée. En l'absence d'autres spécifications ou clarifications, soit du principe que le tribunal adopte, soit de son application de ce principe aux faits et preuves devant lui, ce Tribunal arbitral estime que cette décision n'offre pas un critère pertinent pour le présent débat.

- Dans l'affaire *Fraport c. Philippines,* le tribunal a considéré, comme celui dans la première affaire mentionnée ci-dessus, que la preuve de la corruption devait être *clear and convincing* de façon que l'on puisse raisonnablement croire que les faits se sont passés comme allégué.[210] Dans cette affaire, le tribunal était confronté à une allégation que Fraport était conscient de et avait participé à la corruption et la fraude quand elle avait fait son investissement initial. L'Etat avait à cette fin d'abord invoqué des faits postérieurs à l'investissement, et allégué, pour la période préalable à l'investissement, que Fraport avait été conscient d'un paiement prétendument impropre qui avait été fait à un consultant par la société de projet-concessionnaire via une banque off-shore. Plus tard dans la procédure, l'Etat alléguait que la preuve *prima facie* qu'elle avait produite avait renversé la charge de la preuve sur Fraport et que des paiements à des fonctionnaires ne doivent pas être prouvés par des preuves directes, mais peuvent l'être par des preuves « circonstancielles » et des indices. Le tribunal a analysé les preuves soumises pour appuyer les allégations de corruption dans les périodes avant et après l'investissement mais a conclu qu'elles ne démontraient pas que Fraport était conscient de et était engagé dans la corruption et la fraude concernant le projet du terminal 3 au moment où il faisait son investissement.

- Il en est de même pour le tribunal *EDF c. Romanie* qui a exigé *clear and convincing evidence*[211] et a ensuite passé en revue les preuves soumises par l'investisseur de la prétendue demande d'un pot de vin par un fonctionnaire. Parmi ces preuves se

---

[210] *Fraport AG Frankfurt Airport Services Worldwide c. République des Philippines*, CIRDI ARB/11/12, Sentence, 10 décembre 2014 (C-323) §§ 477 et 479.
[211] *EDF (Services) Limited c. Roumanie* CIRDI ARB/05/13, Sentence, 8 octobre 2009 (C-327) § 221.

trouvaient les témoignages écrits et oraux de la personne à qui la demande avait prétendument été adressée, mais que le tribunal a jugé, comme les autres preuves, ne pas être *clear and convincing*.[212]

- Dans l'affaire *TSA*, des investigations criminelles concernant la corruption alléguée avaient été ouvertes et poursuivies en Argentine mais n'étaient pas encore finies au moment où le tribunal devait rendre sa sentence. Le tribunal a estimé que la corruption n'était pas prouvée par le matériel présenté ; il restait ouvert à la possibilité qu'elle soit prouvée par l'enquête pénale qui se poursuivait, mais n'a pas retenu la corruption comme motif de son incompétence, qui existait aussi pour d'autres raisons.[213] Le Tribunal arbitral constate que le tribunal *TSA* ne s'est pas prononcé dans l'abstrait sur le degré de preuve qu'il exigeait pour la corruption.

- Comme mentionné par les Demanderesses[214], le tribunal dans l'affaire *SPP c. Egypte* a, lui aussi, constaté que *« the allegations concerning irregular contacts and connections are not supported by the evidence in the record and are based on suppositions, guilt by association and what [Egypt] describes as* 'commencement de preuve' ».[215] Ce tribunal ne s'est toutefois pas référé à une règle concernant le degré de preuve requise.

- Le seul tribunal international qui a, selon les citations des Demanderesses, exigé que la preuve de corruption soit irréfutable est celui qui a jugé l'affaire *African Holding c. La République Démocratique du Congo*. Ce tribunal a même spécifié que cette preuve irréfutable serait « telle que celles qui résulteraient de poursuites criminelles dans les pays où la corruption constitue une infraction pénale ». Cette expression donne l'impression que le tribunal a voulu viser le degré de preuve requis dans des

---

[212] *EDF (Services) Limited c. Roumanie* CIRDI ARB/05/13, Sentence, 8 octobre 2009 (C-327) §§ 222-232.

[213] *TSA Spectrum de Argentina S.A. c. République argentine* CIRDI ARB/05/5, Sentence, 19 décembre 2008 (C-325) §§ 174-176.

[214] Répl. §34.

[215] *EDF (Services) Limited c. Roumanie* CIRDI ARB/05/13, Sentence, 8 octobre 2009 (C-327) § 132.

affaires pénales, c.à.d. *beyond any doubt*. En fait, toutefois, la mention de ce degré élevé était gratuite parce que le tribunal a jugé que la corruption n'était pas prouvée alors que les seules allégations étaient fondées exclusivement sur des considérations générales concernant la période Mobutu et les évènements politiques connexes.[216]

183.   Ce Tribunal arbitral considère dès lors que ces tribunaux - à l'exclusion du dernier - ont parfaitement décrit le standard de la preuve à appliquer à la corruption, même si, comme l'a reconnu le tribunal *Fraport*, la preuve peut être « circonstancielle » vu la difficulté de prouver la corruption par des preuves directes.[217] Ainsi comprise correctement, la jurisprudence citée par les Demanderesses n'est pas substantiellement différente de celle sur laquelle s'appuie la Défenderesse, même si dans la plupart des affaires citées par la Défenderesse il ne se posait pas de question de corruption[218], mais d'autres faits graves allégués contre un Etat ou des autorités publiques. Le Tribunal arbitral estime toutefois que la question de savoir si la nature de l'allégation exige un degré de preuve plus élevé est la même pour toutes allégations graves impliquant un Etat, qu'elles concernent la corruption ou un autre délit. Ce Tribunal arbitral estime donc que la jurisprudence citée par la Défenderesse est pertinente :

-   Le tribunal *Metal-Tech c. Ouzbékistan,* qui concernait bel et bien la corruption, a exigé une « certitude raisonnable », tout en acceptant, comme le tribunal *Fraport,* que la preuve pouvait être circonstancielle.[219] Même si, comme l'ont fait remarquer

---

[216] *African Holding Company of America, INC, et Société Africaine de Construction au Congo S.A.R.L. c. République démocratique du Congo* CIRDI ARB/05/21, Sentence sur les déclinatoires de compétence et la recevabilité, 29 juillet 2008 (C-324) § 52.

[217] *Fraport AG Frankfurt Airport Services Worldwide c. République des Philippines* CIRDI ARB/11/12, Sentence, 10 décembre 2014 (C-323) § 479: *The Tribunal holds that considering the difficulty to prove corruption by direct evidence, the same may be circumstantial. However, in view of the consequences of corruption on the investor's ability to claim the BIT protection, evidence must be clear and convincing so as to reasonably make-believe that the facts, as alleged, have occurred.*

[218] Mem.AAC § 302.

[219] *Metal-Tech Ltd. c. République d'Ouzbékistan* CIRDI ARB/10/3, Sentence, 4 octobre 2013 (R-54) § 243: *The Tribunal will determine on the basis of the evidence before it whether corruption has been established with **reasonable certainty**. In this context, it notes that corruption is by essence difficult to establish and that it is thus generally admitted that it can be shown through circumstantial evidence.*

les Demanderesses[220], ce tribunal n'a pas jugé nécessaire de déterminer laquelle des parties avait la charge de la preuve, il a - contrairement à ce que les Demanderesses veulent faire croire[221] - clairement spécifié le standard de preuve qu'il jugeait applicable.

- Le tribunal dans l'affaire *Tokios Tokelès c. Ukraine* a rejeté les deux thèses selon lesquelles la preuve de « nayizd »[222] exige une norme spéciale de preuve, soit plus élevée, soit moindre que la norme habituelle ; il a par la suite simplement exigé que la partie concernée prouve que son allégation est « *plus probablement correcte qu'incorrecte* ».[223]

- De même, dans l'affaire *Libananco c. République de Turquie,* le tribunal a jugé, non pas à propos de corruption, mais concernant la fraude et d'autres *serious wrongdoing*, que le fait que l'allégation porte sur un fait très grave ne suffit pas en soi pour exiger un degré de preuve plus élevé.[224]

- Le tribunal siégeant dans l'affaire *The Rompetrol Group N.V. c. Roumanie,* après avoir étudié la jurisprudence existante qui couvre des allégations d'irrégularités très diverses, a conclu que la nature de l'allégation, tout comme la position de la personne concernée, influencent nécessairement un arbitre dans son évaluation des

---

[220] Mem.AAC § 307.

[221] Dans leur note de bas de page n°185, les Demanderesses citent entre autre le § 243 de la sentence *Metal-Tech c. République d'Ouzbékistan* mais omettent précisément la phrase très claire citée ci-avant.

[222] Une pratique concertée de différentes autorités pour intentionnellement nuire une société privée ou un individu.

[223] *Tokios Tokelès c. Ukraine* CIRDI ARB/02/18, Sentence, 26 juillet 2007 (R-109) § 124: *We […] shall approach the issues on the basis that in order to prove its case on the existence and causal relevance of a nayizd the Claimant must show that its assertion is more likely than not to be true.*

[224] *Libananco Holdings Co. Limited c. République de Turquie* CIRDI ARB/06/8, Sentence, 2 septembre 2011 (R-111) § 125: *While agreeing with the general proposition that "the graver the charge, the more confidence there must be in the evidence relied on […] this does not necessarily entail a higher standard of proof."*

preuves, mais que ce sont les circonstances particulières de l'affaire qui sont déterminantes et qui rendent toute codification impossible.[225]

184.  Ce Tribunal arbitral conclut qu'il n'y a pas de précédent valable pour soutenir, comme le font les Demanderesses, que le degré de preuve requis doit être plus élevé pour la corruption que pour d'autres faits. Il vérifiera dès lors ci-après si les preuves soumises par la Défenderesse sont claires et convaincantes et si elles peuvent donner à ce Tribunal une certitude raisonnable que la Convention de concession a été obtenue par la corruption active de Getma International.

**b. Les preuves directes**

185.  Ce Tribunal estime qu'il n'est pas nécessaire de se pencher à nouveau sur les éléments de preuve qui ont déjà été soumis à et évalués par le Tribunal CCJA[226], soit :

- L'attestation de M. Steven Fox (également produite dans le présent arbitrage comme R-33), lequel a par ailleurs été entendu comme témoin par le Tribunal CCJA[227]. Comme la Défenderesse n'a pas jugé nécessaire de réintroduire M. Fox comme témoin dans le présent arbitrage, ce Tribunal arbitral estime que l'opinion du Tribunal CCJA sur son témoignage est concluant Le Tribunal arbitral note que le Tribunal CCJA a constaté que M. Steven Fox n'a pas été témoin, direct ou indirect, des faits de corruption qu'il rapporte, qu'il ne se réfère à aucun document, et que ses allégations sont invérifiables, pour conclure que son attestation « ne permet pas d'accorder la moindre pertinence au grief particulièrement grave de corruption ».[228]

---

[225] *The guidance which the Tribunal draws from the cases is that there may well be situations in which, given the nature of an allegation of wrongful (in the widest sense) conduct, and in the light of the position of the person concerned, an adjudicator would be reluctant to find the allegation proved in the absence of a sufficient weight of positive evidence – as opposed to pure probabilities or circumstantial inferences. But the particular circumstances would be determinative, and in the Tribunal's view defy codification.*

[226] Le 30 novembre 2015, la Cour CCJA a annulé la sentence CCJA au motif que le « tribunal arbitral ne s'est pas conformé à sa mission » en ignorant délibérément les dispositions impératives du règlement d'arbitrage, qui interdisent les accords entre parties et arbitres sur le montant de leurs honoraires. Cette annulation n'empêche pas à ce Tribunal arbitral de se former une opinion sur les constatations factuelles du Tribunal CCJA et qui n'ont rien à voir avec le motif de l'annulation.

[227] Sentence CCJA § 73.

[228] Sentence CCJA § 76.

- Le Tribunal CCJA a ajouté qu'«il en est de même d'attestations proposées de toute dernière minute dont la République de Guinée reconnaît qu'elles ont été élaborées le 13 décembre aux fins de l'audience du 16 décembre 2013 ».[229] Toutefois, comme le Tribunal CCJA n'a pas autorisé la production de ces deux attestations, il n'en a pas pu prendre connaissance et n'a pas non plus entendu leurs auteurs. Comme le Tribunal CCJA n'a pas non plus motivé la mention citée, ce Tribunal arbitral ne se sent pas lié par cette mention et donnera à ces attestations et aux témoignages de leurs auteurs le poids qui leur revient.

186. Ce Tribunal arbitral se concentrera donc sur les attestations de MM. Demba Kourouma et Ibrahima Lamizana Condé et la plainte déposée le 13 décembre 2013 par l'Etat guinéen des chefs de corruption et de trafic d'influence (R-34). Il se penchera également sur « le faisceau d'indices de corruption » qui, selon la Défenderesse, corroborent l'existence de la corruption.

(i)   Les attestations des « témoins » - Pièces (R- 35 et 36)

187.   Le Tribunal arbitral note que ces deux pièces qui portent comme titres « Attestation » (R-35) et « Déclaration sur honneur » (R-36), respectivement, n'ont dans le présent arbitrage pas été communiquées par la Défenderesse avec son Contre-Mémoire du 30 mars 2015 sous forme de dépositions écrites de témoins, mais l'ont été comme simples pièces parmi de nombreuses autres. La Défenderesse n'a par ailleurs pas non plus demandé que le Tribunal arbitral entende MM. Kourouma et Condé comme témoins et était donc apparemment disposée à se priver des témoignages oraux de ces deux personnes qui avaient en principe vocation à renforcer la crédibilité des pièces (R-35 et 36).

188. Si le Tribunal arbitral a quand même pu entendre les auteurs de ces pièces, c'est à la suite de la demande du 20 octobre 2015 des Demanderesses de pouvoir les contre-

---

[229] Sentence CCJA § 76.

interroger à l'audience commençant le 23 novembre 2015. La Défenderesse a d'abord protesté contre cette demande parce qu'elle l'estimait tardive et a demandé que le Tribunal arbitral accorde aux pièces (R-35 et 36) la valeur probante d'une confession écrite. Le Tribunal arbitral a rejeté cette demande dans son Ordonnance de Procédure n°8 du 2 novembre 2015, estimant qu'il lui revenait d'apprécier cette valeur probante le moment venu, en fonction de tous les éléments du dossier alors connus.

189.  Nonobstant l'opposition initiale de la Défenderesse à l'audition de MM. Kourouma et Condé et, après, son incertitude quant à la faisabilité de cette audition (entre autres à cause de prétendus problèmes de visa et/ou passeport) - incertitude qui a d'ailleurs continué à exister pour ce qui concerne M. Lamizana Condé jusqu'au matin de son audition[230] – les deux témoins ont comparu devant le Tribunal arbitral, dans la matinée du troisième (et dernier) jour de l'audience.

190.  Lors de son témoignage du 25 novembre 2015, M. Kourouma a confirmé :

-  qu'il a été invité d'écrire l'attestation[231] - ultérieurement produite comme la pièce (R-35) -  par le Ministre de la Justice, M. Christian Sow[232] qui l'a informé que l'attestation à rédiger serait utilisée dans le contentieux entre l'Etat et Getma International[233] ; qu'il a écrit l'attestation le 13 décembre 2013 à la main dans le bureau de l'agent judiciaire de l'Etat, M. Goureissy, lequel l'a par la suite fait dactylographier sur place par sa secrétaire[234] ; que le Ministre de la Justice suivant, M. Sako, lui a demandé le « vendredi dernier » [soit le vendredi 20 novembre 2015 ou trois jours avant le début de l'audience] de venir témoigner à Paris[235] ce qu'il a pu faire parce qu'il avait un visa permanent[236] ;

---

[230] TR III, p.4:5-8.
[231] TR III, p.26:13-15.
[232] TR III, p. 30:4-30.
[233] TR III, p. 30:6-7 ; voir aussi TR III, p.31:1-2.
[234] TR III, p.33:29-p.34:16.
[235] TR III, p.31:12-p.32:9.
[236] TR III, p.32:10-16.

- qu'il ne s'est jamais posé la question de savoir si ses propos pourraient être retenues contre lui dans une procédure pénale ou quelles pourraient être les conséquences de son « aveu »[237]; et qu'il n'a jamais été informé du dépôt d'une plainte contre lui[238];

- qu'on lui a promis l'argent, avant que celui-ci ne lui ait été payé[239] [240] ; que c'était le président de la commission, M. Ansoumane Camara qui lui a fait comprendre « qu'il faut aider Getma et si Getma est adjudicataire […]. il va nous faire quelque chose. … Ça va être de l'argent »[241] et que cet argent « sera de la part de Getma »[242];

- qu'il a été surpris par la proposition, parce que *d'autres n'ont pas l'habitude de le faire* »[243] [244] ;

- qu'en tant que rapporteur, il avait une voix dans la Commission d'évaluation des offres et qu'il lui revenait « d'étoffer le rapport […] comme pour justifier chaque note »[245];

- que M.Diallo lui a donné l'argent « au nom de Getma »[246]; qu'il s'agissait de 35.000 euros, nonobstant le fait que l'attestation de M. Fox - qu'il n'a jamais vue - parle de USD 100.000[247]; que le montant a été payé en deux tranches, une première de 15.000

---

[237] TR III, p.32:19-29.

[238] TR III, p.40:1-23; p.39:32– p.40:7.

[239] TR III, p.27: 9.

[240] Le Tribunal arbitral constate que ceci n'avait pas été mentionné dans son attestation écrite.

[241] TR III, p.44:2-23.

[242] TR III, p.46:12-24.

[243] TR III, p.27: 25-31.

[244] Ceci semble contredire les allégations de la Défenderesse concernant le caractère « endémique » de la corruption en Guinée (C-Mem. § 101).

[245] TR III, p. 42:40-42 ; p.53:37-38.

[246] TR III, p.45:30-33 et p. 46:12-14.

[247] TR III, p.47:31-42 et p. 48:21-22.

euros et une deuxième de 20.000 euros[248] comme d'ailleurs mentionné dans son attestation[249] ;

- qu'à son avis, d'autres membres de la commission ont également reçu de l'argent[250];

- qu'il ne pouvait pas dire exactement ce qu'il avait fait en échange pour la promesse de paiement.[251]

191. Interrogé sur la régularité de l'offre de Getma International et son évaluation, M. Kourouma ne se souvient plus si elle avait été régulière et/ou s'il avait « fermé les yeux » sur certains de ses éléments[252]; il a confirmé juste avoir donné des notes en fonction de ce que les autres membres de la commission donnaient et des notes « possiblement » plus élevées de ce que « en âme et conscience il aurait normalement donné ».[253] Réinterrogé sur le même point, il ne se rappelait pas des détails de l'évaluation[254].

192. Ce Tribunal arbitral trouve incompréhensible que M. Kourouma, quand il a été – selon ses propres propos - corrompu pour la première fois de sa vie, ne s'est pas posé la moindre question: ni sur le montant promis, ni sur ce qu'on attendait exactement de lui, ni sur les conséquences possibles de ses actes, et qu'il ne se souvenait plus de ce qu'il avait fait exactement en échange de l'argent dont il était certain à l'époque qu'il allait le recevoir, même s'il n'avait aucune idée du moment du paiement ni de son montant. Il est encore moins compréhensible que, toujours sans se poser la question des conséquences possibles, il a, à la première demande, avoué sa corruption passive, a

---

[248] TR III, p.50:40-p.51:8.

[249] La réponse qu'il donne quelques minutes plus tard et dont on peut déduire qu'il a d'abord reçu le montant de 20.000 euros et puis celui de 15.000 euros, est peut-être due à un malentendu. Le Tribunal arbitral ne la tient donc pas contre le témoin.

[250] TR III, p.50:34-37.

[251] TR III, p.53:39-p.54:20.

[252] TR III, p.51: 2-8; p.51 :25 – p.52:20.

[253] TR III, p. 53:39- p.54: 21.

[254] TR III, p. 56 :20-28.

consenti à rendre l'aveu par écrit, et, enfin, accepté de venir témoigner à Paris sur sa corruption.[255]

193. Son témoignage ne peut donc être sérieusement retenu, aussi parce qu'en dépit de son aveu de corruption passive, il n'a pas été poursuivi.

194. L'audition de M. Ibrahima Lamizana Condé a d'autre part révélé ceci :

- On lui a également demandé seulement le vendredi avant l'audience à Paris, de venir témoigner[256];

- Ses déclarations concernant la façon dont il avait été contacté pour faire et signer l'attestation contenant son « aveu » sont confuses[257]: on en retient qu' « un avocat » s'est rendu dans le bureau de M. Condé, lui a demandé d'écrire l'attestation et que M. Condé en a fait « un brouillon par écrit »[258] et l'a lu « au fur et à mesure », ce qui a permis à l'avocat de dactylographier le texte sur place (c'est-à-dire dans le bureau de M. Condé à la Direction Nationale de la Programmation des Investissements)[259];

- M. Condé n'a pas appris à quoi devait servir son attestation et il était surpris de se retrouver à Paris[260];

- Quand il a fait son attestation, M.Condé était conscient qu'il pourrait être poursuivi, mais il estimait plus important de dire la vérité comme il est d'usage dans son ethnie[261]; toutefois, l'avocat l'a rassuré et il n'a effectivement pas eu de problème.[262]

---

[255] TR III, p.56:30-39.
[256] TR III, p.58:17-22.
[257] TR III, p.58:37-p.60:21.
[258] TR III, p.60:8.
[259] TR III, p.60:12-21.
[260] TR III, p.61:25-p.62:6.
[261] TR III, p. 62:7-19.
[262] TR III, p.62:39-42.

Plus tard dans son interrogation, M. Condé dit avoir été menacé de poursuite (sans spécifier si la menace visait son aveu de corruption passive ou bien un éventuel déni ultérieur de son aveu initial)[263], puis il refuse catégoriquement de dire s'il a effectivement été poursuivi[264];

- Nonobstant sa propre insistance sur la nécessité de dire la vérité[265], M. Condé refuse de répondre à la question de savoir s'il avait déjà fait l'objet d'autres tentatives de corruption passive[266];

- M. Condé n'avait pas connaissance de la plainte déposée contre lui et par la suite il n'a jamais été convoqué par la police ni par la gendarmerie.[267] Ultérieurement il répond toutefois avoir été informé de la plainte par l'agent judiciaire[268];

- Comme M. Kourouma, M. Condé s'attendait à une « récompense » parce que le président de la Commission d'évaluation lui « avait dit de travailler, qu'on sera récompensé de bien travailler de toutes les façons » [269];

- M. Condé nie avoir reçu USD 100.000 comme le prétend M. Fox[270] et affirme avoir reçu une enveloppe kaki avec 20.000 euros en coupures de 50 euros[271] ;

- M. Condé s'abstient de dire clairement que l'argent qu'il a reçu provient de Getma International:

---

[263] TR III, p.67:6-12.
[264] TR III, p.67:13–17.
[265] Voir aussi TR III p.72:17-19.
[266] TR III, p.66:22-27.
[267] TR III, p.63:1-12.
[268] TR III, p.67:24-33.
[269] TR III, p.66:19-21.
[270] TR III, p.68:24-33.
[271] TR III, p.67:1-5.

> **Me Fischer**.- *À l'unanimité. Est-ce que vous en concluez que, à l'unanimité, tout le monde a reçu de l'argent de Getma ?*
>
> **M. Condé**.- *Non. Moi j'ai reçu de l'argent. De Getma, non. Moi, je l'ai reçu et celui qui me l'a remis m'a dit : « Monsieur Condé, c'est de la part de Getma ». Pour les autres, je ne sais pas.*[272]

- Après son contre-interrogatoire, en réponse aux questions du conseil de la Guinée, M. Condé explique en détail son entretien avec le président de la Commission d'évaluation au cours duquel celui-ci lui a demandé de le « soutenir à chaque fois, surtout au moment des votes et des attributions ».[273]

195. Il ressort du témoignage de M. Condé que le président de la Commission d'évaluation ne lui a pas dit, avant l'évaluation, quel était le soumissionnaire à favoriser. Le nom de M. Challoub (le représentant de Getma International à Conakry) est tombé, mais M. Condé ne le connaissait pas (et ne savait pas non plus qui il était ou représentait) et, selon ses propres affirmations, ce n'est qu'en cours de négociations (donc après la décision de la Commission d'évaluation) que le président lui a parlé de M. Challoub.[274] Il semblerait donc que M. Condé n'ait pas su qu'il devait favoriser Getma International, mais que le président lui a juste demandé de voter comme lui. Dans ce cas, il n'a pas non plus su par qui il était (sur le point d'être) corrompu. En effet, ce n'est qu'au moment de la négociation de la Convention qu'il est devenu clair pour M. Condé qui était M. Challoub et qu'il faisait partie du « groupe de Getma »[275] ; la simple connaissance du fait que M. Challoub avait approché le président de la Commission, ne suffisait pas pour que M. Condé devine que c'était Getma International qu'il fallait favoriser. A la fin de son audition, M. Condé a tenté de faire le rapprochement entre Getma et M. Challoub :

> **Mme la Présidente.-** *C'est donc ce M. Camara qui vous a fait comprendre qu'il y aurait une récompense si Getma emportait le contrat ?*

---

[272] TR III, p.69:20-24.
[273] TR III, p.70:17-37.
[274] TR III, p. 71:22-44.
[275] TR III, p.71:22-28.

> *M. Condé.- Si Challoub remportait le contrat - le terme qu'il m'a dit. À voir, maintenant, si Challoub avec Getma ou…. Bon…[276]*

196. Le Tribunal arbitral constate que M. Condé n'a pas été un témoin particulièrement fiable; l'extrait ci-après illustre combien il a évité de répondre à des questions pourtant claires et que, malgré sa dénégation, il était conscient de ce que d'autres personnes ont été appelées pour témoigner:

> *M. le Pr Tercier.- Monsieur Condé,... Vous avez signé, vous, la déclaration sur l'honneur. C'est la déclaration que vous avez signée. Vous l'avez faite donc en présence d'un avocat ?*
>
> *M. Condé.- Bien sûr.*
>
> *M. le Pr Tercier.- Est-ce que vous savez si d'autres personnes ont aussi été appelées à faire une déclaration de ce type ?*
>
> *M. Condé.- Non. On nous a convoqués tous individuellement.*
>
> *M. le Pr Tercier.- D'accord. Mais vous pensez qu'il y avait d'autres personnes qui ont été appelées à signer une déclaration comparable ?*
>
> *M. Condé.- Non. En bref, l'avocat m'a dit que nous sommes engagés individuellement, les membres de la commission.[277]*

197. M. Condé n'a pas non plus renforcé la crédibilité de son témoignage devant le Tribunal arbitral, lorsque, confronté à la contradiction entre, d'une part, ses témoignages répétés lors de son audition du 25 novembre 2015 qu'il avait reçu l'argent « après la signature de la convention »[278] et, d'autre part, son attestation écrite selon laquelle «[a]u cours des négociations de la convention de concession, M. Mamadou Diallo…. m'a donné une enveloppe contenant 20000 €en coupures de 50 euros »[279] :

> *Mme la Présidente.- Merci. Est-ce que c'est correct alors qu'il y a une contradiction entre ce que vous avez écrit dans votre déclaration sur l'honneur,*

---

[276] TR III, p.76:16-18.

[277] TR III, p.72:3-14.

[278] Voir TR III, p.66:38-39 ; p.70:38 ; p.74:38 et p. 75:25-26.

[279] Déclaration de M. Ibrahima Lamizana Condé en date du 13 décembre 2013 (R-36).

*d'une part, et d'autre part, ce que vous avez attesté jusqu'à trois reprises ce matin ici, devant notre Tribunal.*

**M. Condé.-** *Hum, hum.*

**Mme la Présidente.-** *Pardon, qu'est-ce que cela veut dire « hum, hum » ?*

**M. Condé.-** *Je dis oui, je n'ai pas compris, c'est ce que je veux dire. Vous me dites qu'il y a une contradiction ?*

**Mme la Présidente.-** *Oui.*

**M. Condé.-** *Je dis quoi ce matin qui n'est pas écrit là ? J'ai dit ce matin :* **après la signature de la convention**, *M. Diallo m'a appelé pour me donner cet argent.*

**Mme la Présidente.-** *Oui, après la signature de la convention, on vous a donné l'argent.*

**M. Condé.-** *Après notre signature, ce n'est pas nous qui signons la convention. J'ai bien dit : « Ça, c'est à ma signature. Ça, c'est notre signature ». Nous, nous avons signé un document. Nous avons envoyé. C'est après cette signature qu'on a reçu ce montant.*

**Mme la Présidente.-** *Oui, mais ici, il est quand même écrit qu'on vous a donné l'enveloppe – je cite : « Au cours des négociations de la convention ».*

**M. Condé.-** *Exactement.*

**Mme la Présidente.-** *Alors est-ce que la déclaration écrite concorde avec votre déclaration orale de ce matin ?*

**M. Condé.-** *C'est ce que je voulais dire exactement, c'est au moment de la convention qu'on nous a donné cet argent, parce qu'on était dans la salle. C'est dans la salle que nous sommes sortis, nous avons signé le procès-verbal, on nous a donné l'argent, on m'a donné l'argent. En ce moment, ils étaient, on était en pleine négociation.*

*Madame la Présidente, j'ai répété ça dix fois, mais ce matin je me sens beaucoup fatigué. Depuis hier, c'est 8 heures le matin, j'étais debout, assis, je n'ai pas fait une minute de sommeil.*

**Mme la Présidente.-** *Donc votre dernière déclaration, c'est que c'est au moment de la convention.*

**M. Condé.-** *Exactement.*

**Mme la Présidente.-** *Sans spécifier si c'est la signature ou la négociation.*

**M. Condé.-** *En tout cas, c'est ce que j'ai écrit ici, c'est comme ça que ça s'est passé.*[280]

---

[280] TR III, p.75:17 – p.76:5.

198. Pour le conseil de la Défenderesse, les contradictions tiendraient au fait que, quand M. Condé parlait de « signature », il visait sa signature sur le Procès-verbal de négociation.[281] Si le Tribunal arbitral est attentif au risque de malentendus ou même de petites erreurs ou nuances dans un témoignage, il estime que le fait que M. Condé ait, à trois reprises, explicitement parlé de « signature **de la convention** » ne peut être anéanti par une simple « précision » qu'il visait une autre signature. Cela est d'autant plus vrai que M. Condé s'est aussi contredit sur un autre point : il a d'abord expliqué que, « après l'évaluation et la signature du contrat », il voulait rejoindre son propre bureau, mais que le président de la Commission d'évaluation lui a dit de ne pas partir parce qu'on allait l'appeler (ce qu'il ne regretterait pas), et que « **deux jours, trois jours après », M. Diallo l'a appelé** pour lui tendre l'enveloppe avec l'argent.[282] Toutefois, un peu plus tard dans son audition, il déclare, tout aussi fermement, que *« c'est au moment de la convention qu'on nous a donné cet argent, parce qu'on est dans la salle. C'est dans la salle que nous sommes sortis, nous avons signé le procès-verbal, on nous a donné l'argent. En ce moment ils étaient, on était en pleine négociation ».*[283]

199. Même en ayant de la compréhension pour une certaine confusion du témoin parce qu'il se sentait « beaucoup fatigué » et n'avait « pas fait une minute de sommeil »[284], le Tribunal arbitral ne retient pas de ce témoignage une idée claire et précise sur la façon dont la corruption s'est déroulée. En plus, les faits rapportés ne prouvent pas clairement que la corruption a été le fait de Getma International.

200. Les Demanderesses ont beaucoup insisté dans leur Mémoire après Audience sur les contradictions entre les témoignages de MM. Kourouma et Condé. Le Tribunal arbitral est d'avis que ces seules contradictions ne suffisent pas pour jeter un doute sur la crédibilité des témoignages. Au contraire, dans la mesure où chaque témoin parle de sa propre corruption passive, il est normal que leurs témoignages ne soient pas concordants

---

[281] Mem.AAR §126-128.
[282] TR III, p.70:38 – 71:2.
[283] TR III, p.75:38-41.
[284] TR III, p.72:44-45.

entre eux. Par contre, une contradiction par le même témoin, p.ex. entre son attestation écrite et sa propre déclaration orale, ou entre différentes déclarations orales, influence nécessairement l'opinion qu'un tribunal se fait sur la crédibilité du témoignage, même s'il fait une réserve pour des malentendus pendant l'audition ou pour une confusion possible, tant de la part du témoin, que de la part de l'interrogateur.[285]

201.  Il est remarquable qu'aucun des deux témoins n'ait fait mention de la prétendue irrégularité ou inadmissibilité de l'offre de Getma International ; même interrogés sur les aspects financiers de l'offre, les deux témoins se souvenaient juste de l'importance du ticket d'entrée.[286] Aucun d'eux n'a confirmé avoir « fermé les yeux » sur des irrégularités – et aucun d'eux n'a pu les décrire – alors que la Guinée affirme aujourd'hui qu'elles sont à ce point grossières que l'admission de l'offre ne peut s'expliquer que par la corruption des membres de la Commission d'évaluation. Le Tribunal arbitral estime que, si les deux témoins avaient vraiment été corrompus, ils se seraient mieux souvenus des irrégularités de l'offre. Jusqu'à la fin de son audition, M. Condé n'a pas pu donner d'exemple précis du favoritisme pour Getma International.[287] Des détails sur ces aspects sont toutefois importants pour apprécier la preuve de la corruption alléguée.

202.  Les deux témoins souffraient de trous de mémoire quand il s'agissait de décrire les détails de la convocation qu'ils avaient reçue pour attester qu'ils avaient accepté des

---

[285] Voir, par exemple TR III, p.64:23-35.
   *Me Fischer.- Qui était présent physiquement à cette réunion ? Puisque vous nous avez dit que vous avez reçu une lettre, vous avez donc répondu à l'invitation qui vous a été faite. Qui étaient les personnes qui étaient à cette réunion?*
   *M. Condé.- Il y avait l'agent judiciaire, le conseiller juridique à la présidence. Il y avait deux autres avocats guinéens, il y avait... Je ne sais pas.* **On était au moins quelque chose comme neuf personnes dans la salle.**
   *Me Fischer.- Et est-ce qu'il y avait - je ne vous demande pas le nom des avocats, parce que vous ne vous en souvenez peut-être pas, à moins que...*
   *M. Condé.- Non, je... Pour moi, parce qu'on nous a convoqués individuellement, toute la commission, mais moi pratiquement, on m'a posé la question sur mon attestation.*
   *Me Fischer.- J'ai bien compris. Est-ce qu'il y avait d'autres membres de la commission lors de cette...*
   *M. Condé.- Non, lors de l'interview,* **j'étais seul.**
   La contradiction entre « neuf  personnes » ou « seul » est claire mais il est impossible de vérifier si le témoin parle de la même réunion ou convocation.

[286] M. Kourouma : TR III, p.51:39-p.52:12 ; M. Condé : TR III, p.72:34 - p.73:15.

[287] TR III, p.77:41 – p.78:37.

pots-de-vin : ils ne s'en souvenaient plus et soulignaient que les faits dataient d'il y a sept ans.[288]

203. Quoi qu'il en soit, l'audition de ces deux témoins a révélé que - l'un et l'autre ayant été invité par ou sur instruction des Ministres de la Justice successivement en fonction, d'abord pour attester qu'ils s'étaient fait corrompre et ensuite pour venir le confirmer à Paris – ni leur aveu, ni leur témoignage n'a été spontané, même s'ils ont, l'un et l'autre, beaucoup insisté sur le fait qu'ils étaient eux-mêmes les auteurs de leurs attestations respectives.

204. Pour le Tribunal arbitral, le fait que les deux attestations aient été sollicitées par le Ministère de la Justice peut expliquer les similarités de forme et de présentation, en dépit du fait que les deux attestations aient été dactylographiées sur deux ordinateurs différents dans deux bureaux différents (celle de M. Kourouma dans le bureau de l'agent judiciaire de l'Etat, M. Goureissy, qui l'a fait dactylographier par sa secrétaire, et celle de M. Condé dans son bureau, dactylographié par « l'avocat » dont M. Condé ne se rappelle plus du nom). Interrogé à ce sujet, M. Condé, a essayé d'expliquer ces similarités en indiquant que toutes les machines à écrire ont fait l'objet d'un achat général globalisé par l'administration. Même si le Tribunal arbitral acceptait cette explication, elle ne saurait expliquer que deux dactylographes différents, agissant séparément (voir ci-dessus) choisissent respectivement sur deux machines à écrire (lire « ordinateurs » ou  « programmes des traitement de texte ») – même si elles proviennent du même fabriquant - la même police et la même taille des caractères, ainsi qu'une mise en page quasiment identique pour dactylographier des messages qui leur sont respectivement remis en brouillon par un auteur et lu au fur et à mesure par un autre auteur.

205. Force est en outre de constater que la date de la convocation pour rédiger et signer les attestations, le 13 décembre 2013, n'est pas due au hasard non plus: Le Tribunal CCJA

---

[288] M. Kourouma : TR III, p. 35:18, p.47:6, p. 51:43 et p. 56:25 ; M. Condé : TR III, p.60:21, p.62:2, p.73:14 et p.78:36.

était sur le point de rendre sa sentence et la Guinée a réussi à obtenir encore une audience pour l'audition de M. Fox, le 16 décembre 2013. Les attestations semblent avoir été produites en relation avec le cours de la procédure CCJA: elles auraient en effet pu être obtenues beaucoup plus tôt et le dossier ne contient aucun indice pouvant expliquer autrement pourquoi les attestations ont été sollicitées à cette date seulement.

206. C'est donc le même Ministère, soit celui de la Justice, qui a rendu possible la défense de la corruption dans le présent arbitrage d'investissement; c'est lui aussi qui avait le pouvoir de décider de la suite à donner à la plainte pénale, mais il n'y a donné aucune suite (voir sous-chapitre (ii) ci-après).

207. Si les invitations du Ministère de la Justice aux « témoins » de la corruption n'a en soi rien de répréhensible, la question se pose toutefois de savoir pourquoi les deux témoins ont consenti à s'« auto-incriminer ». L'absence de réponse à cette question n'est pas de nature à augmenter la crédibilité des témoins.

208. Même sans s'attacher aux contradictions inhérentes et aux lacunes des deux témoignages, le Tribunal arbitral ne peut faire abstraction de la réticence dont a fait preuve la Défenderesse pour présenter ces deux témoins. En effet, si les attestations et leurs auteurs n'avaient pas de points faibles, les témoignages oraux ne pouvaient que renforcer les allégations de la Défenderesse.

209. En outre, pourquoi deux attestations seulement et – avec réticence - deux témoins ont-ils été présentés dans cette procédure ? Selon les témoins, tous les membres de la Commission d'évaluation ont été convoqués à la présidence (M. Fofana) par l'agent judiciaire, afin d'être entendu sur ce qui s'était passé dans la Commission d'évaluation.[289] On peut donc raisonnablement en déduire que le Ministère a cherché à obtenir des attestations ou aveux des autres membres également. Il y a même eu des confrontations entre M. Diallo et M. Condé dans lesquelles M. Diallo a contredit

---

[289] M. Kourouma : TR III, p.40:23 et suivants ; M. Condé : TR III, p.64:18-35.

M. Condé et nié la corruption.[290] Il est également raisonnable de croire que les autres membres l'ont également nié, sinon leurs attestations auraient été produites.

210. Néanmoins, la Défenderesse a annoncé au Tribunal CCJA que, dans une période de quelques semaines, elle rassemblerait d'autres preuves de la corruption. Et pourtant, en dehors de ces deux attestations (et de la plainte), aucune autre preuve n'a été produite depuis.

211. Le Tribunal arbitral constate qu'il n'y a pas d'autres preuves confirmant les témoignages de MM. Condé et Kourouma (si ce n'est l'attestation de M. Fox, à condition de ne pas prendre en considération les différences dans les montants des pots-de-vin payés à ces deux témoins.)[291] Leurs deux témoignages ne sont aucunement confirmés par d'autres preuves : M. Diallo n'a pas été présenté comme témoin, et depuis le témoignage de M. Condé, on sait que cela s'explique par le déni que M. Diallo a opposé à l'aveu de M. Condé. M. Ansoumane Camara, le Président de la Commission qui a demandé à MM. Kourouma et Condé de le suivre dans les points qu'il donnait aux différents soumissionnaires, est décédé.[292]

212. Le rôle de M. Ansoumane Camara dans la corruption des deux « témoins » ne ressort d'ailleurs pas clairement des deux témoignages. M. Kourouma dit d'abord que M. Camara lui a dit que Getma l'avait approché pour l'aider et lui en serait reconnaissant.[293] Ensuite, il devient plus vague :

> **Me Fischer.-** *Monsieur Ansoumane Camara vous a fait une proposition précise ?*
>
> **M. Kourouma.-** *Non.*
>
> **Me Fischer.-** *Vous a laissé entendre... Dans votre esprit, qu'est-ce que…vous considériez quoi ? Dans votre esprit, vous avez compris quoi de ses paroles ?*

---

[290] TR III, p.69:29-38 ; p.76:6-8 et p.78:39 - p.79:19.

[291] Le Tribunal arbitral note que selon l'attestation de M. Fox (R-33), M. Talbot a fourni à M. Challoub un budget d'un montant total de 2.5 millions d'euros (3.3 millions USD) avec des fonds provenant d'un compte ouvert à Zug, en Suisse. Ceci est partiellement concordant avec le témoignage de M. Condé que le Président de la Commission d'évaluation lui avait dit avoir été approché par M. Challoub.

[292] TR III, p.68:38-41.

[293] TR III, p.44:14-19.

*M. Kourouma.- Dans ses paroles, j'ai compris qu'il faut aider Getma et si Getma est adjudicataire... C'est clair, il a dit : il va nous faire quelque chose.*

*Me Fischer.- Et vous espériez quoi personnellement ?*
*M. Kourouma.- Je ne sais pas quel espoir. Il nous a promis, il va nous faire quelque chose. Je me dis que... Ce n'est pas des voitures qu'on va nous distribuer. Ça va être de l'argent.*
*M. Kourouma.- Vous vous attendiez donc qu'on vous propose quelque chose si vous votiez dans le bon sens ?*
*M. Kourouma.- Je me dis que c'est la promesse qu'ils ont faite au Président.*[294]

213. Par contre, M. Camara aurait demandé à M. Condé seulement de le « soutenir à chaque fois, surtout au moment des votes et des attributions »[295], sans lui dire exactement quel soumissionnaire était à favoriser, mais tout en indiquant qu'il serait récompensé.[296]

214. Les déclarations des deux témoins concernant la demande de « complaisance » que leur a faite le président de la Commission d'évaluation, M. Ansoumane Camara, sont plausibles, mais invérifiables puisque M. Camara est décédé depuis les faits.

215. Le fait qu'il n'y ait que deux témoins qui ont avoué leur corruption passive (alors que, selon le rapport de M. Fox, au moins huit personnes, soit deux ministres et six membres de la Commission d'évaluation, auraient été corrompues), ne prouve en soi pas que la corruption n'ait pas eu lieu. L'auto-incrimination est en soi assez extraordinaire pour ne pas s'étonner de ce que six personnes ont refusé de s'y prêter. Mais l'absence (à part le rapport de M. Fox) de toute autre preuve, écrite ou autre, de la corruption soit des deux témoins, soit d'un des autres corrompus, affaiblit considérablement la valeur probante que pourraient avoir les deux témoignages dans d'autres circonstances.

216. Cette absence est d'autant plus étonnante qu'aucun des deux témoins n'a été inquiété à la suite de son aveu de corruption passive. Ils ne savaient même pas qu'une plainte avait été déposée contre eux.[297] Il est par ailleurs frappant à quel point M. Condé s'est montré

---

[294] TR III, p.44:14-26.
[295] TR III, p.70:17-37.
[296] TR III, p.71:13-28 et p.76:15-18.
[297] M. Kourouma: TR III, p.39:29-p.40:7 ; M. Condé: TR III, p.62:43-p.63:9.

même insouciant des conséquences possibles de son aveu tout en insistant sur le fait qu'il avait dit la vérité.[298]

217.  M. Condé a témoigné avoir « découvert » l'existence de la plainte pénale pendant son audition devant ce Tribunal arbitral[299] et confirme ne jamais avoir été interrogé au sujet de la plainte par la police ou la gendarmerie, mais que c'est l'agent judiciaire qui lui en a parlé par la suite.[300] Plus tard dans son interrogation, il indique que l'agent judiciaire a menacé de « transmettre le dossier à la justice ».[301] M. Condé est très incertain quant à la date de cet entretien avec l'agent judiciaire[302] : d'abord, il semble dire qu'il y a plus de deux ans (donc avant fin 2013), mais plus tard il confirme que cette réunion était postérieure à la date de son attestation.[303] L'on n'échappe pas totalement à l'impression que la plainte pénale a été utilisée pour mettre de la pression sur les auteurs de l'attestation afin d'assurer leur témoignage oral, même si, dans la chronologie des faits, la demande spécifique qu'ils viennent témoigner à l'audience de ce Tribunal arbitral semble avoir été formulée seulement le vendredi 20 novembre 2015.

218.  Ce Tribunal arbitral ne peut que conclure que les témoignages de MM. Kourouma et Condé n'ont pas apporté la preuve claire et convaincante de la corruption dont Getma International est accusée et cela nonobstant tous pouvoirs et ressources dont disposait la Guinée pour en apporter la preuve. Il reste toutefois à évaluer ces témoignages dans le contexte d'autres éléments.

(ii)   La plainte déposée le 13 décembre 2013 par l'Etat guinéen des chefs de corruption et de trafic d'influence (R-34)

219.  Selon la plainte, c'est « [d]ans le cadre de la procédure d'arbitrage opposant l'Etat Guinéen à Getma International » que le conseil de l'Etat a mandaté M. Fox pour

---

[298] TR III, p.62:7-19; p.64:17.
[299] TR III, p. 62:44; p.63:9.
[300] TR III, p. 63:10-14.
[301] TR III, p.67:24-33.
[302] TR III, p.63:27.
[303] TR III, p.64:4-28.

enquêter sur les conditions dans lesquelles la concession avait été octroyée. La plainte a de toute évidence été basée sur les données du rapport de M. Fox qui, lui, parle de « paiements [qui …] auraient été versés aux personnes […] en échange de leur assistance pour l'octroi à Getma de la concession portuaire recherchée ». Elle conclut que, «[s]i l'enquête démontre que les faits susvisés sont avérés, ils seraient susceptibles de constituer les délits de corruption et de trafic d'influence prévus et réprimés aux articles 191 et suivants du Code Pénal de la République de Guinée ». M. Fox n'a donc pas estimé déjà avoir en mains la preuve de la corruption. En plus, l'agent judiciaire auteur de la plainte a également reconnu que l'attestation de M. Fox ne constituait en soi pas une preuve de la corruption alléguée, mais nécessitait une enquête. Or, cette enquête n'a apparemment jamais eu lieu ; du moins la Guinée n'en a jamais produit la preuve. L'interrogatoire de MM. Kourouma et Condé du 13 décembre 2013 ne s'est pas fait dans le cadre d'une enquête (et ne pouvait d'ailleurs pas l'être, puisque la plainte même date du 13 décembre 2013), mais s'inscrivait apparemment dans la défense de l'Etat dans l'arbitrage CCJA, lequel touchait à sa phase ultime. La date de la plainte, qui est la même que celle des attestations de MM. Kourouma et Condé, confirme qu'elle aussi a été déposée en lien avec la défense de la Guinée devant le Tribunal CCJA : le rapport de M. Fox n'est – étrangement - pas daté, mais il est de toute évidence à la base de la lettre des conseils de la Défenderesse au Tribunal CCJA du 4 novembre 2013, par lequel celui-ci est informé de ce que « [l]a République de Guinée a très récemment obtenu des informations et des éléments de preuve sur les circonstances de la conclusion de la Convention de concession du Terminal à conteneurs du port de Conakry en 2008 » ; donc la Guinée en a eu connaissance au plus tard le 4 novembre 2013 et elle a pourtant encore attendu jusqu'au 13 décembre 2013 pour déposer plainte, probablement incitée par la lettre du conseil des Demanderesses du 29 novembre 2013 qui s'était étonné que les prétendus corrompus ne fassent pas l'objet de poursuites judiciaires en Guinée.[304]

220. Ultérieurement, dans le cadre de la présente procédure arbitrale et son processus de production de documents, les Demanderesses ont demandé que la Défenderesse

---

[304] Lettre des Demanderesses au Tribunal en date du 29 novembre 2013 (C-340), p.5, point 3.

produise « [l]es documents établis par la Défenderesse suite à la plainte pénale déposée le 13 décembre 2013 du Procureur de la République près le tribunal de première instance de Kaloum (pièce n° R34) » (point 12 de la demande de production de documents des Demanderesses). La requête des Demanderesses portait notamment sur les documents administratifs (et donc pas couverts par le secret de l'instruction ou l'enquête) qui sont normalement rédigés à la suite d'une plainte, tel que l'avis de classement de la plainte, l'avis d'ouverture d'information judiciaire, la constitution de partie civile, ou les citations directes (cfr. Redfern Schedule, requêtes des Demanderesses n°12a, 12b et 12c). Nonobstant l'Ordonnance n°6 (point 12) du Tribunal arbitral selon laquelle ces documents étaient à produire pour le 8 juin 2015, ils n'ont pas été produits, parce que, selon la lettre des conseils de la Guinée du 19 juin 2015 aux conseils des Demanderesses (dont le Tribunal arbitral a reçu copie), ces documents n'ont pas pu être retrouvés, et cela, « malgré les démarches entreprises auprès du parquet près le tribunal de première instance de Kaloum, Conakry ».

221.   Le Tribunal arbitral estime pouvoir conclure de cette absence de production, combinée avec l'absence flagrante de toute autre preuve d'une quelconque suite donnée à la plainte du 13 décembre 2013, que la Guinée et son Ministère de la Justice se sont davantage efforcés de prouver la corruption dans la procédure CCJA, que de la sanctionner. La Défenderesse a donné priorité au moyen de défense que constitue la corruption, plutôt qu'à la poursuite des corrompus. Même si le délit de corruption avait été prescrit au moment où la Guinée, sur la base du rapport de M. Fox avait pris connaissance de la corruption[305], on pouvait s'attendre à ce que l'Etat préserverait ses intérêts publics en veillant à ce que les personnes suspectées de corruption passive, n'aient plus l'occasion d'abuser une deuxième fois de leur fonction publique pour s'enrichir. Or, aucun des deux témoins n'a été congédié, ni rétrogradé: M. Kourouma, « précédemment directeur ad interim à la Direction des Infrastructures et Transports [a été] nommé Directeur des

---

[305] Les Demanderesses se sont référées à l'article 4 du Code pénal guinéen, selon lequel les délits se prescrivent après trois ans (Répl. § 77 et note de bas de page n°59) et sont d'avis que la Défenderesse a admis que la prescription était effectivement acquise (Mem.AAC §§ 6 et 121-123).

Travaux Publics et Urbanisme » par décret du Président Alpha Condé du 8 mars 2011,[306] et M. Lamizana Condé exerce selon sa propre attestation la fonction d'Inspecteur des services financiers et comptables.[307] De même, M. Cheick Touré, une des autres personnes mises en cause par le rapport de M. Fox, a été confirmé dans sa fonction de secrétaire-général au Ministère des Transports par le Président Alpha Condé.[308] Et le 18 juin 2014, le Président a nommé M. Mamadou Diallo, qui, selon le rapport de M. Fox, a fait les paiements allégués, comme Directeur national adjoint de la marine marchande et M. Mohamed Fofana comme Directeur-Général du Bureau d'études et de planification.[309]

222. Selon le plainte du 13 décembre 2013, « [l]ors de l'attribution de la Convention de concession, un certain nombre d'articles de presse ont dénoncé des faits de corruption qui ont permis à Getma d'obtenir la concession contre des concurrents ayant une expérience et capacité financière largement supérieure à la sienne » . Ces articles ont en effet été produits dans cet arbitrage, non par la Guinée, mais par les Demanderesses elles-mêmes[310] pour illustrer ce qu'elles appellent une campagne de presse diffamatoire à leur encontre et à la suite de laquelle Getma International et son PDG Richard Talbot ont déposé plainte[311] à Paris (plainte classée sans suite). Le seul article de presse que la Défenderesse a produit concernant la prétendue corruption relative à la concession de Getma International semble être celui du 6 mai 2009 et concerne des « soupçons de manœuvres occultes pour obtenir la levée de la suspension de la concession de Getma»[312] (suspension ordonnée le 14 janvier 2009 et levée le 9 avril 2009). Il ne concerne donc pas l'attribution même de la concession.

---

[306] Article d'AfricaLog en date du 2 juillet 2015 (C-339).

[307] Déclaration de M. Ibrahima Lamizana Condé en date du 13 décembre 2013 (R-36).

[308] Article du site internet Guineenews.org en date du 19 juin 2014 (C-334).

[309] Article du site internet Guineenews.org en date du 19 juin 2014 (C-334).

[310] Articles du site internet guinee24.com en date du 25 septembre 2008 ; du 27 septembre 2008, du 10 octobre 2008, du 24 octobre 2008, et des 30 et 31 octobre 2008 (C-130 à C-135).

[311] Plainte des Demanderesses contre X avec constitution de partie civile en date du 31octobre 2008 (C-137).

[312] Article du site internet Guinée Actu en date du 16 avril 2012 (R-30).

223. Le Tribunal arbitral s'étonne que, nonobstant ces rumeurs de corruption, la Guinée ait attendu jusqu'en 2013, soit cinq ans, avant de mandater M. Fox/ Veracity Worldwide LLC pour enquêter sur les conditions dans lesquelles la concession avait été attribuée. On ne s'explique pas non plus pourquoi le Président Alpha Condé qui avait publiquement annoncé vouloir résilier la concession, n'a pas ordonné une enquête qui aurait pu prouver la corruption et justifier la résiliation.

224. Le Tribunal arbitral ne peut que constater que l'Etat lui-même n'a pas attaché suffisamment d'importance à la corruption pour lancer une enquête ou, s'il l'a fait, pour lui donner la suite qui s'imposait dans l'intérêt général. Une telle plainte est de ce fait dépourvue de toute pertinence comme élément de preuve.

225. Qui plus est, en ne donnant pas de suite à la plainte et en ne lançant pas d'enquête, la Guinée s'est privée de la possibilité qu'elle avait pour prouver la corruption alléguée de façon claire et convaincante. La Défenderesse n'avait pas seulement les pouvoirs nécessaires pour rassembler la preuve de la corruption alléguée, elle avait aussi l'obligation de le faire parce qu'elle a la charge de la preuve de la corruption qu'elle invoque.

226. En l'absence de toute justification de la part de la Défenderesse pour son omission d'utiliser ses pouvoirs pour apporter la preuve, le cas échéant, de la corruption, le Tribunal arbitral ne voit pas d'autre conclusion possible à tirer de cette omission que celle que l'Etat ne croyait pas lui-même que la preuve existe.

(iii)   Le « faisceau d'indices » de corruption

227. La Défenderesse a beaucoup insisté sur le « caractère endémique » de la corruption en Guinée, notamment en 2008, et en a parlé dans son Mémoire après Audience, même avant de traiter des témoignages de MM. Kourouma et Condé dont elle demande qu'ils soient «pris dans le contexte de la corruption généralisée qui sévit en Guinée ».[313]

---

[313] MemAAR § 101.

228. Ce Tribunal estime toutefois que ce contexte ne change rien à la valeur probante de chacune des preuves individuelles qui lui sont soumises et qui sont à juger indépendamment, à moins que ces preuves aient une force probante dépassant un seuil de crédibilité que le Tribunal arbitral n'a pas trouvé dans les deux témoignages et la plainte du 13 décembre 2013. Même une corruption généralisée ne permet pas de considérer une corruption spécifique alléguée comme prouvée. Inversement, l'absence de corruption généralisée ou endémique ne permet pas non plus de neutraliser la preuve d'une corruption spécifique. Même si on accepte que la corruption est *plausible* dans un cas spécifique parce qu'elle est endémique dans le pays, cela ne prouve pas qu'elle existe effectivement. Comme la Défenderesse l'admet, il ne s'agit en effet que d'un indice qui, certes, incite à être plus attentif aux éléments de preuve avancés, mais qui ne suffit pas pour autant à rendre convaincants des éléments de preuve qui ne le sont pas. Même si ce Tribunal arbitral reconnaît qu'il n'est pas impossible que Getma International ait obtenu son contrat moyennant corruption, les deux témoins et la seule plainte ne l'ont pas convaincu que cette corruption a effectivement eu lieu. Au contraire, la sollicitation des témoignages par l'Etat (qui n'a eu une réaction positive que de la part de MM. Kourouma et Lamizana Condé, et non des six autres « corrompus » dénoncés par le rapport de M. Fox) et l'absence de toute suite à la plainte prouvent plutôt qu'il n'y a pas eu de corruption en l'espèce.

229. Aussi les allégations de corruption entourant l'attribution de la concession à Bolloré après la résiliation du contrat de Getma ne suffisent pas comme indice de corruption pouvant augmenter la crédibilité des témoignages de MM. Kourouma et Condé. Au contraire, quand le Tribunal arbitral a essayé de tester, par ses questions à ces témoins, le prétendu caractère endémique de la corruption en Guinée, il n'en a pas obtenu de confirmation claire : M. Kourouma a affirmé qu'il n'avait jamais reçu une offre d'argent en échange pour un comportement irrégulier[314], ce qui serait plutôt un indice de l'absence de corruption endémique; M. Condé pour sa part s'est obstinément refusé à répondre à la question de savoir s'il avait fait l'objet de (autres tentatives de)

---

[314] TR III, p.56:7-9.

corruption[315], ce qui peut bien entendu s'expliquer par un souci de ne pas davantage s'incriminer. Interrogé directement sur le caractère endémique de la corruption dans son pays, il a répondu que « [p]eut-être avec les journaux… Vous savez qu'on était au centre du pays le plus corrompu au temps de Conté. Ca, on reconnaît ».

230. La Défenderesse s'est également basée sur de prétendues irrégularités dans l'offre de Getma International et la « passivité coupable» des membres de la Commission d'évaluation qui ne les ont pas prises en compte; elle estime que cette attitude ne peut s'expliquer que par la corruption. Le Tribunal se demande une fois encore pourquoi cet argument n'a été évoqué qu'après que Getma International avait commencé l'arbitrage CCJA pour être indemnisée pour la résiliation de la concession et pourquoi, si fraude il y avait lors de la conclusion de la concession, celle-ci n'a pas été le motif – légal – d'une annulation de la Convention de concession.

231. Le Tribunal arbitral vérifiera toutefois ces irrégularités alléguées, non seulement en tant qu'éventuels indices de corruption, mais également sous l'angle de la fraude. En effet, la Défenderesse soutient que l'investissement de Getma International n'est pas seulement entaché de corruption, mais aussi de fraude à cause des fausses déclarations faites par Getma International lors de l'appel d'offres concernant ses références et son expérience, sa situation financière et l'existence d'un partenariat avec le groupe MSC. Selon la Défenderesse, ces « manœuvres frauduleuses sont contraires aux lois guinéennes relatives au dol, aux principes généraux relatifs aux commandes publiques et à l'obligation d'investir dans le respect des lois guinéennes ».[316]

## 1   Le partenariat entre MSC et Getma

232. Les Parties ont beaucoup parlé d'un partenariat Getma International - MSC, mais en fait, le partenariat, s'il y en a un, l'est avec la filiale de MSC, Europe Terminal. Selon

---

[315] TR III, p.77:5-39.
[316] C-Mem. § 242-244.

la Défenderesse, Getma International s'est faussement vantée d'avoir un partenariat avec MSC et s'est à tort attribué les références de celle-ci.

233.  Il faut d'abord constater que ce partenariat n'a pas été mentionné comme tel dans la lettre que Getma International a adressée le 10 mars 2008 en réponse à l'appel de manifestation d'intérêt pour l'extension et la mise en concession du TAC daté du 9 mars 2008. Cette lettre mentionnait MSC comme l'un des onze « principaux armateurs clients ou partenaires »[317] et contenait parmi ses trois annexes une lettre du Vice-Président de MSC écrite déjà le 5 mars 2008 et ayant pour objet l'« Engagement du groupe MSC dans le cadre de la mise en concession du Terminal ».[318] Le Vice-Président se référait à « des accords généraux liant le groupe MSC à Getma International sur la Côte Ouest Africaine » et confirmait que Getma International bénéficiait «à ce titre de tout l'appui nécessaire que peut vous apporter notre groupe et en particulier notre filiale terminaliste ». La lettre poursuivait ainsi :

> Il entre parfaitement dans le cadre de l'accord de partenariat que nous avons sur l'Afrique entre MSC et Getma International.
>
> Ce partenariat couvre tous les domaines de compétence et d'éligibilité requis spécifiquement pour ce projet...
>
> Nous vous autorisons à en faire mention dans votre offre finale et présenter MSC comme partenaire conjoint et solidaire de GI conformément aux termes du Règlement de la Consultation (Article 4). Notre armement serait très intéressé par votre gestion de ce terminal et pourrait ainsi envisager de desservir le port de Conakry à l'avenir.[319]

234.  Le lendemain de cette lettre, le 6 mars 2008, un Accord de Partenariat Technique a été signé entre Getma International et la filiale Europe Terminal de MSC (C-174, p.89 – 92), dont les principaux termes prévoyaient ceci:

> Art.1 : *Définitions : [...]*

---

[317] Manifestation d'Intérêt de Getma International en date du 10 mars 2008(C-103), p.8.
[318] Manifestation d'Intérêt de Getma International en date du 10 mars 2008 (C-103), p.15.
[319] Manifestation d'Intérêt de Getma International en date du 10 mars 2008 (C-103), p.15.

*Mandataire :*          *La société GETMA INTERNATIONAL représentée par TRANSAFRICA agissant en tant que représentant de chacun des Parties auprès du Concédant et, le cas échéant auprès de tiers ;*

*Partenaire Technique :*      *La société EUROPE TERMINAL ; […………]*

Art.2 : *... en vue d'élaborer et soumettre au Concédant l'Offre et pour le cas où les parties seraient adjudicataires du Projet, de négocier le Contrat avec le Concédant et de réaliser le Projet.*

Art.3 :  [….]
*Si, à la demande du Concédant, les Parties acceptent le principe d'un engagement « conjoint et solidaire » à l'égard du Concédant pour la réalisation du Projet, la solidarité est exclue dans les relations avec les tiers ainsi que pour les rapports des Parties entre elles.*

Art. 4 : *D'une façon générale, la mission du Mandataire est d'assurer la représentation de chacune des Parties vis-à-vis du Concédant et, le cas échéant des tiers, ainsi que la gestion du Projet.*
*Le Mandataire est plus particulièrement chargé des taches suivantes :[… ]*

Art.5 : *D'une façon générale, la mission du Partenaire Technique est d'apporter le support technique en vue de permettre la réalisation du Projet.*
*Le Partenaire Technique est plus particulièrement chargé des taches suivantes :*

♦      *étude d'ingénierie (dimensionnement des infrastructures, échantillonnage, etc.)*
♦      *analyse des trafics et de leur projection*
♦      *proposition sur les équipements de manutention requis*
♦      *élaboration des documents nécessaires au Projet*

*Le Partenaire Technique autorise le Mandataire à se prévaloir de son support technique pour le compte et au nom des Parties.*

Art. 7: *L'Accord […] demeurera en vigueur :*

-    *En cas de non-acceptation de l'Offre, jusqu'à la date de notification par le Concédant du rejet de l'Offre;*

- *En cas d'acceptation de l'Offre, jusqu'à la signature du Contrat entre le Concédant et GETMA INTERNATIONAL.*

235. C'est cet Accord de Partenariat Technique que Getma International a joint, le 28 juillet 2008, à l'« Offre Technique du Groupe NCT Necotrans, Getma International / Transafrica SA ».[320] Cette offre (dont le seul titre crée déjà une ambiguïté quant à l'identité du soumissionnaire) parle de son partenaire Europe Terminal dans le chapitre 1.1 qui fait une «Présentation générale du Soumissionnaire et de son Partenaire » dans les termes suivants :

> **GETMA INTERNATIONAL** *est un réseau d'agences établi essentiellement sur la Côte Atlantique de l'Afrique, spécialisé dans les métiers du transport que sont l'agence maritime ... la manutention portuaire et la gestion de terminaux à conteneurs, le transit, le post-acheminement vers les pays enclavés, le magasinage et la logistique internationale.* (p.5)
> *[…]*
> *GETMA INTERNATIONAL est manutentionnaire de conteneurs dans les ports de Dakar, Conakry (à travers sa filiale Transafrica S.A), San Pedro, […] et Luanda. GETMA INTERNATIONAL est actionnaire et operateur du terminal à conteneurs de Douala (DIT), propriétaire et operateur de deux grues à conteneurs Gottwald de dernière génération au port de Dakar, manutentionnaire historique du port de Libreville-Owendo où il est devenu en 2007 actionnaire du nouveau terminal à conteneurs, opérateur du futur terminal roulier du port d'Abidjan et opérateur et concepteur du futur terminal à conteneurs de Luanda.*(p.6-7)
> *[………]*
> *Les principaux armateurs clients ou partenaires de GETMA INTERNATIONAL en matière de manutention conteneurs sont :*
> • *MAERSK LINE N°1 mondial*
> • *MSC N°2 mondial* (p.8)
> *[…]*
> *Getma International est le partenaire privilégié d'Europe Terminal filiale du groupe Mediterranean Shipping Company (MSC) avec lequel a été signé un contrat global de manutention portuaire sur les principaux ports de la Côte Ouest Africaine. A ce titre, GETMA INTERNATIONAL bénéficie du soutien total d'Europe Terminal.*

---

[320] Proposition technique (C-174).

> *Ses références pour la mise en place et la gestion d'un terminal à conteneurs sont présentées ci-dessous.* <u>*L'accord de partenariat technique liant Getma International à Europe Terminal est joint en annexe OT 2.*</u>[321](p.9)

236.  L'offre ajoute encore ceci à la p. 10, sous le titre « Partenaire Contractuel » :

> *Europe Terminal est une filiale de l'armement Mediterranean Shipping Company (MSC) et partenaire a 50% de MSC Home Terminal S.A à ANVERS. Cette société opère et exploite des terminaux à conteneurs en Belgique (Anvers), en Espagne (Valence), en Italie (Naples), en France (Le Havre, et Marseille) et au Brésil avec la création récente d'un terminal a Navegantes (Côte sud-est du Brésil).*
> *Le volume annuel des conteneurs (EVP) transitant sur les différents terminaux dépasse très largement en trafic cumulé les 5 millions d'EVP.*
> *Les performances de quelques terminaux Européens gérés et opérés intégralement et sous contrôle direct et unique d'Europe Terminal (parmi la trentaine de terminaux à conteneurs à travers le monde dans lesquels MSC est soit actionnaire unique, soit partenaire) font de cette entité un des leaders européens dans la gestion de terminaux à conteneurs. [ …]*
> *La stratégie technico-commercial du groupe Mediterranean Shipping Company (MSC) et une présentation synthétique d'Europe Terminal sont jointes en Annexes OT 3 et OT 4.*[322]

237.  A première vue, il existait donc un partenariat entre Getma International et Europe Terminal, qui obligeait celle-ci à assister Getma International dans la négociation du Contrat et la réalisation du Projet, et, « pour le cas où les parties seraient adjudicataires », de négocier le Contrat avec le Concédant et de réaliser le Projet. Le Tribunal arbitral est conscient de ce qu'une telle façon d'opérer en cas de regroupement de deux ou plusieurs partenaires pour un projet est habituelle: Les partenaires s'engagent d'abord pour une coopération pendant la phase précontractuelle et précisent ensuite, après que le contrat leur est attribué, plus en détail leur coopération pour l'exécution.

238.  L'impression que la manifestation d'intérêt et l'offre, en combinaison avec leurs documents joints, donnent ne correspond toutefois pas à la réalité parce que Getma

---

[321] Notre soulignement.

[322] Les annexes OT 3 et OT 4 étaient des brochures commerciales de MSC et Europe Terminal, respectivement.

International n'a manifesté son intérêt qu'en son propre nom et pas au nom d'un groupement entre elle-même et son "partenaire".

239.  En effet, l'article 4 du Règlement de la Consultation prévoyait ce qui suit :

> *La présente Consultation est réservée aux candidats sélectionnés suite à l'appel à manifestation d'intérêt. Le terme « Soumissionnaire" utilisé ci-après, s'applique strictement aux candidats sélectionnés. II reste entendu qu'aucun regroupement entre les candidats sélectionnés suite l'appel à manifestation d'intérêt n'est désormais autorisé.*[323]

240.  Getma International savait donc – ou devait savoir - depuis le début de la mise en concurrence de la concession qu'Europe Terminal ne saurait être soumissionnaire solidaire et conjoint si les deux partenaires ne manifestaient pas ensemble et formellement en tant que groupement leur intérêt pour l'appel d'offres. Sans une manifestation d'intérêt conjointe qui permettrait de présélectionner également Europe Terminal, celle-ci ne pouvait jamais devenir un des adjudicataires du projet comme l'envisageait pourtant l'Accord de Partenariat Technique.[324]

241.  Qui plus est, Getma International, en n'incluant pas Europe Terminal dans la manifestation d'intérêt, a méconnu les termes de la lettre de M. Aponte du 5 mars 2008, citée ci-avant. Celle-ci autorisait Getma International à "présenter MSC comme partenaire conjoint et solidaire de Getma International **conformément aux termes du Règlement de la Consultation (Article 4)**".[325] Getma International n'a pas respecté cette modalité de l'autorisation quand elle a manifesté son intérêt toute seule et non au nom du partenariat. Cela implique que l'Accord de Partenariat Technique qui a été signé le lendemain de la lettre de soutien de M. Aponte, ne pouvait pas prendre effet si la manifestation d'intérêt émanait seulement de Getma International et pas également

---

[323] Règlement de la Consultation (C-108) p.13.

[324] L'article 2 confirme que si leur offre prévaut, les deux parties deviennent "adjudicataires" et les articles 4 et 5 relatif à la répartition des rôles entre elles dans ce cas sous-entendent également un engagement contractuel du Partenaire Technique à l'égard du Concédant et nullement une relation de sous-traitance.

[325] Notre soulignement.

d'Europe Terminal. En effet, comme déjà noté ci-avant, l'Accord lui-même envisageait que les partenaires deviennent adjudicataires.

242. L'article 7 de l'Accord de Partenariat Technique prévoit que l'Accord prendrait fin à la signature du Contrat entre Getma International et le Concédant, c'est-à-dire, précisément au moment où Getma International aurait besoin d'Europe Terminal pour exécuter ses obligations contractuelles pour la réalisation du nouveau terminal.[326] S'il est plausible que les parties à l'Accord de Partenariat Technique ont envisagé de conclure un nouveau contrat, plus détaillé, à la signature de la Convention avec le Concédant, comme cela se fait généralement dans ce type de partenariat, cette intention n'est toutefois pas exprimée et, selon la lettre de l'article 7, l'Accord de Partenariat Technique – dans l'hypothèse qu'il aurait pris effet nonobstant le non-respect de l'article 4 du Règlement sur lequel M. Aponte avait insisté - a pris fin à la signature de la Convention de concession, soit le 22 septembre 2008. Le dossier ne contient aucune indication établissant qu'un nouveau contrat a effectivement été signé entre les partenaires après l'attribution de la concession à Getma International. Celle-ci n'a pas non plus prouvé, ni même prétendu avoir fait appel à Europe Terminal pour la réalisation d'études d'ingénierie ou d'analyses de trafic. Au contraire, elle a reconnu qu'Europe Terminal n'a pas fourni de prestations au bénéfice de Getma International au titre de l'exécution de la Convention de concession.[327] Si « d'autres filiales du groupe MSC » sont intervenues dans l'exécution selon M. Quérel, ces interventions se sont limitées à l'achat de matériel et l'ouverture d'une ligne sur Conakry en tant qu'armateur.[328] En tout cas, si le partenariat avait été prolongé au-delà de l'adjudication à Getma International, il n'aurait pas été conjoint et solidaire à l'égard du Concédant comme l'offre et l'Accord le laissaient entendre.

---

[326] Le Tribunal CCJA a cité cette clause mais sans la discuter: il a simplement ajouté que l'article 2 élargissait l'objet de l'Accord au-delà de l'élaboration de la soumission (C-50 § 134) et semble ne pas s'être rendu compte que cela exigeait qu'Europe Terminal soit co-adjudicataire.
[327] Répl. §176.
[328] TR I, p. 54:18-55:20.

243.  Bref, (i) cet Accord – dans l'hypothèse qu'il était entré en vigueur nonobstant la manifestation d'intérêt "caduque" - n'a existé que très brièvement et n'a pas été renouvelé; (ii) même pendant cette courte période, le partenariat n'était pas conjoint et solidaire, et (iii) ce qui restait après l'attribution de la concession à Getma International n'était qu'un partenariat "général", envisageant une éventuelle détention, directe ou indirecte, de 50% du capital de Getma International, ainsi que la possibilité de prestations de manutention portuaire en Afrique et d'une participation commune à des projets portuaires en Afrique.

244.  En présence de ces constations, il revient au Tribunal de déterminer si le partenariat était faux comme la Guinée l'allègue.

245.  Les Demanderesses soutiennent que ces références à un partenaire se justifient par un *Memorandum of Understanding* (MoU), signé le 9 novembre 2005 entre le groupe Necotrans et le groupe MSC, définissant les grandes lignes de la coopération entre les deux groupes relativement aux activités portuaires en Afrique, dans le cadre duquel a été conclu e.a. l'Accord de Partenariat Technique du 6 mars 2008[329], mais qui était beaucoup plus large et couvrait toutes les opérations portuaires.[330] Selon les Demanderesses, ce MoU est toutefois confidentiel[331], ce qui a été confirmé par la réponse du PDG de MSC, M. Aponte, du 10 avril 2013[332] à la demande de M. Talbot, PDG de Necotrans, d'autoriser la communication du MoU dans le cadre de l'arbitrage CCJA.[333] Dans cette même lettre, M. Aponte a confirmé que « c'est dans le cadre de nos accords incluant notamment notre participation dans le capital de Getma International que vous avez soumissionné à la mise en concession du terminal à conteneurs de Conakry et que, dans ce cadre, vous avez inclus dans votre offre notre

---

[329] Répl. §§ 154-155.
[330] TR I, p.59:18-20.
[331] Répl. §§ 150-158 et TR I, p.58:11-21.
[332] Lettre de Mediterranean Shipping Company S.A. à NTC Necotrans en date du 10 avril 2013 (C-346).
[333] Lettre de Necotrans à Mediterranean Shipping Company en date du 3 janvier 2013 (C-347).

accord de partenariat, ma lettre du 5 mars 2008 ainsi que les références d'Europe Terminal ».

246.  Le Tribunal arbitral constate que les renseignements dont il dispose relatifs au MoU, à la participation indirecte de MSC dans le capital de Getma International et à l'Accord de Partenariat Technique, prouvent qu'il existait effectivement un partenariat entre Getma International (ou au moins sa société mère Necotrans) et MSC (ou au moins Europe Terminal). Le dossier ne contient aucune trace de ce que MSC se serait plainte du fait que Getma International ne l'avait pas impliqué comme un partenaire à part entière dans la manifestation d'intérêt ou dans l'offre. Au contraire, la lettre de M. Aponte à Necotrans du 10 avril 2013 confirme que MSC maintenait son soutien à Getma International, aussi dans le contexte des arbitrages suivant la résiliation du contrat, et que, nonobstant le fait que MSC ou Europe Terminal n'était pas devenue le co-adjudicataire de la concession, une coopération sous une autre forme pour cette exploitation était certainement envisagée. On peut accepter comme un fait que Getma International pouvait à tout moment faire appel à l'assistance d'Europe Terminal et l'aurait probablement obtenue, à condition pour les deux sociétés de s'entendre sur les modalités. Dans ce sens, les deux sociétés étaient des partenaires.

247.  Ce partenariat n'était toutefois que commercial et le dossier ne contient aucune preuve de ce qu'Europe Terminal a effectivement été juridiquement engagé à l'égard de Getma International. Dès son exclusion de la manifestation d'intérêt et surtout après l'attribution de la concession à Getma International seule, Europe Terminal n'était plus liée par l'Accord de Partenariat Technique. En outre, et surtout, il n'y avait pas de solidarité entre les deux partenaires et Europe Terminal n'a pris aucun engagement à l'égard du Concédant. La participation de MSC dans le capital social de Getma International ne créait aucun engagement au-delà du montant de cette participation financière et en tout cas ne donnait à la Guinée pas un deuxième débiteur pour les obligations contractuelles assumées par Getma International à son égard. M. Aponte dans sa lettre du 10 avril 2013 n'a pas non plus confirmé que son groupe s'était engagé concrètement à l'égard de Getma International pour l'exécution des obligations de celle-ci à l'égard de la Guinée – au-delà de ce qui était couvert par l'Accord de Partenariat

Technique du 6 mars 2008. Pendant son audition, M. Quérel qui fut en 2008/2010 secrétaire-général de la société NCT Necotrans, a d'ailleurs reconnu qu'au sein du groupe Necotrans, on était conscient qu'en répondant seule et en son nom propre à la manifestation d'intérêt, Getma International avait exclu qu'Europe Terminal devienne un partenaire solidaire et conjoint.[334]

248.   Dès lors se pose la question si Getma International, consciente de ce qu'il n'y avait aucun engagement concret d'Europe Terminal pour la concession, pouvait faire état dans sa manifestation d'intérêt à la lettre de M. Aponte du 5 mars 2008 et pouvait joindre l'Accord de Partenariat Technique du 6 mai 2008 à l'offre qu'elle a remise le 28 juillet 2008. Au moins à première vue, la réponse est négative.

249.   M. Quérel a été interrogé pendant l'audience sur cette attitude incohérente, notamment à la suite de sa déclaration que « le mode de soumission en groupement conjoint et solidaire a été abandonnée suite à la constatation que Getma International, et elle seule, avait été présélectionnée ».[335]Dans son souvenir, cela « se rapportait, d'après l'explication donnée par nos équipes locales, au fait que le dossier avait été retiré au nom de Getma International ».[336] Donc il semble dire que les deux partenaires aient été mis devant un fait accompli, à la suite du retrait du dossier et la manifestation d'intérêt au seul nom de Getma International. Pourtant, comme l'a fait remarquer la Défenderesse[337], cette déclaration ne concorde pas avec celle faite devant le Tribunal CCJA selon laquelle l'entreprise conjointe a été abandonnée à la suite d'une décision des actionnaires des deux sociétés, notamment parce qu'ils n'ont pas jugé nécessaire de créer encore une entité commune alors qu'elles étaient déjà ensemble dans l'actionnariat de Getma International.[338] Réinterrogé au sujet de cette contradiction pendant l'audience de ce Tribunal arbitral, le témoin a encore une fois répété cette explication:

---

[334] TR I, p.62:1-7.
[335] Notre soulignement.
[336] Attestation de G. Quérel §19.
[337] Dupl. §§117-119.
[338] Transcription de l'audience CCJA du 27 mai 2013 (R-43), p.41:28-41.

Getma avait retiré son dossier et les équipes ont diligenté le dossier, les actionnaires ont été prévenus et ont alors décidé « de ne pas aller dans le mécanisme juridique », parce que le partenariat existait toujours mais pas selon ce qui avait été envisagé au début.[339]

250. Le Tribunal arbitral peut comprendre qu'il y ait eu une malentendu entre "les équipes locales de l'époque" qui, selon M. Quérel, ont retiré le dossier sur place et diligenté le dossier, d'une part, et les actionnaires à Paris qui devaient décider de la forme et du degré de coopération, d'autre part. Mais quand l'interrogatoire a été poussé davantage, M. Quérel a répondu que "[l]es exécutants de Getma International ne sont pas forcément au fait de l'accord complet qu'il y a entre le Groupe Necotrans et le Groupe MSC".[340] Cette remarque peut être correcte pour les équipes locales, mais pas pour M. J-F. Ollivier, le Directeur-Général de Getma International qui a signé la lettre de couverture de la manifestation d'intérêt[341] à Paris et dont on peut présumer qu'il était au courant de l'intention de soumissionner conjointement. Même si, comme les équipes sur place, il n'était effectivement pas au courant de cette intention et croyait que la manifestation d'intérêt ne concernait que Getma International toute seule, on ne peut expliquer comment la manifestation d'intérêt a pu avoir comme annexe la lettre de M. Aponte du 5 mars 2008, qui lui avait précisément été adressée en tant que "Directeur-Général de Getma International – Paris" et qui l'autorisait de présenter MSC comme partenaire conjoint et solidaire. On ne comprend pas non plus comment la page de signature de la manifestation d'intérêt (p.14/19) a pu mentionner comme annexe l' "engagement de MSC", sans alerter les exécutants responsables, qui qu'ils soient, au fait que cet engagement nécessitait une présentation des partenaires en tant que groupement.

251. Une autre contradiction existe entre les déclarations suivantes :

---

[339] TR I, p.62:1-7.

[340] TR I, p.61:28-29.

[341] Lettre de Getma International à la Direction Générale du port Autonome de Conakry en date du 28 mars 2008 (R-27 et C-16).

*Les exécutants de Getma International ne sont pas forcément au fait de l'accord complet qu'il y a entre le Groupe Necotrans et le Groupe MSC.*[342] et

*Ensuite, dans la production de documents, nos équipes ont sollicité MSC qui, d'eux-mêmes, ont fait cette lettre.*"[343]

252. Comment peut-on expliquer encore que M. Quérel, dans un laps de temps de quelques minutes présente d'abord les exécutants comme des ignorants de tout ce qui concerne les accords de coopération entre leurs dirigeants/actionnaires et MSC et puis comme des personnes qui prennent même l'initiative de solliciter MSC qui font « d'eux-mêmes »[344] la lettre litigieuse autorisant de présenter MSC comme partenaire conjoint et solidaire ? Les Demanderesses, apparemment conscientes des faiblesses de ce témoignage, ont répondu dans leur Mémoire après Audience que M. Quérel n'avait pas été impliqué à la manifestation d'intérêt.[345] Cela ne peut qu'accroître le doute concernant sa crédibilité sur ce sujet.

253. Le Tribunal arbitral n'est pas convaincu par ces explications changeantes, contradictoires et parfois même incorrectes. Ce n'est effectivement pas l'identité de celui qui retire le dossier à l'administration qui détermine qui peut manifester son intérêt et, après sa présélection, soumissionner. Il suit de l'article 4 du Règlement que des groupements peuvent participer à la procédure à condition qu'elles soient présélectionnées. Pour cela, il suffisait de déposer la manifestation d'intérêt au nom des deux sociétés. La lettre de couverture de la manifestation d'intérêt a été reçue par le PAC le 28 mars 2008[346], c'est-à-dire trois semaines après la lettre de M. Aponte du 5 mars et la signature de l'Accord de Partenariat du 6 mars 2008. Ce laps de temps permettait parfaitement d'accorder les violons entre les équipes et exécutants d'une part et les actionnaires d'autre part.

---

[342] TR I, p.61:28-29.

[343] TR I, p.62:23-24.

[344] Le terme semble contredire le fait que MSC a été sollicitée par Getma International.

[345] Mem.AAC § 242.

[346] Voir la date de réception manuscrite sur la lettre de Getma International à la Direction Générale du port Autonome de Conakry (R-27 et C-16).

254. Dans leur Mémoire après Audience, les Demanderesses ont même essayé de blâmer la Défenderesse pour la situation en alléguant que « […] si […] l'indication que MSC autorisait Getma à la présenter dans son offre finale comme partenaire conjoint et solidaire avai[t] joué le rôle crucial prétendu par la Guinée dans la présélection de Getma par le PAC, il aurait dû présélectionner (aussi) MSC. [En note de bas de page n°116 :] En ne le faisant pas il a définitivement mis fin – face à la teneur de l'art. 4 de Règlement […] - à toute possibilité que Getma se présente en groupement conjoint et solidaire formel avec MSC ».[347] Le Tribunal arbitral ne peut accepter ce rejet de responsabilité qui est celle des Demanderesses: elles seules choisissaient, en pleine connaissance du Règlement si et comment, avec ou sans partenaire, l'une d'elles soumissionnaient. Si Getma International soumissionnait toute seule, il ne revenait pas au Concédant, qui était lui-même également lié par son propre Règlement d'attirer une tierce partie comme soumissionnaire et de la forcer dans un groupement avec un autre soumissionnaire.

255. Il n'est donc pas prouvé que Getma International a effectivement eu l'intention de soumissionner en groupement avec Europe Terminal et que c'est effectivement par une mauvaise communication entre les exécutants de Getma International sur place et les actionnaires à Paris que Getma International a agi seule dans la procédure d'adjudication.

256. M. Quérel n'a pas pu expliquer pourquoi, nonobstant l'abandon du partenariat solidaire et conjoint, Getma International a quand-même joint la lettre de MSC à sa candidature, sauf en disant que la lettre était, à part un engagement conjoint et solidaire, « également une manifestation commerciale » et que MSC a « comme les autres armateurs, [………] commercialement confirmé son intérêt pour le projet ».[348]

257. L'offre de Getma International ne fait pas de secret de sa dépendance d'autres sociétés du groupe Necotrans et aussi de partenaires en dehors de celui-ci : elle fait référence de nombreuses fois à différents partenaires de Getma International et les mentionne

---

[347] Mem.AAC § 228.
[348] TR I, p.62:16-18.

presque chaque fois que Getma International, Necotrans et le groupe sont mentionnés ; l'offre ne dit rien qui peut faire croire qu'un d'eux est conjointement et solidairement engagé avec Getma International sur le projet de la concession.

258.  La situation est toutefois différente pour Europe Terminal : Getma International a fait dans son offre (chapitre 1.1) une présentation de soi-même **et de son partenaire**[349] en l'appelant son « **PARTENAIRE CONTRACTUEL** »[350], a décrit dans son chapitre 1.2 les engagements de Getma International **et de son partenaire Europe Terminal** relatifs à la mise en concession du TAC de Conakry et de son extension[351], et a confirmé que « [n]otre groupe **et ses partenaires s'engagent** à prendre en charge les travaux de réhabilitation du terminal existant''[352] et « les travaux d'extension du terminal existant ».[353] Toutefois ces déclarations ne reposaient que sur un MoU entre Necotrans et MSC qui n' pas été joint à l'offre (ni n'a pu être produit dans le présent arbitrage). Si le MoU permettait encore d'appeler Europe Terminal (comme MSC et toutes ses filiales) un partenaire (dans le sens commercial), le Tribunal arbitral ne voit pas de justification pour la confirmation d'engagements des partenaires et surtout pas pour appeler Europe Terminal un partenaire contractuel.[354]

259.  Il n'y a aucun doute qu'en annexant à son offre l'Accord de Partenariat Technique avec Europe Terminal[355], Getma International a voulu rendre crédible sa référence à un partenaire « contractuel ». Mais comme relevé ci-avant, la condition pour permettre à cet Accord de prendre effet, notamment une soumission conjointe, n'a pas été remplie. Le Tribunal est d'accord avec les Demanderesses que la Guinée ne peut pas faire d'amalgame entre un partenariat et un groupement conjoint et solidaire et « qu'il est

---

[349] Proposition technique (C-174), p.26.
[350] Proposition technique (C -174) p.31.
[351] Proposition technique (C-174), p. 32.
[352] Proposition technique (C-174), p.59.
[353] Proposition technique (C-174), p.59.
[354] Nos soulignements.
[355] Proposition technique (C-174), p.89-92.

possible d'avoir un partenariat sans avoir un groupement conjoint et solidaire ».[356] Toutefois un « partenaire contractuel » suppose un contrat entre les partenaires et l'existence d'un contrat liant Europe Terminal n'a pas été prouvé.

260.  En outre, même si, dans son offre, Getma International n'a pas déclaré avoir un partenariat "conjoint et solidaire" avec Europe Terminal, l'emploi de ce terme dans l'article 3 de l'Accord de Partenariat Technique (p. 90/254) cité ci-avant, ne pouvait que renforcer l'impression cherchée d'un partenariat contractuel.

261.  La question suivante est celle de savoir si Getma International a eu l'intention de tromper la Guinée en présentant l'offre de cette manière et si la Guinée a été trompée.

262.  Le Tribunal arbitral remarque préalablement que le "flou artistique" de la manifestation d'intérêt et de l'offre de Getma International s'étend aussi à l'identité du soumissionnaire-même: la lettre avec laquelle Getma International a transmis au PAC la manifestation d'intérêt indique que la manifestation d'intérêt est celle « du groupe GETMA INTERNATIONAL »[357] et avait comme pièce jointe, entre autres, « la plaquette de présentation du groupe NECOTRANS»; la manifestation d'intérêt elle-même mentionne que « GETMA INTERNATIONAL et le groupe NCT Necotrans s'engagent…. »[358]; et l'offre technique mentionne à sa première page qu'elle est l' « Offre du Groupe NCT Necotrans   Getma International/Transafrica ».[359]

263.  Nonobstant ces références multiples au groupe, le dossier ne contient aucune preuve de ce que d'autres sociétés du groupe Necotrans, à part Getma International, ont pris un engagement à l'égard de la Défenderesse. Même Getma International Investissements qui a été constituée par Getma International et NCT Necotrans le 31 octobre 2008 et a constitué à son tour, le 20 novembre 2008, la société d'exploitation guinéenne (STCC),

---

[356] Mem.AAC §241.

[357] Lettre de Getma International à la Direction Générale du port Autonome de Conakry en date du 28 mars 2008 (C-16 et R-27); notre soulignement.

[358] Manifestation d'intérêt de Getma International au PAC (C-103), p.11; notre soulignement.

[359] Proposition technique (C-174); notre soulignement.

n'a pas pris un engagement additionnel à ceux de Getma International. Elle s'est simplement substituée à Getma International pour remplir l'obligation contractuelle que celle-ci avait assumée à l'égard de la Défenderesse, soit celle de constituer dans les trois mois après la signature de la Convention une société d'exploitation de droit guinéen qu'elle contrôlait.[360]

264.  Ce ne sont toutefois pas les engagements du groupe qui sont mis en question, mais ceux du « partenaire contractuel » de Getma International que Getma International a impliquée dans son offre d'une façon que les circonstances ne justifiaient pas. Ce Tribunal arbitral estime qu'elle a fait plus que commercialement « embellir » les faits et qu'elle a au moins frôlé, si elle n'a pas dépassé, la limite entre une présentation favorable et commercialement habile et une présentation trompeuse. Même si on ne prend pas en compte l'absence de solidarité, Getma International a toujours présenté Europe Terminal comme un « partenaire contractuel » alors qu'il n'y avait aucun contrat qui liait les deux sociétés et dans l'arbitrage elle a tenté de justifier cette présentation en s'appuyant sur un MoU entre les sociétés mères des partenaires commerciaux qui n'avait rien de concret.

265.  Toujours est-il que la Défenderesse, de son côté, ne pouvait pas ignorer qu'une société seule et non un groupement avait manifesté son intérêt, soumis l'offre et ultérieurement négocié et signé la Convention, et que son seul co-contractant était Getma International et non pas Europe Terminal. Le dossier ne contient pas de trace d'une demande par la Défenderesse d'un engagement d'Europe Terminal. Cela peut s'expliquer par la confiance de la Défenderesse dans les déclarations faites par Getma International concernant son partenariat. Il est difficile de déterminer si cette confiance était justifiée.

---

[360] Convention de concession (C-11), art. 7.1. Voir aussi §§ 52 et 54 ci-dessus et la note en bas de page n°14. Selon le Mémoire en Demande des Demanderesses, il a été décidé de constituer Getma International Investissements « comme une structure intermédiaire […] qui aurait ainsi accès directement aux financements de la holding du groupe Necotrans » (§ 56). Le Tribunal arbitral se demande toutefois pourquoi une filiale de Getma International aurait eu plus directement accès à ces financements que Getma International-même et soupçonne que d'autres motifs ont joué.

266. Pourtant, pour conclure qu'il y a eu fraude, il ne faut pas seulement qu'une partie ait fait une déclaration fausse, mais aussi que celle-ci porte sur un élément substantiel et que l'autre partie ait effectivement été induite en erreur.

267. Il est toutefois judicieux de ne pas se prononcer sur ces aspects sans prendre simultanément en compte le deuxième reproche de la Défenderesse au sujet de l'offre.

## 2   Les références dans l'offre

268. **L'appel à manifestation d'intérêt** pour l'extension et la mise en concession du TAC précisait qu'il s'adressait « exclusivement aux candidats ayant une longue et solide expérience dans la conception, le financement, la réalisation, l'exploitation et l'entretien de TAC. Seule une candidature par une personne morale ou groupement sera recevable ».[361] Il n'est pas facile de déterminer si la réponse de Getma International à cet appel[362] confirme cette longue et solide expérience dans des activités très vastes et diverses. Getma International écrit e.a. ceci :

*GETMA INTERNATIONAL souhaite s'impliquer durablement dans la région à travers la mise en concession de certaines activités portuaires, dont le terminal à conteneurs de Conakry est un des projets prioritaires.*[363](p.1)
*[………]*
*Dès 1989, le réseau GETMA s'est investi le long de la côte ouest africaine dans les opérations portuaires et la logistique terrestre [………]*
*[………] la logistique de projets industriels et parapétroliers, ont donné au groupe NCT Necotrans sa dimension actuelle.*
*Cette dimension a été renforcée en 2007 par la création de la société «NCT Infrastructure - logistique» spécialisée dans les projets d'infrastructures terrestres (rail, routes, ports et aéroports. (p.2)*

269. Getma International ne prétend donc nullement posséder l'expérience requise. Des phrases comme:

---

[361] Annonces Légales, Magasine Jeune Afrique n°2461 (C-102), point 2.
[362] Manifestation d'intérêt de Getma International au PAC (C-103).
[363] Notre soulignement.

> *Spécialiste de l'Afrique, le groupe NCT Necotrans s'est rapidement diversifié autour des métiers du transport international et de la logistique multimodale*

ou

> *En 1992, le groupe NCT Necotrans a saisi l'opportunité de se diversifier en construisant un réseau de distribution automobile*

sont certainement une preuve d'un esprit d'initiative et d'ambition, mais en fait ne disent pas que Getma International ou le groupe auquel elle appartient à l'expérience requise « dans la conception, le financement, la réalisation, l'exploitation et l'entretien de TAC ». La lettre est commerciale et il convient de la lire attentivement pour comprendre ce qu'elle dit vraiment et ce qu'elle ne dit pas.

270. On lit encore que « NCT Infrastructure et Logistique est la dernière filiale créée par NCT Necotrans pour répondre aux besoins de son propre réseau et de ses filiales, des réseaux ferroviaires, des Collectivités ou de toute autre Société et dont le but est de réaliser toutes études, expertises, audits dans tous les domaines liés à la logistique et aux transports terrestres, maritimes et aériens. Cette nouvelle filiale est spécialisée sur les projets d'infrastructure tels que l'on peut en trouver dans le domaine portuaire et ferroviaire mais également en ce qui concerne la logistique minière ou pétrolière et s'inscrit dans une logique de complémentarité avec les différentes filiales du groupe NCT Necotrans afin de répondre au mieux aux défis logistiques et opérationnels de ses différentes structures » (C-103) (p.5-6).

271. Le lecteur attentif comprend que toute l'expérience du groupe concernant la conception, la réalisation et l'entretien des infrastructures se trouvait chez NCT Infrastructure et Logistique, laquelle existait au 10 mars 2008 au maximum depuis un an et dont les services étaient à l'époque « complémentaires » à ceux des autres filiales du groupe, c.à.d. qu'elle opérait avant tout au sein du groupe. Et pourtant, le document continue avec des phrases rassurantes:

> *Necotrans aata, AMT SA et Vopak-AMT sont toutes des vecteurs de croissance des trafics que ce soit par le biais de la commission de transport ou celui des grands projets industriels et miniers. [ ………]*
> *L'expérience et le professionnalisme de **GETMA INTERNATIONAL** pour la gestion,*

*l'aménagement, l'exploitation et le développement d'activités portuaires, sont un gage de réussite dans la conduite du projet.* (p.12)

272.   Par un tel langage, on crée habilement l'impression que ce grand groupe réunit en effet toute l'expérience requise, au moins pour l'opération d'un TAC. La chose est moins claire pour la conception et la réalisation d'un TAC. Le lecteur inattentif peut être induit en erreur… et cela était sans doute l'objectif. Pourtant, la lettre ne contient pas d'affirmations fausses : quand elle dit que, pour les études, Getma International peut compter sur le bureau d'étude Inros-Lackner AG, le cabinet d'ingénierie Gottwald Port Technology et, en troisième lieu, NCT Infrastructure et Logistique (p.11), on comprend que le rôle de Getma International et de NCT Infrastructure et Logistique dans cet aspect de la concession sera minime. Même si la lettre ajoute que « [l]'expertise de NCT Infrastructure et Logistique est, dans ce cadre, un atout véritable pour le développement de l'intermodalité notamment en ce qui concerne le développement terrestre et la desserte de l'hinterland guinéen » (p.11), reste que cette expertise n'a pu être accumulée au sein de la société que depuis un an au plus.

273.   Le financement par contre n'est nullement mentionné dans la longue liste des « Engagements de GETMA INTERNATIONAL relatifs à la prise en Concession du Terminal Conteneurs du Port Autonome de Conakry et de sa future extension » (p.11-14).

274.   La manifestation d'intérêt et sa présentation du groupe n'a pas manqué l'effet recherché, puisque, le 7 avril 2008, le Directeur-Général du Port Autonome de Conakry (PAC) a informé Transafrica en tant que représentant de Getma International qu'elle avait été présélectionnée et qu'elle pouvait remettre une offre.[364] Il a peu été question dans cet arbitrage du processus de présélection, mais on peut conclure du fait que la manifestation d'intérêt a été adressée au PAC et que c'est le PAC qui y a répondu, que cette présélection a été faite par le PAC. La Défenderesse n'a pas allégué que le PAC a

---

[364] Lettre du DG du PAC à Getma International en date du 7 avril 2008 (C-105).

également été corrompu[365] et le Tribunal arbitral en déduit que, si Getma International a été sélectionnée, cela n'est pas dû à une corruption, mais au fait que la présentation du groupe avait été jugée satisfaisante, au moins pour les besoins de la présélection.

275. Cela n'empêche que la décision du PAC de présélectionner GI est contestable. Même M. Quérel a admis, après une longue interrogation par le conseil de la Défenderesse, que Getma International n'avait « ni conçu, ni réalisé, ni financé de terminaux à conteneurs en 2008 »[366] et qu'il aurait été possible qu'elle ne passe pas le cap de la présélection.[367] Cette interrogation a montré à quel point l'aspect commercial et l'ambition peuvent prendre les devants sur la rigueur dans des procédures d'appel d'offres. M. Quérel a initialement défendu la manifestation d'intérêt en insistant sur le financement par Getma International de « terminaux portuaires » au Cameroun, soit « un quai »[368], sur le fait qu'« on[369] a financé, on a exploité, on a réalisé, on a entretenu des espaces dédiés aux conteneurs, mais qui n'avaient pas la notion de terminaux »[370], et sur le fait que la notion « terminaux à conteneurs » n'existait pas en 2008 au Sénégal, ce qui implique que le financement par Getma International d'une « opération portuaire » à Dakar pouvait aussi répondre au critère d'expérience.[371]

276. La question se pose alors de savoir si la manifestation d'intérêt de Getma International constitue une fraude. Le Tribunal arbitral estime que ce n'est pas le cas. Il est courant que, dans la pratique, des entreprises qui ne réunissent pas toutes les conditions d'admissibilité participent à une présélection, dans l'espoir de passer le cap nonobstant

---

[365] Nonobstant le fait qu'un des articles de presse concernant l'attribution de la concession à Getma International, produites par les Demanderesses pour prouver le caractère diffamatoire de la campagne organisée selon elles par la concurrence, mentionne que le Directeur du PAC, M. Morlaye Camara, a également reçu de l'argent de Getma International, notamment EUR 300.000. Articles de guinee24.com en date du 10 octobre 2008, du 24 octobre 2008, et du 31 octobre 2008(C-132 et C-134).

[366] TR I, p.63:17–p.64:34.

[367] TR I, p.64:39.

[368] TR I, p.64:1-10.

[369] Le Tribunal arbitral note l'emploi du terme "on" qui n'indique nullement si le financier, exploitant et réalisateur était effectivement Getma International ou une autre société du groupe MSC.

[370] TR I, p.64:13-14.

[371] TR I, p.64 :20-26.

leur manque de qualifications. Un motif évident est celui de s'ouvrir de nouveaux marchés. C'est précisément la raison pour laquelle les appels d'offres sont précédés d'une présélection. L'autorité adjudicatrice peut être plus ou moins stricte dans l'évaluation des critères qu'elle a elle-même fixés (sous réserve bien entendu, de ne pas discriminer les autres concurrents). Le Tribunal arbitral estime que, dans le cas concret, Getma International ne s'est pas rendue coupable d'une fraude et les manœuvres qu'elle a utilisées dans sa manifestation d'intérêt ne se situent pas au-delà des manœuvres commerciales courantes et n'étaient pas dolosives. Sa présélection peut en tout cas s'expliquer autrement que par une corruption.

277. **L'offre technique** de Getma International est plus explicite en ce qui concerne les références. L'article 11.2.1 du Règlement de la Consultation exigeait explicitement les renseignements techniques suivants:

- *Expériences et références DU SOUMISSIONNAIRE dans la conception, le financement, la réalisation, l'exploitation et la gestion de terminaux à conteneurs;*

- *Trafic global consolidé par port et sur l'ensemble des terminaux gérés au nom et sous la responsabilité DU SOUMISSIONNAIRE pour les années 2005, 2006 et 2007 ;*

- *Présentation des activités et des références DU SOUMISSIONNAIRE dans les domaines de la manutention, de l'exploitation, de l'entretien, de la conception, du financement et de la réalisation des terminaux à conteneurs indiquant les informations suivantes :*

- *[….]*

- *Liste des ports pour lesquels la conception, le financement et la réalisation des terminaux ont été assurés par le SOUMISSIONNAIRE …*

- *Justification des capacités pour la réalisation de l'étude, de la planification et du suivi des travaux de construction des terminaux à conteneurs ;*

- *Indication des éventuels PARTENAIRES TECHNIQUES et financiers pour la mise en œuvre de la Concession.[372]*

278. On constate donc que les références qui sont demandées sont celles du soumissionnaire même et que les partenaires devaient juste être mentionnés.

279. L'offre remise par Getma International comporte dans son chapitre 1.3 les "Expériences et références du SOUMISSIONNAIRE dans la conception, le financement, la réalisation, l'exploitation et la gestion de terminaux à conteneurs".[373] Il s'agit d'un tableau qui énumère dix terminaux à conteneurs, entre autres à Anvers, Le Havre, Los Angeles et Marseille, ainsi que, la date de leur création, leurs surfaces en m², la longueur de leurs quais et le fait que MSC opère sur ces terminaux. On ne peut en déduire quel est ou a été le rôle de Getma International dans la conception, le financement, la réalisation, l'exploitation ou la gestion de ces différents terminaux. Le Tribunal arbitral comprend qu'il s'agit peut-être de terminaux où l'une des filiales du groupe Necotrans rendait des services à MSC ou peut-être de terminaux financés ou réalisés par Europe Terminal. De toute façon, il ne s'agissait pas de terminaux à conteneurs que le soumissionnaire, c.à.d. Getma International, avait conçus, financés et/ou réalisés. Pourtant, l'expérience demandée devait couvrir tous ces aspects, non tous pour chacun des terminaux, mais au moins pour l'un d'eux.

280. Quand le Tribunal arbitral a interrogé les Demanderesses sur ces références, un de leurs conseils a répondu que « Getma International était à l'époque détenue à hauteur de 50 % par le groupe MSC. Donc Getma International était une société sœur de toutes les sociétés du groupe MSC » et que «[c]'était une société commune à 50/50 avec 2 familles ». Ainsi, la présidente du Tribunal arbitral a conclu que les « références qui ont été données ne sont pas seulement celles ou ne sont pas celles [...] du soumissionnaire compris dans le sens juridique technique, c'est-à-dire Getma International, mais ce sont

---

[372] Mise en œuvre de la Concession (C-108), p.8-16. Nos majuscules.
[373] Proposition technique (C-174) p.36. Nos majuscules.

aussi ou exclusivement des références des actionnaires du soumissionnaire », ce qui a été confirmé. [374]

281. Cette réponse n'est donc pas satisfaisante. En effet, si un actionnaire peut très bien former un groupement avec sa filiale et si les deux peuvent alors en tant que groupement soumissionner ensemble, un actionnaire n'est pas d'office soumissionnaire et ses références ne peuvent pas être mentionnées comme étant celles du soumissionnaire. Le conseil des Demanderesses a confirmé pendant l'audience que « les indications des références indiquent très clairement quelle est la société qui est la gérante »[375], mais le Tribunal arbitral estime que cette déclaration est incorrecte: le tableau à la p. 15 de l'offre technique mentionne pour les dix terminaux à conteneurs uniquement quelles lignes sont opérées sur chacun d'eux (MSC), mais ne dit pas que c'est également MSC qui les a conçus et réalisés.[376]

282. Le chapitre suivant de l'offre technique est intitulé: « 1.4. Trafic global consolidé par port et sur l'ensemble des terminaux gérés au nom et sous la responsabilité du Soumissionnaire[377] (2005, 2006, 2007) ». Le Tribunal arbitral ne peut qu'en déduire que Getma International gère des terminaux à Anvers, Freeport aux Bahamas, Long Beach aux Etats Unis, Las Palmas et Le Havre. Toutefois, M. Quérel a admis clairement qu'il s'agit de références de MSC.[378]

283. Le chapitre 1.5 « Présentation des activités et références du Soumissionnaire[379] (manutention, exploitation, entretien, conception, financement, réalisation) » contient une simple référence aux annexes OT 1 et OT 4, la première étant une description du

---

[374] TR I, p.36:19-29.
[375] TR I, p.36:31-32.
[376] Proposition technique (C-174), p. 36.
[377] Notre soulignement.
[378] TR I, p.71:16-23.
[379] Notre soulignement.

"réseau Getma International en Afrique" consistant de présences[380] dans quatorze pays différents du continent, et la deuxième étant une présentation d'Europe Terminal (incluant son « home terminal » à Anvers). Dès lors que le Tribunal arbitral rejette la notion qu'un actionnaire d'un soumissionnaire puisse, par le simple fait de son actionnariat, devenir lui-même soumissionnaire, la production de l'annexe OT 4 n'était pas justifiée. Le Tribunal note, incidemment, la même confusion entre Getma International, seule actionnaire et Europe Terminal, filiale de MSC, quand les états financiers d'Europe Terminal pour les années 2005, 2006 et 2007 ont été joints, avec ceux de Getma International à l'offre financière, représentant près de 90 pages dans ce document de 230 pages. [381]

284. Suit alors le chapitre 1.6 avec la "Liste des ports pour lesquels la conception, le financement et la réalisation des terminaux ont été assurés par le Soumissionnaire.[382] Ici, l'offre ne parle pas de « terminaux à conteneurs », mais de « terminaux » tout court.[383] Le tableau en mentionne quatre, dont on comprend, grâce à une comparaison avec les annexes OT 1 et 4, que seul le premier, à construire en 2008-2013 à Luanda, a un lien – dont l'intensité n'est pas connu - avec Getma International, dans la mesure où celle-ci est « actionnaire de la société 5M, en charge de la construction, de la gestion et de l'exploitation du Terminal à Conteneurs de Luanda » et que les trois autres sont des références de Europe Terminal. Bref, Getma International a une seule référence d'un projet futur encore à construire pour un prix non mentionné et par une société filiale dont elle n'est même pas le seul actionnaire ou l'actionnaire majoritaire. Le Tribunal arbitral note que Getma a été nettement plus transparente dans la note intitulée « Port de

---

[380] Le Tribunal arbitral note une certaine négligence dans la désignation de ces « présences » : il s'agit, selon le pays, d'une filiale, implantation ou agence, soit de Getma International, soit du « groupe Getma International» qui n'a jamais été défini par les Demanderesses.

[381] Offre Financière de juillet 2008 (C-179), p.112-201/230.

[382] Proposition technique (C-174), p.16. Notre soulignement.

[383] Les Demanderesses ont dans leur Mem.AAC reconnu que GI "*n'avait pas personnellement toutes les références [...] au niveau de la conception, du financement ou de la réalisation spécifiquement de terminaux à conteneurs*" mais ont insisté sur le fait qu'elle avait "*conçu, financé, exploité, réalisé, entretenu des opérations portuaires, des espaces dédiés ou pouvant être dédiés à des conteneurs mais aussi à d'autres types de marchandises comme l'a expliqué M. Quérel*" (Mem.AAC § 229).

Conakry: la vérité et les preuves » qu'elle a publiée le 14 février 2011 pour se défendre contre les rumeurs de la menace de résiliation de son contrat :

*1.2.2. Preuve de l'expérience de Getma*

*GETMA était à l'époque liée [sic] groupe MSC (Europe Terminal) par un accord de partenariat technique (annexe no 13).*

*Dans le cadre de l'appel d'offres, GETMA a pu justifier d'une expérience significative (annexe n°14); à ce jour, GETMA exploite seule ou en coopération (notamment avec Bolloré et Maersk) des terminaux portuaires à Luanda, Lomé, Douala, Libreville, Cotonou et Abidjan.*[384]

285.  Le Tribunal arbitral conclut que Getma International n'avait pas les références requises et qu'elle a donné des références qui n'étaient pas les siennes et auxquelles elle ne pouvait pas se référer parce que l'actionnaire auquel elles appartenaient (ou sa société mère MSC) n'était pas co-soumissionnaire, ni engagé autrement à l'égard du Concédant.

286.  Ainsi donc, l'offre de Getma International ne répondait pas au prescrit du Règlement de la Consultation selon lequel : « [l]'offre du Soumissionnaire (entité seule ou groupement de sociétés) devra contenir […] tous les membres du groupement doivent être responsables, conjointement et solidairement, vis-à-vis du Concédant, de l'exécution de la Concession. Une déclaration à cet effet est incluse dans le mandat mentionné ci-dessus ainsi que dans la soumission ».[385] Ou bien Getma International renonçait aux références d'Europe Terminal et soumissionnait seule, ou bien elle formait un groupement avec Europe Terminal qui devait alors s'engager solidairement et conjointement vis-à-vis du Concédant.

287.  Nonobstant les problèmes que posait donc l'offre de Getma International, elle a quand-même reçu une appréciation positive et elle a même obtenu le contrat, au détriment de ses concurrents. La Défenderesse estime que cela ne peut s'expliquer que par la

---

[384] Conférence de presse donnée par Me Fischer et son associé sur la vérité et les preuves sur le Port de Conakry (C-193) p.5.
[385] Règlement de la Consultation (C-108) p. 4.

corruption des membres de la Commission d'évaluation. Comme l'objectif de la corruption était d'emporter la concession, il convient de vérifier si les fausses références ont permis à Getma International de devenir l'adjudicataire. Si l'attribution ne dépend pas des références, on ne peut pas considérer ces fausses références comme un indice de corruption. Dans ce cas, les références ne constituent pas non plus un élément substantiel pour la conclusion du contrat et leur fausseté ne peut pas constituer une fraude.

288. Le Tribunal arbitral a donc vérifié l'impact que la présentation des références d'Europe Terminal par Getma International comme les siennes, a pu avoir sur l'évaluation des offres et l'attribution de la concession.

289. Le Rapport d'Evaluation de Offres montre que la Commission a procédé en deux étapes: elle a d'abord analysé les offres techniques des quatre soumissionnaires sur la base des critères définis à l'article 17 du Règlement de Consultation. Les références faisaient partie du critère "proposition technique", bon pour 15 points. Ces 15 points étaient répartis sur six sous-critères, dont les suivants sont affectés:

b.1  *Expériences et références en conception, financement, réalisation, exploitation et gestion de terminaux à conteneurs*: 4 points.

Getma International a reçu 4/4 au motif que "Le Soumissionnaire possède […] plus de deux (2) expériences en conception, financement, réalisation, exploitation et gestion de terminaux à conteneurs". Son concurrent Bolloré, par contre, n'en a reçu que deux parce que « la Commission note que le Soumissionnaire ne présente aucune expérience en conception et en réalisation des terminaux à conteneurs ».

Le Tribunal arbitral constate que Getma International ne possédait pas ces références non plus, ni celle pour le financement, et qu'elle n'avait donc pu recevoir que 2/4, au maximum (puisqu'on n'est même pas certain que c'est bien elle et pas Europe Terminal qui exploitait et gérait les terminaux à conteneurs). Afin de vérifier l'impact maximum du manque de références, le Tribunal arbitral lui accorde 1/4.

b.2 *Traffic global consolidé par port pour 2005, 2006, et 2007*: 1 point.

Getma a reçu 1/1, parce que "Le Soumissionnaire a présenté le trafic global par port et sur l'ensemble des ports gérés en son nom et sous sa responsabilité […]. Les ports concernés sont situés en Belgique, aux Bahamas, aux Etats-Unis, en Espagne et en France.*"*

Il s'est avéré dans cet arbitrage que cette évaluation était inexacte: ces ports sont gérés par Europe Terminal et nullement au nom et sous la responsabilité de Getma International qui n'était manutentionnaire que dans les ports de la Côte Atlantique africaine. Donc: 0/1

b.3 *[…]*

b.4 *Liste des terminaux à conteneurs conçus, financés et réalisés par le Soumissionnaire*: 2 points.

La Commission a déduit 0,5 points parce qu'elle avait noté que "la structure du capital des sociétés d'exploitation et le système d'exploitation de chaque terminal ne sont pas précisés."

Bolloré a reçu 0 points parce que "Le Soumissionnaire n'a présenté aucune expérience en matière de conception, financement et réalisation de terminaux à conteneurs".

Getma n'avait pas davantage d'expérience et la justification que la Commission donne pour le point de 1,5 est fausse: "Les informations fournies par le Soumissionnaire sont les suivants [sic]: […] la longueur des quais varie de 900 à 2.140 m; les coûts et délais de construction varient de 130 à 200 millions d'euros et les délais de construction vont de 2 à 8 ans; […] la liste de matériel mis en œuvre et les caractéristiques ont été fournies". Comme on a vu ci-dessus, Getma n'avait encore jamais construit un TAC et les chiffres que la Commission cite ici sont ceux du tableau constituant le chapitre 1.6 de l'offre technique de Getma International, où le seul TAC parmi les quatre cités qui n'est pas une référence de MSC, concerne

le terminal de Luanda, à construire par 5M entre 2008 et 2013 avec des quais de 300 + 600 m, soit plus court que la longueur de 900 à 2.140 m que la Commission cite.

Getma International avait dû recevoir, comme Bolloré, 0/2.

290. Ainsi, le Tribunal arbitral constate qu'au lieu de recevoir 14,5/15 comme note totale pour sa Proposition Technique (alors que Bolloré en avait 11), Getma International n'en méritait que 9/15. Le Tribunal arbitral n'a aucune raison de vérifier les autres aspects de l'évaluation, parce que seulement le partenariat et les références ont fait l'objet de débats dans cet arbitrage. Ainsi, la somme des points pour l'offre technique de Getma aurait été 86,75 points, au lieu des 92,25 points que la Commission a attribués (à comparer avec les 90,75 points de l'offre technique de Bolloré).

291. Comme les quatre soumissionnaires avaient obtenu le minimum de 70 points, leurs offres financières ont également été ouvertes par la Commission qui a attribué 78,54 points à Getma International et 69,95 points à Bolloré. Le Tribunal arbitral constate toutefois que parmi les sous-critères financiers, il y en avait aussi un qui se rapportait aux références, notamment les références de financement de projets similaires. La Commission a donné sur ce critère 5/5 à Getma International, estimant que "[l]es références présentées par le Soumissionnaire prouvent sa capacité en conception, financement, réalisation et exploitation de terminaux à conteneurs." Puisqu'il a été établi ci-dessus que Getma International n'avait en 2008 jamais conçu, financé ou réalisé un terminal à conteneurs, elle ne méritait pas ces 5 points. Ce jugement se justifie par les standards appliqués par la Commission pour le même sous-critère à Bolloré: "La Commission note qu'à la lecture des quatre attestations présentées il ressort que le Soumissionnaire n'a pas fourni de référence en conception, ainsi que des travaux de construction de murs quais et le remblayage". Ainsi, les points à attribuer à Getma International n'étaient que de 73,54 au lieu des 78,53 attribués par la Commission (à comparer avec les 55,68 points de l'offre financière de Bolloré).

292. Les notes finales ont été calculées par la Commission en additionnant les notes techniques et financières pondérées. Si le Tribunal applique la même pondération aux points corrigés de Getma International, on obtient:

$$(86,75 \times 0,60) + (73,54 \times 0,40) = 52,02 + 29,416 = 81,436 \text{ (au lieu de 86,77)}$$

293. Cela signifie que, dans la classification générale des quatre concurrents, Getma International aurait dû avoir au moins quatre points en moins, mais aurait toujours été la première avec au moins quatre points de plus que Bolloré. Donc, si Getma International a gagné la mise en concurrence, ce n'est pas dû aux fausses références. Les références ne comptaient, parmi les différents critères d'adjudication, que pour 10 points sur 100 dans l'évaluation de l'offre technique et pour 5 sur 100 dans celle de l'offre financière, donc, au total $10 \times 0.6 + 5 \times 0.4 = 8$ points sur 100 .

294. Par ailleurs, le fait que les critères de l'expérience et les références étaient cotées, comme les autres critères de l'évaluation, moyennant l'attribution de points, prouve que ces critères n'étaient pas des critères éliminatoires. L'élimination des intéressés qui n'avaient pas l'expérience et les références requises avait dû se faire au moment de la présélection. Or, comme constaté au § 274 ci-dessus, le PAC qui est en l'espèce au-delà de toute suspicion de corruption, a jugé satisfaisant la manifestation d'intérêt de Getma International.

295. Ainsi, le Tribunal arbitral n'accepte pas que l'attribution de la concession à Getma International nonobstant ces fausses références, prouve la corruption.

296. Reste alors la question de savoir si l'investissement est illégal parce qu'il a été obtenu par une fraude comme l'allègue la Défenderesse.

297. Il n'est pas exclu que l'offre ait pu tromper le Concédant. Etant donné la taille et l'expertise du groupe auquel appartenait Getma International, il n'est pas non plus exclu que c'était précisément l'intention de Getma International. Une entreprise comme elle est familière des règles et des pratiques de soumissions pour des contrats et ne peut nier connaître la différence entre – et les conséquences juridiques de - une offre soumise en

nom propre et une offre liant un groupement d'entreprises. Par ailleurs, le Règlement de la Consultation était clair à ce sujet.

298. Le Tribunal arbitral estime que le caractère séducteur/trompeur de l'offre technique n'est pas évident. Tant la manifestation d'intérêt que l'offre technique étaient des documents volumineux et leur analyse exigeait une étude sérieuse comme le démontrent les paragraphes précédents. Seul une lecture attentive de l'Accord de Partenariat Technique, tel que joint à l'offre, pouvait révéler qu'il n'engageait pas Europe Terminal à l'égard de la Défenderesse, qu'il n'était jamais devenu effectif et ne pouvait plus le devenir sans infraction au Règlement de la Consultation (parce que Getma International seule avait manifesté son intérêt et elle seule pouvait soumissionner). Le Tribunal arbitral ignore s'il y avait un juriste dans la Commission d'évaluation[386], mais il appartenait en tout cas à la Défenderesse de constituer une commission comprenant des personnes suffisamment averties pour juger correctement d'une offre.

299. En tout cas, M. Sory Camara, l'un des deux membres de la Commission d'évaluation qui selon le rapport de M. Fox n'avaient pas été corrompus et qui a comparu en qualité de témoin pour la Guinée dans l'arbitrage CCJA a attesté que,

> *pour nous, il apparaissait donc que Getma International soumissionnait dans le cadre de son partenariat avec MSC. La présence de MSC apportait donc une crédibilité à la candidature de Getma International qui lui a permis d'être sélectionnée à ce stade [387];*

> *[p]our les membres de la Commission, il était clair que Getma International soumissionnait avec son partenaire MSC, lequel disposait de références sérieuses en matière de conception, financement et construction de terminaux à conteneurs.*

---

[386] La liste des membres de la Commission se trouve en début du rapport d'évaluation (C-111, p.3). Le dossier ne contient sur certains d'eux que les renseignements suivants :
- M. Kourouma était fin 2013 Directeur des travaux publics et urbanisme (R-35);
- M. Condé était en 2013 Inspecteur des services financiers et comptables (R-36) ;
- M. Sory Camara a une formation en économie « finances » (R-31);
- M. Morlaye Camara était Directeur des services techniques du PAC et chef de projet (§ 16).
[387] Attestation de M. Sory Camara produite dans l'arbitrage CCJA, 22 mars 2013 (R-31) § 13.

*Compte tenu de ce partenariat, il paraissait normal que Getma International présente les références de MSC...* [388]; et

*La Commission a également pris en compte les engagements de stratégie commerciale pris par Getma International, et en particulier celui au titre d'un accord avec les chargeurs maliens, qui répondait à l'objectif visé dans l'appel à manifestation d'intérêt, que le terminal à conteneurs devienne une plateforme de transbordement et de transit pour lespays de l'hinterland, et en particulier le Mali, pays voisin de la Guinée.* [389]

300.  Ce témoignage confirme:

(i)  que la Guinée était consciente de ce que les références n'étaient pas celles de Getma International mais celles de MSC; et

(ii)  que d'autres critères que les références avaient également joué en faveur de Getma International.

301.  Même si l'offre a été présentée par Getma International d'une façon qui peut induire en erreur le lecteur inattentif, et même si, d'un point de vue strictement juridique, Getma International n'était pas autorisée de mentionner les références de son partenaire commercial parce que l'offre n'émanait pas de leur groupement, la Défenderesse n'a pas ignoré que l'offre était celle de Getma International seule et que les références étaient celles de MSC. La Défenderesse n'a donc pas été trompée (et si elle l'a quand-même été, cela tient aussi à sa propre négligence dans le dépouillement de l'offre et ses annexes) et la Convention a été conclue par la Défenderesse en connaissance de cause. Le Tribunal arbitral conclut qu'il n'est pas prouvé que la conclusion de la Convention a été basée sur une fraude. Cette conclusion se confirme, même quand on prend en compte, non seulement les fausses références, mais aussi la mention d'un faux partenariat contractuel.

## 3   Les engagements financiers

302.  Le Règlement de la Consultation exigeait que l'offre soit accompagnée d'

---

[388] Attestation de M. Sory Camara produite dans l'arbitrage CCJA, 22 mars 2013 (R-31) § 19.
[389] Attestation de M. Sory Camara produite dans l'arbitrage CCJA, 22 mars 2013 (R-31) § 20.

> *attestation(s) de la capacité financière établie(s) conformément au modèle en annexe et délivrée(s) par une (des) banque(s) de premier ordre en Guinée ou à l'étranger, certifiant que le candidat a accès aux crédits pour un montant lui permettant d'une part, la prise en charge et l'exploitation du terminal à conteneurs existant et, d'autre part, la réalisation de l'extension du terminal à conteneurs et l'aménagement d'un terre-plein sur la plate-forme de la gare ferroviaire.[390]*

303.   Selon le modèle de la formule, celle–ci devait attester que

> *le candidat a accès aux crédits de…….Euro […] lui permettant d'une part, la prise en charge et l'exploitation du terminal à conteneurs existant et, d'autre part, la réalisation de l'extension du terminal à conteneurs et l'aménagement d'un terre-plein sur la plate-forme de la gare ferroviaire.[391]*

304.   Getma International a produit une attestation de capacité financière de la Société Générale dont les termes ne reprenaient aucunement ceux de la formule prescrite par l'appel d'offre mais confirmaient seulement que :

> *la société GETMA International […] est, depuis 1993, titulaire en nos livres d'un compte qui fonctionne à notre entière satisfaction. Nous entretenons d'excellentes relations avec cette entreprise qui, à ce jour, n'a jamais pris d'engagements commerciaux et financiers qu'elle n'ait pu respecter […].[392]*

305.   Elle a aussi produit une « attestation de notoriété », libellée de façon semblable, de la part de la société Natexis.[393]

306.   Il est évident et il a dû être évident pour les membres de la Commission d'évaluation que ces attestations n'étaient pas conformes. La Commission a d'ailleurs explicitement noté la non-conformité dans le rapport d'évaluation et elle a aussi donné une note réduite (1/3) pour ce poste.

---

[390] Dossier d'appel d'offres de la République de Guinée sur la Mise en Concession du Terminal à Conteneurs du Port de Conakry, son extension et l'Aménagement d'un espace de la gare ferroviaire (C- 108) p.7.

[391] Convention de Concession (R-4) p.61.

[392] Proposition technique (C-174) p.17 de la version électronique.

[393] Proposition technique (C-174), p. 18 de la version électronique.

307.   Le fait que des points sont attribués pour le sous-critère d'évaluation « Attestations sur la capacité financière » prouve que ces attestations ne constituent pas une condition d'admissibilité de l'offre, mais sont, avec d'autres sous-critères, un élément de l'évaluation globale.

308.   Cela est confirmé par le fait que d'autres offres, qui n'étaient pas non plus accompagnées des attestations financières requises, n'ont pas non plus été éliminées. Ainsi, il a été démontré en cours d'audience qu'un autre concurrent, APM Terminals, n'avait pas joint d'attestation financière conforme, mais que son offre n'a quand même pas été éliminée.[394] Il a même reçu 3/3 points pour ce poste du dossier administratif sur base de la simple constatation de la Commission d'évaluation que « l'attestation sur la capacité financière présentée par le Soumissionnaire est délivrée par la banque HSBC des Pays-Bas ».[395] Un autre concurrent, le groupement Maritime TCB/Afrimarine, n'a pas présenté d'attestation bancaire du tout[396] comme l'ont fait remarquer les Demanderesses dans leur Réplique.[397] Le Tribunal arbitral a pu vérifier que TCB/Afrimarine a reçu 0/3 points pour ne pas avoir remis d'attestation d'une banque (mais de KPMG).[398] Seules les attestations de Bolloré étaient conformes[399] et cette société a reçu le maximum de points pour ce poste du dossier administratif.

309.   La prise en considération de l'offre de Getma International, nonobstant la non-conformité de ses attestations financières au modèle, n'est donc nullement un indice de corruption et se justifie encore une fois par le poids peu important qu'avaient ces attestations parmi les différents sous-critères de l'évaluation et l'importance relative de certains autres sous-critères, tel le ticket d'entrée, pour lequel Getma International était

---

[394] TR I, p.87:37-88:12.
[395] Commission Nationale des Grands Marchés de la République de Guinée (C-111) p. 26.
[396] Lettres de Soumission et d'Intérêt (C-358).
[397] Répl. § 202 et note en bas de page n°173.
[398] Commission Nationale des Grands Marchés de la République de Guinée (C-111) p.9.
[399] TR I, p.82:1–83:11.

de loin le plus offrant.[400] Le témoignage de M. Sory Camara devant le Tribunal CCJA l'a confirmé :

> ***Me Fischer***.-*Vous avez donc estimé que la commission à laquelle vous avez participé avait, de son propre chef, changé l'ordre des critères et avait décidé que le critère financier -Ticket d'entrée, pour faire simple- primait sur le critère technique ?*

> ***M. Camara***.- *Dans les notes qui avaient été attribuées à chacun des soumissionnaires, les Tickets d'entrée avaient recueilli beaucoup plus de points parce que Getma avait proposé 15 M€ par rapport aux autres qui avaient proposé 5 ou 10 millions. Les redevances qu'ils ont proposées étaient supérieures à celles des autres. Vu le contexte dans lequel on se trouvait, recueillir des fonds pour l'État apparaissait important. Je crois que c'est ce qui a fait... Parce que chaque fois que la commission travaillait, le représentant du ministère des Finances consultait le département pour la décision à prendre. Quand il y a eu les évaluations des offres techniques, il a recueilli l'avis du ministre, quand il y a eu les évaluations financières, l'avis du ministre des Finances. Je crois que c'est ça.[401]*

310. Les attestations financières non-conformes ne constituent pas non plus une fraude: elles n'étaient pas fausses et leur non-conformité n'a pas échappé à la Défenderesse, qui n'a donc pas été trompée à ce sujet.

## 4   La défaillance à réaliser les investissements

311. La Défenderesse invoque la défaillance de Getma à financer et réaliser les investissements de la concession comme la conséquence de son obtention frauduleuse. Cette défaillance - sur laquelle le Tribunal arbitral n'est pas appelé à se prononcer, mais dont il constate qu'elle n'a pas été invoquée comme motif de résiliation de la concession – ne peut en aucun cas prouver la corruption. Elle est tout au plus un indice de ce que la qualité de l'offre, du partenariat avec MSC et des références données, n'était pas suffisamment bonne pour pouvoir garantir une exécution ponctuelle de la Convention de concession. Ni cette défaillance, ni ses causes possibles, que ce soit l'offre non conforme ou la mention de références d'un partenaire non-engagé, ne prouvent la corruption, que ce soit *per se* ou en combinaison avec d'autres éléments. Aucun de ces

---

[400] Commission Nationale des Grands Marchés de la République de Guinée (C-111) p.88/88.
[401] Transcription de l'audience CCJA du 28 mai 2013 (R-104) p.36:23-35.

prétendus indices n'est de nature à donner plus de crédibilité aux deux témoignages discutés ci-dessus.

312.  En l'absence d'autres preuves, le Tribunal arbitral ne peut que conclure que la corruption ou la fraude n'est pas prouvée de façon claire et convaincante et que l'investissement n'était pas illégal d'un de ces chefs.

**(2) La compétence du Tribunal sur les effets de la résiliation, le gain manqué et les préjudices supplémentaires découlant du Décret de résiliation, du fait de la Décision sur la Compétence du 29 décembre 2012**

313.  Dans sa Décision du 29 décembre 2012, le Tribunal arbitral a décidé ce qui suit :

-  *Il y a un « accord contraire » en vertu duquel la compétence du Tribunal CCJA se substitue à celle du CIRDI, mais dont le champ d'application est strictement délimité par les termes de l'article 32.5. Il n'y a donc pas de compétence concurrente du Tribunal CCJA et de ce Tribunal CIRDI pour les demandes basées sur la résiliation de la Convention causée par un Acte de la Puissance Publique, mais tout au plus une compétence complémentaire de ce Tribunal si le concessionnaire estime qu'un Acte de la Puissance Publique constitue une violation du Code des investissements et a entraîné des conséquences dommageables autres que (celles de) la résiliation de la Convention.*[402]

-  *Le champ d'application de la compétence de ce Tribunal ne comprend donc pas les litiges découlant de la Convention de concession, y compris sa résiliation, même à la suite d'un Acte de la Puissance Publique. Les articles 32.5 et 31 de la Convention de concession s'imposent en effet également à ce Tribunal. Ce ne sera toutefois qu'au moment de l'analyse des demandes précises des Demanderesses, de leur fondement juridique, de leur causes factuelles et des dommages-intérêts que ce Tribunal pourra déterminer si et dans quelle mesure sa compétence complémentaire à celle du Tribunal CCJA peut effectivement être mis en œuvre pour décider d'une indemnité «complémentaire» pour un préjudice «complémentaire », qui sortirait de la compétence du Tribunal CCJA.*[403]

314.  Les Demanderesses allèguent que le gain manqué (tout comme les préjudices supplémentaires découlant du Décret de résiliation) « n'est pas *in casu* une conséquence contractuelle de la résiliation du contrat, mais une conséquence de la violation du Code

---

[402] Décision sur la Compétence § 125.
[403] Décision sur la Compétence, § 152.

des investissements, résultant d'un acte d'expropriation illégal prenant l'apparence d'une résiliation du contrat ».[404]

315.   Contrairement à ce que prétendent les Demanderesses, le gain manqué, tout comme la plupart des préjudices supplémentaires[405] sont les conséquences de la résiliation et les distinctions suivantes que font les Demanderesses pour maintenir le contraire, n'y changent rien.

316.   La distinction que les Demanderesses veulent faire entre « la résiliation » et « l'acte de résiliation » n'est pas justifiée. Ce n'est pas parce que la façon dont la résiliation a en l'espèce été réalisée (par décret) n'est pas explicitement prévue dans l'article 32.5 que la résiliation ne constituerait pas une violation du contrat et deviendrait une violation du Code des investissements. Une résiliation irrégulière constitue a fortiori une violation du contrat et le litige qui s'ensuit est de la compétence du tribunal contractuellement prévu. Si la résiliation est un Acte de la Puissance Publique, la conséquence est la même : il s'agit toujours de la résiliation du même contrat, dont les différends et litiges en découlant font l'objet de la compétence exclusive du Tribunal CCJA. L'article 32.5 de la Convention contient une définition très large des Actes de la Puissance Publique avec une liste exemplative de ceux qui peuvent entraver sa bonne exécution, en particulier l'expropriation. C'est donc aussi en vain que les Demanderesses insistent sur le fait que l'acte de résiliation était en fait une expropriation, celle-ci étant également comprise dans l'article 32.5.

317.   La distinction que font les Demanderesses entre les conséquences dites « contractuelles » et les conséquences « extracontractuelles » de la résiliation ne peut être suivie par le Tribunal arbitral. En effet, leur définition de conséquences contractuelles est inacceptable : "*les conséquences contractuelles de l'acte de*

---

[404] Répl. § 340.

[405] Soit les frais de rapatriement du matériel réquisitionné, et les frais de salariés causés par le chômage technique du personnel. La chose est moins claire pour les frais de gestion de crise ; voir plus bas.

*résiliation sont celles qui sont prévues au contrat*".[406] Il s'ensuivrait, selon elles, que toutes les indemnités non-prévues à l'article 32.3 seraient des conséquences extracontractuelles et dès lors couvertes par le Code des investissements et tombant sous la juridiction de ce Tribunal dans la mesure où le dommage dépasse le plafond contractuel des indemnités prévues à l'article 32.3.

318. Le raisonnement des Demanderesses ne peut être suivi. Un dommage ne change pas de nature parce qu'il est contractuellement limité et le montant qui dépasse le forfait contractuel ne devient pas « extracontractuel ». Les Demanderesses semblent perdre de vue que ce Tribunal arbitral a déjà déclaré dans sa Décision sur la Compétence que « [c]e que la Convention règle, ce sont les conséquences de ces actes [de la Puissance Publique] sur la Convention. Dans la mesure où la résiliation est consécutive à un Acte de la Puissance Publique, l'article 32.5 *« contractualise »* les *treaty claims* qui, par voie de conséquence, doivent être soumis au Tribunal CCJA conformément à l'article 31 de la Convention".[407]

319. Contrairement à ce que suggèrent les Demanderesses, le caractère grave de la résiliation n'empêche pas non plus qu'elle s'inscrive dans le cadre contractuel. En effet, celui-ci prévoit dans son article 32.5 des Actes de la Puissance Publique qui peuvent, de par leur nature, être graves et ne distingue pourtant pas entre ces actes selon leur gravité.

320. La Convention a clairement plafonné l'indemnité à laquelle le concessionnaire peut prétendre. Ce caractère forfaitaire/limitatif de l'indemnité de l'article 32.3 n'a apparemment pas fait l'objet de débats devant le Tribunal CCJA. Comme noté dans la Décision sur la Compétence, il s'agit là d'une question de fond "qui devra être résolue par le tribunal saisi des demandes relatives à ces indemnités supplémentaires".[408] Contrairement à ce qu'essayent de faire les Demanderesses, cette phrase ne peut être interprétée comme une reconnaissance de compétence de ce Tribunal arbitral au cas où

---

[406] Répl. § 341.
[407] Décision sur la Compétence § 123.
[408] Décision sur la Compétence § 124.

le Tribunal CCJA ne se considèrerait pas compétent, et encore moins au cas où celui-ci ne se prononcerait pas sur la question pour une autre raison.

321. En effet, Getma International avait initialement demandé au Tribunal CCJA non seulement ce qu'elle appelait son « préjudice contractuel », soit les quatre postes de dommages-intérêts forfaitairement fixés à l'article 32.3 de la Convention, mais aussi le « préjudice complémentaire » comprenant « une indemnité égale à la perte des bénéfices qu'il pouvait légitimement escompter pour toute la durée de la Convention de la concession ».[409] Après avoir encore confirmé dans le compromis d'arbitrage CCJA sa demande d'une indemnité au titre du préjudice complémentaire[410], Getma International a toutefois omis ce *lucrum cessans* de sa demande dans son Mémoire CCJA du 15 juin 2012[411], tout en y maintenant sa demande pour l'Indemnité Forfaitaire de Résiliation qui est, selon l'article 32.3, « destinée à compenser le perte d'activité ». Aussi le Tribunal CCJA a constaté dans sa sentence du 29 avril 2014 que Getma International a confirmé à l'audience CCJA du 8 juillet 2013 le retrait de sa demande d'une indemnité de manque à gagner et a décidé qu'il ne pouvait, sous peine d'*ultra petita*, se prononcer sur la demande retirée.[412]

322. Les Demanderesses estiment maintenant que « [c]e Tribunal arbitral est compétent pour se prononcer sur la violation du Code des investissements, parce que le Tribunal CCJA a reconnu ne pas être saisi de la demande de dédommagement liée au gain manqué et de la demande de dédommagement liée à la réquisition des biens ».[413] Ce raisonnement ne peut être suivi: Ce n'est pas parce que Getma International a retiré sa demande d'un préjudice complémentaire de l'arbitrage CCJA et l'a par la suite introduite dans le présent arbitrage CIRDI, que le Tribunal CCJA était ou serait incompétent et que le Tribunal CIRDI est ou serait compétent. La saisine d'un tribunal ne suffit pas pour en

---

[409] Décision sur la Compétence § 129 et Demande d'Arbitrage de auprès de la CCJA en date du 10 mai 2011 (R-9).

[410] Procès-verbal CCJA en date du 12 mars 2012 (R-10) p. 16.

[411] Mémoire CCJA des Demanderesses en date du 15 juin 2012 (R-6) et Décision sur la Compétence § 139.

[412] Sentence CCJA du 29 avril 2014 §§ 189 et 190.

[413] Mem.AAR p.12, titre B.

confirmer ou justifier la compétence. Les compétences complémentaires des deux tribunaux exigent que la compétence de chacun d'eux soit déterminée en fonction des règles qui s'y appliquent respectivement. Le « carve out » réalisé par l'article 32.5 de la Convention est clair et net et concerne les résiliations consécutives à un Acte de la Puissance Publique : « Le champ d'application de la compétence de ce Tribunal ne comprend donc pas les litiges découlant de la Convention de concession, y compris sa résiliation, même à la suite d'un Acte de la Puissance Publique ».[414]

323. Dans leur Mémoire en Demande, les Demanderesses ont saisi ce Tribunal arbitral pour une demande d'indemnité complémentaire pour gain manqué[415] et ont réclamé la somme de 103.031.250 euros (ultérieurement augmenté à 108.428.125 euros) « correspondant à la valeur nette des flux de trésorerie actualisés pour la période de Concession dont les Demanderesses ont été privées du fait de leur expropriation », ainsi que la somme de EUR 1.058.502, « correspondant aux préjudices supplémentaires découlant du Décret de résiliation ».

324. La valeur nette des flux de trésorerie n'est autre que le gain manqué[416] et vise donc même dommage que l'indemnité forfaitaire de résiliation de l'article 32.3 qui est, toujours selon la lettre de cet article « destinée à compenser la perte d'activité » en cas de résiliation de la Convention. Cette Indemnité Forfaitaire de Résiliation est égale:

   o *au chiffre d'affaires réalisé au cours des 12 (douze) mois précédents si la résiliation a lieu plus de 12 (douze) mois après l'Entrée en Vigueur de la Convention ;*
   o *au chiffre d'affaires de la première année prévue dans le business plan réaliste mentionné à l'annexe 8 si la résiliation a lieu au cours des 12 (douze) premiers mois suivant l'Entrée en Vigueur de la Convention.*[417]

---

[414] Décision sur la Compétence § 153.

[415] La Demande d'Arbitrage réclamait en général une indemnisation «juste et adéquate » mais pas quantifiée pour le dommage causé par la violation par la Guinée des articles 5, 6 et 7 du Code d'Investissement.

[416] Mem. §§ 443 et suivants où les Demanderesses expliquent comment elles utilisent la méthode des flux de trésorerie actualisé pour calculer *le préjudice découlant de la perte des revenus futurs de la Concession*.

[417] Art.32.3 Convention.

325. Il apparaît donc que les Parties, en convenant que le dommage suivant de la perte d'activité ou de revenus, soit le gain manqué, serait limité à un montant égal au chiffre d'affaires d'un an, ont implicitement reconnu que ce dommage est un dommage résultant de la résiliation de la Convention.

326. Dans l'arbitrage CCJA, Getma International a fondé sa demande en compensation des bénéfices qu'elle avait « pu espérer pendant la durée totale de la concession » sur l'article 104, al. 2 du Code des Marchés Publics de la République de Guinée qui règle les formalités à suivre « [q]uand l'autorité contractante met fin à l'exécution des prestations avant l'achèvement de celles-ci par une décision de résiliation du marché ».[418] Cela confirme encore que la demande de gain manqué est directement liée à la résiliation de la concession et que le litige dont la demande fait l'objet est bel et bien un différend découlant de la Convention.

327. Il en est de même pour les "*préjudices supplémentaires découlant du Décret de résiliation*" qui sont une conséquence de la résiliation de la Convention qui a été réglée dans sa totalité par la Convention.

328. Il ne suffit en effet pas de changer la terminologie et de ne plus parler d'une perte de bénéfice après résiliation d'un contrat, mais d'un « *préjudice subi par les investisseurs expropriés* » [419] ou d'«*une conséquence de la violation du Code des investissements, résultant d'un acte d'expropriation illégal prenant l'apparence d'une résiliation du contrat* »[420] pour changer le fondement juridique et la cause de la demande. Que l'article

---

[418] *Quand l'autorité contractante met fin à l'exécution des prestations avant l'achèvement de celles-ci par une décision de résiliation du marché, celle-ci doit être notifiée par plis recommandé ou remise par porteur contre récépissé d'accusé de réception au titulaire du marché, ce dernier peut présenter une demande d'indemnisation pour le préjudice qu'il estime subir. Cette demande doit être présentée soixante jours au plus tard après la notification de la décision de résiliation. L'indemnité ne peut, en aucun cas, être supérieure à la perte de bénéfices du titulaire dont le marché est résilié, telle que cette perte résulte des pièces comptables justificatives.* Code des marchés publics de la Guinée, Ordonnance nº 1988- (R-57) p.16.
[419] Contre-Mémoire N°1sur la Compétence § 109.
[420] Répl. § 340.

32.5 de la Convention soit applicable aussi dans les cas où la résiliation est la suite d'une expropriation, suit de la lettre même de cet article qui s'applique à :

> *Tout acte ou décision,….émanant de l'Etat,….. ayant pour effet direct ou indirect d'empêcher la bonne exécution de ses obligations par le Concessionnaire…, et notamment :*
>
>> *(iii)...*
>> *(iv) Expropriation…… [421]*

329.   Ce n'est donc pas en utilisant le terme « expropriation » que les Demanderesses peuvent se soustraire aux conséquences de l'accord auquel elles ont consenti après des négociations intensives.[422] Leur accord portait tant sur la compétence du Tribunal CCJA que sur la limitation des dommages-intérêts. Donc même si ce Tribunal arbitral était compétent pour les conséquences dommageables de la résiliation – quod non –, il devrait encore appliquer l'accord des Parties, soit l'article 32.3 et non le Code des investissements.

330.   Les dommages que les Demanderesses réclament ont été causés par la résiliation de la Convention. Peu importe que cette résiliation ait été faite par une notification telle que prévue dans le Code des Marchés Publics, par une simple lettre ou par un Décret ; l'intention des Parties de limiter les indemnités auxquelles le concessionnaire aurait droit dans ces cas, était claire. Les articles 31, 32.3 et 32.5 n'ont pas été imposés unilatéralement au concessionnaire par la Défenderesse dans le cadre d'une procédure de mise en concurrence où les clauses contractuelles sont parfois non-négociables. Au contraire, le cahier des charges sur la base duquel les candidats-concédant ont remis leur offre, prévoyait que « [l]e règlement des litiges nés de l'application ou de l'interprétation du présent Cahier des Charges se fera conformément aux dispositions de la convention de Concession » (article 26).[423] Au sujet de la fin de la concession, le cahier des charges

---

[421] Notre soulignement.

[422] Mem. § 188 et Copie d'écran du répertoire informatique contenant les différentes versions de travail du Projet de Convention de Concession (C-117).

[423] Rapport d'évaluation des offres (C-11) p.54-62.

précisait seulement que « la durée de la concession sera fixée dans la convention » (art.2) et que « [l]es conditions de résiliation sont définies dans la convention » (art.24). Les négociations portant sur la Convention ont débuté le 2 septembre 2008[424] et elles ont duré plusieurs semaines, la Convention ayant été signée le 22 septembre 2008. Même si la Défenderesse n'a nullement prouvé son allégation que Getma International est « l'auteur » de l'article 32.5[425], le Tribunal arbitral est satisfait que celle-ci a eu l'occasion de se prononcer sur le régime d'indemnités de l'article 32.3 et celui des Actes de la Puissance Publique réglé par l'article 32.5. Les Demanderesses elles-mêmes ont apporté la preuve de ce qu'il y a eu 15 projets de négociation[426] et que les délégations comptaient deux juristes et trois avocats du côté de Getma International et deux juristes du côté de l'Etat[427] qui « discutèrent, article par article, le projet de convention de concession établi à partir du projet figurant en annexe du Cahier des charges ».[428] Ce Tribunal arbitral est donc satisfait que le texte des articles 31 et 32 a été valablement convenu par les Parties et que rien ne s'oppose à leur application.

331. De toute évidence, après la résiliation de la Convention, les Demanderesses n'ont pas pu se contenter de cette indemnisation limitée et ont essayé d'échapper au plafond contractuel en commençant un deuxième arbitrage en invoquant des infractions du Code d'investissement devant un tribunal CIRDI. L'un des conseils des Demanderesses a reconnu explicitement que l'objectif était de trouver une manière d'échapper à la limitation que Getma International avait pourtant librement acceptée:

> *Deuxième point, pourquoi avons-nous glissé, évolué comme vous le disiez ? C'est parfaitement exact, car la question qui se posait à nous était de savoir si l'indemnité forfaitaire prévue par la Convention de concession était nécessairement, dans le cadre contractuel, limitée et est-ce que l'on pouvait solliciter une somme supérieure ou pas ? En d'autres termes, pouvait-on, au titre de la Convention de concession,*

---

[424] Notification de décision d'adjudication provisoire (C-10).

[425] Mem.AAR § 52.

[426] Copie d'écran du répertoire informatique contenant les différentes versions de travail du Projet de Convention de Concession (C-117).

[427] Mémoire CCJA des Demanderesses en date du 15 juin 2012 (R-6) §§ 162-163 et Mem. §185.

[428] Mémoire CCJA des Demanderesses en date du 15 juin 2012 (R-6) § 165, confirmé par l'attestation de Mme Mangiante, témoin des Demanderesses §§ 5-7.

*considérer que le dommage contractuellement fixé épuisait tout le préjudice dont on pouvait solliciter indemnisation au titre de la Convention de concession ?*[429]

332. Mise à part la constatation que cette seule interrogation indique que, aussi pour les Demanderesses, le *lucrum cessans* est une matière contractuelle, régie par la Convention, la réponse est clairement que le dommage contractuellement fixé épuisait tout le préjudice. Les Demanderesses n'ont apporté aucun argument valable pour prouver le contraire. Elles n'ont pas expliqué pourquoi leur accord ne signifie pas ce qu'il dit et pourquoi, nonobstant l'accord clair, il suffirait de s'adresser à un autre tribunal et d'invoquer le Code des investissements pour que la limitation contractuelle des dommages-intérêts ne soit plus valable. Au contraire, la réaction spontanée des Demanderesses après la résiliation, d'avoir recours au Tribunal CCJA, confirme qu'aussi dans leur esprit les conséquences d'une résiliation, quelle qu'en soit la cause, étaient celles qui étaient contractuellement convenues. Certes, demander cette indemnisation en se basant sur le Code des investissements et présenter la résiliation comme une expropriation, permettait aux Demanderesses d'espérer obtenir la compétence d'un tribunal CIRDI. Mais tant que l'objet de la demande concernait les conséquences de la résiliation et non des conséquences dommageables autres que (celles de) la résiliation, un tribunal CIRDI ne saurait assumer compétence.

333. En effet, il a été décidé que ce Tribunal arbitral CIRDI a « tout au plus une compétence complémentaire […] [que] si le concessionnaire estime [430] qu'un Acte de Puissance Publique constitue une violation du Code des investissements et a entraîné des conséquences dommageables autres que (celles de) la résiliation ».[431] Il sera vérifié dans le chapitre VI si ces conditions sont remplies.

334. *En conclusion*, le Tribunal ne peut que confirmer ce qui avait déjà été décidé dans sa Décision sur la Compétence, soit que « [c]e Tribunal n'est pas compétent pour se

---

[429] Procès-verbal, audience sur la Compétence CIRDI, p.69:24-31.
[430] La formule implique nécessairement aussi 'et prouve'.
[431] Décision sur la Compétence § 125.

prononcer sur les effets de la résiliation de la Convention de concession à l'égard des quatre Demanderesses ».

**(3) Les effets de l'article 32.5 de la Convention de concession en tant qu'accord contraire à la lumière de la Décision du 29 décembre 2012**

335. La Décision sur la Compétence a déjà clairement constaté que l'article 32.5 était un accord contraire en vertu duquel la compétence du Tribunal CCJA se substitue à celle du CIRDI, mais dont le champ d'application est strictement délimité par les termes de l'article 32.5.[432]

336. Les Demanderesses s'appuient maintenant sur une constatation du Tribunal arbitral dans la même Décision pour affirmer que l'article 32.5 de la Convention n'est pas applicable en l'espèce :

> *Même si cela n'est pas explicitement stipulé, il résulte de la procédure de Notifications Préliminaire et Finale prévue à l'article 32.5 que la décision de résilier la Convention consécutivement à un Changement de Loi/Acte de la Puissance Publique appartient au concessionnaire. Seule cette décision crée le droit pour le concessionnaire aux indemnités prévues à l'article 32.3 (qui sont identiques à celles prévues en cas de résiliation pour cause de faute du concédant).*[433]

337. La Défenderesse s'oppose avec différents arguments à la conclusion que les Demanderesses tirent de cette constatation, soit que ce Tribunal arbitral est compétent pour trancher la question du préjudice complémentaire.

338. Il n'est pas nécessaire pour ce Tribunal arbitral d'évaluer les arguments de part et d'autre sur ce point, parce qu'il suit de la Décision sur la Compétence et les compétences respectives de ce Tribunal arbitral et du Tribunal CCJA qu'il ne revient pas au premier de décider si l'article 32.5 de la Convention s'applique ou non en l'espèce. La constatation citée n'était qu'un motif non-décisoire qui suivait la constatation de ce

---

[432] Décision sur la Compétence § 125.
[433] Décision sur la Compétence § 116.

Tribunal arbitral que l'article 32.5 n'établit pas "une corrélation stricte entre le Changement de Loi/Acte de la Puissance Publique et la résiliation de la Convention". Aucune des deux Parties n'avait, au moment où ce Tribunal arbitral a rendu sa Décision sur la Compétence, formulé un argument basé sur les formalités prescrites par l'article 32.5 ou l'auteur des notifications envisagées dans cet article. Au cours de la première phase de cet arbitrage et préalablement à la Décision sur la Compétence, il n'y a donc pas eu de débat sur cette question ; aussi le paragraphe 116 de cette Décision n'était qu'une réflexion au bout d'une analyse juridique poussée jusqu'au bout, sans être nécessaire pour les besoins de la décision.

339. Nonobstant leur connaissance de cette réflexion (la Décision date du 29 décembre 2012), les Demanderesses n'ont formulé aucun argument concernant l'applicabilité de l'article 32.5 devant le Tribunal CCJA, seul compétent pour ce sujet ; au contraire, elles ont continué à demander l'application de cet article:

> *GETMA observe que le Décret de résiliation est un acte juridique qui s'impose à elle (Mémoire récapitulatif n°833) avec effet immédiat et sans retour possible au statu quo ante en raison de la conclusion d'un contrat avec un nouveau concessionnaire. L'effet direct du Décret a ainsi empêché le concessionnaire d'exécuter ses obligations contractuelles. Sur le fondement de cette analyse, la Demanderesse a appliqué les dispositions de l'article 32.5 de la Convention relatives aux "Changements de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées". Elle a donc procédé à une Notification Préliminaire de Changement de Loi que la République de Guinée a laissée sans réponse, puis à une notification définitive, passé le délai de 60 jours prévu à l'article 32.5.*
> *En conséquence, GETMA International demande l'application de la stipulation de l'article 32.5 qui dispose que : [....]*
>
> *Elle a ainsi demandé le paiement des indemnités énumérées à l'article 32.3 et l'indemnisation de la violation de l'article 32.5, alinéa 3, qui impose au Concédant de minimiser les effets du Changement de Lois et des Actes de Puissance Publique".*[434]
>
> *GETMA considère que la décision de résiliation, prise sans notification préalable, était illégale.*

---

[434] Sentence CCJA du 26 mai 2014 (C-50) § 59.

> *Elle assimile la résiliation intervenue à un changement de loi et acte de puissance publique entravant le bon fonctionnement des activités concédées (art. 32.5 de la Convention) lui ouvrant droit à l'indemnisation prévue à l'article 32.5 de la Convention.*[435]

340. L'absence de tout débat au sujet de l'applicabilité de l'article 32.5 devant le Tribunal CCJA ne crée pas de fondement juridique pour étendre la compétence de ce Tribunal arbitral en méconnaissance de l'accord des Parties. Les arguments échangés entre les Parties dans le présent arbitrage concernant l'applicabilité de l'article 32.5 et en particulier les objections des Demanderesses contre cette applicabilité[436] avaient pu et dû être présentés devant le Tribunal CCJA, compétent pour tous les litiges découlant de la Convention, donc a priori un différend concernant l'application de l'article 32.5 en l'espèce. En aucun cas, le présent Tribunal arbitral ne saurait méconnaître la compétence du Tribunal CCJA en basant sa décision sur la constatation que l'article 32.5 ne serait pas applicable en l'espèce.

341. Une décision éventuelle d'un Tribunal CCJA que l'article 32.5 n'est pas applicable dans le cas d'espèce, ne signifierait toujours pas que ce Tribunal arbitral deviendrait automatiquement compétent pour juger des conséquences de la résiliation sur la base du Code des investissements. Même une résiliation qui se fait d'une façon qui n'est pas prévue explicitement dans le contrat et qui, pour citer les Demanderesses, « sort de la logique contractuelle » en ce qu'elle est effectuée (i) au moyen d'un décret présidentiel, (ii) sans respecter les formalités contractuelles et (iii) sans articuler une justification contractuelle, est toujours une violation de ce contrat et le litige qui s'en suit continue à être de la compétence du tribunal désigné dans la Convention.

342. Les Demanderesses ont elles-mêmes opté pour cette voie en qualifiant  la résiliation comme une « expropriation », précisément afin de la cadrer dans l'article 32.5. Si elles estimaient que la résiliation était irrégulière, rien ne les obligeait à se baser sur cet article dans leurs notifications successives ou dans leurs mémoires et rien ne les empêchait de

---

[435] Sentence CCJA du 26 mai 2014 (C-50) § 98.
[436] Le plus récemment dans Mem.AAC §§ 19-76.

soutenir qu'aucune des provisions de l'article 32 ne s'appliquait. Quel qu'eût pu être l'argument développé, il aurait dû l'être devant le Tribunal CCJA qui était compétent pour trancher un litige suivant de la Convention, y compris sa résiliation.

343. Le principe de l'*estoppel,* invoqué par la Défenderesse, défend effectivement aux Demanderesses d'invoquer devant ce Tribunal arbitral l'inapplicabilité de l'article 32.5, après que Getma International s'est explicitement basée sur cet article dans ces notifications du 9 mars et du 4 mai 2011, après qu'elle a demandé et obtenu du Tribunal CCJA l'application de cet article et continue à poursuivre l'exécution de la sentence CCJA nonobstant son annulation.[437]

### (4) *Res judicata* et renonciation

344. Les Demanderesses estiment que les arguments de la Défenderesse concernant la renonciation et la *res judicata* ne sont plus d'actualité depuis l'annulation de la sentence CCJA, dont aucune partie ne survit selon elles. Le Tribunal arbitral estime qu'il n'est pas nécessaire d'analyser l'impact de l'annulation de la sentence sur ces arguments supplémentaires de la Défenderesse à l'appui de son objection à la compétence de ce Tribunal. Même si ces arguments tombent, l'annulation ne peut donner à ce Tribunal arbitral une compétence qu'il n'a jamais eue. Sa compétence n'en est pas une par défaut, mais concerne exclusivement les violations du Code des investissements à l'exception de celles qui ont été contractualisées. Ainsi, les litiges découlant de la Convention et de sa résiliation demeurent de la compétence d'un Tribunal CCJA.

### (5) L'annulation de la sentence CCJA

345. Le Tribunal arbitral ne peut pas suivre les Demanderesses dans leur analyse des conséquences de l'annulation de la sentence CCJA. Tout d'abord, il n'est pas exact que

---

[437] Dans leur Mem.AAC §§ 85-87 et 92, les Demanderesses indiquent que leur saisine initiale du Tribunal CCJA pour le gain manqué et les préjudices suivant de la réquisition ne peut plus avoir un effet d'*estoppel* depuis l'annulation de la sentence CCJA. Ce Tribunal arbitral fait toutefois remarquer que l'*estoppel* n'est pas lié à la sentence CCJA, mais au comportement antérieur des Demanderesses.

« les *contract claims* ont cessé d'exister »[438]; ce n'est que la <u>décision</u> relative aux demandes dont Getma International a saisi le Tribunal CCJA qui a été annulée et qui de ce fait risque de ne plus pouvoir être exécutée dans certains pays. L'annulation de cette décision ne peut toutefois pas influencer la compétence de ce Tribunal arbitral, la clause contractuelle de compétence qui a contractualisé les Actes de la Puissance Publique entravant l'exécution de la Convention, subsistant toujours. Cette contractualisation comporte aussi la forfaitisation des dommages-intérêts suivant de la résiliation de la Convention. Les questions de la validité et de l'applicabilité de cette limitation sont des questions contractuelles qui continuent à être de la compétence d'un tribunal CCJA.

346.   Ensuite, ce n'est pas la saisine initiale du Tribunal CCJA d'une demande de préjudice complémentaire qui empêche les Demanderesses de demander cette indemnisation dans le présent arbitrage, comme le suggèrent les Demanderesses.[439] Même si Getma International n'avait jamais adressé la demande au Tribunal CCJA, ce Tribunal arbitral se serait déclaré incompétent parce qu'il s'agit de dommages découlant de la résiliation. Contrairement à ce que suggèrent les Demanderesses, l'intention de ce Tribunal arbitral n'a jamais été « d'accepter la décision du Tribunal CCJA dans [les] domaines [du gain manqué et réquisition] »[440], mais bien de déterminer en toute indépendance sa propre compétence, tout en laissant à un tribunal CCJA le droit et le devoir de faire de même.

347.   Les Demanderesses ont déclaré que « l'injustice de l'annulation de la Sentence CCJA n'a pas modifié le champ de compétence de la présente procédure arbitrale ».[441] Le Tribunal arbitral estime également que l'annulation est sans influence sur sa compétence, telle que spécifiée dans sa Décision sur la Compétence et confirmée ci-dessus. L'annulation de la sentence CCJA ne peut donner à ce Tribunal arbitral une compétence qu'il n'a jamais eue. Même si les arguments de la Défenderesse relatifs à l'*estoppel*, renonciation, et *res judicata* tombent avec l'annulation de la sentence CCJA

---

[438] Mem.AAC § 83.

[439] Mem.AAC § 84.

[440] Mem.AAC § 88.

[441] Mem.AAC § 91.

comme le prétendent les Demanderesses[442], les deux sous-chapitres précédents démontrent que ce ne sont pas ces arguments sur lesquels ce Tribunal arbitral a fondé sa décision. Sa décision d'incompétence pour les litiges découlant de la Convention de concession, y compris sa résiliation, même à la suite d'un Acte de la Puissance Publique[443], a été prise indépendamment d'une quelconque décision du Tribunal CCJA (et même 17 mois avant la sentence CCJA) et continue à être valable, nonobstant l'annulation de celle-ci. Si la Décision sur la compétence a spécifié que «[c]e ne sera toutefois qu'au moment de l'analyse des demandes précises des Demanderesses, de leur fondement juridique, de leur causes factuelles et des dommages-intérêts que ce Tribunal pourra déterminer si et dans quelle mesure sa compétence complémentaire à celle du Tribunal CCJA peut effectivement être mis en œuvre pour décider d'une indemnité 'complémentaire' pour un préjudice 'complémentaire', qui sortirait de la compétence du Tribunal CCJA», cela ne signifie pas, comme semblent le croire les Demanderesses, que tout dommage non obtenu du Tribunal CCJA (que ce soit à cause du rejet de la demande ou à cause de l'annulation de la sentence accueillant la demande) pourrait être attribué par ce Tribunal arbitral, c'est-à-dire, deviendrait d'office de sa compétence. La phrase se référait seulement au fait que les demandes des Demanderesses devant ce Tribunal arbitral n'étaient, fin 2012, pas encore détaillées et ne permettaient pas dès lors de désigner *nominatim* et concrètement celles pour lesquelles le Tribunal arbitral pourrait assumer une compétence.

348. Dans leur lettre du 21 décembre 2016 par laquelle elles ont informé ce Tribunal arbitral de l'annulation de la sentence CCJA, les Demanderesses ont appelé le présent Tribunal arbitral « *le dernier bastion séparant les Demanderesses du déni de justice* ». Cette vue n'est pas correcte. Elles se sont à cet égard elles-mêmes référé[444] à l'article 29.5 du Règlement CCJA. Celui-ci prévoit qu'après une annulation, soit la Cour évoque si les parties le demandent, soit l'affaire est reprise à la requête de la partie la plus diligente.

---

442 Mem.AAC § 92.
443 Décision sur la Compétence § 152.
444 Mem.AAC § 93.

Si, comme l'ont remarqué les Demanderesses, la Cour n'a pas désigné le « dernier acte de l'instance arbitrale reconnu valable par la Cour », il s'ensuit que l'instance est à reprendre à zéro mais non que les Demanderesses sont privées de tout accès à la justice. Si elles n'ont plus confiance dans l'institution CCJA comme le suggère l'opinion dissidente[445] cela ne prouve en soi pas encore un déni de justice. Si un tribunal CIRDI peut avoir compétence pour décider d'un déni de justice, celui-ci doit être prouvé et être attribuable à la Défenderesse. En l'espèce, les Demanderesses n'ont pas adapté leurs demandes ou arguments afin de justifier une correction par ce Tribunal arbitral du déni de justice allégué survenu depuis la fin de l'audience. Les demandes devant ce Tribunal arbitral sont toujours les mêmes, soit le gain manqué et les préjudices supplémentaires et leur fondement est toujours la résiliation de la Convention. Ce n'est pas parce qu'un prétendu déni de justice a été commis par l'annulation de la sentence CCJA, que ce Tribunal arbitral peut étendre sa compétence à des matières que les Parties, par leur accord contraire, ont exclues de la compétence des tribunaux CIRDI.

### (6) En ordre subsidiaire : l'irrecevabilité des demandes

349. Puisque le Tribunal arbitral a décidé que l'investissement des Demanderesses n'était pas illégal, les demandes ne sont pas irrecevables, mais échouent sur l'absence de compétence du Tribunal.

### (7) En ordre infiniment subsidiaire : rejet des demandes pour cause de fausses déclarations

350. La Défenderesse invoque inutilement l'affaire *Azinian c. Mexique*, qui n'est pas comparable en l'espèce. Dans cette affaire, le contrat avait été résilié par le Concédant qui avait préalablement déterminé qu'il avait des raisons valables et sérieuses (fausses déclarations lors de l'appel d'offre) pour le résilier ; ensuite, trois niveaux successifs de tribunaux mexicains avaient sur l'initiative des investisseurs vérifié et confirmé la validité de la décision de résiliation. Enfin, un tribunal CIRDI a rejeté la demande

---

[445] Opinion dissidente de M. Bernardo Cremades §11. Cette Opinion figure en Annexe B de cette Sentence.

d'indemnisation des investisseurs entre autres motifs parce qu'ils n'avaient pas prouvé que les tribunaux mexicains avaient commis des erreurs ou un déni de justice.[446]

351.  Dans le présent cas, la Défenderesse n'a pas prouvé qu'elle a été induite en erreur par les déclarations de l'offre ni que la concession a été attribuée à Getma International sur la base de déclaration fausses. Au contraire, il a été démontré ci-dessus que son offre a été acceptée en pleine connaissance de ses défauts, parce qu'elle prévoyait un ticket d'entrée auquel la Défenderesse n'a pas pu résister et qui a primé sur toutes autres considérations.

* * *

352.  *En conclusion*, le Tribunal arbitral décline sa compétence pour statuer sur les effets de la résiliation de la Convention. Il reste toutefois compétent pour vérifier si des Actes de la Puissance Publique, autres que la résiliation, constituent une violation du Code des investissements et ont entraîné des conséquences dommageables autres que celles de la résiliation.

---

[446] *Robert Azinian, Kenneth Davitian, et Ellen BACA c. Etats-Unis du Mexique*, CIRDI ARB(AF)/97/2, Sentence, 1er novembre 1999 (R-133).

## VI. LA RESPONSABILITE

### A. *Position des Demanderesses*

**(1) La Guinée a violé l'article 5 du Code des investissements et le droit international coutumier en tant qu'elle a réalisé une expropriation illégale résultant tant du Décret de résiliation que du Décret de réquisition**

### a. Décret de résiliation

353.   Les Demanderesses soutiennent que le Décret de résiliation, en tant qu'acte de puissance publique, constitue une expropriation relevant du Code des investissements et du droit international coutumier, car (i) la résiliation a été effectuée en dehors du cadre contractuel (ii) par le Président de la République et (iii) sans fondement ou justification contractuelle.

354.   Pour caractériser le Décret de résiliation d'acte de puissance publique sortant de toute logique contractuelle, les Demanderesses font référence à plusieurs affaires dans lesquelles il a été déterminé que les actes de l'Etat n'étaient pas ceux d'un cocontractant mais émanaient de la puissance publique[447] : *Biwater c. Tanzanie*[448] (annonce par voie de presse de la résiliation d'une licence et occupation par l'autorité publique des locaux du cocontractant); *SAUR c. Argentine*[449] (prise de contrôle administrative de la concession et résiliation du contrat par décret); *RFCC c. Maroc*[450] (distinction entre agissements contractuels et ceux relevant du droit international, dont l'*instrumentum* – tel une loi, un décret ou une décision de justice – est un indice du caractère non-contractuel).

355.   Sur ces bases, les Demanderesses soutiennent tout d'abord que la résiliation ne s'est inscrite dans aucun cadre contractuel car elle a été effectuée au moyen d'un décret

---

[447] Mem. §§ 456-468.

[448] *Biwater Gauff (Tanzania) Ltd c. République Unie de Tanzanie*, CIRDI ARB/05/22, Sentence, 24 juillet 2008 (C-231).

[449] *SAUR Internationale SA c. République argentine*, CIRDI ARB/04/4, Sentence, 6 juin 2012 (C-237).

[450] *Consortium RFCC c. Royaume du Maroc*, CIRDI ARB/00/6, Sentence, 22 décembre 2003 (C-240).

présidentiel, sans respecter les dispositions de la Convention relatives à sa résiliation et sans correspondre à l'application d'une procédure prévue par la Convention. Au contraire, le Décret de résiliation serait un acte de puissance publique émanant de la seule volonté du Président sans articuler de justification ou fait d'inexécution contractuelle.[451] Les Demanderesses estiment que l'apparence fictivement contractuelle donnée par la Guinée à la résiliation ne doit pas confondre le Tribunal dans la mesure où les inexécutions alléguées par la Guinée étaient inexistantes.[452]

356. Elles affirment en outre ceci:

> *Ex abundante cautela, si tous ces éléments ne suffisaient pas à qualifier le Décret de résiliation d'acte de puissance publique, la présence de l'armée et de la police en armes sur le TAC et dans le locaux [sic] du Concessionnaire pour interdire l'accès des employés du Concessionnaire et de STCC à leurs installations dès la signature du Décret de résiliation, et ce avant même que ne soit signé le Décret de réquisition et qu'aucun de ces deux Décrets n'ait été notifié au Concessionnaire, constitue une démonstration évidente de la nature extracontractuelle du Décret de résiliation.[453]*

357. Ayant conclu que le Décret de résiliation constitue une expropriation, les Demanderesses analysent ensuite les critères de l'article 5 du Code pour conclure que l'expropriation issue de la résiliation était illégale pour les motifs suivants :

(i) il ne s'agirait pas d'un cas d'utilité publique car le but ultime était d'accorder la concession au groupe Bolloré.[454] Le décret ne mentionne aucunement l'utilité publique comme fondement de la résiliation et, en tout état de cause, en droit guinéen, l'expropriation pour être légale, doit être précédée d'une notification aux parties, suivie d'un acte déclaratif d'utilité publique;

---

[451] Mem. §§ 431-437.
[452] Mem. §§ 427-452.
[453] Mem. § 448.
[454] Mem. §§ 474-483.

(ii) l'expropriation aurait été discriminatoire car le Décret de résiliation visait uniquement et spécifiquement la concession, plutôt qu'un secteur particulier ou groupe de sociétés. D'autres investisseurs étrangers n'ont pas fait l'objet de la même animosité du Gouvernement même lorsque celui-ci a voulu résilier leur contrat ; la Guinée leur a en effet accordé un traitement plus favorable [455];

(iii) aucune indemnisation n'a été accordée, tel que précisé expressément dans le Décret de résiliation lui-même.[456]

358. Les Demanderesses soutiennent enfin, à titre subsidiaire, que, même si l'on devait conclure que le Décret de résiliation n'a pas été violé par l'article 5 du Code, il constitue néanmoins une violation du standard minimum du traitement que la Guinée était tenue d'accorder aux Demanderesses en vertu du droit international.[457]

359. Les Demanderesses considèrent que ce standard implique « de juger les agissements de l'État envers les étrangers présents sur son territoire à l'aune des « standards ordinaires de la civilisation » » et le définissent comme une protection contre « tout agissement arbitraire, dépourvu de raison, ou contraire à la bonne foi » en se basant sur la sentence rendue dans l'affaire *Abengoa c. Mexique*.[458] Les Demanderesses allèguent que la résiliation a été opérée sans notification préalable et a été utilisée comme un outil politique de la campagne présidentielle de M. Condé.[459]

---

[455] Mem. §§ 484-488.

[456] Mem. §§ 489-490.

[457] Mem. § 491 (il faut noter que le Code ne contient pas d'article sur le traitement juste et équitable, d'où le fondement sur le droit coutumier).

[458] *Abengoa S.A. et Cofides S.A. c. États-Unis du Mexique*, CIRDI ARB/(AF)/09/2, Sentence, 18 avril 2013 (C-251).

[459] Mem. §§ 491-498.

**b. Décret de réquisition**

360. Les Demanderesses affirment, en évoquant l'affaire *Saur. c. Argentina*[460], « qu'il ne fait aucun doute » que le Décret de réquisition constitue un acte de puissance publique relevant du Code des investissements et du droit international en général.[461]

361. Elles estiment ensuite que la réquisition a violé l'article 5 quand bien même elle n'a été que temporaire[462], en se fondant sur le projet n°12 de la Convention de Harvard, et les sentences des affaires *Wena Hotels c. Egypte*[463], et *Middle East Cement c. Egypte.*[464]

362. Les Demanderesses soutiennent enfin, à titre subsidiaire, que, même s'il était conclu que le Décret de réquisition n'a pas violé l'article 5 du Code, il est néanmoins contraire au standard minimum de traitement en droit international coutumier. Elles soutiennent que le test en cas d'abstention ou d'insuffisance d'action de la part de l'exécutif de l'État d'accueil, est celui de la « simple absence ou manque de diligence ». Les Demanderesses soutiennent ici que la Guinée n'a pas pris les mesures nécessaires pour minimiser les conséquences de la réquisition sur elles, par exemple en assurant la protection et l'entretien des biens requis.[465]

**(2) La Guinée a violé l'article 6 du Code des investissements**

363. Les Demanderesses estiment que les décrets (de résiliation et de réquisition) ont violé l'article 6 du Code sur le traitement national, car, en étant expropriées sans être indemnisées, elles ont reçu un traitement moins favorable qu'un investisseur guinéen. Selon les Demanderesses, les investisseurs guinéens auraient bénéficié des dispositions

---

[460] *SAUR Internationale SA c. République argentine*, CIRDI ARB/04/4, Sentence, 6 juin 2012 (C-237).

[461] Mem. §§ 499-501.

[462] Mem. §§ 504.

[463] *Wena Hotels Limited c. République Arabe d'Egypte*, CIRDI ARB/98/4, Sentence, 8 décembre 2000 (C-253).

[464] *Middle East Cement Shipping and Handling Co. S.A. c. République Arabe d'Egypte*, CIRDI ARB/99/6, Sentence, 12 avril 2002 (C-254).

[465] Mem. §§ 506-509.

de la Loi Fondamentale guinéenne et du Code civil, qui prévoient des indemnisations en cas d'expropriation.[466]

## B. *Position de la Défenderesse*

### (1) L'application de l'article 5 du Code des investissements au cas d'espèce

364.  La Défenderesse indique que l'article 5 du Code des investissements prévoit « qu'en cas d'expropriation, l'investisseur a droit de percevoir une juste et adéquate réparation dont le montant sera déterminé selon les règles et pratiques habituelles du droit international », et que, dans la présente affaire, les Parties ont contractuellement prévu la juste et adéquate indemnisation des conséquences d'une expropriation aux articles 32.5 et 32.3 de la Convention de concession.[467]

365.  Ainsi, l'article 32.5 constitue une convention spéciale sur la juste indemnisation du préjudice réclamé dans le cadre d'un *treaty claim* résultant de la résiliation de la Convention de concession consécutive à un acte de puissance publique[468] et les indemnités de l'article 32.3 couvrent l'intégralité des conséquences de l'expropriation alléguée, et notamment le gain manqué.[469] La Défenderesse considère par ailleurs ceci :

> *Le Tribunal doit donc faire application de l'accord d'indemnisation conclu par les parties conformément aux principes d'autonomie de la volonté et de la force obligatoire du contrat, qui sont, tous deux, des principes généraux du droit international. Ce n'est que dans le silence du contrat qu'il peut appliquer les standards généraux du droit international qui n'ont qu'une vocation supplétive.*
>
> *Le fait que le Tribunal soit saisi sur le fondement d'une loi, en l'espèce le Code des investissements, ne saurait en effet avoir pour conséquence d'écarter le principe de l'autonomie de la volonté des parties.[470]*

---

[466] Mem. §§ 511-518.
[467] Dupl.§§ 246.
[468] Dupl. § 260.
[469] Dupl.§§ 254, 268-269.
[470] Dupl. §§ 261-262.

366.  La Défenderesse conclut que la valeur de l'investissement en cas de perte de celui-ci à la suite d'une résiliation par acte de puissance publique étant définie par l'article 32.2 de la Convention, elle correspond également à la « juste et adéquate réparation » visée à l'article 5 du Code des investissements. « C'est donc ce montant qui devra être alloué aux Demanderesses dans l'hypothèse où le Tribunal estimerait que les Demanderesses ont droit à une indemnisation. »[471]

367.  La Défenderesse soutient par ailleurs qu'il n'y a aucune contradiction au détriment d'autrui à solliciter, à titre subsidiaire l'application de l'accord forfaitaire d'indemnisation conclu par les Parties, dans l'hypothèse où le Tribunal estimerait que les Demanderesses ont droit à une indemnisation[472] et que, en tout état de cause, l'accord d'indemnisation constitue la *lex specialis* de droit international applicable aux conséquences de la résiliation de la Convention de concession causée par un acte de puissance publique.[473] La Défenderesse l'explique ainsi :

> *[E]n application de l'article 5 susvisé du Code des investissements, les règles indemnitaires en matière d'expropriation sont à trouver dans les normes du droit international au sens large et cela inclut les contrats d'investissement tel que la Convention de concession. ... [S]'agissant d'un contrat d'Etat, les règles indemnitaires de la Convention trouvent leur fondement dans le droit international, et notamment dans le principe pacta sunt servanda qui se trouve au sommet de la hiérarchie des normes du droit international. Parmi toutes les normes du droit international potentiellement applicables, les articles 32.5 et 32.3 de la Convention de concession constituent donc la lex specialis par laquelle les parties ont expressément fixé les règles d'indemnisation des conséquences de la résiliation de la Convention de concession causée par un Acte de Puissance Publique.*

## (2)  L'article 6 du Code des investissements

368.  La Défenderesse ne présente pas d'arguments sur ce point.

---

[471] Dupl. §§ 268-269.
[472] Dupl. §§ 280-285.
[473] Dupl. §§ 286-293.

### C. *Analyse du Tribunal*

369. Dans leur Demande d'arbitrage, les Demanderesses ont reproché à la Défenderesse de les avoir expropriées de manière discriminatoire et sans prompte, juste et adéquate indemnisation, en violation des articles 5, 6 et 7 du Code des investissements et/ou en violation du droit international coutumier. La violation de l'article 7 n'a toutefois pas été discutée et ne figure plus dans leurs mémoires ultérieurs. Ainsi, ce Tribunal arbitral se limite au dispositif repris au paragraphe 471 du Mémoire après Audience qui ne mentionne que les violations, tant par le Décret de résiliation que par le Décret de réquisition, des articles 5 et 6 du Code des investissements et, à titre subsidiaire, du standard minimum de traitement en vertu du droit international coutumier.

### (1) L'article 5 du Code des investissements

370. L'article 5 stipule ceci:

> *L'Etat guinéen ne prend aucune mesure d'expropriation ou de nationalisation des investissements réalisés par les personnes ou entreprises sous réserve des cas d'utilité publique constatés dans les conditions prévus par la loi.*
>
> *Dans le cas d'utilité publique, les mesures d'expropriation ne doivent pas être discriminatoires et doivent prévoir une juste et adéquate réparation dont le montant sera déterminé selon les règles et pratiques habituelles du droit international.*[474]

### a. Le Décret de résiliation

371. Ce Tribunal arbitral a déjà relevé qu'il ne suffit pas d'appeler une résiliation d'un contrat une « expropriation » pour rendre applicable le Code des investissements. Les Demanderesses estiment toutefois que la résiliation constitue une expropriation parce (i) qu'elle a été opérée par un décret présidentiel, (ii) qu'elle ne se réfère à aucune inexécution contractuelle, et (iii) qu'elle ne respecte pas les dispositions contractuelles pour une résiliation.[475]

---

[474]Code des investissements de la Guinée, Ordonnance n° 001/PRG/87 en date du 3 janvier 1987 (R-1).

[475] Mem. §§ 431-447.

372.  Sur ces éléments, ce Tribunal arbitral constate ce qui suit :

(i)  L'intervention du président est surprenante dans la mesure où le Ministre des Transports et le Ministre de l'Economie et des Finances avaient signé la Convention et étaient donc les personnes habilitées à résilier le contrat.

(ii)  Le Décret mentionne explicitement que la Convention est résiliée « *pour manquements aux obligations du Concessionnaire* », sans toutefois préciser les griefs.

(iii) Le concessionnaire n'a pas été enjoint par une notification écrite des manquements à y remédier et n'a pas eu un délai de grâce de 60 jours, comme l'exige l'article 32.2.

373.  Il est incontestable que cela rend la résiliation irrégulière et contractuellement fautive. Selon les Demanderesses, cette « *faute contractuelle, du fait de sa gravité, constitue également une violation du Code des investissements et du droit international coutumier* ».[476]

374.  Le Tribunal arbitral est conscient de la doctrine citée par les Demanderesses selon laquelle la résiliation d'un contrat peut constituer une expropriation. Mais, comme le reconnaissent les Demanderesses, «pour relever du droit international, cette résiliation doit cependant présenter certaines caractéristiques », notamment résulter d'un acte de puissance publique par lequel l'Etat agit en dehors et au-delà du cadre contractuel.

375.  Ce Tribunal arbitral estime que la contractualisation opérée par l'article 32.5 de la Convention, d'Actes de la Puissance Publique entrainant la résiliation de la concession est spécifique au présent dossier et permet de le distinguer de la jurisprudence qu'invoquent les Demanderesses.[477] Ainsi, la forme qu'a prise la décision de résiliation, soit celle d'un décret présidentiel, ne suffit pas à la faire sortir du cadre de la Convention.

---

[476] M.AAC § 319.
[477] Mem. § 460.

Celle-ci prévoit dans son article 32.5 expressément les actes de la puissance publique. Le résultat de la résiliation aurait été le même si les ministres compétents avaient pris la décision de résilier au lieu du Président. De toute façon, la contractualisation des actes de la puissance publique, y compris l'expropriation qu'est la résiliation du contrat, implique que ce Tribunal arbitral est incompétent même pour une résiliation irrégulière.

376. L'attribution ultérieure de la concession à Bolloré est également citée par les Demanderesses comme une preuve du caractère expropriateur de la résiliation. Le Tribunal arbitral constate toutefois que Bolloré était classé deuxième à l'issue de l'évaluation des offres et que les Demanderesses n'ont pas prouvé que le Code des Marchés Publics guinéen exigeait un nouvel appel d'offres avant de pouvoir réattribuer la concession ou que cette attribution était autrement irrégulière en droit guinéen.[478] Le fait qu'il est prouvé que la résiliation a été inspirée par le souhait du Président de donner la concession à Bolloré, pourrait confirmer que la concession n'a pas été résiliée dans l'intérêt public, mais cela ne suffit pas pour requalifier la résiliation comme une expropriation.

377. Par contre, l'annonce publique par le Président de son intention de résilier le contrat de Getma International[479], la lecture au journal télévisé de 20 heures le jour même de la prise du Décret de résiliation[480] avant même que celui-ci n'ait été notifié et l'engagement de militaires et de policiers, dès 21 heures, devant les bureaux de STCC sur le TAC[481] sont effectivement des circonstances aggravantes et vexantes qui dépassent la

---

[478] Les Demanderesses affirment que le contrat de Bolloré est plus avantageux que le leur, mais ne prouvent pas que cela le rend illégal, ni qu'elles ont exercé un recours contre cette attribution prétendument irrégulière.

[479] Dans une interview du Président Alpha Condé sur le site de la chaine France 24 mise en ligne depuis le 6 février 2012 (C-227), le Président a déclaré : « *Avant mon élection, j'avais dit à des amis qui avaient soutenu que si je gagne j'allais annuler ce contrat. [...] Cette entreprise n'a fait aucun investissement au port, allez regarder le port. Donc, ils ont passé le contrat en mentant, en disant qu'ils géraient beaucoup de ports, alors qu'ils ne géraient de ports nulle part. Donc, ce contrat, j'avais dit dès le départ que ce contrat était contre les intérêts de la Guinée* ».
Attestation de M. Wiltzer selon lequel, très vite après l'élection, le 2 décembre 2010, de M. Alpha Condé comme Président « *des rumeurs circulent dans les milieux informés à Conakry sur l'intention qu'aurait le nouveau Président de remettre en cause la concession du [TAC], et cela en vue de la donner au Groupe Bolloré...* » (§4).
[480] § 3 de l'attestation de Claude Barone du 14 novembre 2014, que la Défenderesse n'a pas appelé comme témoin à contre-interroger et dont le Tribunal arbitral accepte les déclarations.
[481] Para. 4 de l'attestation de Claude Barone du 14 novembre 2014.

résiliation, quelle qu'en soit la forme, et constituent des actes de la puissance publique autres que la résiliation.

378. En ce qui concerne la preuve de ces faits dépassant le cadre de la résiliation, le Tribunal arbitral constate que l'attestation de M. Barone est plus fiable que l'article de presse que les Demanderesses citent *in extenso* comme suit:[482] « Port de Conakry, extérieur nuit. Le 8 mars, aux alentours de 21 heures, une escouade de policiers et de militaires guinéens, kalachnikovs en bandoulière, investissent les docks où sommeillent grues et conteneurs. Le commando saute sur les bureaux de Getma International, la société française qui exploite la zone portuaire depuis 2008. Les salariés sont expulsés manu militari. Les locaux, bouclés à double tour. « Réquisition » ? L'ordre est tombé du palais présidentiel.»[483] L'article mélange clairement les évènements de la soirée du 8 mars 2011, suivant le Décret de résiliation mais précédant le Décret de réquisition, avec ceux du 9 mars 2011, suivant le Décret de réquisition. Selon M. Barone, la soirée du 8 mars, vers 21 heures, des militaires et des policiers "étaient en train de prendre place devant les bureaux de STCC (rez de chaussée et 3ème étage)"[484] et "Le lendemain matin (09 mars)", ils étaient toujours "de garde devant les différentes entrées des bureaux de STCC".[485] "De plus, le matin du 09 mars 2011, tous les employés administratifs de STCC étaient restés hors du bureau, sur le parking car les militaires leur avaient interdit l'accès à leurs postes de travail sans même pouvoir récupérer leurs effets personnels. Ils ont été rejoints par un certain nombre de chauffeurs et personnel de la manutention… Il devait y avoir environ une soixantaine de personnes devant les bureaux. Les employés étaient très choqués et traumatisés par ce qu'ils voyaient…..les forces armées, comme s'il s'agissait d'arrêter des criminels".

379. Le Tribunal arbitral conclut donc que, contrairement à ce que les article de presse cités par les Demanderesses et surtout la bande dessinée produite comme pièce C-203 (p.8)

---

[482] Mem. § 320.

[483] Article des Archives classées en date du 24 mars 2011 (C-199). Soulignement ajouté par les Demanderesses.

[484] § 4 de l'attestation de Claude Barone du 14 novembre 2014.

[485] § 5 de l'attestation de Claude Barone du 14 novembre 2014.

laissent entendre, les militaires et les policiers n'ont pas, dans la nuit du 8 mars 2011 par la force et en compagnie de représentants de Bolloré, "sauté" sur les bureaux de Getma, ni expulsé son personnel. Il n'empêche que la présence de militaires et policiers devant les bureaux dès la veille du 8 mars 2011, alors que le Décret de réquisition n'avait pas encore été adopté, est un acte de la puissance publique, nullement nécessaire pour résilier un contrat et pour lequel la Défenderesse n'a pas avancé la moindre justification. Il s'agit là d'un acte de la puissance publique non couvert par la Convention qui constitue une violation du standard minimum de traitement en vertu du droit international coutumier.

380. On verra plus loin, dans le Chapitre VII si et quels dommages, autres que ceux de la résiliation, ces circonstances aggravantes ont causés aux Demanderesses.

## b. Le Décret de réquisition

381. Le Décret de réquisition du 9 mars 2011 a été pris «[v]u la nécessité de la continuité des services publics fournis au Terminal à Conteneurs de Conakry »[486] et il portait sur « les personnels, matériels, installations, les immeubles et actifs qu[e l'Etat guinéen] jugera nécessaire, appartenant à la société Getma International et à la Société du Terminal à Conteneurs de Conakry ».

382. Il n'est pas contesté qu'il s'agit d'un acte de la puissance publique, mais les Demanderesses estiment en outre que la réquisition constitue une expropriation illégale, même si la réquisition n'a été que temporaire.[487] Elles se basent, non seulement sur ce qu'elles appellent « la Convention de Harvard » (mais qui n'est à ce jour qu'un projet), mais aussi sur les affaires *Wena Hotels c. Egypte* et *Middle East Cement c. Egypte.*[488]

---

[486] Décret de réquisition (C-21).

[487] La réquisition a en effet été levée le 22 juin 2011 avec comme seule justification, à part les références aux textes légaux, « *les nécessités de l'exploitation et de la mise en œuvre de projet d'extension du Terminal à Conteneurs  de Conakry* » (C-26).

[488] Mem. § 504.

383. Ce Tribunal arbitral estime que la réquisition pendant plus de trois mois constitue effectivement une expropriation illégale, si et dans la mesure où l'Etat n'a pas compensé la perte subie par les Demanderesses et STCC, même si les biens ont ultérieurement été restitués. La restitution de biens le 22 juin 2011 a comme conséquence que l'expropriation n'a été que temporaire, ce qui aura une influence sur la détermination de l'indemnité due.

**(2) L'article 6 du Code des investissements**

384. L'article 6 a la teneur suivante :

> *1) Sous réserve des lois et règlements de la République, les personnes physiques et morales étrangères régulièrement établis en Guinée reçoivent le même traitement que les ressortissants guinéens eu égard aux droits et obligations relatifs à l'exercice de leurs activités.*[489]

385. Le Tribunal Arbitral constate que le recours aux forces de l'ordre a été excessif et il n'a pas été démontré que les actes d'intimidation auprès du personnel des Demanderesses qui ont accompagné la réquisition étaient nécessaires, dûment justifiés, et proportionnés.

386. Le Tribunal Arbitral rappelle que toute mesure administrative ou acte de puissance publique doit être dûment justifié et proportionnel au but qu'il poursuit; cela constitue un principe général qui s'applique aussi en droit guinéen. Ce principe est essentiel dans tout Etat de droit afin d'éviter l'arbitraire. Il s'applique aussi bien en matière civile et administrative que pénale, et aussi bien pour les étrangers que pour les ressortissants nationaux. En ce sens, le Tribunal Arbitral constate que l'action du Gouvernement envers les Demanderesses a outrepassé ses prérogatives.

387. Le Tribunal Arbitral conclut que l'acte de réquisition et les mesures qui ont accompagné la résiliation n'ont pas respecté l'article 6 du Code des Investissements.

---

[489] Code des Investissements de la Guinée, Ordonnance n° 001/PRG/87 en date du 3 janvier 1987 (R-1).

388.  De même, le Tribunal Arbitral conclut que les investisseurs étrangers n'ont pas été traités conformément aux standards minimaux du droit international.

## VII. LA REPARATION DU PREJUDICE

### A. *Position des Demanderesses*

**(1)  Les Demanderesses ont droit à une réparation intégrale et l'indemnisation forfaitaire de l'article 32.3 de la Convention de concession est inapplicable**

389.  Selon les Demanderesses, la réparation du préjudice résultant de la violation par la Guinée du Code des investissements et du droit international coutumier doit être calculée conformément au droit international coutumier. Ainsi, en évoquant l'affaire *Chorzow* et la Commission du Droit International des Nations Unies, les Demanderesses soutiennent que la réparation du dommage subi doit être conforme au principe de la réparation intégrale.[490]

390.  Elles estiment aussi que :[491]

> *Le Code des Investissements (en son article 5, alinéa 2) ne régit directement la mesure de la réparation qu'en tant que condition d'une expropriation licite. Cette dernière ne peut donc servir de fondement direct pour déterminer la mesure de réparation due au titre d'une expropriation illicite, rendant ainsi nécessaire de se référer au droit international coutumier et au critère d'indemnisation qu'il prévoit dans les cas d'expropriation illicite.*

et que

> *En, tout état de cause, le critère de réparation de l'article 32.3 de la Convention de concession n'a pas vocation à s'appliquer en l'espèce.*[492]

---

[490] Mem. §§ 523-531 ; Affaire de l'Usine de Chorzów (demande en indemnité) (fond), Cour Permanente de Justice Internationale, Recueil des arrêts, Série A – No. 17, 13 septembre 1928, p. 47 (C-263).

[491] Mem. § 535.

[492] Mem. § 536.

391.   Les Demanderesses prétendent que le standard de la réparation intégrale implique plus précisément, *« de se placer dans le scénario hypothétique où la Convention de concession aurait été exécutée jusqu'à son terme »* et par conséquent *« toute disposition contractuelle relative à l'indemnisation due en cas de résiliation de ladite Convention ne saurait être prise en compte. »*[493]

392.   Sur les deux arguments soulevés par la Défenderesse, elle estime (i) que la Guinée n'est pas recevable à invoquer l'article 32.3 de la Convention de concession et le principe *pacta sunt servanda* alors que c'est elle-même qui a violé ses différents engagements contractuels à plusieurs reprises[494], et (ii) que le principe de *lex specialis* ne peut aboutir au fait que la Convention (un accord contractuel) puisse primer sur une règle établie de droit international public prévoyant une réparation intégrale ; au surplus la Convention a été « répudiée » par le Décret de résiliation et son article 32.3 ne trouve donc pas à s'appliquer.[495]

**(2) Montant de la réparation**

393.   Les Demanderesses demandent réparation de quatre préjudices : (i) la perte de revenus futurs causée par la résiliation de la Convention de concession (également appelé le « gain manqué ») ; (ii) le préjudice lié à la réquisition ; (iii) le préjudice supplémentaire issu de la résiliation ; et (iv) le préjudice moral.[496]

394.   <u>*Sur la perte de revenus futurs*</u>, les Demanderesses soumettent un rapport de PwC se fondant sur la méthode des flux de trésorerie actualisés, ou *discounted cash-flow* (DCF)*,* prenant en compte comme point de départ la valeur de la Concession à la date de la résiliation, qu'elles ont considéré comme la date de l'évaluation. Le rapport établit deux

---

[493] Mem. § 538.
[494] Répl. §§ 453-460.
[495] Mem. §§ 536-539; Répl. §§ 461-471.
[496] Il faut noter que les Demanderesses ne considèrent pas que seule la réquisition soit une expropriation, et comme vu précédemment, la résiliation est selon elles un des aspects de l'expropriation dont elles ont été victimes.

flux de trésorerie (en fonction de deux hypothèses différentes sur l'inflation) jusqu'à la fin de la Convention de concession, à savoir l'année 2034, à hauteur de 1.134.548 millions de GNF et 882.607 millions de GNF. Les deux hypothèses sont ensuite actualisées par le taux de coût du capital et le coût de la dette. La moyenne entre les deux hypothèses conduit PwC à conclure que la valeur de la concession au 8 mars 2011 (date du Décret de résiliation) était de 105 millions d'euros, et que Getma International détenant 98,125% de STCC, le préjudice de gain manqué s'élève pour les Demanderesses à 103.031.250 euros.[497]

395. Dans leur Réplique, les Demanderesses, se basant sur un deuxième rapport de PwC, ont révisé ces montants à la hausse : Ayant modifié le taux d'inflation estimé ainsi que les charges fiscales, PwC détermine dans son second rapport la valeur de la concession à 124 et 97,5 millions d'euros dans les deux hypothèses respectives, ce qui donne une valeur moyenne de 110,5 millions d'euros[498], dont les Demanderesses réclament 98,125% , soit 108.428.125 euros.[499]

396. Dans leur Réplique, les Demanderesses soutiennent que l'hypothèse de calcul de PwC correspond au prix de vente de la concession à un temps t, mais que ceci ne constitue qu'une hypothèse de travail qui ne requiert pas qu'une cession soit effectivement autorisée au moment t par la Convention de concession elle-même.[500] Elles soutiennent également que l'évaluation doit bien être faite au 8 mars 2011 avec les informations disponibles à cette date (et non pas au jour du rapport de PwC), sans que l'article 7.2 de la Convention ne déroge à ce principe, surtout que le droit international place l'évaluation au jour de l'expropriation.[501] Elles avancent enfin que, si la Guinée souhaite prouver qu'elles ont en fait tiré un bénéfice de la résiliation, la Défenderesse doit

---

[497] Mem. §§ 543-570.
[498] Deuxième rapport PwC, § 219.
[499] Répl. §§ 578-589.
[500] Répl. §§ 509-513.
[501] Répl. §§ 514-540.

apporter la preuve de cette affirmation.[502] Elles ajoutent que le modèle de PwC est basé sur de solides hypothèses car, contrairement à ce qu'affirme la Défenderesse, elles avaient les capacités de financer les investissements et la méthode pour calculer les projections de croissance du trafic de conteneurs et des prix est détaillée avec précision par PwC.[503]

397. *Sur le préjudice supplémentaire causé par le Décret de résiliation*, les Demanderesses réclament le remboursement de certains frais qui sont selon elles indépendants du gain manqué, à savoir:[504]

- Les frais de rapatriement du matériel réquisitionné à hauteur de 734.212 euros. Elles précisent dans leur Réplique qu'il est courant en matière de concession que le Concédant rachète le matériel à l'issue du contrat.[505]

- Les frais de gestion de crise à hauteur de 258.834 euros. Elles ajoutent dans leur Réplique que ces frais sont directement liés à la faute spécifique de la Guinée et que même des frais déjà engagés avant le Décret de Résiliation sont recouvrables parce qu'ils sont « la conséquence matérielle et directe de cette violation ».[506]

- Les frais de salaires causés par le chômage technique de plusieurs employés, à hauteur de 65.456 euros. Elles précisent dans leur Réplique que les obligations du droit du travail en termes de reclassement et de congés payés ne laissaient aux Demanderesses pas d'autres solutions pour les deux employés concernés que le chômage technique.[507]

---

[502] Répl. §§ 548-558.
[503] Répl. §§ 559-599.
[504] Mem. §§ 601-615; Répl. §§ 600-614.
[505] Mem. §§ 602-606; Répl. §§ 600-604.
[506] Mem. §§ 607-609; Répl. §§ 605-610.
[507] Mem. §§ 610-615; Répl. §§ 611-614.

398. _Sur le préjudice causé par la réquisition_, les Demanderesses estiment avoir droit aux postes suivants[508]

- Le remboursement des frais de remise en état du matériel d'exploitation réquisitionné. Elles estiment que deux grues et cinq véhicules de déplacement de conteneurs ont été considérablement abîmés, le coût de leur remise en état s'élevant à 1.151.508 euros. Elles précisent dans leur Réplique que les dommages ont bien eu lieu pendant la période de réquisition, et non avant.[509]

- Le remboursement pour les stocks (tels que du carburant ou des pièces détachés pour les engins de manutention) qui faisaient partie des biens réquisitionnés et qu'elles n'ont récupérés qu'en partie à la levée de la réquisition, pour un montant de 210.070 euros.[510] Elles précisent dans leur Réplique que ces stocks ont été consommés par la Guinée et que le montant réclamé à ce titre ne fait pas double emploi avec l'indemnisation de la valeur de la concession, celle-ci ayant été calculée d'après la méthode DCF et donc nette de la valeur comptable des stocks au 8 mars 2011.[511]

- Le paiement de prestations effectuées par STCC mais non facturées au jour de la réquisition à hauteur de 589.418 euros. Elles expliquent qu'à cause de la réquisition, il a été impossible de savoir si les marchandises avaient été livrées à leurs propriétaires[512] et que la facturation ne pouvait se faire que sur la base de documents en possession de son successeur.[513] Elles ajoutent que leur expert PwC a vérifié que les données issues du logiciel de Getport à partir duquel elles ont calculé ce préjudice, sont fiables.[514] Enfin, elle confirment que le montant des factures à émettre n'est pas compris dans le chiffre d'affaires 2011 utilisé pour la calcul de la

---

[508] Mem. §§ 571-600.
[509] Mem. §§ 571-587; Répl. §§ 615-622.
[510] Mem. §§ 588-593.
[511] Répl. §§ 623-632.
[512] Mem. § 599.
[513] Répl. §§ 637-638.
[514] Répl. § 639 et rapport PwC du 10 juillet 2015 §§ 240-243.

valeur de la concession et que ce préjudice ne fait donc pas double emploi avec le gain manqué.[515]

399. *Sur le préjudice moral*, les Demanderesses rappellent tout d'abord la reconnaissance du principe de réparation de ce type de préjudice en droit international et considèrent que le dommage moral peut consister « en un dommage causé au crédit ou à la réputation d'une personne (physique ou morale) »[516] et en un préjudice causé à la personne morale pour « la violence physique exercée sur le personnel d'une société ».[517]

400. Les Demanderesses estiment que leur préjudice moral revêt la gravité nécessaire pour être indemnisable[518], mais rappellent quand-même que la doctrine est d'avis que s'oppose à ce traitement différent des dommages matériels des dommages moraux.[519] Elles soulignent la brutalité de la résiliation et de la réquisition, qui, selon elles, a été menée par un commando de militaires et policiers armés, dans un climat hostile et tendu, dans lequel les salariés ont été « réquisitionnés » et « les locaux ont été en parties pillés ». En outre, les Demanderesses ont subi une atteinte à leur image du fait de la propagation de l'idée erronée par le Président de la République, le groupe Bolloré et la presse nationale et internationale que Necotrans était un opérateur « piètre » et « défaillant », suite à la résiliation et l'octroi du contrat à l'entreprise Bolloré, son concurrent direct.[520]

401. Les Demanderesses considèrent avoir droit à une indemnisation de 1.000.000 euros à ce titre.[521]

---

[515] Répl. §§ 635-636.

[516] Mem. §§ 616-617 (citant l'affaire *Desert Line Projects LCC c. République du Yémen*, CIRDI ARB/05/17, Sentence, 6 février 2008, (C-267) ; *et Opinion dans les affaires du Lusitania, Commission Mixte Allemagne-États-Unis,* 1er novembre 1923, Recueil des sentences arbitrales, Volume VII pp. 32-44, p. 40, (C-280)).

[517] Mem. §§ 618-619.

[518] Mem. § 620 (citant *Franck Charles Arif c. République de Moldavie*, CIRDI ARB/11/23, Sentence, 8 avril 2013, (C-282); *Joseph Charles Lemire c. République d'Ukraine*, CIRDI ARB/06/18, Sentence, 28 mars 2011, (C-281)).

[519] Répl. §§ 641-649.

[520] Mem. § 620 et Répl. §§ 650-669.

[521] Mem. §§ 616-624, Répl. §§ 640-669.

402. *Sur les intérêts,* les Demanderesses demandent le paiement d'intérêts capitalisés annuellement au taux de 8,7% depuis le 8 mars 2011.[522] Elles précisent dans leur Réplique que ces intérêts sont bien dus afin de les indemniser pour l'écoulement du temps entre la date de l'expropriation et la date du paiement de l'indemnité et que ces intérêts se chiffrent au 10 juillet 2015 à 160.087.489 euros.[523]

**(3) Les allégations de la double réparation**

403. Sur le point de la double réparation, les Demanderesses estiment tout d'abord que la Défenderesse est mal placée pour invoquer cet argument dans la mesure où (i) les Demanderesses n'ont à ce jour obtenu aucun paiement en vertu de la sentence CCJA, et (ii) la Défenderesse a introduit un recours en annulation contre ladite sentence – entretemps couronné de succès.[524] De plus, cette question n'est pas nouvelle en arbitrage CIRDI et le Tribunal a toute liberté dans son dispositif pour réduire la réparation accordée en fonction d'autres paiements effectivement reçus de la Guinée (et non pas seulement octroyés par le Tribunal CCJA). Les Demanderesses citent plusieurs sentences CIRDI et une décision de la Cour d'appel de Paris qui ont adopté cette solution en cas de procédures parallèles.[525]

404. Les Demanderesses estiment que la position de la Défenderesse consistant à ne prendre en compte que les montants investis au jour de la résiliation, pour ensuite estimer que les Demanderesses avaient déjà récupéré une partie de ces sommes par leur exploitation du TAC, ignore totalement le principe de réparation intégrale, y compris du gain manqué.[526]

---

[522] Mem. §§ 625-630.

[523] Répl. §§ 670-677.

[524] La sentence CCJA a entretemps été annulée par arrêt de la CCJA du 30 novembre 2015.

[525] Répl. §§ 472-488.

[526] Répl. §§ 489-504.

### B. *Position de la Défenderesse*

**(1) L'indemnisation forfaitaire de l'article 32.3 de la Convention de concession est applicable et exige que toute indemnisation soit appréciée strictement**

405.   La Défenderesse soutient que l'article 32.3 de la Convention de concession, qui prévoit le paiement par la Guinée d'une indemnité forfaitaire de résiliation, couvre l'intégralité des conséquences de l'expropriation alléguée.[527]

406.   Plus précisément, la Défenderesse cite plusieurs sources juridiques ayant confirmé la possibilité de prévoir un accord forfaitaire d'indemnisation en arbitrage international.[528] Elle soutient ensuite que le forfait couvre l'ensemble des demandes car (i) le gain manqué est inclus dans l'expression « compenser la perte d'activité » de l'article 32.3, et (ii) la liste des indemnités de l'article 32.3 (qui inclut les biens non amortis ou les indemnités de licenciement) est exhaustive.[529] Elle ajoute dans sa Duplique que l'ajout de l'article 32.3 avait été expressément requise par Getma International lors du processus de conclusion de la Convention et avait fait l'objet d'une rédaction précise et sophistiquée afin de couvrir l'intégralité du préjudice subi en cas de résiliation, tout en évitant d'enrichir le concessionnaire en cas de résiliation précoce.[530]

407.   Les deux principes que la Défenderesse souhaite voir appliqués par le Tribunal sont (i) *pacta sunt servanda*, à savoir le fait que les Parties s'étant entendu contractuellement sur l'indemnité à verser en cas de résiliation, il n'est pas possible d'appliquer le principe de réparation intégrale issue selon les Demanderesses du droit international[531] et (ii) de plus, la Convention constitue une *lex specialis* qui permet de déroger au droit commun

---

[527] C-Mem. §§ 350-353.
[528] C-Mem. §§ 334-346.
[529] C-Mem. §§ 347-354.
[530] Dupl. §§ 246-258.
[531] C-Mem. §§ 359-365 ; Dupl. §§ 259-269.

de la réparation sans que la résiliation de la Convention de concession emporte inapplication de l'accord d'indemnisation qu'elle contient.[532].

408. Dans sa Duplique, la Défenderesse ajoute que le principe de l'*estoppel* interdit aux Demanderesses de contester l'application de l'article 32.5 alors que c'est l'argument qu'elles ont présenté (et sur lequel elles ont obtenu réparation) devant le Tribunal CCJA, et que de son côté elle n'a jamais renoncé à son droit d'invoquer l'accord d'indemnisation (ni par une prétendue résiliation de la Convention qui entrainerait l'inapplicabilité de l'accord forfaitaire selon les Demanderesses, ni par le principe de l'*estoppel* dont les conditions d'application ne sont pas réunies en l'espèce).[533]

409. La Défenderesse estime en outre que le Tribunal doit adopter une vision stricte des préjudices allégués, afin d'éviter tout enrichissement sans cause, considérant qu'à la date de la résiliation, les résultats de l'exploitation ont permis à Getma International de couvrir intégralement les investissements qu'elle avait faits.[534]

410. A ce titre, elle soutient que les Demanderesses ont déjà perçu, lors de la période d'exploitation, 20 millions d'euros, ce qui couvre, selon la Défenderesse, leur ticket d'entrée, ainsi que les investissements en travaux réalisés, correspondant à un montant d'environ 3 millions d'euros.[535] En outre, les Demanderesses ont récupéré dans leur intégralité les équipements d'un montant de 10-12 millions d'euros.[536]

**(2) Montant de la réparation**

411. *Sur le gain manqué*, la position principale de la Défenderesse consiste à soutenir que ce préjudice est déjà couvert par l'indemnité forfaitaire de l'article 32.3 ayant servi de base à la sentence CCJA et qui est destinée à compenser la perte d'activité.

---

[532] C-Mem. §§ 366-376 ; Dupl. §§ 286-298.
[533] Dupl. §§ 270-285.
[534] C-Mem. § 505.
[535] C-Mem. §§ 500-502.
[536] C-Mem, § 503.

412.  A titre subsidiaire, la Défenderesse critique la méthode de calcul de PwC.[537]

- Elle estime tout d'abord que le postulat de calcul (PwC a recherché au 8 mars 2011 le prix de la cession de la concession à un tiers potentiel) est erroné et inopérant car la Convention ne pouvait pas être cédée en vertu de l'article 7.2 de la Convention de concession qui interdisait la cession.

- PwC aurait dû prendre en compte l'ensemble des données et informations nouvelles « *ex post* » connues au jour de son évaluation, et non pas seulement les informations disponibles au 8 mars 2011. En particulier, la valeur de la concession aurait dû être calculée en prenant en compte l'ensemble des flux de trésorerie qu'aurait générée la poursuite de la Convention sur la période 2011-2034.[538] Selon la Défenderesse, la prise en compte de tous les éléments ex post est conforme au principe de réparation intégrale dégagé dans l'affaire *Chorzów* présentée par les Demanderesses, soit de replacer l'investisseur dans une situation financière identique à celle qui aurait été la sienne en l'absence du fait dommageable.[539] Cette méthode permet en outre une évaluation du gain manqué précise et cohérente[540] et évite en même temps le caractère punitif de l'indemnisation.[541]

- PwC ne pouvait pas ajouter à la valeur de la concession des intérêts de retard entre le 8 mars 2011 et la date de la sentence dans la mesure où en cas de maintien de la concession, les Demanderesses n'auraient jamais été créditées au 8 mars 2011 d'une somme égale à la valeur de la concession. La Défenderesse ajoute que des intérêts ne sont pas accordés automatiquement en droit international, que l'accord forfaitaire exclut l'ajout d'intérêt surtout pour le préjudice de gain manqué, et que l'octroi

---

[537] C-Mem §§ 509-533 ; Dupl. §§ 377-433.
[538] Dupl. § 380.
[539] Dupl. §§ 380-398.
[540] Dupl. §§ 399-403.
[541] Dupl. §§ 404-406.

d'intérêts doit être exclu pour la période pendant laquelle les Demanderesses ont prolongés sans motifs la procédure devant ce Tribunal arbitral.[542]

- PwC n'a pas pris en compte la mauvaise situation financière des Demanderesses et ignore le fait qu'elles auraient été dans l'incapacité de financer les investissements y compris pour le deuxième terminal et que par conséquent toutes les projections financières de PwC fondées sur l'existence de ce deuxième terminal et l'augmentation des volumes et des redevances supposées en découler doivent être écartées.[543]

- PwC ignore les bénéfices qu'ont retirés les Demanderesses de la résiliation, par exemple en n'ayant pas à s'endetter car les Demanderesses ont été libérées de leur obligation de mobiliser des fonds à hauteur de 77,7 millions pour réaliser les investissements du TAC.[544]

413. Sur les aspects comptables du calcul du gain manqué, la Défenderesse soutient que:[545]

- Le chiffre d'affaires (servant de base de calcul aux flux de trésorerie actualisés) a été surévalué car (i) PwC n'explique pas comment le volume de conteneurs traités a été calculé, alors que les perspectives de croissances de la Guinée ne sont pas optimistes, (ii) le calcul de l'évolution du prix de prestation par conteneur n'a pas pris en compte l'inflation réelle ;

- Les charges prévisionnelles prises en compte par PwC ne font l'objet d'aucun détail et ne peuvent donc pas être vérifiées ;

- Le taux d'actualisation des flux est mal calculé car la prime risque de marché utilisée par PwC n'était pas correcte et la prime risque de pays a été sous-évaluée.

---

[542] Dupl. §§ 416-433.
[543] Dupl. §§ 407-410.
[544] Dupl. §§ 411-415.
[545] C-Mem. §§ 534-549; Dupl. §§ 435-472.

414. La Défenderesse conclut qu'au 30 octobre 2015, la valeur de la concession prise au 8 mars 2011 est de 30 millions d'euros, ou 33 millions d'euros constants.[546]

415. *Sur le préjudice supplémentaire causé par le Décret de résiliation* [547], la Défenderesse soutient que (i) les frais de rapatriement sont injustifiés car le Concédant n'avait en tout état de cause pas d'obligation de reprise, et le matériel aurait donc dû être rapatrié dans tous les cas, (ii) les frais de gestion de crise sont sans rapport avec la résiliation car ils correspondent à des prestations rendues avant le Décret de résiliation ou sans rapport avec le présent litige, (iii) les salaires ont été payés parce que les Demanderesses ont décidé de garder les salariés en question sur place où ils ont par ailleurs encore rendu des services; et que les deux premiers préjudices sont en outre couverts par l'indemnité de l'article 32.2.

416. *Sur les préjudices causés par la réquisition*[548], la Défenderesse soutient ceci :

- Les frais de remise en état du matériel sont injustifiés car (i) la même demande a été faite et rejetée devant la CCJA, et (ii) la cause réelle de l'endommagement est le mauvais entretien par Getma International lors de l'exploitation du TAC comme établi, selon la Défenderesse, dans les rapports présentés par les Demanderesses ; enfin, le rapport présenté par les Demanderesses dans leur Réplique et censé prouver le bon état du matériel au jour de la réquisition est très limité (seulement deux grues) et la Défenderesse s'interroge sur le fait que ce rapport n'a pas été présenté au Tribunal CCJA vu sa pertinence.

- La valeur de stocks non restitués suppose que les Demanderesses ne les aient pas effectivement récupérés, ce qu'elles ne sont pas en mesure de prouver[549] ; les Demanderesses ont fait procéder à un inventaire de leurs biens par un huissier le 12 mars 2011 et leur défense qu'aucun inventaire physique de leurs stocks n'a pu être

---

[546] Dupl. § 469.
[547] C-Mem. §§ 550-567; Dupl. §§ 473-479.
[548] C-Mem. §§ 568-606; Dupl. §§ 484-499.
[549] C-Mem. §§ 594-597 et Dupl. § 496.

réalisé le 8 mars 2011 ne justifie donc pas le calcul qu'elles font maintenant de la valeur des stocks prétendument non-restitués[550] ; en outre, ce préjudice a déjà fait l'objet d'une indemnisation devant le Tribunal CCJA, à concurrence du montant réclamé de 210.070 euros.[551]

- Le paiement de services non facturés est injustifié car les Demanderesses ne prouvent pas qu'elles aient tenté de recouvrir la moindre somme de la part de leurs débiteurs[552] et qu'elles aient été dans l'impossibilité de facturer.[553] Elles rappellent que les Demanderesses avaient eu accès au RAC après la réquisition, comme prouvé par l'inventaire du 12 mars 2011 et l'expertise sur une grue Gottwald du 15 avril 2011.[554]

417. *Sur le préjudice moral*, la Défenderesse soutient que, même si ce type de préjudice a été reconnu en arbitrage, il suppose, pour ouvrir droit à réparation, l'existence de circonstances exceptionnelles lorsque les faits allégués sont d'une gravité particulière, spécialement lorsqu'il est invoqué par une personne morale, et cite plusieurs sentences CIRDI en la matière.[555]

418. La Défenderesse estime ensuite qu'aucune circonstance exceptionnelle ne justifie ici l'octroi de dommages et intérêts pour préjudice moral car (i) un manquement contractuel ne peut suffire, surtout si comme en l'espèce il est réparée par une indemnisation forfaitaire[556], (ii) la présence des forces de polices et militaires ne s'apparente pas à un commando comme le soutiennent les Demanderesses et correspond à un exercice

---

[550] Dupl. § 496 et Mem.AAR §§ 425-429.

[551] C-Mem. § 592; Dupl. §495; Mem.AAR § 425.

[552] C-Mem. §§ 601-603 et Dupl. § 499.

[553] C-Mem. §§ 604-606 et Dupl. § 498.

[554] Mem.AAR §§ 436-440.

[555] C-Mem. §§ 607-616 (citant les affaires *Desert Line Projects LCC c. République du Yémen*, CIRDI ARB/05/17, Sentence, 6 février 2008, (C-267); *Franck Charles Arif c. République de Moldavie*, CIRDI ARB/11/23, Sentence, 8 avril 2013, (C-282); *Joseph Charles Lemire c. République d'Ukraine*, CIRDI ARB/06/18, Sentence, 28 mars 2011, (C-281); Dupl. §§ 500-520.

[556] C-Mem. §§ 616-62; Dupl. §§ 502-505, Mem.AAR §§ 503-505.

normal de l'autorité publique, surtout que les Demanderesses ne prouvent pas qu'il y ait eu usage de force[557], (iii) le soi-disant pillage par les employés du PAC et de l'entreprise Bolloré n'est allégué que par une déclaration de témoin et le simple stress d'un salarié ne peut pas être qualifié de préjudice moral, et les Demanderesses avaient accès au TAC pendant la période de réquisition [558] et (iv) l'atteinte à l'image n'est pas avérée dans la mesure où les Demanderesses ont recentré leurs activités sur un type différent de conteneurs et travaillent même avec l'entreprise Bolloré sur certains projets.[559]

**(3) La double réparation**

419. La Défenderesse estime que si les Demanderesses obtiennent la réparation intégrale à laquelle elles prétendent dans la présente affaire, elles bénéficieront d'une double réparation du même préjudice.[560] Elle insiste sur le fait que les mêmes demandes ont déjà été formulées au Tribunal CCJA et que ce dernier a octroyé :

- 20.884.966 euros pour l'indemnité forfaitaire de résiliation qui a été demandé à la hauteur de 103.031.250 €au titre des revenus futurs de la concession, et couvrirait selon la Défenderesse la totalité de l'indemnité due en cas d'expropriation ;

- 210.070 euros au titre des biens restitués qui correspondrait aussi à l'indemnité demandée au titre de stocks non restitués ;

- 734.212 euros au titre des frais de rapatriement du matériel d'exploitation et 258.834 euros au titre de frais de gestion de crise, compris dans le montant de 38.321.057 euros, octroyé à Getma International en application de l'article 32.3 de la Convention.[561]

---

[557] C-Mem. §§ 622-630; Dupl. §§ 506-509; Mem.AAR §§ 506-508.
[558] C-Mem. §§ 631-633; Dupl. §§ 510-514.
[559] C-Mem. §§ 634-644 ; Dupl. §§ 515-520.
[560] C-Mem. §§ 490-499.
[561] C-Mem. § 493.

420.   La Défenderesse soutient qu'il ne suffit pas « d'effectuer une compensation entre les sommes éventuellement octroyées au titre de la présente procédure et celles effectivement payées par la République de Guinée pour les mêmes préjudices au titre de l'arbitrage CCJA pour éviter ce risque de double indemnisation. »[562]

421.   Selon la Défenderesse, « la seule manière d'éviter tout risque de double indemnisation est donc de constater que les Demanderesses ont déjà obtenu la condamnation de la République de Guinée au paiement d'indemnisations » sollicités par les Demanderesses. Dans le cas contraire, la République de Guinée pourrait être en possession de deux titres exécutoires, ordonnant tous deux des condamnations pécuniaires pour les mêmes dommages.

422.   La Défenderesse allègue tout d'abord que les Demanderesses ne sont pas de bonne foi car sans contester qu'elles ont obtenu une indemnisation pour les préjudices qu'elles soumettent de nouveau au Tribunal CIRDI, elles ne déduisent cependant des montants demandés dans la présente procédure les sommes déjà accordées par le Tribunal CCJA.[563]

423.   Il y a donc, selon la Défenderesse un risque entourant l'argument des Demanderesses selon lequel il faudrait leur accorder réparation complète, charge à elles de n'exécuter la sentence CIRDI que de façon partielle afin de ne récupérer que le surplus des sommes auxquelles elles auraient droit, surtout que la Guinée ne sera pas en mesure d'empêcher l'exécution parallèle des sentences CCJA et CIRDI.[564] En effet, il n'existe selon la Défenderesse aucun mécanisme contractuel qui obligerait aux Demanderesses à rembourser des sommes perçues deux fois, ou un mécanisme quelconque qui permettrait à la République de Guinée d'éviter le double indemnisation, créant ainsi un véritable risque d'enrichissement sans cause.[565]

---

[562] C-Mem. §§ 495-498.
[563] Dupl. §§ 351-356.
[564] Dupl. §§ 357-365.
[565] Dupl. §§ 362, 364, 366-368.

424. La Défenderesse ajoute que son recours en annulation contre la sentence CCJA n'enlève rien au risque de double réparation. Elle soutient qu'il faut que ce Tribunal prenne toutes les précautions nécessaires pour éviter ce risque[566] et conclue en exhortant le Tribunal de déduire tout simplement les montants accordés par le Tribunal CCJA de toute réparation qu'il pourrait accorder dans la présente procédure.[567]

## C. *Analyse du Tribunal*

### (1) Les principes de réparation

425. Comme le Tribunal arbitral est incompétent pour se prononcer sur les conséquences de la résiliation, il n'y a pas lieu de trancher sur les demandes d'indemnisation pour les conséquences dommageables de la résiliation, soit le gain manqué et les préjudices supplémentaires issus de la résiliation, ceux-ci ayant été forfaitisés par l'accord des Parties.

426. Le Tribunal arbitral ne se penchera donc pas sur les postes suivants :

(i) les frais de rapatriement du matériel, ceux-ci étant une conséquence de la résiliation (comme l'a par ailleurs aussi décidé le Tribunal CCJA[568]) ;

(ii) les salaires des deux salariés pendant la période de latence ayant suivi le Décret de résiliation (EUR 65.456), ceux-ci étant une conséquence de la résiliation et de la décision interne de Getma International de maintenir du personnel. Selon l'article 32.5 de la Convention, 75 jours pouvaient s'écouler au maximum entre l'Acte de la Puissance Publique et la résiliation ; en cas de résiliation sur la base de l'article 32.3, il y aurait eu 60 jours entre la notification des griefs et la résiliation. Dans les deux cas, Getma International aurait eu à absorber lui-même les coûts de la latence, étant

---

[566] Dupl. §§ 348-350.
[567] Dupl. §§ 369-376.
[568] Sentence CCJA § 256.

entendu que l'article 32.3 ne prévoyait que le remboursement des indemnités de licenciement et encore uniquement pour autant que le concessionnaire les ait payées.

427. Par contre, les dommages causés non par la résiliation, mais par les circonstances aggravantes entourant la résiliation ainsi que ceux causés par le Décret de réquisition étant de la compétence du Tribunal arbitral, sont à indemniser.

### (2) Le montant de la réparation

428. Reste des demandes des Demanderesses cinq postes d'indemnisation (dont trois liés à la réquisition) pour lesquels le Tribunal arbitral est compétent et a constaté la responsabilité de la Défenderesse.

### a.   Les frais de gestion de crise

429. Dans le paragraphe 608 de leur Mémoire en Demande, les Demanderesses confirment que ces frais s'élèvent à 248.834 euros[569] et se réfèrent dans la note en bas de page n°492 à l'annexe 57 au rapport d'expertise PwC. Il apparaît que les factures se trouvent en réalité dans l'annexe 56 au rapport PwC, au moins dans la version papier.[570] Huit de ces 19 factures qui, selon les Demanderesses, « constituent une conséquence naturelle et directe du Décret de Résiliation (à venir et consommée) » datent d'avant la résiliation (la plus ancienne datant du 28 janvier 2011 et concernant la création d'un site internet pour STCC). Cela a amené la Défenderesse à alléguer que ces frais ne sont pas recouvrables parce qu'ils précèdent la résiliation. Elles ont également affirmé que ces frais ne découlent pas d'une faute spécifique de la Guinée.

430. Cette demande a déjà été soumise au Tribunal CCJA qui a estimé que « ces frais sont compris dans l'indemnité de l'article 32.3 » et que « Getma n'a pas démontré une

---

[569] Dans la procédure CCJA, Getma International a demandé 2**5**8.834 euros à ce titre.

[570] Dans la version digitale, ces factures n'ont pas été produites, l'annexe 56 contenant les tableaux détaillés et bulletins de salaire de MM. Bérenger et Chanchevrier.

dépense spéciale qui serait due, en dehors de la résiliation, à une faute spécifique de la République de Guinée ».

431. Le Tribunal arbitral, ayant vérifié les factures en question (parmi lesquels non seulement des factures d'agences conseils en communication, mais aussi de Me Fischer), constate qu'elles concernent des services dans le cadre de la réaction contre les rumeurs qui circulaient début 2011 après la nomination de M. Alpha Condé comme Président au sujet de son intention de résilier la Convention. Comme constaté ci-dessus, l'annonce par le Président de son intention de rompre la Convention était une violation du Code des investissements, à distinguer de la résiliation même. Les Demanderesses étaient justifiées de se défendre contre les rumeurs et à faire connaître leur position publiquement par des communiqués et notes.[571] Le manque de discrétion concernant l'intention de résilier la Convention constitue une faute à distinguer de la résiliation même, dont les conséquences, autres que celles de la résiliation, ne sont pas couvertes par l'article 32.3 et donc recouvrables. Ainsi, la Guinée doit indemniser les Demanderesses pour les frais de communication et de défense publique qu'elles ont été obligées de faire, à concurrence de **248.834 euros**.[572]

**b.  Les frais de remise en état du matériel d'exploitation réquisitionné**

432. Les Demanderesses ont prouvé la violation du Code des investissements par le Décret de réquisition de la Défenderesse mais elles ont également la charge de la preuve de l'existence du préjudice et de son montant, ainsi que du lien de causalité avec la violation.

433. Pour apprécier cette preuve, il est utile de préalablement rappeler quelques dates pertinentes:[573]

-  Le 8 mars 2011, l'accès aux bureaux de STCC et au TAC est bloqué;

---

[571] Dont des exemples et traces se trouvent dans (C-193), (C-173), (C-187), (C-283) (qui fait état d'une conférence de presse donnée par Me Fischer et son associé), et (C-199).

[572] La somme des factures est EUR 2**5**8.83, mais le Tribunal arbitral ne peut pas attribuer un montant *ultra petita*.

[573] Généralement affirmées par les Demanderesses (Mem. §§ 575-581) et pas contestés par la Défenderesse.

- Le 9 mars 2011 la réquisition est effectuée;

- Une « passation de pouvoirs » entre le PAC et Bolloré a lieu le 11 avril 2011;

- Le 29 avril 2011, Getma International propose à Bolloré de lui vendre les biens réquisitionnés alors utilisés par Bolloré ; mais la proposition reste sans réaction;

- Le 22 juin 2011, l'Etat lève la réquisition ;

- Du 22 juin au 19 août 2011 Getma International organise le rapatriement des biens réquisitionnés ; entretemps, le matériel était sur un terre-plein adjacent au TAC et  sous la garde du PAC et de Bolloré[574];

- Le 19 août 2011, les biens réquisitionnés sont transportés sur le navire Happy River de Conakry à Lomé où ils sont débarqués par la société Manuport.[575]

434. En ce qui concerne les dommages au matériel réquisitionné, les Demanderesses ont produit avec leur Mémoire en Demande (i) une liste des biens réquisitionnés (établie entre le 12 et le 25 mars par un huissier de justice mandaté par Getma International et STCC, qui est un inventaire du matériel se trouvant dans les bureaux et sur le périmètre du TAC[576] et qui ne dit rien sur l'état de ces biens), et (ii) un rapport d' inspection générale qui fut rédigé selon les Demanderesses le 15 avril 2011 à l'occasion de la « passation de pouvoir » entre le PAC et Bolloré, par un employé de la société Raoul Neveu-Gottwald et qui concerne une des deux grues Gottwald de Getma International à Conakry, portant le n°360190.[577] Les Demanderesses ont cité de ce rapport trois affirmations selon lesquelles certaines parties sont en bon état.

435. A la lecture de ce rapport, qui confirme pour l'essentiel que la grue est en général en bon état et bien entretenu, le Tribunal arbitral note toutefois qu'il mentionne aussi des points négatifs tels que :

---

[574] Mem. § 580.

[575] Rapport d'expertise Gexco (C-278), p.2.

[576] Procès-verbal de constat des lieux en date du 25 mars 2011 (C-170) ; Voir aussi annexe PwC 17.

[577] Inspection Générale STCC Conakry – Guinée en date du 15 avril 2011(C-276), p.1.

- « Le joint tournant hydraulique est quant à lui HS ! Des fuites ont été constatées et de l'huile jonche le sol du puits » (p.7);

- Dans le motoréducteur d'orientation « [l]e filtre est à changer pour que le refroidissement de moteur se fasse correctement et tourne dans des conditions nominales [sic] » (p.7);

- Les climatiseurs dans la salle électrique « (manque d'un déshumidificateur !) » (p.8);

- « Plusieurs lampes Néons sont HS rendant ainsi l'accès à la 'Cabine Tour' dangereux. » (p.10);

- Dans la cabine de la tour, on constate que « [n]éanmoins, le manipulateur d'orientation présente un jeu. »(p.10);

- « Le support de lampe halogène au milieu de flèche n'est plus fixé correctement! (risque d'accident !!) » (p.11);

- « Le vérin présente une fuite importante » (p.11) « une légère fuite décelée au crochet inondant ainsi le spreader d'huile » (p.12) ;

- Les flippers « commencent à fatiguer » (p.12) ;

- La flèche n'a pas été vérifiée dans sa totalité: « les parties 'Tête de Flèche' et 'Enrouleur' ne seront pas traitées faute de moyen d'atteindre ces éléments d'une part et de non disponibilité de la grue d'autre part. » (p.11).

436. Le Tribunal arbitral en déduit que cette grue n'était pas dans un état impeccable. De toute façon, ce rapport ne concerne qu'une seule grue et ne prouve rien quant à l'état, le 9 mars 2011, des autres biens réquisitionnés.

437. Les Demanderesses s'appuient[578] ensuite sur le fait que « les deux grues Gottwald HMK étaient alors inspectées à deux reprises par trois experts indépendants» :

- *Un premier examen technique [...] effectué sur le port de Conakry, juste avant l'embarquement des grues pour Lomé et après leur arrivée par Messieurs Ferreiro et Delaroche de la société Raoul Neveu-Gottwald.*[579]

---

[578] Mem. § 582.

[579] Mem. § 582, premier point; avec référence à l'annexe 48 du rapport de PwC, expert des Demanderesses, et à la pièce Rapport d'expertise Gexco (C-278).

- *Des opérations d'expertises […] menées à Lomé du 22 au 26 août 2011 par Monsieur Dur (décédé, depuis) de la société Gexco.*[580]

438. L'étude de ces rapports soulève quelques interrogations de la part du Tribunal arbitral:

1   Le rapport de MM. Ferreiro et Delaroche de la société Raoul Neveu SAS explique sur sa première page qu'il « vient en complément du rapport d'expertise établi par M. Christian DUR-GEXCO », que le lieu d'expertise est « Conakry Lomé », que la période est « semaines 33 et 34 » et qu'il concerne l' « état général des deux grues tel [sic] que trouvés [sic] sur le port de Conakry avant toutes interventions ».[581] Les semaines 33 et 34 de 2011 étaient les semaines du 15 et du 22 août 2011. On comprend donc que l'examen technique de MM. Ferreiro et Delaroche a commencé à Conakry au plus tôt quatre jours avant le départ du matériel pour Lomé, le 19 août, et s'est poursuivi après le transport, à Lomé, pour y être terminé au plus tard le 26 août 2011.[582] Toutefois, le rapport de M. Dur-Gexco porte comme titre « Expertise à Lomé du 22 au 26 août 2011 d'un lot de matériel de manutention transporté par le navire « Happy River » en provenance de Conakry »[583] et mentionne en page 89 la date du 21 septembre 2011. Si M. Dur a commencé ses opérations d'expertise le 22 août 2011 à Lomé[584], on comprend mal comment MM. Ferreiro et Delaroche qui, selon les Demanderesses ont commencé leur examen avant l'embarquement des grues pour Lomé, peuvent écrire que leur rapport, par ailleurs non daté, « vient en complément » du rapport d'expertise de M. Dur qui n'a reçu son mandat que le 12 août 2011.[585]

---

[580] Mem. § 582, deuxième point; avec également référence à la pièce Rapport d'expertise Gexco (C-278).

[581] P. 1 de l'annexe 47 (version papier) au rapport PwC et de l'annexe 48 (version digitale à laquelle semblent se référer les Demanderesses).

[582] Ces dates sont plus ou moins corroborés par la facture que l'on trouve pour cette expertise dans l'annexe 49 (p.19-1) au rapport PwC et qui se rapporte entre autres à « *déplacement de Messieurs Delaroche et Ferreiro du 16 au 27/08/2011 à Conakry puis Lomé* ».

[583] Rapport d'expertise Gexco (C-278), p.1.

[584] Rapport d'expertise Gexco (C-278), p.2 : « *visite d'expertise : celle-ci s'est tenue le 22 au 26 août 2011 à Lomé sur le navire « Happy River » et sur le quai du port autonome de Lomé(Togo)* ».

[585] Rapport d'expertise Gexco (C-278), p.2.

2    Le rapport de M. Dur spécifie les matériels par leurs types, leurs numéros d'immatriculation, leurs numéros de châssis et leurs numéros de parc, bref d'une façon beaucoup plus détaillée et précise que ce qui avait été fait par l'huissier à Conakry entre le 12 et le 25 mars 2011. La corrélation entre l'énumération dans le rapport Gexco et l'inventaire de l'huissier n'est que partielle et la comparaison qu'en a fait le Tribunal arbitral révèle qu'il y a des pièces mentionnées dans l'un qui ne le sont pas dans l'autre et vice versa.

3    Le rapport non daté de MM. Ferreiro et Delaroche indique dans l'entête à la première page que leur employeur est Raoul Neveu S.A.S., soit une société par actions simplifiée et il porte sur la même page un cachet de Raoul Neveu S.A., soit une société anonyme avec la même adresse que celle mentionnée dans l'entête du rapport pour la direction technique de Raoul Neveu S.A.S.[586] Même si on admet que deux sociétés différentes mais appartenant au même groupe peuvent porter le même nom, le Tribunal s'étonne de ce que le rapport d'inspection générale du 15 avril 2011 de Raoul Neveu S.A. (C-276) porte encore une autre entête et a une forme qui ne ressemble nullement à celui du rapport des « semaines 33 et 34 2011 » (annexe 47/48 au rapport PwC).

4    L'objet du rapport non daté de MM. Ferreiro et Delaroche (Raoul Neveu S.A.S.), même s'« il vient en complément » du rapport de M. Dur, est beaucoup plus restreint que celui-ci et se limite à des constatations relatives aux deux grues Gottwald.[587] Au début des chapitres de son rapport concernant chacune des grues Gottwald, M. Dur explique sa coopération avec Raoul Neveu S.A.(S ?) comme suit : « les constatations suivantes ont été faites en présence du Directeur technique de Gottwald France dont l'expertise nous a permis de déceler les anomalies, les défauts,

---

[586] Annexe 47, rapport PwC (version papier) ou annexe 48 en version digitale.

[587] Cela s'explique sans doute par le fait que Raoul Neveu S.A. (ou S.A.S.) est un spécialiste des grues Gottwald en France : voir l'entête sur son rapport du 15 avril 2011 : « *Raoul Neveu SA, Gottwald France* » (C-276), p.1 ainsi que la mention dans le rapport de M. Dur concernant la participation à son expertise de « *M. Delaroche Raoul Neveu SA, représentant du constructeur Gottwald (grues)* » (C-278), p.2.

les pannes et les avaries affectant ce matériel ».[588] En page 2 de son rapport, M. Dur dresse la liste des parties présentes lors de son expertise, parmi lesquels se trouve M. Delaroche, mais non M. Ferreiro. Pourtant le rapport de Raoul Neveu des semaines 33 et 34 mentionne explicitement qu'il a été établi <u>conjointement</u> par MM. Ferreiro et Delaroche.

5    Une autre question apparaît à la lecture des rapports de M. Dur et ceux de Raoul Neveu S.A.S. : chaque rapport qui concerne les grues Gottwald contient pour chaque grue un relevé des heures de fonctionnement. Ainsi on peut comparer ces relevés dans les différents rapports, y compris les seules heures de moteur mentionnées dans la liste de colisage que les Demanderesses ont produite seulement avec leur Réplique :

| Rapport | N/S 360189, N° de parc G6401 | | | | N/S 360190, N° de parc G6402 | | | |
|---|---|---|---|---|---|---|---|---|
| | Moteur Diesel | Pompe hydrau- lique | Levage | Orienta- tion | Moteur Diesel | Pompe hydrau- lique | Levage | Orienta- tion |
| 15 avril 2015 Raoul Neveu C-276 p. 1 | | | | | 7117 h | 6225 h | 3100 h | 2392 h |
| 19( ?) août 2011 Liste de colisage C-391 | 712773 ( !?) | | | | 7273 | | | |
| Semaine 33 & 34 août 2011 Raoul Neveu Annexe 47 PwC p. 2 & 4 | 7237 h | 6316 h | 3132 h | 2417 h | 7127 h | 6050 h | 3210 h | 2508 h |
| 22-26 août 2011 Gexco-M. Dur C-278 p. 8 & 30 | 7127 h | 6050 h | 3129 h | 2508 h | 7273 h | 6319 h | 3133 h | 2417 h |

On constate dans ce tableau (i) que, nonobstant la coopération de M. Dur avec MM. Ferreiro et Delaroche (Raoul Neveu S.A.S.), l'un de leurs rapports d'août a interverti les valeurs des deux grues ; (ii) que les valeurs mentionnées dans les deux

---

[588] Rapport d'expertise Gexco (C-278), pp. 8 et 20.

rapports Raoul Neveu successifs ne se suivent pas logiquement, dans la mesure où l'une d'elles, pour la pompe hydraulique, était en avril supérieure à la valeur en août 2011. Il semblerait donc que c'est Raoul Neveu S.A.S. qui a fait l'inversion entre les deux grues dans son rapport des semaines 33 et 34 de 2011.

439.   Mises à part ces questions, ainsi que celles, très pertinentes, de la Défenderesse concernant le rapport Raoul Neveu d'avril 2011[589] qui n'a même pas été communiqué à l'expert des Demanderesses, PwC, le Tribunal arbitral ne doute pas du rapport de M. Dur-Gexco en tant que preuve des dommages au matériel le jour où il a été expertisé. Toutefois, il faut constater qu'aucun des rapports produits par les Demanderesses, y compris celui de M. Dur-Gexco, ne prouve

-   l'état du matériel avant la réquisition : l'inventaire du huissier du 12 mars 2011 ne décrit pas l'état du matériel[590] et la Défenderesse, n'ayant pas la charge de la preuve, ne devait pas faire de description ; néanmoins la preuve que le matériel n'était avant la réquisition pas dans le bon état que les Demanderesses veulent faire croire, a été apportée par la Défenderesse au moyen de l'avis technique du Directeur technique du PAC du 9 février 2011 sur la Convention de concession[591] ; le rapport de Raoul Neveu S.A.S. du 15 avril 2015 ne peut servir à établir l'état du matériel à ce moment parce qu'il s'agit d'un document apparemment rédigé à d'autres fins (une « passation de pouvoirs » entre l'Etat et Bolloré)[592] et de toute façon il ne concernait que la seule grue 36109, soit la G6402 ;

-   que les dommages constatés après la levée de la réquisition, leur stockage en attendant leur transport, leur transport de Conakry à Lomé et leur déchargement à

---

[589] C.Mem. §§ 579-583.

[590] La Défenderesse a à juste titre fait remarquer que cet inventaire très détaillé, fait le lendemain de la réquisition, prouve bel et bien que GI avait accès à son matériel, même dans ses locaux, et avait donc, à part un huissier, aussi pu mandater un expert technique pour faire les constats nécessaires sur l'état de ce matériel (Mem.AAR §§ 421-424).

[591] « Trois grues sont en panne. Etat de dégradation avancé des autres grues est à constater » : (C-175) p.4. Cette pièce a été produite par les Demanderesses à d'autres fins, et la partie citée, pourtant pas flatteuse pour GI, n'a pas été contestée par elles.

[592] On ignore qui a mandaté Raoul Neveu pour ce rapport et on peut même se demander pourquoi et comment les Demanderesses ont pu obtenir une copie de ce rapport.

Lomé[593] ont été causés pendant la réquisition : d'abord parce que l'état du matériel au moment de la réquisition n'est pas connu ; ensuite parce qu'entre la levée de la réquisition et les rapports de août 2011 deux mois se sont écoulés. Le Tribunal arbitral note en outre que cette période, du 22 juin au 19 août 2011, est problématique. Les Demanderesses affirment que le matériel était pendant cette période « entreposé sur un terre-plein adjacent au TC sous la garde du PAC et de Bolloré ».[594] Or, il n'est pas clair si et dans quelles circonstances cette garde a été imposée à Getma International et pourquoi elle l'a acceptée. Dès la levée de la réquisition, elle récupérait la possession de son matériel et redevenait responsable de sa garde.

440. En ce qui concerne le chiffrage du coût de remise en état du matériel que les Demanderesses réclament, M. Dur a exposé dans son rapport d'expertise que le chiffrage précis pour la remise à niveau des grues Gottwald G6401 et G6402 doit être communiqué à Getma International par Gottwald [595] et que le chiffrage pour le reste des engins sera fait par le service technique de Manuport.[596] Or, la société Manuport Togo, titulaire d'une licence de manutention conteneurs, est une filiale contrôlée à 100% par Getma International.[597] On peut donc s'interroger sur l'objectivité des prix pratiqués par elle. Les Demanderesses ont produit comme annexe 50[598] au rapport PwC les factures payées par elles pour cette remise en état, pour un montant total d'EUR 1.151.508. Le Tribunal arbitral constate que la plupart des factures, initialement émises par Raoul Neveu à l'attention de Necotrans Trading, ont par la suite été refacturées par Necotrans Trading à Manuport, qui est apparemment devenu le propriétaire ou au moins

---

[593] Le Tribunal note que la totalité du matériel réquisitionné a apparemment été déchargé à Lomé, nonobstant la mention sur la liste de colisage (C-391) que seulement 13 pièces de matériel, dont la grue Gottwald G6402, avaient comme destination finale Lomé, alors que la destination de toutes les autres pièces, y compris la grue G6401, était encore « à définir » (p.2).

[594] Mem. §580.

[595] (C-278), pp.11 et 23.

[596] (C-278), pp.89.

[597] Offre Financière de juillet 2008 (C-179), p.110/230.

[598] Annexe 49 dans la version papier.

l'utilisateur du matériel après son arrivée à Lomé. Certaines de ces factures se réfèrent explicitement au matériel à réparer (telle par exemple la grue N° 361090) mais pour de nombreuses autres commandes ou factures, il est impossible de les lier à une pièce de matériel endommagé. L'expert de la Défenderesse s'est d'ailleurs plaint de ce qu'il ne pouvait pas rattacher certaines factures à des dommages constatés par Gexco.[599] Les Demanderesses ont répondu que PwC avait pu établir ce lien sur la base du catalogue Konecrane relatif aux *reachstackers.*[600] La Réplique n'indique toutefois pas où et dans quel rapport de PwC le Tribunal arbitral peut trouver cette conciliation. De toute façon, elle ne concerne que les *reachstackers*.

441.  *En conclusion,* le Tribunal arbitral conclut qu'il ne peut faire droit à la demande des Demanderesses pour une indemnisation pour les frais de remise en état du matériel réquisitionné, parce que ni le lien causal entre la réquisition et le dommage, ni le montant des dommages, ne sont prouvés à satisfaction de droit.

### c.   Préjudice correspondant aux stocks non restitués

442.  La défense de la Guinée que ce Tribunal arbitral ne peut plus allouer une indemnité pour ce préjudice parce que le Tribunal CCJA l'a déjà attribuée, n'est plus valable depuis l'annulation de la sentence CCJA.

443.  De toute façon, ce préjudice est clairement lié à la réquisition (comme l'a par ailleurs aussi constaté la Tribunal CCJA[601]) et ce Tribunal arbitral est compétent pour décider de toutes les conséquences de l'acte de la puissance publique qu'était la réquisition.

444.  Si la restitution des biens réquisitionnés après la levée de la réquisition est de la responsabilité de la Défenderesse, la charge de la preuve qu'elle n'a pas restitué tous les stocks réquisitionnés appartient aux Demanderesses. Ainsi donc, elles doivent prouver la valeur des stocks réquisitionnés et celle des stocks non restitués. Les Demanderesses

---

[599] Premier rapport d'OCA du 30 mars 2015, §§ 242-249.
[600] Répl. § 621.
[601] Sentence CCJA § 255.

se basent pour ce faire sur le rapport de l'expert PwC du 13 novembre 2014 qui renvoie à son tour au rapport PwC du 7 janvier 2013 dans l'arbitrage CCJA.[602] Celui-ci explique dans son §149 ce qui suit :

> *Compte tenu du contexte, aucun inventaire physique des stocks n'a pu être réalisé le 8 mars 2011. Pour cette raison, les montants comptabilisés dans la balance générale à cette date correspondent à la valorisation des stocks à la date de clôture du dernier exercice (31 décembre 2010) à laquelle ont été ajoutés les mouvements 2011.*

445. La valeur ainsi obtenue est 244.828 euros, montant aussi repris au § 327 du rapport de PwC du 13 novembre 2014. PwC indique alors que le stock restitué a fait l'objet d'une vente par STCC à NCT Trading pour 36.608 euros.[603] Ce Tribunal arbitral s'attendait alors à ce que la valeur de stocks non restitués serait calculée en déduisant ce montant de la valeur des stocks au 31 décembre 2010, soit 208.220 euros. PwC obtient toutefois une valeur de 210.070 euros sur la base de la balance générale au 31 décembre 2011, et la conversion du montant en GNF que ce tableau mentionne comme stocks provisionnés (GNF 2.196.936.859) au taux de change du 8 mars 2011.[604]

446. L'expert de la Défenderesse, OCA, ne critique toutefois pas ce calcul que le Tribunal accepte donc. Il estime par contre que la valeur des stocks non restitués fait double emploi avec la valeur de la concession que les Demanderesses réclament en premier lieu : si la concession n'avait pas été résilié, STCC aurait utilisé ces stocks, dont la consommation est nécessairement déjà prise en compte dans les calculs des flux de trésorerie que la poursuite de la concession aurait générés. [605] PwC a répliqué que, au § 293 de son rapport du 13 novembre 2014, il a, pour calculer la valeur nette du projet,

---

[602] Annexe 1 au rapport de PwC du 13 novembre 2014.

[603] Rapport de PwC du 7 janvier 2013, § 152 qui comporte comme annexe 20 la facture de cette cession. Si ce rapport a été produit dans le présent arbitrage comme l'annexe 1 au rapport de PwC du 13 novembre 2014, il n'en est pas de même avec son annexe 20. Le Tribunal n'a donc pas pu prendre connaissance du libellé de cette facture qui contient probablement des détails du matériel vendu qui avait pu être comparé au matériel mentionné dans l'inventaire du 8 mars 2011.

[604] Rapport de PwC du 13 novembre 2014, §§ 328-330 et son annexe 1 §§ 154-156.

[605] Expertise OCA 253-255.

déduit les besoins en fonds de roulement qui comprend aussi les stocks déterminés à partir de la balance au 8 mars 2011.[606] OCA dans son deuxième rapport a pris acte de cette réponse et confirmé l'absence de doublon.[607]

447. Ainsi, il ne reste plus que le reproche de la Défenderesse que les Demanderesses ont fait faire un inventaire au 12 mars 2011 et que c'est à partir d'un tel inventaire physique qu'elles auraient dû prouver leur préjudice. A l'audience des témoins, l'expert de PwC, Madame Perrier, interrogée à ce sujet, a reconnu qu'au moment de la restitution des stocks, les Demanderesses n'avaient pas vérifié si les stocks qui manquaient avaient été inventoriés le 12 mars 2011. Par contre, PwC a « adopté une approche globale qui consistait à partir du stock comptable. Nous avons déduit ce qui avait été retourné par la Guinée et déterminé le stock perdu par différence. Il n'était pas possible de rentrer davantage dans le détail. Donc, c'est une approche estimative. ».[608] L'expert a également témoigné que vérifier que ce qui était prétendument manquant figurait bien dans l'inventaire physique du 12 mars 2011 « aurait été très compliqué puisqu'il aurait fallu pouvoir mettre à côté de ces éléments-là l'état de stock au 31 décembre. Et il n'y a pas nécessairement assez de précisions. En tout état de cause, il n'y a pas que cette partie-là, il y en a beaucoup d'autres. Par exemple, quand on voit « stock huile total, 2 fûts pleins, fûts entamés », je ne vois pas comment on peut réconcilier cela avec des stocks. Nous nous sommes trouvés dans la situation où nous avions un inventaire comptable et ces éléments détaillés, mais non rapprochables. C'est pourquoi nous avons fait une approche estimative ».[609]

448. Le Tribunal arbitral constate ceci :

---

[606] Deuxième rapport de PwC du 10 juillet 2015, § 231 et annexe 45 au rapport de PwC du 13 novembre 2014.

[607] Deuxième rapport d'OCA du 14 octobre 2015, § 284.

[608] TR II, p.39:37-40.

[609] TR II, p.39:44- p.40:5.

(i) Faute de production de la facture des biens restitués et vendus par STCC à NCT Trading, il est rendu impossible de comparer la liste de ces biens restitués avec l'inventaire physique des biens du 12 mars 2011 ;

(ii) PwC n'a pas pu convaincre le Tribunal arbitral que c'était impossible de travailler sur base d'inventaires physiques (au lieu d'inventaires comptables) ;

(iii) PwC n'a pas non plus convaincu le Tribunal arbitral qu'il ne pouvait pas se baser sur l'inventaire physique du 12 mars 2011 sans le rapprocher préalablement « à l'état du stock au 31 décembre » ;

(iv) L'inventaire physique du 12 mars 2011 est aussi détaillé qu'on peut l'espérer et n'a nullement négligé les stocks ;

(v) PwC a déclaré dans son rapport du 7 janvier 2013 pour le Tribunal CCJA que « [c]ompte tenu du contexte, aucun inventaire physique des stocks n'a pu être réalisé le 8 mars 2011 »[610] et ainsi justifié pourquoi il a travaillé avec un inventaire comptable : « les montants comptabilisés dans la balance générale à cette date [8 mars 2011] correspondent à la valorisation des stocks à la date de clôture du dernier exercice (31 décembre 2010) à laquelle ont été ajoutés les mouvements 2011 ». Dans la note en bas de page de ce même rapport, il déclare que « [n]ous avons été informés de l'existence d'un constat d'huissier attestant de l'utilisation des matériels par le nouveau concessionnaire ».[611] Il apparaît donc qu'au moment de son rapport pour le Tribunal CCJA, PwC n'avait pas connaissance de l'inventaire physique qu'avait préparé l'huissier le 12 mars 2011. Quand il a établi son rapport du 13 novembre 2014 pour le présent arbitrage, PwC avait toutefois connaissance de cet inventaire physique, puisqu'il l'a joint à ce rapport comme annexe 17 (pour prouver la présence d'équipements neufs, devant permettre de constater que la phase I des investissements requis par la Convention de concession avait été réalisée).[612] Dès lors, dans son rapport du 13 novembre 2014, PwC n'explique plus pourquoi il a fait son calcul de la valeur des stocks non-restitués à partir de la balance générale au 31

---

[610] Rapport de PwC pour le Tribunal CCJA du 7 janvier 2013, p. 27 § 149.

[611] Rapport de PwC pour le Tribunal CCJA du 7 janvier 2013, p. 28, note n°42.

[612] Rapport de PwC du 13 novembre 2014, § 98 et note N° 27.

décembre 2010, à laquelle ont été rajouté les mouvements jusqu'au 8 mars 2011. D'où l'interrogation de Madame Perrier à ce sujet pendant l'audience.

449. Le Tribunal arbitral estime donc que la méthode de calcul qu'a suivi l'expert des Demanderesses ne se justifie pas et est trop théorique. Ce n'est pourtant pas une raison pour rejeter la demande. En effet, il est tout à fait raisonnable de supposer que les stocks réquisitionnés ont été utilisés dans l'exploitation du TAC suivant le 8 mars 2011 et la Défenderesse ne l'a pas non plus nié. En l'absence d'autres preuves (comme p.ex. l'usage moyen mensuel de stocks) et comme la Défenderesse n'a pas non plus formulé d'objection contre le prix de cession des stocks restitués, le Tribunal arbitral fixe le montant de ce préjudice forfaitairement à **200.000 euros**.

**d.   Préjudice relatif aux prestations terre effectuées avant la réquisition mais non facturées**

450. Le Tribunal arbitral estime que les Demanderesses n'ont pas prouvé qu'il leur a été impossible d'émettre les factures pour les prestations de STCC liées aux conteneurs en débarquement ou en stockage au moment de la réquisition :

- D'abord, parce qu'il est avéré que, contrairement à ce que prétendent les Demanderesses, elles ont pu avoir accès au TAC après le 8 mars 2011, ce qui est établi par le fait qu'elles ont pu faire faire un inventaire détaillé, le 12 mars 2011, et une expertise sur une des deux grues Gottwald, le 15 avril 2011.

- Ensuite, parce qu'il est également avéré que, pour pouvoir facturer, les Demanderesses n'avaient nullement besoin de connaître la date d'enlèvement de la marchandise par les importateurs. En effet, après le 8 mars 2011, les Demanderesses n'exploitaient plus le TAC; donc, les seuls services qu'elles pouvaient encore facturer étaient ceux rendus jusqu'au 8 mars 2011. Pour cela, il n'était pas nécessaire d'avoir la preuve documentaire de relevage des conteneurs, ni de connaître la date d'enlèvement de la marchandise. Celle-ci aurait tout au plus été pertinente pour déterminer à quelle date la facture était échue.

- Les Demanderesses avaient un logiciel de gestion de facturation qui permettait d'émettre les factures. C'est d'ailleurs ce logiciel, combiné avec les données issues du logiciel de Getport concernant les opérations qui leur a permis de faire le calcul du montant des factures à émettre.

451. Les Demanderesses n'ont par ailleurs pas non plus prouvé qu'elles ont au moins essayé de recouvrer les montants pour leurs services jusqu'au 8 mars 2011 auprès de leurs clients, ni qu'elles ont mis en demeure la Défenderesse de lui permettre d'émettre ses factures.

452. En l'absence de toute preuve que la non-facturation est due à la réquisition, la demande est rejetée.

**e.  Préjudice moral**

453. La question de savoir si un dommage moral peut être réparé en arbitrage d'investissement est controversée. Quelques décisions en ont admis le principe et sont invoquées, tant par les Demanderesses que par la Défenderesse. Le Tribunal arbitral les a analysées et en retient ceci :

- Il ne fait pas de doute que la mesure conserve un caractère particulier et que, dans les seules décisions qui l'ont admise, la situation était particulière : dans la vielle affaire du *Lusitania*, on a reconnu la douleur mentale et consternation des familles des 128 morts parmi les 197 personnes à bord du navire coulé et dans l'affaire *Desert Line* de 2008, il avait été prouvé que la demanderesse avait été la victime d'un véritable siège de son chantier, de l'arrestation de trois de ses dirigeants, dont le fils du président de la société, de violences physiques et de vols par des bandes armées. Il faut en particulier une atteinte d'une gravité particulière.

- Le tribunal dans l'affaire *Lemire* (2011) s'est basé sur les deux affaires mentionnées, ainsi qu'une troisième, *Siag*, qui a simplement rappelé la règle de *Desert Line* que les dommages moraux sont réservés pour des cas extrêmes, pour arrêter trois conditions pour reconnaître un préjudice moral :

(i) les actes de l'état doivent impliquer des menaces physiques, détention illégale ou situation analogue dont l'abus viole les normes des nations civilisée ;

(ii) les actes de l'état causent une détérioration de la santé, du stress, anxiété ou autre douleur mentale tel que l'humiliation, honte, et dégradation, ou perte de réputation, crédit et position sociale ;

(iii)tant la cause que le préjudice doivent être grave et substantiel.[613]

- Le tribunal dans la troisième affaire citée par les Parties, *Arif,* a rejeté l'application stricte et cumulative des trois conditions de l'affaire *Lemire*, et insisté sur la discrétion qu'un tribunal a dans la règle générale que le dédommagement d'un préjudice moral est un remède exceptionnel.[614]

- Deux affaires, *Lemire* et *Arif*, ont dans leur décision de ne pas indemniser le préjudice moral, référé à l'indemnisation des dommages matériels :

> *[t]he acknowledgement in the First Decision that Ukraine has indeed breached the BIT, and **the present award of substantial compensation**, are elements of redress which may significantly repair Mr. Lemires loss of reputation. […] the moral aspects of his injuries have already been compensated by the **awarding of a significant amount of economic compensation**, and [that] the extraordinary tests required for the recognition of separate and additional moral damages have not been met in this case.* [615]

> *A pecuniary premium for compensation for such sentiment, **in addition to the compensation of economic damages**, would have an enormous impact on the system of contractual and tortious relations.*[616]

---

[613] Traduction libre de l'anglais: "*the State's actions imply physical threat, illegal detention or other analogous situations in which the ill-treatment contravenes the norms according to which civilized nations are expected to act; the State's actions cause a deterioration of health, stress, anxiety, other mental suffering such as humiliation, shame and degradation, or loss of reputation, credit and social position; and both cause and effect are grave or substantial.*" (C-281) § 333

[614] *Franck Charles Arif c. République de Moldavie*, CIRDI ARB/11/23, Sentence, 8 avril 2013 (C-282) §§ 590-591.

[615] *Joseph Charles Lemire c. l'Ukraine* CIRDI ARB/06/18), Sentence, 28 mars 2011 (C-281) §§ 339 and 344. Notre soulignement.

[616] *Franck Charles Arif c. République de Moldavie*, CIRDI ARB/11/23, Sentence, 8 avril 2013 (C-282) §592. Notre soulignement.

454. Ce Tribunal arbitral examinera les preuves produites pour le préjudice moral des Demanderesses à la lumière des principes établis par cette jurisprudence relativement limitée. Elles invoquent quatre éléments pour justifier leur préjudice moral :

    (i)      Le non-respect de la Convention ;

    (ii)     L'intervention des forces de police et militaires ;

    (iii)    Le pillage et l'attitude des employés du PAC et de Bolloré ;

    (iv)    Les atteintes à l'image et la réputation des Demanderesses.

455. Le Tribunal arbitral renvoie au chapitre VI.C (1) a ci-dessus, où il a déjà conclu que « l'annonce publique par le Président de son intention de résilier le contrat de Getma International, la lecture au journal télévisé de 20 heures le jour même de la prise du Décret de résiliation avant même que celui-ci n'ait été notifié et l'engagement de militaires et de policiers, dès 21 heures, devant les bureaux de STCC sur le TAC sont effectivement des circonstances aggravantes et vexantes qui dépassent la résiliation, quelle qu'en soit la forme, et constituent des actes de la puissance publique autres que la résiliation ».

456. Le Tribunal arbitral estime toutefois qu'aucun de ces faits ne présente la gravité qu'exige la jurisprudence pour que le préjudice moral soit indemnisable :

    (i)      l'annonce du Président de son intention de résilier le contrat a fait l'objet de rumeurs qui n'ont été confirmés qu'au jour où le Président l'a mentionnée, onze mois après la résiliation, dans son interview du 6 février 2012.[617] Selon l'interview, l'annonce a été faite à des amis et était donc moins brutale que l'annonce publique faite en décembre 2008 par le capitaine Moussa Dadis Camara dans l'interview avec Jeune Afrique, quelques jours après sa prise de pouvoir après le décès du Président Lansana Conté sous le régime duquel Getma International avait remporté la concession: «...Tous les contrats de l'administration vont être revisités. La concession du Port autonome de Conakry

---

[617] Voir la note en bas de page n°478.

à Getma International, par exemple, va être purement et simplement annulée. En dépit d'un audit mené par FFA Ernst & Young, qui déclare ce contrat manifestement défavorable à l'Etat, le gouvernement sortant s'est entêté à brader notre port ».[618] Les nombreux articles de presse produits dans ce dossier, aussi au sujet de l'attribution de la concession à Bolloré démontrent à quel point ces grands contrats importants pour l'économie du pays étaient au centre de l'attention publique et ne présentent pas un caractère extraordinaire.

(ii)     Ce Tribunal arbitral a déjà constaté au paragraphe 379 ci-avant que le placement de militaires et policiers devant les bureaux de STCC le 8 mars 2011 avant même que le Décret de réquisition ne fût adopté était ni justifié, ni nécessaire, mais que leur intervention a été correcte et n'avait pas été aussi brutale que suggéré par les articles de presse[619] et la bande dessinée concernant ces évènements[620] que les Demanderesses ont produits.

(iii)    M. Barone a attesté que le 10 mars 2011, quand les forces de l'ordre ont procédé à la réquisition proprement dite, une « *cohue* » régnait dans les bureaux de STCC en fin de matinée (§ 7 j) où étaient alors aussi présents « *au moins 25 membres du personnel de Bolloré, très sûrs d'eux et parfaitement tranquilles, avec même de l'arrogance dans leur comportement* » (§ 8). Que « *[l]es employés de STCC […] ont eu l'impression qu'on leur arrachait une partie d'eux-mêmes* » (§ 9) et que « *les cadres expatriés de STCC ont décidé de quitter la Guinée […] en laissant leurs effets personnels dans leurs domiciles* » (§ 13). Ces évènements étaient certes désagréables pour le personnel comme pour M. Barone lui-même, mais ne prouvent pas un pillage ou autre comportement excessif. Aussi le fait que les stocks réquisitionnés n'aient pas été retournés ne constitue pas de pillage.

---

[618] Interview du capitaine Moussa Dadis Camara (R-29).

[619] Article des Archives classées en date du 24 mars 2011 (C-199). Voir aussi C-395.

[620] R. Dély et Aurel, bande dessinée intitulée « Sarkozy et les riches », Drugstore, extrait, pp. 42-50 (C-203).

(iv)   La présence et même l'arrogance du personnel de Bolloré ont pu être vexantes pour celui de Getma International, surtout dans le contexte de concurrence qui existait entre les deux groupes depuis que Getma International avait remporté la concession. Elles n'ont toutefois rien de surprenant ou choquant, puisqu'il était un secret public que la concession était retirée pour être donnée à Bolloré : les journaux en parlaient depuis le 8 février 2011[621] et les communiqués de presse que Getma a publié elle-même les 28 février et le 1er mars 2011, ainsi que sa lettre du 9 février 2011 au Ministre des Transports font explicitement état des démarches personnelles de M. Vincent Bolloré du 3 et 4 février 2011 à Conakry pour mettre pression sur les autorités en vue de la résiliation de la Convention.[622] L'opposition des deux concurrents s'est par ailleurs aussi manifestée en France; elle était forte, mais n'avait rien d'extraordinaire, comme d'ailleurs prouvé par la coopération qui s'est ultérieurement développée entre les deux groupes.

(v)   M. Barone a également mentionné des visites à domicile chez plusieurs cadres de STCC par des huissiers et des cadres du PAC qui ont créé un sentiment de danger et conduit les cadres expatriés à quitter le pays dès le 11 mars 2011. Il n'est toutefois pas prouvé, ni même allégué, que ces visites ont impliqué de la violence physique ou étaient plus que des visites administratives, liés au déroulement de la reprise du TAC et ses opérations.

457.   Les actes de la puissance publique qui ont entouré la résiliation de la Convention et la réquisition ne revêtent donc nullement la gravité qu'exige la reconnaissance d'un préjudice moral. Les Demanderesses ont par ailleurs obtenu du Tribunal CCJA une sentence qui attribue à Getma International une compensation pour le préjudice matériel causé par la résiliation et dans la présente sentence une compensation pour les préjudices causés par la réquisition et par les rumeurs d'une résiliation prochaine du contrat. Que les montants attribués sont moins élevés que ce que Getma International, respectivement

---

[621] Article de Guinée en ligne (C-184).
[622] Article et lettre de Getma International au Ministre d'Etat sur l'Affaire du port de Conakry (C-187 et C-188).

les Demanderesses, ont demandé aux deux tribunaux arbitraux est dû à des raisons différentes (manque de preuves, retrait de la demande de gain manqué devant un tribunal et incompétence de l'autre). Donc même si une interprétation large de l'affaire *Lemire* laisse la marge pour plaider qu'un préjudice moral peut être indemnisé quand la compensation pour le préjudice matériel n'est pas significative, ce Tribunal arbitral ne peut, dans ce cas concret, pas tenir compte de l'indemnisation réduite des préjudices matériels.

458. Le Tribunal arbitral rejette la demande de compensation du préjudice moral.

**f. Intérêts**

459. Les Demanderesses demandent des intérêts capitalisés annuellement sur les sommes qui leur sont attribuées au taux de 8.7 % pour la période du 8 mars 2011 jusqu'au jour de leur paiement effectif et intégral. Dans leur Mémoire après Audience, elles chiffrent ces intérêts, arrêtés au 3 février 2016, à 56.950.551 euros.

460. La Défenderesse s'est catégoriquement opposée à l'application d'intérêts au montant du *lucrum cessans*, mais n'a pas spécialement réagi au taux demandé, ni à la capitalisation demandée. Sa seule défense concerne l'application d'intérêts pendant la période pendant laquelle le présent arbitrage a été suspendu, selon elle sur l'initiative des Demanderesses, du 31 janvier 2013 jusqu'au 17 juin 2014.

461. Dès lors que ce Tribunal arbitral n'est pas compétent pour se prononcer sur le *lucrum cessans*, le désaccord sur l'application d'intérêts sur son montant devient sans objet.

462. En ce qui concerne la période pour laquelle les intérêts sont dus, le Tribunal arbitral rappelle les faits suivants :

- Le 10 janvier 2013, le Tribunal arbitral a invité les Parties « dès qu'elles auront pris connaissance de la Décision sur la Compétence du Tribunal arbitral […] de se consulter afin de se mettre si possible d'accord sur la suite de la procédure, en particulier si elles entendent demander la suspension de la procédure ».

- Par lettre du 31 janvier 2013, les Demanderesses ont demandé au Tribunal arbitral de suspendre la procédure d'arbitrage CIRDI jusqu'à la Décision de la procédure d'arbitrage CCJA. Le même jour, la Défenderesse a répondu que la poursuite ou la suspension de la procédure dépendait des clarifications que les Demanderesses apporteront sur les demandes qu'elles entendent poursuivre devant ce Tribunal arbitral.

- Le 12 février 2013 le Tribunal arbitral a suspendu l'instance en raison du non-paiement de la deuxième avance demandée aux Parties, conformément à l'article 14(3) (d) du Règlement administratif et financier. Il a par ailleurs informé les Parties qu'il ne donnerait suite à la demande de suspension des Demanderesses du 31 janvier 2013, aussi longtemps que l'instance sera suspendue pour cause de non-paiement de l'avance.

- Le 21 août 2013, les Demanderesses ont confirmé s'être substituées à la Défenderesse pour le paiement de la deuxième avance et ont réitéré leur demande de suspension du procès jusqu'à la notification de la sentence arbitrale CCJA.

- Le 22 août 2013, le Tribunal arbitral a déclaré la reprise de l'instance, à la suite du paiement par les Demanderesses de la totalité de la deuxième avance et a invité la Défenderesse à se prononcer sur la demande de suspension des Demanderesses. La Défenderesse a maintenu sa position du 31 janvier 2013.

- Le 30 septembre 2013, le Tribunal arbitral a suspendu l'instance jusqu'au 1er décembre 2013.

- Cette suspension a été prolongée à trois reprises, et a été levée le 17 juin 2014.

463. Ainsi, la suspension due à la double instance n'a duré que du 30 septembre 2013 jusqu'au 17 juin 2014, soit 260 jours.

464. Même si les Demanderesses ont dans un premier temps demandé la suspension en réponse à une invitation du Tribunal arbitral et même si la suspension était justifiée par les circonstances, ces circonstances faisaient suite à un choix des Demanderesses de lancer deux arbitrages en parallèle. Ainsi, le Tribunal arbitral considère qu'elles sont responsables de la suspension et n'ont pas droit à des intérêts pendant cette période.

465. Des intérêts au taux de 8.7 % annuellement capitalisés sont dus sur la somme principale de 448.834 euros à partir du 8 mars 2011 jusqu'au 30 septembre 2013 et à partir du 17 juin 2014 jusqu'au jour du paiement effectif et intégral.

**(3) Les allégations de double réparation**

466. Etant donné (i) les restrictions juridictionnelles de ce Tribunal arbitral, (ii) sa décision de condamner la Défenderesse au paiement d'un montant de 200.000 euros à titre d'indemnité déterminée *ex aequo et bono* pour les biens réquisitionnés qui n'ont pas été restitués, il apparaît qu'une double réparation ne serait possible qu'au cas où les Demanderesses, après avoir reçu le paiement de ces 200.000 euros sur la base de la présente sentence, réussissaient nonobstant l'annulation de la sentence CCJA de la faire exécuter et recevaient sur base de cette sentence également la somme de 210.070 euros pour le même préjudice.

467. Afin d'éviter ce risque de double réparation, ce Tribunal arbitral accompagnera la condamnation de la Défenderesse au montant de 200.000 euros de la condition que les Demanderesses n'aient pas préalablement recouvert le montant de 210.070 euros sur la base de la sentence CCJA et, alternativement, renoncent pour l'avenir à leur titre pour ce montant de la sentence CCJA.

468. Les Demanderesses ont également demandé au Tribunal arbitral de « dire que toute somme effectivement et définitivement payée [.....] par le groupe Bolloré au titre de la procédure contre le groupe Necotrans devant les tribunaux étatiques français s'imputera

sur les sommes allouées par ce Tribunal ».[623] Le Tribunal arbitral constate que ni les Demanderesses ni la Défenderesse n'ont abordé cette demande dans leurs mémoires, ne fût-ce que pour expliquer quelles demandes pendantes devant les tribunaux français pourraient faire double emploi avec les demandes attribuées par ce Tribunal arbitral. La demande ne peut donc être acceptée et ne doit pas l'être dans la mesure où les Demanderesses peuvent veiller elles-mêmes à ne pas réclamer d'exécution forcée d'indemnisations doubles.

## VIII. FRAIS DE LA PROCEDURE

### A. *Position des Demanderesses*

469. Les Demanderesses signalent d'abord que l'article 31, paragraphe 7 de la Convention de concession[624], n'est applicable qu'aux procédures envisagées par ladite Convention, soit l'arbitrage OHADA.[625]

470. Elles considèrent les frais et dépens du présent arbitrage comme une partie de leur *damnum emergens* et rappellent qu'elles ont réservé leur droit d'en quantifier le montant dès leur Mémoire en Demande. Elles se réfèrent à l'accord des Parties, en fin d'audience du 25 novembre 2015, sur les modalités de preuve de ces frais et dépens et présentent des frais et dépens pour un total de 1.729.519,33 euros plus USD 725.000,00, consistant en ceci :

|   |   |   |   |
|---|---|---|---|
| - | Honoraires et frais du cabinet PLMJ | EUR | 961.148,49 |
| - | Honoraires et frais du cabinet FTMS | EUR | 484.770,84 |
| - | Honoraires et frais de PwC | EUR | 283.600,00 |
| - | Montants directement payés au CIRDI | USD | 425.000,00 |

---

[623] § 107 ci-avant.

[624] *Chacune des parties supportera le coût de l'arbitre qu'elle désigne. Les autres coûts engendrés par l'arbitrage seront partagés à égalité entre les parties.*

[625] Mémoire sur les coûts de l'arbitrage du 17 février 2016,  note en bas de page n°1.

- Pour le compte de la Guinée                    USD    300.000,00[626]

471. Les Demanderesses invoquent la jurisprudence et la doctrine internationales pour demander que la répartition des coûts de l'arbitrage prenne en compte le mauvais comportement de la Défenderesse :

- La présentation, à des fins dilatoires, d'une demande de récusation d'arbitre qu'elle savait dénuée de fondement ;
- Le non-paiement par la Défenderesse des avances qui lui avaient été demandées par le Centre;
- La présentation et le maintien d'arguments qu'elle savait non fondés ;
- Le retard dans la production de certains documents et la non-production d'autres ;
- L'appui sur une clause contractuelle et une sentence qu'elle n'a jamais eu l'intention de respecter ;
- L'entretien du suspense concernant la comparution de MM. Kourouma et Lamizana Condé à l'audience de novembre 2015.

### B.  *Position de la Défenderesse*

472. La Défenderesse demande de son côté dans ses mémoires successifs que la totalité des coûts de l'arbitrage soient mis à charge des Demanderesses. Ces frais s'élèvent à 1.630.028,41 euros, soit :

- 1.485.799,05 euros pour le cabinet Orrick
- 140.000,00 euros pour le cabinet OCA
- 4.229,36 euros pour les frais des témoins à l'audience du 25 novembre 2015.[627]

---

[626] Selon la note en bas de page n°6, ce montant inclut les USD 125.000 que les Demanderesses devaient payer jusqu'au 11 mars 2016 en vertu de la lettre du Secrétariat du 10 février 2016 mais non le montant que la Défenderesse était tenue de payer.
[627] Lettre en date du 17 février 2016.

### C. *Analyse du Tribunal*

473. A teneur de l'article 61(2) de la Convention CIRDI, sauf accord contraire des Parties, le Tribunal arbitral fixe le montant des dépenses exposées par elles et décide des modalités de répartition desdites dépenses, des honoraires, des frais de membres du Tribunal et des redevances dues pour l'utilisation des services du Centre.

474. Les honoraires et dépenses du Tribunal ainsi que les redevances administratives et dépenses du CIRDI sont les suivants (en USD):[628]

Honoraires et dépenses des arbitres :

| | |
|---|---|
| Mme Vera Van Houtte | 247.695.31 |
| Prof. Bernardo Cremades: | 208.277,78 |
| Prof. Pierre Tercier: | 153.718,90 |

| | |
|---|---|
| Redevances administratives du CIRDI : | 160.000,00 |
| Dépenses réglées par le CIRDI (estimation):[629] | 52.344,31 |

475. En ce qui concerne les montants réclamés de part et d'autre, le Tribunal constate ceci :

- Nonobstant les trois demandes successives de paiement d'avances par le Secrétariat, la Défenderesse n'a jamais payé sa part et la Demanderesse a dû se substituer pour ce paiement, pour un total, à ce jour de 425.000 euros[630]; ainsi, les Demanderesses ont avancé la totalité des frais et honoraires des arbitres et du Secrétariat, soit USD 850.000 ;

---

[628] Le Secrétariat du CIRDI enverra aux Parties un état financier détaillé du compte de l'affaire dès que ce dernier sera finalisé.

[629] Ce montant couvre notamment les frais relatifs à l'audience, et inclut l'estimation des coûts (messagerie rapide, impression, copie) relatifs à l'envoi de la présente Sentence. Le solde sera remboursé aux Parties à proportion des avances payées au CIRDI.

[630] Lettres du Secrétariat aux Parties du 10 février 2016 aux Parties (notant que le Secrétariat avait reçu dans le passé trois virements de USD 100.000 de la part des Demanderesses en paiement de l'acompte dû par la Défenderesse et invitant chacune des .Parties à verser un quatrième acompte, de USD 125.000) et du 27 avril 2016 (accusant réception du paiement des Demanderesses de USD 125.000 et notifiant le défaut de paiement de la Défenderesse) et lettre en date du 28 avril 2016 des Demanderesses au Secrétariat (constatant que la Défenderesse a manqué quatre fois à ses obligations de paiement d'avance et annonçant leur paiement de USD 125.000 en substitution de la Défenderesse.

- Les montants des honoraires des conseils de chacune des Parties sont du même ordre de grandeur et peuvent être considérés comme raisonnables; qu'il en est de même pour les honoraires des experts, même si ceux de PwC représentent le double de ceux de l'expert de OCA, et pour les frais des témoins de la Défenderesse; que par ailleurs aucune des Parties n'a demandé de pouvoir réagir à la communication des frais de l'autre.

476. En ce qui concerne le comportement de la Défenderesse, le Tribunal arbitral ne peut suivre les Demanderesses dans leur critique (la demande de récusation et les arguments développés par la Défenderesse n'étant pas manifestement infondés ; et la lenteur ou l'absence de production, tout comme la confirmation tardive de la comparution des témoins de la Défenderesse pouvant s'expliquer autrement que par des manœuvres intentionnelles), sauf en ce qui concerne le non-paiement des avances au CIRDI. L'article 14 du Règlement administratif et financier du CIRDI prévoit que les Parties effectueront à l'avance des versements afin de permettre au Centre de couvrir les frais directs se rapportant à une instance CIRDI en cours, y compris les honoraires et dépenses des arbitres. La Défenderesse, qui n'a même pas tenté de justifier son non-paiement, a donc violé son obligation de payer sa part, à laquelle elle s'est pourtant engagée en prévoyant dans son Code des investissements que les différends relatifs à l'application du Code sont, sauf accord contraire des Parties, réglés par arbitrage conformément aux dispositions de la Convention CIRDI, ratifiée par elle le 4 novembre 1986.

477. Pour rendre sa décision concernant les frais d'arbitrage, le Tribunal prendra en considération, d'une part, le fait que les Demanderesses ont obtenu gain de cause (même si ce choix est accompagné d'importantes nuances) dans la Décision sur la Compétence du 29 décembre 2012 et sur le principe de la violation du Code des investissements, et, d'autre part, le fait que la Défenderesse n'a pas pu prouver la corruption et la fraude (sujets qui ont beaucoup occupé le Tribunal arbitral), mais a eu gain de cause en ce qui concerne l'incompétence pour le *lucrum cessans* suivant la résiliation et, en ce qui concerne le fond, sur plusieurs chefs de préjudice qui ont été soit rejetés, soit réduits en montant.

478. Par conséquent, faisant usage de son pouvoir d'appréciation que lui laisse aussi l'article 28 du Règlement d'arbitrage du CIRDI, le Tribunal décide que les frais de l'arbitrage sont à répartir comme suit :

- Chaque partie supportera ses propres frais et honoraires de conseils et experts engagés dans la présente procédure ;

- Les frais d'arbitrage, y compris les frais et honoraires des membres du Tribunal ainsi que les frais du CIRDI seront supportés par les Demanderesses à concurrence de 60% et par la Défenderesse à concurrence de 40%.


## IX. DISPOSITIF

A. L'investissement n'était pas illégal pour cause de corruption et le Tribunal arbitral confirme donc sa compétence (déjà décidée le 29 décembre 2012) pour se prononcer sur les effets de la réquisition et autres violations alléguées du Code des investissements n'entrant pas dans le cadre de la Convention de concession à l'égard des quatre Demanderesses.

B. Le Tribunal arbitral n'est pas compétent pour la demande relative à la valeur nette des flux de trésorerie pour la période de concession dont les Demanderesses ont été privées (*lucrum cessans*) parce que cette privation est une conséquence de la seule résiliation de la Convention de concession.

C. Le Tribunal arbitral n'est pas compétent pour les demandes concernant les préjudices supplémentaires découlant du Décret de résiliation qui sont les conséquences de la seule résiliation de la Convention.

D. La Défenderesse a violé les articles 5 et 6 du Code des investissements par les actes de la puissance publique que sont certaines circonstances aggravantes du Décret de résiliation et le Décret de réquisition.

E.   La Défenderesse est condamnée à indemniser les Demanderesses pour le préjudice lié à la gestion de crise et à payer à ce titre 248.834 euros.

F.   La Défenderesse est condamnée à indemniser les Demanderesses pour le préjudice lié à la non-restitution d'une partie des biens réquisitionnés et à payer à ce titre 200.000 euros. Si Getma International obtient nonobstant son annulation une exécution forcée de la sentence CCJA et le paiement d'EUR 210.070 que le Tribunal CCJA lui a accordé pour le même préjudice, le montant déjà reçu pour ce préjudice, s'imputera sur le montant alloué ici au même titre.

G.   La Défenderesse est condamnée à payer des intérêts capitalisés annuellement sur les montants ci-avant à partir du 8 mars 2011 jusqu'au 30 septembre 2013 et à partir du 17 juin 2014 jusqu'au jour du paiement effectif et intégral.

H.   La Défenderesse est condamnée à payer aux Demanderesses 40 % des frais de l'arbitrage, soit USD 340.000.

I.   Toutes autres demandes des Parties sont rejetées.

M. Bernardo M. Cremades
Arbitre
(Sous réserve de l'opinion dissidente ci-jointe)
Date:   8/ 6/ 16

Prof. Pierre Tercier
Arbitre

Date:   8/3/16

Mme Vera Van Houtte
Présidente du Tribunal

Date:   1/27/16

# ANNEXE A

# CENTRE INTERNATIONAL POUR LE RÈGLEMENT DES DIFFÉRENDS RELATIFS AUX INVESTISSEMENTS

Washington D.C.

Dans  la procédure entre

# GETMA INTERNATIONAL, NCT NECOTRANS, GETMA INTERNATIONAL INVESTISSEMENTS & NCT INFRASTRUCTURE & LOGISTIQUE

Demanderesses

contre

# LA RÉPUBLIQUE DE GUINÉE

Défenderesse

(Affaire CIRDI No. ARB/11/29)

---

## DECISION SUR LA COMPÉTENCE

---

Rendue par

**Mme Vera Van Houtte, Présidente**

**M. Bernardo M. Cremades, Arbitre**

**Le Professeur Pierre Tercier, Arbitre**

Secrétaire du Tribunal: Mme Mairée Uran Bidegain

---

Conseils des Demanderesses :

Me José Miguel Júdice
Me Tiago Duarte
*PLMJ Sociedade de Advogados, RL*
Me Cédric Fischer
Me Elisabeth Mahé
*Fischer, Tandeau de Marsac, Sur & Ass.*

Conseils de la Défenderesse :

Me Laurent Jaeger
Me Pascal Agboyibor
Me Romain Sellem
*Orrick Rambaud Martel, Société d'avocats*
Me Mamadou Traoré
Me Edasso Bayala
*Cabinet Mamadou S. Traoré*

Date d'envoi aux parties: 29 décembre 2012

# Table des matières :

I.     LES PARTIES ................................................................................................3

   a.   Les Demanderesses ...................................................................................3

   b.   La Défenderesse ........................................................................................3

II.    LE TRIBUNAL ARBITRAL ......................................................................4

III.   LA CONVENTION D'ARBITRAGE...........................................................5

IV.   EXPOSE SUCCINT DES FAITS ................................................................5

V.    HISTORIQUE DE LA PROCEDURE...........................................................7

   a.   Commencement de la procédure...............................................................7

   b.   Demande de récusation..............................................................................9

   c.   Bifurcation de la procédure.......................................................................9

VI.   DEMANDES DES PARTIES QUANT A LA COMPETENCE ............................10

   a.   Défenderesse ...........................................................................................10

   b.   Demanderesses ........................................................................................11

VII.  ARGUMENTS DES PARTIES ...................................................................11

   a.   Thèse de la Défenderesse........................................................................11

   b.   Thèse des Demanderesses........................................................................15

VIII. DISCUSSION ...........................................................................................21

   a.   Introduction – Bifurcation ......................................................................21

   b.   Clause compromissoire en tant qu' « accord contraire »........................21

   c.   Article 32.5 de la Convention de concession.........................................24

   d.   Les demandes de Getma International dans l'arbitrage CCJA .................29

   e.   L'accord contraire des 2ème, 3ème et 4ème Demanderesses. .................38

IX.   DECISION................................................................................................44

# I.    LES PARTIES

### a.  LES DEMANDERESSES

1.    La première Demanderesse est **Getma International**, une société par actions simplifiée de droit français, dont le siège est établi au 66 rue Pierre Charron, 75008 Paris.

2.    La deuxième Demanderesse est **NCT Necotrans**, une société anonyme de droit français, dont le siège est établi au 66 rue Pierre Charron, 75008 Paris.

3.    La troisième Demanderesse est **Getma International Investissements**, une société par actions simplifiée de droit français, dont le siège est établi au 66 rue Pierre Charron, 75008 Paris.

4.    La quatrième Demanderesse est **NCT Infrastructure & Logistique**, une société par actions simplifiée de droit français, dont le siège est établi au 66 rue Pierre Charron, 75008 Paris.

5.    Les Demanderesses sont représentées, dans le cadre de la procédure d'arbitrage, par :

> Me José Miguel Júdice
> Me Tiago Duarte
> PLMJ – A.M. Pereira, Sáragga Leal, Oliveira Martins, Júdice e Associados, RL
> Société d'Avocats au Barreau de Lisbonne
> Avenida da Liberdade, 224
> 1250-148 Lisbonne
> Portugal
>
> et
>
> Me Cédric Fischer
> Me Elisabeth Mahé
> Fischer, Tandeau de Marsac, Sur &Ass.
> Société d'Avocats au Barreau de Paris
> Boulevard Malesherbes, 67
> 75008 Paris
> France

### b.  LA DÉFENDERESSE

6.    La Défenderesse est la **République de Guinée**, représentée par l'Agence Judiciaire de l'Etat dont les bureaux sont établis à BP 1005 Conakry, République de Guinée (ci-après dénommée la « Défenderesse » ou la « République »).

7.    La Défenderesse est représentée, dans le cadre de la procédure d'arbitrage, par :

3

Me Laurent Jaeger
Me Pascal Agboyibor
Me Romain Sellem
Orrick Rambaud Martel, Société d'avocats
Avenue Pierre 1er de Serbie
75782 Paris
France

et

Me Mamadou Traoré
Me Edasso Bayala
Cabinet Mamadou S. Traoré
11 BP 721 CMS Ouagadougou
Place Naba Koom, 11
Burkina Faso

## II.   LE TRIBUNAL ARBITRAL

8.   Le 14 novembre 2011, les Demanderesses ont, conformément à l'article 2 du Règlement CIRDI, nommé comme arbitre :

M.Bernardo M.Cremades
B. CREMADES Y ASOCIADOS
Goya, 18
28001 Madrid
Espagne

9.   Le 12 décembre 2011, la République a, conformément à l'article 2 du Règlement CIRDI,nommé comme arbitre:

M. le Professeur Pierre Tercier
Chemin Guillaume Ritter 5
1700 Fribourg
Suisse

10.   Le 20 janvier 2012, les Parties ont conjointement nommé comme Présidente du Tribunal arbitral:

Mme Vera Van Houtte
STIBBE
Central Plaza
Rue de Loxum, 25
1000 Bruxelles
Belgique

11.   Le 2 février 2012, le Secrétaire général du Centre a désigné Mme MairéeUranBidegain, Conseillère juridique au CIRDI, comme Secrétaire du Tribunal arbitral.

### III.   LA CONVENTION D'ARBITRAGE

12.   L'Ordonnance No. 00/PRG/87 du 3 janvier 1987, modifiée par la loi n° L/95/029/CTRN du 30 juin 1995 portant le Code des investissements de la République de Guinée(le « Code des investissements ») stipule en son article 28 que:

*« 1) Les différends résultant de l'interprétation ou de l'application du présent code, sont réglés par les juridictions guinéennes compétentes conformément aux lois et règlements de la République.*

*2) Toutefois, les différends entre l'Etat Guinéen et les ressortissants étrangers, relatifs à l'application ou l'interprétation du présent code, sont, sauf accord contraire des parties en cause, définitivement réglés par arbitrage conduit :*

- *conformément aux dispositions de la convention du 18 mars 1985 pour le « Règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats » établie sous l'égide de la Banque Internationale pour la Reconstitution et le Développement, ratifiée par la République de Guinée le 4 novembre 1986, ou ;*

- *si la personne ou l'entreprise concernée ne remplit pas les conditions de nationalité stipulée à l'article 25 de ladite convention, conformément aux dispositions des règlements du mécanisme supplémentaire approuvé le 27 septembre 1978, par le Conseil Administratif du Centre International pour le Règlement des Différends Relatifs aux Investissements (CIRDI). »*

### IV.   EXPOSE SUCCINT DES FAITS

13.   Le 22 septembre 2008, la République de Guinée et Getma International ont conclu une convention de mise en concession du terminal à conteneurs du port de Conakry, son extension et l'aménagement d'un espace de la gare ferroviaire (la « Convention de concession ») (Pièce C-11[1]). Aux termes de cette convention, la République de Guinée a concédé à Getma International la concession de service public de gestion et d'exploitation du terminal à conteneurs de Conakry (la « Concession »).

14.   Suivant l'article 7 de la Convention de concession, Getma International devait constituer une société d'exploitation de la Concession de droit guinéen. En application de cette disposition, la Société du Terminal à Conteneurs de Conakry SA (la « STCC ») a été constituée le 20 novembre 2008 (Pièce C-13).La STCC est détenue à 95% par Getma International Investissements. Getma International Investissements, créée le 12 novembre 2008, est elle-même détenue à 51% par Getma International et à 49% par NCT Necotrans (Contre-Mémoire n°2 § 219, Mémoire n°2 § 69).

15.   Le 7 novembre 2009, la République et Getma International ont conclu un Avenant n°1 à la Convention de concession afin de préciser les conditions de suspension et de computation

---

[1] Les pièces déposées par les Demanderesses sont identifiées par la lettre « C-… », tandis que les pièces déposées par la Défenderesse sont identifiées par la lettre « R-… ».

des termes et délais contenus par la Convention de concession, le nombre de membres du Comité de Suivi, la nature des Activités Concédées, la part des frais de stationnement et les Redevances (l'« Avenant n°1 ») (Pièce C-12).

16.     Getma International, par l'intermédiaire de sa filiale de droit français NCT Infrastructure & Logistique, a lancé un appel d'offres international, clôturé en février 2011, afin de réaliser la construction du nouveau quai et l'aménagement d'une superficie de 120.000 m$^2$ (Contre-Mémoire n°2 § 219, Mémoire n°2 § 70).

17.     Le 8 mars 2011, le Président de la République a adopté un décret en application duquel la Convention de concession et son avenant ont été « *résiliés pour manquements aux obligations du Concessionnaire* […] *avec effet immédiat et sans indemnités, aux frais, risques et torts des Sociétés*[sic.] *GETMA International SAS* »(le « Décret de résiliation ») (Pièce C-19).

18.     Le 9 mars 2011, le Président de la République a adopté un deuxième décret en vertu duquel « *l'Etat guinéen décide de réquisitionner pendant une durée de 60 jours ou plus, à compter de la date de signature du présent Décret, les personnels, matériels, installations, les immeubles et actifs qu'il jugera nécessaire, appartenant à la Société GETMA International SAS et à la Société du Terminal à Conteneurs de Conakry, qu'ils se trouvent sur le Terminal à Conteneurs de Conakry ou ailleurs sur le territoire national de la République de Guinée* » (le « Décret de réquisition ») (Pièce C-21).

19.     Le 10 mai 2011, Getma International a soumis une demande d'arbitrage auprès de la Cour Commune de Justice et d'Arbitrage (la « CCJA ») de l'Organisation pour l'Harmonisation en Afrique du Droit des Affaires (l' « O.H.A.D.A.) contre l'état Guinéen, en application de la clause compromissoire stipulée à l'article 31 de la Convention de concession (la « Clause compromissoire »).

20.     Aux termes de sa demande d'arbitrage du 10 mai 2011, Getma International a demandé au tribunal constitué à la suite de cette demande et composé de Messieurs Eric Teynier, Juan Antonio Cremades et Ibrahim Fadlallah (ci-après « le Tribunal CCJA ») de :

« *Dire et juger irrégulière, nulle et de nul effet la résiliation de la Convention de concession décrétée par le Président de la République de Guinée* ;

*Constater que, du fait de la nouvelle convention de concession consentie le 11 mars 2011 à BAL, ou à toute autre société du groupe Bolloré, le retour au « statu quo ante bellum » est désormais impossible* ;

*Condamner le Défendeur à indemniser le Concessionnaire du préjudice subi du fait de la résiliation de la Convention de concession, et comprenant,* notamment *et sauf à parfaire (i) l'Indemnité forfaitaire de résiliation, (ii) l'Indemnité de Résiliation, (iii) le Montant non amorti du Ticket d'Entrée, (iv) les Indemnités de licenciement et (v) le préjudice complémentaire, outre les intérêts au taux légal à compter de la Notification Préliminaire de Changement de Loi* ;

*Laisser à la charge du Défendeur l'ensemble des frais, dépens et honoraires supportés par le Demandeur* »(Pièce R-9).

21.    La procédure CCJA est actuellement en cours.

22.    Le 29 septembre 2011, les Demanderesses ont introduit une requête en application de l'article 36 de la Convention CIRDI ainsi que de l'Ordonnance No. 00/PRG/87 du 3 janvier 1987, modifiée par la loi n° L/95/029/CTRN du 30 juin1995 portant le Code des investissements de la République de Guinée.

23.    Aux termes de leur requête d'arbitrage du 29 septembre 2011, les Demanderesses ont demandé au Tribunal CIRDI (soit le Tribunal dont la composition est mentionnée au chapitre II ci-avant, ci-après aussi dénommé « le Tribunal arbitral ») de :

« *a) Déclarer que l'Etat de Guinée a enfreint sa législation d'investissement et/ou le droit international, en particulier, qu'il a exproprié, de manière discriminatoire, l'investissement des Demanderesses, sans une prompte, juste et adéquate indemnisation, en violation des articles 5, 6 et 7 du Code des Investissements et/ou en violation du droit international coutumier ;*

*b) Ordonner à la Guinée d'indemniser la partie Demanderesse en raison de la violation de sa législation d'investissement et/ou du droit international d'un montant à déterminer au moment approprié de cette procédure, en monnaie librement convertible acceptée par les Demanderesses, plus les intérêts versés à un taux commercialement raisonnable pour la monnaie en question depuis la date de l'expropriation jusqu'à ce que le paiement intégral du montant soit réalisé ;*

*c) Attribuer toute autre compensation que le Tribunal considère appropriée, et ;*

*d) Ordonner à l'Etat de Guinée de payer tous les coûts de la présente procédure arbitrale, y compris, sans limitation, les honoraires et dépenses du Tribunal, les honoraires et frais du CIRDI, les honoraires et frais relatifs à la présentation juridique de la partie Demanderesse et les frais et honoraires de tout expert désigné par la Demanderesse ou le Tribunal, majoré des intérêts dus ».*

## V.    HISTORIQUE DE LA PROCEDURE

### a.    COMMENCEMENT DE LA PROCEDURE

24.    Le 29 septembre 2011, Getma International, NCT Necotrans, Getma International Investissements et NCT Infrastructure & Logistique (ci-après dénommées les «Demanderesses») ont introduit une Requête d'arbitrage («la Requête») auprès du Centre international pour le règlement des différends relatifs aux investissements («CIRDI» ou le «Centre») contre la République de Guinée.

25.    La Requête a pour fondement la Convention pour le Règlement des Différends relatifs aux investissements entre États et ressortissants d'autres États (la «Convention» ou «la Convention CIRDI») ainsi que l'Ordonnance No. 00/PRG/87 du 3 janvier 1987, modifiée par la loi n° L/95/029/CTRN du 30 juin1995 portant Code des investissements de la République de Guinée.

26.    Le 19 octobre 2011, le Secrétariat du CIRDI, afin de poursuivre l'examen de la Requête, a demandé aux Demanderesses de notamment clarifier le rôle respectif des parties requérantes dans la concession et d'expliciter l'investissement réalisé par les sociétés Getma International Investissements et NCT Infrastructure & Logistique. Selon les informations soumises par les Demanderesses le 28 octobre 2011 :

   –   NCT Necotrans est la société holding de tête du groupe détenant directement ou indirectement, 100% des trois autres Demanderesses, et a financé l'investissement en Guinée ;

   –   Getma International était le concessionnaire du terminal à conteneurs ;

   –   Getma International Investissements est une société holding intermédiaire contrôlée par Getma International et contrôlant la société de droit Guinéen STCC qui est la société d'exploitation du terminal ;

   –   NCT Infrastructure & Logistique est la filiale technique de NCT Necotrans, chargée des travaux d'extension du terminal.

27.    Conformément à l'article 36(3) de la Convention CIRDI, le Secrétaire général du CIRDI a enregistré la Requête le 3 novembre 2011.

28.    Par lettre en date du 14 novembre 2011, les Demanderesses ont proposé que le différend soit tranché par un tribunal composé de trois membres, un arbitre nommé par chacune des Parties et le troisième nommé d'un commun accord. Dans cette même lettre, les Demanderesses ont confirmé la nomination comme arbitre de M. Bernardo Cremades, de nationalité espagnole, qu'elles avaient déjà annoncée dans la Requête.

29.    Par lettre en date du 12 décembre 2011, la Défenderesse a accepté la proposition des Demanderesses concernant la méthode de constitution du Tribunal arbitral et a nommé le Professeur Pierre Tercier, de nationalité suisse, comme arbitre.

30.    Par lettre du 20 décembre 2011, le Secrétariat du Centre a informé les Parties que M. Bernardo Cremades et le Professeur Pierre Tercier avaient accepté leurs nominations, et leur a transmis les déclarations d'acceptation et d'indépendance signées respectivement par les deux arbitres, conformément à l'article 6(2) du Règlement de procédure relatif aux instances d'arbitrage du CIRDI (le «Règlement d'arbitrage»).

31.    Le 20 janvier 2012, les Parties ont conjointement nommé Mme Vera Van Houtte, de nationalité belge, comme Présidente du Tribunal arbitral. Mme Van Houtte a accepté sa nomination le 2 février 2012. Le même jour, le Secrétaire général du Centre a informé les Parties que les trois arbitres avaient accepté leurs nominations et que, conformément à l'article 6(1) du Règlement d'arbitrage, le Tribunal était réputé constitué et l'instance engagée à cette date, soit le 2 février 2012. Une copie de la déclaration signée de Mme Van Houtte a été également transmise aux Parties le même jour.

32.    Mme Mairée Uran Bidegain a par ailleurs été désignée en qualité de Secrétaire du Tribunal à cette même date.

33.  Conformément à l'article 13 du Règlement d'arbitrage, la première session du Tribunal arbitral s'est tenue à Paris avec les Parties le 30 mars 2012. Lors de cette session, le Tribunal arbitral a notamment arrêté les règles spécifiques pour la procédure. Un procès-verbal de cette session a été approuvé par les Parties comme indiqué ci-après.

**b.  DEMANDE DE RECUSATION**

34.  Le 16 avril 2012, la Défenderesse a soumis une demande de récusation à l'encontre de M. Bernardo Cremades (la « Demande de récusation ») en application de l'article 57 de la Convention CIRDI.

35.  Par lettre du 18 avril 2012, le Secrétariat du CIRDI a informé les Parties que, conformément à l'article 9(6) du Règlement d'arbitrage, l'instance était réputée suspendue à ladate du dépôt de la Demande, soit le 16 avril 2012. La Secrétaire du Tribunal arbitral leur a transmis unprojet du procès-verbal de la première session tenue le 30 mars 2012, avec l'indication que les Parties seraient invitées à confirmer leur accord sur les différents points de l'ordre du jour à lareprise de l'instance.

36.  Après un échange de mémoires entre les Parties sur la Demande de récusation et le dépôt des observations de M. Bernardo Cremades, Mme Vera Van Houtte et le Professeur Pierre Tercier ont considéré la Demande de récusation et l'ont mise aux voix sans délai, hors la présence de M. Bernardo Cremades. Suite au partage des voix desdeux arbitres, le Président du Conseil administratif s'est prononcé, le 28 juin 2012, sur la Demande de récusationconformément à l'article 58 de la Convention CIRDI. Selon la décision du Président du Conseil administratif :

« *1. La Demande en récusation formulée par la République de Guinée le 16 avril 2012 àl'encontre de M. Bernardo M. Cremades est rejetée.*

*2.  Les frais encourus par les parties et les membres du Tribunal dans le cadre de l'examen de cette Demande en récusation feront l'objet d'une décision ultérieure du Tribunal.*

*3.   Conformément à l'article 9(6) du Règlement d'arbitrage, cette instance est réputée reprendre à la date de cette décision* ».

**c.  BIFURCATION DE LA PROCEDURE**

37.  Lors de sa première session, le Tribunal arbitral – après avoir noté que la Défenderesse entendait contester la compétence du Tribunal arbitral et que les Parties s'accordaient sur la bifurcation de la procédure – a fixé le calendrier procédural sur la question de la compétence comme suit :

- Le 22 juin 2012 : Mémoire sur la compétence de la Défenderesse

- Le 13 juillet 2012 : Contre-Mémoire sur la compétence des Demanderesses

- Le 3 août 2012 : Réponse de la Défenderesse

- Le 7 septembre 2012 : Réplique des Demanderesses

- Le 28 septembre 2012 : Audience

38.     Le 7 juin 2012,le Tribunal arbitral a proposé aux Parties de ne pas suspendre le calendrier de procédure et de maintenir les dates fixées à la première session,nonobstant la suspension de la procédure suite à la Demande de récusation de la Défenderesse.Les Parties ont marqué leur accord le 8 juin 2012.

39.     Le 22 juin 2012, la Défenderesse a soumis par courriel son Mémoire n°1 sur la compétence (le « Mémoire n°1 »).

40.     Le 28 juin 2012, les Parties ont été invitées à confirmer leur accord sur le projet du procès-verbal de la première session du Tribunal arbitral. Les Demanderesses et la Défenderesse ont marqué leur accord sur le procès-verbal respectivement le 4 et le 12 juillet 2012. A cette occasion, les Parties ont également indiqué qu'elles ne s'opposaient pas à la publication par le CIRDI de la décision du Président du Conseil administratif sur la Demande de récusation.

41.     Le 13 juillet 2012, les Demanderesses ont soumis par courriel leur Contre-Mémoire n°1 sur la compétence (le « Contre-Mémoire n°1 »).

42.     Le 30 juillet 2012, la Défenderesse a sollicité, en application de l'article 26(2) du Règlement CIRDI, une extension de trois jours pour présenter son Mémoire n°2 sur la compétence. Compte tenu de l'accord des Demanderesses, le Tribunal arbitral a consenti à l'extension demandée.Le 6août 2012, la Défenderesse a soumis par courriel son Mémoire n°2 sur la compétence (le « Mémoire n°2 »).

43.     Le 7 septembre 2012, les Demanderesses ont soumis par courriel leur Contre-Mémoire n°2 sur la compétence (le « Contre-Mémoire n°2 »).

44.     Le 28 septembre 2012, une audience sur la compétence de ce Tribunal arbitral a eu lieu à Paris, dont un procès-verbal a été soumis aux Parties et arbitres sous forme de projet, le même jour, et sous forme de version finale, sous réserves d'éventuelles corrections par les Parties ou les arbitres, le 2 octobre 2012.


## VI.     DEMANDES DES PARTIES QUANT A LA COMPETENCE

### a.   DEFENDERESSE

45.     Dans son Mémoire n°1 sur la compétence du 22 juin 2012 et son Mémoire n°2 sur la compétence du 6 août 2012, la Défenderesse demande au Tribunal arbitral :

«   -   *de se déclarer incompétent ;*

   -   *de condamner les demanderesses à payer l'intégralité des frais d'arbitrage en ce compris les frais et honoraires exposés par la Défenderesse pour les besoins de sa défense dans le cadre du présent arbitrage, dont le montant sera déterminé à la fin de la procédure.* »

### b. DEMANDERESSES

46.     Dans leur Contre-Mémoire n°1 sur la compétence du 13 juillet 2012 et leur Contre-Mémoire n°2 sur la compétence du 7 septembre 2012, les Demanderesses demandent au Tribunal arbitral :

« - *de se déclarer compétent ;*

- *de condamner la République de Guinée à payer tous les frais encourus jusqu'à présent, y compris les frais d'arbitrage se rapportant au déclinatoire de compétence et les frais et honoraires des conseils des Demanderesses.* »

## VII.    ARGUMENTS DES PARTIES

### a. THESE DE LA DEFENDERESSE

*i)      Clause compromissoire en tant qu' « accord contraire »*

47.     La Défenderesse conteste la compétence du présent Tribunal arbitral, sur base de l'article 25 de la Convention CIRDI. Elle soutient que les Parties n'ont pas donné leur consentement par écrit pour soumettre leur différend au CIRDI.

48.     La Défenderesse prétend que l'offre d'arbitrage CIRDI contenue dans le Code des investissements est limitée. L'article 28 du Code des Investissements stipule en effet que « *Les différends entre l'Etat Guinéen et les ressortissants étrangers, relatifs à l'application ou l'interprétation du présent code, sont, **sauf accord contraire des parties en cause**, définitivement réglés par arbitrage* [CIRDI] … » (souligné par la Défenderesse)(Mémoire n°1 §§ 12 et 14).

49.     La Défenderesse considère que l'article 28 du Code des investissements doit être interprété de manière objective. Il convient de rechercher la commune intention des Parties. Selon la Défenderesse, l'article 28 signifie que le CIRDI n'a compétence qu'à défaut de choix par les Parties d'une autre juridiction. L' « *accord contraire* » dont question doit être un accord contractuel entre l'Etat guinéen et l'investisseur étranger qui a un résultat contraire à celui de la désignation du CIRDI comme institution d'arbitrage compétente pour connaître de leur litige d'investissement. Un tel accord pourrait prendre la forme d'une clause d'exclusion ou de sélection de for (Mémoire n°1 §§ 18-24).

50.     La Défenderesse affirme que les Parties ont conclu un tel « *accord contraire* » en insérant la Clause compromissoire désignant la CCJA dans leur Convention de concession. Cette Clause compromissoire englobe, selon la Défenderesse, l'ensemble des griefs et litiges découlant de la Convention de concession quel que soit leur nature ou leur fondement juridique (Mémoire n°1 § 31).

51.     Contrairement à ce qu'affirment les Demanderesses, la Défenderesse considère que l' « *accord contraire* » ne doit pas expressément porter sur les litiges relatifs à l'interprétation et l'application du Code des Investissements. Elle affirme que la règle

11

d'interprétation restrictive invoquée par les Demanderesses n'est fondée sur aucune règle ou jurisprudence (Mémoire n°2 §§ 34-37). A supposer même qu'un accord contraire spécifique soit requis, la Défenderesse précise que l'article 32.5 de la Convention de concession incorpore clairement la protection accordée aux investisseurs par le Code des investissements. Cet article vise en effet les « *modifications du Code Guinéen des Investissements et des lois en vigueur* […] », c'est-à-dire des actes de l'Etat agissant en tant que législateur et non en tant que partie à la Convention de concession (Mémoire n°2 §§ 38-40).

52. La Défenderesse soutient que le choix des Parties de donner compétence à la CCJA est irrévocable. Elle se fonde sur l'emploi du terme « *irrévocable* » dans la Clause compromissoire. La Défenderesse prétend que l'article 28 du Code des investissements est identique aux clauses dites « *fork in the road* ». Ainsi, comme les clauses « *fork in the road* », l'article 28 propose un choix exclusif entre le CIRDI ou une autre juridiction et le choix – une fois opéré – est irrévocable (Mémoire n°1 §§ 47-51).

53. En outre, la Défenderesse allègue que le choix de la CCJA par les Parties a été confirmé par (i) le dépôt de la demande d'arbitrage de Getma International devant la CCJA le 10 mai 2011 et (ii) la signature du procès-verbal de la réunion du Tribunal CCJA du 12 mars 2012 qui vaut compromis arbitral (Mémoire n°1 §§ 54-55).

*ii)   Champ de la Convention de concession et de la Clause compromissoire*

54. Selon la Défenderesse, les demandes formulées par les Demanderesses devant le CIRDI découlent directement de la Convention de concession et sont couvertes par la Clause compromissoire puisque (i) la Convention de concession constitue le support exclusif de l'investissement dont les Demanderesses se prévalent, (ii) la résiliation de la Convention de concession constitue le fondement de la demande des Demanderesses, et (iii) le préjudice dont les Demanderesses demandent réparation repose sur les stipulations de la Convention de concession (Mémoire n°1 §§ 35-37).

55. Concernant l'investissement, la Défenderesse allègue qu'il ressort des termes de la Requête d'arbitrage des Demanderessesque la Convention de concession en est le support exclusif. Les Demanderesses ont, en effet, affirmé que « *nous sommes confrontés à un véritable investissement* [...] *En effet, (i) l'exécution du Contrat de concession de service public a impliqué un investissement financier à réaliser par le Concessionnaire (investisseur)* » (Mémoire n°1 § 35).

56. Concernant le fondement de la demande, la Défenderesse cite la Requête d'arbitrage des Demanderesses selon laquelle « *la résiliation du contrat représente* […] *un acte de puissance publique et pas seulement une simple exécution contractuelle, constituant ainsi une mesure d'effet équivalent à une expropriation* ». La Défenderesse précise que l'article 32.5 de la Convention de concession régit expressément les litiges relatifs aux actes de puissance publique contrevenant aux droits de l'investisseur (Mémoire n°1 §§ 39-41, Mémoire n°2 § 23). Dès lors que l'expropriation est expressément régie par la Convention de concession, la Défenderesse estime que tout litige relatif à une expropriation découle de la Convention de concession et entre dans le champ de la Clause compromissoire. La Clause

compromissoire et l'article 32 sont d'ailleurs contenus dans le même chapitre de la Convention de concession (Mémoire n°2 §§ 25-26).

57.     Concernant le préjudice, la Défenderesse argumente que le préjudice extracontractuel dont se prévaut Getma International pour justifier la compétence du présent Tribunal arbitral (à savoir le *lucrum cessans)* résulte en réalité directement de la résiliation de la Convention de concession. Selon la Défenderesse, la « *juste et adéquate réparation* » prévue par le Code des investissements ne peut être que celle qui a été convenue par les Parties dans la Convention de concession. En effet, l'application des « *règles et pratiques habituelles du droit international* » auxquelles se réfère le Code des investissements conduit à l'application de la Convention de concession par le biais du principe *pacta sunt servanda*. Le préjudice réclamé par Getma International découle donc bien de la Convention de concession (Mémoire n°2 §§ 98-110).

        *iii)     Parties à la Clause compromissoire*

58.     La Défenderesse précise que l' « *accord contraire* » lie l'ensemble des Demanderesses à la présente procédure d'arbitrage. La Défenderesse se base sur la théorie des groupes de sociétés (consacrée par la Cour d'appel de Paris dans l'affaire *Dow Chemical*) pour étendre les effets de la Clause compromissoire à NCT Necotrans, Getma International Investissements et NCT Infrastructure & Logistique. La Défenderesse considère que la théorie des groupes de sociétés est applicable en l'espèce car, en vertu d'une règle matérielle du droit international de l'arbitrage reconnue par l'Acte Uniforme sur le Droit de l'Arbitrage OHADA, l'existence et l'efficacité d'une clause compromissoire s'apprécie d'après la commune volonté des Parties, indépendamment de toute référence à une loi étatique (Mémoire n°2 §§ 87-91).

59.     Selon la Défenderesse, les Demanderesses - appartenant au même groupe de sociétés - ont, par leur participation à la conclusion et à l'exécution de la Convention de concession et de l'Avenant n°1, manifesté leur volonté d'être liées par la Clause compromissoire. En effet (Mémoire n°2 §§ 58-74):

        a) les Demanderesses appartiennent toutes au même groupe de sociétés (le groupe Necotrans) et ont des dirigeants communs qui sont également mandataires sociaux de NCT Necotrans ;

        b) les Demanderesses (à l'exception de Getma International Investissements) ont participé et étaient personnellement représentées lors de la négociation de la Convention de concession, qui a été signée par Monsieur Talbot en qualité de « *président du groupe NCT Necotrans* » ;

        c) NCT Necotrans était en charge d'obtenir les financements nécessaires à la réalisation des investissements prévus par la Convention de concession, Getma International Investissements a été constituée pour être le véhicule de détention de la participation du groupe Necotrans dans la STCC et NCT Infrastructure & Logistique a lancé l'appel d'offres pour la construction du nouveau quai prévue par la Convention de concession pour le compte de Getma International ;

        d) l'Avenant n°1 à la Convention de concession – qui vise expressément la société Getma

13

International Investissements - a été signé par le président du groupe Necotrans et par le président de la STCC et de NCT Infrastructure & Logistique ;

e)  l'arbitrage CCJA a été initié et poursuivi à l'initiative et sous le contrôle de NCT Necotrans.

*iv)   Identité entre le litige soumis au Tribunal CCJA et au Tribunal CIRDI*

60.   La Défenderesse soutient que le procès-verbal du Tribunal CCJA démontre que les litiges et les demandes portés devant le Tribunal CCJA et devant le Tribunal CIRDI sont identiques et que le Tribunal arbitral est compétent pour traiter les litiges d'investissement. D'une part, l'exposé du litige par Getma International repris dans le procès-verbal de la réunion du Tribunal CCJA du 12 mars 2012 est identique mot pour mot à la présentation faite par les Demanderesses dans leur requête d'arbitrage CIRDI et, d'autre part, l'ensemble des demandes des Demanderesses ont été portées devant le Tribunal CCJA, y compris celles relevant de la législation sur les investissements (Mémoire n°1 § 77).

61.   La Défenderesse précise que le litige dont est saisi la CCJA n'est pas seulement contractuel mais également d'investissement. La Défenderesse se réfère au mémoire en demande introduit par Getma International dans le cadre de la procédure CCJA, duquel il ressort que :

a)  L'action est fondée sur les principes internationaux de protection des investissements. Getma International invoque les règles et principes du droit international, la notion de « *Contrat d'Etat* », les principes généraux applicables aux investissements (tels que la bonne foi, les attentes légitimes ou le traitement juste et équitable) ainsi que de la doctrine en matière de droit des investissements internationaux et de la jurisprudence CIRDI (Mémoire n°1 §§ 80-84, Mémoire n°2 § 54).

b)  Le litige est relatif au Décret de résiliation et au Décret de réquisition, qui sont des actes de puissance publique. Getma International reconnaît donc que la compétence du Tribunal CCJA ne se cantonne pas aux seuls aspects contractuels mais englobe l'ensemble des aspects liés aux actes illégaux de la puissance publique (Mémoire n°1 § 89, Mémoire n°2 § 49).

c)   Le litige est relatif à une expropriation. Getma International utilise des termes propres à ce type de mesure tels que « *réquisitionner* […] *par la force des armes* » ou « *manu militari* » et demande d'être indemnisée au titre de cette expropriation. La Défenderesse précise que la CCJA est compétente pour statuer sur l'intégralité des demandes relatives à l'expropriation alléguée, y compris au titre de la violation de la législation sur les investissements (Mémoire n°1 §§ 92-97).

62.   La Défenderesse réfute l'allégation des Demanderesses selon laquelle les demandes de Getma International devant le Tribunal CCJA ne couvriraient pas l'ensemble de leur préjudice.

63.   En ce qui concerne la réquisition de biens propres, la Défenderesse souligne que l'indemnité réclamée devant le Tribunal CCJA correspond à la valeur des biens. Cette indemnité couvre donc l'intégralité des conséquences du Décret de réquisition et pas seulement les conséquences du manquement de la République à son obligation contractuelle de minimiser

le préjudice subi par Getma International en sa qualité de concessionnaire (Mémoire n°2 §§ 46-48).

64.     En ce qui concerne le gain manqué (*lucrum cessans*), la Défenderesse soutient que celui-ci est compris dans l'indemnité forfaitaire de résiliation prévue à l'article 32.3 de la Convention de concession qui est réclamée par Getma International devant le Tribunal CCJA. En effet, l'indemnité forfaitaire a pour objet de compenser la perte d'activité et est fondée sur le chiffre d'affaires (Mémoire n°2 §§ 51-53).

65.     La Défenderesse souligne que Getma International a saisi la CCJA en toute liberté et en connaissance de cause. C'est en raison des garanties d'indépendance et de compétence de la CCJA que Getma International aurait prétendument accepté et confirmé la compétence de cet organisme d'arbitrage. En revanche, la procédure CIRDI relèverait d'une stratégie de « *forum shopping* » de la part des Demanderesses (Mémoire n°1 §§ 64-65).

*v)      Qualité d'investisseur et réalisation d'un investissement*

66.     La Défenderesse allègue que ni NCT Necotrans ni Getma International Investissements ni NCT Infrastructure & Logistique ne font état d'un quelconque différend présentant un lien direct avec un investissement. Ces sociétés ne précisent pas la nature de leur investissement, les violations du Code des investissements ou les faits qu'elles entendent invoquer et ne prouvent pas leur qualité d'investisseur ou le préjudice propre qu'elles allèguent avoir subi. D'après la Défenderesse, il ne suffit pas d'alléguer un *treaty claim* pour justifier la compétence du CIRDI. La Défenderesse cite à ce sujet les décisions des tribunaux dans les affaires *SGS c. Philippines* et *Impregilo c. Pakistan*, selon lesquelles il faut - au stade de la compétence - examiner si les faits allégués sont *prima facie* de nature à constituer une violation de la législation d'investissement. Elle demande donc au Tribunal arbitral de constater que les *treaty claims* invoqués par les sociétés NCT Necotrans, Getma International Investissements et NCT Infrastructure & Logistique sont inexistants (Mémoire n°2 §§ 113 et 122).

67.     Finalement, la Défenderesse soutient que NCT Necotrans n'a pas la qualité d'investisseur car elle n'a fait aucun investissement en République de Guinée au sens du Code des investissements. En effet, seuls les apports directs auprès d'une société établie en Guinée en échange de titres sociaux sont considérés comme des investissements au sens de l'article 3.2 du Code des investissements, à l'exclusion des participations indirectes. Or, selon la Défenderesse, NCT Necotrans participe au présent arbitrage uniquement du fait de son contrôle sur Getma International (Mémoire n°2 §§ 129-131).

**b.   THÈSE DES DEMANDERESSES**

*i)      Clause compromissoire en tant qu' « accord contraire »*

68.     Les Demanderesses contestent l'existence d'un « *accord contraire* » entre les Parties, au sens de l'article 28 du Code des investissements, qui exclurait la compétence du CIRDI pour le règlement des litiges relatifs à l'interprétation et l'application dudit Code. Selon les Demanderesses, seul existe un accord entre l'une d'elles et la Défenderesse en ce qui concerne le mode de résolution des litiges contractuels (Contre-Mémoire n°1 § 149).

15

69.     Les Demanderesses soutiennent que, pour écarter la compétence du CIRDI en application de l'article 28 du Code des investissements, l'« accord contraire » doit être conclu par la République elle-même et tous les investisseurs concernés et doit porter sur le même litige, les mêmes demandes et l'application des mêmes normes juridiques (Contre-Mémoire n°1 §§ 17-18). L' « accord contraire » doit en outre être explicite et non équivoque (Contre-Mémoire n°2 § 11). Les Demanderesses considèrent que tel n'est pas le cas en l'espèce.

70.     Les Demanderesses allèguent que la Clause compromissoire et l'article 28 du Code des investissements n'ont pas le même champ d'application *rationae materiae*. Selon les Demanderesses, l'article 28 couvre uniquement les différends relatifs à l'interprétation ou l'application du Code des investissements, tandis que la Clause compromissoire couvre les différends découlant de la Convention de concession et de ses avenants (Contre-Mémoire n°1 §§ 25-27).

71.     Les Demanderesses considèrent que le simple fait qu'il existe une clause arbitrale dans la Convention de concession ne permet pas d'éliminer l'existence d'un autre accord arbitral relatif à l'interprétation et à l'application du Code des investissements (Contre-Mémoire n°1 § 35). Les Demanderesses se réfèrent à la jurisprudence arbitrale selon laquelle le mode de résolution des litiges prévu dans un traité bilatéral d'investissement ne peut être exclu par la simple consécration d'un forum alternatif dans un contrat. Les Demanderesses citent, à ce sujet, les affaires *Aguas del Tunari c. Bolivie* et *Vivendi c. Argentine* (Comité ad hoc) (Contre-Mémoire n°1 §§ 33-39).

72.     Les Demanderesses considèrent, en effet, qu'il est exceptionnel qu'une clause contractuelle de règlement des litiges s'étende aux litiges d'investissement. Si telle était la volonté des Parties, les Demanderesses considèrent qu'il était nécessaire de l'exprimer d'une façon claire et non équivoque. Or, la Convention de concession ne fait aucune référence aux litiges relatifs à l'interprétation et à l'application du Code des investissements, à la volonté des Parties d'écarter l'arbitrage CIRDI ou au fait que la Clause Compromissoire est l' « accord contraire » au sens du Code des investissements. Le champ d'application de la Clause compromissoire est en outre étroit en ce qu'il ne s'applique qu'aux différends ou litiges « découlant de la présente Convention ou de ses avenants » (Contre-Mémoire n°2 §§ 23-27).

73.     Les Demanderesses ajoutent qu'en vertu de l'article 32.5 de la Convention de concession, les Parties ont explicitement prévu une obligation de maintenir les dispositions du Code des investissements. Au vu de cette obligation expresse, les Demanderesses considèrent qu'il n'est pas raisonnable de prétendre que les Parties ont voulu exclure de manière implicite certaines des clauses les plus importantes du Code des investissements (telle que celles relatives aux limites des expropriations ou au mode de règlement des différends) (Contre-Mémoire n°2 § 31).

74.     Selon les Demanderesses, le comportement des Parties démontre en outre qu'il n'existe aucun « accord contraire ». Ainsi, la République n'a, jusqu'au 15 mars 2012, émis aucune objection par rapport à la lettre des Demanderesses du 24 mai 2011 portant acceptation de l'offre d'arbitrage CIRDI (Contre-Mémoire n°2 §§ 41-42).

75.     Même à considérer qu'un accord contraire existe, les Demanderesses estiment qu'il n'est pas démontré que cet accord donne une compétence exclusive au Tribunal CCJA pour traiter les litiges d'investissement par opposition à une compétence alternative à celle du CIRDI. Les Demanderesses font une analogie avec l'article 26 de la Convention CIRDI qui stipule que, « *sauf accord contraire* », le consentement à l'arbitrage CIRDI implique la renonciation à l'exercice de tout autre recours. En cas de dérogation à la règle de compétence exclusive du CIRDI, les autres forums ont une compétence alternative à celle du CIRDI qui n'est toutefois pas exclue (Contre-Mémoire n°2 §§ 48-56). Les Demanderesses rejettent l'argumentation de la Défenderesse relatif au caractère « *irrévocable* » du choix de l'arbitrage CCJA ou de l'analogie avec les clauses « *fork in the road* ». Les Demanderesses considèrent que l'adjectif « *irrévocable* » se réfère à la décision du tribunal arbitral et non au choix des Parties du Tribunal CCJA. Les Demanderesses notent qu'il est d'ailleurs toujours possible pour les Parties de modifier postérieurement une clause d'arbitrage, de sorte que le choix d'un arbitrage CCJA n'est jamais irrévocable. En ce qui concerne les clauses « *fork in the road* », les Demanderesses allèguent que l'article 28 du Code des investissements n'offre pas de choix entre plusieurs tribunaux mais exige que les litiges relatifs à son interprétation ou son application soient réglés exclusivement par un tribunal CIRDI (Contre-Mémoire n°1 §§ 87-92 et 96-99).

76.     Un « *accord contraire* » explicite et non-équivoque n'existant pas entre les Parties, les Demanderesses estiment que le Code des investissements doit être interprété en faveur de la protection des investisseurs et, plus particulièrement, en faveur de la compétence CIRDI (Contre-Mémoire n°2 §§ 12-13).

77.     Les Demanderesses argumentent qu'au stade de la compétence, le Tribunal arbitral doit uniquement examiner, *prima facie*, si les faits allégués par les Demanderesses (dans le cas où ils s'avéreraient fondés) sont de nature à constituer une violation du Code des investissements. Les Demanderesses se réfèrent à ce sujet auxaffaires *AMCO c. Indonésie*, *Impregilo c. Pakistan* et *SGS c. Pakistan*. Les Demanderesses rappellent que cette dernière affaire concernait également une résiliation contractuelle et que le Tribunal arbitral s'est reconnu compétent, malgré que la clause d'arbitrage contractuelle était plus large que la Clause compromissoire dans le cas d'espèce (Contre-Mémoire n°2 §§ 132-141 et §§90-94, 122 et 213).

  *ii)*  *Champ de la Convention de concession et de la Clause compromissoire*

78.     Contrairement à ce qu'allègue la Défenderesse, les Demanderesses contestent que le régime des expropriations soit régi par la Convention de concession et que les demandes relatives aux expropriations tombent sous le champ de la Clause compromissoire. La Convention de concession certes prévoit qu'un acte d'expropriation peut conduire à la résiliation de celle-ci et au paiement d'une indemnisation contractuelle. Mais, selon les Demanderesses, cela n'implique pas que l'expropriation – comme acte de puissance publique – ne puisse également être constitutif d'une violation du Code des investissements (qui n'a pas été abrogé), comme reconnu par les tribunaux dans les affaires *SPP c. Egypte*, *Azurix c. Argentine* ou *Impregilo c. Pakistan* (Contre-Mémoire n°2 §§ 65-73).

79.     Selon les Demanderesses, la Convention de concession n'avait pas pour but de se substituer au Code des investissements. La référence à l'expropriation avait uniquement pour but d'interdire à la République de modifier son ordre juridique afin de permettre, par exemple, que les résiliations contractuelles suite à des expropriations ne donnent lieu à aucune indemnisation. La mention du Code des investissements prouve, selon les Demanderesses, que, pour Getma International, le fait de maintenir les clauses du Code des investissements continuait à être une garantie utile (Contre-Mémoire n°2 §§ 95-99).

80.     En ce qui concerne spécifiquement l'indemnité, les Demanderesses contestent que la *« juste et adéquate réparation »* visée à l'article 5 du Code des investissements soit définie par l'article 32.5 de la Convention de concession. Selon elles, il existe une distinction entre l'indemnisation (en raison de la résiliation contractuelle) prévue dans la Convention de concession et calculée selon les règles prévues contractuellement d'une part, et la réparation (en raison de l'expropriation) prévue dans le Code des investissements et calculée selon les règles et pratiques habituelles du droit international, d'autre part. Elles ajoutent que le Code des investissements ne permet pas aux Parties de s'écarter des critères d'évaluation prévus à l'article 5 du Code des investissements et que la Convention de concession ne fait nullement référence à l'article 5 du Code des investissements (Contre-Mémoire n°2 §§ 110-114).Pour démontrer la différence entre la réparation contractuelle de la résiliation et la réparation légale de l'expropriation, les Demanderesses soutiennent qu'en cas d'expropriation partielle n'entraînant pas la résiliation de la Convention de concession, seule l'indemnisation légale serait due (Contre-Mémoire n°2 §§ 146-149).

*iii)     Parties à la Clause compromissoire*

81.     Les Demanderesses soutiennent que seule Getma International est partie à la Clause compromissoire. Elles considèrent que la théorie du groupe des sociétés n'est pas applicable en l'espèce et ne conduirait de toute façon pas à écarter l'arbitrage CIRDI (Contre-Mémoire n°2 § 155).

82.     D'une part, les Demanderesses allèguent que la théorie du groupe des sociétés est loin d'être établie et a même été rejetée dans plusieurs pays. En tout état de cause, elles considèrent que l'élément essentiel pour l'application de la théorie du groupe des sociétés – à savoir la commune intention des Parties de lier des non-signataires – n'est pas démontré par la Défenderesse. Elles soulignent que la Défenderesse se contente de constater que les Demanderesses font partie du même groupe de sociétés et d'alléguer (sans le prouver) que celles-ci ont participé à la négociation, la conclusion ou l'exécution de la Convention de concession. Or, la *« négociation, conclusion et exécution »* peuvent, selon les Demanderesses, uniquement servir d'indice qu'il y a eu une volonté commune des Parties. En l'espèce, les Demanderesses contestent qu'elles aient eu la volonté d'être liées par la Clause compromissoire et, en particulier, par un *« accord contraire »* implicite de nature à écarter l'arbitrage CIRDI. Les Demanderesses précisent que la signature de la Convention de concession par M. Talbot n'est pas pertinente, dans la mesure où celle-ci était nécessaire pour engager valablement Getma International (Contre-Mémoire n°2 §§ 157-181, 190-197).

83.     D'autre part, les Demanderesses allèguent que la théorie du groupe des sociétés n'a jamais été utilisée par la jurisprudence pour écarter le droit d'un investisseur de recourir à

l'arbitrage CIRDI. L'effet de cette théorie est, au contraire, d'étendre les droits des créanciers ou des membres du groupe de sociétés en impliquant dans l'arbitrage des non-signataires. Quant à la théorie du « *piercing of the corporate veil* », les Demanderesses estiment qu'elle ne peut trouver à s'appliquer que s'il est démontré que le voile social est utilisé à des fins abusives. Or, les Demanderesses affirment que la signature par Getma International de la Convention de concessionne résulte pas d'une tentative de frauder ou de bénéficier indûment d'un quelconque droit (Contre-Mémoire n°2 §§ 201- 211).

*iv)   Identité entre le litige soumis au Tribunal CCJA et au Tribunal CIRDI*

84.     Les Demanderesses soutiennent que l'arbitrage CCJA et l'arbitrage CIRDIsont distincts, traitant de litiges différents, de demandes différentes et de fondements différents.Seuls les faits sont les mêmes (Contre-Mémoire n°2§§ 114-115). Les Demanderesses allèguent que la Défenderesse a d'ailleurs reconnu l'existence d'un litige contractuel et d'un litige d'investissement au paragraphe 79 de son Mémoire. Elles soulignent à cet égard que, contrairement à ce que la Défenderesse allègue, la CCJA n'est pas saisie du litige d'investissement. Cette interprétation relèverait d'une mauvaise lecture du mémoire introduit par Getma International dans la procédure CCJA (Contre-Mémoire n°2 §§ 117 et 130).En tout état de cause, le Tribunal CCJA pourrait toujours décliner sa compétence si elle était effectivement saisie de demandes relatives à l'application de la législation d'investissement (Contre-Mémoire n°2 § 125).

85.     Les Demanderesses rappellent que la jurisprudence arbitrale internationale admet que le même ensemble de faits peut constituer simultanément une violation d'un contrat et d'un traité bilatéral d'investissement (ou *mutatis mutandis* d'une législation nationale de protection des investissements étrangers). Les Demanderesses citent les décisions prises dans les affaires *Vivendi c. Argentine* (sentence d'annulation du comité ad hoc), *Bayindir c. Pakistan*, *Impregilo c. Pakistan*, *Vivendi c. Argentine* (Vivendi II) et *Biwater c. Tanzanie* (Contre-Mémoire n°1 §§ 57-67).

86.     Les Demanderesses soutiennent qu'en l'espèce, le Décret de résiliation est un acte de puissance publique qui – de manière incidente – a aussi eu pour conséquence une violation de la Convention de concession (Contre-Mémoire n°2 §§ 68-70). Les Demanderesses soulignent que la Défenderesse reconnait elle-même que les Décrets de résiliation et de réquisition sont des actes de puissance publique et pas seulement un acte d'une partie contractuelle (Contre-Mémoire n°2 § 73).

87.     Les Demanderesses expliquent que le litige soumis au Tribunal CIRDI concerne précisément les effets extracontractuels de l'acte de puissance publique constitutif d'une mesure d'expropriation au sens du Code des investissements. Le Tribunal CCJA, quant à lui, est saisi des effets contractuels de ce Décret de résiliation constitutif d'un acte « *entravant le bon fonctionnement des activités concédées* » au sens de l'article 32.5 de la Convention de concession (Contre-Mémoire n°1 §§ 48-49, 78-80,Contre-Mémoire n°2 §§ 82-87).

88.     De plus, les Demanderesses allèguent que le fondement des demandes et l'indemnisation réclamée devant le Tribunal CCJA et le Tribunal CIRDI sont distincts. A ce sujet, les Demanderesses citent le mémoire en demande soumis par Getma International dans la

procédure CCJA, duquel il ressort que les demandes sont fondées sur la violation par le République de son obligation contractuelle de minimiser les effets de tout changement de loi et actes de puissance publique entravant le bon fonctionnement des Activités Concédées. Dans ce même mémoire, Getma International, en outre, indique que les dommages réclamés en sa qualité de concessionnaire correspondent à « *la part de son préjudice qui a été contractualisé aux termes de la Convention de concession* » mais que « *l'indemnisation prévue à l'article 32.3 alinéa 5, ainsi que celle découlant de la violation de l'article 32.5, alinéa 3 de la Convention de concession (cf. Titre 5.5) n'est pas de nature à indemniser Getma International de l'intégralité du préjudice qu'elle a subi en sa qualité d'investisseur évincé par un acte illégal de la puissance publique ayant les effets d'une expropriation* » (Contre-Mémoire n°1 §§ 105-107, Contre-Mémoire n°2 §§ 125-130).

89.     Les Demanderesses ajoutent qu'elles entendent réclamer devant le Tribunal CIRDI une décision de nature à les placer dans la position économique et financière qui aurait été la leur si la Convention de concession s'était poursuivie pour la période totale de 25 ans (*lucrum cessans*). Ce montant sera considérablement plus élevé que le montant demandé, dans les termes strictement contractuels, par Getma International, dans l'arbitrage CCJA (Contre-Mémoire n°1 §§ 72-76, 109, 141-142).

90.     Les Demanderesses précisent finalement que l'indépendance des Tribunaux CCJA et CIRDI, soulignée par la Défenderesse, n'est pas mise en cause et n'est pas pertinente pour résoudre la question de la compétence (Contre-Mémoire n° 1 § 38).

        *v)      Qualité d'investisseur et réalisation d'un investissement*

91.     A titre préliminaire, les Demanderesses notent que la République reconnaît que Getma International et la Convention de concession sont respectivement un investisseur et un investissement. Concernant les autres membres du groupe, les Demanderesses renvoient à leur lettre du 28 octobre 2011 adressée au Secrétariat du CIRDI, et soutiennent que les investissements qu'elles ont respectivement réalisés découlent de : (i) la signature de la Convention de concession et l'actionnariat direct dans la société STCC pour Getma International, (ii) l'activité d'exploitation pour STCC, (iii) la réalisation des travaux d'extension du terminal à conteneurs pour NCT Infrastructure Logistique, (iv) l'actionnariat direct ou indirect dans les entreprises susmentionnées pour NCT Necotrans and Getma International Investissements (Contre-Mémoire n°2 §§ 216-222).

92.     Les Demanderesses précisent que le Code des investissements ne restreint pas son champ d'application à certains types d'investissements. Le Code des investissements ne stipule en effet pas que les litiges soumis à l'arbitrage CIRDI doivent être relatifs à des investissements etne contient pas de définition de la notion d'investissement (l'article 3.2 ne concernant que les « *investissement de capitaux provenant de l'étranger* »). Selon les Demanderesses, il suffit, aux termes de l'article 28 du Code des investissements, que le demandeur soit un investisseur étranger et que le litige soit relatif à l'application et à l'interprétation dudit code, ce qui est le cas en l'espèce (Contre-Mémoire n°2 §§ 230-240).

93.     Finalement, les Demanderesses allèguent qu'elles ont chacune subi un préjudice personnel en relation directe avec les agissements de la République, en leur qualité respective de partie

contractante à la Convention de concession, actionnaire dans les sociétés du groupe, financeur des investissements, concessionnaire, investisseur de premier rang, bailleur de fond de STCC et maître d'ouvrage délégué. Elles précisent toutefois que le bien-fondé des préjudices allégués devra être examiné au stade du fond (Contre-Mémoire n°2 §§ 248-265).

## VIII.   DISCUSSION

### a.   INTRODUCTION – BIFURCATION

94.     Lors de la première réunion de procédure du 30 mars 2012, la Défenderesse ayant annoncé qu'elle entendait contester la compétence du Tribunal arbitral, les Parties se sont accordées sur la bifurcation de la procédure et sur un calendrier procédural qui mettait cette bifurcation en œuvre.

95.     Le Tribunal arbitral est ainsi appelé, à ce stade, à statuer exclusivement sur sa compétence sans se prononcer sur le fond du litige. Toutefois, et comme il apparaîtra ci-dessous, des questions de fond sont ou risquent d'être soulevées à ce stade, pendant l'analyse de la question de savoir si les Demanderesses, et en particulier les deuxième, troisième et quatrième Demanderesses, sont des « investisseurs » ou ont fait des « investissements » au sens du Code des investissements, et la question de la relation entre les clauses matérielles de la Convention de concession et celles du Code des investissements, questions qui surgissent inévitablement dans l'analyse de la compétence de ce Tribunal arbitral.

96.     Les arbitres estiment toutefois que la présente décision sur leur compétence peut et doit être prise en faisant abstraction de ses liens possibles avec le fond du litige. Compte tenu de l'accord des Parties sur la bifurcation, le Tribunal arbitral est, lui aussi, d'avis que sa décision sur la compétence est à prendre indépendamment de toute question de fond. Le Tribunal arbitral adopte donc la décision suivante sur sa compétence, sans préjudice des éventuelles questions de fond sur lesquelles il sera, le cas échéant, appelé à se pencher à un stade ultérieur.

### b.   CLAUSE COMPROMISSOIRE EN TANT QU' « ACCORD CONTRAIRE »

97.     La compétence de ce Tribunal arbitral (si elle existe) repose sur l'article 28 alinéa 2 du Code des investissements cité ci-avant auparagraphe 12. Cette disposition réserve toutefois aux parties en cause le droit de conclure des accords contraires. Par conséquent, le Tribunal arbitral serait dépourvu de compétence s'il s'avérait que les Parties ont conclu un tel « accord contraire ».

98.     Le Tribunal arbitral estime que l'expression « accord contraire » :

a) permet une compétence parallèle: il ne suffit pas de donner à un autre for une compétence pour les mêmes litiges pour que la compétence de l'arbitrage CIRDI soit exclue ;

b) suppose l'expression d'une volonté claire des parties ; et

c) met la charge de la preuve sur la partie qui entend s'en prévaloir.

99.     Il s'agit dès lors de déterminer si l'article 31 de la Convention de concession, sur lequel la Défenderesse fonde son exception d'incompétence, constitue un « accord contraire des parties en cause » au sens de l'article 28 du Code des investissements.

100.    L'article 31 est le premier article du Chapitre 4 de la Convention de concession qui couvre à la fois « *Règlement des différends et litiges, résiliation et indemnisation* ». Il stipule que :

> « *La présente clause survivra à la résiliation de la Convention.*
>
> *Le traité OHADA et ses actes uniformes subséquents s'appliquent à la présente Convention.*
>
> *Tout différend ou litige découlant de la présente Convention ou de ses avenants sera réglé à l'amiable.*
>
> *A défaut d'un règlement amiable dans les 3 (trois) mois suivant la contestation, les Parties pourront recourir à l'arbitrage de la manière stipulée ci-après :*
>
> *Le grief, différend ou litige sera tranché définitivement et irrévocablement aux termes d'une procédure arbitrale soumise au Règlement d'Arbitrage de la Cour Commune de Justice et d'Arbitrage OHADA (le « Règlement d'Arbitrage CCJA »).*
>
> *La commission arbitrale sera composée de 3 (trois) arbitres, l'un désigné par le Concédant, le second par le Concessionnaire, et le troisième d'un commun accord par les deux arbitres. Si une Partie ne nomme pas un arbitre dans un délai de trente (30) jours à compter de la réception d'une demande à cette fin émanant de l'autre Partie, ou si les deux arbitres ne s'accordent pas sur le choix du troisième arbitre dans un délai de trente (30) jours (à compter de la désignation la plus tardive des deux), la Cour Commune de Justice et d'Arbitrage se substituera aux Parties conformément au Règlement d'Arbitrage CCJA.*
>
> *Chacune des Parties supportera le coût de l'arbitre qu'elle désigne. Les autres coûts engendrés par l'arbitrage seront partagés à égalité entre les Parties.*
>
> *L'arbitrage sera conduit en langue française à Abidjan, République de Côte d'Ivoire.*
>
> *L'Autorité Concédante renonce expressément à se prévaloir pour elle-même et pour ses biens de toute immunité souveraine afin de faire échec à l'exécution d'une sentence rendue par une commission arbitrale constituée conformément à la présente clause.* » (ci-après « la Clause compromissoire»).

101.    L' « accord contraire » doit être conclu entre les « parties en cause ». Il n'est pas contesté que la Convention de concession a été conclue entre les parties signataires, à savoir l'Etat guinéen et la première Demanderesse, Getma International. Le Tribunal arbitral se penchera, si nécessaire, sur la question de savoir si les trois autres Demanderesses y sont également parties, après avoir décidé si l'article 31 constitue un « accord contraire » conclu entre l'Etat guinéen et Getma International.

102.    La Clause compromissoire consacre le recours à un tribunal arbitral selon le Règlement OHADA (le « Tribunal CCJA ») pour :

a) tout « différend ou litige » (art. 31, al. 3), voire « le grief, différend ou litige » (art. 31, al. 5), une formule qui paraît large et certainement plus large que « les différends » faisant l'objet de l'article 28.2 du Code des investissements ;

b) « découlant de la présente Convention et de ses avenants ».

103. Selon la Défenderesse, un accord contraire entre les parties « doit conduire à un résultat « contraire » à celui de la désignation du CIRDI comme institution d'arbitrage compétente pour connaître de leur litige d'investissement »[2] (Mémoire n°1 § 23). Elle estime que la Clause compromissoire désigne « irrévocablement » le tribunal CCJA pour tout litige découlant de la Convention et exclut la compétence du CIRDI[3] (Mémoire n°1 § 29).

104. Le Tribunal ne peut pas suivre le raisonnement de la Défenderesse. Pour qu'il y ait accord « contraire », encore faut-il que la Clause compromissoire contenue à l'article 31 de la Convention de concession donne compétence à un tribunal CCJA pour trancher toutes les prétentions que Getma International pourrait déduire du Code des investissements, privant ainsi le tribunal CIRDI de toutes les compétences qu'il aurait sinon de se prononcer à ce sujet.

105. Or, la Clause compromissoire, en donnant compétence au tribunal CCJA (i) n'a ni précisé que cette compétence se substituait à celle du CIRDI, ni explicitement exclu la compétence du CIRDI ; et (ii) n'a pas spécifiquement attribué au tribunal CCJA la compétence de trancher les différends « relatifs à l'application et l'interprétation du Code des investissements ». Or, les différends « découlant de la présente Convention » ne sont *a priori* pas nécessairement les mêmes que ceux « relatifs à l'application et l'interprétation du Code des investissements ».

106. Contrairement à ce que prétend la Défenderesse, le fait que l'ensemble des litiges découlant de la Convention doive être soumis à un tribunal CCJA, quels que soient leur nature ou le fondement juridique invoqué par les parties (Mémoire n°1 § 31), ne démontre pas que la Clause compromissoire s'applique aussi aux (ou à tous les) différends relatifs à l'application et l'interprétation du Code des investissements et exclut la compétence CIRDI. La Défenderesse tente ainsi de faire un amalgame[4] entre les *contract claims* et les *treaty claims* (dont la nature et le fondement différents sont pourtant généralement reconnus par la jurisprudence arbitrale[5]) et nie le fait qu'un même acte peut constituer à la fois une violation

---

[2] Nous soulignons.

[3] Nous soulignons.

[4] Bien qu'elle reconnaît la distinction, puisque, dans son Mémoire n°2 elle postule que la Clause compromissoire inclut non seulement les *contract claims*, mais aussi les *treaty claims* (§§ 17 et svts.).

[5] "*whether there has been a breach of the BIT and whether there has been a breach of contract are different questions. Each of these claims will be determined by reference to its own proper or applicable law(... )*" (*Vivendi c. Argentine*, décision d'annulation, Aff. ARB/97/3, § 96); "*treaty claims are juridically distinct from claims for breach of contract, even where they arise out of the same facts*" (*Bayindir c. Pakistan*, décision sur la compétence, Aff. ARB/03/29, § 148); "*The fact that a breach may give rise to a contract claim does not mean that it cannot also – and separately – give rise to a treaty claim. Even if the two perfectly coincide, they remain analytically distinct, and necessarily require different enquiries*" (*Impregilo c. Pakistan*, décision sur la compétence, 22 avril 2005, Aff. ARB/03/3, § 258).

d'une obligation contractuelle et une violation du Code des investissements, et, le cas échéant, être soumis à deux juridictions différentes.

107. La lecture littérale de l'article 28.2 du Code des investissements, qui ne mentionne que les litiges découlant de la Convention de concession, ne constitue nullement une « interprétation restrictive » comme la Défenderesse le prétend (Mémoire n°2 §§ 35-37).

108. Pour autant que la compétence du Tribunal CIRDI n'ait pas été exclue, ce Tribunal est en principe compétent pour trancher les différends relatifs à l'application et l'interprétation du Code des investissements. Dans la mesure où un acte de l'Etat constituerait à la fois une violation du contrat et une violation du Code des investissements, il y aurait alors compétence parallèle des deux tribunaux. Elle ne serait toutefois pas concurrente, puisque l'objet de la compétence de chaque tribunal dépendrait du fondement juridique respectif de chaque demande, des droits violés, des parties lésées, des préjudices subis et des droits à réparation respectivement sous la Convention de concession, ou le Code des investissements. Le fait que les compétences parallèles puissent mener à un double recouvrement de dommages, n'empêche pas que chaque juridiction sera appelée à exercer sa propre compétence. C'est dans le traitement du fond et en particulier au moment de la vérification de la preuve du dommage, que le double recouvrement devra être évité.

109. Sous la réserve de ce qui est dit dans le sous-chapitre d. ci-après, le Tribunal rejette l'argumentation de la Défenderesse que Getma International aurait irrévocablement choisi le Tribunal CCJA comme tribunal seul compétent en le saisissant en premier lieu. Contrairement à ce que prétend la Défenderesse (Mémoire n°1 § 44), l'emploi du terme « irrévocable » à l'article 31 de la Convention de concession ne signifie pas que le choix de l'arbitrage CCJA exclut toute autre voie judiciaire ou arbitrale. Il ressort clairement du texte de l'article que les termes « irrévocablement » et « définitivement » se rapportent à la façon dont le différend découlant de la Convention sera tranché par le Tribunal CCJA, c.-à-d. sans possibilité d'appel. Le fait que les deux termes soient sans doute des pléonasmes ne permet pas d'interpréter l'un d'eux comme se rapportant à tout autre chose que la décision du tribunal. L'irrévocabilité du choix entre les deux juridictions impliquerait par ailleurs que la compétence des deux tribunaux (OHADA et CIRDI) soit mutuellement exclusive. Or, il n'a pas encore été démontré que la compétence du Tribunal CCJA exclut celle du CIRDI pour les différends relatifs à l'interprétation et l'application du Code des investissements.

110. Pour la même raison, le Tribunal ne peut suivre l'argument de la Défenderesse selon lequel l'article 28.2 du Code des investissements serait comparable à une clause *« fork in the road »*. Cette comparaison tiendrait, selon la Défenderesse, au caractère du choix « exclusif » que le Code offre aux parties (Mémoire n°1 §§ 46-53, et en particulier § 52). Or, jusqu'ici l'analyse des arguments avancés par la Défenderesse ne permet pas de conclure que la Clause compromissoire ait exclu la compétence CIRDI.

### c. Article 32.5 de la Convention de concession

111. La Défenderesse invoque aussi l'article 32.5 de la Convention de concession pour soutenir son argument que la Clause compromissoire CCJA couvre non seulement les *contract claims*

mais aussi les *treaty claims* et exclut donc la compétence CIRDI pour les *treaty claims*.

112.   L'article 32.5 fait partie du même Chapitre 4 (« *Règlement des différends et litiges, résiliation et indemnisation* ») que l'article 31. Le Tribunal arbitral reconnaît que cette circonstance pourrait être pertinente pour l'interprétation de la Clause compromissoire. Cet article stipule :

> « *32.5 Changements de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées*
>
> *Tout acte, décision, ou absence d'acte ou de décision, émanant de l'Etat, des démembrements de l'Etat ou de l'Autorité Concédante de nature constitutionnelle, législative, réglementaire ou autre, ayant pour effet direct ou indirect d'empêcher la bonne exécution de ses obligations par le Concessionnaire (un « Changement de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées »), et notamment :*
>
> (i)    *Retrait, non renouvellement ou non délivrance de tout permis, licence ou autre forme d'autorisation nécessaire à l'exécution de la Convention, à l'exploitation ou à la gestion des Activités Concédées, qui ne soit pas justifié.*
>
> (ii)   *Expropriation, nationalisation, expropriation graduelle et nationalisation graduelle.*
>
> (iii)  *Modification du Code des Investissements et des lois en vigueur.*
>
> (iv)   *Mesures directes et indirectes ayant pour effet de défavoriser le Concessionnaire au profit d'éventuel(s) concurrent(s) du Concessionnaire, ou de favoriser ceux-ci au détriment de celui-là, au Port de Conakry.*
>
> *Le Concessionnaire adressera au Concédant une « Notification préliminaire de Changement de Loi » dans les quinze (15) jours du Changement de Loi (ou dans les quarante-huit (48) heures de la prise de connaissance du Changement de Loi si le Concessionnaire ne pouvait raisonnablement en prendre connaissance au préalable).*
>
> *Le Concédant mettra tout en œuvre pour minimiser les effets de tout Changement de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées.*
>
> *Si, à l'expiration d'un délai de soixante (60) jours, il n'a pas été remédié aux conséquences du Changement de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées de manière satisfaisante pour le Concessionnaire, celui-ci pourra adresser au Concédant et au Comité de Suivi une « Notification Finale de Changement de Loi ».*
>
> *En cas de résiliation consécutive à un Changement de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées », le Concessionnaire percevra les indemnités prévues à l'article 32.3 de la Convention. »*

113.   Cet article contient donc plusieurs dispositions visant des actes qui constituent des violations du Code des investissements tels que :

- le retrait etc…d'une quelconque autorisation qui ne soit pas justifié ;

- l'expropriation et la nationalisation (même graduelle) (art. 5 du Code des investissements) ;

- les mesures défavorisant le concessionnaire au profit de ses éventuels concurrents ou favorisant ceux-ci au détriment de celui-là (art. 6 du Code des investissements).

114.    Par contre, l'acte, visé au sous-paragraphe (iii), consistant à modifier le Code des investissements, ne constitue pas nécessairement une violation de ce Code. Tel est le cas notamment lorsque les garanties dont bénéficie l'investisseur en vertu du premier livre du Code ne sont pas restreintes par ladite modification. L'article 32.5 de la Convention de concession quant à lui ne vise la modification du Code des investissements que dans la mesure où elle a « pour effet direct ou indirect d'empêcher la bonne exécution de ses obligations par le Concessionnaire ».

115.    En outre, les autres dispositions de l'article 32.5 ne concernent pas telles quelles des violations du Code des investissements, mais les visent exclusivement dans la mesure où elles empêchent « la bonne exécution de ses obligations par le concessionnaire ». L'article vise avant tout les obligations du concessionnaire et nullement ses droits. Si un Changement de Loi ou un Acte d'Autorité Publique empêche le concessionnaire de bien exécuter ses *obligations*, l'article 32.5 confère au concessionnaire le droit de résilier la Convention après l'envoi de deux notifications et le respect d'un délai d'attente. Sur ce point, l'article 32.5 s'écarte clairement du Code des Investissements, qui vise le maintien des *droits* du concessionnaire en tant qu'investisseur.

116.    L'article 32.5 utilise aussi le terme « entravant le bon fonctionnement des Activités Concédées ». Les «Activités Concédées » sont toutefois des activités opérationnelles et d'exploitation, définies de façon objective (article 2, ainsi que l'article 6 de la Convention de concession) et ne concernent pas directement les conditions dans lesquelles le concessionnaire doit les exécuter (élément subjectif dans le chef de l'opérateur). Ceci confirme que l'article 32.5 ne se soucie guère de la situation du concessionnaire, sauf à l'autoriser à résilier la Convention de concession avec des conséquences financières prévues dans un autre article (article 32.3) et identiques à celles qui prévalent en cas de résiliation de par la faute du concédant. L'article 32.5 n'établit en effet pas une corrélation stricte entre un Changement de Loi/Acte de la Puissance Publique et la résiliation de la Convention. Même si cela n'est pas explicitement stipulé, il résulte de la procédure de Notifications Préliminaire et Finale prévue à l'article 32.5 que la décision de résilier la Convention consécutivement à un Changement de Loi/Acte de la Puissance Publique appartient <u>au concessionnaire</u>. Seule cette décision crée le droit pour le concessionnaire aux indemnités prévues à l'article 32.3 (qui sont identiques à celles prévues en cas de résiliation pour cause de faute du concédant).

117.    Selon la Défenderesse, (i) l'article 32.5 « introduit le contentieux de l'expropriation dans le champ contractuel » et (ii) la combinaison de cette disposition et de l'article 31[6] (qui soumet

---

[6] Le Tribunal note que la Défenderesse reconnaît ici implicitement que le seul article 31 ne suffit pas pour conclure que la compétence du CIRDI est exclue par l'article 31, conclusion du sous-chapitre b.ci-dessus.

tout litige découlant de la Convention de concession au tribunal CCJA) constituent un accord contraire à la compétence du CIRDI (Mémoire n°2, § 17). Les expropriations étant expressément régies par l'article 32.5 et cette clause se trouvant dans le même chapitre 4 que la Clause compromissoire, la Défenderesse estime que « *cela confirme que les parties ont entendu placer le contentieux de l'expropriation dans le champ de la Clause Compromissoire CCJA* » (Mémoire n°2 § 26).

118.     Le Tribunal accepte que « *l'expropriation et ses conséquences sont expressément régies par l'article 32.5 de la Convention de Concession. Elles entrent donc dans le champ de la Clause Compromissoire CCJA* » (Mémoire n°2 § 31). Toutefois, cela n'est correct que dans la mesure où l'expropriation devient la cause de la résiliation de la Convention et ainsi d'un litige découlant de la Convention. L'article 32.5, tout comme l'article 31, ne couvre donc qu'un aspect particulier de l'expropriation, à savoir la résiliation qui y est consécutive. Elle ne régit pas l'expropriation en soi. Cette distinction a été parfaitement illustrée par l'exemple d'une expropriation partielle donné par les Demanderesses[7]: dans l'hypothèse où l'Etat exproprierait deux grues dans le port de Conakry appartenant à Getma International, sans toutefois entraver la bonne exécution par le concessionnaire de ses obligations ou le bon fonctionnement des Activités Concédées, tant l'article 5 que l'article 28.2 du Code des investissements resteraient applicables.

119.     Ainsi, le Tribunal ne peut pas suivre la Défenderesse quand elle déduit de la constatation citée en début du paragraphe 117 ci-dessus, que les parties « *ont expressément choisi de donner compétence à la CCJA pour les litiges relatifs au Code Guinéen des Investissements* » et qu'elles « *ont entendu retirer ce litige à la compétence du CIRDI* » (Mémoire n°2 §  41). La compétence donnée au Tribunal CCJA concerne les litiges découlant de la Convention, y compris ceux relatifs à la résiliation de la Convention à la suite d'un Changement de Loi ou un Acte de la Puissance Publique qui empêche la bonne exécution par le concessionnaire de ses obligations ou entrave le bon fonctionnement des Activités Concédées. Elle ne couvre cependant rien d'autre.

120.     L'article 32.5 de la Convention instaure un régime particulier de résiliation consécutive à un Changement de Loi ou autre Acte de Puissance Publique applicable sous réserve du respect de certaines conditions de fond (entraver le bon fonctionnement des Activités Concédées et/ou soit[8] avoir pour effet direct ou indirect d'empêcher la bonne exécution de ses obligations par le concessionnaire) et de forme (deux notifications et deux périodes d'attente). Ce régime particulier se distingue du régime applicable à la résiliation de par la faute du concédant (couverte par l'article 32.3 de la Convention) par :

-     Une double notification (Notification Préliminaire de Changement de Loi  et Notification Finale de Changement de Loi), alors qu'en cas de faute purement contractuelle, une seule notification écrite précisant la liste des griefs invoqués est suffisante ;

---

[7] Contre-Mémoire n°2 §§ 147-149.

[8] C'est une question de fond qui ne doit pas être résolue à ce stade, que de savoir si « entraver le bon fonctionnement des Activités Concédées » est la même condition que, ou une condition additionnelle à, ou seulement alternative par rapport à, la condition d' « avoir pour effet direct ou indirect d'empêcher la bonne exécution de ses obligations par le concessionnaire ».

- Un délai de correction fixe de 60 jours, alors qu'en cas de faute purement contractuelle le délai peut être fixé par le concessionnaire lui-même, sans toutefois être inférieur à 60 jours ;

- Le délai de 15 jours à partir du Changement de Loi  (voire de 48 heures de la prise de connaissance du Changement de Loi) pour l'envoi de la Notification Préliminaire, alors qu'aucun délai contraignant n'est prévu en cas de faute purement contractuelle ;

- L'intervention du Comité de Suivi, qui doit également recevoir la Notification Finale de Changement de Loi.

121.    Par contre, l'indemnité contractuellement due en cas de résiliation à la suite d'un Changement de Loi ou d'un Acte de Puissance Publique et celle qui est due en cas de résiliation de par la faute du concédant sont identiques. Ce régime n'est pas illogique : en signant la Convention, l'Etat a reconnu que tout Changement de Loi ou Acte de Puissance Publique, sans même être fautif ou injustifié, autorisait le concessionnaire à résilier la Convention et lui donnait droit à une indemnité identique à celle due en cas de faute du concédant, si, et seulement si, le Changement de Loi ou l'Acte de la Puissance Publiqueentravait le bon fonctionnement des Activités Concédées / ou avait pour effet direct ou indirect d'empêcher la bonne exécution de ses obligations par le concessionnaire.

122.    Les litiges concernant l'application de l'article 32.5, tout comme ceux relatifs aux autres articles de la Convention, sont de toute évidence de la compétence exclusive du Tribunal CCJA.

123.    Le fait pour les parties d'avoir ainsi réglé spécifiquement l'impact que pourrait avoir un Changement de Loi ou Acte de la Puissance Publique sur leur contrat, ne permet pas en soi de soutenir que ce régime contractuel se substitue au régime légal du Code des investissements. L'article 32.5 a son propre objectif contractuel spécifique qui ne peut remplacer un régime légal général. La mention, dans l'article 32.5 de la Convention de concession, de « *tout acte* […] *émanant de l'Etat »*ne peut non plus avoir comme effetde remplacer le Code des investissements. Comme dit ci-avant, ces actes ne sont pris en compte – et ne seront couverts – par la Convention que s'ils ont *« pour effet direct ou indirect d'empêcher la bonne exécution de ses obligations par le Concessionnaire »* ou s'ils entravent « *le bon fonctionnement des Activités Concédées »*. Ce que la Convention règle, ce sont les conséquences de ces actes sur la Convention. Dans la mesure où la résiliation est consécutive à un Acte de la Puissance Publique, l'article 32.5 « contractualise » les *treaty claims*qui, par voie de conséquence, doivent être soumis au Tribunal CCJA conformément à l'article 31 de la Convention.

124.    La question qui demeure alors est de savoir si la Convention règle de façon exhaustive les conséquences des Actes remplissant les conditions de l'article 32.5. La réponse à cette question déterminerait concrètement si le concessionnaire, agissant en sa qualité d'investisseur ou autrement, peut – en cas d'une expropriation conduisant à la résiliation de la Convention – prétendre à d'autres indemnités ou à des indemnités plus élevées que celles prévues à l'article 32.3, et devant quelle juridiction. Il s'agit d'une question de fond qui

devra être résolue par le tribunal saisi des demandes relatives à ces indemnités supplémentaires.

125. Ce Tribunal arbitral conclut donc qu'il y a un « accord contraire » en vertu duquel la compétence du Tribunal CCJA se substitue à celle du CIRDI, mais dont le champ d'application est strictement délimité par les termes de l'article 32.5. Il n'y a donc pas de compétence concurrente du Tribunal CCJA et de ce Tribunal CIRDI pour les demandes basées sur la résiliation de la Convention causée par un Acte de la Puissance Publique, mais tout au plus une compétence complémentaire de ce Tribunal si le concessionnaire estime qu'un Acte de la Puissance Publique constitue une violation du Code des investissements et a entraîné des conséquences dommageables autres que (celles de) la résiliation de la Convention.

### d. LES DEMANDES DE GETMA INTERNATIONAL DANS L'ARBITRAGE CCJA

126. La Défenderesse soutient que le dépôt de la demande d'arbitrage de Getma International devant la CCJA du 10 mai 2011 et la signature du procès-verbal de la réunion du Tribunal CCJA du 12 mars 2012 confirment l'accord des parties d'exclure totalement la compétence CIRDI pour les différends relatifs à l'application et l'interprétation du Code des investissements en vertu de la Clause compromissoire (Mémoire n°1 §§ 54 et suivants).

127. Il convient donc de vérifier si le comportement de la première Demanderesse (i) prouve son accord de substituer la compétence CIRDI dans sa totalité (et pas seulement pour l'Acte de la Puissance Publique qui cause la résiliation de la Convention) par celle du Tribunal CCJA, (ii) peut constituer une renonciation à la compétence CIRDI ou (iii) fait obstacle (« estoppel ») à ce qu'elle nie maintenant avoir accepté la compétence du Tribunal CCJA pour les *treaty claims* qui « découlent de la Convention ».

128. La saisine du Tribunal CCJA ne prouve pas en soi la renonciation de Getma International à la compétence CIRDI. Dans le cas de compétences parallèles, chaque tribunal exerce sa juridiction propre et la saisine préalable de l'une ne prive pas l'autre de sa compétence. En effet, la doctrine de la « *fork in the road* » ne s'applique qu'en cas de compétences concurrentes.

129. En revanche, le fait de soumettre à une juridiction des demandes qui relèvent de la compétence propre de l'autre juridiction pourrait éventuellement constituer une renonciation. A ce sujet, l'exposé fait par la Défenderesse des demandes formulées par Getma International devant le Tribunal CCJA (Mémoire n°1 §§ 54-97 et Mémoire n°2 §§ 44-56) est intéressant. Il apparaît en effet que la demande d'arbitrage introduite le 10 mai 2011 par Getma International devant le Tribunal CCJA ne portait pas seulement sur les dommages contractuels tels que définis à l'article 32.3 de la Convention de concession. Getma International a notamment demandé au Tribunal CCJA de condamner la Défenderesse au paiement, non seulement du « préjudice contractuel » (para. 3.3.1) comprenant les quatre indemnités mentionnées à l'article 32.3, mais aussi au « préjudice complémentaire », comprenant, en sus d'une indemnisation pour atteinte à sa réputation, « *une indemnité égale à la perte des bénéfices qu'il pouvait légitimement escompter pour toute la durée de la Convention de la concession* » (para.3.3.2) (Pièce R-9). Le Tribunal note que Getma

International fonde cette demande sur l'article 104, alinéa 2 du Code des Marchés Publics de la République de Guinée.

130.   Il est remarquable que, nonobstant ce langage très clair, les Demanderesses allèguent catégoriquement, dans leur Contre-Mémoire n°1, que, « *dans l'arbitrage CCJA – contractuel – Getma n'a notamment pas demandé la réparation du lucrum cessans qui fait indiscutablement partie du préjudice subi par les investisseurs expropriés*[…] » (§ 109).

131.   Les demandes formulées dans la demande d'arbitrage CCJA ont encore été élargies ultérieurement, notamment dans le procès-verbal de la réunion des parties avec le Tribunal CCJA du 12 mars 2012 (aussi appelé « compromis d'arbitrage CCJA »). A ce stade, Getma International entendait voir condamner la Défenderesse au payement des indemnités suivantes, dûment quantifiées :

« - *20.894.966 € au titre de l'indemnité forfaitaire de résiliation ;*

- *2.508.214,00 € au titre de l'indemnité de résiliation ;*

- *14.201.096,00 € au titre de l'indemnité égale au montant non amorti du ticket d'entrée ;*

- *13.606.721,00 € au titre de l'indemnité due au titre des biens propres réquisitionnés*[9] *;*

- *1.361.305,00 € au titre de l'indemnité due au titre des frais d'établissement et de constitution ;*

- *110.557,00 € au titre de l'indemnité due à des contrats en cours ;*

- *806.959,00 € au titre de l'indemnité due à la non perception de l'actif net réalisable ;*

- *87.124,00 € au titre de l'indemnité due au titre des frais de rapatriement du personnel ;*

- *279.863,00 € au titre de l'indemnité due au titre des dépenses liées à la gestion de crise ;*

- *Une indemnité, à quantifier, au titre du préjudice complémentaire*[10] *visé au § 3.3.2 de la demande d'arbitrage ;*

- *Les intérêts au taux légal sur toutes les sommes précédentes à compter de la Notification Préliminaire de Changement de Loi* »(Pièce R-10, p.16).


132.   Parmi cette liste, seuls les trois premiers postes se rapportent clairement aux indemnités contractuelles prévues à l'article 32.3 de la Convention ; le 6ème et le 8ème postes pourraient représenter le quatrième dommage contractuel prévu à l'article 32.3, à savoir *« le montant des éventuelles indemnités de licenciement dont le concessionnaire serait redevable vis-à-vis de son personnel »*. Le « préjudice complémentaire » y est encore réclamé, mais,

---

[9] Nous soulignons.

[10] Nous soulignons.

une fois de plus, sans être chiffré. Parmi les autres postes nouveaux, un attire particulièrement l'attention : le montant de 13.606.721,00 €, réclamé « *au titre de l'indemnité due au titre des biens propres réquisitionnés* ».

133. Même si tous les autres nouveaux postes, tout comme le préjudice complémentaire, pourraient être considérés comme des dommages contractuels (nonobstant le fait qu'ils ne soient pas compris dans les indemnités forfaitairement fixées à l'article 32.3 de la Convention), l'indemnité pour les biens réquisitionnés est quant à elle clairement en dehors du champ d'application contractuel et constitue sans aucun doute une demande d'investisseur basée sur les garanties contenues dans l'article 5 du Code des investissements[11].

134. Le comportement initial de Getma International pourrait ainsi mener à conclure que cette dernière a reconnu ou accepté la compétence du Tribunal CCJA, même pour des *treaty claims* qui ne sont pas explicitement visés par l'article 32.5 de la Convention de concession ou,alternativement, a renoncé à la compétence du CIRDI pour ceux-ci. Les Demanderesses contestent toutefois cette conclusion.

135. Tout d'abord, elles mettent l'accent sur une lettre envoyée par Getma International au Président guinéenle 24 mai 2011 pour confirmer son consentement de soumettre à l'arbitrage CIRDI les différends existant avec l'Etat concernant l'application et l'interprétation du Code des investissements et pour accepter l'offre d'arbitrage réalisée par l'Etat dans l'article 28 du Code des investissements (Pièce C-6). Le Tribunal estime, avec la Défenderesse, que la simple acceptation de l'offre, sans pour autant formuler la moindre demande et sans même référer à l' « expropriation » (datant pourtant du 8 mars 2011 et notifiée formellement à Getma le 18 mars 2012) ne peut pas être considérée comme une saisine du CIRDI. Les Demanderesses l'ont par ailleurs implicitement reconnu en affirmant que : « *Le document n° C-6 est un document très standard. Il a comme objectif de ne plus permettre à la République de Guinée de retirer son offre qui est dans le Code des investissements* » (PV d'audience sur la compétence CIRDI, p. 54, lignes 24-26). Le Tribunal estime en outre que, puisque la compétence du Tribunal CCJA pour les *treaty claims* est limitée à ceux qui tombent sous l'article 32.5, laissant ainsi une compétence complémentaire au CIRDI, la Défenderesse n'avait aucune raison de protester contre l'acceptation de principe de l'offre d'arbitrage CIRDI.

136. Deuxièmement, dans leur Contre-Mémoire n°2, les Demanderesses se distancient de leurs demandes d'indemnités pour le préjudice complémentaire et les biens propres réquisitionnés. Elles ne répondent pas à l'argument développé par la Défenderesse dans son Mémoire n°2 (§§ 44 - 56) selon lequel Getma International aurait soumis ses *treaty claims* au Tribunal CCJA dans sa demande d'arbitrage CCJA et dans le compromis d'arbitrage CCJA. Les Demanderesses démentent avoir saisi le Tribunal CCJA pour le *lucrum cessans* et l'indemnisation pour la réquisition, non seulement par leur silence sur ce qu'en disent la

---

[11] Article 5 du Code des investissements : « *L'Etat guinéen ne prend aucune mesure d'expropriation ou nationalisation des investissements réalisés par les personnes ou les entreprises sous réserve des cas d'utilité publique constatés dans les conditions prévu[e]s par la loi. Dans le cas d'utilité publique, les mesures d'expropriation ne doivent pas être discriminatoires et doivent prévoir une juste et adéquate réparation dont le montant sera déterminé selon les règles et pratiques habituelles du droit international* ».

demande en arbitrage CCJA et le compromis CCJA, mais aussi par le fait qu'elles nient explicitement avoir présenté une *treaty claim* : *« Tout d'abord, il importe de rappeler que, même si Getma International avait présenté un treaty claim auprès du Tribunal arbitral CCJA – <u>ce qui n'est pas le cas</u>[12] – cela ne signifierait pas que le Tribunal CCJA soit nécessairement compétent pour trancher ce même claim »* (§ 125). Elles s'appuient exclusivement sur le Mémoire présenté par Getma International dans le cadre de l'arbitrage CCJA (Pièce R-6) et reprochent à la Défenderesse de ne pas se référer à ce Mémoire dans ses mémoires sur la compétence déposés dans le cadre du présent arbitrage CIRDI. Elles renvoient (§ 129) en particulier au paragraphe 571 du Mémoire CCJA selon lequel *« malgré son obligation contractuelle, l'Etat guinéen non seulement n'a pas cru devoir minimiser le préjudice qu'il causait volontairement à Getma International. Bien pire, il a préféré réquisitionner l'ensemble des actifs, biens et salariésde Getma International par la force des armes ».*Elles concluent (au § 130) que le fondement juridique de cette demande d'indemnisation est la violation de l'art. 32.5 de la Convention de concession, qui stipule que*« [l]e Concédant mettra tout en œuvre pour minimiser les effets de tout Changement de Loi et Actes de la Puissance Publique entravant le bon fonctionnement des Activités Concédées ».*

137.   Afin de bien comprendre le changement de position des Demanderesses que celles-ci tentent de nier -à tort selon ce Tribunal-, il est important de rappeler la chronologiedes faits et actes de procédure pertinents :

-   8 mars 2011 : Décret de résiliation appris par Getma par la télévision (et formellement communiqué le 18 mars 2011)

-   9 mars 2011 : Notification Préliminaire par Getma, en référence à l'article 32.5, d'un Changement de Loi

-   9 mars 2011 : Décret de réquisition

-   9 mai 2011 : Notification Finale par Getma

-   10 mai 2011 : demande d'arbitrage CCJA de Getma, s'appuyant sur l'article 32.5 de la Convention et visant, outre le préjudice contractuel, aussi le préjudice complémentaire (comprenant le *lucrum cessans*) (pièce R-9)

-   24 mai 2011 : lettre acceptant l'offre d'arbitrage CIRDI dans l'article 28.2 du Code des investissements (Pièce C-6)

-   22 juin 2011 : Décret levant la réquisition des actifs de Getma (Pièce C-26)

-   29 septembre 2011 : demande d'arbitrage CIRDI demandant une juste et adéquate indemnisation – qui n'est pas quantifiée – pour violation des articles 5, 6 et 7 du Codes des investissements

---

[12] Nous soulignons.

-   12 mars 2012 : compromis (PV) d'arbitrage CCJA, comprenant 13,6 Mio€ pour les biens réquisitionnés et une indemnité non quantifiée pour le préjudice complémentaire (Pièce R-10)

-   30 mars 2012 : PV de la première session de ce Tribunal CIRDI

-   15 juin 2012 : Mémoire CCJA présentant l'indemnité (fortement réduite) pour les biens réquisitionnés comme une indemnité pour la violation d'un devoir contractuel et ne réclamant plus le *lucrum cessans* (Pièce R-6)

-   22 juin 2012 : premier Mémoire sur la Compétence dans l'arbitrage CIRDI,de la Défenderesse

-   13 juillet 2012 : premier Contre-Mémoire sur la Compétence dans l'arbitrage CIRDI, des Demanderesses.

138.   Le Tribunal arbitral constate que c'est seulement après la première session de ce Tribunal que les Demanderesses ont enlevé de leur demande au Tribunal CCJA les indemnités pour le *lucrum cessans* et pour les biens réquisitionnés

139.   En effet, le Mémoire CCJA contient, à sa page 119, en conclusion la demande de condamner la Défenderesse au paiement d'un montant total de 42.245.208 € pour les postes suivants (Pièce R-6) :

-   *Indemnité Forfaitaire de Résiliation :*          *20.884.966 €*

-   *Indemnité de Résiliation :*          *4.189.140 €*

-   *Indemnité au titre du Ticket d'Entrée :*          *14.201.096 €*

-   *Indemnité liée au personnel rapatrié :*          *172.874 €*

-   *Indemnité relative aux factures à émettre :*          *589.418 €*

-   *Indemnité relative aux biens restitués :*          *1.974.885 €*

-   *Indemnité relative aux contrats non résiliés :*          *187.995 €*

-   *Indemnité relative aux frais de gestion de crise :*          *258.834 €*

140.   Ces chefs de demande sont à première vue semblables à ceux repris dans le compromis d'arbitrage CCJA[13] (même s'il y a plusieurs différences, pas seulement dans les montants, mais aussi dans leurs libellés). Toutefois, le montant total des demandes n'est plus 53.856.805 € (comme dans le compromis d'arbitrage CCJA), mais réduit à 42.459.208 €. Il n'y a plus de demande d' « indemnité complémentaire » (*lucrumcessans*). En plus, la liste ne contient plus « *l'indemnité due au titre des biens propres réquisitionnés* » pour un montant de 13.606.721,00 €, mais « *une indemnité relative aux biens réquisitionnés* » d'un montant de 1.974.885 €.   Aux paragraphes 568-572, elle présente cette demande d'indemnité relative

---

[13]Voir § 131 ci-dessus.

aux biens réquisitionnés comme basée sur une violation du devoir contractuel de la Défenderesse de minimiser, après la réception d'une Notification Préliminaire, les effets de tout Changement de Loi et Actes de de la Puissance Publique. Dans les paragraphes 590 à 623 du même Mémoire CCJA, Getma International explique alors qu'à la suite du Décret de réquisition du 9 mars 2011, son matériel d'exploitation et ses stocks ont été rendus indisponibles et « *n'ont été restitués que par la suite* », par un nouveau décret, en date du 22 juin 2011, aux fins de lever la réquisition de ces actifs[14]. Les frais portés en compte concernent alors le rapatriement et la remise en état du matériel.

141.   Cette présentation nouvelle des faits et des demandes mène au constat que, au moins dans le Mémoire CCJA il n'y a plus, à l'heure actuelle, des demandes qui pourraient être considérées comme des *treaty claims*.

142.   Lors de l'audience sur la compétence de ce Tribunal à Paris, le 28 septembre 2012, un des conseils des Demanderesses a spécifié que « [d]*ans le Mémoire*[CCJA] [...]*pièce R-6*[...]*, les préjudices sont cette fois-ci précisés et quantifiés ; c'est le paragraphe 645.Dans l'ensemble de ces préjudices, pas un seul ne concerne la perte du revenu futur[15]....En revanche, dans la demande d'arbitrage devant votre Tribunal, la question, qui est antérieure au Mémoire en demande devant la CCJA, est extrêmement précise. Même si la quantification n'est pas encore à ce stade effectuée,*[...]. » (PV d'audience sur la compétence CIRDI, p.58, ligne 26 – p.59, ligne 3).

143.   Le Tribunal a alors cherché la confirmation du changement de position de Getma International dans l'arbitrage CCJA :

« ***M. le Pr P. Tercier****.- [...] dans l'état actuel de la procédure CCJA, vous n'avez plus de demande fondée sur la violation du Code ...d'investissements ?*

***Me C. Fischer****.- C'est parfaitement exact. Une nuance, ce n'est pas « plus », il n'y en a pas[16]. À mon sens, il n'y en a jamais eu de façon expresse et claire.*

***M. le Pr P. Tercier****.- [...] il y avait à la fin le renvoi au chiffre 332 dont on comprenait [...]que c'était un préjudice qui découlait cette fois de la violation de l'Article 5, de l'Article 6 et de l'Article 7 du Code [minier].*

*Est-ce que c'est la modification de votre position ?*

***Me C. Fischer****.- La référence que j'ai faite aux Articles 5, 6 et 7 du Code des investissements, c'est bien dans la demande d'arbitrage CIRDI.*

***M. le Pr P. Tercier****.- D'accord. Ma question est évidemment : au CCJA, vous n'avez plus de demande fondée ?*

---

[14]Ce Décret de levée de la réquisition est aussi mentionné à la page 12 de la demande d'arbitrage CIRDI.

[15] Nous soulignons.

[16]Nous soulignons.

*Me C. Fischer.- <u>Non, il n'y en a plus</u>.*[17]

**M. le Pr P. Tercier**.- *Il n'y en a plus, pour répondre en plus, parce qu'il y en avait, si je peux me permettre, dans un premier temps ; est-ce exact ?*

*Me C. Fischer.- Non, ce n'est pas notre compréhension des choses.*[18] » (PV d'audience sur la compétence CIRDI, p.60, ligne 8 –26).

144. Plus tard, un autre conseil des Demanderesses a déclaré dans le même sens :

> « **Me J. M. Júdice**.- [….] *ma conviction la plus forte c'est dans le sens que nous avons utilisé d'une façon explicite les critères de l'Article 32.3 et pas d'autres critères. <u>Nous n'avons pas demandé lucrumcessans</u>*[19]... » (PV d'audience sur la compétence CIRDI, p.62, lignes 25-27).

145. La question relative à ce que le Tribunal ne pouvait que considérer comme un changement de position de Getma International – mais que ses conseils étaient réticents à reconnaître – est toutefois revenue sur la table en relation avec l'indemnité de 13,6 Mio€ due au titre de biens réquisitionnés demandée dans le compromis d'arbitrage CCJA, mais plus dans le Mémoire CCJA du 15 juin 2012. A ce moment, les Demanderesses ont reconnu la modification de la demande et l'ont expliquée comme suit:

> « **Me C. Fischer**.- [….] *Deuxième point, pourquoi avons-nous glissé, évolué comme vous le disiez ? C'est parfaitement exact, car la question qui se posait à nous était de savoir si l'indemnité forfaitaire prévue par la Convention de concession était nécessairement, dans le cadre contractuel, limitée et est-ce que l'on pouvait solliciter une somme supérieure ou pas ? En d'autres termes, pouvait-on, au titre de la Convention de concession, considérer que le dommage contractuellement fixé épuisait tout le préjudice dont on pouvait solliciter indemnisation au titre de la Convention de concession ? »*(PV d'audience sur la compétence CIRDI, p.69, lignes 20-27).

146. Le Tribunal estime qu'il ne peut pas se contenter de cette réponse. Il est clair que Getma International a initialement bel et bien envisagé de porter devant le Tribunal CCJA toutes ses demandes découlant tant de la résiliation que de la réquisition, y compris pour une indemnité pour son *lucrum cessans* et pour une indemnité substantielle pour les biens réquisitionnés. L'idée de baser certaines des demandes sur le Code des investissements et de les réclamer devant un tribunal CIRDI était un deuxième réflexe. Elle n'a toutefois pas été suivie de façon conséquente :

(i) la demande d'arbitrage CIRDI du 29 septembre 2011 dont est saisi ce Tribunal est – à l'exception de (i) la description des faits, qui est pratiquement identique à celle de la

---

[17]Nous soulignons.

[18]Nous soulignons.

[19]Nous soulignons.

demande d'arbitrage CCJA et (ii) du fondement juridique[20] – fort vague et ne quantifie nullement le préjudice mais prévoit de le déterminer « au moment approprié de cette procédure » (p.22, b), laissant ainsi toujours planer un doute sur ce qui est demandé dans chacune des deux procédures et ;

(ii)   même après le dépôt de la demande d'arbitrage CIRDI, Getma International a encore signé, le 12 mars 2012, un procès-verbal/compromis d'arbitrage CCJA qui couvre explicitement une demande d'indemnisation pour son *lucrum cessans* et pour les biens réquisitionnés. Ce n'est que dans son Mémoire CCJA du 15 juin 2012, soit six semaines après la première session de ce Tribunal CIRDI, que Getma International semble[21] avoir réduit sa demande aux chefs de demande qu'elle considère « contractuels ».

147.   L'évolution dans la stratégie procédurale des Demanderesses n'empêche toutefois pas que ce Tribunal doit déterminer l'intention commune des parties au moment de la conclusion de la Convention de concession et que cette intention, si elle n'a pas été explicitée, peut aussi se déduire de l'exécution que les parties ont donnée au contrat. Alors devient pertinent le fait que Getma International a inclus, dans sa demande d'arbitrage CCJA, des demandes qui n'étaient pas « strictement contractuelles » dans le sens qu'elles dépassaient ce que l'article 32.3 prévoyait, mais dont plusieurs (les indemnités pour le préjudice du *lucrum cessans*, pour atteinte à la réputation et pour biens réquisitionnés) pouvaient être, selon leur fondement, contractuelles ou basées sur le Code des investissements.

148.   Si la demande du *lucrum cessans* ne figure plus dans le Mémoire CCJA du 15 juin 2012, la question se pose de savoir si le Tribunal CCJA en est toujours saisi. Selon le conseil de la Défenderesse, le compromis d'arbitrage définit le périmètre de la mission du Tribunal CCJA et il importe peu que Getma ait modifié sa position dans son Mémoire (PV d'audience sur la compétence CIRDI, p. 63, lignes 6-12). Ce Tribunal estime que la question relève du Tribunal CCJA, seul compétent pour décider de l'étendue de sa saisine, d'autant plus que la Défenderesse n'a pas accepté l'abandon ou la renonciation de Getma International à la compétence CCJA pour le *lucrum cessans* et la réquisition de biens. Ce Tribunal doit donc accepter comme un fait la saisine initiale du Tribunal CCJA pour les indemnités pour le *lucrum cessans* comme pour la réquisition de biens.

149.   Ce Tribunal a essayé au cours de son audience sur la compétence, le 28 septembre 2012, de clarifier les positions respectives des Parties. Il a spécifiquement interrogé les Demanderesses sur l'interprétation juridique à donner à la limitation de leurs demandes dans le Mémoire CCJA et en particulier si les demandes qui n'y figuraient plus avaient été abandonnées devant le Tribunal CCJA et si cette renonciation était alors explicite et définitive (PV d'audience sur la compétence CIRDI, p.68, lignes 24 - 31).

150.   En réponse, les Demanderesses ont reconnu que « [n]*otre analyse* […] *a évolué et nous avons considéré que, au titre de la Convention de concession, il y avait un préjudice que*

---

[20]  Qui, en résumé, consiste à dire que la résiliation du contrat était discriminatoire, a produit des effets comparables à ceux d'une expropriation (p. 14) et représente un acte de puissance publique et pas seulement une simple exécution ou violation contractuelle (p. 15 et 16).

[21]  Etant entendu que ce Tribunal n'a pas à se prononcer sur la nature des demandes devant le Tribunal CCJA et en a d'ailleurs pas non plus les moyens.

*avait été contractualisé et que, sur le fondement de la Convention de concession, nous n'avions pas les moyens de demander, au titre de la perte du contrat, des profits futurs. […] Les choses sont aujourd'hui très claires, à défaut qu'elles l'aient été auparavant, devant la CCJA : nous ne demandons pas et nous ne demandons plus, si l'on veut considérer que l'on a formulé une demande […] les profits futurs. Il a été considéré contractuellement que le préjudice de la perte du contrat […]n'était pas un nombre d'années de résultat, mais forfaitisé à une année de chiffre d'affaires »* (PV d'audience sur la compétence CIRDI, p. 69, ligne 28 –p.70, ligne 20).

151.   Il convient alors de déterminer ce que les Demanderesses demandent à ce Tribunal. L'analyse de la demande portée devant ce Tribunal révèle que les Demanderesses estiment que:

   i.   En ayant agi de manière unilatérale, l'Etat guinéen a violé les standards auxquels il s'était obligé par l'intermédiaire du Code des investissements, notamment en matière d'expropriation, soit les règles les plus consolidées du droit international coutumier (p.13, 3ème al.) ;

   ii.   Que la décision de résiliation du contrat, dans les termes où elle a été effectuée, a été discriminatoire dans la mesure où elle ne pouvait pas être appliquée à un investisseur de Guinée (p.14, 1er al.) ;

   iii.   Que la résiliation a produit des effets comparables à ceux d'une expropriation (p.14, 4ème al.) ;

   iv.   Que la résiliation du contrat par le Président représente un acte de puissance publique p.15, 4ème al.) et dépasse le cadre de l'exécution du contrat parce que :

      1.   L'Etat est représenté dans le contrat par le Ministre du Transport ;

      2.   Les formalités préalables pour une résiliation contractuelle pour faute du concessionnaire, comme p.ex. une mise en demeure et un délai de correction de 60 jours, n'ont pas été remplies (p.17) ;

   v.   Que la réquisition a également produit des effets équivalents à ceux d'une expropriation, parce qu'aucun type d'indemnisation n'est prévu (p.17) ;

   vi.   Que les deux Décrets constituent des actes de *jus imperii*et pas seulement des actes réalisés en vertu d'un contrat en vigueur (p.17, dernier paragraphe).

152.   *Prima facie* ce Tribunal est compétent pour les demandes ainsi formulées, sous réserve des demandes que les parties à la Convention de concession ont exclues de la compétence CIRDI par leur accord contraire, conformément à l'article 28.2 du Code des investissements. Le champ d'application de la compétence de ce Tribunal ne comprend donc pas les litiges découlant de la Convention de concession, y compris sa résiliation, même à la suite d'un Acte de la Puissance Publique. Lesarticles 32.5 et 31 de la Convention de concession s'imposent en effet également à ce Tribunal. Ce ne sera toutefois qu'au moment de l'analyse des demandes précises des Demanderesses, de leur fondement juridique, de leur causes

factuelles et des dommages-intérêts que ce Tribunal pourra déterminer si et dans quelle mesure sa compétence complémentaire à celle du Tribunal CCJA peut effectivement être mis en œuvre pour décider d'une indemnité « complémentaire » pour un préjudice « complémentaire », qui sortirait de la compétence du Tribunal CCJA.

**e.  L'ACCORD CONTRAIRE DES 2EME, 3EME ET 4EME DEMANDERESSES.**

153.    Ce Tribunal doit ensuite déterminer quelles sont les parties liées par la Clause compromissoire. Pour ce faire, il ne suffit pas de constater que les deuxième, troisième et quatrième Demanderesses appartiennent toutes au même groupe de sociétés et qu'elles ont des dirigeants communs. Pour apprécier si ces trois autres Demanderesses ont bel et bien eu la volonté d'être liées par la Clause compromissoire, il convient d'examiner leur rôle respectif lors de la négociation, la conclusion et l'exécution de la Convention de concession. C'est ce que ce Tribunal fera dans un premier temps.

*(i)        La signature de la Convention de concession par NCT Necotrans*

154.    Il n'est pas contesté que seule Getma International a signé la Convention de concession. Selon l'introduction et la page de signature (p. 27)de la Convention de Concession, Getma International était représentée, à la conclusion de la Convention, par son Président, la société NCT Necotrans, elle-même représentée par Monsieur Richard Talboten sa qualité de Président du Conseil d'Administration de NCT Necotrans. La représentation de Getma International par son Président semble régulière[22] et ne permet nullement d'en déduire une volonté de NCT Necotrans d'être en son propre nom impliquée dans la Convention de concession. Même si l'article 15 des statuts de Getma International prévoit que *« le président* [c.-à-d. NCT Necotrans] *est investi en toute circonstance de tous les pouvoirs nécessaires pour représenter et diriger la société »*, ce pouvoir n'est qu'un pouvoir de représentation et de gestion *« [à] l'égard des tiers »*[23] et ne permet pas de conclure qu'il y a identité ou confusion entre les deux sociétés.

155.    Si la signature par Monsieur Talbot implique l'accord de la société NCT Necotrans(dont il était un mandataire social) avec la conclusion du contrat par sa filiale Getma International, cela ne signifie toujours pas que NCT Necotrans, bien qu'actionnaire de Getma International, soit elle-même liée par le contrat (comme la Défenderesse le prétend dans son Mémoire n°2 §66).

---

[22]Selon l'article 12 des statuts : « *La société est représentée, gérée et administrée par un président, personne morale ou personne physique, de nationalité française ou étrangère, actionnaire ou non de la société.*
*Le président personne morale est représenté par ses mandataires sociaux ou par un représentant spécialement désigné à cet effet.* » (Pièce R-12).
Selon l'extrait du registre du commerce et des sociétés au 12 septembre 2011 relatif à Getma International, le Président de Getma International était NCT-Necotrans (Pièce C-1).
Le Tribunal constate que, selon l'immatriculation au registre du commerce et des sociétés au 13 mai 2011 de NCT Necotrans, Monsieur Richard Talbot était à ce moment le Président du Conseil de Surveillance, alors que le Président du Directoire était Monsieur Gregory Quérel (Pièce C-2). Ceci ne permet toutefois pas de conclure que le 22 septembre 2008, le titre utilisé par Monsieur Talbot n'était pas correct (ce qu'aucune Partie n'a d'ailleurs soulevé). De toute façon, l'un et l'autre était un « mandataire social » de NCT Necotrans Ce qui semble suffire aux termes de l'article 12 des statuts de Getma International.

[23] La Défenderesse omet de citer ces mots importants au § 60 de son Mémoire n°2.

156.   De même, le fait que ce soit le Président du directoire de NCT Necotrans, Monsieur Quérel, qui ait signé pour NCT Necotrans agissant en qualité de Président de Getma International le mandat spécial aux cabinets Fischer et Júdice pour représenter Getma International dans l'arbitrage CCJA (Pièce R-14), ne signifie nullement que ce mandat ait été donné par NCT Necotrans, et encore moins que celle-cisoit ainsi devenue partie au contrat, voire à la procédure. Il n'y a aucun doute que NCT Necotrans a, dans tous ces actes, agi comme Président de Getma International.

157.   Il apparaît que la société NCT Necotrans est le président du Conseil d'administration, non seulement de Getma International (Pièce C-1), mais aussi de Getma International Investissements (Pièce C-3). La signature du président de NCT Necotrans peut donc, selon le cas, lier cette société-même ou une deses sociétés filiales dont NCT Necotrans est le représentant légal. Il convient donc de vérifier chaque fois en quelle qualité NCT Necotrans a apposé sa signature. Il n'est pas prouvé que NCT Necotrans a apposé sa signature dans une autre qualité que comme Président de Getma International.

*(ii)   Adresse commune*

158.   On constate en outre que NCT Necotrans, Getma International, Getma International Investissements et NCT Infrastructure & Logistique ont toutes les quatre leur siège respectif à la même adresse (66, rue Pierre Charron, 75008 Paris).

159.   Cette même adresse, tout comme les doublures de fonctions, sont susceptibles de créer une certaine confusion entre les différentes sociétés.Toutefois, elles n'autorisent pas à méconnaître les identités distinctes de ces diverses personnes morales et à confondre les droits et obligations des unes avec ceux des autres. Les tiers sont tenus de reconnaître l'identité propre de chaque société, à moins que les sociétés elles-mêmes ne la respectent pas et créent une confusion à ce sujet.

*(iii)   Le rôle du directeur juridique de NCT Necotrans dans l'arbitrage CCJA*

160.   La Défenderesse invoque aussi la participation directe de Monsieur Jean-Daniel Littler, directeur juridique de NCT Necotrans, à l'arbitrage CCJA, et en particulier sa présence à l'audience du 12 mars 2012, ainsi que la signature du Compromis d'arbitrage CCJA par ce dernier (Mémoire n° 2 § 74).

161.   Monsieur Littler était certes présent, mais l'était clairement au titre de « Directeur juridique NCT Necotrans » (Pièce R-10, dernière page). La seule présence d'un directeur juridique de la société holding d'un groupe ne permet pas de conclure qu'il représentait à cette audience une ou plusieurs sociétés non parties à la procédure. Il est d'usage qu'une société mère fournisse des services (*e.a.* juridiques) à ses sociétés filiales[24]. Le procès-verbal n'indique nulle part que Monsieur Littler était présent dans une autre capacité que celle de directeur juridique du groupe (et donc aussi de Getma International), par exemple en tant que représentant légal de NCT Necotrans. Monsieur Littler a aussi signé le procès-verbal de l'audience (Pièce R-10), mais il était bien précisé à la page 1 du procès-verbal qu'il était

---

[24]Cfr. Aussi la présence de Monsieur Littler à l'audience de ce Tribunal du 30 mars 2012.

(présent en tant que) « Directeur Juridique NTC [sic] Necotrans ».

162.   Le Tribunal conclut que la seule signature du procès-verbalpar Monsieur Littler n'engage pas davantage NCT Necotrans que sa présence à l'audience.

*(iv)   La signature par Monsieur Abdel Aziz Thiam*

163.   La présidence de NCT Infrastructure & Logistique par Monsieur Abdel Aziz Thiam, qui est également Vice-Président du conseil de surveillance NCT Necotrans (Pièce C-4), ne suffit pas non plus en soi pour conclure que ces deux sociétés sont liées par les contrats conclus par Getma International.

164.   Monsieur Abdel Aziz Thiam a co-signé (avec Monsieur Richard Talbot) l'Avenant n°1 à la Convention de concession. Etant à la fois président du conseil d'administration de la société d'exploitation STCC et président du conseil d'administration de NCT Infrastructure & Logistique, il est toutefois clair qu'il a signé cet Avenant dans sa capacité de mandataire social de la STCC : sa signature prouve que la société d'exploitation a « lu et approuvé » (comme indiqué au-dessus de sa signature) l'Avenant n°1 auquel seuls Getma International et l'Etat Guinéen étaient parties. L'Avenant n°1 rappelle dans son exposé introductif que la société d'exploitation était (conformément à la Convention de concession) le « Mandataire du Concessionnaire ». C'est en tant que mandataire contractuel qu'elle était présente à la signature de l'Avenant, tout comme le Port Autonome de Conakry qui était là comme « Mandataire du Concédant ». Aucun de ces mandataires n'était toutefois partie à l'Avenant n°1.

*(v)   Les négociateurs de la Convention de concession*

165.   La Défenderesse tire également un argument du fait que Monsieur Abdel Aziz Thiam a aussi dirigé l'équipe de négociation de Getma International, comme confirmé par Getma International dans son Mémoire en demande devant la CCJA (Pièce R-6 § 161). Getma International a toutefois spécifié que ce même Monsieur Aziz Thiamest devenu par la suite président du conseil d'administration de la Société d'Exploitation (« STCC ») qui devait être constituée conformément aux obligations découlant de l'article 7.1 de la Convention de concession. Le Tribunal arbitral considère qu'il est tout à fait normal que la personne destinée à diriger la société d'exploitation et possédant les connaissances techniques relatives aux opérations de concession soit un membre, voire même le dirigeant de l'équipe de négociation. On ne peut déduire de sa seule présence dans l'équipe que la future société d'exploitation ou NCT Necotrans envisageait d'être liée par le contrat.

166.   Il en est de même pour le directeur juridique et le directeur juridique adjoint du groupe NCT Necotrans qui faisaient également partie de l'équipe de négociation du contrat. Si NCT Necotrans délègue ses directeurs juridiques à la négociation, cela n'implique pas nécessairement que ces personnes représentent leur employeur dans ces négociations. Comme déjà relevé ci-avant, ces personnes ont participé aux négociations en tant que juristes du groupe dont les services juridiques peuvent être rendues à toutes les sociétés du groupe sur base d'accords de services intergroupes. Dans un tel cas,ces services concernent desprestations purement intellectuelles et ne peuvent être confondus avec un mandat de représentation de leur employeur.

167.     « Monsieur Michel Kerambrun, expert portuaire intervenant pour le compte de la filiale NCT Infrastructure & Logistique » et « Monsieur Jean de Montmarin, chargé de projet au sein de NCT Infrastructure & Logistique » (Mémoire en demande devant le Tribunal CCJA § 162 et Pièce C-11 p.38) ont également participé aux négociations. Cette seule constatation ne permet toutefois pas de conclure que NCT Infrastructure & Logistique est devenue une partie à la Convention de concession. En effet, selon  la lettre des Demanderesses du 28 octobre 2012 au Secrétariat CIRDI, NCT Infrastructure & Logistique était une filiale technique de NCT Necotrans chargée en qualité de maître d'ouvrage délégué des travaux d'extension du terminal à conteneurs.Dans ces circonstances, la seule délégation par cette société deses experts techniques aux négociations n'était pas anormale et ne signifiait pas nécessairement queNCT Infrastructure & Logistique devenait ou avait la volonté de devenir une partie à la Convention de concession elle-même.

168.     C'est en cette même qualité que NCT Infrastructure & Logistique a pu exécuterune partie des obligations découlant de la Convention de concession, entre autres en lançant, pour le compte de Getma International, l'appel d'offres pour la construction du nouveau quai prévu par la Convention de concession (Requête d'arbitrage CIRDI, p. 11). La maîtrise d'ouvrage déléguéepeut constituer le fondement juridique sur base duquel NCT Infrastructure & Logistique a exécuté certaines obligations de la Convention de concession pour Getma International, fondement qui serait alors distinct du contrat liant Getma International et l'Etat Guinéen.

169.     Le Tribunal conclut donc que, prise de façon isolée,chacune des interventions des deuxième, troisième et quatrième Demanderesses dans la négociation, la signature et l'exécution de la Convention de concession – dans la mesure où elles sont prouvées – est juridiquement et/ou dans les faits justifiée par et fondée sur des mandats spécifiques. En elles-mêmes ces interventions ne prouvent nullement être dues à une négligence de,ou une confusion entre, dessociétés appartenant à un même groupe économique, agissant en violation de leurs identités juridiques et rôles respectifs. Le mandat et le rôle spécifique de chaque société du groupe, tels qu'ils apparaissent du dossier, démentent que les deuxième, troisième et quatrième Demanderesses aient consenti à être liées directement par la Convention de concession.Sous réserve de ce qui suit,le Tribunal constate que la Défenderesse ne prouve pas que l'implication des Demanderesses susmentionnées dans la négociation, la signature ou l'exécution de la Convention démontrent une telle volonté dans leur chef.

*(vi)      L'action conjointe et concertée des Demanderesses*

170.     Le Tribunal arbitral estime toutefois nécessaire de considérer les interventions différentes des Demanderesses dans cette négociation, signature et exécution, non seulement séparément, mais aussi dans leur ensemble et dans leur contexte. Une toute autre impression se dégage alors.

171.     D'abord, on constate que les Demanderesses reconnaissent que l'investissement sur lequel elles se basent pour formuler leurs demandes dans le présent arbitrage CIRDI, est exclusivement le produit de la contribution de chacune d'elles à l'exécution de la Convention de concession (lettre des Demanderesses au Secrétariat du CIRDI du 28 octobre 2011). Dans leur Requête d'arbitrage CIRDI,les Demanderesses ont reconnu que « *l'exécution du Contrat*

*de concession de service public a impliqué un investissement financier à réaliser par le Concessionnaire (investisseur) »*(Requête d'arbitrage CIRDI, p. 21). Donc, cette obligation financière du contrat n'a en réalité pas été exécutée, ou certainement pas exclusivement par le Concessionnaire, Getma International, mais par NCT Necotrans, via le Concessionnaire Getma International etpar la société holding intermédiaire Getma International Investissements qui a été créée spécialement pour détenir 95% de la société d'exploitation STCC. Ce Tribunal estime que la structure financière de la concession prouve que l'intervention de NCT Necotrans dans l'exécution de la Convention de concession (et en particulier ses obligations financières) était envisagée depuis le début de la soumission de l'offre par Getma International. Ceci semble confirmé par la dénomination de la Pièce C-15 dans l'index des pièces jointes à la Requête d'arbitrage CIRDI : *« Extrait de l'offre financière du Groupe NCT NECOTRANS,* [blanc] *GETMA INTERNATIONAL/TRANSAFRICA S.A., contenant le résumé des investissements effectuéspendant les 2 premières années de la concession ».* L'argumentation de NCT Necotransqu'elle n'était pas liée par la Convention de concession ne peut donc être suivie.

172.   La situation est comparable pour NCT Infrastructure & Logistique qui avait apparemment les connaissances techniques nécessaires pour remplir d'autres obligations de la Convention de concession et notamment devenir le maître d'ouvrage délégué par Getma International pour l'extension du Terminal.

173.   Cela étant dit, la participation de représentants de NCT Necotrans etNCT Infrastructure & Logistique(même s'ils peuvent individuellement aussi être considérés comme des représentants ou des conseils juridiques ou techniques de Getma International comme exposé ci-dessus au sous-chapitre (v)) prend une signification particulière : si on les prend comme un groupe, il s'agit des représentants des sociétés qui envisageaient dès le début des négociations (ou même depuis le dépôt de l'offre) d'exécuter ensemble la Convention de concession. En fait, la liste des participants à la négociation de la Convention (jointe à celle-ci comme son annexe 10) ne mentionne aucune personne qui ne représente que le seul Concessionnaire, Getma International. Il convient donc de considérer Getma International, NCT Necotrans et NCT Infrastructure & Logistique comme une association ou groupement dont les membres se sont engagés entre eux à exécuter ensemble les obligations de la Convention de concession.

174.   Même si cet engagement solidaire n'a pas été pris par écrit à l'égard de la Défenderesse (dont ces deux Demanderesses n'ont toutefois pas pu ignorer qu'elle tirerait des assurances de la présence des représentants des différentes sociétés aux négociations et des liens étroits entre elles[25]), ce Tribunal conclut que la participation aux négociations de personnes physiques avec des doubles «casquettes», mais représentant en fait aussi des sociétés dont il était clair qu'ils participeraient à l'exécution de la Convention - ce qui s'est effectivement confirmé par la suite – justifie de tenir ces sociétés non signataires de la Convention comme tenues par la Convention, si pas solidairement, au moins chacune pour sa part, et aussi par la Clause compromissoire.

---

[25] Il pourrait s'agir ici de la confusion créée dans le chef d'un tiers, dont il est question au § 158 ci-dessus.

175.    En outre, sans vouloir préjuger de la qualité d'investisseurs des deuxième et troisième Demanderesses (soit NCT Necotrans et NCT Infrastructure & Logistique), le Tribunal estime que leur affirmation, dans leur lettredu 28 octobre 2011 au Secrétariat du CIRDI, qu'elles sont toutes les deux des investisseurs (Pièce C-44), confirme qu'elles se sont tout autant engagées que Getma International et aux mêmes conditions, y compris la Clause compromissoire.

176.    Dans la mesure où le ou les investissements réalisés en Guinée constituent l'exécution de la Convention de concession, ce Tribunal ne peut admettre que ces Demanderesses se basent sur leur investissement respectif, voir leur investissement solidaire tout en niant d'être liées par la Convention. Il est inadmissible qu'elles déduisent un droit du Code des investissements sur base des mêmes actes qui constituent l'exécution d'obligations contractuelles qu'elles prétendent ne pas avoir assumées. Ce Tribunal ne doit toutefois pas se prononcer sur l'exécution de la Convention de concession, mais seulement de l' « accord contraire » qui a écarté la juridiction de ce Tribunal CIRDI pour les conséquences de la résiliation de la Convention qui résulte d'un Acte de la Puissance Publique.

177.    Pour les motifs ci-dessus, ce Tribunal estime que NCT Necotrans et NCT Infrastructure & Logistique sont liées par la Clause compromissoire de l'article 31 de la Convention.

**(vii)    Getma International Investissements**

178.    En ce qui concerne Getma International Investissements, le Tribunal a noté qu'elle n'a été constituée que le 12 novembre 2008, comme une société holding intermédiaire, afin de canaliser l'investissement que Getma International s'était obligée à faire dans une société guinéenne d'exploitation, elle-même créée le 20 novembre 2008. Cela implique donc que, contrairement aux autres Demanderesses, Getma International Investissements n'a pas participer dans les négociations de la Convention de concession ni exprimer une quelconque volonté au sujet de la Clause compromissoire. Ceci ne suffit toutefois pas pour maintenir que cette société holding intermédiaire n'est pas tenue par cette Clause compromissoire.

179.    Précisément parce que Getma International Investissements n'est qu'un instrument créé spécialement pour les besoins de l'exécution de l'obligation de Getma de constituer une société d'exploitation (article 9 de la Convention) et n'a servi que de « passe-plat » pour la capitalisation de STCC par Getma International et NCT Necotrans, il n'y a aucune raison de l'exclure de l'application de la Clause compromissoire qui lie ses deux actionnaires. Que la Clause compromissoire peut lui être appliquée, est confirmé par son assemblée générale qui a décidé, le  9 mai 2011, comme l'ont d'ailleurs aussi fait (i) l'assemblée générale de NCT Infrastructure & Logistique,(ii) le directoire de NCT Necotrans et (iii) l'actionnaire unique de Getma International[26] :

        « *d'engager toutes procédures judiciaires ou arbitrales destinées à obtenir la réparation*

---

[26] Documents n° 1, n° 2, n° 3 et n° 4, joints à la lettre des Demanderesses au Secrétariat CIRDI.

*du préjudice subi par la Société consécutivement à la résiliation de la convention de concession du terminal de containers de Conakry et à l'expropriation dont elle a été victime, et notamment dans le cadre d'arbitrages <u>devant la C.C.J.A.</u> et le CIRDI contre l'Etat guinéen ainsi que contre le groupe Bolloré. »*[27]

### (viii)   Conclusion

180.   Pour les raisons exposées ci-dessus, ainsi que pour la reconnaissance implicite dans les décisions de leurs organes compétents respectifs en date du  9 mai 2011, dont le texte, identique pour chaque Demanderesse, est mentionné dans le paragraphe 179 ci-avant, ce Tribunal conclut que sa compétence pour juger des différends relatifs à l'interprétation et l'application du Code des investissements est limitée, à l'égard des quatre Demanderesses par la Clause compromissoire de l'article 31 de la Convention de concession.

## IX.   DECISION

Pour les raisons exposées ci-dessus, le Tribunal décide :

1. Ce Tribunal n'est pas compétent pour se prononcer sur les effets de la résiliation de la Convention de concession à l'égard des quatre Demanderesses.

2. Ce Tribunal est compétent pour se prononcer sur les effets de la réquisition et autres violations alléguées du Code des investissements n'entrant pas dans le cadre de la Convention de concession à l'égard des quatre Demanderesses.

3. Les frais encourus par les parties et les membres du Tribunal jusqu'à présent, y compris les frais d'arbitrage se rapportant au déclinatoire de compétence feront l'objet d'une décision ultérieure du Tribunal.

BERNARDO  M. CREMADES

Arbitre

PIERRE TERCIER

Arbitre

VERA VAN HOUTTE

Présidente

---

[27] Nous soulignons.

# ANNEXE B

# CENTRE INTERNATIONAL POUR LE RÈGLEMENT DES DIFFÉRENDS RELATIFS AUX INVESTISSEMENTS

## GETMA INTERNATIONAL, NCT NECOTRANS, GETMA INTERNATIONAL INVESTMENTS, NCT INFRASTRUCTURE&LOGISTIQUE c. REPUBLIQUE DE GUINEE

## (Affaire CIRDI No ARB/11/29)

### Opinion Dissidente de Bernardo M. Cremades

1.  En dépit du profond respect que m'inspirent mes prestigieux collègues, il m'est impossible de souscrire aux conclusions de la majorité du Tribunal Arbitral dans lesquelles il est affirmé qu'il n'appartient pas au Tribunal Arbitral de trancher sur un possible déni de justice, moyen allégué par les Demanderesses durant la procédure, et sur les conséquences de l'annulation de la sentence arbitrale de la CCJA en date du 29 avril de 2014, par la CCJA elle-même, notifiée aux Parties le 30 novembre 2015. Ces moyens ont été formulés dans le courrier des Demanderesses au Tribunal arbitral en date du 21 décembre 2015, ainsi que dans leurs mémoires post-audience du 3 février 2016[1].

2.  Concernant les antécédents de la Décision du Tribunal Arbitral, il est opportun de rappeler sa Décision sur la compétence en date du 29 décembre 2012 (ci-après, « ***Décision sur la compétence*** »), dans laquelle le Tribunal Arbitral a décidé que :

    > *« 1. Ce Tribunal n'est pas compétent pour se prononcer sur les effets de la résiliation de la Convention de concession à l'égard des quatre Demanderesses.*

    > *2. Ce Tribunal est compétent pour se prononcer sur les effets de la réquisition et autres violations alléguées du Code des investissements n'entrant pas dans le cadre de la Convention de concession à l'égard des quatre Demanderesses.*

    > *3. Les frais encourus par les parties et les membres du Tribunal jusqu'à présent, y compris les frais d'arbitrage se rapportant au déclinatoire de compétence feront l'objet d'une décision ultérieure du Tribunal ».*

---

[1] Mémoire après audience des Demanderesses du 3 février 2016, §§ 77 à 93.

3.    Dans la Décision sur la compétence, la différence existant entre les « *Treaty Claims* » (soumises aux Code des investissements, concrètement à son article 28.2) et les « *Contract claims* » (soumises à la Convention de concession, concrètement à ses articles 31 et 32) est sous-entendue. C'est dans cette optique que, le Tribunal Arbitral a confirmé la possibilité d'une compétence juridictionnelle parallèle à celle de la CCJA.

4.    Il convient également de rappeler la position du Tribunal Arbitral CCJA dans sa sentence du 29 avril 2014 (ci-après « ***Sentence CCJA*** ») :

> « *1. Rejette la demande de la République de Guinée de bénéficier d'un délai de quatre mois pour réunir les preuves de corruption alléguée à l'encontre de la Société GETMA International SAS ;*
>
> *Statuant au fond :*
>
> *2. Dit irrégulière la résiliation de la Convention de mise en concession du Terminal à conteneurs conclue le 22 septembre 2008 entre la République de Guinée et la société GETMA International SAS ;*
>
> *3. Constate que, du fait de la nouvelle convention de concession conclue le 11 mars 2011 avec BAL ou tout autre société du Groupe BOLLORE, le retour au statu quo ante est désormais impossible ;*
>
> *4. Condamne la Défenderesse à indemniser la société GETMA International SAS du préjudice subi du fait de la résiliation, qui se décompose ainsi :*
>
> *a. Une indemnité forfaitaire de résiliation de 20.884.966 € ;*
>
> *b. Une indemnité de résiliation relative aux biens concédés de 3.234.995 € ;*
>
> *c. Le montant non amorti du Ticket d'entrée de 14.201.096 € ;*
>
> *5. Condamne en outre la Défenderesse à verser à GETMA une indemnité relative aux stocks non restitués de 210.070 € ;*
>
> *6. Rejette toutes les autres indemnités demandées par GETMA International SAS ;*
>
> *7. Dit que les montants alloués aux paragraphes 4 et 5 ci-dessous produiront intérêts, au taux d'escompte de la Banque Centrale Européenne majoré d'un pour cent, et ce depuis la requête d'arbitrage, le 10 mai 2011, jusqu'à complet paiement ;*
>
> *8. Maintient la confidentialité de la pièce R107 dans le cadre de la procédure d'arbitrage, sous réserve des droits de la défense ;*
>
> *9. Sur les frais :*
>
> *-Laisse à chaque Partie la charge de ses propres frais légaux (avocats, consultations, experts, témoins) ;*

> *-Dit que les Parties supporteront à égalité les autres frais de l'arbitrage ;*
>
> *-Constate que la Cour a fixé les frais d'arbitrage à 100.480.332 FCFA, dont 40.480.332FCFA comme honoraires pour les arbitres ;*
>
> *-Dit que la Partie qui aura payé plus que sa part a le droit d'exiger de l'autre le remboursement du surplus ;*
>
> *10. Rejette toutes les autres demandes des parties ».*

5. L'arrêt de la CCJA, notifiée aux Parties le 30 novembre 2015 (« ***Décision CCJA*** »), a annulé la totalité de la sentence CCJA. Cette annulation était fondée sur le désaccord de la CCJA avec les montants des honoraires du Tribunal, que celui-ci avait accordé avec les Parties. La CCJA ayant considéré qu'ils n'étaient pas conformes au barème prévu par l'article 10.1 de son Règlement d'arbitrage.

6. Les Demanderesses allèguent que : « *avec l'annulation de la sentence CCJA, les contract claims de Getma ont cessées d'exister* », et soulignent que « *Ceci est d'importance, même dans l'optique de ce Tribunal, qui est que des contract claims peuvent tout à fait coexister avec des Treaty claims* »[2]. Pour les Demanderesses « *toute hésitation (...) n'a plus lieu d'être sur le fait de savoir si la présentation par Getma dans le procès-verbal d'arbitrage CCJA (...) de demandes relatives à* « *l'indemnité due au titre des biens propres réquisitionnés* » *et au* « *préjudice complémentaire* » *empêchait les Demanderesses de demander une indemnisation à ces titres dans le présent arbitrage, sur le fondement de violations du Code des Investissements* »[3].

7. Aussi, selon les Demanderesses, le fait que le Tribunal CCJA ait refusé de statuer sur les questions relatives au gain manqué et à la réquisition afin d'éviter de statuer *ultra petita* n'a pas d'importance, puisque ladite sentence est annulée.

8. Les Demanderesses mettent en évidence que seule cette présente procédure arbitrale est à même de permettre de trancher si l'expropriation des investissements des Demanderesses, au moyen des Décrets de résiliation et de réquisition, a violé le Code des Investissements. Dans l'hypothèse où il serait constaté une violation dans ce sens, l'indemnisation prévue devra compenser l'intégralité du *damnum emergens* et du *lucrum cessans*, conséquences desdits décrets.

9. Selon les Demanderesses, la Guinée s'est appuyée sur la sentence CCJA afin de fonder ses allégations relatives au principe de l'*Estoppel*, renonciation et *res judicata*. Mais l'annulation totale de la sentence par la CCJA fait tomber ladite argumentation. Les Demanderesses font d'ailleurs noter que la CCJA aurait pu opter pour maintenir les actes de procédure réalisés dans le cadre de la procédure CCJA conformément à l'article 29.5 de son Règlement, mais cette option n'a pas été retenue. Aux dires des Demanderesses, il est donc clair que la CCJA a considéré que tous les actes de procédure effectués devant le Tribunal CCJA étaient nuls, comme d'ailleurs le demandait la Guinée[4].

---

[2] *Idem*, §83.
[3] *Idem*, §84.
[4] *Idem*, §§ 92-93.

3

10.   Concernant les arguments relatifs au déni de justice, la Défenderesse, dans son Mémoire après audience, insiste sur le fait que les Demanderesses n'ont pas évoqué la Décision CCJA d'annulation à l'audience alors que selon la Défenderesse, elles en avaient connaissance. Pour fonder son affirmation selon laquelle les Demanderesses avaient connaissance de l'annulation, la Défenderesse se base sur la suivante déclaration des Demanderesses durant l'audience : « *le système CCJA, qui a déjà démontré n'être pas du tout impartial, peut faire annuler la sentence sous un quelconque prétexte alors qu'une décision du CIRDI est quant à elle finale* »[5]. La Défenderesse en conclut finalement que les Demanderesses ont délibérément choisi d'envoyer un courrier après l'audience au Tribunal Arbitral à des fins purement opportunistes afin qu'il se déclare compétent. La Défenderesse affirme en outre que les Demanderesses ont la possibilité d'initier une nouvelle procédure d'arbitrage devant la CCJA, ce qui exclurait un déni de justice[6].

11.   Au vu de ce qu'il précède, il apparaît que les circonstances de l'affaire, suite à l'annulation de la sentence CCJA, imposent l'application du principe *rebus sic stantibus*, lequel vient tempérer les potentiels effets du principe de *res judicata* s'agissant de la Décision sur la compétence, et ceci dans la mesure où la Décision sur la compétence part du postulat que la procédure arbitrale relative aux *Contract Claims* respectait une série de garanties. Un postulat qui n'a pas été confirmé dans les faits. Par conséquent, si l'on tient compte: du courrier des Demanderesses adressé au Tribunal Arbitral suite à l'annulation de la sentence CCJA, où les Demanderesses annoncent le déni de justice qu'une telle situation impliquant pour elles, ainsi que de l'éventuelle responsabilité exclusive des membres du Tribunal CCJA concernant le montant des honoraires et l'annulation totale de la sentence CCJA au préjudice exclusif des Parties, il n'est pas possible de conclure, simplement, que les Demanderesses peuvent initier un autre arbitrage devant une institution qui n'a plus la confiance des Parties quant à leur garanties procédurales fondamentales. Contrairement à ce qui a été affirmé par la majorité du Tribunal Arbitral, la considération d'un éventuel déni de justice allégué par les Demanderesses concerne le présent Tribunal Arbitral.

12.   Il est nécessaire en outre d'ajouter que le Tribunal arbitral a un devoir de loyauté procédurale vis-à-vis des Parties. Et pourtant, c'est en toute conscience de cette situation d'un éventuel déni de justice au début de ses délibérations, qu'il n'a pas convoqué les Parties sur ce point, ni même requis aux Parties qu'elles abordent la question de façon plus détaillée dans leurs Mémoires après audience. Il n'est fait aucune mention de la compétence du Tribunal Arbitral sur la base de la Décision sur la compétence prise à l'époque. Or, le Tribunal a pu donner une impression bien différente aux Parties au vu de son attitude lorsque, par exemple, après l'audience de novembre 2015, il a permis que Monsieur Ouaniche corrige son rapport d'expert « *en relation à la valeur et au chiffrage des investissements établi dans ses rapports* » et a demandé l'accès à la matrice de simulations de PwC[7] .

13.   Le présent Tribunal Arbitral a un devoir envers les Parties de gardien de la bonne conduite de l'arbitrage impliquant le respect des standards du procès équitable. En tant que garant du droit à un procès juste et du droit à un accès effectif à la justice,

---

[5] Mémoire après audience de la Défenderesse, §84.
[6] *Idem* §§85-93.
[7] Ordonnance de procédure n°10 en date du 26 novembre 2015, paragraphe 2.2.

il ne peut maintenir le silence sur des questions aussi fondamentales jusqu'à sa sentence finale comme malheureusement ce fut le cas dans cette procédure.

14. En effet, le Tribunal, dans sa délibération finale, a fait une interprétation excessivement restrictive de sa Décision sur la compétence. La distinction opérée entre résiliation et réquisition conduisant à exclure de façon si restrictive les conséquences directes et indirectes de la résiliation ne correspond pas à ce à quoi les Parties pouvaient s'attendre. Au regard de la conduite de la procédure arbitrale et de son déroulement, on pouvait s'attendre à ce que ces *Contractual Claims* soient considérées comme des *Claims* au vu de la violation du Code des investissements.

15. Le Tribunal aurait dû au moins convoquer les Parties pour se prononcer sur la situation d'injustice alléguée.

16. Au vu de tout ce qui précède, je suis convaincu que la possible efficacité de la *res judicata* de la Décision sur la Compétence doit s'apprécier à l'aune du principe *rebus sic stantibus* et non de façon catégorique sans tenir compte des circonstances qui ont entouré cette Décision, ni de celles qui ont eu lieu postérieurement à la Décision sur la compétence.


_____
Bernardo M. Cremades

Date : 1 août 2016